Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS**<br><br>Hrg. Date:　　April 7, 2025<br>Time:　　　　10:00 a.m.<br>Judge:　　　Hon. Claudia Wilken<br>Courtroom:　TBD |

1

<u>**NOTICE OF MOTION AND MOTION**</u>

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3      PLEASE TAKE NOTICE that on April 7, 2025, at 10:00 a.m. in Courtroom TBD of the

4  Honorable Claudia Wilken of the United States District Court for the Northern District of California,

5  Oakland Division, located at 1301 Clay Street, Oakland, CA 94612, the Class Plaintiffs ("Plaintiffs")

6  will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order

7  certifying the proposed settlement classes and granting final approval to the class action settlement with

8  the National Collegiate Athletic Association, Pac-12 Conference, The Big Ten Conference, Inc., The

9  Big 12 Conference, Inc., Southeastern Conference, and Atlantic Coast Conference (collectively,

10  "Defendants") and approving Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation

11  Expenses, and Service Awards for the Class Representatives (ECF No. 583).

12      This motion is based on this Plaintiffs' Notice and Motion, the accompanying memorandum of

13  Points and Authorities in Support of Motion, declarations filed in support thereof, the complete records

14  and files of this action, all other matters of which the Court may take judicial notice, and any other such

15  evidence and oral argument as may be made at the hearing of this matter.

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
Case No. 4:20-cv-03919-CW

010912-11/3050037 V1

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. THE SETTLEMENT MEETS THE REQUIREMENTS FOR FINAL
    APPROVAL ...............................................................................................................4

    A.  The Settlement is Fair, Reasonable, and Adequate..............................................4

    B.  The Approved Notice Plan Was Successfully Implemented .................................5

        1.  The Notice Campaign Satisfied Rule 23 and Due Process ...................6

    C.  The Reaction of the Settlement Class Has Been Overwhelmingly
        Positive...............................................................................................................8

    D.  The Proposed Settlement Class Satisfies Rule 23 ...............................................9

III. OMNIBUS RESPONSE TO OBJECTIONS.................................................................9

    A.  The Historic Damages Settlement and Allocations to Class
        Members are Clearly Fair, Reasonable, and Adequate........................................9

        1.  Objections to Specific Recoveries in the Damages
            Settlement Are Not a Basis for Denying Final Approval ...................11

        2.  The Damages Allocations Are Fair and Based on
            Reasonable and Neutral Methodologies ............................................14

    B.  The Injunctive Relief Settlement Provides Relief That Is More
        Than Fair and Adequate....................................................................................15

        1.  The Injunctive Relief Settlement Is More than Fair and
            Adequate: It Will Provide Class Members with Tens of
            Billions of Dollars in Previously Prohibited
            Compensation and Unlimited Scholarships ........................................16

            a.  The Injunctive Relief Secured by the Settlement
                Transforms Defendants' Long-Defended
                Compensation Rules ...............................................................16

            b.  Defendants' Ability to Continue Prohibitions on
                 Improperly Characterized NIL Payments by
                 Collectives and Associated Entities Is Not
                 Grounds to Reject the Settlement ............................................20

        2.  The Revenue-Sharing "Pool" Cap Is a Settlement
            Compromise That Is Lawful and Fair to the Class .............................21

3.  Collective Bargaining Was Not Required to Establish, and Will Not Be Impeded by, the Settlement's Revenue-Sharing System ............................................................24

4.  Approval of the Settlement Does Not Create Any Antitrust Immunity for Defendants..........................................26

5.  The Injunctive Settlement Does Not Violate State NIL Laws or Court Orders....................................................26

C.  There are No Conflicts Precluding Settlement Approval. ...........................27

1.  Separate Counsel is Not Required for the Injunctive Relief and Damages Classes ............................................29

a.  Professor Silver's Declaration in support of the Vogelsong Objectors is unpersuasive. ...................34

2.  Separate Counsel is Not Required For Any "Sub-Groups" Within the Damages Classes.........................................36

a.  Damages for athletic services claims. ...................37

b.  Damages for claims based on scholarship limitations. ..........................................................41

3.  The Hausfeld Objectors Raise No Legitimate Conflicts.....................42

D.  NCAA-Imposed Roster Limits Do Not Provide a Basis for Denying Final Approval ..........................................................43

1.  NCAA Roster Limits Do Not Alter the Conclusion That the Settlement Agreement is Overwhelmingly Fair and Reasonable to the Class ....................................................43

2.  Roster Limits Do Not Pose "Conflicts" Precluding Final Approval ..........................................................47

E.  There Are No Title IX Issues Raised by The Settlement................................48

F.  The Release Language is Consistent with Governing Law and is Not Overly Broad..........................................................51

G.  The Settlement Notice Was Implemented with Overwhelming Success ..........................................................52

H.  The Court Should Not Stay the Injunction Pending Appeal...........................55

I.  No One Has Objected to the Attorneys' Fees Requested ................................58

IV.  CONCLUSION..........................................................58

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

CASES

4

*Aarons v. BMW of N. Am., LLC,*
5       2014 WL 4090564 (C.D. Cal. Apr. 29, 2014) ................................................................. 41

6

*Alexander v. Nat'l Football League,*
        1977 WL 1497 (D. Minn. Aug. 1, 1977) ....................................................................... 23
7

*Alvarez v. Sirius XM Radio,*
8       2021 WL 1234878 (C.D. Cal. Feb. 8, 2021) .................................................................. 16

9

*Amchem Prods., Inc. v. Windsor,*
10      521 U.S. 591 (1997) ...................................................................... 30, 31, 32, 35

11

*Amin v Mercedes Benz USA, LLC,*
        2020 WL 5510730 (N.D. Ga. Sept. 11, 2020) ................................................................. 8
12

*In re Anthem, Inc. Data Breach Litig.,*
13      327 F.R.D. 299 (N.D. Cal. 2018) ..................................................................... 6, 7, 53

14

*In re Apple Inc. Device Performance Litig.,*
15      50 F.4th 769 (9th Cir. 2022) ........................................................................... 6, 53

16

*In re Apple iPhone 4 Prods. Liab. Litig.,*
        2012 WL 3283432 (N.D. Cal. Aug. 10, 2012) ............................................................... 12
17

*Asghari v. Volkswagen Grp. of Am., Inc.,*
18      2015 WL 12732462 (C.D. Cal. May 29, 2015 ) ................................................................ 3

19

*Bayat v. Bank of the W.,*
20      2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ............................................................... 45

21

*In re Blue Cross Blue Shield Antitrust Litig.,*
        85 F.4th 1070 (11th Cir. 2023), *cert denied* 144 S. Ct. 2686 (2024) ................................ 21, 28, 29
22

*Bridgeman v. Nat'l Basketball Ass'n,*
23      675 F. Supp. 960 (D.N.J. 1987) ...................................................................... 21, 24, 34

24

*Briseno v. ConAgra Foods, Inc.,*
25      844 F.3d 1121 (9th Cir. 2017) ............................................................................ 53

26

*Browne v. Am. Honda Motor Co., Inc.,*
        2010 WL 9499072 (C.D. Cal. July 29, 2010) ............................................................ 10, 55

27

28

*Campbell v. Facebook, Inc.*,
   951 F.3d 1106 (9th Cir. 2020) ................................................................ 34

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
   2016 WL 3648478 (N.D. Cal. July 7, 2016) ............................................ 10

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ................................................................... 13

*Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013) ................................................................... 37

*Chun-Hoon v. McKee Foods Corp.*,
   716 F. Supp. 2d 848 (N.D. Cal. 2010) ...................................................... 8

*Churchill Vill., LLC v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) .............................................................. 4, 8

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) .................................................................. 4

*CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*,
   465 F. App'x 617 (9th Cir. 2012) ........................................................... 54

*In re Cmty. Bank of N. Va.*,
   622 F.3d 275 (3d Cir. 2010) ................................................................... 42

*In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*,
   795 F.3d 380 (3d Cir. 2015) ................................................................... 29

*Coal. on Homelessness v. City and Cnty. of San Francisco*,
   2023 WL 2775156 (N.D. Cal. Apr. 3, 2023) ........................................... 56

*Cohen v. Brown Univ.*,
   16 F.4th 935 (1st Cir. 2021) ...................................................... 28, 33, 48

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ................................................................. 29

*Crow Tribe of Indians v. Racicot*,
   87 F.3d 1039 (9th Cir. 1996) ................................................................. 21

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ................................................................. 37

*Edwards v. Nat'l Milk Producers Fed'n*,
   2017 WL 3616638 (N.D. Cal. June 26, 2017) ......................................... 13

- v -

*Edwards v Andrews*,
   846 F. App'x 538 (9th Cir. 2021) ................................................................. 13

*Eisen v. Porsche Cars N. Am., Inc.*,
   2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ................................................. 52

*Fata v. Pizza Hut of Am. Inc.*,
   2016 WL 7130932 (M.D. Fla Oct. 31, 2016) ............................................... 30

*Fraley v. Batman*,
   638 Fed. App'x 594 (9th Cir. 2016) .............................................. 21, 37, 42

*Fraley v. Facebook, Inc.*,
   966 F.Supp.2d 939 (N.D. Cal Aug. 26, 2013) .............................................. 30

*Gonzalez v. CoreCivic of Tenn., LLC*,
   2018 WL 4388425 (E.D. Cal. Sept. 13, 2018) ............................................. 42

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................ *passim*

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ................................................................. 51, 52

*In re High-Tech Emp. Antitrust Litig.*,
   2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) .............................................. 14

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3rd Cir. 2009) ....................................................................... 28

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ......................................................................... 8

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ......................................................................... 7

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) .................................................................. 38, 39

*In re Lithium Ion Batteries Antitrust Litig.*,
   2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ............................................ 10

*Meiresonne v. Marriott Corp.*,
   124 F.R.D. 619 (N.D. Ill. 1989) ................................................................... 47

*Milligan v. Toyota Motor Sales, U.S.A., Inc.*,
   2012 WL 10277179 (N.D. Cal. Jan. 6, 2012) ............................................. 10

010912-11/3050037 V1

*Moore v. Verizon Commc'n Inc.*,
    2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ................................................. 8

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    2012 WL 1415508 (D. Kan. Apr. 24, 2012) .................................................... 45

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    872 F.3d 1094 (10th Cir. 2017) ....................................................................... 46

*Mowbray v. Kozlowski*,
    725 F. Supp. 888 (W.D. Va. 1989) .................................................................. 57

*Murray v. Grocery Delivery E-Services USA, Inc.*,
    55 F.4th 340 (1st Cir. 2022)) ........................................................................... 38

*N.L.R.B. v. Town & Country Elec., Inc.*,
    516 U.S. 85 (1995) ............................................................................................ 25

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    311 F.R.D 532 (N.D. Cal. 2015) ................................................................. 47, 48

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ................................................... 10

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ..................................................................... 20, 22

*In re NCAA I-A Walk-On Football Players Litig.*,
    2006 WL 1207915 (W.D. Wash. May 3, 2006) ............................................... 41

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ............................................. 17, 47

*NCAA v. Alston*,
    594 U.S. 69 (2021) .................................................................................... *passim*

*NCAA v. Smith*,
    429 U.S. 459 (1999) .......................................................................................... 49

*Nguyen v. Radient Pharms. Corp.*,
    2014 WL 1802293 (C.D. Cal. May 6, 2014) ................................................... 13

*Norcia v. Samsung Telecomms. Am., LLC*,
    2021 WL 3053018 (N.D. Cal. July 20, 2021) .................................................... 8

*Nwabueze v. AT&T Inc.*,
    2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ................................................. 10

*O'Bannon v. NCAA*,
   802 F.3d 1049 (9th Cir. 2015) ............................................................... 17, 22, 23

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ..................................................... 6, 16, 53, 56

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*,
   910 F. Supp. 2d 891 (E.D. La. 2012) ........................................................ 37, 39

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................ 14

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ............................................................................ 8

*Ortiz v. Fireboard Corp.*,
   527 U.S. 815 (1999) ................................................................................ 31, 33

*Pac. Merch. Shipping Ass'n v. Cackette*,
   2007 WL 2914961 (E.D. Cal. Oct. 5, 2007) ...................................................... 57

*Pallas v. Pac. Bell*,
   1999 WL 1209495 (N.D. Cal. July 13, 1999) ...................................................... 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2024 WL 3236614 (E.D.N.Y. June 28, 2024) ........................................... 19, 32, 33

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016) ........................................................................ 30, 31

*Perez v. Asurion Corp.*,
   501 F. Supp. 2d 1360 (S.D. Fla. 2007) .............................................................. 8

*Perkins v. LinkedIn Corp.*,
   2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ................................................... 6, 52

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ........................................................................ 37

*In re Resistors Antitrust Litig.*,
   2020 WL 2791922 (N.D. Cal. Mar. 24, 2020) .................................................... 14

*Robertson v. Nat'l Basketball Ass'n*,
   556 F.2d 682 (2d Cir. 1977) ........................................................................ 21, 24

*Robertson v. Nat'l Basketball Ass'n*,
   72 F.R.D. 64 (S.D.N.Y. 1976) ......................................................................... 26

*Rodriguez v. W. Pub'lg Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................ 7

*Rosado v. Ebay Inc.*,
   2016 WL 3401987 (N.D. Cal. June 21, 2016) ...................................... 10

*Senne v. Kansas City Royals Baseball Corp.*,
   2023 WL 2699972 (N.D. Cal. Mar. 29, 2023)...................................... 29

*Senne v. Kansas City Royals Baseball Corp.*,
   2023 WL 4824938 (9th Cir. June 28, 2023) ........................................ 29

*Shaffer v. Cont'l Cas. Co.*,
   362 F. App'x 627 (9th Cir. 2010) ........................................................ 56

*Sharif by Salahudding v. N.Y. State Educ. Dep't*,
   127 F.R.D. 84 (S.D.N.Y. 1989) ........................................................... 48

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) .......................................................... 56, 57

*Silber v. Mabon*,
   18 F.3d 1449 (9th Cir. 1994) ................................................................ 6

*Sims v. Montgomery Cnty. Comm'n*,
   890 F. Supp. 1520 (M.D. Ala. 1995) ................................................... 47

*Sims v. Montgomery Cnty. Comm'n*,
   119 F.3d 9 (11th Cir. 1997) ................................................................. 47

*In re Splunk Inc. Sec. Litig.*,
   2024 WL 923777 (N.D. Cal. Mar. 4, 2024).................................... 7, 52

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ............................................................... 33

*Stephens v. Farmers Rest. Grp.*,
   329 F.R.D. 476 (D.D.C. 2019).............................................................. 30

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)................................................................... 8

*Taylor v. Shutterfly, Inc.*,
   2021 WL 5810294 (N.D. Cal. Dec. 7 2021) .......................................... 8

*Tennessee v. NCAA*,
   2024 WL 755528 (E.D. Tenn. Feb. 23, 2024) ...................................... 27

*Touhey v. United States*,
   2011 WL 3179036 (C.D. Cal. July 25, 2011) ................................................................. 8

*In re Volkswagen Clean Diesel Mktg., Sales Pracs. and Prods. Liab. Litig.*,
   895 F.3d 597 (9th Cir. 2018) ............................................................................... *passim*

*White v. Nat'l Football League*,
   822 F.Supp. 1389 (D. Minn. 1993) ..................................................................... *passim*

*Wren v. RGIS Inventory Specialists*,
   2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ............................................................... 12

*Zakikhani v. Hyundai Motor Co.*,
   2023 WL 4544774 (C.D. Cal. May 5, 2023) ................................................................. 3

*Zamora v. Lyft, Inc.*,
   2018 WL 5819511 (N.D. Cal. Nov. 6, 2018) ............................................................... 54

### STATUTES

29 U.S.C. § 151 ..................................................................................................................... 24

Sherman Act ....................................................................................................... 20, 23, 46, 51

### FEDERAL RULES

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

Fed. R. Civ. P. 62 ................................................................................................................. 55

### OTHER AUTHORITIES

1 Newberg and Rubenstein on Class Actions § 3:75 (6th ed. 2024) ................................... 28

4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed.) .......................................... 37

Allen, M.A., et al., "Reference Guide on Estimation of Economic Damages" in *Reference Manual on Scientific Evidence* 425, (Fed. Judicial Ctr. 3d ed. 2011) ............................................. 49

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 392b (5th ed. 2023 supp.) ............................................................................ 49

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
Case No. 4:20-cv-03919-CW

# GLOSSARY OF TERMS

| Term | Long Cite |
|------|-----------|
| Amended Injunctive Relief Settlement or Am. IRS | Amended Injunctive Relief Settlement, Appendix A to Exhibit 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, filed Sept. 26, 2024, ECF No. 535-1 |
| Amended Settlement Agreement or Am. SA | Amended Stipulation and Settlement Agreement, Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, filed Sept. 26, 2024, ECF No. 537 |
| Berman Final Approval Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Final Approval and Omnibus Response to Objections, concurrently submitted herewith |
| Class Counsel | Hagens Berman Sobol Shapiro LLP, Winston & Strawn LLP |
| Desser Class Cert. Rep. | Expert Report of Edwin S. Desser, filed under seal Oct. 21, 2022, ECF 209-3 |
| Klonoff Opening Decl. | Declaration of Professor Robert H. Klonoff Addressing the Argument [Doc. 473] That Separate Counsel Must be Appointed to Represent the Injunctive Class, filed Sept. 26, 2024, ECF No. 536 |
| Klonoff Suppl. Decl. | Supplemental Declaration of Professor Robert H. Klonoff Responding to Professor Charles Silver's Declaration (Doc. 622-2), filed concurrently herewith |
| Peak Decl. | Declaration of Carla A. Peak Re: Notice Procedures, filed concurrently herewith |
| Preliminary Approval Motion or Prelim. Approval Mot. | Plaintiffs' Notice of Motion and Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450 |
| Prelim. Approval Reply | Plaintiffs' Reply in Support of Motion for Preliminary Settlement Approval, filed Aug. 16, 2024, ECF No. 494 |
| Prelim. Approval Order | [*Revised*] Order Granting Plaintiffs' Motion for Preliminary Settlement Approval as Modified, entered Oct. 7, 2024, ECF No. 544 |
| Rascher Class Cert. Rep. | Expert Report of Daniel A. Rascher, filed under seal Oct. 21, 2022, ECF 209-2 |
| Rascher Class Cert. Reply Rep. | Expert Reply Report of Daniel A. Rascher, filed under seal July 21, 2023, ECF No. 290-2 |
| Rascher Prelim. Approval Decl. | Declaration of Daniel Rascher, filed July 26, 2024, ECF No. 450-4 |
| Rascher Prelim. Approval Reply Decl. | Reply Declaration of Daniel A. Rascher, filed Aug. 16, 2024, ECF No. 494-3 |
| Rascher Final Approval Decl. | Declaration of Daniel A. Rascher in Support of Final Approval of House Settlement, concurrently submitted herewith |

| Term | Long Cite |
|---|---|
| Settlement Administrator | Verita Global LLC |

010912-11/3050037 V1

1

2

## I.    PRELIMINARY STATEMENT

On October 7, 2024, this Court preliminarily approved the *House* Settlement Agreement. *See* ECF No. 544. Pursuant to the Settlement Agreement, class members are eligible for direct payments, or distributions after filing a claim, from a $2.576 billion non-reversionary cash fund. The fund represents a substantial portion of the Settlement Class's damages, which far exceed the norm in antitrust settlements of this size—67.4% of estimated NIL damages and 31.6% of estimated athletic services damages. Many Settlement Class Members[1] do not need to make a claim to receive a payment, and the individual payments will be substantial. The Settlement Agreement also features transformative injunctive relief that, among other things, is expected to deliver an additional $20 billion or more in value to college athletes over the next ten years. *See generally* Pls.' Notice of Mot. and Motion for Prelim. Settlement Approval, ECF No. 450; Plaintiffs' Reply in Support of Motion for Preliminary Settlement Approval, ECF No. 494; Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, ECF No. 534 (describing relief provided in the injunctive relief settlement).

