UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

---

*House et al. v. NCAA et al.*

---

No. 4:20-cv-03919 CW

**DECLARATION OF DANIEL A. RASCHER IN SUPPORT OF FINAL APPROVAL OF HOUSE SETTLEMENT**

March 3, 2025

# Table of Contents

1.  **Introduction** .............................................................................................................................. 1
2.  **Summary of opinions** .............................................................................................................. 2
3.  **Proposed injunctive relief class settlement would allow more competition, resulting in higher college athlete compensation** ...................................................................... 3
    3.1  Correct description of the spending cap ..................................................................... 4
    3.2  Competition within the injunctive relief class settlement .......................................... 7
        3.2.1  Under the settlement, there will be less restriction to competition than the price-fixing that current NCAA rules authorize ............................................. 7
        3.2.2  A spending cap only limits competitive activity by schools that would otherwise increase spending above the cap. ..................................................... 9
    3.3  Calculation of the spending cap and comparison to professional athlete compensation ........................... 11
        3.3.1  Revenue categories: spending cap vs. compensation comparison ..................... 12
        3.3.2  Revenue reporting by schools is best available measure ................................... 16
        3.3.3  Aggregate Division I athlete compensation will approximate a 50% revenue share ....................... 19
4.  **Sports programs are not in peril due to roster limits or spending on compensation** ........................... 25
    4.1  The proposed settlement provides for substantially higher scholarship benefits to college athletes without any substantial change in participation ................................ 26
    4.2  The proposed settlement provides schools more flexibility to direct compensation to athletes that generate more benefits ...................................................................... 33
    4.3  The proposed settlement continues and improves schools' ability to achieve the benefits of maintaining sports programs ........................................................................ 35
5.  **Comparison of NIL settlement amounts to supportable NIL damages estimates** ................ 37
    5.1  Invalid objections to damage estimates for BNIL ........................................................ 37
    5.2  Invalid objections to damage estimates for Lost NIL Opportunities ............................ 38
6.  **There are no substantive economic issues raised in the Vogelsong Objections** ................... 40
7.  **Signature** .................................................................................................................................. 43

i

## 1.   INTRODUCTION

1.   My name is Daniel A. Rascher.  I have previously submitted a declaration, a reply
declaration, and five expert reports in this matter.[1]  My credentials appear in my initial
merits report submitted in December 2023, and an updated current *curriculum vitae*
(including a list of all cases in the last 4 years where I testified at trial or was deposed) is
attached as Appendix A.  I am being compensated at $600 per hour, the usual and
customary hourly rate that was effective at the time this engagement began, plus
reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR
staff, working under my supervision and control.  I have no direct financial interest in the
outcome of this matter.

2.   This declaration is a response to declarations submitted with briefs on or before January 31,
2025 objecting to the proposed settlement for litigation related to the *House* litigation,
including the antitrust claims on compensation for athletic services that were asserted in
*Carter v. NCAA* and are now part of the *House v. NCAA* complaint.  The briefs and
opposing declarations, in particular the declarations submitted by Dr. Michael Cragg and by
Professors Rodney Fort and Roger Noll,[2] address my calculations of damages and proposed
distribution of proposed settlement amounts among the classes, as well as the value of the
injunctive relief in the *House* litigation.

3.   To prepare this response, I have reviewed court filings and expert declarations, and publicly
available information, all of which are listed on Appendix B.  These include 1) the
"Objection to settlements on behalf of classes of past, current and future NCAA college
athletes," January 29, 2025 ("Hausfeld Objections"), with Appendix H, "Declaration of
Rodney Fort and Roger Noll in support of objection to settlements on behalf of classes of
past, current, and future NCAA college athletes," January 29, 2025 ("Fort/Noll
Declaration"), and Appendix M, "Declaration of Dr. Michael Cragg in support of objection

---

[1]   Declaration of Daniel A. Rascher, July 26, 2024; Reply Declaration of Daniel A. Rascher, August 16, 2024;
Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification); Expert Reply Report of Daniel A.
Rascher, July 21, 2023 (class certification); Expert Report of Daniel A. Rascher, Dec. 1, 2023 (merits); Expert
PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024; Expert Reply Report of Daniel A. Rascher, Feb. 23,
2024 (merits) with Errata on April 10, 2024.

[2]   Declaration of Dr. Michael Cragg, December 2, 2024 ("Cragg Declaration"); Declaration of Rodney Fort and
Roger Noll, January 17, 2025 ("Fort/Noll Declaration").

to settlements on behalf of classes of past, current, and future NCAA college athletes," January 29, 2025 ("Cragg Declaration"); and 2) the "Objection to Final Approval by Alex Vogelsong," January 31, 2025, ("Vogelsong Objections"), with "Declaration of Ted Tatos," January 30, 2025, ("Second Tatos Declaration").

4.    I also continue to rely on my years of experience and training as an economist and my knowledge of relevant literature.  To the extent I specifically cite an article or study, I include that title in this report and in my list of relied upon materials in Appendix B.

## 2.  SUMMARY OF OPINIONS

5.    In my declaration dated July 26, 2024 ("Rascher Declaration"), I described calculations of damages and settlement amounts for litigation related to NCAA Division I athlete compensation, as well as the value of the injunctive relief in the *House* litigation.  I described the proposed distribution of settlement funds among class members and, based upon a methodology and set of assumptions and procedures that are within the scope of economically reasonable approaches for estimating damages specifically related to compensation for athlete services (other than use of athletes' NIL), I calculated an estimate of potential damages ($1,898 million, in addition to damages already estimated in my prior reports for use of athletes NIL in video games, broadcasts, and other third-party transactions).

6.    In my declaration dated August 16, 2024 ("Rascher Reply Declaration"), I considered a declaration submitted by Ted Tatos,[3] and determined that, taken as a whole, the Tatos Declaration provided a methodology and set of assumptions and procedures that are not within the scope of economically reasonable approaches for estimating damages related to compensation for athlete services (other than use of athletes' NIL).  I also found that the Tatos Declaration applied these unreliable methods to estimate revenue and athlete compensation that led to overstated estimates of damages: either $24 billion or $34 billion (with neither estimate falling within the scope of economically reasonable damages for additional compensation).

---

[3]    Declaration of Ted Tatos, August 9, 2024 ("Tatos Declaration").

7.  In this declaration, I respond to critiques raised in the Hausfeld Objections (with the Fort/Noll Declaration and the Cragg Declaration) and raised in the Vogelsong Objections (with the Second Tatos Declaration). These declarations critique the component of the Injunctive Relief Class Settlement ("IRCS") that establishes a maximum annual amount that NCAA Division I schools can spend on athlete compensation above what NCAA rules currently authorize ("spending cap"), other aspects of the IRCS, the components of the settlements related to estimated damages for use of athletes' NIL, and the treatment of new scholarships allowed under the IRCS.

8.  I conclude that the proposed settlement provides for more competition among schools than under the current NCAA rules (and also more than would be the case for price-fixing how much each athlete gets), notwithstanding the spending cap. I further conclude that the correct understanding of the calculation of the spending cap and of my separate calculation comparing expected athlete compensation to athletic revenue supports the claim that college athletes will, under the proposed settlement, earn in aggregate a portion of revenue comparable to the portion of revenue that professional athletes earn. In addition, I conclude that the proposed settlement allows for schools to substantially increase scholarship benefits and other compensation, without substantially impinging on athletic participation. I affirm my conclusions comparing the settlement amounts to previous damage estimates and I find no substantive economic objections in the Vogelsong Objection or its attached Tatos Declaration.

**3.  PROPOSED INJUNCTIVE RELIEF CLASS SETTLEMENT WOULD ALLOW MORE COMPETITION, RESULTING IN HIGHER COLLEGE ATHLETE COMPENSATION**

9.  One aspect of the settlement that has raised objections is the set of changes to NCAA rules that would allow for schools to spend additional funds on athlete compensation, but only up to a maximum spending cap. In this section, I first clarify and correct the description of the spending cap. Next, I explain how the proposed changes, including the spending cap, would increase competition for athletic services. Finally, I address criticisms about the calculations to determine the amount of the spending cap and confusion about the assessment of the amount of compensation that the cap allows.

**3.1    CORRECT DESCRIPTION OF THE SPENDING CAP**

10.    The spending cap is a single figure each academic year that, under the proposed injunctive relief class settlement, would limit how much any Division I school can spend on athlete compensation beyond what the NCAA rules already allow.  The calculation of the figure, which I address further in Section 3.3, relies on average revenue among Power Five schools, but the single cap in any given year applies to every Division I school.  There is no individualized spending cap calculation for each school – the same cap applies to all schools.  The spending cap calculation allows for growth from year to year, either automatically (at a given percentage increase each year) or, when requested, by recalculation, which I address further in Section 3.3.1.

11.    The spending cap replaces the limit (which is zero) on spending above what NCAA rules currently allow.  The proposed settlement also leaves in place the rules that require each school to spend a minimum amount on athlete compensation (in the form of scholarships) for participation in Division I athletics.  The declarations I reviewed appear to erroneously claim that the amount of spending on new scholarships would be restricted by the spending cap.  For example, Professors Fort and Noll incorrectly posit a limit on the number of new scholarships.[4]  Dr. Cragg incorrectly describes new scholarships as shrinking the amount that schools can pay athletes.[5]

12.    It is correct that the settlement eliminates current scholarship maximums and opens up new possibilities for schools to offer scholarships.  This would be in addition to the possibility, for some schools that currently fund fewer athletic scholarships, of expanding scholarship offers within the current scholarship maximums.  The settlement imposes no upper bound on schools providing such new scholarships, contrary to the statements of Professors Fort and Noll.  The settlement applies only the first $2.5 million in new scholarship spending

---

[4]    "[T]he rules regarding permissible increases in the number of athletic scholarships are expressed as a dollar cap of $2.5 million on spending for new scholarships ... allowing some schools to create over 100 new scholarships while others can create fewer than 30." (Fort/Noll Declaration, ¶12).

[5]    "Several items count as 'offsets' against the benefits pool, meaning that they shrink the maximum amount member institutions may pay.  For instance, new scholarships 'count against the Pool;' a school that spends $5M on new scholarships, for example, may only increase other compensation to college athletes by an additional $18M." (Cragg Declaration, ¶12).

towards the spending cap: any amount above $2.5 million is unbounded by the spending cap.

> "As a result of the elimination of scholarship limits (*see* Article 4, Section 1), Member Institutions will have the option of making incremental athletic scholarships available to student-athletes above the number currently permitted by NCAA Division I rules for a particular sport, subject to the roster limits addressed in Article 4, Section 1.**The full cost-of-attendance dollar value of any new or incremental athletic scholarships—that were not previously permitted by NCAA Division I rules—<u>up to two million five hundred thousand dollars ($2,500,000.00) ('the Athletic Scholarship Cap') will count against the Pool</u> (again, in recognition of schools that award a greater number of athletic scholarships)."**[6]

13.   The spending cap for each school remains the same regardless of the spending on new scholarships, contrary to the statements of Dr. Cragg.  Some of the spending on new scholarships counts toward the spending cap.  However, this effect is limited to the first $2.5 million of spending on new scholarships.

14.   By counting towards the spending cap only the initial $2.5 million of new scholarship spending, the settlement provides each school with the flexibility to choose to give more new scholarship money in addition to other types of athlete compensation.  For example, a school that deems it beneficial to enhance spending on non-revenue generating sports while still attracting top athletes to revenue-generating sports would have the flexibility to offer substantially more scholarships (limited only by roster sizes and not by the spending cap) for the non-revenue generating sports, in addition to offering more scholarships and/or higher compensation beyond scholarships to athletes in revenue-generating sports.[7]

15.   In sum, schools will be able to offer as many scholarships as they want under the settlement agreement (subject to the number of athletes allowed on each team), and only the new scholarship spending up to $2.5 million will count toward the spending cap.  Schools in

---

[6]   Amended Injunctive Relief Settlement, Article 3, Section 3(b), emphasis added.  I note in passing that there is also a similar (but separate) $2.5 million threshold relating to academic achievement awards ("Alston" awards), which are not the subject of any objections.

[7]   The phrase "non-revenue generating" is a commonly used way to describe sports other than men's and women's basketball and football.  Many of those sports do generate revenue, even if the amounts are relatively low.

Power Five conferences have already announced plans to expand the number of scholarships (beyond what would be feasible while remaining under the $2.5 million threshold) and also fully participate in the rest of the revenue sharing that would be allowed by the spending cap.[8]

16. Consider an example with a spending cap of $23.1 million.[9]  Suppose School A increases athletic scholarship spending from $10 million to $12 million per year.  The increase of $2 million is below the $2.5 million threshold and the entire increase counts toward the spending cap for School A, which can also spend $21.1 million on other forms of increased athlete compensation.  Suppose School B increases athletic scholarship spending from $10 million to $14 million.  The increase of $4 million is above the $2.5 million threshold and only $2.5 million counts toward the spending cap for School B, which can also spend $20.6 million on other forms of increased spending.  While both schools hit the cap, School A spends $23.1 million on new compensation and benefits (assuming School A spends up to the cap) and School B spends $24.6 million on new compensation and benefits (also assuming this school spends up to the cap).