The Court preliminarily certified the proposed Settlement Classes and found the settlement to be "fair, reasonable, and adequate pursuant to Rule 23(e)(2)," ECF No. 544 at 2-3, and the events since preliminary approval have confirmed the soundness of this ruling. Verita Global LLC (the "Settlement Administrator") has executed the notice campaign as ordered by the Court and delivered direct notice (by email, mail, or both) on average 2.5 times to approximately 81.9% of the Settlement Class. Peak Decl. ¶¶ 6, 21.

The response by class members to the landmark settlement has been overwhelmingly positive. More than 73,115 class members have filed valid claims. Peak Decl. ¶ 33. And Power Five Football, Men's Basketball, and Women's Basketball college athletes who received a full-GIA scholarship

---

[1] Capitalized terms not otherwise defined in this submission borrow the definitions set forth in the Amended Settlement Agreement. The Amended Settlement Agreement contained a drafting error whereby there were still some references to the term "Boosters," even though use of that term was changed in the relevant sections of the Amended Injunctive Relief Settlement to Associated Entities or Individuals, a narrower group of entities and individuals closely affiliated with the schools. Thus, the parties are concurrently submitting with this Motion, the Second Amended Stipulation and Settlement Agreement, which corrects this error and will serve as the operative settlement agreement moving forward. *See* Berman Final Approval Decl. ¶ 10 Ex. C.

automatically qualify for a distribution simply by updating their contact and payment information, meaning many more athletes are participating in the settlement.[2] Peak Decl. ¶ 33. When these class members updated their payment information, the website disclosed how much they would recover. By comparison, just 343[3] class members (out of nearly 390,000) have opted out, while only 73 timely, valid objections have been filed by class members. Peak Decl. ¶¶ 29, 36; Berman Final Approval Decl. ¶ 5, Ex. A.[4] Even when combined, that is only 0.11% of the class.

It is not surprising that the response to the settlement has been overwhelmingly positive. The $2.576 billion damages settlement is one of the largest in antitrust history. And the more than $20 billion in new compensation and benefits that will be available to members of the injunctive class will be life changing. The injunction will also ensure the continued availability of third-party NIL payments to tens of thousands of college athletes each year, the eradication of all limitations on athletic scholarships, and a new, neutral arbitration system for protecting college athlete rights. Achieving this historic breakthrough for Division I college athletes required more than a decade of litigation. The settlement is clearly in the best interests of the Settlement Classes, and it should now receive final approval by this Court.

While several objections have been filed, none of them provides any basis for depriving class members of the extraordinary benefits provided by the *House* settlement. *See* Section III, *infra* (for response to objections). To begin with, many of the objections are based on a misunderstanding of the settlement's terms. The settlement does nothing to impede future collective bargaining as asserted by the Anderson Objectors (*see* ECF No. 613 at 12-15); it facilitates it if such bargaining becomes permissible. The settlement does not grant the NCAA or the Conference Defendants antitrust immunity against future claims by the Department of Justice or other government enforcers, and it does not release any future

---

[2] These athletes do not need to file claims but are already actively participating in the settlement. In addition to the more than 70,000 claims, the Settlement Administrator has received 28,816 forms from eligible Power Five athletes providing payment information where their damages allocation can be provided to them. Peak Decl. ¶ 33.

[3] The Settlement Administrator received 370 unique requests for exclusion, one was rescinded, 18 were postmarked late, and 8 were made by athletes who are not class members. Peak Decl. ¶ 36.

[4] For transparency's sake and to make the Court's review of the objections and the responses in this briefing easier, Plaintiffs have prepared an index of objections that identifies each valid objection and where in this brief Plaintiffs respond. *See* Berman Final Approval Decl. ¶ 5 & Ex. A.

antitrust damages claims of any class members. Other than claims relating to the distribution of the settlement, the settlement does not release, resolve, or address Title IX issues, which are not part of this antitrust case. The individual schools will have to determine the requirements of Title IX in providing benefits to college athletes in the future, but that is not an issue addressed by this antitrust settlement. There are also no conflicts between members of the Settlement Classes that require appointment of separate counsel or rejecting approval of this landmark settlement as asserted by the Vogelsong Objectors (ECF No. 622) and others. Class Counsel structured settlement negotiations to ensure that no such conflicts arose. *See* ECF No. 450 at 6; ECF No. 494 at 2–5; ECF No. 534 at 16-17 (describing the settlement negotiation procedures). Certain of the objectors complain that the damage claims for class members with athletic services claims or partial scholarship claims were settled for too little. It is common for class members to recover differing amounts based on the value of their claims. Here, despite the many months since preliminary approval, these objectors have failed to provide any plan or expert testimony as to how these classes would be certified for these damages claims or their damages calculated, proving that these objections are meritless.

This is not to say that the settlement resolves all concerns of every class member—no class action settlement could meet that test. By its nature, any settlement is a compromise. This is why the courts have recognized that class member objections to a settlement based on an argument that even more or different benefits might be achieved are not a basis for withholding approval.[5] The test is whether the settlement, viewed as a whole, is in the best interests of the class. The *House* settlement demonstrably is.

---

[5] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 338 (2011) (Settlements are the product of negotiations and compromise, and it is not relevant to ask "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion."); *Zakikhani v. Hyundai Motor Co.*, 2023 WL 4544774, at *6 (C.D. Cal. May 5, 2023) (overruling objections and granting final approval because objections were "merely argu[ments]" that the settlement terms for Class Members could have been better [which] 'does not mean the settlement [is] not fair, reasonable or adequate'" ((quoting *Hanlon*, 150 F.3d 1011at 1027)); *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462, at *26 (C.D. Cal. May 29, 2015 ) ("As an initial matter, the mere fact that the benefits provided under the settlement agreement will not make all class members 'whole,' and/or the possibility that a 'better' settlement might have been reached, do not provide a sufficient basis upon which to conclude that the settlement agreement is unfair.").

As one example, several objections have been filed complaining about roster limits, which the NCAA has adopted for the 2025-26 academic year, when the injunction under the settlement will go into effect. But these objections from a tiny percentage of the class to one discrete part of the settlement compromise, do not provide a basis for denying approval in light of the enormous benefits of the settlement as a whole to the class. In fact, only nine objectors—out of the thousands of current-athlete class members—even claimed that they had already been cut from their teams due to NCAA roster limits. Moreover, the end of all athletic scholarship limitations will create significant financial benefits to the class. In short, the move to roster limits was part of the overall settlement compromise, and any negative effects are dwarfed by the extraordinary benefits provided by the settlement to the Settlement Classes as a whole.

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed Settlement Classes, overrule the objections, and grant final approval of the settlement.

## II.    THE SETTLEMENT MEETS THE REQUIREMENTS FOR FINAL APPROVAL

### A.    The Settlement is Fair, Reasonable, and Adequate

The law strongly favors the settlement of class action lawsuits. *See, e.g.*, *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Moreover, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [the trial judge] is 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon*, 150 F.3d at 1026.

To grant final approval under Rule 23, the district court is not asked to assess whether the proposed settlement is the best possible outcome for all class members, but rather to determine whether the settlement—as a whole—is "fair, reasonable, and adequate." *Hanlon*, 150 F.3d at 1027; *see* Fed. R. Civ. P. 23(e)(2). Plaintiffs' Preliminary Approval Motion addressed all factors courts consider in making this determination, including the factors listed in the Northern District of California's Procedural Guidance for Class Action Settlements. Because the relevant facts generally have not changed since preliminary approval, Plaintiffs will not burden the Court with a repetitive discussion of the settlement terms and applicable fairness criteria. For a comprehensive discussion of those issues, Plaintiffs respectfully refer the Court to their Preliminary Approval Motion. *See* ECF No. 450. In response to

- 4 -

certain objections, Plaintiffs also further explain in Sections III.A and III.B, *infra*, why the damages and injunctive relief is more than fair, reasonable, and adequate—it is outstanding.

**B.      The Approved Notice Plan Was Successfully Implemented**

The Settlement Administrator implemented a multifaceted notice campaign that included an ambitious direct notice plan, a robust digital media campaign, as well as press releases and other organic media efforts to reach Settlement Class Members. Peak Decl. ¶¶ 10-26. This notice was supplemented with an additional press release and email notice to alert Settlement Class Members that there was one week left before the claim-filing deadline. *Id.* ¶¶ 22, 26.

To begin, the Settlement Administrator coordinated with Class Counsel and Defendants to request the last-known contact information and additional data points from 325 Division I universities for the majority of Settlement Class Members. Peak Decl. ¶ 5. This resulted in 372,838 unique class member email notices and 91,084 postcard notices mailed, totaling over 463,922 notices to class members. *Id.* ¶¶ 14, 19-20. Wherever possible, the Settlement Administrator contacted class members through both email and postcard notices. Before mailing each notice, the Settlement Administrator checked the potential class members' names and addresses against the U.S. Postal Service's National Change of Address database to identify any address changes. *Id.* ¶ 7. Before e-mailing each notice, the Settlement Administrator cleansed and validated each email to verify its existence with Internet Service Providers. *Id.* ¶ 17.[6] One week prior to the claim-filing deadline, the Settlement Administrator sent out an additional email notice to all Settlement Class Members reminding them of the deadline. *Id.* ¶ 22.

Evidence of this successful direct notice campaign is the 101,935 class members who filed a unique claim form or updated their payment information with a Claim ID and PIN (and the average daily claim submission rate of 852). *Id.* ¶¶ 28, 35. It is also evidenced by the fact that the settlement website received substantial activity, including over 4.8 million page views, over 1.3 million active session visits, and over 830,000 identifiable unique users. *Id.* ¶ 27.

---

[6] Of the 91,084 postcard notices mailed, 22,359 were returned as Undeliverable Mail; after performing address searches through the credit bureau and other public source databases, 867 notices were remailed successfully. Peak Decl. ¶ 16. Further, the forwarding order expired on 1,071 addresses, and 513 of these were re-verified and remailed. *Id.* ¶ 15.

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
CASE NO. 4:20-CV-03919-CW

010912-11/3050037 V1

In addition to this robust direct notice campaign, the Settlement Administrator undertook an ambitious digital media campaign to purchase over 72 million impressions on numerous digital platforms used extensively by the Settlement Class Members. *See* ECF No. 405-5. This goal was exceeded and 75,363,111 impressions in ads, banners, videos, promoted posts, and texts were purchased over five different digital platforms to inform class members of the settlement. Peak Decl. ¶ 23.

Finally, the Settlement Administrator issued a press release on October 18, 2024 to AP News, and a College Media Influencer List consisting of journalists specifically reporting on college news, which was viewed 9,859 times and picked up by over 910 news outlets nationwide. Peak Decl. ¶ 24. The Settlement Administrator additionally distributed a second press release on January 21, 2025 to alert class members of the pending deadline. *Id*. ¶ 26 (confirming this was viewed over 3,663 times and picked up by over 525 news outlets). Other major nationwide news organizations reported on the settlement, presumably reaching thousands of class members. *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 779 (9th Cir. 2022) (recognizing class members likely received notice through "substantial coverage in the press and on social media").

**1. The Notice Campaign Satisfied Rule 23 and Due Process**

To satisfy Rule 23 and due process, notice "must be the best practicable, reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 329 (N.D. Cal. 2018) (internal quotation marks omitted). This does not require "actual notice to each individual class member." *Id.* (internal quotation marks omitted); *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994); *see* Fed. R. Civ. P. 23(c)(2)(B), (e)(1)(B). Rather, the test is whether notice was reasonably calculated so as to "not systematically leave any group without notice." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982).

This Court previously recognized this notice plan as "the best notice practicable under the circumstances" that would provide "due and sufficient notice to all persons entitled thereto." *See* Prelim. Approval Order at 5; *see also Perkins v. LinkedIn Corp.*, 2016 WL 613255, at *7 (N.D. Cal. Feb. 16, 2016) (finding class notice adequate where the approved notice was sent in accordance with the

- 6 -

approved notice plan, which was consistent with the requirements of Rule 23 and due process); *In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at *5 (N.D. Cal. Mar. 4, 2024).

Direct Notice successfully reached over 81.9% of Settlement Class Members—including college athletes who competed approximately 10 years ago and athletes who competed at 325 different universities across the country. Peak Decl. ¶ 21. Alone, this may have been enough. But here it was combined with multiple other tactics to notify approximately 96.4% of impacted Settlement Class Members, who, on average, were notified 2.5 times. *Id.* ¶¶ 6, 11. Moreover, the Settlement Administrator provided consistent and reliable support to Settlement Class Members' 36,457 inquiries by responding on average within 1.5 days. *Id.* ¶ 31. This ensured that class members were apprised of the action and afforded the opportunity to object or opt out.

The parties did not need to include in the notice granular information about nuanced settlement terms or individual damages estimates. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) ("Notice provided pursuant to Rule 23(e) must generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard," which "does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, [nor] an estimate of the potential value of those claims."); *Rodriguez v. W. Pub'lg Corp.*, 563 F.3d 948, 962-63 (9th Cir. 2009) (notice need only "describe[] the aggregate amount of the settlement fund and the plan for allocation," not "detail the content of objections, or analyze the expected value"). But, in this case, estimates of damages allocations were provided for hundreds of thousands of class members. On December 17, 2024, the settlement website provided "allocation estimates" for 392,298 Settlement Class Members whose Division I university had submitted sufficient data for them. Peak Decl. ¶ 29.

Providing such individual damages estimates created a substantial amount of additional work for Class Counsel, Plaintiffs' experts, and the Settlement Administrator, but these estimates were provided to be more transparent with each member of the damages settlement classes about what they could expect through a damages distribution. Class members were notified of the settlement and understood in detail their rights and options.

**C.      The Reaction of the Settlement Class Has Been Overwhelmingly Positive**

In approving class action settlements, courts often gauge the reaction of the class by reviewing the number of objections and opt-outs in comparison to the claims rate and the overall size of the class. *See Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."). Here, the claims rate and overall participation in the settlement – 101,935 unique claim forms or payment updates were submitted out of 389,700 estimated class members, for a participation rate of 26.2% – is very high compared to similar large class action settlements. For example, in the *Anthem Data Breach Litigation*, Judge Koh approved a settlement class action where only 1.8% of settlement class members made claims. 327 F.R.D at 329; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 941, 944-45 (9th Cir. 2015) (Ninth Circuit affirming final approval of settlement where less than 4% of class members who were sent notice made claims and noting that "settlements have been approved where less than five percent of class members file claims").[7]

The small number of timely objections (73) and opt outs (343) by Settlement Class Members, even when combined, is only 0.11% of the 389,700 estimated class members. That also strongly supports approval of the settlement. *See Churchill Vill.*, 361 F.3d at 577 (affirming final approval where approximately 0.61% of class members either opted out or objected); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (finding that 4.86% opt-out rate "strongly

---

[7] *See also, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 697 (8th Cir. 2017) (affirming final approval of settlement with claims rate of 3%); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (noting evidence that claims rates in class settlements "rarely exceed seven percent, even with the most extensive notice campaigns"); *Taylor v. Shutterfly, Inc.*, 2021 WL 5810294, at *7 (N.D. Cal. Dec. 7 2021) (granting final approval to settlement where 2.4% of class members—2,425 out of 98,000—submitted valid claims); *Norcia v. Samsung Telecomms. Am., LLC*, 2021 WL 3053018, at *3 (N.D. Cal. July 20, 2021) (granting final approval where claims rate was 2.035% (7,468 claims received from approximately 367,00 class members), which the court held was on par with similar cases); *Touhey v. United States*, 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (finding a 2% (38 claims made out of 1,875 notices mailed) response rate acceptable); *Moore v. Verizon Commc'n Inc.*, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (granting final approval of class action settlement with a 3% claims rate—250,236 submitted valid claims out of 8,089,893 potential class members); *Amin v Mercedes Benz USA, LLC*, 2020 WL 5510730, at *1, *3 (N.D. Ga. Sept. 11, 2020) (granting final approval of settlement with 0.63% claims rate); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (approving 10.3 million-member settlement class when less than 119,000—approximately 1.2%—filed claims).

support[ed]" final settlement approval). Focusing on the number of objections (73) out of the total class yields a miniscule objection percentage rate of 0.02%, which further shows that settlement approval is appropriate. *See Pallas v. Pac. Bell*, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) (finding that 48 objections (0.5%) out of 10,000 class members supported final approval).

Overall, the small number of opt-outs and objections is exponentially outweighed by the high level of participation of Settlement Class Members. Combined, these figures show the overwhelmingly positive reaction of class members to the settlement, strongly supporting settlement approval.

**D.      The Proposed Settlement Class Satisfies Rule 23**

For final approval of a class action settlement, the proposed settlement class also must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation. Additionally, the proposed class must meet one of the Rule 23(b) requirements. *See Hanlon*, 150 F.3d at 1019-1022. Plaintiffs seek certification of the proposed damages Settlement Classes pursuant to Rule 23(b)(3) and certification of the proposed injunctive Settlement Class pursuant to Rule 23(b)(2). In the Preliminary Approval Motion, Plaintiffs discussed at length why the Settlement Classes should be certified. Plaintiffs do not repeat that discussion here, but rather for efficiency's sake respond to the relevant objections in Section III *infra*, to the extent that objections challenge whether the Rule 23 requirements have been met.

### III.      OMNIBUS RESPONSE TO OBJECTIONS

In this Section, Plaintiffs respond to the objections submitted to the settlement, organized by type of objection. As explained herein, each of these objections is without merit. The Court should overrule the objections, as it did for virtually all of these same complaints when it granted preliminary approval.