17. Dr. Cragg says that the "injunctive relief in the IRCS allows member institutions to decrease the maximum amount they are permitted to pay students by the amount of students' NIL earnings."[10]  This correctly applies to only students' NIL earnings *paid by the*

---

[8]    Notably, multiple schools are already explaining that they are going to increase the number of scholarships because of the changes to the NCAA rules as described in Section 4.1.  *See, e.g.*, Weiszer, M. (Updated 2025, February 26). "Georgia athletics unveils plan for its $20.5 million in revenue sharing with athletes." Athens Banner-Herald. Accessed on February 28, 2025 at https://www.onlineathens.com/story/sports/college/bulldogs-extra/2025/02/25/georgia-athletics-revenue-sharing-georgia-football-josh-brooks/79413454007/; Emerson, S. (2025, February 25). "Georgia, SEC schools expected to pay football athletes about 75 percent of revenue sharing." The Athletic. Accessed on February 26, 2025 at https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/; Pells, E. (2024, Nov. 22). "Ohio State to keep all sports, add 91 scholarships in new college landscape." The Associated Press. Accessed on February 25, 2025 at https://apnews.com/article/ohio-state-scholarships-11fd4da3a684389311e7caf1995cc68d; Iacobelli, P. (2024, Nov. 26) "Clemson AD Neff says school will fully fund NCAA settlement and add 150 scholarships in two years." The Associated Press. Accessed on February 25, 2025 at https://apnews.com/article/clemson-neff-ncaa-settlement-740c62b8d694d437ceba1e77618ea32b; Keith, B. (2025, February 28). "Texas Will Add Almost 200 New Athletics Scholarships, including 100% Full Rides for Swim Teams." Swim Swam. Accessed on February 28, 2025 at https://swimswam.com/texas-will-add-almost-200-new-athletics-scholarships-including-100-full-rides-for-swim-teams/.

[9]    The Rascher Declaration projected that 22% of the Pool Revenue averaged across Power Five schools for 2025-26 will be about $23.1 million (Rascher Declaration, Exhibit 25).

[10]   Cragg Declaration, ¶9.

*school.*  NIL earnings paid by third parties do not count toward the spending cap.  When Dr. Cragg discusses the amounts that pro players receive in sponsorships/endorsements, he is providing information about third-party payments: "players receive salaries, which give them a share of NBA revenue, and *sponsorship deals, which are separate from and outside the scope of their contracts with the NBA.*"[11]  Under the proposed settlement, such sponsorship earnings from third parties would not affect the spending cap.[12]  However, Dr. Cragg goes on to state that the approach in the proposed settlement "is tantamount to the Wimbledon tennis tournament reducing the amount of Serena Williams' prize money for winning the tournament by the amount she earned from advertisements."[13]  This implies that, under the proposed settlement, money from third-party compensation ("amount she earned from advertisements") would reduce the money that can be spent by schools to compensate athletes (reducing the amount of Serena Williams' prize money"), which is incorrect.

## 3.2    COMPETITION WITHIN THE INJUNCTIVE RELIEF CLASS SETTLEMENT

18.  I describe in previous filings how the Defendants' conduct harmed competition in the market for college athletic services.[14]  In this section, I address how the settlement mitigates this harm by releasing restrictions to competition among Division I schools.

### 3.2.1  Under the settlement, there will be less restriction to competition than the price-fixing that current NCAA rules authorize

19.  From an economic perspective, it is correct to characterize current NCAA rules as price-fixing.[15]  Beyond what the rules allow schools to pay to cover athletes' costs for attending

---

[11]  Cragg Declaration, ¶36, emphasis added.

[12]  Amended Injunctive Relief Settlement, Article 3, Section 3 (intro) ("Any newly permitted amounts or benefits provided to individual student-athletes <u>by Member Institutions</u> (directly, through an exclusive or non-exclusive license between the student-athlete and the Member Institution (*see* Article 2, Section 2), or otherwise)—shall count against the Pool <u>except for proceeds from third party NIL sublicenses and arrangements as specified in subsection 3(c) of this Article.</u>" (emphasis added)).

[13]  Cragg Declaration, ¶39.

[14]  Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Section 4; Expert Report of Daniel A. Rascher, Dec. 1, 2023 (merits), Section 4.

[15]  For example, "The challenged NIL rules, which have at times during the class period constituted an agreement to fix the prices Defendants (and their member universities) paid for college athlete NIL to zero..." (Expert Report of Daniel A. Rascher, Dec. 1, 2023, p. 6, ¶12).

school (and, more recently, for academic performance), the price of compensation for athletes is fixed at zero. When the *House* matter was first filed, the rules went even further to fix the price that athletes could receive from third parties to zero – only since mid-2021 (and to my understanding, still only on an "interim" basis) have the rules allowed athletes to receive compensation from third parties for use of the athletes' NILs.

20. The proposed injunctive relief class settlement greatly expands the choices for schools to determine differing types and levels of athlete compensation through which to compete for athlete services. From an economic perspective, it is incorrect to characterize the settlement as price-fixing.[16] While there may be economic arguments that price-fixing is presumptively anticompetitive, no such arguments support a presumptive determination that the proposed settlement, inclusive of the spending cap, has anticompetitive effects that outweigh procompetitive benefits. Neither this declaration nor any of the declarations that I reviewed offer a full economic analysis to assess all of the competitive effects of the settlement or to balance possible anticompetitive harm against possible procompetitive benefits. The scope of this declaration is limited to the question of whether the settlement, a negotiated outcome between parties who have been disputing the competitive effects of the NCAA's pre-existing conduct, ameliorates existing harm to competition. The answer is that the settlement succeeds on that measure – competition for athlete services under the settlement will be substantially higher than pre-existing competition for athletes' services.

21. In support of my conclusion that the proposed settlement provides for substantially more competition than the current NCAA rules, I have compared my estimates of school spending in future years for athlete compensation under the proposed settlement with professional team spending for athlete compensation, which occurs in markets where the NCAA rules have not harmed competition.[17] This comparison is not a damages calculation based on previous athletic services being under-compensated. Instead, it is a projection going forward for what I estimate will happen when competition expands under the proposed settlement.

---

[16] "Salary caps, by their very nature, are a form of wage fixing." Appendix D to Hausfeld Objections: Edelman, M. and Carrier, M.A. (2025). Of Labor, Antitrust, and Why the Proposed House Settlement Will Not Solve the NCAA's Problem. *Fordham Law Review*. Submitted Draft, Forthcoming at p. 3.

[17] Rascher Declaration, Section 7.

22. As I and others describe in our declarations, athlete compensation in the professional sports leagues occurs within the context of a collective bargaining agreement ("CBA"). One feature of CBAs can be the determination of specific limits (caps and floors) on overall spending by each team or on salaries for individual athletes.[18] Similarly, both the proposed settlement and the existing NCAA rules incorporate caps, as I discuss in Section 3.1, and floors. The existing NCAA requirements already establish a floor for athlete compensation in the form of the minimum levels of financial support for athletes that are required for schools to be members of Division I.[19]

23. There are important differences between the expected outcome in college athletics, on the one hand, and the actual outcomes in professional sports leagues with CBAs. Comparing the settlement to the CBA is a way of making an economic measurement about whether the settlement moves the compensation for college athletes to be much more similar than it has been to the compensation that professional athletes receive. The comparison is not an attempt to paint the settlement as identical to a CBA or to predict the outcome in college athletics if there were players' associations in college athletics.

24. Such differences notwithstanding, there is an important similarity between the injunctive relief settlement and CBA outcomes: there is ample room for competition among the entities (teams or schools) that are engaging the athletes' services. It is this competition that would lift spending on compensation to college athletes (which for most schools is already above floors set by the NCAA rules) to levels that can be comparable to compensation for professional athletes.

### 3.2.2  A spending cap only limits competitive activity by schools that would otherwise increase spending above the cap.

25. In this section, I explain the reasons why many schools are unhindered by a spending cap and also address incorrect claims about my projections of future school spending. In short, many Division I schools value student athletics, in aggregate, at a level that is below the

---

[18] "Fort and Noll note that the CBAs of the NFL and NBA have both caps and floors" (Hausfeld Objections, p. 14, emphasis removed).

[19] NCAA Division I 2024-25 Manual, Section 20.9.3.2, p. 379. Available at https://www.ncaapublications.com/productdownloads/D125.pdf.

amount that the spending cap would allow.  Such schools would not spend up to the spending cap under the proposed settlement.  However, some schools would spend the full amount possible.  I explain below how this distinction matters for competition among schools.[20]

26.  Regarding the amount of spending that I project schools would pay for athlete compensation under the settlement, there are critiques that misstate my analysis.[21]  First, the opinions and analysis I presented throughout this settlement process are that many Power Five schools will pay the full amount allowed by the spending cap.  I refer back to my previous analysis on preliminary approval about how schools have the incentives to pay the money, especially in the Power Five: the Rascher Declaration assumes (in Ex. 26) that the additional amount spent, **in total by all Division I schools**, would be equal to (at least) the **maximum allowable amount per school times the number of Power Five schools.**  However, many Division I schools will not pay the full amount (because demand for athletes' services differs across Division I schools and, thus, competition between schools results in different levels of compensation), and I have never claimed otherwise.[22]

---

[20]  For instance, the University of Georgia plans to pay football players $13.5 million in the coming year and add 100 scholarships across other sports.  UGA also notes that it thinks that this amount is in line with its peers in the SEC conference.  Emerson, S. (2025, February 25). "Georgia, SEC schools expected to pay football athletes about 75 percent of revenue sharing." *The Athletic*. Accessed on February 26, 2025 at https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/.

[21]  Hausfeld objectors say: "Class counsel's expert, Dr. Daniel Rascher ('Rascher'), speculates without any factual support that colleges will distribute the full value of the pool in 2025-26. [Dr. Cragg says that] smaller Division I schools would be unlikely to spend up to the cap and that the Ivy League schools, for example, will likely opt out entirely from revenue sharing." (Hausfeld Objections, p. 12).  Dr. Cragg states: "Dr. Rascher argues that competition for college athletes among member institutions will lead schools to spend the full amount of their benefits pool on additional compensation of $1,618M" and "it is unlikely that smaller Division I schools with more limited resources would be in a position to spend up to the full $23M cap per schools.  And many Ivy League schools are expected to opt-out of sharing revenue with college athletes beyond grants-in-aid." (Cragg Declaration, pp. 6, 17).

[22]  The amount of $1,618 million in Exhibit 26 of the Rascher Declaration does NOT come from the assumption that all schools pay the full spending cap.  The assumptions are: 1) many Power Five schools pay the full amount of the spending cap, and 2) enough non-Power Five schools increase spending (maybe some even up to the spending cap) to make the total amount equal to at least what it would be if ALL Power Five schools spent the full amount.  The Cragg Declaration misleadingly edits a quote from the Rascher Declaration: "Dr. Rascher assumes that '[a]dding compensation that will be allowed under the injunctive settlement equal to the entire Pool amount . . . would be economically reasonable to expect due to competition.'" (Cragg Declaration, p. 6, fn. 14).  The actual quote without the edit is: "Adding compensation that will be allowed under the injunctive settlement equal to the entire Pool amount **that Power Five schools could pay in 2025-26, which** would be economically reasonable to expect due to competition, would increase athlete compensation by $1,618 million." (Rascher Declaration, ¶87, emphasis added).

27. Having established that there is no dispute that, under the settlement, some schools would pay the full amount allowed and some would not, I now consider how competition would occur under the proposed settlement. As a matter of economics, among schools for which unhindered competition for athlete services would lead to athlete compensation below a spending cap, the ability of each school to compete is not affected by that spending cap. Although many Division I schools would spend *more* on athlete compensation under the proposed settlement (more than current spending), the spending cap would create no constraint when that additional spending would be below the cap anyway. Only schools for which competition could drive new spending on athlete compensation above a spending cap would face any effective constraint, under the proposed settlement. Thus, the effect of a spending cap on competition among schools is dependent on the number and nature of schools for which the cap is a binding constraint.

28. Unlike price-fixing, which could establish a uniform level of spending on athlete compensation, the spending cap allows competition at levels of compensation below the cap unhindered by a binding constraint. Even among schools where the spending cap does constrain spending, there is still more competition than if there were fixed wages, because heterogenous schools have multiple dimensions of compensation by which to attract heterogenous students. For schools that are offering at least $2.5 million in additional scholarships, the spending cap creates no limit on adding more scholarships.

### 3.3 CALCULATION OF THE SPENDING CAP AND COMPARISON TO PROFESSIONAL ATHLETE COMPENSATION

29. As noted above, the existence of CBAs in professional leagues distinguishes professional athlete compensation from college athlete compensation under the settlement. However, there are similarities across the different relevant markets for acquiring the services of professional athletes or college athletes. To understand how much the settlement, with the spending cap, results in substantially increased compensation due to improved competition for college athlete services, it is useful to compare the ratio of compensation to revenue

under the proposed settlement to the ratio of compensation to revenue for professional athletes in leagues with CBAs.[23]

30. It is important, however, to understand that the proposed settlement identifies some specific revenue categories to be used in the process of calculating the spending cap, as I discuss in section 3.3.1. Those categories are simply part of the settlement language. To compare compensation across leagues and, specifically, the ratio of compensation to revenue, requires identifying the comparable revenues across the leagues, as I discussed in the Rascher Declaration.[24]

31. The declarations I reviewed present a number of critiques addressing the details of the settlement's calculations of revenue for the "pool" and the cap on *new* compensation, which I address throughout this section. None of the critiques change my conclusion that competition allowed among Division I schools under the proposed settlement would substantially improve college athlete compensation, even up to the point where it would be broadly similar to professional athlete compensation (relative to revenue).