**A.      The Historic Damages Settlement and Allocations to Class Members are Clearly Fair, Reasonable, and Adequate**

This historic damages settlement secures almost $2.6 billion[8] in damages to nearly 390,000 current and former Division I athletes—a monumental recovery representing 67.4% of estimated NIL damages and 31.6% of estimated athletic services damages, percentages substantially greater than the

---

[8] When the $200 million in damages in the related *Hubbard v. NCAA* settlement is added to this total, it exceeds $2.7 billion.

average class action settlement recovery in antitrust cases such as this one.[9] A small number of class members have nonetheless objected to the settlement on the basis that they believe they are being undercompensated or that their individual circumstances warrant a higher damages settlement amount.[10] But these objections are not a ground for denying final approval. *See Nwabueze v. AT&T Inc.*, 2013 WL 6199596, at *7 (N.D. Cal. Nov. 27, 2013) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement."); *Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, at *18 (C.D. Cal. July 29, 2010) (granting final approval of settlement and recognizing that "[w]hile the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any settlement . . . would achieve such a result"). Indeed, this Court has already granted preliminary approval despite identical objections. *See* Prelim. Approval Order. As the Court noted during the preliminary approval hearing, "Everybody thinks they can do better, getting more money than the other guy got." Sept. 5, 2024 Prelim. Approval Hr'g Tr. at 41:21-23. But such complaints are not a basis for denying approval of a class action damages settlement that is fair, reasonable, and adequate for the class.

With respect to the few objectors complaining about their specific allocations,[11] it is well-established that if a class member believes a settlement does not provide her with a sufficient individual recovery, her remedy is to opt out and separately pursue her claims. *See Rosado v. Ebay Inc.*, 2016 WL 3401987, at *9 (N.D. Cal. June 21, 2016) (granting final settlement approval over objector's contention "that he ha[d] suffered damages that [we]re significantly higher than the typical class member" because the objector "should opt out of the class and separately pursue his claims"); *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012) (granting final approval of a

---

[9] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016) (citing a survey of 71 settled antitrust cases that showed a weighted mean recovery of *19%* of single damages); *see also, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20, 23 (N.D. Cal. Dec. 10, 2020) (in antitrust case, describing a recovery of 11.7% of single damages as an "excellent" result). This Court has previously held that "[f]ar lesser results (with 20% recovery of damages or less) have justified upward departures from the 25% benchmark" award of attorneys' fees. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017).

[10] *See* ECF Nos. 609, 622, 628, 637, 688, 705.

[11] *See* ECF Nos. 609, 637, 688.

settlement over objections that the settlement "provide[d] no benefit to" certain class members because "[o]bjectors who raised these concerns could have simply opted out of the settlement"). Approximately 343 class members (.09% of the members of the damages classes) have exercised their rights to opt out. Sixty-seven of them have already filed their own litigation in this Court. *See* Compl., *Hill v. NCAA*, No. 4:25-cv-01011, ECF No. 1 (N.D. Cal. Jan. 31, 2025). None of these individual complaints provides any basis for denying approval.

### 1. Objections to Specific Recoveries in the Damages Settlement Are Not a Basis for Denying Final Approval

A few objectors argue that the $600 million in damages obtained in exchange for release of the *Carter* claims is insufficient. *See, e.g.*, ECF Nos. 622, 628, 705. Similar arguments were raised at the preliminary approval stage (*see* Prelim. Approval Reply at 16-17), but were properly rejected by the Court as a ground for denying preliminary approval. *See* Prelim. Approval Order. The Court should reach the same conclusion at the final approval stage.

Objectors complaining about the *Carter* damages amount ignore the significant hurdles these claims would face with respect to both class certification and liability. *See* ECF No. 450 at 18-20; ECF No. 494 at 13 (noting Defendants' previous success in this Court and Circuit arguing that there are procompetitive justifications for limiting performance-based compensation); *see also* ECF No. 450 at 20-21 (explaining the risk that no damages, or minimal damages, would be awarded for the additional compensation claims and further noting that, even if Plaintiffs could overcome the challenges posed and obtain significant damages relief post-trial and appeals, there would be a substantial delay in paying out those damages); *infra* Sect. III.C.2.a (further discussing the class certification and liability challenges of these claims). It is noteworthy that despite the many months since objecting to preliminary approval, these objectors have put forth no expert or trial or class certification proposal detailing how they would overcome these hurdles. Class Counsel has been litigating claims over the NCAA's compensation restrictions for over a decade and has a more informed view than objectors about the value of—and hurdles to prevailing in—these claims from the extensive proceedings in both *Alston* and *House*. As the Ninth Circuit has made clear, complaints that a higher amount of damages could have been obtained through a trial may be reason for individual class members to opt out; they are not a ground for denying

approval of the settlement for the more than three hundred thousand class members who want to receive their damage distributions. *See Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *12 (N.D. Cal. Apr. 1, 2011) (finding that "class members' challenges to the amount of their individual awards do not provide any grounds to reject the proposed settlement"); *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) (rejecting objections that settlement damages were insufficient because "if any objector believed that his or her personal claim was being sacrificed for the greater good . . . they had the right to opt-out of the class" (citation omitted)).

There is similarly no basis for the Vogelsong Objectors' argument that class members who are partial scholarship athletes stand to "gain very little from the settlement" because "partial-scholarship claims have real value." Vogelsong Obj. at 12-13, ECF No. 622. An identical argument was previously raised by the (same) Colorado Objectors at the preliminary approval stage. *See* Prelim. Approval Reply at 15-17 (addressing argument raised by Colorado Objectors (ECF No. 473)). This objection, as before, simply ignores the substantial hurdles that would confront any attempt to certify a class, let alone prove damages on a class-wide basis, for athletes who only received partial scholarships, given the previous failed attempts to certify classes of athletes challenging the NCAA's scholarship limits. *See* Prelim. Approval Reply at 16; *see also infra* Section III.C.2.b. If class members with such claims believed their recoveries under the settlement are inadequate, their remedy was to opt out—not to seek to deny final approval for everyone else. And these objectors have had many months to develop their objection and have utterly failed to provide the Court with a plan on how they would certify this class or prove class-wide damages.

The Anderson Objection (also referred to herein as the Hausfeld Objectors) (ECF No. 613) lodges similarly meritless arguments about Dr. Rascher's methodology for calculating Lost NIL Opportunities damages. Contrary to the claims in the Anderson Objection (*see id.* at 24) and accompanying expert declaration (*see* Decl. of Michael Cragg ¶¶ 55-56, ECF No. 613-13), Dr. Rascher made use of a natural experiment to estimate Lost NIL Opportunities damages and apply a common class-wide formula for allocating the settlement amount to individual class members. *See* Rascher Final Approval Decl. ¶ 92; Rascher Class Cert. Rep. ¶¶ 194–95; Rascher Class Cert. Reply Rep. ¶ 111. Defendants challenged this model in a *Daubert* motion at class certification, which the Court rejected.

*See* ECF No. 386 at 23-24 (holding "Dr. Rascher's third-party NIL methodology is not subject to exclusion" and explaining that his model "is designed to take the economic value of NIL payments in the 'after period' and use them as a baseline for estimating the economic value of payments in the 'before period.'" (emphasis omitted)). While the Hausfeld Objectors' economist, Dr. Cragg, cites a single, unverified internet source to claim the Lost NIL Opportunities damages calculated by Dr. Rascher should be larger (*see* ECF No. 613-13 ¶¶ 59-60), Dr. Rascher relied on verified data obtained through hundreds of subpoenas to Division I schools to review the actual amounts paid to specific class members in third-party NIL deals. *See* Rascher Class Cert. Rep. ¶¶ 196-97, Rascher Final Approval Decl. ¶¶ 90-93. Dr. Rascher's reliance on *evidence* to come to a careful damages analysis versus the Hausfeld Objectors' reliance on cherry-picked information from the internet underlines the problem with such armchair quarterbacking. Rascher Final Approval Decl. ¶¶ 90-93. Further, Dr. Rascher's use of the individualized NIL reporting from schools with more detailed transaction-specific information allowed him to analyze and opine regarding injury to specific athletes, which was critical to showing class-wide injury. Rascher Final Approval Decl. ¶ 94. Class Counsel's success at the class certification stage was a key factor to achieving the high percentage of damages through the settlement. And it is worth recalling that in *O'Bannon*, Hausfeld's damage methodology was unsuccessful and the class not certified – class members in that case recovered zero damages from the proffered methodology.

In sum, courts routinely approve class action settlement allocations based on such a neutral and evidence-based expert damages methodology over objections arguing for damages methodologies that are speculative and unsubstantiated by record evidence. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 237 n.20 (3d Cir. 2001) (rejecting objection that was "not only speculative, but also undermined by the evidence in the record"); *Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *7 (C.D. Cal. May 6, 2014) (rejecting objection based on evidence that was "speculative at best" and noting that such an objection "does not render [a] settlement . . . unreasonable or unfair"); *Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3616638, at *2 (N.D. Cal. June 26, 2017) (rejecting objections that other experts estimated "higher damages . . . than [p]laintiffs' ultimate damages expert" because "it is the parties themselves, as opposed to the court or the objectors, who are in the best position to assess whether a settlement fairly reflects their expected outcome in litigation"), *aff'd sub nom. Edwards v. Andrews*, 846

F. App'x 538 (9th Cir. 2021). No antitrust damages settlement—even one that is almost $2.6 billion—is going to satisfy every class member. But that is no basis for withholding final approval when the settlement, viewed as a whole, is unquestionably in the best interests of the class.

### 2.    The Damages Allocations Are Fair and Based on Reasonable and Neutral Methodologies

A methodology for allocating damages in a class action settlement is considered reasonable and fair when it is based on objective, relevant criteria that are consistent with expert testimony and account for the relative value of class members' damages claims. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *6 (N.D. Cal. Sept. 2, 2015) (rejecting objection to settlement's damages allocation because the methodology relied on "a neutral and uniform metric . . . consistent with [p]laintiffs' expert opinions"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.") ; *In re Resistors Antitrust Litig.*, 2020 WL 2791922, at *2 (N.D. Cal. Mar. 24, 2020) (finding plan to allocate "on a pro rata basis based on the dollar value of approved purchases . . . [to be] fair, reasonable, and adequate"). That is exactly the type of neutral and fair expert damages allocation methodology applied here. *See* ECF No. 450 at 24-25; *see generally* Rascher Prelim. Approval Decl.

Several objectors argue that BNIL damages should be allocated to walk-on athletes or to athletes in sports other than football and basketball.[12] But Dr. Rascher's neutral damages analysis and methodology does not support such an allocation. *See* Rascher Class Cert. Reply Rep. ¶ 35, ECF No. 290-2; Rascher Prelim. Approval Decl. ¶ 25 n.11. Indeed, with respect to walk-on football and basketball players, Dr. Rascher found that since schools have not competed to offer these athletes compensation through athletic scholarships, it would be wholly speculative to conclude that the schools would have compensated them with BNIL payments, had they been allowed to do so. *See* Rascher Class Cert. Reply Rep. ¶¶ 35, 82. To the extent an individual walk-on player had a unique story (*à la* Baker Mayfield, who was referenced in several objections) and felt he could prove that he would have

---

[12] *See* ECF Nos. 593, 601, 612, 619, 632–34, 636, 638, 639, 665-1, 653–54, 659, 664, 668, 670, 671, 672–73, 675, 678–79, 682, 684–85, 689, 690, 692, 693.

010912-11/3050037 V1

uniquely received BNIL damages, he was free to opt out and pursue his own unique claim. The claim to BNIL damages by athletes outside of football and basketball are even more speculative.[13] The BNIL damages are based on Dr. Rascher's and Mr. Desser's expert analyses of the very large BNIL values provided by the athletes on the P5 football and basketball teams *See* Rascher Class Cert. Rep. ¶¶ 174-78; Desser Class Cert. Rep. at 60-62. No objector has provided any expert testimony to support an argument that other D-I athletes in far smaller revenue sports would have received BNIL payments of their own. But even if some class members believed that they could prove such damages, their remedy was to opt out of the settlement and pursue their own claims.

Nor is there any basis for the objections related to the Lost Opportunities damages allocations. A few objectors who did not compete after the NCAA introduced its interim NIL policy in July 2021 argue that it is unfair they do not receive Lost NIL Opportunities damages because of the use of Dr. Rascher's before-and-after methodology. *E.g.*, ECF Nos. 635, 637, 640. Another objector argues that Dr. Rascher's formula does not account for the value an athlete could have attained if the NCAA's NIL ban had never existed. *See* ECF No. 624. But such complaints that a neutral and objective expert damages methodology does not provide every class member with the amount of damages that he or she desires is not a proper ground for objection to a class action settlement. *See* p. 14 *supra* (discussing cases).

## B.    The Injunctive Relief Settlement Provides Relief That Is More Than Fair and Adequate

After decades of litigation resulting in incremental gains against Defendants' compensation and benefits rules, the injunction class settlement throws the door open and allows an avalanche of new benefits to class members that are expected to exceed $20 billion over the injunctive relief term. That is nothing short of transformative.

But every settlement is a compromise, and no settlement impacting hundreds of thousands of class members is going to be free from some objectors. In this case, a tiny percentage of objectors have opposed the injunctive settlement because: (i) some of them argue for the ability to obtain even greater compensation to class members going forward; (ii) some of them oppose having any "cap" on

---

[13] *See, e.g.*, ECF No. 638 at 5 (women's lacrosse player objecting on the basis that she "believe[s] that [she] [is] entitled to a significant NIL Broadcast payment"); ECF No. 671 (women's tennis player objecting on the basis that she "believe[s] that [she] [is] entitled to a significant NIL Broadcast payment").

compensation to class members because they believe such a cap is an antitrust violation; (iii) some of them believe it would be preferable for the class members to agree upon a future compensation system through collective bargaining with a labor union; (iv) some of them want to make sure that Defendants cannot invoke the settlement approval as a defense to future antitrust claims; and/or (v) some of them argue that the injunctive relief terms purportedly conflict with state NIL laws and other courts' orders. None of these objections provides any basis for the Court to deny final approval of an extraordinary injunctive settlement which provides tens of billions of dollars in future benefits to class members and is clearly in the best interests of the class.

### 1. The Injunctive Relief Settlement Is More than Fair and Adequate: It Will Provide Class Members with Tens of Billions of Dollars in Previously Prohibited Compensation and Unlimited Scholarships

#### a. The Injunctive Relief Secured by the Settlement Transforms Defendants' Long-Defended Compensation Rules

By any measure, the tens of billions of dollars in new benefits that will be available to the injunctive class members is one of the most lucrative antitrust settlements in history. The fact that a few class members argue that an even more generous amount of future compensation might have been achieved after a trial is irrelevant to final approval. The law is clear that class action settlements are "not to be judged against hypothetical speculative measure of what might have been achieved." *Officers for Just.*, 688 F.2d at 624. Because any settlement is a compromise, the role of the Court in considering approval is to determine whether the settlement is fair and adequate to the class—not whether it might hypothetically be even better. *See Hanlon*, 150 F.3d at 1026 (settlement "is the offspring of compromise[,] the question is . . . not whether the final product could be prettier, smarter or snazzier"); *Alvarez v. Sirius XM Radio*, 2021 WL 1234878, at *7 (C.D. Cal. Feb. 8, 2021) (overruling objection that allowed defendant to continue some challenged conduct because "a full recovery is often not possible in a settlement . . . and a partial recovery does not render a settlement unreasonable"). As noted above, this Court observed in considering (and ultimately rejecting) similar objections at the preliminary approval phase: "everybody thinks they can do better, getting more money than the other guy got." Sept. 5, 2024 Prelim. Approval Hr'g Tr. at 41:21–23; *see e.g.*, ECF No. 613 at 12–21; ECF 628 at 20-23. But this is

not a ground for opposing the approval of a transformative injunctive relief settlement that will positively change the lives of hundreds of thousands of class members over the next ten years.

To put the tremendous strides made by the injunctive relief settlement in context, just nine years ago, the Ninth Circuit vacated this Court's injunction that would have allowed college football and basketball players to receive $5,000 in deferred compensation for the use of their NILs. *O'Bannon v. NCAA*, 802 F.3d 1049, 1078 (9th Cir. 2015).[14] The appellate court concluded that such a remedy would constitute a "quantum leap" from what was previously permissible. *Id.* If those rejected $5,000 payments would have been a quantum leap, this settlement represents an intergalactic paradigm shift. Schools will be able to provide athletes across all Division I sports new direct benefits worth up to 22% of the power conferences' average athletic revenues each year, an amount expected to begin at over $20 million per school in 2025-26 and grow to nearly $33 million per school over the course of the decade Rascher Prelim. Approval Declaration ¶¶ 39-49. Those figures represent a total of $19.4 *billion* in additional spending by the power conference schools alone over the ten-year injunctive relief period, with additional compensation and benefits expected to be provided by some of the non-power conference schools as well. ECF No. 450-4 at ¶ 85 Ex. 25.

As Dr. Rascher's declarations describe, the expected payments to the Injunctive Settlement Class from the 22% revenue share compare favorably to what professional athletes have secured through collective bargaining, when also accounting for the existing scholarships, health insurance, *Alston* payments and other benefits that the schools provide to class members. *See* Rascher Prelim. Approval Declaration ¶¶ 86-87; *see also* Rascher Final Approval Decl. ¶¶ 7, 45-61.[15] In total, the amount of compensation and benefits to all class members is projected by Dr. Rascher to reach the approximately 50% revenue share that professional athletes have achieved through collective bargaining. *See* Rascher

---

[14] As for damages, the court denied class certification of the *O'Bannon* damages class. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *8–10 (N.D. Cal. Nov. 8, 2013) ("*O'Bannon*").

[15] A few objectors quibble that revenue categories like concessions and marketing should be counted in the 22% pool calculation, *see* ECF No. 613 at 15-21; ECF No. 622 at 17-18. First, they are minor criticisms of the overall negotiated resolution to undermine the overall fairness and adequacy of the settlement to resolve the claims. Second, the categories to be included were part of a hard-fought negotiation.

Prelim. Approval Declaration ¶¶ 86-87. While the Hausfeld Objectors argue that existing scholarships and other benefits should not be factored in (ECF No. 613 at 21), Dr. Rascher has explained why this is not economically correct. Rascher Final Approval Decl. ¶ 45 (citing Rascher Prelim. Approval Reply Decl., Sect. 4).

Dr. Rascher also notes that the objectors, in some cases, do not understand how the injunctive settlement works. For example, the Hausfeld Objector's economists apparently believed that the settlement included a cap on new scholarships at $2.5 million per school. In fact, as Dr. Rascher explains, new scholarships are effectively an *exception* to the cap on compensation, as the settlement enables schools to provide unlimited new scholarships to class members without having to count all these scholarships against the spending cap. *See* Rascher Final Approval Decl. ¶¶ 11-16 (discussing misunderstanding reflected in declarations of Dr. Cragg and Professors Fort and Noll). The elimination of the scholarship maximums in the settlement means that, if all Division I schools opted-in, there would be the opportunity for more than 115,000 additional scholarships available to class members under the injunctive settlement on an annual basis. Rascher Final Approval Decl. ¶ 74 & Ex. 5.