### 3.3.1  Revenue categories: spending cap vs. compensation comparison

32. The injunctive relief class settlement identifies specific categories of school revenue as "pool revenue."[25] While all Division I schools report revenue across these various revenue categories, only the revenue at Power Five schools go into these calculations. The total of the specified revenue categories for all Power Five schools, averaged across the number of Power Five schools ("average pool revenue"), form the basis for determining the spending cap that would apply to all Division I schools. The proposed settlement establishes the spending cap at 22% of the average pool revenue.

---

[23] This sort of comparison has been used in other NCAA litigation, including in *O'Bannon*, where at the Class Certification stage of the case, Professor Noll stated that "practices in professional sports" is one of the considerations that led to his conclusion regarding the appropriate portion of revenue going to athlete compensation and that "The most recent collective bargaining agreement between the NFL and the NFL Players Association (NFLPA) provides more indirect evidence." (Expert Report on Class Certification of Roger G. Noll, October 22, 2012, pp. 100-101, with additional explanation pp. 101-104).

[24] Rascher Declaration, Section 5.1, ¶¶49-53, 86-7.

[25] Rascher Declaration, ¶¶82-5.

33. In the Rascher Declaration, Exhibit 25, I provided an analysis of projected revenue over the course of the period covered by the injunctive relief settlement, focusing on the scope of revenue incorporated into the "revenue pool" calculation, and an expected level of compensation related to the limit imposed on revenue sharing (the spending cap). The projected amount of revenue for Power Five schools ranged from about $7.4 billion in 2025-26 to about $10.5 billion in 2034-35. This analysis is useful for understanding how the settlement details determine the spending cap: 22% of the Power Five revenue ($1.6 billion in 2025-26, for example) divided by the number of Power Five schools provides the spending cap that applies to all Division I schools (leading to a spending cap in 2025-26 of $23.1 million per school, for example).

34. I then provided in the Rascher Declaration, Exhibit 26, an analysis of total athlete compensation, for all Division I schools, relative to total athletic revenue.[26] The revenue in that analysis differs from the "pool revenue" in two important ways. First, it is revenue for all Division I athletic programs, not just Power Five. Second, it incorporates the same categories of revenue that I used to assess possible damages for additional athlete compensation in previous years related to conduct challenged in the *Carter* case (as I understand from counsel that the claims in that case have been added to the *House* case for settlement). This is a more expansive set of revenues than those included in the "pool revenue" calculation detailed by the settlement. With those two differences, the baseline revenue for academic year 2025-26 would be about $10.9 billion for all of Division I, as compared to the pool revenue total for Power Five schools at $7.4 billion. I then added up the various categories of compensation allowed under the current rules, plus the expected level of compensation to occur under the spending cap (at least $1.6 billion), to determine that total compensation would be approximately ($5.6 billion), or about 51 percent of revenue.

35. Many of the objections stated in the declarations that I reviewed relate to whether the revenues specified for the "revenue pool" calculation are correctly comparable with professional league revenues. The categories included in the settlement determination of pool revenue matter only for the calculation of the spending cap and are not relevant to my

---

[26]   Rascher Declaration, ¶¶86-7.

comparison of expected compensation for college athletes to compensation for professional athletes. It is apparent that some of the objections to the proposed settlement fail to account for this distinction.

36. For example, the Fort/Noll Declaration asserts that the calculation of the "revenue pool" in the proposed settlement excludes "concessions, parking, programs, gambling, sports-related business ventures (e.g., camps), and the imputed value of some complimentary tickets".[27] It is correct that the "revenue pool" calculation excludes these categories. However, my baseline for revenue for the comparison of college to professional athlete compensation (for Exhibit 26 of the Rascher Declaration) does include concessions, parking, programs, and half of donations (this is my approximation for some portion of charitable contributions that provide for goods or services – excluding from revenue any charitable contributions that are not payments for goods and services is an accurate way to identify comparable revenue across college athletics and professional leagues). The only other differences between the revenues that I use to compare to professional leagues and the revenues that the Fort/Noll Declaration lists in this specific passage are camps (a very small amount of revenue) and gambling (a category that does not exist in the historical data for Division I schools).

37. The Fort/Noll Declaration further questions the exclusion of other sources for funds that may be available to school sports programs but are not available to professional sports leagues. I discuss the revenue categories in detail in Section 3.3.2. For this assessment of injunctive relief going forward, the comparison between college athletics and professional leagues of compensation to revenues incorporates appropriately comparable sets of revenue.

38. Another critique is that the annual increases built into the proposed settlement projection of revenue at 4% annually would not be sufficient to accommodate actual revenue growth. The critique notes that there was a 31% increase in revenue between 2021 and 2022.[28] The citation to this specific year is very misleading and the critique is more generally inapt.

---

[27] Fort/Noll Declaration, ¶8.

[28] Objection to Amended Settlement Agreement and Opposition to Final Approval, January 31, 2025, ECF 628, ("Molo Objection"), p. 21.

39. First, the growth of revenue over time historically is smooth, "jumping" only with conference broadcast rights deals and realignments, or in response to external conditions, such as the COVID-19 pandemic, as shown on Exhibit 1.[29]  During the 2020-21 season, the NCAA faced severe disruptions due to COVID-19.  By mid-March 2020, all intercollegiate sports in the U.S. were suspended, and when games resumed, most were played with restricted in-person capacity.[30]  The pandemic led to the complete cancellation of the 2020 March Madness tournaments and a significant reduction in college football games, from 3,760 in 2019-20 to 1,010 in 2020-21.[31]  However, by 2021-22, NCAA athletics had largely returned to normal.  Unlike the previous season, all conferences participated in the 2021-22 college football season without major disruptions, and March Madness returned to pre-pandemic conditions, with fans back at full capacity.  Therefore, the growth from 2021 to 2022 is clearly not typical.[32]

---

[29]  I provided a very similar analysis in the Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Exhibits 16 and 17.

[30]  Leeds, M. A., Allmen, P.V., and Matheson, V. A. (2023). *The Economics of Sports*. (7th ed.). Routledge, p. 21: "[B]y the middle of March 2020, all professional and intercollegiate sports in the US as well as most major sports leagues around world suspended operations, and when games returned, most leagues began play behind closed doors or with severely restricted in-person capacity."

[31]  Leeds, M. A., Allmen, P.V., and Matheson, V. A. (2023). *The Economics of Sports*. (7th ed.). Routledge, p. 21.

[32]  Russo, R.D. (2021, August 22). "College football 2021: Return to normal wrapped in change." *AP News*. Accessed on February 27, 2025 at https://apnews.com/article/sports-college-football-football-health-utah-utes-football-be9c91d43fe864619e1f8166ca1ca17b; Hale, D. (2022, January 31). "Why 2021 was a year of constant upheaval for college football." *ESPN*. Accessed on February 27, 2025 at https://www.espn.com/college-football/story/_/id/33110193/why-2021-was-year-constant-upheaval-college-football; Goldman, T. (2022, March 18). "March Madness is back, and it looks more normal than it has in 3 years." *NPR*. Accessed on February 27, 2025 at https://www.npr.org/2022/03/18/1087617011/march-madness-is-back-and-it-looks-more-normal-than-it-has-in-3-years.

**Exhibit 1. Total NCAA Division I Revenue, 2016 – 2022**



*Source: MFRS data.*

40. Second, to the extent that the revenue projections incorporated into the settlement do not match the actual growth that occurs over the course of the injunctive relief class settlement, the terms of the settlement allow for the annual amounts to be recalculated in certain circumstances.  It is my understanding that this happens in two ways under the settlement agreement.  First, there is an automatic recalculation of the spending cap based on actual revenues every three years.  Second, should class counsel observe changes in revenue– such as a larger new broadcast deal or new source of revenue not previously incorporated into the amounts reported by schools – they can request an accelerated recalculation of the spending cap up to twice during the ten-year term.[33]

### 3.3.2  Revenue reporting by schools is best available measure

41. In addition to the objections raised about which categories of revenue are incorporated into determining the spending cap, there are objections asserting that any categories of revenue (or spending) reported by schools inherently lack clarity because "neither accounting costs nor revenues have much meaning as measures of the value of either athletics programs or

---

[33]  Amended Injunctive Relief Settlement, Article 3, Section 1.

the compensation of athletes."[34]  These objections fail to address any issue of economic substance – there is no systemic bias undermining my calculations of revenue or cost.

42. First, as a general point, it is commonplace for economic analysis to rely on accounting data regarding revenue and costs, both in academic research and in the context of litigation.  For example, one of the authors of the Fort/Noll Declaration, Professor Fort, provides a large compilation of data for sports economic research (and "identified for inclusion in the Library of Congress") that includes revenue and expense data reported by NCAA schools.[35] The Economics Committee of the American Bar Association identifies both "audited company financial statements and internal company data detailing sales and costs or profits and losses" as sources "often-used" by damages experts, while explicitly noting that these sources "may imperfectly reflect the economic realities that should be the focus of damage analyses" and "adjustments to accounting data may be necessary."[36]

43. Second, these objections overlook, on the revenue side, the detailed explanation that I provide in my Reply Declaration for identifying revenue that is relevant for comparing college athletes' compensation under the proposed settlement to professional athletes' compensation under CBAs.  There, I address the specific sources of revenue information, EADA and MFRS, and the specific revenue categories, as well as specific adjustments I make to align the accounting data with economic concepts of revenue.[37]

44. The Hausfeld Objection attempts to reference one of my own reports as a general refutation of using school-reported data, in which I and my co-author wrote "Athletic Department financial reporting has a systematic tendency to understate revenues and overstate costs from athletics."[38]  However, the use of this reference fails in the specifics to support the objections.  The report notes that Contributions (the revenue category reported by athletic

---

[34]  Fort/Noll Declaration, ¶12; Hausfeld Objections, p. 17.

[35]  "Rodney Fort's Sports Business Data." Rodney Fort's Sports Economics. Accessed on February 23, 2025 at https://sites.google.com/site/rodswebpages/codes?authuser=0.

[36]  American Bar Association. (2017). *Proving Antitrust Damages, Legal and Economic Issues*. (3rd ed.). pp. 111-2.

[37]  Rascher Reply Declaration, Section 3.

[38]  Appendix Q to Hausfeld Objection: Rascher, D.A., & Schwarz, A.D. (Revised 2015, April 30). *The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and Secondary Study)*. Rascher and Schwarz (Unpublished), p. i.

departments) may reflect some understatements: this is because philanthropic donations that happen to be motivated through exposure to sports programs do not count as benefits of the athletic programs.[39]  However, in the context of the analysis comparing expected compensation under the settlement, this is not relevant.  There is no set of cash flows for professional leagues that correspond to philanthropic donations, so I do not include such philanthropic donations in my comparison.  Specifically, I do not include contributions outside of the athletic department, and, within the athletic department, I include only half of the reported revenue category labelled Contributions.[40]

45.  Finally, with respect to athlete compensation, the Fort/Noll Declaration states that "a large fraction of the compensation that the IRCS would cap is not derived from a market process" and "consists of in-kind benefits valued at internal transfer prices that are both paid for and received by the university (examples are tuition and fees and on campus room and board charges)."  This is incorrect.  The only in-kind compensation that counts within the spending cap is the first $2.5 million of incremental (new) scholarships – this is a small fraction of the spending cap.  Also, there are market transactions for tuition and, in many cases, for room and board.  Division I schools have always competed using scholarships, (and the settlement opens up room for this competition).  I have previously addressed the use of the full cost of attendance in my calculation of total athlete compensation, including an explanation of why it is incorrect, as a matter of economics, to presume that the value of the benefit to the student (and the "sticker price" of tuition) of the education provided is tied directly to the marginal cost of providing the education.[41]

---

[39]  Appendix Q to Hausfeld Objection: Rascher, D.A., & Schwarz, A.D. (Revised 2015, April 30). The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and Secondary Study). *Rascher and Schwarz (Unpublished)*, pp. 31-2.

[40]  "For voluntary contributions, which in college athletics can be tied together with attendance privileges (tickets), I include half of the reported amount and for endowment income, which may in some cases compare directly to professional team investment income and in other cases may involve unrelated educational institution endowments, I also include half of the reported amount." (Rascher Declaration, ¶43).

[41]  Rascher Reply Declaration, Section 4.