The Anderson Objectors' argument that schools may not pay the new benefits because they are not forced to do so by the injunction (ECF No. 613 at 3) is legally irrelevant and factually unsupportable.[16] It is legally irrelevant because even if Plaintiffs were to secure a complete litigation victory to remove *every* compensation and benefit limitation imposed by the NCAA (a daunting prospect),[17] antitrust law does not permit Plaintiffs or the Court to *force* Defendants to pay anything— just like defendants in *Alston* were not *forced* to make academic incentive payments and just like defendants in *O'Bannon* were not *forced* to offer full cost-of-attendance scholarships. The remedy is an

---

[16] Notably, counsel for the Hausfeld Objectors, who served as Class Counsel in the *O'Bannon* litigation, had previously touted the lack of spending mandates as a *virtue* of the *O'Bannon* cap. *See* Pls-Appellees' Opp'n Br. in Resp. to NCAA's Opening Appellate Br., Case Nos. 09-1967-CW & 09-CV-3329-CW, ECF No. 43-1, at *23–24 (9th Cir. Jan. 21, 2015).

[17] *See White v. Nat'l Football League*, 822 F. Supp. 1389, 1418 (D. Minn. 1993) (granting final approval to settlement, noting that even if "it were conclusively established [at trial] that all of the player rules challenged in the present class action violate the antitrust laws, there [still] is uncertainty as to the scope of injunctive relief that would be afforded to the plaintiffs.").

1   injunction *removing* and/or lessening restraints on competition, not *mandating* specific behavior to

2   compete.

3   The argument is also factually unsupportable because, as Dr. Rascher explains, competition will

4   necessarily compel the schools in the power conferences (and some others) to provide the new benefits

5   or risk losing the athletes they need to generate revenues. *See* Rascher Prelim. Approval Declaration ¶

6   84; Rascher Final Approval Declaration ¶¶ 26-28. Just like *Alston* payments and full cost-of-attendance

7   scholarships became ubiquitous even though they were ruled to be permissible rather than compulsory,

8   it is not surprising that many schools have already announced their intention—and many have already

9   reached agreements with athletes—to pay additional compensation and benefits to class members

10  beginning in the upcoming 2025-26 academic year if the Settlement is approved. Rascher Final

11  Approval Decl. ¶¶ 15, 73; ECF No. 534 at 7.[18]

12  The Vogelsong Objectors' reliance on *In re: Payment Card Interchange Fee & Merch. Disc.*

13  *Antitrust Litig.* misses the mark. *See* ECF No. 622 at 17-18 (citing 2024 WL 3236614 (E.D.N.Y. Jun. 28,

14  2024)). There, the Eastern District of New York declined to grant preliminary approval because it found,

15  after a highly fact-based analysis, that the injunction agreed to in the proposed settlement provided only

16  "modest," "significantly limited" relief, that "many [plaintiffs] will not be able to fully avail themselves

17  of." *Payment Card*, 2024 WL 3236614, at *1, *27, *37-38. That situation bears no resemblance to the

18  injunction here.

19  The injunction settlement here will also provide immediate relief to class members—starting

20  with the 2025-26 academic year—before many of them graduate without being able to realize the

21

22  ───────────────
    [18] *See also* Andy Staples, *Tennessee to add 10 percent 'talent fee' to ticket prices to raise money to*

23  *give to players*, On3 (Sept. 17, 2024), https://www.on3.com/news/tennessee-to-add-10-percent-talent-fee-
    to-ticket-prices (the University of Tennessee recently announced that it will add a 10% "talent fee" to

24  ticket prices to raise money to give to players, with the Tennessee athletic director anticipating that post-
    settlement his school could provide $30 million more to athletes per year, including a "raise [to] the

25  number of available athletic scholarships"); Seth Emerson, *Georgia, SEC schools expected to pay football*
    *athletes about 75 percent of revenue sharing*, The Athletic (Feb. 25, 2025)

26  (https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/)
    (University of Georgia representatives have said that in addition to increased spending on football and

27  men's basketball, "it is now able to add more than 100 scholarships to other sports, thanks to the settlement
    terms," with the athletic director stating that he thinks the school will be in line with its "conference

28  peers").

010912-11/3050037 V1

benefits of the injunction. That is yet another reason why the settlement is so beneficial to the class in comparison to waiting for years more of litigation and appeals before the first new benefit is provided to the class.

### b. Defendants' Ability to Continue Prohibitions on Improperly Characterized NIL Payments by Collectives and Associated Entities Is Not Grounds to Reject the Settlement

Some objectors once again raise the complaint that the Settlement permits the NCAA to continue prohibitions on "faux" NIL payments by Associated Entities or Individuals (referred to colloquially as "Collectives"). *Compare, e.g.*, ECF No. 613 at 21-23; ECF No. 628 at 6, 20-21, *with* Vogelsong Objectors (ECF No. 473) at 18-21; Menke Objectors (ECF No. 475) at 17-18; Anderson Prelim. Approval Objectors (ECF No. 539) at 11-13. Plaintiffs demonstrated why these objections are ill-conceived in Plaintiffs' Supplemental Brief in Support of Preliminary Settlement Approval. *See* ECF No. 534 at 5-16. The court properly found that these objections did not stand in the way of preliminary approval. A few points about these objections are worthy of repetition.

*First*, the rules which the NCAA are permitted to impose regulating "faux" NIL payments by collectives and individuals associated with the schools are narrower than the prohibitions on pay-for-play payments that this Court and the Ninth Circuit have previously upheld against antitrust challenge. *See In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1264-65 (9th Cir. 2020) (affirming this Court's finding that "limits on cash compensation unrelated to education do *not*, on this record, constitute anticompetitive conduct"). *Second*, the permitted NCAA rules regarding "fair market value" limitations do not apply to any payments made by the schools directly under the revenue sharing "pool." Nor do they apply to payments for NIL made by third parties who are not Associated Entities or Individuals of the schools. *Third*, unlike under existing NCAA rules whereby the NCAA may impose and adjudicate discipline over pay-for-play payments by collectives, the settlement creates a new neutral arbitration system through which athletes (and schools) may challenge NCAA enforcement actions. *See* Am. IRS Art. 6 § 2. To the extent a neutral arbitrator determines that an NIL payment is improper, the athlete still need not be penalized. He or she will have an opportunity to rescind the agreement or renegotiate the NIL arrangement *See* IRS. Art. 4 § 3(d); ECF No. 588-1 (Additional Settlement Communication Q&A #8). The fact that the Settlement does not prohibit the NCAA from continuing to

- 20 -

prohibit "faux" NIL payments by Associated Entities or Individuals, with neutral arbitral review, is a small compromise that does not detract from the overall benefits provided to the class by the injunctive settlement.

### 2. The Revenue-Sharing "Pool" Cap Is a Settlement Compromise That Is Lawful and Fair to the Class

A few objectors re-raise the argument, made by some at the preliminary approval stage,[19] that the settlement should be rejected because it includes a "pool" cap on the amount of new compensation and benefits that may be provided by schools. Vogelsong Objection at 18; *see also* Anderson Objection at 6[20]; ECF No. 628 ("Menke-Weidenbach Objectors") at 20; ECF No. 705 ("Roberts Objectors") at 2. But such a cap was the only way to implement a compromise settlement between the current rules—which prohibit all such compensation—and an ultimate court victory eliminating all such rules. There is nothing unlawful about such a compromise settlement approach, which has been adopted and approved in other antitrust class action settlements creating a new, more generous system for compensating athletes. *See, e.g.*, *White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993); *Bridgeman v. Nat'l Basketball Ass'n*, 675 F. Supp. 960 (D.N.J. 1987); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682 (2d Cir. 1977).

Indeed, "[s]o long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1089-90 (11th Cir. 2023), *cert denied* 144 S. Ct. 2686 (2024) (granting final approval to settlement with Hausfeld LLP as class counsel); *see also Fraley v. Batman*, 638 Fed. App'x 594, 597 (9th Cir. 2016) (A district court abuses its discretion in approving a settlement only if the agreement sanctions "clearly illegal" conduct." (emphasis added)). Here, the Ninth Circuit previously held that the

---

[19] *See* ECF No. 475 at 14–17; ECF No. 473 at 17–18, 21–24; ECF No. 539 at 7–8.

[20] The Anderson Objection is accompanied by a declaration from Baruch College Business School Professor Mark Edelman, which details his legal opinion that the revenue sharing system contemplated by the Settlement "constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act." ECF No. 613-6 at 2. The Court should disregard the Edelman Declaration as improper legal opinion. *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law" because an expert's role is limited to "interpret[ing] and analyz[ing] factual evidence." (citation omitted)); *see also* ECF No. 385 at 12 (excluding Defendants' expert's opinions because they constituted "impermissible legal conclusions").

rule of reason—not the per se rule—applies to NCAA compensation restraints. *O'Bannon*, 802 F.3d at 1079 ("[W]e reaffirm that NCAA regulations are subject to antitrust scrutiny and must be tested in the crucible of the Rule of Reason."); *Alston*, 958 F.3d at 1256 ("When considering agreements among entities involved in league sports, such as here, we must determine whether the restriction is unreasonable under the Rule of Reason.") (cleaned up). The Supreme Court in *Alston* likewise applied a rule of reason analysis to evaluate the NCAA's rules. 594 U.S. at 91. Even Justice Kavanaugh's concurrence in *Alston*—which multiple objectors cite—emphasized that "[a]fter today's decision, the NCAA's remaining compensation rules should receive *ordinary 'rule of reason'* scrutiny under the antitrust laws." *Id.* at 108. And, despite now arguing that "agreements among competitors on the price they pay for workers are ordinarily *per se* unlawful," ECF No. 595 at 6, the DOJ advocated in its amicus brief to the Supreme Court that "the unique features of the product made [per se] Treatment inappropriate" and that "the district court [had] correctly held that the [NCAA's] limitations on student-athlete compensation are subject to standard rule-of-reason review."[21] *See* Brief for the United States as Amicus Curiae Supporting Respondents at 10-11; *NCAA v. Alston*, 594 U.S. 69 (2021). Accordingly, because the cap is not a *per se* antitrust violation, there is no legal bar to an antitrust class action settlement by NCAA athletes which—as a compromise—agrees to a reduction in, but not the complete elimination of, NCAA limits on schools directly compensating athletes.

The reason for reaching a compromise on a capped system in which Division I athletes will be able to receive approximately 50% of D-I revenues is well-grounded in the extensive litigation experience of Class Counsel in challenging the NCAA's restraints. As this Court knows, *trial victories* in the lengthy litigation history against NCAA athlete compensation restrictions have previously resulted not in the complete elimination of those restrictions, but in new "caps." *Alston* resulted in an injunction imposing a "cap[] on education-related benefits" that schools could provide, including the specific $5,980 annual limit on academic achievement awards. 569 U.S. at 84. And *O'Bannon* "capp[ed]" the payments that schools could offer athletes as the cost-of-attendance (after the Ninth Circuit overturned

---

[21] *See also Altson* Supreme Court Oral Argument Tr. at 74:25-75:14, *Alston v. NCAA*, 594 U.S. 69 (Mar. 31, 2021) ("GENERAL PRELOGAR: So I think the rule of reason would properly apply to [] hypothetical" where a new professional league decided "to cap the salaries of all of [its] players at 1955 levels, corrected for inflation.").

as a "quantum leap" the $5,000 deferred compensation "cap: that this Court ordered after trial).

*O'Bannon v. NCAA,* 802 F.3d at 1074-75; *see also id.* at 1075 (the "compensation cap" established by the *O'Bannon* trial decision "is a substantially less restrictive alternative means of accomplishing the NCAA's legitimate procompetitive purposes"). Against the backdrop that even rule-of-reason trials result in capped benefits, it makes no sense for objectors to argue that the injunctive relief settlement, which is by nature a compromise, is unreasonable and cannot be approved if any cap on future compensation to athletes is permitted. *See* Prelim Approval Mot. at 17-18.

In fact, as Dr. Rascher explains, this compromise of a capped revenue-sharing system is of great benefit to the class as it "greatly expands the choices for schools to determine differing types and levels of athlete compensation through which to compete for athlete services." Rascher Final Approval Decl. ¶ 20. Dr. Rascher further opines that, "[w]hile there may be economic arguments that price-fixing is presumptively anticompetitive, no such arguments support a presumptive determination that the proposed settlement, inclusive of the spending cap, has anticompetitive effects that outweigh procompetitive benefits." *Id.* The reality is that "the proposed settlement provides for substantially more competition than the current NCAA rules" and is anticipated to raise compensation to college-athletes to "levels that can be comparable to compensation for professional athletes." *Id.* ¶ 21.

Ironically and certainly disingenuously, while the Hausfeld Objectors protest that the Injunctive Relief Settlement should be rejected for including a "cap," which they wrongly argue is "unlawful on its face" (ECF No. 613 at 6-9), they are the very same counsel who represented the plaintiffs in *O'Bannon,* where they defended a $5,000 cap on NIL compensation as "allow[ing] the NCAA to place a reasonable cap on such compensation." Pls-Appellees' Opp'n Br. in Resp. to NCAA's Opening Appellate Br., Case Nos. 09-1967-CW & 09-CV-3329-CW, ECF No. 43-1, at *23–24 (9th Cir. Jan. 21, 2015). The reality is that when a player compensation system is the subject of a class action settlement—or even a verdict—it is not uncommon for a compromise to be adopted, in which a capped or otherwise restricted system of compensation plays an important part.

For example, in *Robertson v. National Basketball Association,* the court approved the new system for player compensation agreed to in a class action settlement over objections that it "perpetuate[d] for ten years two 'classic group boycotts' in violation of Section 1 of the Sherman

Antitrust Act" because "the challenged practices have not been held to be illegal per se in any previously decided case." 556 F.2d at 686. Likewise, in *Alexander v. National Football League*, the court approved a class action settlement between football players and the NFL because it did not "authorize[] or involve[] any future conduct within the NFL that is 'clearly illegal' or illegal to a 'legal certainty.'" 1977 WL 1497, at *21 (D. Minn. Aug. 1, 1977). And in *White v. National Football League*, the court approved a class action settlement—which created a salary cap—while noting that at the approval stage, "it is unnecessary for the court to determine whether every provision of the settlement, if adopted outside a settlement context and made subject to a trial on the merits, would be deemed reasonable after a full rule of reason inquiry. In fact, the court should not make such inquiry." 822 F. Supp. 1389, 1432 (D. Minn. 1993); *see also Bridgeman*, 675 F. Supp. at 962-63 (approving antitrust class action settlement with a salary cap system). Following these precedents, this Court should not hesitate to approve the injunctive settlement, which, even with a cap, is a fair compromise in the best interest of the Class.

Finally, it is important to note that the settlement does not foreclose all future antitrust challenges to the "pool" cap, or any other restrictions permitted by the settlement. There is no release of future antitrust damages claims by any class member. Further, each year of the injunctive settlement, incoming student-athletes who become injunctive class members will be given notice of the injunctive settlement each year and will have the opportunity to present any future objections to the Court. Amended Settlement Agreement ¶ 14. The fairness of the revenue sharing system to the injunctive class, with its pool "cap," can thus be evaluated by the Court on a continuing basis to the extent warranted.

### 3. Collective Bargaining Was Not Required to Establish, and Will Not Be Impeded by, the Settlement's Revenue-Sharing System

A few objectors assert that the revenue sharing system under the settlement cannot be implemented without collective bargaining. *See, e.g.*, ECF No. 595 at 8; ECF No. 613 at 12-13; ECF No. 622 at 2; ECF No. 705 at 2. Other objectors wrongly believe that the settlement will impede collective bargaining. *See* ECF No. 705 at 19-22; ECF No. 613 at 12-15. The Vogelsong Objectors go one step further to argue that the settlement should not be approved because it "fail[s] to provide for collective bargaining." ECF No. 622 at 17. None of these arguments have merit.

To begin with, the terms of the injunctive settlement do nothing to impede the formation of a union and collective bargaining. To the contrary, they expressly provide that if collective bargaining is ever permitted, such bargaining may change the terms of the settlement agreement as the parties may "agree[] upon additional, expanded or different benefits than those permitted by this Injunctive Relief Settlement." Am. IRS Art. 7 § 2.

Further, the settlement could not, as the Vogelsong Objectors argue, "provide for collective bargaining." ECF No. 622 at 17. This is an antitrust action, not a labor law case before the NLRB. At the current time, the NCAA's (and its schools') position is that college athletes are prohibited from collective bargaining because they are not "employees." *See* 29 U.S.C. § 151; *N.L.R.B. v. Town & Country Elec., Inc.*, 516 U.S. 85, 89 (1995). While there had been two cases pending before the NLRB to challenge that position, both of those cases were withdrawn after a new administration came into power this year. *See Nat'l Coll. Players Ass'n v. Univ. of S. Cal.*, N.L.R.B. No. 31-CA-290326 (2022); *Trs. of Dartmouth Coll.*, 01-RC-325633 (2023). There is thus no current proceeding to seek to recognize college athletes as employees before the NLRB. If the position of the Vogelsong Objectors were accepted, therefore, it would be impossible to settle this litigation as no union of college athletes is presently recognized.

Collective bargaining, however, was not required to achieve this historic settlement. For example, it was the antitrust class action **settlement** in *White*—not collective bargaining—that created the NFL salary cap and free agency system. There, the "NFLPA was not . . . acting as the players' collective bargaining representative."[22] 822 F. Supp. at 1431. Instead, class counsel negotiated the settlement, including the salary cap. *Id.* Similarly, the settlement in *Robertson* was negotiated by "class counsel and counsel for NBA defendants" and resulted in an agreed-upon ten-year injunction, supervised by the court, which was used to introduce restricted free agency rules (and eventually a

---

[22] Indeed, the settlement agreement was signed on February 26, 1993, *before* the NFLPA was reformulated as the collective bargaining representative of the NFL players in late March 1993. *White*, 822 F. Supp. at 1395-96.

salary cap and revenue sharing system) into the NBA. *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 66 (S.D.N.Y. 1976).[23]

### 4. Approval of the Settlement Does Not Create Any Antitrust Immunity for Defendants

On January 16, 2025—just days before the change in administration—the Department of Justice filed a Statement of Interest raising concerns about how Defendants may attempt to use the Court's approval of the Settlement in future antitrust litigation. *See* ECF No. 595 at 10. But, because Defendants have expressly acknowledged that the settlement does not provide them immunity from future antitrust actions, these concerns are simply misplaced. ECF No. 595-2. Plaintiffs strongly disagree with the DOJ's criticisms of the settlement, which are inconsistent with the positions taken in *Alston*, where the DOJ did not challenge the $5,980 academic achievement awards cap in *Alston*. On the contrary, it filed an amicus brief strongly defending this Court's approach of leaving some compensation-related restrictions in place. *See* Brief for the United States as Amicus Curiae Supporting Respondents at 11, *NCAA v. Alston*, 594 U.S. 69 (2021) ("To maintain the product's appeal to consumers who value amateurism, the schools must implement agreements between competitors that eliminate an element of price competition.").

### 5. The Injunctive Settlement Does Not Violate State NIL Laws or Court Orders

Desperate to overturn this settlement and insert themselves into this important antitrust issue that they have been out of since *O'Bannon*, the Hausfeld Objectors offer a potpourri of misleading assertions about the alleged illegality of the Settlement under various state and federal laws, and other court's orders. *See* ECF No. 613 at 6-11, 21–23. None has merit.