### 3.3.3 Aggregate Division I athlete compensation will approximate a 50% revenue share

46. The spending cap allows for, but does not require, schools to increase spending on athlete compensation. In 2025-26, the amount allowed for is about $1.6 billion across all Power Five schools. In the same year, the amount allowed for is much higher across all Division I schools. As I discussed above in Section 3.2.2, I do not assume that all Division I schools would increase their spending all the way up to the cap. Instead, my conclusion is that competition among Power Five schools would cause many of them to increase their spending up to the cap, and that some increased spending would also occur for many Division I schools. I provide a conservative estimate that the sum of all increased spending across all Division I schools would be at least $1.6 billion. In other words, to the extent that some Power Five schools do not increase spending all the way to the cap (Power Five schools increase spending by less than $1.6 billion), other Division I schools would, together, increase spending enough to make up any gap.[42]

47. As I described in the Rascher Declaration and in Section 3.3.2, the professional league CBA revenue share percentages can provide an economically appropriate benchmark for Division I college athlete compensation expected to occur under the injunctive relief class settlement. Although the calculation of the amount of the spending cap involves a specific set of revenue established in the proposed settlement, my estimate of the actual increase in compensation across all Division I schools, at least $1.6 billion in 2025-26, is not identical to the spending cap. Also, I do not compare that increase in compensation to the revenues specified for the spending cap (such revenues would total about $7.4 billion in 2025-26). Instead, I compute total college athlete compensation by adding my estimate of increased compensation to other compensation athletes already receive, and then I compare that total college athlete compensation to a measure of school athletic revenue that is comparable to professional athletics revenue (such revenues would total about $10.9 billion in 2025-26).[43]

---

[42] Rascher Declaration, ¶87.

[43] Rascher Declaration, Section 7.

48. The Cragg Declaration states that this analysis comparing compensation to revenue "relies extensively on assumptions given to him by Class Counsel."[44]  This is false.  To be clear, the only assumptions that could possibly be tied to Class Counsel would be the interpretation of the language of the proposed settlement agreement.  None of the objections dispute the interpretations that I use.  Furthermore, those interpretations apply only to the calculations for determining the spending cap.  With respect to calculations of college athlete compensation and college athletic revenue, I rely entirely on my own sports economics expertise.  I explain my choices for calculating compensation and revenue in detail in my Reply Declaration.[45]

49. When added to the value of the current compensation and benefits college athletes receive under current NCAA rules, my estimate of a lower bound of expected additional compensation brings total Division I athlete compensation in 2025-26 up to about $5.6 billion, which is 51% of comparable revenue.

50. Thus, the spending cap results in approximately half of Division I athletic revenue being shared with Division I athletes, not because the cap dictates a 50% share of the set of revenue categories agreed to in the settlement, nor because schools must spend the cap amount.  Instead, the cap allows for increases in compensation, which competition will drive many schools to make, from the currently allowed level of compensation to a higher level.  That higher level of compensation is slightly more than half of a set of revenue categories – chosen to align college athletic revenue reasonably closely with professional league revenue.

51. The careful choice of revenue categories is a process that I described fully in my Reply Declaration.[46]  There, I explain that the categories of school revenue specified in the settlement all have corresponding professional league revenue.  As I show in my first Declaration, that revenue, across all Division I schools, would add up to an amount

---

44  Cragg Declaration, ¶13.

45  Rascher Reply Declaration, Sections 3 and 4.

46  Rascher Reply Declaration, Section 3.

expected to be about double the sum of 1) the proposed spending cap and 2) athlete compensation from schools that is authorized under existing NCAA rules.[47]

52. Here, I address each of the specific critiques about the revenue categories included in the calculation of the spending cap that are made in the objections to the proposed settlement.

53. First, the Fort/Noll Declaration states, "One excluded category is revenues from concessions, novelties, parking and programs."[48]  While this is a correct statement about the categories of revenue used to calculate the spending cap, it would be an incorrect statement about the share of college athletic revenue expected to go toward college athlete compensation.  When I compare total college athlete compensation to college athlete revenue, I do include this category of revenue.[49]

54. Second, the Fort/Noll Declaration states, "A related revenue category that is not included in the shared revenue pool is income derived from gambling."[50]  College programs have, by and large, avoided gambling sponsorships but my understanding is that in those few cases where a school has partnered with a gambling entity,[51] the MFRS data account for that as part of "sponsorship" and thus those revenues are included in my calculations.  As for those Division I schools that do not have revenue from gambling – it would be speculative to add an amount for gambling.  It is my understanding that, in the event that Division I schools begin to obtain revenue from gambling in the future, class counsel can, through the audit process allowed for by the proposed settlement, incorporate that gambling revenue into the calculation of the cap.  This would lead to a higher cap, presumably.  With a higher cap, competitive pressure can cause some (not necessarily all) schools to increase athlete compensation, thus preserving, roughly, the amount of compensation relative to revenue.

---

[47]   Rascher Declaration, Section 7, Exhibit 26.

[48]   Fort/Noll Declaration, ¶41.

[49]   Rascher Declaration, ¶87, referencing Section 5.1 (see ¶43).

[50]   Fort/Noll Declaration, ¶42.

[51]   Keeler, S. (Updated 2020, September 8). "CU Buffs announce 5-year partnership with online sportsbook PointsBet." The Denver Post. Accessed on February 27, 2025 at https://www.denverpost.com/2020/09/08/cu-buffs-betting-on-sports-gambling-football/;  Draper, K. (2023, March 29). "Facing Criticism, a Gambling Company and a University End Their Deal." The New York Times. Accessed on February 27, 2025 at https://www.nytimes.com/2023/03/29/sports/sports-betting-universities-pointsbet-caesars.html.

55. Third, the Fort/Noll Declaration states, "The shared revenue pool also excludes all government payments, including appropriations that are paid on a per-student basis (that is, that are based on enrollment)."[52]  Government spending has no clear comparator in the professional leagues that would be part of the revenues for the revenue-sharing arrangements in CBAs.

56. Fourth, the Fort/Noll Declaration states, "... if seat license fees are sports-related revenue for pro teams, charitable contributions that serve the same purpose should have the same status."[53]  While it is correct that charitable contributions are not included in the categories of revenue used to calculate the spending cap, I do include half of such contributions as revenue in my analysis of the share of college athletic revenue expected to go toward college athlete compensation.[54]  I did this for the very reason pointed to in the Fort/Noll Declaration, because the inclusion is conditional on whether the contribution relates to purchase of goods or services: the money should be included *if* it related to ticket purchases but not *if* it relates to other philanthropic issue.  The Fort/Noll Declaration's use of "if" shows that inclusion of 100% of these revenues would be an overestimate.  I agree.  The Fort/Noll Declaration does not specifically dispute my adoption of 50% as an estimate of the portion to include.

57. The Cragg Declaration complains that funds NIL collectives receive and pay to college athletes at a particular school are not included in college athletic revenue, and that, with respect to payments by colleges for the use of NILs of college athletes, this fact renders the comparison to professional revenue sharing inaccurate.  However, my calculations of college athlete compensation and college athletic revenue both exclude only third-party payments, which is directly comparable to CBA calculations for professional league revenue-sharing, and do include compensation by schools.  The Cragg Declaration acknowledges that "Professional sports leagues do not offset revenue-sharing with sponsorship payments" and notes that professional athletes receive "sponsorship deals,

---

[52]  Fort/Noll Declaration, ¶44.

[53]  Fort/Noll Declaration, ¶46.

[54]  Rascher Declaration, ¶87, referencing Section 5.1 (see ¶43).

which are separate from and outside the scope of their contracts with the NBA."[55]  On the college side, in comparison, payments by schools for the use of athletes' NILs do count toward the maximum spending cap.  In other words, my estimate of college athlete compensation under the proposed settlement includes compensation from schools for the use of athletes' NILs but does not include compensation from third-parties for the use of athletes' NILs.

58.  Finally, the objections raise a number of points about non-monetary differences between the arrangements for college athletes in the proposed settlement and the arrangements for professional athletes in CBAs.  The Fort/Noll Declaration flatly states, "a CBA is not a valid benchmark for the IRCS unless all provisions in the CBA that are not part of the ICRS [sic] deliver no net benefits to athletes."[56]

59.  It is my understanding that the proposed settlement does not require athletes to give up the potential for collective bargaining or employee status, and thus my analysis does not assume that athletes are surrendering this option when I evaluate the settlement.  Furthermore, I observe that differences arising from collective bargaining in the professional leagues do not bias the comparison calculation in a specific direction.  Each side of the comparison, college or professional, has non-monetary forms of compensation not available to the other side.  For example, professional leagues generally have more events per season, while Division I colleges have more slots for athletes (with a much higher number of teams), which in typical labor situations would involve a trade off with level of pay.  Similarly, college athletes now have considerable flexibility to transfer between teams (they have as much flexibility as possible without risking contest legitimacy issues – *i.e.*, if they transferred during the season and played) without foregoing monetary compensation (and possibly increasing monetary compensation).  This is more flexibility than free agent professional athletes have under professional CBAs and that too is a benefit for which athletes will often accept lower aggregate compensation to achieve.  Most notably, college athletes gain the benefit of advancing their college education while pursuing their athletic career, a choice that is not available for professional athletes.

---

[55]  Cragg Declaration, Section III.B.1 header and ¶36.

[56]  Fort/Noll Declaration, ¶19.

60. The Fort/Noll Declaration also states, when discussing that the proposed settlement differs from CBAs in the coverage of a broad set of sports and more heterogenous set of athletes, "the prospect of donations from a few benefactors may be sufficient to cause a college to support a minor sport, but such charitable contributions are not part of shared revenue in the IRCS" and goes on to talk about the value to schools of greater demand for applications that such a sport might bring.[57]  It should be obvious that schools were prevented from fully compensating college athletes relating to any of these values under the existing NCAA rules (or this lawsuit would not exist).  In contrast, the settlement allows schools to provide such compensation.  The argument presented by objectors here simply asserts that some schools may have to choose among priorities if the level of compensation they choose to provide approaches the spending cap.  Schools that see more value in the benefits arising from adding a "minor sport" than other spending would be able to make that choice under the settlement, just as they are able to now.[58]

61. Thus, the comparison to the amount of compensation to athletes in the pros is instructive even in the presence of some distinctions in non-monetary aspects of athlete engagement. Most importantly, the comparison confirms that proposed settlement provides college athletes with significant relief from the harm to competition created by the existing NCAA rules.  In fact, as I noted above in Section 3.3, one of the authors of the Fort/Noll Declaration engaged in this same sort of comparison in the *O'Bannon* case, despite flatly objecting to such a comparison in this matter.[59]

---

[57]  Fort/Noll Declaration, ¶26, fn. 9.

[58]  As one example, under the current rules, a women's softball team is limited to a total of 12 GIAs.  My analysis shows that, on average, a softball team has approximately 23 athletes per year.  Under new rules, the team could pay a full GIA to all of the 25 athletes allowed under the new roster cap, which would represent an increase in pay of 13 GIAs.  Even if the team did not expand the roster size, it still could provide 11 additional GIAs above the current limits.

[59]  In the *O'Bannon* matter, the discussion concerned the choices of which revenue categories to incorporate into the analysis for damages related to athlete NIL, whereas the discussion here concerns the choices of which revenue categories to use for the purpose of assessing the level of compensation under the proposed settlement, but the concept of comparing college athlete compensation to professional athlete compensation (within the context of CBAs) is the same in both matters, despite college athletes not having a CBA (for example, Expert Report on Class Certification of Roger G. Noll, October 22, 2012, pp. 100-101, with additional explanation pp. 101-104).

**4. SPORTS PROGRAMS ARE NOT IN PERIL DUE TO ROSTER LIMITS OR SPENDING ON COMPENSATION**

62. In previous reports, I addressed arguments that Defendants asserted (incorrectly) as pro-competitive justifications for the current rules restricting NIL compensation to athletes. In particular, I demonstrated, in my PCJ Rebuttal Report that there is neither empirical or theoretical support for claims that the current rules improved competition for athletes' services across all sports.[60] Some of the objections raised to the proposed injunctive relief class settlement similarly touch upon the prospect of changes in funding for athletic programs, either overall or for specific sports or categories of athletes.

63. For example, with respect to the proposed settlement, Hausfeld Objectors note that third-party compensation does not count as revenue for calculating the spending cap: "One of the exclusions also specifically targets lucrative funds presently distributed by NIL Collectives that would most likely take the form of unrestricted gifts to the schools (rather than direct payments to the athletes)."[61] I have previously explained why the critiques about categories of revenue to include in calculating the spending cap are misplaced (in Section 3.3.1) and how the practice of 1) excluding funds to NIL collectives from revenue, and 2) excluding corresponding athlete compensation from the spending cap, correctly isolates those cash flows from the measurement of school compensation to athletes. Here I address the parenthetical implication of the objection: that third parties might shift from making direct payments to athletes via NIL collectives, under the current rules, to making (possibly) unrestricted donations to schools, under the proposed settlement.

64. It is my understanding that under the proposed settlement only NIL deals that involve "Associated Entities or Individuals" are subject to the fair market value (FMV) standard, while the current rules are more restrictive, applying to "boosters," which is much broader in its definition of who constitutes a booster.[62] In other words, the proposed settlement allows for more leeway on third party NIL deals than under the current rules.

---

[60] Expert PCJ Rebuttal Report of Daniel A. Rascher, January 26, 2024, Sections 5 and 6.