*First*, the Anderson Objectors wrongly claim that the Settlement violates numerous state NIL laws (ECF No. 613 at 9-11). They raised an identical objection during the preliminary approval stage. *See* ECF No. 539 at 8-11. They were wrong then and are wrong now. The settlement only resolves antitrust claims, and there is nothing in the settlement that releases non-compliance with individual state NIL laws. *See* ECF No. 613 at 9.

---

[23] Although the general counsel for the National Basketball Players Association was "involved" in the discussions, its terms were negotiated by class counsel, not the union. *Id.*

The settlement requires the NCAA to amend its NIL rules to allow for previously prohibited direct benefits; it has no bearing on existing state NIL laws that might already provide for broader compensation; nor does it prohibit students or State Attorneys General from bringing claims under those laws. The settlement does not ask the Court to grant Defendants any kind of preemption from state NIL laws. Indeed, the Injunctive Relief Settlement acknowledges that only legislative action could preempt state laws, and that future legislation may actually go in the opposite direction and "provide student-athletes with benefits *in addition* to those permitted by this Injunctive Relief Settlement." *See* Am. IRS Art. 7, § 1 (emphasis added).

*Second*, there is equally no merit to the Hausfeld Objectors' wild assertion that the settlement somehow violates the First and Fourteenth Amendments to the U.S. Constitution by purportedly "deny[ing] the free speech rights of college athletes to deal with NIL Collectives." ECF No. 613 at 22. The Hausfeld Objectors offer no explanation for how anyone's constitutional rights to free speech might be infringed; nor are Plaintiffs aware of any. The settlement does not, in any way, deny college athletes the ability to communicate or associate with NIL Collectives or limit their free speech rights about this or any other issue in any way.

*Third*, the Hausfeld Objectors falsely claim that the Settlement "attempts to circumvent the decision by the court in *Tennessee v. NCAA*[24] that preliminarily enjoined implementation of an NCAA rule requiring that potential college athletes refrain from discussing NIL deals until they commit to a particular school." ECF No. 613 at 21. The settlement does no such thing. In fact, it says nothing about pre-enrollment communication whatsoever. But in any event, that litigation has been settled, making this merely another red-herring objection that the Court should disregard.[25]

Simply put, the Defendants are not excused by the settlement from complying with any state or federal law or applicable court order. Nothing in the settlement suggests otherwise.

## C.    There are No Conflicts Precluding Settlement Approval.

Certain objectors argue that there were conflicts of interest between members of the Settlement Classes that required separate counsel for different class segments. Plaintiffs responded to similar

---

[24] *Tennessee v. NCAA*, 2024 WL 755528 (E.D. Tenn. Feb. 23, 2024).

[25] *See* https://www.tn.gov/attorneygeneral/news/2025/1/31/pr25-6.html.

objections (by some of the same objectors) in support of their motion for preliminary approval of settlement. *See* ECF Nos. 494 at 2-11; ECF No. 534 at 16-22; *see also* ECF No. 536 (Klonoff Opening Decl.). Consistent with their earlier briefing, Plaintiffs explain herein that Class Counsel provided adequate, indeed exceptional, representation for all classes and claims, and there are no conflicts that require separate counsel for any class members.

In the Ninth Circuit, when assessing adequacy of representation in class action settlements, courts ask whether "the named plaintiffs and their counsel have any conflicts of interest with other class members." *See In re Volkswagen Clean Diesel Mktg., Sales Pracs. and Prods. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018). Inadequate representation may be shown by "irreparable conflict[s] of interest" as indicated by "serious conflicts" in either the structure of the class or the terms of the settlement. *Id.* at 607-08 (citing *Hanlon*, 150 F.3d at 1021). As explained below, while there is diversity among class members, there are no such "irreparable conflict[s] of interest," much less ones that require separate settlement counsel. *See id.*; *In re Blue Cross*, 85 F.4th at 1091 (overruling conflict objection and noting that separate counsel is not required unless the conflict is "substantial and fundamental to the specific issues in controversy," in a case where the Hausfeld firm, representing one set of objectors here, was class counsel).[26]

Professor Klonoff also explained in his Opening Declaration that courts have recognized that there are costs of imposing multiple separately represented subclasses, including the potential for "Balkanization." Klonoff Opening Decl. ¶¶ 28-30 (citing, *inter alia*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d. 241, 271 (3d Cir. 2009), which held that, "[w]hile subclasses [with separate representation] can be useful in preventing conflicts of interest, they have their drawbacks," including the potential to "create a 'Balkanization' of the class action and [they] present a huge obstacle to settlement if each subclass has an incentive to hold out for more money" (citation omitted)). Indeed, a single group of lawyers, capable

---

[26] *See also* 1 Newberg and Rubenstein on Class Actions § 3:75 (6th ed. 2024) ("In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed."); *Cohen v. Brown Univ.*, 16 F.4th 935, 945-46 (1st Cir. 2021) ("The standard though is not 'perfect symmetry of interest' among the class . . . The perfect is sometimes the enemy of the good, and intra-class conflicts breach Rule 23(a)(4)'s adequacy-of-representation standard only when they are 'fundamental to the suit and . . . go to the heart of the litigation.").

of settling the entire controversy, may wield increased bargaining power that benefits all class members. *See, e.g.*, *Volkswagen*, 895 F.3d at 607 (explaining it was likely that the value of lesser-value claims were enhanced by being negotiated alongside the higher-value claims).[27] Thus, while certain potential conflicts may require *some type of adequate structural protection*, that does not necessarily mean separately represented subclasses, which is only one such option, and one with serious drawbacks. Klonoff Opening Decl. ¶ 30 (citing cases).[28] Here, there are no fundamental conflicts of interest between segments of the classes and, moreover, Class Counsel provided structural protections during the settlement negotiations to guard against potential conflicts. Separate counsel is not required or desirable in these circumstances.

### 1.    Separate Counsel is Not Required for the Injunctive Relief and Damages Classes

Two objectors—including the Vogelsong Objectors, who brought the competing *Fontenot* action—argue that Class Counsel could not adequately represent both the (b)(2) injunctive-relief and the (b)(3) damages classes, and that new counsel should be appointed to represent the injunctive relief class. *See* ECF No. 622 at 15-21 (Vogelsong Obj.); ECF No.614 at 8-15 (O'Bannon Obj.). These objections should be overruled for several reasons.

*First*, Professor Klonoff explains in his Declaration that numerous courts across the country—including the Ninth Circuit—regularly approve settlements where the same attorneys negotiated injunctive relief and damages. *See* Klonoff Opening Decl. ¶¶ 37-39 (citing cases, including the Eleventh Circuit's recent decision in *Blue Cross*, 85 F.4th at 1091). The Vogelsong Objectors know this: less than two years ago, their lead counsel successfully secured approval of a class action settlement in this District where they simultaneously negotiated a settlement for both injunctive relief and damages claims (without any indication that counsel took the prophylactic steps Class Counsel used here). *Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972, at * 16 (N.D. Cal. Mar. 29, 2023), *aff'd* 2023 WL 4824938 (9th Cir.

---

[27] *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("logic dictates that one set of negotiators, with the authority to release defendants from all claims, would be in a better bargaining position than negotiators with authority to compromise only part of the action").

[28] *See, e.g. In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir. 2015) (Even where there is a conflict, "'appointing separate counsel [is not] the only acceptable means of addressing any conflicting interests of class members, and providing structural assurance of fair and adequate representation for the entire class.'" (quoting *Prof. Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 646–47 (8th Cir. 2012)).

June 28, 2023). Plaintiffs pointed this out in previous briefing (ECF No. 534 at 16), but Vogelsong counsel did not offer a response in their objection.[29] And in the case relied on most heavily by the Vogelsong and O'Bannon Objectors, the decision in *Payment Card*, the Second Circuit held there is no *per se* rule against the same counsel representing both damages and injunctive relief classes. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 235 (2d Cir. 2016) (making clear it was *not* holding "that (b)(3) and (b)(2) classes necessarily and always require separate representation").

*Second*, Professor Klonoff explains that the sequential, separate negotiations employed here—negotiating the injunctive relief first and only then the damages—which he refers to as the "gold standard" to address potential conflicts, "provide[d] structural assurance of fair and adequate representation." Klonoff Opening Decl. ¶ 43 & n.52 (collecting authorities); *see Fata v. Pizza Hut of Am. Inc.*, 2016 WL 7130932, at *3 (M.D. Fla Oct. 31, 2016) ("[I]n particular, the extensive, arms-length negotiations performed separately by counsel on behalf of each Subclass, with the assistance of an experienced mediator, at least at the conditional certification stage, provide 'structural assurance of fair and adequate representation.'"); *see also, e.g.*, *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 485 (D.D.C. 2019) (holding "that the absent Rule 23 class members were adequately represented" based on the "representations" that counsel "negotiated the settlement amounts for the [two groups] separately" and "the apparent reasonableness of the settlement terms"). Importantly, as Professor Klonoff further explains, Class Counsel's structuring of the negotiations followed the well accepted practice to avoid conflicts in negotiating class settlements and attorneys' fees by first negotiating the class settlement and only then

---

[29] *See also, e.g.*, Pls.' Unopposed Mot. for Final Approval of Class Action Settlement and Mem. of Law in Support, *Taylor v. Serv. Corp. Int'l*, No. 0:20-cv-60709 (S.D. Fla. Jan. 12, 2023); *Fraley v. Facebook, Inc.*, 966 F.Supp.2d 939 (N.D. Cal Aug. 26, 2013) (other cases where Korein Tillery, counsel for the Vogelsong Objectors, simultaneously represented injunctive relief (b)(2) and damages (b)(3) classes in settlement class actions). Hausfeld, which also objected to the settlement on conflicts and other grounds, also has, several times, simultaneously represented (b)(3) damages and (b)(2) injunctive relief classes in settlements. *See, e.g.*, Developer Pls.' Renewed Mot. for Prelim. Settlement Approval, *In re Google Play Developer Antitrust Litig.*, No. 20-cv-05792-JD (N.D. Cal. Oct. 12, 2022); Final Order and J. Granting Approval of Subscriber Class Action Settlement and Appointing Settlement Administrator, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, No. 13-cv-20000-RDP (N.D. Ala. Aug. 9, 2022); Pls.' Mot. for Final Approval of Proposed Settlement, *In re Equifax, Inc. Customer Security Data Breach Litig.*, No. 1:17-md-02800-TWT (N.D. Ga. Dec. 5, 2019); Pls.' Unopposed Mot. for Final Approval of the Settlement, Certification of the Settlement Class, and Incorporated Mem. of Law, *In re The Home Depot, Inc. Customer Data Breach Litig.*, No. 1:14-md-02583 (N.D. Ga. Aug. 23, 2017).

negotiating fees. *See id.* ¶¶ 40-45 & nn. 51-57 (citing several cases, including in the Ninth Circuit).

Professor Klonoff opines that because appointing separate counsel is merely *one option* to address potential conflicts—and a costly and risky one at that—the careful, phased negotiations implemented by the Parties here more than adequately addressed any potential divergence of interest between the injunctive relief and damages classes. *See id.*; *see also* 1 McLaughlin on Class Actions § 4:45 (20th ed. 2023) ("Absent the kind of stark divergence of interests that is present in mass tort cases between present and future claimants, the district court has considerable discretion to decide whether appointment of separate counsel is required for a particular subclass.")

*Third*, the cases primarily relied on by the objectors—*Amchem*, *Ortiz*, and *Payment Card* most prominently—do not call for a different conclusion. Those courts indicated that separate counsel was needed because there was clear evidence that the rights and relief for some categories of class members had been traded away to benefit others, which is not the situation here.

In particular, the Second Circuit's decision in *Payment Card*, which held that the injunctive relief class there was inadequately represented and required separate counsel, is materially distinct from this case. *See* Klonoff Opening Decl. ¶¶ 46-51. There was no indication that class counsel in *Payment Card* utilized the sequential negotiation structure employed here, or indeed made any other effort to provide structural protections against (or even acknowledge) the myriad conflicts that permeated their settlement negotiations. Additionally, there was strong evidence that class counsel's simultaneous negotiations of injunctive relief and damages settlements actually resulted in trading valuable injunctive relief for enhanced damages. *Id.* ¶ 47. The adverse results for the Injunctive Relief Class in *Payment Card* were at least threefold—the *Payment Card* settlement (i) left vast portions of the injunctive class with worthless relief which terminated after a fixed period, (ii) while still binding them to a *perpetual* release of injunctive and damages claims, (iii) against *all* Visa and MasterCard rules, including those unchallenged in the litigation. *See Payment Card*, 827 F.3d at 240. Moreover, a critical fact in *Payment Card* was that the settlement occurred without a prior contested class certification motion, "making it especially vulnerable to conflicts of interest." *Id.* at 235-36 ("[W]e have blessed multi-class settlements that were the product of unitary representation, but those were entered into *after* class certification." (emphasis in original)); *see*

- 31 -

*also* Klonoff Open. Decl. ¶ 50 (explaining that the Supreme Court in *Amchem* also explained settlements obtained prior to contested class certification require heightened scrutiny).

None of these problems exist here. The injunctive relief that the parties negotiated is the opposite of worthless; it opens the door to *billions* of dollars in new compensation for the injunctive relief class every year. The settlement does not bind injunctive relief class members to a perpetual release of damages claims. And the settlement has a release that applies only to certain NCAA rules, and does not apply to employment law or Title IX claims.[30] Amended Settlement Agreement ¶ 1(vv)(2)–(3) (definition of "Unreleased Claims"). And this is all separate and apart from the billions of dollars in relief obtained for the damages classes through separate negotiations. Moreover, the settlements here followed a hotly contested class certification fight where this Court certified three damages classes and an injunctive relief class.

The absence of every *Payment Card* indicia of conflicts and tradeoffs between classes did not happen by accident—as Professor Klonoff explains, it was the result of the structure of the negotiations—and Class Counsel took great pains, with *Payment Card* at the front of their minds, to fully and finally negotiate the injunctive relief *before* negotiating damages to fully protect the interests of both the injunctive relief and damages classes. Klonoff Opening Decl. ¶¶ 40-45. Against that backdrop, Plaintiffs respectfully submit that the Court should conclude that Class Counsel did not trade injunctive relief benefits for damages (or vice versa). The separate negotiation structure ensured that there was no such trading between the benefits obtained and the proof is in the pudding. *Id.*

The Vogelsong Objectors argue the district court's decision denying preliminary approval after remand in *Payment Card* supports their conflicts argument "under similar circumstances." Vogelsong Obj. at 17-18 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614 (E.D.N.Y. June 28, 2024)). That is blatantly wrong as no alleged conflict between a (b)(2) and (b)(3) class was at issue *because the settlement involved a b(2) injunctive relief class only*. *Id.* at *6. Indeed, as Professor Klonoff points out, that the court found the settlement negotiated by separately appointed counsel to be inadequate shows the Vogelsong Objectors are wrong "in assuming that

---

[30] The settlement's release does extend to claims that the settlement distribution plan violates Title IX.

appointment of their attorneys to represent the injunctive class would be a silver bullet to ensure a new, strong injunctive relief settlement." Klonoff Opening Decl. ¶ 51. The court denied preliminary approval in *Payment Card* largely because the relief was not in the "range of reasonableness" (2024 WL 3236614, at *24-28), which is not the situation here, as this Court held at preliminary approval and as further demonstrated *supra*, in Sect. III.A, III.B.1.

As for *Ortiz* and *Amchem*, those cases involved attempts to settle millions of then-present and future mass tort damages claims covering decades of asbestos exposure. *See Ortiz v. Fireboard Corp.*, 527 U.S. 815, 823 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). This "elephantine mass of asbestos cases," and the attempts to resolve them through class settlements, led the Supreme Court to proclaim that *Ortiz* and *Amchem* "suffice to show how [asbestos] litigation defies customary judicial administration and calls for national legislation." *Ortiz*, 527 U.S. at 821. The primary (though not only) deficiency in these cases was that they attempted to settle pending damages claims and anticipated future damages claims, which the Supreme Court held could not be fairly compensated through a single, joint fund. *Id.* at 842–44. Neither case involved injunctive relief. *See generally Ortiz*, 527 U.S. 815; *Amchem Prods.*, 521 U.S. 591. This makes them entirely inapposite here, where no claims for damages in the future have been released.

The O'Bannon Objectors relatedly claim that separate counsel is required for *future* members of the injunctive relief class who they say were inadequately represented. O'Bannon Obj. at 8-9, 11; *see also* Volgelsong Obj. at 16; ECF No. 709 at 2 (objection also arguing class representatives are inadequate). But as explained previously (ECF No. 534 at 19-21), named plaintiffs and current and future athletes at the time of the settlement, Sedona Prince and Nya Harrison, were adequate representatives under Rule 23 because they "possess the same interests and suffer the same injury" as absent class members (including future athletes)[31]—being subject to the same NCAA and Conference Defendant rules as future athletes

---

[31] *See* Class Cert. Order (ECF No. 387), at 11 (quoting *Amchem Prods.*, 521 U.S. at 625-26). Ninth Circuit law is also clear that there is no requirement that there be a separate class representative for future athletes. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (approving injunctive relief settlement class of Boeing employees, including future employees, but rejecting the attorneys' fee provisions of the settlement); *see also Cohen*, 16 F.4th at 948-951 (rejecting argument that class representatives for injunctive relief class were inadequate and conflicted even where at time of latest

that limit or prohibit permissible forms and amounts of compensation and benefits. Moreover, the structural protections discussed above ensured that Class Counsel focused on maximizing (and have achieved) ground-breaking injunctive relief, before even discussing damages. Additionally, the fact that the injunctive relief extends ten years into the future is in line with approved class settlements in other cases, particularly in cases resolving the class claims of athletes in the sports industry, where long-term solutions are often desirable. *See* ECF No. 450 at 22-23 (collecting authority). And unlike in several of these sports cases (*e.g.*, *White*, *Robertson*, and *Bridgeman*), future athletes will receive notice of the settlement upon entering college and will have the opportunity to object to the continuation of the settlement. *Id.* at 14-15. Moreover, and contrary to the claims of the objectors, if future student-athletes wish to sue for damages, they can do so with an attorney of their choice, consistent with Paragraph 46 of the Amended Settlement Agreement. Thus, there are no indicia of conflicts requiring separate counsel for future injunctive relief class members and the settlement provides them with additional safeguards to protect their interests, all the while also giving them the opportunity to receive tens of billions of dollars from revenue sharing with schools, made possible by the injunctive relief settlement. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1124 (9th Cir. 2020) ("the settlement's benefits must be considered by comparison to what the class actually gave up by settling").