[61] Hausfeld Objections, p. 16.

[62] Amended Injunctive Relief Settlement, Article 4, Section 3 (and Article 1, Section 1, which defines "Associated Entity or Individual"); NCAA. "Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement." Available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf.

65. I consider, as an assumption (not a conclusion), the idea that third parties who desire to support college athletics and are currently doing so through donations to NIL collectives could alternatively donate some or all of that money to the schools rather than to the collective. Rather than presume that such donations would be restricted or unrestricted, I instead expect that schools and donors would work out the extent of restrictions on a case-by-case basis (within the boundaries of what the NCAA rules allow). Thus, this argument becomes a discussion about who, among individual schools and individual donors, controls how the money gets used, not whether there is a substantially different amount of money available to compensate athletes. Notably, however, it would no longer be the collective set of Division I schools establishing control over athlete compensation. Instead, it is competition between schools that can drive some schools to seek out and/or spend more donor money on athlete compensation.

## 4.1 THE PROPOSED SETTLEMENT PROVIDES FOR SUBSTANTIALLY HIGHER SCHOLARSHIP BENEFITS TO COLLEGE ATHLETES WITHOUT ANY SUBSTANTIAL CHANGE IN PARTICIPATION

66. My previous declarations did not address the part of the settlement that includes changes to roster sizes across various Division I sports. In this section, I analyze whether those changes would injure class members by harming competition for college athlete services.

67. Under the existing rules without the settlement, some Division I sports were "headcount" sports, meaning that there were limits on the number of athletes (for a given sport) who could receive any athletic scholarship (whether full or partial). The implications of the existing rules were that athletes in headcount sports included a number of full-scholarship athletes, within a specified range for each school, as well as a number of "walk-ons" without scholarships (and, less commonly, sometime schools' rosters included partial GIA recipients). For equivalency sports, those athletes received either full or partial scholarships, but the total amount of scholarship dollars across all athletes in a given sport could not exceed the equivalent limit of GIAs set by NCAA rules. For example, an equivalency sport with a limit of 20 GIAs could have 20 full-scholarship athletes or 40 athletes with 50% scholarships. "Under previous rules, most NCAA sports featured a scholarship limit (different by sport), but a few sports had a finite roster cap. For example,

the sport of men's volleyball was allotted just 4.5 scholarships but often kept on its roster as many as 25 players, or however many the school permitted."[63]

68. Under the proposed settlement, NCAA Division I rules essentially merge the notion of headcount versus equivalency sports. As I addressed above in Section 3.1, the settlement will not impose any limit on the number of scholarships offered or spending on scholarships by each school. However, all sports would have a roster limit on the number of participating athletes. "As part of the new policy, scholarship caps were removed, replaced by formal roster limitations that permit schools – not require them – to offer scholarships to their entire rosters."[64]

69. One issue in the objections to the proposed settlement is whether the new roster-size limits would reduce participation in Division I athletics, even while the amount of scholarship funding increases. An article attached to the Hausfeld Objection makes the (partially) erroneous statement that "While this will likely produce more scholarships, the roster caps will require the elimination of walk-on athletes and even, perhaps, some on partial scholarships ...."[65] The settlement does not eliminate walk-on athletes – it does not end the possibility of schools continuing to employ walk-ons, to the extent the number of GIA recipients is less than the number of available roster spots. Moreover, to the extent a walk-on or partial GIA position is eliminated because that athlete receives a full GIA, that outcome should not be seen a harm to competition.

---

[63] Appendix C to Hausfeld Objections: Dellenger, R. (2024, Oct. 25) "Historic House-NCAA settlement leaving hundreds of Olympic sport athletes in peril," Yahoo! Sports. A few sports such as baseball, hockey, and FCS football have rules that combine aspects of both categories – headcount and equivalency. For example, baseball has been limited to 11.7 total GIAs, but if a school provides any GIA funding to a baseball athlete, that funding must be at least 25%, meaning that no more than 4*11.7 athletes can receive baseball GIAs (NCAA Manual states annual limit of 27 on the total number of counters for Baseball). In Hockey, the limit is 18 GIAs, but those GIAs could be shared by no more than 30 athletes. FCS football is limited to 63 GIAs spread across no more than 85 recipients. See NCAA Division I 2024-25 Manual, p. 191, p.193, p.194. Available at https://www.ncaapublications.com/productdownloads/D125.pdf.

[64] Appendix C to Hausfeld Objections: Dellenger, R. (2024, Oct. 25). "Historic House-NCAA settlement leaving hundreds of Olympic sport athletes in peril," Yahoo! Sports.

[65] Appendix C to Hausfeld Objections: Dellenger, R. (2024, Oct. 25). "Historic House-NCAA settlement leaving hundreds of Olympic sport athletes in peril," Yahoo! Sports. The sentence concludes with the accurate parenthetical "(though both the settlement and NCAA rules prohibit existing scholarship athletes from losing his or her scholarship)."

70. Other than incorrect claims that scholarships would be limited under the proposed settlement, I do not observe any objections related to competition.  In other words, there appears to be no dispute that the lack, under the proposed settlement, of any limits on funding of scholarships by any Division I school will be procompetitive.  Hence, the objections are limited to whether athletic participation would decline or specific class members would be harmed.  For example, "The revenue sharing came with cuts in existing college athlete rosters that are already wreaking havoc, and artificial limits on new scholarships that will injure non-revenue creating sport programs at numerous colleges" and "Grant House..., one of the named plaintiffs, is on record as saying that he did not agree to any such roster limitations that could cost his sport hundreds of lost positions"[66]

71. To address these objections, I examined the actual number of athletes on the rosters across each Division I sport under the existing rules in two academic years (2022-23 and 2023-24).[67]  I analyzed what would be the effect of imposing the new roster limits on those prior years.  These expressed concerns do not, in actuality, relate to any substantial restriction in competition among Division I schools for college athletes.  While there may be some impact at some schools for a small number of athletes, the settlement would not require any school to cancel any so-called "non-revenue" sports programs (including Grant House's sport of Swimming and Diving, which would have more roster slots available under the new rules than the average number of athletes on the rosters in either of the previous years I examined).

---

[66]  Hausfeld Objections, pp. 4 and 5.

[67]  I note that both of these academic years may have some continuing effects from the COVID-19 pandemic, including a "bump" of additional athletes from a temporarily permitted sixth year of participation that will be working its way out of the participation numbers as the settlement implementation begins. (Goodrow, Z. (2021, March 15). "Understanding the NCAA COVID-19 eligibility extensions." Grand Valley Lanthorn. Accessed on February 28, 2025 at https://lanthorn.com/81318/sports/understand-the-ncaa-covid-19-eligibility-extensions/; Moskowitz, J. (2023, December 6). "Student-athletes navigate COVID eligibility loopholes." The Ithacan. Accessed on February 28, 2025 at https://theithacan.org/51832/sports/sports-features/student-athletes-navigate-covid-eligibility-loopholes/).

**Exhibit 2. 2022-23 and 2023-24 Division I Actual Roster Sizes vs Proposed Roster Limits**

| Sport | Actual Average Roster Size: 2022-23 | Actual Average Roster Size: 2023-24 | Proposed Roster Limits |
|---|---|---|---|
| Baseball | 39.7 | 41.9 | 34 |
| Football - FBS | 128.2 | 142.4 | 105 |
| Football - FCS | 113.3 | 118.7 | 105 |
| Men's Basketball | 15.7 | 15.9 | 15 |
| Men's Cross Country | 15.8 | 16.4 | 17 |
| Men's Fencing | 18.3 | 18.0 | 24 |
| Men's Golf | 9.8 | 10.0 | 9 |
| Men's Gymnastics | 20.8 | 21.6 | 20 |
| Men's Ice Hockey | 28.4 | 28.5 | 26 |
| Men's Indoor Track and Field | 39.1 | 41.5 | 45 |
| Men's Lacrosse | 50.8 | 52.7 | 48 |
| Men's Outdoor Track and Field | 39.0 | 41.5 | 45 |
| Men's Skiing | 14.5 | 13.2 | 16 |
| Men's Soccer | 31.7 | 32.5 | 28 |
| Men's Swimming and Diving | 29.2 | 29.2 | 30 |
| Men's Tennis | 10.1 | 10.1 | 10 |
| Men's Volleyball | 21.1 | 21.5 | 18 |
| Men's Water Polo | 25.6 | 25.2 | 24 |
| Men's Wrestling | 34.7 | 34.8 | 30 |
| Rifle | 10.7 | 10.8 | 12 |
| Softball | 22.8 | 23.5 | 25 |
| Women's Acrobatics and Tumbling | 38.3 | 35.7 | 55 |
| Women's Basketball | 14.5 | 14.4 | 15 |
| Women's Beach Volleyball | 17.8 | 19.2 | 19 |
| Women's Bowling | 8.9 | 9.2 | 11 |
| Women's Cross Country | 16.6 | 17.4 | 17 |
| Women's Equestrian | 39.2 | 39.0 | 50 |
| Women's Fencing | 18.0 | 16.8 | 24 |
| Women's Field Hockey | 25.0 | 24.9 | 27 |
| Women's Golf | 8.5 | 8.4 | 9 |
| Women's Gymnastics | 20.7 | 20.6 | 20 |
| Women's Ice Hockey | 25.8 | 25.6 | 26 |
| Women's Indoor Track and Field | 39.9 | 41.9 | 45 |
| Women's Lacrosse | 34.3 | 34.7 | 38 |
| Women's Outdoor Track and Field | 39.9 | 41.7 | 45 |
| Women's Rowing | 57.1 | 59.5 | 68 |
| Women's Rugby | 38.0 | 38.5 | 36 |
| Women's Skiing | 13.3 | 13.6 | 16 |
| Women's Soccer | 30.4 | 31.2 | 28 |
| Women's Stunt | | 38.1 | 65 |
| Women's Swimming and Diving | 30.7 | 30.8 | 30 |
| Women's Tennis | 9.2 | 9.3 | 10 |
| Women's Triathlon | 8.9 | 8.8 | 14 |
| Women's Volleyball | 17.3 | 18.1 | 18 |
| Women's Water Polo | 22.7 | 22.2 | 24 |
| Women's Wrestling | 16.5 | 23.7 | 30 |

*Notes:*

*Rifle is a Coed Championship Sport, although some schools field all-women's teams. The Settlement Agreement sets a single roster cap without regard for gender, but the NCAA Sports Sponsorship and Participation Rates Report reports separate men's and women's counts for Rifle. Since no schools field all-men's teams, the "Rifle" roster sizes above reflect the number of women's teams and the sum of men's and women's players listed in the NCAA Sports Sponsorship and Participation Rates Report.*

*The NCAA Sports Sponsorship and Participation Rates Report lists women's stunt as an "other" sport in 2022-23 with only one team.*

*Sources:*

*See backup materials.*

72. The effect of the roster limits varies across sports.  In the 2022-2023, 17 specific sports had actual average roster sizes that were above the new roster limits (with the majority of those being men's sports) and 28 sports had actual average roster sizes that were below the new roster limits.  In the second year, 20 specific sports had actual average roster sizes that were above the new roster limits (all 17 from the previous year plus 3 more) and 26 had actual average roster sizes that were below the new roster limits.  Only the men's sports of baseball and football (which shows up as two sports on the exhibits: FBS football and FCS football) had actual average roster sizes exceeding the new limits by more than five athletes per squad.[68]  And for football, the new roster sizes allow for *more* scholarships to football athletes in each squad than the prior "headcount" limits.  For sports other than football, in aggregate, *the roster limits exceeded the number of participating athletes in both years*.[69]

**Exhibit 3. Summary of Division I Actual Average Roster Sizes vs Proposed Roster Limits**

| Category | 2022-23 | 2023-24 |
|---|---|---|
| Actual Average Roster Size Above Proposed Roster Limits: Men's Sports | 13 | 13 |
| Actual Average Roster Size Above Proposed Roster Limits: Women's Sports | 4 | 7 |
| **Total** | **17** | **20** |
| | | |
| Actual Average Roster Size Below Proposed Roster Limits: Men's Sports | 6 | 6 |
| Actual Average Roster Size Below Proposed Roster Limits: Women's Sports | 22 | 20 |
| **Total** | **28** | **26** |

*Notes:*
*Analysis considers rifle as part of women's sports. FBS and FCS football considered as separate sports.*
*In 2023-24, actual average roster sizes for all 17 sports from 2022-23, along with three additional sports, exceeded the proposed roster limits.*

*Sources:*
*See backup materials.*

73. It would be erroneous to conclude that the roster limits will have no effect on any Division I athlete, although it is notable that the settlement does protect the existing scholarships of

---

[68]   Text Cite - Sports Exceeding by Five.

[69]   Text Cite - Roster Limits ex-Football.

current athletes who continue to participate during the period covered by the injunctive relief class settlement. In general, however, there will be more athletic compensation in the form of scholarships. For example, Ohio State and Clemson have already announced an increase in scholarships with Ohio State adding 91 scholarships and Clemson adding 150 for the 2025-26 academic year.[70] The University of Georgia plans to pay football players $13.5 million in the coming year and add 100 scholarships across other sports. UGA also notes that it thinks that this amount is in line with its peers in the SEC conference.[71] Texas, also in the SEC, will be adding almost 200 scholarships.[72] With expansions in scholarships, some athletes who are currently walk-ons or have only partial scholarships may under the settlement be able to receive more scholarship compensation. Also, athletes who face constrictions obtaining scholarship funds at one school would be able to offer their services at a different school where roster slots are less limited.