### a. Professor Silver's Declaration in support of the Vogelsong Objectors is unpersuasive.

In response to Professor Klonoff's Opening Declaration, the Vogelsong Objectors offer a declaration by Professor Charles Silver. *See* ECF No. 622-2 ("Silver Decl."). Professor Silver opines that the conflict of interest between the injunctive relief (b)(2) class and the (b)(3) damages class here is irreconcilable and could only be cured by informed consent, which "cannot be obtained in class actions," thus requiring that separate counsel be appointed. *Id.* ¶ 9. Professor Silver criticizes counsel's use here of sequential negotiations as a structural device to reduce or eliminate potential for conflicts, opining that even the well-accepted practice of negotiating fees only after other relief shows only that judges have

---

settlement none were currently participating in sports at the subject university, which is not the case here). There is also no merit to the objection that the class representatives do not have a male basketball player. *See* ECF No. 705 at 27-34. The interest of male basketball players were substantially the same as those of football players, for which there are class representatives: Tymir Oliver and DeWayne Carter.

allowed an "obvious violation of the fiduciary duty . . . ." *Id.* ¶¶ 35-46. As Professor Klonoff explains in a Supplemental Declaration concurrently submitted herewith ("Klonoff Suppl. Decl."), by taking this position "Professor Silver urges this Court to reject a well-recognize method for reducing or eliminating conflicts, even though he cites no authority for his position, and even though his position (if accepted) would put this Court in conflict with countless other courts[.]" Klonoff Suppl. Decl. ¶ 7 (noting that cases in the Ninth Circuit have recognized the effectiveness of the sequential approach).

Professor Silver relies heavily on *Payment Card*, but as Professor Klonoff points out, Professor Silver ignores the critical differences between that case and these circumstances. *Id.* ¶¶ 12-23. For example, Professor Silver does not consider that while the injunctive relief was worthless to most class members in *Payment Card*, the injunctive relief here is extraordinary and historic for class members. Professor Silver references and does not dispute Professor Klonoff's characterization of the settlement as historic, but then fails to compare the transformative benefits obtained here to the minimal settlement benefits most of the (b)(2) class received in *Payment Card*. *Id.* ¶ 15. Moreover, unlike here, there was no prior contested class certification motion in *Payment Card*, which Professor Silver in other court submissions has acknowledged—consistent with the prevailing case law—should play a major role when a court evaluates the fairness of a settlement. *Id.* ¶¶ 16-23.

Similarly, Professor Silver fails to discuss or distinguish the numerous cases cited by Professor Klonoff where courts found no conflict with the same attorneys representing both the damages class and the injunctive class in settlements, or to provide guidance as to when that should be permitted. *Id.* ¶¶ 5, 12, 24. Ultimately, Professor Silver espouses the view that "fiduciary law has not embraced the view that prophylactic measures can cure conflicts." Silver Decl. ¶ 18. But as Professor Klonoff explains, "virtually every class action has differences among class members; and in virtually every class settlement an objector could argue for some sort of subclassing with separate representation. [Professor Silver's] approach would vastly complicate class settlements because objectors, eager to seek their own attorneys' fees or side payments—or to secure appointment as additional class counsel—would inevitably (and routinely) mount myriad challenges." Klonoff Suppl. Decl. ¶¶ 33-34 (explaining that such an approach would also be "exactly the opposite of the approach courts and authoritative treatise authors have taken"). In a publication following *Amchem*, Professor Silver agreed with these concerns and explained that "'a

- 35 -

standard of zero tolerance for conflicts is impossible to defend or meet. Class counsel must be allowed to incur and resolve many conflicts. Otherwise, they cannot make the strategy calls and financial decisions that have to be made for class actions to proceed.'"[32] That is exactly what Class Counsel did here.

The Vogelsong Objectors also rely, in part, on Professor Silver to argue that the settlement's fee provisions raise conflict concerns because Class Counsel are "only" requesting a $20 million flat upfront injunctive fee, but "20% of the NIL Settlement Fund" and "10% of the Additional Compensation Fund." *See* Vogelsong Obj. at 20; Silver Decl. ¶¶ 28-30. As an initial matter, this is an inaccurate description of the fee request, which includes a portion based on the value of the injunctive relief that class members actually receive over the settlement term. Further, as explained previously, Class Counsel negotiated the attorneys' fee provisions in the injunctive relief settlement separately and only after the substantive settlement terms were agreed to, so they would not create any conflicts. ECF No. 494 at 5 n.4; Klonoff Suppl. Decl. ¶ 10. Moreover, the Vogelsong Objectors completely omit from their briefing—though Professor Silver admits it in his footnote 6—that Class Counsel's fees are in fact tied to the value of the injunctive relief, because they have requested to seek up to 1.25% of the total amount spent by Division I member institutions under the revenue Pool for each academic year during the injunctive relief term, which could equate to $250 million over ten years. *See* ECF No. 583 at 14; Klonoff Suppl. Decl. ¶¶ 10-11. Finally, if large fee awards tied to a class's recovery automatically created conflict concerns, this would inappropriately disincentive Class Counsel from maximizing relief.[33]

### 2. Separate Counsel is Not Required For Any "Sub-Groups" Within the Damages Classes.

---

[32] Klonoff Suppl. Decl. ¶ 35 (quoting Charles Silver & Lynn Baker, *I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds,* 84 Va. L. Rev. 1465, 1499-1500 (1998)).

[33] The Vogelsong Objectors also shamelessly and disingenuously claim that a letter from Class Representatives Sedona Prince, Grant House, and Nya Harrison "complained" that the "proposed injunctive relief is inadequate." Vogelsong Obj. at 2, 15, 17, 20. But a plain reading of the letter shows that they believe that the "landmark settlement agreement" is a "significant step forward" that "will unlock billions of dollars for athletes past, present, and future." ECF No. 580. While lauding the settlement agreement, they also believe that there should be a "players' association" to provide "independent representation" and collective bargaining. *Id.* They do not say or imply that the injunctive settlement terms are inadequate. Moreover, the settlement agreement is clear that it imposes no impediment to establishing a players' association or collective bargaining (Am. IRS Art. 7 § 2), and while it takes no position on these steps, Class Counsel applauds the continued organizing and advocacy of the class representatives, which affirms their adequacy as class representatives.

1    Certain objectors also argue that there were conflicts within the Damages Classes, requiring that

2    separate counsel be required for different class segments. *See* Vogelsong Obj. at 5-9, 11-15; O'Bannon

3    Obj. at 9-15. However, courts "often" allow unitary counsel to represent classes with "different payment

4    levels reflect[ing] the relative value of different claims. . . . Such rigid formalism [as requiring separate

5    subclasses with separate counsel for every potential 'conflict' created by the different value of class

6    claims] would produce enormous obstacles to negotiating a class settlement with no apparent benefit, is

7    not required and could even reduce the negotiating leverage of the class." *In re Oil Spill by Oil Rig

8    Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012), *aff'd sub nom. In re

9    Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). The Ninth Circuit held in *Volkswagen*, for example,

10   that no conflicts precluded adequate representation in a single settlement class comprised of different

11   groups of vehicle owners with different claims because the settlement properly reflected the differing

12   value of the claims. *Volkswagen*, 895 F.3d at 608-09; *see also Fraley*, 638 Fed App'x at 597-98 (rejecting

13   objection where the same counsel represented multiple subclasses and noting "a difference in the value of

14   claims does not necessarily mean there is a structural conflict of interest requiring separate counsel").[34] In

15   fact, it was likely that the value of lesser-value claims were *enhanced* by being in the same class as the

16   higher-value claims. *See id.* Once again, the Court may scrutinize the settlement every which way and

17   find tremendous value for all the various claims and class members at issue. No differences among

18   damages class members required separate counsel here.

19          a.    **Damages for athletic services claims.**

20          The Vogelsong and O'Bannon Objectors argue that Class Counsel provided inadequate and

21   conflicted representation to damages class members to settle their athletic-services compensation claims

22

23          [34] Decisions from other courts are in accord. *See, e.g.*, *Charron v. Wiener*, 731 F.3d 241, 253-54 (2d
     Cir. 2013) ("[a]ll class settlements value some claims more than others, based on their perceived

24   merits, and strike compromises based on probabilistic assessments"; these types of compromises do not
     "automatically create[] subclasses that require[] separate representation"); *Petrovic v. Amoco Oil Co.*, 200

25   F.3d 1140, 1146 (8th Cir. 1999) ("If the objectors mean to maintain that a conflict of interest requiring
     subdivision is created when some class members receive more than other class members in a settlement,

26   we think that the argument is untenable. It seems to us that almost every settlement will involve different
     awards for various class members."); *cf.* 4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed.)

27   ("The inference that differential treatment is the sign of an unfair settlement can be rebutted by evidence

28   that the class members should be treated differently because they are situated differently.").

- 37 -

because the Settlement also resolved the NIL-based damages claims. *See* Vogelsong Obj. at 6-8; O'Bannon Obj. at 9. Objectors contend that the evidence of the conflict includes that there is not a perfect overlap of the damages class members seeking these claims, the NIL Compensation Fund is larger than the Additional Compensation Fund (which resolves the athletic-services claims), and the former recovery is a larger percentage of single damages than the latter. *See id.*

These arguments are mistaken because, first, counsel took the structural protections against conflicts by separately negotiating the NIL damages claims and the additional compensation claims based on separate assessments of their value, resulting in separate settlement funds for each type of claim, with separate, neutral allocation formulas for each. ECF No. 494 at 4-7. That distinguishes these facts from the case relied on most prominently by objectors, the decision in *Literary Works*, where the court held that counsel provided inadequate representation to the holders of one of three types of claims because the settlement created a single, capped common settlement fund with an allocation formula to split the fund among the three groups and placed the risk that claims would exceed the capped amount *only* on the backs of the holders of one type of claim, as opposed to all three, "provid[ing] strong evidence—in the 'C' reduction—of inadequate representation." *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250-56 (2d Cir. 2011).[35] Unlike here, the court had no assurance that class counsel did anything to account for divergent interests when it negotiated on behalf of the entire class. *Id* at 256. In this case, by contrast, each category of class members' damages was settled for a separate amount reflecting the different litigation risks and damages calculations. And class members' recovery for one category of damages is entirely independent of recovery for the other damages categories.[36]

---

[35] This also distinguishes this case from *Murray v. Grocery Delivery E-Servs. USA Inc.*, another case relied on by the Vogelsong Objectors, where there was a single lump settlement fund created for groups of class members with different types of claims. *See* 55 F.4th 340, 346 (1st Cir. 2022).

[36] The neutral allocation formula for the NIL claims, based on Dr. Rascher's methodologies at class certification that this Court held were reliable, also shows why the O'Bannon Objectors are wrong that there is a conflict between athletes who played before and after the *Alston* decision. *See* O'Bannon Obj. at 11. No matter when an athlete played, their settlement allocation is based on a neutral allocation formula that estimates what the world would have looked like but-for the challenged conduct. Thus, whether an athlete played before or after the Interim NIL Rules, for example, does not affect how the neutral allocation formula is applied or favor certain athletes based on the rules that were in force when the athlete played.

Also unlike *Literary Works*, Plaintiffs have put forward extensive evidence that the Additional Compensation Fund provides settlement class members with an excellent recovery: a $600 million fund representing approximately 31.6% of the value of the claims. ECF No. 450-4 ¶ 49; *see also* cases cited *supra*, in footnote 9. In their earlier objection, the Vogelsong Objectors offered the declaration of Ted Tatos to dispute the strength of the recovery, but in a Reply Declaration, Dr. Daniel Rascher explained that Tatos's conclusions are based on faulty economics and a profound misunderstanding of the data. *See* ECF No. 494 at 12-15 (discussing and citing Rascher Reply Declaration, ECF No. 493-3). Notably, while that Reply Declaration was filed in August 2024, the Vogelsong Objectors offer no new expert testimony, by Mr. Tatos or anyone else, to dispute Dr. Rascher's conclusions and rebuttal of Mr. Tatos regarding the strength of the recovery for the athletic-services compensation claims.

Insofar as an excellent 31.6% recovery on Additional Compensation Fund claims is lower than the settlement percentage recovery for the NIL damages claims, that difference reasonably reflects the differing value of those claims and particular obstacles to recovery. *See Deepwater Horizon*, 910 F. Supp. 2d at 918, *supra*; *Volkswagen*, 895 F.3d at 608–09, *supra*; cases and other authorities cited in footnote 34. The Vogelsong Objectors respond only in conclusory fashion that "[f]rom a class certification standpoint the fair pay claims should be just as strong as the *NIL Litigation* claims." Vogelsong Obj. at 10. That argument is striking in its detachment from reality. Several previous cases (including this Court's decision in *O'Bannon*) indicate that certifying damages classes for pay-for-play claims would be very difficult. ECF Nos. 450 at 18-19; 494 at 13. And even *if* such classes could be certified, the Vogelsong Objectors also ignore that *this Court* rejected pay-for-play claims not tethered to education just several year ago in *Alston*. In fact, the Court held after a 10-day trial, that the NCAA's rules prohibiting unlimited cash compensation for athletic services were *procompetitive*. *See* ECF No. 494 at 13-14 (citing *In re NCAA Athlete Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019); ECF No. 450 at 20. Then the Supreme Court unanimously affirmed the trial result. *See NCAA v. Alston*, 594 U.S. 69 (2021).

Furthermore, challenges to Defendants' NIL restrictions were strengthened when Defendants relaxed their NIL restraints with no perceivable harm to college athletics, exposing their prior restraints as unjustified. But Defendants have not changed their prohibition on pay-for-play compensation, which

- 39 -

1   this Court has twice upheld as lawful. Given these challenges to pay-for-pay claims, it is likely that, as the

2   court concluded in *Volkswagen*, 895 F.3d at 607-08, the value of such athletic services claims was

3   enhanced by being part of the settlement here that also include the NIL damages claims.

4         The Vogelsong Objectors' lack of any meaningful response on any of these points is telling. They

5   have had months since they began objecting to proffer evidence and experts as to how they would certify

6   this class and proffer nothing. Instead, they pivot to fancifully claim that they are the first-and-only

7   plaintiffs expressing a real interest in litigating antitrust claims for athletes' services, and that Class

8   Counsel rushed to settle these claims and did not have the information available to properly value them.

9   That is another demonstrable falsehood. As just recounted, Class Counsel first brought those claims in

10  this District in 2014 in the *Alston* litigation, saw them through trial, through the Ninth Circuit, and through

11  Supreme Court review. Class Counsel intended to bring claims for additional compensation for athletic

12  services, similar to those raised in *Alston*, after the class certification decision in *House* and informed

13  Defendants of this intention during settlement negotiations. ECF No. 494-1, Joint Decl. of Steve W.

14  Berman and Jeffrey L. Kessler in Further Support of Pls.' Mot. for Prelim. Settlement Approval, ¶ 9.

15  Discovery obtained in *Alston*, as well as in *House*, addressed issues relevant to the athletic services claims

16  and informed Class Counsel's assessment of valuation and risk of those claims during settlement

17  negotiations. *Id*. at ¶ 10.

18        Although *Alston* was a tremendous victory, there is no denying that the outcome was much more

19  modest than what Class Counsel sought in that case and what the *Fontenot* plaintiffs seek in their copycat

20  lawsuit. The Vogelsong Objectors ignoring—rather than confronting—these realities undermines their

21  objections. *Alston*—litigated for over seven years by Class Counsel before this Court—was the first case

22  to challenge Defendants' restraints on compensation for athletic-services compensation and faced

23  daunting obstacles at every turn. The Vogelsong Objectors, by contrast, did not bring any claim on behalf

24  of college athletes until nine years later—in the Fontenot action filed in December 2023—after this Court

25  certified the classes in *House*. Moreover, the discovery obtained in *Alston*, as well as in *House*, addressed

26  issues relevant to the athletic services claims and informed Class Counsel's assessment of valuation and

27  risk of those claims during settlement negotiations.

28

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
CASE NO. 4:20-CV-03919-CW

010912-11/3050037 V1

### b.     Damages for claims based on scholarship limitations.

The Vogelsong Objectors, repeating their objections from preliminary approval, contend that the proposed settlement "provides no compensation and exemplifies inadequate treatment representation" for the scholarship claims asserted by Vogelsong counsel in *Cornelio* on behalf of partial-scholarship recipients. Vogelsong Obj. at 11-15. The objections fail on the facts and law.

*First*, while Vogelsong counsel slapped together the *Cornelio* complaint in the week *following* Plaintiffs' motion for preliminary approval, they provide no explanation of how they will get a partial scholarship class claim certified, *e.g.*, how they will model class-wide antitrust impact and damages from the NCAA scholarship limits alone, when there is a long history of failure to do so in previous cases. *See* ECF No. 494 at 15-17 (citing cases). They have had months from preliminary approval to make some showing how these claims could be certified but have offered the Court no plan, no case law, and no expert opinion to back up their claims. Given this litigation history, it was reasonable for counsel to conclude that past damages for NCAA scholarship restrictions alone have *de minimis* value. And as explained, it is common and reasonable for settlements to value different claims differently based on their probabilistic value. Notably, despite Plaintiffs' lengthy prior discussion of the immense difficulties of certifying scholarship claims, the Vogelsong Objectors fail to address this at all in their current objections— demonstrating that they have no response. They offer no class certification plan, no experts and no impact and damage methodologies and fail to distinguish the denial of certification in the *Walk On* case. *See In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D. Wash. May 3, 2006) (denying class certification).

*Second*, it is false that such damages claims were released without any compensation. As explained previously, Dr. Rascher's analysis already accounts for athletes receiving the full 50% revenue share absent the restraints on compensation for athletic services (including the NCAA scholarship limits), *i.e.*, there are no more damages to claim without pursuing *more* than the 50% share for the athletes. *See* ECF No. 494 at 16. Class Counsel, accounting for the substantial litigation risks, settled for 31.6% of the estimated potential damages. This outcome is far more than reasonable. *See Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *13 (C.D. Cal. Apr. 29, 2014) (finally approving settlement and rejecting

1  objection "that the settlement does not compensate" certain car owners who "would likely find it difficult

2  to prove their damages").

3      While the Vogelsong Objectors claim at page 14 that named objector Alex Vogelsong "is not

4  receiving any pay for athletic services," that is false. As a matter of fact, Mr. Vogelsong made a claim and

5  is set to receive a settlement allocation for compensation for athletic services, as well as for lost NIL

6  opportunities (and a *Hubbard* payment). Peak Decl. ¶ 38. The objectors also claim that the announcement

7  of one school to raise the number of scholarships for baseball indicates that damages for such claims for

8  a class of all sports at all Power Five Schools "are many hundreds of millions of dollars if not more."

9  Vogelsong Obj. at 13. But they provide no evidence that this "extrapolation" is based on reasonable

10  economics,[37] and they have never addressed the class certification obstacles that Plaintiffs have pointed

11  out plague such claims. All that said, if class members believed that they have larger partial scholarship

12  claims to pursue on an individual basis, they could have opted out. *See Fraley*, 638 Fed App'x at 597-98

13  (rejecting objection where the same counsel represented multiple subclasses and noting that members of

14  the lowest-recovering subclass with concerns were "free to opt out").[38] And if these claims were truly

15  worth hundreds of millions, it's inconceivable that the plaintiffs' bar would not have brought them years

16  ago.