74.    Exhibit 4 shows that the new roster limits allow for more scholarships to athletes. Schools will have the ability under the settlement to increase scholarship compensation in almost every sport (of the sports that had teams in 2023-24, there is no decline for any sport and the level remains unchanged for only one sport). Exhibit 5 shows, for example, that the proposed settlement would allow Power Five schools alone the flexibility to increase scholarship levels across sports by over 24,000.

---

[70]    Pells, E. (2024, November 22). "Ohio State to keep all sports, add 91 scholarships in new college landscape." The Associated Press. Accessed on February 25, 2025 at https://apnews.com/article/ohio-state-scholarships-11fd4da3a684389311e7caf1995cc68d; Iacobelli, P. (2024, Nov. 26) "Clemson AD Neff says school will fully fund NCAA settlement and add 150 scholarships in two years." The Associated Press. Accessed on February 25, 2025 at https://apnews.com/article/clemson-neff-ncaa-settlement-740c62b8d694d437ceba1e77618ea32b.

[71]    Emerson, S. (2025, February 25). "Georgia, SEC schools expected to pay football athletes about 75 percent of revenue sharing," New York Times. Accessed on February 26, 2025 at https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/.

[72]    Keith, B. (2025, February 28). "Texas Will Add Almost 200 New Athletics Scholarships, Including 100% Full Rides for Swim Teams." Swim Swam. Accessed on February 28, 2025 at https://swimswam.com/texas-will-add-almost-200-new-athletics-scholarships-including-100-full-rides-for-swim-teams/.

**Exhibit 4. Number of Additional Scholarships That Can Be Awarded**

| Sport | Teams | Proposed Roster Limits | Maximum GIA Allowed in 2024-25 | Total Maximum GIA Allowed in Future | Total Maximum GIA Allowed Now | Difference |
|---|---|---|---|---|---|---|
| Baseball | 295 | 34 | 11.7 | 10,030 | 3,452 | 6,579 |
| Football - FBS | 134 | 105 | 85.0 | 14,070 | 11,390 | 2,680 |
| Football - FCS | 121 | 105 | 63.0 | 12,705 | 7,623 | 5,082 |
| Men's Basketball | 352 | 15 | 13.0 | 5,280 | 4,576 | 704 |
| Men's Cross Country | 318 | 17 | 5.0 | 5,406 | 1,590 | 3,816 |
| Men's Fencing | 22 | 24 | 4.5 | 528 | 99 | 429 |
| Men's Golf | 295 | 9 | 4.5 | 2,655 | 1,328 | 1,328 |
| Men's Gymnastics | 12 | 20 | 6.3 | 240 | 76 | 164 |
| Men's Ice Hockey | 41 | 26 | 18.0 | 1,066 | 738 | 328 |
| Men's Indoor Track and Field | 269 | 45 | 3.8 | 12,105 | 1,022 | 11,083 |
| Men's Lacrosse | 71 | 48 | 12.6 | 3,408 | 895 | 2,513 |
| Men's Outdoor Track and Field | 293 | 45 | 3.8 | 13,185 | 1,113 | 12,072 |
| Men's Skiing | 11 | 16 | 6.3 | 176 | 69 | 107 |
| Men's Soccer | 203 | 28 | 9.9 | 5,684 | 2,010 | 3,674 |
| Men's Swimming and Diving | 130 | 30 | 9.9 | 3,900 | 1,287 | 2,613 |
| Men's Tennis | 236 | 10 | 4.5 | 2,360 | 1,062 | 1,298 |
| Men's Volleyball | 25 | 18 | 4.5 | 450 | 113 | 338 |
| Men's Water Polo | 27 | 24 | 4.5 | 648 | 122 | 527 |
| Men's Wrestling | 73 | 30 | 9.9 | 2,190 | 723 | 1,467 |
| Rifle | 21 | 12 | 3.6 | 252 | 76 | 176 |
| Softball | 297 | 25 | 12.0 | 7,425 | 3,564 | 3,861 |
| Women's Acrobatics and Tumbling | 6 | 55 | 14.0 | 330 | 84 | 246 |
| Women's Basketball | 350 | 15 | 15.0 | 5,250 | 5,250 | 0 |
| Women's Beach Volleyball | 67 | 19 | 6.0 | 1,273 | 402 | 871 |
| Women's Bowling | 38 | 11 | 5.0 | 418 | 190 | 228 |
| Women's Cross Country | 349 | 17 | 6.0 | 5,933 | 2,094 | 3,839 |
| Women's Equestrian | 19 | 50 | 15.0 | 950 | 285 | 665 |
| Women's Fencing | 27 | 24 | 5.0 | 648 | 135 | 513 |
| Women's Field Hockey | 77 | 27 | 12.0 | 2,079 | 924 | 1,155 |
| Women's Golf | 267 | 9 | 6.0 | 2,403 | 1,602 | 801 |
| Women's Gymnastics | 61 | 20 | 12.0 | 1,220 | 732 | 488 |
| Women's Ice Hockey | 26 | 26 | 18.0 | 676 | 468 | 208 |
| Women's Indoor Track and Field | 334 | 45 | 6.0 | 15,030 | 2,004 | 13,026 |
| Women's Lacrosse | 125 | 38 | 12.0 | 4,750 | 1,500 | 3,250 |
| Women's Outdoor Track and Field | 342 | 45 | 6.0 | 15,390 | 2,052 | 13,338 |
| Women's Rowing | 90 | 68 | 20.0 | 6,120 | 1,800 | 4,320 |
| Women's Rugby | 10 | 36 | 12.0 | 360 | 120 | 240 |
| Women's Skiing | 11 | 16 | 7.0 | 176 | 77 | 99 |
| Women's Soccer | 336 | 28 | 14.0 | 9,408 | 4,704 | 4,704 |
| Women's Swimming and Diving | 191 | 30 | 14.0 | 5,730 | 2,674 | 3,056 |
| Women's Tennis | 301 | 10 | 8.0 | 3,010 | 2,408 | 602 |
| Women's Triathlon | 12 | 14 | 6.5 | 168 | 78 | 90 |
| Women's Volleyball | 334 | 18 | 12.0 | 6,012 | 4,008 | 2,004 |
| Women's Water Polo | 35 | 24 | 8.0 | 840 | 280 | 560 |
| Women's Wrestling | 3 | 30 | 10.0 | 90 | 30 | 60 |

Notes:
  Figures based on number of teams in 2023-24.
  Calculations use equivalency limits where available, and headcount limits otherwise.
  For women's beach volleyball, equivalency limits based on guidelines for schools that sponsor both volleyball and beach volleyball.
  The Division I 2024-25 manual only provides equivalency limits for men's rifle (co-ed sport).
  Rifle team counts based on women's rifle data, since no schools field all-men's teams.
  Analysis assumes indoor and outdoor track and field have the same equivalency limit. This limit is calculated using equivalencies allocated for 1) "Cross
  Country/Track and Field" and 2) institutions that sponsor cross country but not indoor/outdoor track and field.
  Women's stunt is an emerging sport and not included in the table (the NCAA Sports Sponsorship Spreadsheet does not list any teams in 2023-24), but the
  maximum scholarship limit goes from 14 to 65 in the proposed settlement.

Sources:
  See backup materials.

## Exhibit 5. Summary of Additional Scholarships That Can Be Awarded

| Category | Total Maximum GIA Allowed in Future | Total Maximum GIA Allowed Now | Difference |
|---|---|---|---|
| Power Five: All Sports | 41,940 | 17,777 | 24,163 |
| Non-Power Five: All Sports | 150,087 | 59,049 | 91,038 |
| | | | |
| All Division I: Counter Sports | 60,592 | 41,047 | 19,546 |
| All Division I: Non-Counter Sports | 131,435 | 35,780 | 95,655 |
| | | | |
| Power Five: Counter Sports | 13,967 | 10,081 | 3,886 |
| Power Five: Non-Counter Sports | 27,973 | 7,696 | 20,277 |
| **All Division I: All Sports** | **192,027** | **76,826** | **115,201** |

*Notes:*
*Figures based on number of teams in 2023-24.*
*For this analysis, "Counter Sports" include FCS football, baseball, ice hockey, and beach volleyball. However for these sports, the analysis uses scholarship (equivalency) limits. All other Counter Sports use participation limits.*

*For women's beach volleyball, equivalency limits based on guidelines for schools that sponsor both volleyball and beach volleyball.*

*Rifle team counts based on women's rifle data, since no schools field all-men's teams*

*Analysis assumes indoor and outdoor track and field have the same equivalency limit. This limit is calculated using equivalencies allocated for 1) "Cross Country/Track and Field" and 2) institutions that sponsor cross country but not indoor/outdoor track and field.*

*Sources:*
*See backup materials.*

### 4.2 THE PROPOSED SETTLEMENT PROVIDES SCHOOLS MORE FLEXIBILITY TO DIRECT COMPENSATION TO ATHLETES THAT GENERATE MORE BENEFITS

75. Some of the objections raised to the proposed settlement highlight the differences between schools and the various ways that specific settlement terms may differentially affect the competitive advantages of some schools for attracting college athletes. These arguments are a mirror-image of the arguments about athlete heterogeneity presented incorrectly as pro-competitive benefits for the NCAA rules that have previously existed.[73]

---

[73]    Expert PCJ Rebuttal Report of Daniel A. Rascher, January 26, 2024, Section 6.1.

76. The nature of competitive markets is to provide transacting parties with the ability to co-create value by identifying the most beneficial transactions. The nature of anti-competitive restrictions on schools is to prevent schools from "putting their best foot forward" to attract the college athletes with compensation commensurate with the benefits that each athlete brings to the school. The fact that some schools may be able to make more attractive offers than other schools on some dimensions is not new with the settlement, but what is new is that schools will have substantially more freedom to compete with far more attractive and flexible packages, in aggregate and to individual athletes.

77. A prominent example of this type of spurious objection is the assertion that "Fort and Noll demonstrate that any rule limiting increases in the number of scholarships should not be expressed as a dollar cap, but should instead be identified with reference to the number of additional scholarships that are allowed."[74] The specific passage cited to in the Fort/Noll Declaration is not clear, but it may be referencing the passage that begins with the following paragraph:

> The problem that is created by this restriction arises because the face value of a scholarship differs greatly among Division 1 colleges. Consequently, the permitted increase in the number of athletes varies substantially among schools due to differences in their cost of attendance. The resulting distortion in the market for Division 1 athletes is new – it does not exist in the pre-settlement world in which the number of scholarships, not their aggregate value, is capped. Thus, under the old rules all schools could have the same number of scholarships regardless of the sticker price of attending the university.[75]

78. It is correct that the face value of a scholarship differs greatly among Division I colleges, reflecting differences in value that markets place on different educational programs. Fort/Noll claim that the settlement introduces a new distortion that did not previously exist, but the heterogeneity of education across different schools is neither new nor a distortion – it is simply a characteristic of the market. The distortion occurs when schools collectively agree to restrictions that result in all schools offering the same compensation packages – the conduct that the settlement would terminate.

---

[74] Hausfeld Objections, p. 20.

[75] Fort/Noll Declaration, ¶30.

79. Under the proposed injunctive relief class settlement, each school would have more freedom to use the tools at its disposal to most efficiently attract the available athletes that the schools value the most. Because of this competition, compensation to athletes would rise toward the actual value of the athletes' services, rather than remain at the distorted (suppressed) compensation that existed because of the Defendants' anticompetitive conduct.

80. The same argument applies for in-state vs. out-of-state tuition at public schools: "...the public college has an incentive to give its new scholarships to in-state students in order to maximize its numerical advantage in incremental scholarships over its cross-town rival."[76] As an initial matter, Fort/Noll base this argument on the idea that there is a dollar cap on new scholarships that can be awarded, but as described above, that is not accurate. Furthermore, in terms of attracting the students that the school values the most, this point is true about any scholarship under any budget restriction, not just athletic scholarships. Schools are free to use the tools at their disposal to most efficiently attract the available athletes that the schools value. That is a feature of competition, not a problem with the proposed settlement.

### 4.3 THE PROPOSED SETTLEMENT CONTINUES AND IMPROVES SCHOOLS' ABILITY TO ACHIEVE THE BENEFITS OF MAINTAINING SPORTS PROGRAMS

81. There appears to be no dispute between the objectors and the parties to the proposed settlement that athletic programs are beneficial to Division I schools. Even when the collusive restraint of NCAA Division I rules restricting athlete compensation distorted expenditures within the athletics department, with schools making allowable expenditures because they were prevented from more efficient expenditures directly compensating athletes, schools only ever intended for the amount expended on athletic programs to be capped by the benefits of the athletic programs to the schools. The concerns do not relate to any substantial restriction in competition among Division I schools for college athletes.