17  ### 3.    The Hausfeld Objectors Raise No Legitimate Conflicts

18      The Hausfeld Objectors contend that the Injunctive Relief Settlement Agreement is "embedded"

19  with "numerous 'indicia of conflict.'" ECF No. 613 at 2-6. Most of the supposed "indicia" are merely

20  claims that the relief obtained is inadequate, which is shown in Section III.B.1, *supra* to not be a proper

---

[37] *See* Rascher Final Approval Decl.¶¶ 95-99.

[38] The *Community Bank* and *Gonzalez* cases cited by the Vogelsong Objectors are also not remotely on point. The Third Circuit in *Community Bank* rejected a proposed settlement and remanded for further proceedings because the district court failed to conduct a proper analysis of alleged inter-class conflicts and purported inadequacies of counsel's representation. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304-08 (3d Cir. 2010). The Circuit Court "stress[ed] that [it] does not hold that class counsel are necessarily inadequate representatives for the class (or any subclass that is created)." *Id.* at 308. And *Gonzalez* declined to approve an "indelibl[y] stain[ed]" settlement agreement. *Gonzalez v. CoreCivic of Tenn., LLC*, 2018 WL 4388425, at *5 (E.D. Cal. Sept. 13, 2018). There, class counsel agreed to release certain claims without securing any relief, and when the district court pointed out that discrepancy, the parties amended the settlement agreement to cosmetically allocate $100,000 of the "already agreed-to total settlement amount" to those claims. *Id.*

ground for objecting to a class action settlement approval.[39] These Objectors also wrongly claim that there is a purported conflict because Class Counsel has allegedly agreed to "support the position that the Court's approval of the proposed settlement provides an automatic antitrust defense and to support an effort to secure Congressional antitrust immunity if that argument fails . . . ." ECF No. 613 at 4-5. Wrong again.

Class Counsel has not agreed that this settlement provides Defendants with a broad, automatic antitrust defense from any future antitrust claims. What the settlement *actually* says is that Class Counsel will support federal or state legislation implementing the settlement, and they will cooperate in support of legislation codifying that "conduct undertaken by Defendants in compliance with or to implement the terms of this Injunctive Relief Settlement" does not violate the antitrust laws. *See* Am. IRS Art. 7 § 1. In other words, Class Counsel has agreed to take the unremarkable legislative position that the settlement terms and acts taken to comply with or implement the settlement should not be antitrust violations. Put yet another way, because Class Counsel is of the firm conviction that the Settlement is in the best interests of the classes, Class Counsel agreed to cooperate with Defendants to help ensure the settlement is effectuated. That does not indicate any conflict with the Class. Rather, it demonstrates Class Counsel's alignment with the interests of the Class.

**D.    NCAA-Imposed Roster Limits Do Not Provide a Basis for Denying Final Approval**

### 1.    NCAA Roster Limits Do Not Alter the Conclusion That the Settlement Agreement is Overwhelmingly Fair and Reasonable to the Class

Out of hundreds of thousands of class members,[40] 269 have objected to the fact that the Injunctive Settlement does not prohibit the NCAA from imposing the roster limits specified in Appendix B. They argue that these roster limits adversely impact non-scholarship athletes by reducing the number of available positions on various teams. Such a myopic focus on available roster spots for walk-on (non-

---

[39] Notably, in the *Blue Cross* case where the court rejected several conflict arguments, including that class counsel could not simultaneously represent a damages and injunctive relief class, Hausfeld LLP served as class counsel and argued, among other things, that "'the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict be a *fundamental* one going to the specific issues in controversy." Subscriber Pls.' Reply Mem. of Law in Support of Prelim. Approval at 7-9, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP (N.D. Ala. Nov. 23, 2020) (quoting *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003)).

[40] This excludes the submitted Change.org petition (ECF No. 691), many of the signatories to which were non-class members with no standing to object, and other of the total 370 objectors to the roster limits that are non-class members.

scholarship) athletes, however, is not a basis for disapproving the settlement. Rather, Rule 23 mandates a holistic assessment, *see Hanlon*, 150 F.3d at 1026, and that assessment demonstrates that the settlement provides life-changing benefits—including eliminating NCAA caps on available scholarships—that far outweigh the roster-spot harms asserted by these few objectors.

The potential reduction in walk-on roster positions is outweighed by the $20 billion worth of direct compensation and benefits that the settlement will yield for class members over the next ten years. And the Settlement Agreement is explicit that roster limits may not be lower than the number of scholarships previously permitted by the NCAA and otherwise may not cause any athlete to lose his or her scholarship. *See* Amended Settlement Agreement Art. 4 § 1.[41] The upshot is that the Settlement Agreement will create *more* scholarships for Division I athletes—which Dr. Rascher estimates could lead to the opportunity for more than 115,000 additional scholarships available to class members annually, with more than 24,000 possible new scholarships at Power Five institutions that are most likely to spend more under the settlement. Rascher Final Approval Declaration ¶ 74 Ex. 5. That number dwarfs the small number of athletes who have objected because they may lose a walk-on spot on a team.

To be sure, losing a roster spot is no small matter for those impacted. But just like the least competitive walk-on athletes may lose a roster spot under the settlement, the more competitive walk-on athletes may now enjoy an athletic scholarship that was previously unavailable to them. On balance, that is an extremely reasonable compromise. *See White v. Nat'l Football League*, 822 F. Supp. 1389, 1405-06 (D. Minn. 1993) *aff'd*, 41 F.3d 402 (8th Cir. 1994) ("If [] the court concludes that the Settlement Agreement as a whole is fair, reasonable and adequate to the class, its inquiry is ended and it should approve the entire settlement. … Thus, even if it were sympathetic to objections directed at one or more provisions of the Settlement Agreement, the court may not pick and choose which provisions to approve and which to disapprove.").

---

[41] Three current-athlete objectors indicated that their scholarships have been impacted by the roster limits. Class counsel has reached out to all three to inform them of this protection in the settlement agreement and help them address any issue.

Further, for 26 out of 46 sports, the NCAA-imposed roster limits still allow for more roster positions than the current average squad size for the respective sports.[42] Rascher Final Approval Decl. ¶¶ 71-72. In other words, for nearly 2/3 of NCAA sports, the roster spots being eliminated were on average not occupied by any athlete anyway. Only nine objectors have indicated they have actually been cut from their teams.[43] And 58% (156 out of 269) of the current-athlete class members who objected to the elimination of roster spots play a sport where the NCAA's new roster limit is larger than the current average team size, so their fears may very well be unfounded.

Moreover, outside of the Power Four conferences who are defendants in this case, there will be no new NCAA roster limits unless member institutions choose to opt-in to the revenue sharing model outlined by the settlement. Thus, to the extent that schools and conferences elect not to share revenues with athletes under the settlement, as the Ivy League and William & Mary have already announced, then athletes at such schools will not be impacted by any NCAA roster limits at all.[44] In fact, 24 class member objectors, all represented by Molo Lamken, are athletes at schools in the Ivy League and William & Mary, who will not be impacted at all by the roster limits that they are complaining about.

Viewed in context, the limited adverse impact of the NCAA and conferences remaining able to establish roster limits does not come close to outweighing the overall beneficial impact to the class from the settlement. *See, e.g. Bayat v. Bank of the W.*, 2015 WL 1744342, at *6 (N.D. Cal. Apr. 15, 2015) (granting final approval even though a large number of class members were "*worse off* as a result of th[e injunctive relief] settlement"); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 1415508 (D.

---

[42] For an additional eight sports, the roster limit is less than 1 slot lower than the current average team size. Rascher Final Approval Decl. ¶ 71 Ex 2.

[43] Of those, 5 are SEC men's swimmers (and 27 of the total 269 class member objectors are SEC men's swimmers). The NCAA has set a roster limit of 29 for men's swimming and diving, which is higher than the current average participation in Division I. The SEC, however, enacted a lower roster limit of 22. *See* Sophie Kaufman, *Sources: SEC Will Set Men's Swim & Dive Roster Limits at 22 Athletes in Wake of House v. NCAA*, SWIMSWAM (Oct. 18, 2024). Thus, lost SEC swimming and diving roster spots are not because of the NCAA roster limits set forth in the Appendix B to the Settlement Agreement.

[44] *See* Noah Henderson, *Ivy League Declines NIL Revenue Sharing Amidst House Settlement Changes*, SPORTS ILLUSTRATED (Jan. 23, 2025); *William & Mary to Opt-In to House Settlement in 2026*, *available at* https://tribeathletics.com/news/2025/2/28/tribe-athletics-william-mary-to-opt-in-to-house-settlement-in-2026.aspx

1   Kan. Apr. 24, 2012), *aff'd*, 872 F.3d 1094 (10th Cir. 2017) (granting final approval over objection "that

2   the proposed injunctive relief will hurt class members").

3       The decision in *White v. National Football League*, the antitrust class action that introduced free

4   agency for NFL players, is directly on point. There, a number of objectors to the class settlement argued

5   that some class members would be worse off under the free agency created by the injunctive relief due

6   to increased competition from other class members. 822 F. Supp. 1389, 1405-06 (D. Minn. 1993) *aff'd*,

7   41 F.3d 402 (8th Cir. 1994). Similarly, defendants in *White* opposed injunctive-class certification by

8   arguing that introducing free agency would benefit some class members while hurting others because a

9   starting position gained through free agency by one class member would mean a starting position lost by

10  another class member. *See* Defs.' Opp'n to Pls.' Mot. for Injunctive Class Certification at 10, *White v.

11  Nat'l Football League*, No. 4-92-CIV-906 (D. Minn. Nov. 3, 1992).[45] The *White* court rejected these

12  arguments because, as here, on balance the settlement served to increase competition for player services

13  while providing tremendous benefits to the class that outweighed any claimed detrimental impact:

14          Taken as a whole, the revised player employment rules set forth in the Settlement
            Agreement constitute a new and unique approach to player employment in the NFL.
15          Class counsel and the NFLPA believe that the entire Agreement will benefit the
            overwhelming majority of the players in the NFL, and raise salaries throughout the
16          league.

17  *White*, 822 F. Supp. at 1426; *see also id.* at 1405 (also noting that "on numerous occasions, courts have

18  certified settlement classes consisting of all players in a particular sports league." (citing cases)).

19      It also bears emphasis that roster limits are something the NCAA could have always done. *See*

20  Settlement Agreement Art. 4 § 1 ("The NCAA *may* adopt Division I roster limits . . ." (emphasis

21  added)). And, as for conference-imposed roster limits, the Settlement Agreement is completely silent.

22  That is important because a number of the objectors are not complaining about the NCAA roster limits

23  permitted (but not required) by Appendix B; they are complaining about lower roster limits announced

24  *by conferences. See, e.g.*, ECF No. 628-5 at 225 ("I only realized the roster limits would seriously

25  impact me when the SEC announced a further cut to the NCAA roster limits with a 22-man roster."); *id.*

26  at 2 (similar). But that is not an objection to anything in the Settlement Agreement. Moreover, the

27

28      _____

    [45] *See Alston*, No. 4:14-md-02541-cw (N.D. Cal. June 26, 2015), ECF No. 230-5.

Conference Defendants already limit the number of athletes that can "dress" for and travel to competitions, and virtually all of those limits are lower than or equal to the NCAA's roster limits.[46] Yet these limitations likewise have nothing to do with the Settlement Agreement.

Finally, as with other aspects of the settlement, there is no release of antitrust treble damages claims related to the future implementation of roster limits, and non-class members (e.g. any student who is not able to play Division I sports) are not subject to the settlement release.

### 2. Roster Limits Do Not Pose "Conflicts" Precluding Final Approval

Certain objectors complain that the roster limits have additionally "exposed serious intra-class conflicts." ECF No. 628 at 17; ECF No. 641 at 1; ECF No. 627 at 2. This Court has considered—and rejected—similar arguments in certifying the litigated classes in this very case (*see* ECF No. 387), in *Alston* (311 F.R.D. 532, 546 (N.D. Cal. 2015)), and in *O'Bannon* (2013 WL 5979327, at *6). Defendants repeatedly argued that substitution effects for scholarships or positions on the team created class conflicts fatal to certification. Each time, the Court rejected those arguments. As this Court recognized, if promoting competition for class members' services—the *objective* in any antitrust case concerning a labor market—posed an insurmountable conflict, it would doom litigation and settlement class certification in all such cases. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 311 F.R.D. at 546 ("If the fact that illegal restraints operate to the economic advantage of certain class members were enough to defeat certification, the efficacy of classwide antitrust suits—and the deterrence function they serve—would wither:"). This is anathema to the Sherman Act.

It is therefore unremarkable that numerous courts have found that class conflicts are not created by fostering competition among class members. *See, e.g.*, *Sims v. Montgomery Cnty. Comm'n*, 890 F. Supp. 1520, 1529 (M.D. Ala. 1995), *aff'd sub nom. Sims v. Montgomery Cty. Comm'n*, 119 F.3d 9 (11th Cir. 1997) (approving settlement setting procedures for promotions where there "is no delineation among class members as to the applicability of any provision contained in the proposed decree … [and] "the settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same" (internal quotations omitted)); *Meiresonne v. Marriott Corp.*, 124

---

[46] *See* 2022-23 ACC Manual §§ 3.1.6, 3.8.2.2; 2022-23 Big 12 Conference Handbook § 10.4; 2021-22 Big 10 Conference Handbook §§ 16.8.2, 16.8.3; 2024-25 SEC Commissioner's Regulations at 22–23.

F.R.D. 619, 625 (N.D. Ill. 1989) (rejecting argument that "because class members compete against *each other* for the same promotions, none can adequately represent the class . . . In the universe Marriott would create, discrimination law would be simpler because class-discriminatory promotion would be cost-free." (internal citations omitted, emphases in original)); *Sharif by Salahudding v. N.Y. State Educ. Dep't*, 127 F.R.D. 84, 88 (S.D.N.Y. 1989) (rejecting argument that because of a limited number of scholarships, "any change in the scholarship criteria would benefit some females at the expense of others who would win a scholarship but for the change").

In *Cohen*, the First Circuit upheld the grant of final approval of a revised settlement agreement between a class of female college athletes and the university over objections that there was an irreconcilable intraclass conflict between athletes of different teams. 16 F.4th at 949-51. Objectors argued that class members whose teams had been cut had conflicting interests from class members whose teams had not been cut because the latter preferred the status quo. *Id.* The First Circuit affirmed, holding that there was no conflict because there was "a significant interest common to all student-athletes" even though "this interest may have been less important" to some students than others. *Id.* at 950.

As in *Cohen*, all class members here—antitrust plaintiffs—share a common interest in obtaining a more competitive market through the availability of increased compensation, benefits and scholarships. *Cf. In re NCAA GIA*, 311 F.R.D. 532, 542 ("class members might prefer to leave an unlawful restraint in place because they otherwise would have to compete against one another, [but] such preference for non-competition does not justify denying injunctive relief class certification"). The fact that enhanced market competition may not benefit every class member is not a defect in the Settlement Agreement, it is an existential reality of successfully resolving antitrust claims.

## E.        There Are No Title IX Issues Raised by The Settlement

A subset of objectors argue that the settlement undercompensates female athletes and therefore violates Title IX. *See* ECF Nos. 613, 618, 628, 631, 638, 647, 665, 670, 671, 674. This argument is misplaced.

As an initial matter, the question of whether Title IX applies to the types of payments contemplated under the injunctive relief settlement remains unresolved. The objectors argue that Title IX applies to NIL

revenue sharing payments from institutions, relying on a Fact Sheet that was issued by the Department of Education's Office for Civil Rights (OCR) on January 16, 2025, which stated: "When a school provides athletic financial assistance in forms other than scholarships or grants, including compensation for the use of a student-athlete's NIL, such assistance also must be made proportionately available to male and female athletes."[47] But that guidance was officially rescinded in a February 12, 2025 press release, which stated: "The claim that Title IX forces schools and colleges to distribute student-athlete revenues proportionately based on gender equity considerations is sweeping and would require clear legal authority to support it. That does not exist."[48] Some of the objectors further suggest that Title IX liability should extend to payments from the conferences or the NCAA itself, but the only case to address this issue—*NCAA v. Smith*, 429 U.S. 459 (1999)—held that Title IX does not apply to the NCAA or conferences. While the objectors argue that a court could hypothetically find the NCAA or conferences subject to Title IX based on a new and different theory than the one analyzed in *Smith*, no court has yet to do so.

Regardless of how these questions may ultimately be resolved, the applicability of Title IX is an issue of legal statutory interpretation that the Court need not resolve to grant final approval of this settlement. To begin with, there is only a very narrow release of Title IX claims "arising from distribution of the gross settlement agreement." Amended Settlement Agreement ¶ 1(vv)(3). Certain objectors nonetheless take issue with this release, but as explained at preliminary approval, the settlement is a resolution of antitrust claims that must, as a matter of law, be based on market realities "but for" the challenged compensation rules. *See* P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 392b (5th ed. 2023 supp.); *see also* Allen, M.A., et al., "Reference Guide on Estimation of Economic Damages" in *Reference Manual on Scientific Evidence* 425, 432 (Fed. Judicial Ctr. 3d ed. 2011) ("Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources."). Plaintiffs did not assert

---

[47] U.S. Department of Education Office for Civil Rights, *Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities*, January 16, 2025.

[48] *U.S. Department of Education Rescinds Biden 11th Hour Guidance on NIL Compensation*, Press Release, February 12, 2025.

1  Title IX claims in this litigation and the settlement does not and cannot address them. Accordingly, Title

2  IX does not govern how past damages should be allocated. Thus, it is not surprising that these objectors

3  cite no case law—because there is none—that Title IX applies to damages awards.

4        The settlement appropriately provides relief for antitrust violations that harmed settlement class

5  members' ability to earn NIL compensation in the constrained market, which, for better or for worse, has

6  historically been driven by revenues from Division I football and men's basketball, as well a Division I

7  women's basketball to a lesser extent. The settlement allocations followed Dr. Rascher's damages

8  methodology from class certification, which this Court found reliable. And the undisputed reason that Dr.

9  Rascher's damages methodology estimates more damages for male athletes in football and basketball is

10  because in the actual world, the NCAA and its conferences and schools received far more revenues,

11  including broadcast revenues, from football and men's basketball than other sports (including women's

12  basketball) during the class period. The settlement, which followed Dr. Rascher's damages methodology,

13  allocates funds according to Defendants' real-world conduct. In other words, the settlement, pursuant to

14  Dr. Rascher's methodology, allocates settlement funds how they would have been allocated in the but-for

15  world. Moreover, if Title IX did apply to require more equal spending, schools could have provided greater

16  payments to female athletes in other sports in addition to the damages payments allocated under the

17  settlement, but there is no reason to believe that Title IX precludes a damages award estimate that mirrors

18  the disparity in broadcast revenues and school spending in the actual world, given the economic principle

19  that the but-for world must be based on reasonable assumptions of what occurs in the actual world absent

20  the challenged restraints.