82. I addressed this point directly in my Merits Reply Report:

> "... schools will choose to make expenditures that maximize benefits. If there are marginal benefits to spending money on athletes in various

---

[76] Fort/Noll Declaration, ¶33.

> sports, then the incentives for such spending exist regardless of the
> existence of the challenged NIL rules.  Attributing the existence of
> benefits to the challenged NIL rules instead of the obvious value that
> schools display when recruiting athletes is, with respect to economics,
> merely a strawman argument to undermine the direct finding of antitrust
> injury."[77]

83.     I also made a similar point in a report cited in the Hausfeld Objections, "A general estimate
        using these adjustments ... shows that only 10% of D1 schools were losing money from
        their athletics program during the mid-1990s despite most Athletic Departments showing
        accounting losses."[78]

84.     The Fort/Noll Declaration echoes this sentiment: "University administrators allocate
        general funds to athletics because college sports are good investments in building public
        support for a university, ..."  However, the Fort/Noll Declaration then goes on to
        mischaracterize the proposed settlement, saying, "The agreement plays to a 'stop them
        before they spend again' mentality without any attention at all to the details of the true
        relationship between university administrators and their college sports endeavor. The
        rationale for the IRCS hangs on this thoroughly discredited myth."[79]

85.     The proposed settlement, from an economic perspective, hangs on a balance between what
        plaintiffs think they can obtain by prevailing in the lawsuits and what defendants think they
        can protect by prevailing in the lawsuits.  It removes many of the distortions that previously
        incentivized inefficient spending and it provides for greatly increased flexibility for schools.
        The proposed settlement does not go so far as to remove all constraints: it does stop some
        schools from spending some money.  However, as explained in Section 3.1, the proposed
        settlement stops no school from vastly increasing spending on athletic scholarships.  And
        further, as explained in Section 3.2.2, the proposed settlement stops no spending at most
        Division I schools, because the allowed spending cap is far above what competition

---

[77]    Expert Reply Report of Daniel A. Rascher, Feb. 23, 2024 (merits), ¶287.

[78]    Appendix Q to Hausfeld Objection: Rascher, D.A., & Schwarz, A.D. (Revised 2015, April 30). *The Incremental
        Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and
        Secondary Study)*. Rascher and Schwarz (Unpublished), p. iii.

[79]    Fort/Noll Declaration, ¶52.

between schools would drive most Division I schools to spend (the exception being schools within the Power Five conferences).

86.    The proposed settlement does nothing to change the incentives that Division I schools currently have to maintain quality athletic programs, nor does it inhibit the schools' ability to spend more money on these programs than they currently spend.

**5.    COMPARISON OF NIL SETTLEMENT AMOUNTS TO SUPPORTABLE NIL DAMAGES ESTIMATES**

87.    In my first declaration, I described calculations comparing settlement amounts to damages for the use of athletes' NILs for broadcasts ("BNIL damages") and by third parties ("Lost NIL Opportunities").  For this comparison, I relied entirely on damages methodologies that I have provided throughout the litigation process, beginning with my class certification reports and continuing through the merits reports.  Although there have been updates to the calculations based on new data and changes to class definitions, there have been no changes to the damages methodologies for BNIL and for Lost NIL Opportunities.

88.    Objections to the proposed settlement include claims that the settlement amount is not reasonable in relation to the estimated damages for BNIL and for Lost NIL opportunities. These objections address the size of the estimated damages, not the size of the settlement amounts.

**5.1    INVALID OBJECTIONS TO DAMAGE ESTIMATES FOR BNIL**

89.    With respect to BNIL damages, as I understand Professor Zimbalist's critique, the objectors appear to be complaining my damages estimates are too high.  To that end, Professor Zimbalist makes the following statement that I read to mean that he believes there is little or no NIL damage at all: "To the extent that pro athlete publicity or NIL rights are involved, they are diminutive and basically occur in the form of video clips to promote forthcoming telecasts."[80]  The statement from Professor Zimbalist appears to be a legal position about contractually granted rights or obligations, an argument that, to my understanding, the class certification process already addressed.  I presented the economics behind the damages

---

[80]    Declaration of Andrew Zimbalist Regarding the Settlement in *House et al. v. NCAA et al.*, January 30, 2025, p. 4.

calculation in my previous testimony, which as I explained did not hinge on whether or not the athletes had any specific legal right of publicity.[81]  Dr. Zimbalist provides no economic critique beyond this reliance on the right of publicity, nor does he critique my comparison of the proposed settlement amount for BNIL to the estimated BNIL damages.

## 5.2    INVALID OBJECTIONS TO DAMAGE ESTIMATES FOR LOST NIL OPPORTUNITIES

90. With respect to Lost NIL Opportunity damages, objectors complain that the estimated amounts are too low.  First, Dr. Cragg correctly states that I reference in my declaration the methodology for estimating damages that I presented in my earlier reports, which I then adjust "to account for the differences in the makeup of the DCS classes as compared to the *House* classes."[82]  Dr. Cragg incorrectly states that, my calculations "overlook the fact that NIL payments would likely have commenced earlier than 2021, but for the NCAA's restrictions" – in fact, my calculations *begin* with the fact that NIL payments would have commenced earlier.[83]  Dr. Cragg then refers to public reporting by a single entity, Opendorse, to support his claim that college athletes earned over $3 billion from use of their NILs since July 1, 2021.[84]

91. Reliance on this publicly reported data, instead of the information on NIL transactions that schools reported as part of the litigation process, is the primary substantive difference between Dr. Cragg's analysis and mine.  I rely on the data that schools reported about actual NIL transactions, as required for the *House* case.  If athletes did not report NIL transactions to schools, or provide sufficient detail, or if schools did not send along or document those reports correctly, then there is no transaction information to analyze. While it is possible that actual NIL compensation may lie somewhere between media reports and the properly documented and usable NIL transaction data provided by the schools, as I mention in my previous reports, my damages methodology relies on careful and appropriate analysis.  Other than data reliability issues, which weigh very heavily in

---

[81]    Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Section 4.1.3, ¶65.

[82]    Cragg Declaration, ¶51.

[83]    Cragg Declaration, ¶54; Rascher Declaration, Section 4.1.3; Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Sections 4.1.1 and 7.3.

[84]    Cragg Declaration, ¶¶59-60, Table 1, and Cragg Declaration Appendix B, p. 4.

favor of using the data provided by schools, this is not a topic of economics, but rather the legal topic of what sources provide reliable evidence for litigation. I rely on data produced in the course of the lawsuit; Dr. Cragg does not.

92. Dr. Cragg goes on to assert that a "data-driven way to estimate damages is to observe actual NIL payments since 2021 and project how NIL payments likely would have evolved from 2016 onward had the NCAA restrictions not been in place."[85] I agree that there is a data-driven method to estimate damages, due to the natural experiment that occurred when the NCAA rules about third-party payments for use of athletes' NIL changed in 2021.[86] Dr. Cragg is incorrect when he states: "Despite acknowledging that the July 1 policy change represents a natural experiment, Dr. Rascher does not leverage it in his 2022 report or future reports to measure damage from lost NIL payments prior to 2021."[87] In fact, that sort of analysis is exactly what I use to develop my estimate of Lost NIL Opportunities damages.[88]

93. Dr. Cragg relies on Opendorse estimates of total NIL earnings.[89] Opendorse does not describe its data or estimation process, so there is no way to validate those estimates.[90] This makes the Opendorse information less reliable than the school reports. Published reports and third-party estimates do not examine the detail of the transaction sufficiently to confirm that the reported amount reflects the actual compensation to the athlete. School reports provide more detail to allow for conservatively estimating the actual compensation.

94. A second and important difference between the analysis suggested by Dr. Cragg and what I have presented in my previous testimony is that Dr. Cragg ignores whether individual athletes were, in fact, injured and, thus, eligible for damages. Importantly, Dr. Cragg has

---

[85]   Cragg Declaration, ¶54.

[86]   Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Section 4; Expert Reply Report of Daniel A. Rascher, July 21, 2023 (class certification), ¶¶111, 140.

[87]   Cragg Declaration, ¶56.

[88]   Rascher Declaration, Section 4.1.3; Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification), Section 7.3; Expert Report of Daniel A. Rascher, Dec. 1, 2023 (merits), Section 9.3.

[89]   Cragg Declaration, ¶¶59-60, Table 1, and Cragg Declaration Appendix B, p. 4.

[90]   Dr. Cragg does not and cannot validate the accuracy of the data – Cragg Declaration, p. 21, Table 1, and Cragg Declaration Appendix B, p. 4. Nor does Dr. Cragg seek to make any comparisons to any other publicly available estimates of NIL compensation for college athletes.

undertaken no analysis to determine how much of the NIL earnings since July 2021 went to athletes who were not enrolled during the damages period. Plaintiffs' damages class contains fewer athletes for each year earlier in time, i.e., the number of injured athletes in 2020 is much larger than in 2017, but Dr. Cragg's estimates do not reduce damages to account for that. Thus, there is no determination in Dr. Cragg's analysis that any specific athlete would have received compensation prior to July 2021 (and thus be eligible for Lost NIL Opportunity damages), and he provides no methodology to account for changes in individual earnings available to athletes over time. Dr. Cragg simply takes his estimates of total NIL compensation (from Opendorse) and adjusts estimated NIL earnings for previous years based solely on changes in Power Five revenue. This is the only adjustment available when using Opendorse estimates, which do not distinguish among individual athletes. Thus, there is no way to make adjustments to Opendorse estimates that would account for variations over time in the amount of NIL earnings athletes would have been expected to receive prior to July 2021.

**6. THERE ARE NO SUBSTANTIVE ECONOMIC ISSUES RAISED IN THE VOGELSONG OBJECTIONS**

95.   My review of the Vogelsong Objection identifies two lines of argument against the proposed settlement. The first argument is that the settlement of claims purportedly related to *Fontenot* matter is too low because the estimate of $1.8 billion (compared to a settlement of $600 million) is too low. The second argument is that the settlement of claims purportedly related to *Cornelio* matter is too low because there is no specific damages recovery for claims that athletes in the past who did not get full scholarships would have received more scholarship benefits if not for the NCAA's scholarship maximums. The Second Tatos Declaration identifies as potential additional scholarships valued at $6.6 million for two athletes in two sports at one school.

96.   With respect to the *Fontenot* matter, the Tatos Declaration estimated potential claims at over $24 billion (or over $30 billion). I addressed this claim in my reply declaration, concluding that the estimated amounts fell outside of the scope of economically reasonable damages for additional compensation.

97.   With respect to the *Cornelio* matter, the Vogelsong Objection claims that there is zero damage recovery – however, the preliminary assessment of damages for additional

compensation that I present in my first declaration is inclusive of additional scholarship benefits, as one of the many forms additional compensation could take. Also, the Vogelsong Objection cites the Second Tatos Declaration estimates that baseball and softball athletes at Clemson in recent years would have, under the new scholarship rules in the proposed settlement, been eligible for $6.6 million in additional scholarships (across four seasons). The Vogelsong Objection calls this figure a damages estimate, despite there being no economic evaluation provided in the Second Tatos Declaration of injury from harm to competition. The Vogelsong Objection states that Clemson has announced plans to raise scholarships for the 2025-26 season and uses this fact alone to support the claim that previous seasons would have had similarly higher scholarships, and then suggests that extrapolating that estimate to all Power Five schools would lead to damages that "are many hundreds of millions of dollars if not more."

98. The analysis presented in the Second Tatos Declaration fails to address whether which athletes were injured due to the harm to competition. The calculation is not an economic damage estimate because, absent an economic analysis of injury, the calculation bears no relation to any harm to competition. Furthermore, the calculation severely biases the result of attempting to extrapolate to more sports or schools, due to cherry-picking. Clemson is a Top-20 overall baseball program in recent years and so is not representative of dozens of Power Five baseball programs, nor of hundreds of Division I baseball programs. The analysis is limited to sports for which the new rules provide for a high number of *possible* (but not required) new scholarships and applies only to a school for which there is a high demand for athletes in those specific sports. Even if the Second Tatos Declaration provided some connection between this calculation and injury for baseball and softball athletes at Clemson from harm to competition, there would still be no economic basis for extending that estimate to any other sport or school.

99. The fact that Clemson is adding new GIAs in baseball and softball is another example of economic evidence that benefits would flow to athletes from the proposed settlement: if the case proceeded to trial without settlement and GIA limits for baseball and softball teams continued to remain low, there may be no additional benefits at all flowing to baseball or softball athletes at Clemson, as compared to more than a million dollars a year that the Second Tatos Declaration estimates. With respect to damages, however, considerably more

economic analysis would be required to establish this as economic evidence of antitrust damage for any athletes who participated in any sport at any Division I school in previous years.

## 7. SIGNATURE

I certify that, to the best of my knowledge and belief:

- The statements of fact in this report are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

DANIEL A. RASCHER declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the preceding is true and correct.