21        Although this is not the proper setting in which to resolve these questions, if there is ultimately a

22  determination that Title IX does apply to NIL revenue sharing and/or other future payments or benefits

23  paid out under the injunctive relief settlement, schools will need to comply with Title IX. In that event,

24  there is nothing in the settlement that prevents schools from allocating additional funds to women athletes

25  if doing so is necessary in order to maintain Title IX compliance, and there is nothing in the settlement

26  that would immunize them from the obligation to do so.

27

28

**F.      The Release Language is Consistent with Governing Law and is Not Overly Broad**

Some objectors take issue with the release of claims under the settlement, contending that it is too broad. *See* ECF Nos. 622, 625, 628, 630. The Court should reject these objections because they are based on misinterpretations or mischaracterizations of the Amended Settlement Agreement, as well as misapplication of controlling law.

The release in the settlement is properly limited to claims that were raised or could have been raised in this case and is only as broad as the relief secured. Although it extends beyond the specific claims in the current operative Complaint, that will no longer be the case if the Third Amended Complaint filed with the settlement is accepted and becomes the operative complaint. Further, the damages settlement release is only broader than the current operative Complaint so to encompass potential claims "(1) on account of, arising out of, or resulting from any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions, or (2) relating in any way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport." Amended Settlement Agreement ¶ 1(oo). This release is tailored to the conduct at issue in these actions and is thus consistent with release provisions approved by courts in the Ninth Circuit. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (release may extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement"). The injunctive claim release similarly reflects the contours of the Injunctive Relief Settlement and encompasses the injunctive relief requested in the operative complaint. *Compare* Second Am Compl. at 103–104 (Request for Relief), with Amended Settlement Agreement ¶ 1(pp). The scope of the Release does not render the settlement unfair or unreasonable; instead, it represents the nature of a bargained-for solution.

The named plaintiffs in *Brantmeier v. NCAA*, No. 1:24-CV-00238-CCE-JEP (M.D.N.C.), object to the scope of the release based on the erroneous belief that it releases the claims in that case. *See* ECF No. 625 ("Brantmeier" or "Brantmeier Objection"). It does not. Nor is it, as the Brantmeier Objectors claim, a request for an unprecedented declaratory judgment determining that *all* of the regulations in the 443 pages of the Bylaws are lawful under the Sherman Act and all other laws, except for those challenged in the present litigation." ECF No. 625 at 9 (emphasis in original).

Certain other objectors argue that the release is overly broad because it includes non-parties to the lawsuit. For example, one objector contends that the settlement improperly releases claims against the College Football Playoff, *see* ECF No. 630, while another objects to the release of NCAA member institutions who were not named as defendants in the litigation. *See* ECF No. 628. But courts routinely approve releases covering affiliated persons and entities of the parties to the lawsuit. *See Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *9 (C.D. Cal. Jan. 30, 2014) (noting "[r]eleases of non-parties in class action settlements are readily approved and enforced" because "[n]o defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant"). The CFP and NCAA member schools are closely affiliated with the Defendants in this litigation and their inclusion as released parties for factually related claims is appropriate.

Finally, relying on the court's holding in *Hesse*, the Vogelsong Objectors contend that the settlement improperly releases partial scholarship claims that they asserted were not litigated in this case. *See* ECF No. 622. Other aspects of the Vogelsong Objection are addressed in greater detail in Section III.C above and are not repeated here. But as it specifically relates to the release, their arguments also fail. Unlike in *Hesse* which addressed releases of claims that were not alleged in the operative complaint, the partial scholarship claims at issue were covered in the operative complaint that Plaintiffs filed with their Motion for Preliminary Approval. *See* ECF No. 533-1 ¶¶ 125-26.

## G.      The Settlement Notice Was Implemented with Overwhelming Success

This Court previously recognized that the proposed notice plan satisfied Federal Rule of Civil Procedure 23 and due process.[49] The handful of criticisms by Objectors regarding the notice and claims process do not undermine the overwhelming success of the notice plan that was delivered as ordered by the Court to 96.4% of Settlement Class Members. Peak Decl. ¶ 41.

*First*, a few Objectors raise the concern that not every class member received notice. *See, e.g.*, O'Bannon Obj. (ECF No. 614) at 3-4; Dancy Obj. (ECF No. 629) at 1; Arizona State Obj. (ECF No. 676) at 6. A court approving a class action settlement must "direct notice in a reasonable manner to all class

---

[49] *See* Prelim. Approval Order at 5; *and see Perkins*, 2016 WL 613255, at *7 (finding class notice adequate where the approved notice was sent in accordance with the approved notice plan, which was consistent with the requirements of Rule 23 and due process); *In re Splunk*, 2024 WL 923777, at *5 (finding sufficient notice when the notice procedures "adhered to the previously approved notice plan").

010912-11/3050037 V1

members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). "Rule 23 and due process require only a 'reasonable effort' to notify individual class members."[50] To satisfy this standard, the parties need not publicize the Settlement via an Objector's chosen means. Nor does it require "actual notice to each individual class member" in order to be sufficient.[51]

Here, notice was widely distributed by email, postcard, social media, press releases, organic media efforts, and news outlets, all of which focused on targeting the entire population of Settlement Class Members. *See* Peak Decl. ¶¶ 10-36. There are multiple examples of this widespread effort—over 325 Division I schools provided data for 392,298 athletes to receive direct notice and allocation estimates, over 1,435 news outlets reported on the press releases nationwide resulting in over 12,000 views, and over 75 million impressions were purchased across 5 different social media channels that targeted adults 18-34 years of age who participate in an NCAA sport, watch an NCAA sport on television or online, and either currently attend college or have graduated from college. *Id.* at ¶ 23. In contrast to the O'Bannon Objectors' contention that African American athletes did not receive adequate notice, the widespread notice plan ensured that no group was systematically left without notice, thus satisfying Rule 23's requirements, as evidenced by the high percentage of the class that received notice and the high number of claim submissions by Settlement Class Members.[52]

The O'Bannon Objectors, and one amici, additionally raise the concern that the notice provided to future incoming college athletes is insufficient. *See* ECF No. 614 at 20; ECF No. 603 at 9. Both assert practical difficulties (such as a limited time frame and inexperience with lawyers) for new athletes to object within sixty days to the injunctive relief. *Id.* Sixty days is widely regarded—including explicitly by guidance in this district—as more than sufficient time to notify an individual of their rights. *See* Northern

---

[50] *See In re Apple Inc. Device Performance Litig.*, 50 F.4th at 780; *see* Fed. R. Civ. P. 23(c)(2)(B) (For a proposed Rule 23(b)(3) Settlement Class, the court should "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.").

[51] *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017); *Anthem*, 327 F.R.D. at 329 (internal quotation marks omitted).

[52] *Officers for Just*, 688 F.2d at 624 (holding notice was reasonable if "not systematically leav[ing] any group without notice.")

District of California Procedural Guidance for Class Action Settlements, at ¶ 9 ("The parties should ensure that class members have at least thirty-five days to opt out or object to the settlement . . . .").

*Second*, a few Objectors identify varying issues with the claim submission process and the settlement website. O'Bannon Obj. (ECF No. 614) at 7-9; Dunne Obj. (ECF No. 624) at 1; Arizona State Obj. (ECF No. 676) at 8, 10. These appear to be at most isolated instances. *See* Peak Decl. ¶ 28 (confirming no system wide website issues and over 70,000 filers using an EC ID or Claim ID and PIN). The high claims rate, combined with the 4.8 million views and over 838,271 identifiable unique users of the approved settlement website, provide objective evidence of an accessible and successful claims process. *Id.* ¶ 27. To the extent class members experienced issues, the Settlement Administrator consistently and reliably provided assistance when requested. *Id.* ¶¶ 30-31. Further, Class Counsel provided additional support—confirmed by Objectors O'Bannon, Jr. and Anderson, who communicated directly with Class Counsel—and resolved Class Member concerns and will continue to do so. *See* O'Bannon Obj. (ECF No. 614) at 5-6; Bradford Decl. (ECF No. 614-1) ¶ 11. If Class Members encounter difficulties going forward, Class Counsel and the Settlement Administrator are ready and willing to assist. The Arizona State Objectors make unverified claims—without supporting declarations or identification of class members— that requests for support went unanswered. *See generally* Arizona State Obj. (ECF No. 676). Class Counsel and the Settlement Administrator have spent thousands of hours assisting class members throughout the claims period, and after reviewing relevant records did not find any evidence of Arizona State athletes' requests going unanswered. *See* Peak Decl. ¶ 31; Berman Final Approval Decl. ¶ 3.

*Finally*, certain Objectors raise concerns about their individual estimated allocation provided on the settlement website. Dunne Obj. (ECF No. 624) at 1-2; Wells Obj. (ECF No. 656) at 2-3; Baker Obj. (ECF No. 680) at 2-4; Arizona State Obj. (ECF No. 676) at 11-14; Townsend Obj. (ECF No. 688) at 1-2. The parties were *not* required to provide estimated damages allocations in order to provide sufficient notice, but they nevertheless have done so in an effort to promote transparency.[53] And while multiple

---

[53] *See CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 F. App'x 617, 619 (9th Cir. 2012) ("Our cases require that settlement notice describe[] the aggregate amount of the settlement fund and the plan for allocation, but do not require that such notice allow class members to estimate their individual recovery."); *Zamora v. Lyft, Inc.*, 2018 WL 5819511, at *1 (N.D. Cal. Nov. 6, 2018) ("[T]here is no

1  athletes may disagree with their particular allocation, these objections are not evidence that the settlement

2  is unfair.[54] Most importantly, all allocation estimates were provided in line with that class-wide allocation

3  plan proposed to the Court and subsequently approved. ECF No. 544. Furthermore, all forms of notice

4  directed recipients to the settlement website, where any interested party could access an array of pertinent

5  information, including the distribution plan and how allocations were determined, all relevant case filings,

6  FAQs that were updated to reflect Class Member outreach, and steps for how to object or opt out.

7      Put simply, the notice and claims process was designed to, and did, provide an extraordinary level

8  of transparency to allow Settlement Class Members to fully assess their rights. Tellingly, an overwhelming

9  number of claims were filed without any issue, and on average each Settlement Class Member was noticed

10  2.5 times. Peak Decl. ¶ 6. But recognizing the technical difficulties a narrow subset of Settlement Class

11  Members faced, Plaintiffs respectfully ask that the Court accept claims filed up to any order on Final

12  Approval of the settlement. Peak Decl. ¶ 32 (identifying over 5,000 late claims as of February 27).

13  **H.      The Court Should Not Stay the Injunction Pending Appeal**

14      The Court should deny any request to stay the injunction pending appeal. The circumstances do

15  not justify a stay and doing so would irreparably harm tens of thousands of athletes who would be deprived

16  of the substantial benefits and compensation permitted under the injunction without any recourse. Indeed,

17  for those class members whose last year competing in Division I is the 2025-26 academic year, a stay

18  during an appeal could deprive them of the chance of ever benefitting from the injunctive settlement and

19  its life changing benefits.

20      There is no automatic stay of an injunction pending appeal. Fed. R. Civ. P. 62. Thus, a party

21  seeking such relief bears a heavy burden to show that the circumstances justify a stay. § 2904 Injunction

22  Pending Appeal, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.). Courts in the Ninth Circuit consider four

23  factors to determine whether to stay an injunction pending appeal: (1) whether the applicant has made a

24

25  requirement that a notice inform class members of the precise dollar amount they will receive from a
    settlement.").

26  [54] *Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, at *18 (C.D. Cal. July 29, 2010) (granting

27  final approval of settlement and recognizing that "[w]hile the proposed settlement does not perfectly
    compensate every member of the class, it is unlikely that any settlement of the claims of a class of more

28  than 740,000 members would achieve such a result").

strong showing that they are likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies. *Sierra Club v. Trump*, 929 F.3d 670, 687 (9th Cir. 2019). "The first two factors are the most critical, and [the court] only reach[es] the last two once an applicant satisfies the first two factors." *Id.* (citation and internal quotation marks omitted). Still, a stay is "not a matter of right, even if irreparable injury might otherwise result" from the injunction remaining in place pending an appeal. *Id.* Because a stay is "an intrusion into the ordinary processes of administration and judicial review," courts should not issue stays "reflexively." *Id.* at 697-98.

Here, the Amended Settlement Agreement provides that "[t]he Injunctive Relief Settlement shall be effective as of the date of entry of the Final Approval Order, regardless of any appeal that may be taken . . . ." Amended Settlement Agreement ¶ 18. Just a single objector has requested that the Court modify paragraph 18 and order a stay of the Injunction pending an appeal. ECF No. 602 at 4-5. In support, the objector argues that some athletes will be irreparably harmed absent the stay because rosters will be reduced for the 2025-2026 season even if the settlement is later reversed. *Id.* at 4.

Each of the four factors outlined by the Ninth Circuit weighs against issuing a stay. To start, there has been no showing—let along the "strong showing" required—that approval of the settlement by the Court would be likely to be overturned on appeal. In assessing such an appeal, the Ninth Circuit would review the Court's approval of the settlement for a "clear abuse of discretion." *Shaffer v. Cont'l Cas. Co.*, 362 F. App'x 627, 629 (9th Cir. 2010); *Officers of Just.*, 688 F.2d at 625-26 (explaining that the appellate court is "not to substitute [its] notions of fairness for those of the district judge and the parties to the agreement" (citation omitted)). And the Ninth Circuit will not overturn final approval based on an argument that one specific part of the settlement—such as that relating to roster limits—might not be desirable to a small percentage of the class, while the settlement, as a whole, is demonstrably fair and reasonable and in the best interests of the class. *See Hanlon*, 150 F.3d at 1026 ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

Further, no showing can be made that a stay would prevent any of the claimed harm to class members impacted by roster limits. There is thus no assurance that the NCAA or conferences will cease to impose roster limits, even if the injunctive settlement relief is stayed. *See Coal. on Homelessness v.*

- 56 -

*City and Cnty. of San Francisco*, 2023 WL 2775156, at \*5 (N.D. Cal. Apr. 3, 2023) (denying request to stay injunction pending appeal because moving party failed to "identify . . . concrete harms that are probable if the stay is not granted" (citation and internal quotation marks omitted)).

Most significantly, issuing a stay will substantially and irreparably injure tens of thousands of class members who would be deprived of the opportunity to receive the substantial benefits and payments the injunction permits—including compensation and scholarships that could be life-changing for these athletes. A stay pending appeal would likely extend well into—or perhaps beyond—the upcoming academic year. This means that those class members who have only one more year to compete in Division I would be deprived of the opportunity to ever receive the substantial benefits provided by the settlement. For some class members, this would mean the loss of scholarships, which might prevent them from completing their education at all. This factor alone—an infliction of irreparable harm on the vast majority of the injunctive class—leads to the conclusion that the requested stay should be rejected.

Where, as here, the harm to the non-moving party—here, most of the class members—is "concrete," the court should deny a stay request. *Pac. Merch. Shipping Ass'n v. Cackette*, 2007 WL 2914961, at \*3 (E.D. Cal. Oct. 5, 2007); *Mowbray v. Kozlowski*, 725 F. Supp. 888, 891 (W.D. Va. 1989) (denying stay of permanent injunction and noting that, "harm to class members, if the stay is granted, will be irreparable" where "class members w[ould] be left without any recourse whatsoever" if the court were to stay in the injunction); *see also Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1180 (E.D. Cal. 2010) (denying stay "because any stay would effectively deprive Plaintiffs of any benefit of the preliminary injunction").

Finally, the public interest also weighs heavily against a stay. The settlement provides for groundbreaking injunctive relief, including direct financial benefits that will total more than $1.6 billion dollars in the 2025-2026 school year alone. Prelim. Approval Motion at 8 (citing ECF No. 450-4 (Rascher Rpt.) ¶¶ 84–85). Such financial benefits to class members are long overdue in Division 1 college sports, and these life-changing benefits for tens of thousands of Division I athletes should not be delayed. *Sierra Club* 929 F.3d at 687 (denying motion to stay injunction pending appeal where the public interest weighed "forcefully" against entry of stay of injunction).

I.        **No One Has Objected to the Attorneys' Fees Requested**

On December 17, 2024, Plaintiffs filed their Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives ("Fee Motion"). *See* ECF No. 583. There have been no objections asking the Court to deny the Fee Motion.[55] As this Court knows, in most class action settlements, particularly large ones, there are numerous objections to the fees requested by class counsel and there are certain serial objectors that routinely object to fee requests. Plaintiffs submit that the fact that there are no such objections here further indicates the strength of the settlement obtained.

### IV.        CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their Motion for Final Settlement Approval be granted and that the objections to the settlement be overruled.

Dated: March 3, 2025                                   Respectfully submitted,

By */s/ Steve W. Berman*                              By */s/ Jeffrey L. Kessler*

Steve W. Berman (*pro hac vice*)                 Jeffrey L. Kessler *(pro hac vice)*
Emilee N. Sisco (*pro hac vice*)                   David G. Feher *(pro hac vice)*
Stephanie Verdoia (*pro hac vice*)              David L. Greenspan *(pro hac vice)*
Meredith Simons (SBN 320229)                    Adam I. Dale *(pro hac vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP    Sarah L. Viebrock *(pro hac vice)*
1301 Second Avenue, Suite 2000                  Neha Vyas *(pro hac vice)*
Seattle, WA 98101                                       WINSTON & STRAWN LLP
Telephone: (206) 623-7292                            200 Park Avenue
Facsimile: ( 206) 623-0594                            New York, NY 10166-4193
steve@hbsslaw.com                                       Telephone: (212) 294-6700
emilees@hbsslaw.com                                    Facsimile: (212) 294-4700
stephaniev@hbsslaw.com                               jkessler@winston.com
merediths@hbsslaw.com                                 dfeher@winston.com
                                                                      dgreenspan@winston.com
Benjamin J. Siegel (SBN 256260)                  aidale@winston.com
HAGENS BERMAN SOBOL SHAPIRO LLP    sviebrock@winston.com
715 Hearst Avenue, Suite 300                        nvyas@winston.com
Berkeley, CA 94710
Telephone: (510) 725-3000                            Jeanifer E. Parsigian (SBN 289001)
Facsimile:  (510) 725-3001                            WINSTON & STRAWN LLP
bens@hbsslaw.com                                        101 California Street, 21st Floor
                                                                      San Francisco, CA 94111

---

[55] Certain objectors tangentially address the fees requested by claiming that the structure of the fees for the injunctive relief indicates a conflict. Plaintiffs address those arguments in Section III.C.1, *supra*.

- 58 -

Jeffrey L. Kodroff (*pro hac vice*)
Eugene A. Spector (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF, PC
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Class Counsel for Plaintiffs*

Telephone: (415) 591-1000
Facsimile:  (415) 591-1400
jparsigian@winston.com

*Class Counsel for Plaintiffs*

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
CASE NO. 4:20-CV-03919-CW

010912-11/3050037 V1

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2       Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3   filing of this document has been obtained from the signatories above.

4                                          By: */s/ Steve W. Berman*

5                                              STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND OMNIBUS RESPONSE TO OBJECTIONS
CASE NO. 4:20-CV-03919-CW

010912-11/3050037 V1