Signed on the 3rd of March, 2025, in Orinda, CA

Daniel A. Rascher

# Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
 Director of Academic Programs for the Sport Management Program, 2002-current
 Professor of Sport Management, 2010-current
 Associate Professor of Sport Management, 2005-2010
 Assistant Professor of Sport Management, 2000-2005
 Adjunct Professor of Sport Management, 1999-2000

- M.A. Course – Sport Economics and Finance
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
 Founder and President, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA. Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
 Co-Founder and Partner, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020

NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014

IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
Assistant Professor, 1997-1998

- * M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
- * B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
<u>Teaching Assistant</u>

    \* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

## PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
<u>Affiliate</u>, 2003-2007; <u>Principal</u>, 2000-2003; <u>Senior Economist,</u> 1998-2000

    \* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

    \* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

    \* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.

    \* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
<u>Visiting Scholar</u>, Institute of Industrial Relations, 1998-2000

<u>Research Fellow</u>, 1995-1997

    \* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

    \* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
<u>Research Assistant</u>

    \* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
<u>Research Assistant</u>

    \* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

## HONORS AND AWARDS

Sonny Vaccaro Impact Award (*College Sport Research Institute, Univ. of South Carolina*), 2023

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

Lifetime Achievement Award (*Applied Sport Management Association*), 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004. From the *Center for Instruction and Technology*, University of San Francisco.

Research Grant for the Study of Human Resource Systems (*Alfred P. Sloan Foundation*), 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson. *Journal of Applied Sport Management, 13*(1)*,* 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel. *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler. *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton. *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz. *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel. *Journal of Issues in Intercollegiate Athletics, 12,* 2019. <u>*Article of the year in the publication for 2019*</u>.

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman. In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver. In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun. In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

4

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal*, Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

## BOOKS

"Handbook of Sport Finance" with Mark Nagel.  Edward Elgar Publishing.  (forthcoming).

"Financial Management in the Sport Industry" 4th ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., (forthcoming).  A textbook.

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2024 – 2nd ed., 2020 – 1st ed.).

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice.*  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999. Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Special Issue Introduction: Name, Image, and Likeness and the National Collegiate Athletic Association," with Steven Salaga, Natasha Brison, Joseph Cooper, and Andy Schwarz in *Journal of Sport Management*, 2023.

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz. In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz. In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz. In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy. In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002. Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002. Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz. In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz. In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: Final Report*, 1997.

"Transferability of Case Study Research: An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

## WORKING PAPERS & ARTICLES UNDER REVIEW

"The Impact of COVID-19 on Employment and Output in the Leisure and Tourism Industries," with Lali Odosashvili and Mark Nagel. *In Review*. 2023.

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson. 2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises." 2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel. 2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel. 2012.

"An Analysis and Assessment of Intercollegiate Athletics at the University of San Francisco" with Jeremy Howell. 2011.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

**INVITED SPEAKING ENGAGEMENTS**

"The Economics of Name, Image, and Likeness in College Sports," guest speaking in Sports Journalism, San Jose State University, 2025.

"Financial Management in the Sport Industry," guest speaking in Sports Economics, Loyola Marymount University, 2025.

"Going Local," panelist at Going Beyond the Game symposium, hosted by SEVN Sports & Entertainment.  Oakland.  2025.

"Good Morning Walnut Creek: The Economics of Sports," fireside chat with Visit Walnut Creek, 2024.

"Conversations on NIL Complexities," panelist, Name, Image, and Likeness Conference, University of San Francisco Law School, 2024.

"The Unique Aspects of the Business of Sports," guest speaking at Hult International Business School, 2024.

"Developments in Private Antitrust Enforcement in Sports," panelist, American Antitrust Institute Annual Private Enforcement Conference, 2024.

"The Sports Economics Behind the Massive NCAA and NFL Lawsuits," invited on the Sports Wise podcast (hosted by Gabe Feldman, Director of the Tulane Sports Law Program), 2024.

"Antitrust Issues in Sports," panelist, Antitrust and Unfair Competition Law conference hosted by the California Lawyers Association, 2024.

"Financial Management in the Sport Industry," guest speaking in Sports Economics, Loyola Marymount University, 2024.

"Sports & Entertainment Districts," panelist, San Jose Chamber of Commerce, 2024.

"Getting into the Sports Industry," panelist, <u>The Young Sports Talent Investment Forum</u>, 2023.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2023.

"Economics of College Sports," guest speaking in Intercollegiate Sports Management, <u>St. Mary's College</u>, 2023.

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2023.

"Financial Management in the Sport Industry," invited masterclass presentation for <u>Sportin Global</u>, 2023.

"Legal and Economic Issues in the NCAA: A Review of 20 Years of Litigation," with Andy Schwarz and Mark Nagel, <u>University of South Carolina</u>, College Sport Research Institute, 2023.

"The Business of Intercollegiate Sports," invited guest speaker in Andy Dolich's Make Sense of the Madness course on college sports, <u>Stanford University</u>, 2023.

"An Economist Goes to the Game," invited co-host for *New Books Network* podcast, 2022.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the <u>31st Golden State Institute Conference</u> (2021).

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, <u>University of West Florida</u>, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at <u>California Lutheran University</u>.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, <u>University of Louisville</u>, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by <u>Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College</u>, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, <u>University of San Diego Law School</u>, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, University of South Carolina, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports." Keynote Speaker at the 1st International Congress of Iranian Scientific Association of Sport Management, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the International Conference on Governance and Integrity in Sport, Saudi Arabia, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by the New York State Bar Association and the California Lawyers Association, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen. Masterclass for Australian Sports Technologies Network, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at Loyola University, Seville, Spain, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at Sportin Global Summit. 2020.

"The New Normal of the Sport Industry" at HiVE 24HR Liveathon. 2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by GIMA Esports. 2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond." Sponsored by the American Bar Association's Section of Antitrust Law and Trade, Sports and Professional Associations. 2020.

"Economics of Sports." Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2020.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, University of Northern Colorado, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, UCLA's Anderson School of Business, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, University of Oregon, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C. Presentation for the Applied Sport Management Conference, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." Keynote Address, Applied Sport Management Association, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2018.

"The Business of Sports", presented at the Sports Business Club at Sonoma State University Business School, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at Northwestern University, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the University of South Carolina, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at <u>New York University (NYU)</u> as part of the Faculty-in-Residence program.  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina.</u>

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina</u>.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at <u>University of San Francisco</u>, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at <u>U.C. Berkeley</u>, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the <u>IE Business School</u>, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at <u>U.C. Irvine</u>, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at <u>Sonoma State University Business School</u>, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the <u>Rotary Club of San Jose</u>, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry." Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at Niche Ventures Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003. Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault. Presented at *The Wharton School*, University of Pennsylvania, 1999.

## CONFERENCE PRESENTATIONS

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel. Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel. Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel. Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel. Presentation at *Applied Business and Entrepreneurship Association International*, November 2017. (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown. Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton. Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown. Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart. Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown. Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown. Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive? Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha. Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement." Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz. Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz. Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz. Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel. Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver. Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma". Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel. Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods". Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy. Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies" Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth. Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy. Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer. Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown. Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research: An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

## EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)
*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
   Associate Editor, 2010 – 2012
   Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Applied Economics Letters,* 2018
*Applied Economics,* 2020, 2021
*Axioms,* 2017
*Case Studies in Sport Management,* 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport,* 2019, 2020
*Contemporary Economic Policy*, 2004, 2021
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012, 2020, 2021, 2022
*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022
*Future Internet,* 2019, 2020
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance*, 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018, 2019, 2022a, 2022b, 2023

*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017, 2021
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019, 2021a, 2021b, 2021c, 2021d, 2022, 2023a, 2023b, 2024
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b
*Journal of Economic Surveys,* 2024
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018, 2024
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016, 2021, 2022
*Journal of Issues in Intercollegiate Athletics*, 2021
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e, 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e, 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a, 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f, 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b, 2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b, 2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c, 2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021, 2023, 2024
*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022a, 2022b, 2023
*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Mathematical Problems in Engineering,* 2018
*Perceptual and Motor Skills*, 2009
*PLOS One,* 2025
*Review of Economics and Statistics,* 2017
*Review of Industrial Organization*, 2012, 2013, 2015
*SAGE Open,* 2021
*Soccer & Society*, 2014, 2015, 2020
*Social Science Quarterly,* 2025
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018, 2023a, 2023b
*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017, 2020
*Sport Marketing Quarterly*, 2015, 2018
*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management

North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

**TESTIMONY**

Provided expert report and deposition on economic analyses in *Smart v. NCAA*.  2024.

Provided economic declarations for preliminary injunction in *23XI v. NASCAR*.  2024.

Provided economic analysis for the settlement in *Carter v. NCAA*.  2024.

Provided expert reports, deposition, and trial testimony in *In Re NFL Sunday Ticket Antitrust Litigation*.  2024.

Provided expert reports, deposition testimony, and settlement analysis in *Hubbard v. NCAA*.  2024.

Provided expert reports, deposition testimony, and settlement analysis in *In Re College Athlete NIL Litigation*.  2024.

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide.*  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the <u>Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group</u>, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.*  2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute).  2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*.  2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*.  2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch*. 2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council. 2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams*. 2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV*. 2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al*. 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al*. 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL*. 2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*. 2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*. 2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.* 2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*. 2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.* 2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al*. 2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*). 2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*). 2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*). 2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*). 2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*). 2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*). 2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*). 2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI)*. 2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council. 2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council. 2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*). 2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*). 2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*). Case was settled prior to deposition. 2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings). 2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment. 2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings). 2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*). Submitted expert report. Case was settled prior to deposition. 2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*). 2000.

24

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated March 2025

# Appendix B

# Documents Relied Upon

## Legal Filings

Amended Injunctive Relief Settlement.

Objection to Amended Settlement Agreement and Opposition to Final Approval, January 31, 2025.

Objection to Final Approval by Alex Vogelsong, January 31, 2025.

Objection to Settlements on Behalf of Classes of Past, Current and Future NCAA College Athletes, January 29, 2025, with Appendices.

## Expert Reports and Exhibits, Including Backup Materials

Declaration of Andrew Zimbalist, January 30, 2025.

Declaration of Daniel A. Rascher, July 26, 2024.

Declaration of Michael Cragg, December 2, 2024.

Declaration of Rodney Fort and Roger Noll, January 17, 2025.

Declaration of Ted Tatos, August 9, 2024.

Declaration of Ted Tatos, January 30, 2025.

Expert Class Cert Reply Report of Daniel A. Rascher, April 22, 2024 (Hubbard).

Expert Class Cert Reply Report of Daniel A. Rascher, July 21, 2023.

Expert Class Cert Report of Daniel A. Rascher, Oct. 21, 2022.

Expert Class Cert Report of Roger G. Noll, October 22, 2012 (O'Bannon).

Expert Merits Reply Report of Daniel A. Rascher, Feb. 23, 2024 with Errata on April 10, 2024.

Expert Merits Report of Daniel A. Rascher, Dec. 1, 2023.

Expert PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024.

Reply Declaration of Daniel A. Rascher, August 16, 2024.

## Literature, Articles and Publications

American Bar Association. (2017). "Proving Antitrust Damages, Legal and Economic Issues." 3rd ed.

Leeds, M. A., Allmen, P.V., and Matheson, V. A. (2023). "The Economics of Sports." 7th ed., Routledge.

## Third Party Sources

https://apnews.com/article/ohio-state-scholarships-11fd4da3a684389311e7caf1995cc68d

https://apnews.com/article/sports-college-football-football-health-utah-utes-football-be9c91d43fe864619e1f8166ca1ca17b

https://lanthorn.com/81318/sports/understand-the-ncaa-covid-19-eligibility-extensions/

https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf

https://ncaaorg.s3.amazonaws.com/research/sportpart/2023-
24RES_NCAA_Sports_Sponsorship_Spreadsheet.xlsx

https://ncaaorg.s3.amazonaws.com/research/sportpart/2023RES_SportsSponsorshipParticipationRatesRep
ort.pdf

https://ncaaorg.s3.amazonaws.com/research/sportpart/2024RES_SportsSponsorshipParticipationRatesRep
ort.pdf

https://sites.google.com/site/rodswebpages/codes?authuser=0

https://storage.courtlistener.com/recap/gov.uscourts.cand.360907/gov.uscourts.cand.360907.535.2.pdf

https://swimswam.com/texas-will-add-almost-200-new-athletics-scholarships-including-100-full-rides-
for-swim-teams/

https://theithacan.org/51832/sports/sports-features/student-athletes-navigate-covid-eligibility-loopholes/

https://www.denverpost.com/2020/09/08/cu-buffs-betting-on-sports-gambling-football/

https://www.espn.com/college-football/story/_/id/33110193/why-2021-was-year-constant-upheaval-
college-football

https://www.ncaapublications.com/productdownloads/D125.pdf

https://www.npr.org/2022/03/18/1087617011/march-madness-is-back-and-it-looks-more-normal-than-it-
has-in-3-years

https://www.nytimes.com/2023/03/29/sports/sports-betting-universities-pointsbet-caesars.html

https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/

https://www.nytimes.com/athletic/6159981/2025/02/25/college-football-revenue-sharing-georgia-sec/

https://www.on3.com/news/tennessee-to-add-10-percent-talent-fee-to-ticket-prices

https://www.onlineathens.com/story/sports/college/bulldogs-extra/2025/02/25/georgia-athletics-revenue-
sharing-georgia-football-josh-brooks/79413454007/