**UNITED STATES DISTRICT COURT**
**NORHTERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**IN RE COLLEGE ATHLETE NIL LITIGATION**

**Case No. 4:20-cv-03919-CW**

**SUPPLEMENTAL DECLARATION OF PROFESSOR ROBERT H. KLONOFF RESPONDING TO PROFESSOR CHARLES SILVER'S DECLARATION (Doc. 622-2)**

# I. INTRODUCTION[1]

1. In a Declaration filed on September 26, 2024 (Doc. 536) (hereinafter "Klonoff"), I opined that there was no legitimate basis for requiring separately appointed counsel for the damages class and the injunctive class. In response, the Vogelsong Objectors (hereinafter, the Colorado Objection) have submitted a Declaration by Professor Charles Silver, who disputes my conclusions. Class Counsel have asked me to prepare a Supplemental Declaration responding to Professor Silver's Declaration.[2] In this Supplemental Declaration, I incorporate the Qualifications (including my CV), Materials Relied Upon, and Background paragraphs from my prior Declaration (Klonoff ¶¶ 4–24).[3]

# II. MY OPINIONS IN RESPONSE TO PROFESSOR SILVER'S DECLARATIONS

## A. Summary of this Supplemental Declaration

2. In his Declaration, which focuses heavily on my initial Declaration, Professor Silver contends that the class settlement in this case must be rejected because class counsel

---

[1] All citations to court filings are to the court-assigned page numbers, not those in the original filings.

[2] I address solely Professor Silver's Declaration and do not opine on any of the other points raised in any of the objections.

[3] One update regarding my qualifications: Subsequent to the filing of my initial Declaration, Judge Stephen Bough issued an opinion in the nationwide antitrust litigation involving the real estate industry, in which I served as an expert on attorneys' fees. He noted that my "credentials are extensive" and adopted my suggested methodology for calculating attorneys' fees in the context of multiple settlements. *Burnett et al. v. National Association of Realtors, et al.*, 19-CV-00332-SRB (W.D. Mo. Nov. 27, 2024) (Doc. 1622), slip op. 28, 29, 85.

simultaneously represented both the Rule 23(b)(3) class for damages and the Rule 23(b)(2) class for injunctive relief. He contends that this conflict of interest cannot be cured through anything other than the appointment of separate counsel for the injunctive class because "informed client consent . . . cannot be obtained in class actions." Silver Decl. ¶ 9. Professor Silver relies heavily on the Second Circuit's opinion in *In re Payment Card Payment Card Interchange Fee & Merch. Disc. Antitrust, Litig.*, 827 F.3d 223 (2d Cir. 2016) (hereinafter *Payment Card Interchange Fee*).

3. In my opinion, Professor Silver's analysis is flawed for many reasons. To begin with, while not disputing that in the present case, unlike in *Payment Card Interchange Fee*, there were sequential negotiations of the injunctive and damages claims, he claims that this approach is meaningless in reducing conflicts. Silver ¶¶ 35–37. In making this argument, he cites no authority and is forced to repudiate legions of cases (including Ninth Circuit case law, *see* Klonoff ¶ 44) that have recognized the effectiveness of sequential negotiations in the analogous context of minimizing conflicts when class counsel are negotiating both the class's recovery and attorneys' fees.

4. Moreover, Professor Silver ignores several critical differences between this case and *Payment Card Interchange Fee.* For example, he ignores the crucial fact the that the injunctive relief here is extraordinary (unlike in *Payment Card Interchange Fee*, where the injunctive relief was worthless for most class members). He also ignores the important fact that class certification here was contested (unlike the settlement class in *Payment Card Interchange Fee*). Indeed, Professor Silver's reliance on *Payment Card Interchange Fee* as his main authority is perplexing. As discussed below (¶ 28, *infra*), he was an expert on attorneys' fees *in that case*; in sworn testimony he submitted prior to the Second Circuit's opinion, he raved about the spectacular

damages settlement negotiated by class counsel, who simultaneously represented both the damages and injunctive claims. He did not even allude to any potential conflict. Here, by contrast, in sworn testimony on behalf of objectors, he now accuses those same *Payment Card Interchange Fee* attorneys of operating under a flagrant conflict of interest in negotiating that settlement. And even after the Second Circuit's opinion in *Payment Card Interchange Fee*, he has enthusiastically supported attorneys' fees for attorneys who simultaneously represent both damages and injunctive relief claimants, again without even alluding to any potential conflict. *See* ¶ 29, *infra*.

5. Apart from the readily distinguishable *Payment Card Interchange Fee* case, Professor Silver offers no authority in the context of damages and injunctive relief. He does not refute or distinguish the countless cases approving settlements in which the same class counsel sought both damages and injunctive relief. Nor does he dispute that countless courts have recognized sequential negotiation as the gold standard for reducing or eliminating conflicts when class counsel are negotiating both recovery for the class and attorneys' fees for class counsel. Moreover, his positions here directly conflict with positions he has taken elsewhere—in expert declarations, amicus briefing, and in his scholarship. Those other statements not only undermine his views here; they directly support crucial points I made in my initial Declaration. At bottom, Professor Silver's Declaration does not alter my view that this Court should not unravel this landmark settlement and require appointment of additional counsel.

**B. Sequential Negotiations Here are Critical**

6. In my original Declaration, I analogized the sequential negotiations here—negotiating the injunctive relief and the various damages claims seriatim—to the well accepted practice of avoiding conflicts in negotiating both class settlements and attorneys' fees by first negotiating the

class settlement and only then negotiating fees (Klonoff ¶¶ 40–45 & nn. 51–57). This fact alone (wholly apart from the others noted in ¶¶ 15–16, *infra*) readily distinguishes this case from *Payment Card Interchange Fee* and ensured structural integrity.[4]

7. Professor Silver does not dispute that no such sequential negotiations were used in *Payment Card Interchange Fee.* Nor does he dispute that (1) this analogy is squarely on point; and (2) countless courts have relied on sequential negotiations as the gold standard to ensure structural integrity when attorneys are simultaneously negotiating the class's recovery and their own fees. Instead, he asserts that "[s]equencing negotiations, so that fees are discussed after other relief does not eliminate [the] conflict." Silver ¶ 35. Put another way, Professor Silver urges this Court to reject a well-recognized method for reducing or eliminating potential conflicts, even though he cites no authority for his position, and even though his position (if accepted) would put this Court in conflict with countless other courts that have recognized the value of sequential negotiations, including the Ninth Circuit (*see* Klonoff ¶ 44). Separate negotiations here minimized

[4] Professor Silver criticizes my use of the term "structural integrity" in my initial Declaration. He suggests that I invented the term, and says he is "not certain" what it means and has to venture a "guess." Silver ¶ 20. He further criticizes me for not including a definition of the term in my Declaration. *Id.* I find this criticism puzzling. The highly respected MDL judge in the landmark *Deepwater Horizon* MDL litigation (Judge Carl Barbier) used this exact term—without including a definition—in two separate opinions, *see In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 138 (E.D. La. 2013) ("Magistrate Judge Shushan's involvement ensured *structural integrity* during the negotiations.") (emphasis added); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012) (also using the term "structural integrity"), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); and courts at all levels use similar phrases without including definitions, *see, e.g.*, *Amchem Prods., Inc.*, *v. Windsor*, 521 U.S. 591, 627 (1997) (using the term "structural assurance"); *Payment Card Interchange Fee*, 827 F.3d at 231 (using the term "structural protection").

the risk that class counsel traded off the claims of one class for those of another, just as that approach works to reduce the risk of conflicts in the attorneys' fees context. Indeed, the settlement here speaks for itself: Both the damages and injunctive remedies are tremendous and unprecedented, a point Professor Silver does not dispute.[5] The settlement thus refutes any notion that one class suffered at the expense of the other, or that, as Professor Silver claims, class counsel's "incentive to maximize [the injunctive portion] of the recovery was clearly nil." Silver ¶ 32. Under this settlement, if approved, both classes will achieve excellent relief because class counsel negotiated forcefully (and separately) for each group.

[5] Professor Silver errs in contending that "the size of a settlement is *irrelevant*" when considering whether class members received adequate representation. (Silver ¶ 12, emphasis added). Numerous courts have recognized that the relief secured for the class is a relevant factor in assessing alleged inadequacy of representation and conflicts of interest. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 608 (9th Cir. 2018) ("we see no indication of an 'irreparable conflict of interest,' either in the structure of the class or the *terms of the settlement*") (emphasis added); *In re California Micro Devices Sec. Litig.*, 168 F.R.D. 257, 261 (N.D. Cal. 1996) ("[T]he terms of a settlement may be so defective that they themselves provide compelling evidence that the class representative did not 'fairly and adequately' protect the interests of the class during settlement negotiations."); *Cohen v. Brown Univ.*, 16 F.4th 935, 950–51 n.11 (1st Cir. 2021) (concluding that "the specter of intra-class conflict raised by the Objectors is purely speculative" and that "[t]his conclusion is . . . confirmed by the terms of the Amended Settlement Agreement"); *Larson v. AT & T Mobility LLC*, 687 F.3d 109, 133 n. 39 (3d Cir. 2012) ("while adequacy of representation cannot be determined solely by reviewing the settlement benefits available to class members, examining such benefits may be indicative of whether the Class Representatives did, in fact, vigorously represent the claims of all class members"); *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 485 (D.D.C. 2019) (concluding "that the absent Rule 23 class members were adequately represented," in part, due to "the apparent reasonableness of the settlement terms"). In fact, in Professor Silver's main authority, *Payment Card Interchange Fee*, the court specifically considered "the substance of the deal that was struck"—particularly, the extremely weak injunctive relief—in holding "that class plaintiffs were inadequately represented." 827 F.3d at 236 ("the bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation").

8. In what is presumably the best concrete example he could come up with to illustrate the purported conflict here, Professor Silver states a concern that "every dollar moved from the Additional Compensation Fund to the NIL Settlement Fund increases the fee award by 10 cents." Silver ¶ 30. He says the dangers are "obvious." *Id.* In my view, this argument is meritless for several reasons, and it does not begin to justify Professor Silver's position that this massive settlement should be rejected so that new counsel can be added to the negotiations.

9. First, his point that the concerns he notes are "obvious" does not resonate with me, either as a scholar in this field or as a practicing attorney who has personally represented clients in more than 100 class actions. I cannot imagine that this scenario described by Professor Silver was ever given even a moment's thought by any of the attorneys involved in this case—plaintiff or defense—or by mediator Eric Green. It certainly was not a driving force behind this massive, complicated settlement. Rather, it appears to be a case of an objector (and the objector's supporting expert) searching to find any conceivable conflict. Notably, as I discuss below, Professor Silver, in his academic writings, has warned about the serious risk that class objectors will search for any conceivable conflicts in order to extort payments from class counsel or to derive other benefits; indeed, he has advocated that courts should be very cautious in finding that purported conflicts require separate representation. *See* ¶ 35, *infra*. Here, of course, Professor Silver is advocating on behalf of class objectors—whose attorneys are seeking to secure important benefits for themselves. *See* ¶ 34, *infra* (noting that objectors' counsel are arguing that *they* should be appointed as additional counsel).

10. Second, the attorneys' fees aspect of the injunctive relief was not negotiated until after the negotiation of the injunctive terms. ECF No. 494 at 5 n.4. As I have explained (*see* ¶ 6, *supra*;

Klonoff ¶¶ 42–45), this sequential negotiation of fees is a well-settled technique to reduce or eliminate any conflict concerns—a technique recognized by the Ninth Circuit. *See* Klonoff ¶ 44. Moreover, the proposed fee structure hardly suggests a bias against the injunctive class. As proposed by class counsel and supported by fee expert Brian Fitzpatrick, class counsel seek 20% from the *House* damages recovery ($395 million) and 10% from the *Carter* damages recovery ($60 million), both over a ten-year period. For the injunctive relief—where the value could vastly outstrip the value of the damages settlement—class counsel seek $20 million in fees up front and then only up to *1.25%* from future pool payments. ECF No. 583–5 ¶ 10. Thus, if the Court approves the proposed fee structure, injunctive relief class members will inevitably get a larger percentage of their value than the damages class members.

11. Third, while Professor Silver raises what he calls an "obvious" concern in the text of his Declaration, he makes clear in an accompanying footnote (Silver ¶ 30 n.6) that his concern is anything but obvious. As he concedes, "*Class Counsel have some contingent percentage fee interest in the injunctive relief*." *Id.* (emphasis added). Thus, his assertion in the text (Silver ¶30) that the "incentives [in the injunctive fee structure] are incompatible with zealous representation of absent class members with injunctive claims" is refuted by his own footnote. This structure of aligning attorneys' fees with the class's recovery ensures that as the class does better, class counsel also do better. That is precisely the kind of incentive structure that Professor Silver has praised elsewhere. For example, in his Declaration in support of attorneys' fees in *In re Namenda Direct Purchaser Antitrust Litigation*, No. 1:15-cv-07488-CM-RWL (Doc. 928) (Ex. A), ¶ 21, Professor Silver noted that the goal in setting fees should be "to maximize class members' *net* expected recoveries—the amounts they expect to take home after paying their attorneys." (emphasis added).

That goal is met here by Professor Silver's admission that class counsel have a contingent interest in the injunctive relief. Silver ¶ 30 n.6.

### C. *Payment Card Interchange Fee* is Readily Distinguishable

12. Professor Silver says that the question whether separate counsel are required for damages and injunctive classes "depends upon the facts." Silver ¶ 43. Yet he fails to grapple with the crucial factual distinctions I identified between *Payment Card Interchange Fee*—his primary authority—and the present case. Nor does he attempt to distinguish, on their facts, the many other cases I cited approving class settlements in which the same attorneys sought both the damages and injunctive relief.

13. I have already discussed the fact that class counsel in *Payment Card Interchange Fee* did not employ sequential negotiations—an established practice for addressing conflicts in the attorneys' fees negotiation process. That distinction alone is fatal to Professor Silver's reliance on *Payment Card Interchange Fee.* His only attempt to avoid the clear force of that distinction is to claim that every court (including the Ninth Circuit) that has relied on sequential negotiations to reduce conflicts got it wrong. Silver ¶ 34 (admitting that "judges have approved many settlements in which class counsel negotiated fees for themselves after discussions of the relief for class members concluded," but stating that this is an "*obvious* violation of [] fiduciary duty") (emphasis added). In other words, Professor Silver's approach works only if this Court is willing to cast aside decades of settled law, including Ninth Circuit law.

14. Apart from his weak challenge to the sequential negotiations that occurred here, Professor Silver does not even attempt to address the various critical distinctions I articulated between this case and *Payment Card Interchange Bank.*

15. First, Professor Silver ignores a critical distinction between the terms of the *Payment Card Interchange Fee* settlement and the terms of the settlement in the present case. As I noted in my prior Declaration (Klonoff ¶ 49), the majority of merchants in the (b)(2) class in *Payment Card Interchange Fee* gained little or no benefit from the settlement; indeed, the value of the injunctive portion was worthless to most class members. Here, by contrast, as I noted in my prior Declaration (Klonoff ¶¶ 18, 25, 49), the injunctive relief here is extraordinary and historic. Given this fact, which is directly relevant in assessing adequacy of representation, *see* ¶ 7 n.5, *supra,* it is difficult to credit Professor Silver's argument that class counsel's "incentive to maximize [the injunctive] portion of the recovery was clearly nil." Silver ¶ 32. If that were so, one would have expected a severely lopsided settlement that had massive damages but little or no meaningful injunctive relief. But the actual settlement is very strong both for the damages class and the injunctive class, a point Professor Silver does not dispute.[6] Again, Professor Silver fails to grapple with the fact that the injunctive relief here is enormous while the injunctive relief in *Payment Card Interchange Fee* was patently deficient; his failure is especially notable because he argues that whether separate counsel must be appointed for damages and injunctive claims "depends upon the facts." Silver ¶ 43.

16. Second, as I noted in my prior declaration (Klonoff ¶ 50), in contrast to *Payment Card Interchange Fee*, in which there was *no* prior contested class certification ruling, the settlement

[6] Professor Silver references my praise for the historic nature of this settlement (Silver ¶11); significantly, he does not dispute my characterization and does not claim that the conflict he alleges led to an inadequate settlement. His contention that "the size of a settlement is irrelevant" when considering whether class members received adequate representation (Silver ¶ 12) is incorrect. *See* ¶ 7 n.5, *supra*.

here occurred only after the issue of class certification was extensively litigated and the Court granted class certification.[7] The Second Circuit underscored the importance of the settlement class context there by noting: "[W]e have blessed multi-class settlements that were the product of unitary representation, but those were entered into *after* class certification." 827 F.3d at 236 (emphasis in original). The Court recognized that in the latter context (the context here), it is "more skeptical of allegations that subclass conflicts require[] separate representation." *Id.* Again, despite his statement that the analysis of potential conflicts must be fact-based, Professor Silver ignores this critical difference between *Payment Card Interchange Fee* and this case—even though the Second Circuit itself made clear (even using italicized language) that a case involving a settlement *after* class certification would present a wholly different context.

17. While Professor Silver ignores the Second Circuit's heavy reliance on the settlement class posture of that case, he himself has written extensively elsewhere that there is a critical difference between a contested class certification (like the present case) and a settlement class when a court evaluates the fairness of a settlement and considers attorneys' fees. For example, in

[7] As I noted in my original Declaration (Klonoff ¶ 50 n.70), the contested classes that were certified here were modified to some extent in the settlement process. But I explained that this fact has no significance, and I cited several cases declining to apply *Amchem*'s heightened review even though the class certified for settlement was not identical to the class certified after the contested class certification procedure. Klonoff ¶ 50 n.70. Indeed, as I explained (*id.*), again citing authority, the configuration of classes frequently changes during the settlement review process. As I noted (*id.*), the crucial point is that the existence of hard-fought, contentious class certification proceedings—leading to an order granting class certification—undermines any concern that the settlement negotiations were collusive because class counsel were "disarmed." *Id.* Professor Silver nowhere argues that the changes to the litigation class somehow converted the settlement here into a settlement class subject to *Amchem*'s heightened scrutiny.

a Declaration in support of attorneys' fees that he submitted in *Namenda, supra* (Ex. A), Professor Silver—at the very outset of his Declaration—praised the class settlement because it involved a contested class certification and not a settlement class. He noted: "This litigation is also exceptional in that class certification was achieved over [defendant's] objection rather than with its acquiescence as part of a settlement. Settlement classes are more common than litigation classes, but *the latter convey greater bargaining leverage in settlement negotiations.*" (Doc. 928 ¶ 2; emphasis added).

18. As another example, in his Declaration in support of attorneys' fees in *Allapattah Services, Inc. et al. v. Exxon Corp.*, No. 91-00986-ASG (Doc. 2638) (Ex. B), filed on February 16, 2006, he similarly emphasized, in supporting attorneys' fees of well over $300 million,[8] the fact that class counsel "[p]revailed, in the trial court and on appeal, on class certification"; he noted that this accomplishment alone "would entitle Class Counsel to hold their heads high" —and was one important reason why he believed that "Class Counsel [did] an extraordinary job." (Ex. B at 11, 12).

19. Professor Silver has made the same point in a Supreme Court amicus brief. In ¶ 6 of his current Declaration, Professor Silver cites an amicus brief of law professors in *Amchem*, and states that he was "the principal drafter[.]" In that brief, he explains:

---

[8] *See* Ex. B at 12, 50 (supporting fee request for 33.33% of a "$1.2 billion recovery"); *see also* Supplemental Expert Report of Professor Charles Silver Concerning Attorneys' Fees and Expenses, *Allapattah Services, Inc. et al. v. Exxon Corp. et al.*, No. 91-00986-ASG (Doc. 2638) at 3–4 (supporting revised fee request of "31.33% of $1.060 billion, or roughly $332 million," after a settlement was reached post-trial).

> "*Once a class is properly certified, there is reason to hope the named plaintiffs and their attorneys will adequately represent the absent plaintiffs.* But before certification, and especially when absent plaintiffs object to certification, there is a classic trilateral dispute in which the interests of the named plaintiffs, their attorneys, and the settling defendants conflict with those of the absent plaintiffs, and there is a palpable danger that the former will seek to profit at the latter's expense."
>
> * * *
>
> "*When the Rule 23 requirements are met for trial purposes, a plaintiffs' attorney possesses two important bargaining advantages in settlement negotiations: a credible threat to stick a defendant with an adverse class-wide judgment; and a fee-related interest in trying the lawsuit unless the defendant offers its expected value in settlement*. The threat is a club. The desire for the largest possible recovery yielding the largest possible fee award is an incentive to use it. *Both advantages disappear when the Rule 23 requirements can be met only in settlement. . . . A plaintiffs' attorney who can obtain certification only if a defendant agrees to it in settlement is a boxer whose hands are tied.*"

Amicus Brief of Law Professors in Support of Respondents in *Amchem* 1997 WL 13605 (1997), at *17, *19 (emphasis added).

20. Despite his strong belief—expressed as an attorneys' fees expert and as an amicus brief author—that a contested class is fundamentally different than a settlement class, in his current role as an expert supporting an objector, Professor Silver ignores the fact that the present settlement—like *Namenda* and *Allappattah*—involved a contested class certification. Professor Silver's own logic in his *Namenda* and *Allapattah* Declarations and his *Amchem* amicus brief dovetails the logic of the Second Circuit in *Payment Card Interchange Fee* (emphasizing the crucial difference between the settlement class there and a contested class certification). His logic also dovetails my reliance (in my prior Declaration) on the fact that the settlement here involved a *contested* class certification.

21. In light of his reasoning in his *Namenda* and *Allapattah* Declarations and his *Amchem* amicus brief—and the critical language in *Payment Card Interchange Fee* (quoted in ¶ 16, *supra*)—it is conspicuous that in his 19-page Declaration, Professor Silver never once even acknowledges (let alone grapples with) the fact that the settlement here involved a contested class certification. Surely, he cannot claim that this fact was unimportant in *my* analysis. I devoted two full pages of my initial Declaration to this important point, including multiple footnotes. *See* Klonoff ¶ 50 and accompanying footnotes.

22. Given that this crucial fact (a contested class certification) was front and center when Professor Silver drafted his Declaration, it is quite possible that he did not address this critical point because he had no plausible response and thought it best to simply ignore this damaging fact altogether. After all, his principal case (*Payment Card Interchange Fee*), his *Amchem* amicus brief, and his own prior expert testimony all make clear that this is a very bad fact for him and the Colorado Objection. *See* ¶¶ 17–19, *supra*.

23. It is also possible, however, that Professor Silver misunderstood the facts here and erroneously believed that the present case, like *Payment Card Interchange Fee*, was *also* a settlement class without any prior contested class certification. That possibility seems highly unlikely given my heavy emphasis on the fact that the class certification here was contested. Nonetheless, portions of Professor Silver's Declaration suggest that perhaps he *did* misunderstand the facts. For instance, in his Declaration he emphasizes the inapposite point that "*when a district court certifies a class and approves a settlement concurrently*, the requirements of Rule 23(a) 'demand undiluted, even heightened, attention.'" Silver ¶ 12 (quoting *Amchem*; emphasis added). Moreover, he includes an extensive block quote from the Second Circuit in *Payment Card*

*Interchange Fee*, which similarly highlights the Second Circuit's recognition that "*'[t]he requirements of Rule 23(a) are applied with added solicitude in the settlement-only class context* . . . .'" Silver ¶ 43 n. 10 (quoting the Second Circuit; emphasis added). Why would he highlight the more onerous test applicable to settlement classes if he was aware that the class certification here was *contested*? But in the end, it does not matter. Either way—whether by deliberate omission or by misunderstanding the critical facts—Professor Silver's Declaration is seriously flawed, in my opinion, because it fails to address this core point.

**D. Professor Silver's Position Conflicts with Countless Cases In Which Settlements were Approved Despite Class Counsel Seeking Both Damages and Injunctive Relief**

24. I cited dozens of cases in my original Declaration as examples of the countless cases that found no conflict where the same attorneys sought both the damages and injunctive relief. Klonoff ¶ 38 & nn. 46–48. Yet Professor Silver does not even attempt to distinguish a single one of those cases on their facts, even though, as I noted, he says that whether separate representation is required "depends upon the facts." Silver ¶ 43. Nor does he offer this Court any guidance on how a court should conduct such a fact-based inquiry—or how this Court should grapple with the overwhelming authority that approves settlements involving simultaneous representation of class members seeking damages and those seeking injunctive relief. Indeed, other than the inapposite *Payment Card Interchange Fee* case, Professor Silver does not cite a single case holding that representation of both damages claims and injunctive claims presents a fatal conflict of interest requiring separate representation.

25. Professor Silver *does* make the irrelevant concession that, in his view, separate counsel are not required for damages and injunctive claims when (unlike here) "class actions are tried[.]"

Silver ¶ 43.  But that concession raises more questions than it answers.  The myriad cases that I cited—which did not require separate representation of damages and injunctive claims—were all settlements, not trials, so this concession does not begin to grapple with the case law.  Moreover, his approach (for which he offers no authority) would be impossible to implement.  For example, assume that a case involving damages and injunctive relief settled on the eve of trial without separate counsel for the two subgroups.  Would that settlement be invalid because trial counsel negotiated a settlement, without a separate group of lawyers, hours *before* trial?  Or what if the settlement occurred *during* the trial?  Would that settlement be invalid because separate counsel were not appointed to join the settlement discussions or because the trial was never completed?  Put another way, under his approach, is a settlement *during* trial a *trial* case (no need for separate counsel) or a *settlement* case (separate counsel must be appointed)?  Moreover, what approach would he apply if a settlement is reached shortly *after* a completed trial?  Given the risk of reversal on appeal, it is not uncommon for class actions to settle even *after* plaintiffs achieve a favorable trial verdict.  Would separate counsel have to be appointed before any such settlement discussions could commence?  More generally, is the trial context really distinguishable from the settlement context under his (current) rigid view of conflict principles (*see* ¶ 2, *supra*)?  At a trial, class counsel could choose to devote substantially more time and energy to the damages component before the jury than to the injunctive piece being considered by the court.  Why would that trial approach be acceptable to Professor Silver?  To my knowledge, *no court* has ever adopted Professor Silver's view that, in a case seeking both damages and injunctive relief, separate counsel is required if a case is settled but not if it is tried.  And with good reason: It makes no sense.  Indeed,

I know of no case in which anyone has even tried to *argue* the point. Nor do I know of any law review article or treatise that espouses this distinction.

26. Professor Silver also suggests that he is less concerned about separate representation "[w]hen *all* class members stand to benefit from both forms of relief." Silver ¶ 43 (emphasis added). But that is an extremely rare occurrence, as is clear from the cases I cited in my original Declaration.[9] By so severely limiting the universe of damages/injunction settlements that do not require separate representation, Professor Silver's approach would mean that virtually no settlements in which class counsel represented both damages claimants and injunctive claimants could survive scrutiny. But as I noted (¶ 24, *supra*), settlements involving damages and injunctive relief are routinely approved despite the absence of separate groups of attorneys. No court to my knowledge has ever adopted the stringent test urged by Professor Silver; nor have I seen any scholarly work take this position.

---

[9] For just a few examples, *see, e.g.*, *Charron v. Wiener* 731 F.3d 241, 245, 246, 253 (2d Cir. 2013) (involving a class action against landlords in New York City who conspired to "raise rents above legally chargeable levels and to drive tenants out of rent-regulated units" in order to "charge new tenants a higher, market-rate monthly rent"; the settlement included compensation for "damages for past rent overcharges" and injunctive relief for "all class members who presently reside in Pinnacle-owned housing"); *Nevarez v. Forty Niners Football Co.*, 474 F. Supp. 3d 1041, 1045 (N.D. Cal. 2020) (involving a (b)(2) class of individuals with disabilities who "will attempt to purchase accessible seating" at the stadium and a (b)(3) class who "purchased, attempted to purchase, or for whom third parties purchased accessible seating and who have been denied equal access" to the stadium); *McKibben v. McMahon*, No. EDCV 14-02171 JGBSPX, 2018 WL 11350605 (C.D. Cal. Sept. 10, 2018) at *1, *5 (involving a class action against the San Bernardino County Jail for treatment of inmates based on sexual orientation, gender identity, and gender; settlement included damages for inmates housed in San Bernardino County Jail between October 22, 2012, and March 31, 2018, and injunctive relief for "individuals who currently are, or in the future will be, GBT inmates housed in San Bernardino County jails").

**E. Professor Silver's Position on the Need for Separately Represented Classes Conflicts With His Own Prior Expert Testimony**

27. Significantly, Professor Silver—in his own work as an attorneys' fees expert for class counsel (as opposed to his work on behalf of class objectors)—has made clear that settlements of damages and injunctive claims without separate counsel pose no concerns for him.

28. For instance, in the pre-Second Circuit phase of *Payment Card Interchange Fee*, Professor Silver was not simply an academic bystander; he was an *expert* who submitted a Declaration in support of class counsel's request for attorneys' fees. He had no difficulty submitting a sworn Declaration on behalf of those attorneys—whom he *now* claims operated under a fatal conflict of interest. Specifically, in his 2013 Declaration (ECF No. 2113–5) (Ex. C), he offered testimony urging that the class attorneys who originally settled both the damages and the injunctive portions of the *Payment Card Interchange Fee* case—the settlement later overturned by the Second Circuit—were entitled to their requested fees of approximately $725 million for the damages class.[10] He praised the settlement as "the largest class-based antitrust recovery in history" (Ex. C at 1) and argued that class counsel's fee request was "entirely reasonable and considerably below what the attorneys ought to receive" (Ex. C at 4). In his support of the fees requested for the damages settlement, Professor Silver did not indicate *any* concern about class counsel's simultaneous representation of a (b)(3) and a (b)(2) class. That is notable because his *current* position is that this very *Payment Card Interchange Fee* settlement suffered from a fatal conflict

[10] *See* Ex. C at 1–4 (supporting award of "10 percent in fees" of the proposed $7.25 billion settlement).

of interest, thus rendering the settlement invalid. *See* Silver Decl. ¶ 42 (arguing that the district court in *Payment Card Interchange Fee* should have appointed "(at least) two teams of attorneys—one to negotiate the damages recovery and one to bargain for injunctive relief"). Of course, if the settlement in that case was invalid on conflict-of-interest grounds because separate counsel were not appointed, then class counsel's request for over $700 million in fees for the damages settlement was *a fortiori* invalid and moot. Consistent with his current position, Professor Silver should have declined to testify that class counsel there were entitled to *any* attorneys' fees. Yet, Professor Silver accepted this retention and never even alluded to any potential conflict. Apparently, just as many courts have routinely approved settlements in which the same attorneys represented both damages and injunctive claims, Professor Silver saw no red flags in the *Payment Card Interchange Fee* settlement, and thus he unequivocally supported class counsel's large fee request. And that is true even though, as I explained above, the *Payment Card Interchange* case had severe problems that do not exist here. *See* ¶¶ 6, 13–16, *supra*.

29. Nor did the Second Circuit's 2016 opinion in *Payment Card Interchange Fee* somehow lead to a sea change in Professor Silver's approach as an attorneys' fee expert. For example, in a 2021 Declaration, written five years *after* the Second Circuit's opinion, Professor Silver offered a Declaration supporting the attorneys' fees requested by class counsel in *Kolton v. Frerichs*, No. 16-cv-3792 (N.D. Ill. Sept. 22, 2021) (Doc. 126-1) (Ex. D). In that case, the same attorneys represented both a Rule 23(b)(3) settlement class and a Rule 23(b)(2) litigation class.[11]

---

[11] *See* Ex. D ¶ 14 ("The settlement includes two classes: a settlement class to be certified under Rule 23(b)(3) . . . and a litigation class that the Court previously certified under Rule 23(b)(2)").

Again, under his current position, he should have *declined* class counsel's request to opine on attorneys' fees because, under his current rationale, the settlement suffered from a fatal conflict of interest, given that separate counsel were not appointed for the two classes. Yet, again, he took on that work and did not express any concern in his Declaration about class counsel's simultaneous representation of the damages and injunctive claims. Instead, he offered a 40-page Declaration strongly supporting class counsel's $9.5 million fee request. [12]

30. Professor Silver's failure to acknowledge a red flag in his Declarations in *Payment Card Interchange Fee* and *Kolton* shows that, until the present case, he viewed simultaneous representation of damages and injunctive classes as routine, unremarkable, and not even worth alluding to in sworn testimony. Yet now, testifying on behalf of an objector, he claims that this same structure here requires the draconian remedy of striking down this massive, historic settlement and requiring additional counsel. For this reason, among many others discussed herein, I do not find Professor Silver's current testimony persuasive.

### F. Professor Silver's Current View Would Lead to "Balkanization" and Potentially Countless Separately Represented Classes

[12] Although Professor Silver now says that he is less concerned about separate representation "[w]hen *all* class members stand to benefit from both forms of relief," Silver ¶ 43 (emphasis added), that view does not allow him to distinguish his expert work in *Kolton* because not all class members there benefited from both forms of relief. *See* Ex. D ¶¶ 14–16 (describing the two classes, containing different class periods). Under his current analysis, the *Kolton* settlement should have concerned him deeply. Likewise, he cannot explain his expert work in *Payment Card Interchange Fee* on that basis; it was clearly not the case that *all* class members in that settlement benefited from both forms of relief.

31. It is possible to envision a conflict in virtually every class action, since one can almost always articulate some differences among class members. As I explained, using *Deepwater Horizon* as an example, a class might include some individuals with business losses and others with real estate damages. *See* Klonoff ¶ 33. Given the ability of an objector to theorize conflicts in virtually every class action, I noted concerns about "Balkanization" and explained that courts have been very reluctant, post-*Amchem*, to require separately represented subclasses when other less onerous approaches can be used. *See* Klonoff ¶¶ 27–36 and accompanying footnotes. Indeed, in this case, the Colorado Objection complains not only about the need for separate counsel for the damages and injunctive claims, but also about numerous conflicts within the group of class members seeking damages. And Professor Silver repeats that concern in his Declaration. He notes that "the problem [he] describe[s] [involving simultaneous representation of damages and injunctive claims] also afflicted the negotiations of the various damages claims . . . ." Silver ¶ 24 n.2. And he carefully argues not just for *two* separately represented teams of attorneys but for "(*at least*) two teams of attorneys[.]" Silver ¶ 42 (emphasis added). This is not surprising; as I noted, one can hypothesize multiple conflicts among class members in virtually every class action. Thus, in reality, Professor Silver's approach raises the specter of *numerous* subclasses with separate representation—not only here but in many, if not most, class actions.

32. Professor Silver does not address the serious complications that would ensue if a court goes down the road of creating multiple subclasses with separate representation. Settlement negotiations in class actions are never easy, and adding multitudes of lawyers for separate subgroups only exacerbates the difficulties and can lead to a stalemate. The huge downsides of requiring separately represented classes or subclasses is precisely why courts and commentators

post-*Amchem* have made clear that protections less onerous than subclasses with separate representation are sufficient other than for the most serious and egregious conflicts. I focused in detail on this authority, Klonoff ¶¶ 30–34, but Professor Silver ignores the cases and treatises I reference, including *Deepwater Horizon*, *NFL Concussion*, the McLaughlin treatise, and the Newberg/Rubenstein treatise.

33. In his current Declaration Professor Silver espouses the view that "fiduciary law has not embraced the view that prophylactic measures can cure conflicts." Silver ¶ 18. In other words, his view is that this Court must be "conservative" (Silver ¶ 42) and must err on the side of ordering subclasses with separate representation. Of course, that approach is exactly the opposite of the approach that courts and authoritative treatises have taken (*see supra*; Klonoff ¶¶ 30–32).

34. Professor Silver's current approach—that multiple groups of lawyers should be appointed whenever a potential conflict is identified—would be a green light for strategic objectors to attack virtually any class settlement. As noted, virtually every class action has differences among class members, and in virtually every class settlement an objector could argue for some sort of subclassing with separate representation. Such an approach would vastly complicate class settlements because objectors, eager to seek their own attorneys' fees or side payments—or to secure appointment as the additional class counsel—would inevitably (and routinely) mount myriad challenges.[13] Indeed, this case illustrates the dangers of Professor Silver's approach: The

[13] The 2018 amendments to Federal Rule of Civil Procedure 23, which were drafted when I served as the academic member of the Federal Civil Rules Advisory Committee (and as a member

attorneys who submitted the Colorado Objection do not propose to leave it to this Court to select the additional counsel; instead, they propose *themselves* as the new counsel (Klonoff ¶ 39 n.3), a conflict Professor Silver never mentions.

35. Professor Silver's position here is a 180-degree shift from the position he has taken in his academic writing. As a scholar, he has expressed grave concern that requiring separate representation for subgroups can lead to abuse by objectors. Thus, in a 1998 article that he co-authored with Professor Lynn Baker, written shortly after *Amchem*, he warned against a strict approach to requiring subclasses with separate representation precisely because it would encourage countless strategic objectors. Charles Silver & Lynn Baker, *I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds*, 84 Va. L. Rev. 1465, 1499–1500 (1998).[14] As he and his co-author explained, the imposition of rigid duties on class counsel in light of *Amchem* would only encourage "*endless rounds of extortion*" *by* "*[a]ttorneys representing objectors*." *Id.* at 1499 (emphasis added). As he and his co-author explained: "*No two class members have identical interests*"; therefore, under a literal reading of *Amchem*, "no two can be jointly represented in settlement," meaning that "an objector can logically and cheaply raise this complaint in any class action[.]" *Id*. As a result of this concern, Professor Silver and his co-author urged the following approach: "In class actions, *a standard of zero tolerance for conflicts is*

---

of the Class Action Subcommittee), were designed to *curtail* strategic objections for personal gain. *See* Robert Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 Fordham L. Rev. 475, 493–97 (2020). Professor Silver's approach here would turn back the clock and create vast new grounds for strategic objectors to challenge class settlements.

[14] Professor Silver is listed as the first author, even though alphabetically Professor Baker would be listed first. This suggests that he was the lead author of the piece. But in all events, he put his name on the article as a co-author of the entire article, without reservation.

*impossible to defend or meet. Class counsel must be allowed to incur and resolve many conflicts.* Otherwise, they cannot make the strategy calls and financial decisions that have to be made for class actions to proceed." *Id.* at 1499–1500 (emphasis added). Of course, this flexible approach to conflicts is the exact opposite of the rigid approach that Professor Silver urges here, *i.e.,* that courts must err on the side of designating multiple separately represented classes or subclasses whenever a conflict is raised. *See* Silver ¶ 9.

36. What Professor Silver and his co-author argued in their 1998 article is exactly what class counsel did here—and what courts around the country have approved post-*Amchem* (*see* Klonoff ¶ 30): They negotiated a settlement that included important protective measures short of subclassing with separate representation. Specifically, they first litigated class certification; then they conducted sequential settlement negotiations of the injunctive and damages claims with the assistance of an experienced mediator; and they left the bargaining table only after securing historic results for *both* the damages class and the injunctive class. To use Professor Silver's words, class counsel "resolve[d] [the] conflict[]" without the need for an additional team of lawyers. 84 Va. L. Rev. at 1499–1450. This settlement is thus a textbook example of what Professor Silver himself urged in his 1998 article. Only now does he advocate a completely different approach.

**G. Professor Silver's Attack on My Reliance on the Role of Mediator Eric Green is Meritless**

37. Professor Silver sets up a straw man by attributing to me the view that "plaintiffs' lawyers can *cure* conflicts among co-clients by employing mediators when negotiating settlements . . . ." Silver ¶ 21 (emphasis added). I never said that the presence of a mediator, *standing alone*, was a panacea. Rather, I wrote that "having one of the country's most respected mediators

involved throughout the negotiation process is *one piece of the puzzle in demonstrating fairness*." Klonoff ¶ 41 (emphasis added). My Declaration focused much more heavily on several other reasons why separate counsel are not required: the extraordinary result achieved both for the damages class and the injunctive class (in contrast to the grossly deficient injunctive relief in *Payment Card Interchange Fee*); the staged negotiations (which did not occur in *Payment Card Interchange Fee*); and the fact that this case involved a contested class certification, not a settlement class as in *Payment Card Interchange Fee*.

38. However, contrary to Professor Silver, who argues that *no* weight should be given to the presence of a mediator, Silver ¶¶ 21, 22, I believe that the presence of a mediator is a relevant fact that this Court can and should consider in deciding whether to throw out this historic class settlement, appoint additional counsel, and start over from scratch. The reality is that no mediator wants to preside over a settlement that is likely to be overturned because of severe conflicts of interest; and an experienced mediator such as Eric Green will inevitably be alert to avoiding serious conflicts. That is why the Ninth Circuit (and many other courts) have recognized that the "presence of a neutral mediator" is a "*factor* weighing in favor of a finding of non-collusiveness[.]" *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (emphasis added). The Ninth Circuit's language ("a factor") is exactly what I opined in saying that the presence of mediator Eric Green is "one piece of the puzzle." Finally, Professor Silver's assertion that there is "no authority" for this Court to give *any* weight to the presence of a mediator is mystifying. In fact, I cited several examples from countless cases I could have chosen, *see* Klonoff ¶ 41 n.51 , including Ninth Circuit law. *See also* ¶ 6 n.4, *supra* (quoting *Deepwater Horizon* court's reliance on the involvement of the magistrate judge in approving a class settlement).

**H. Professor Silver's Reliance on Cases Involving Coupon Settlements is Unpersuasive**

39. Although—as I explained above (¶¶ 7, 24, 32, 33, 38, *supra*)—Professor Silver does not and cannot refute the many cases I cite that are directly on point, he chooses to focus extensively on the Ninth Circuit's discussion of coupon settlements in *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013). Silver ¶ 31 (devoted entirely to *HP Inkjet Printer*). But coupon settlements are the polar opposite of the settlement here. The problem with coupon settlements, and the reason they were targeted under the Class Action Fairness Act, is that coupons are often worthless, leaving the class with nothing of value, while class counsel reap substantial attorneys' fees. *See, e.g.*, *Ciolino v. Frank*, 716 F.3d 1173, 1178 (9th Cir. 2013) (noting concern that with coupon settlements "'class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees'") (quoting CAFA legislative history). The settlement here is the exact opposite of what motivated Congress in CAFA to regulate coupon settlements: Congress wanted to address a major category of potentially worthless settlements and thereby ensure that class settlements would create *genuine and substantial value* for the class, exactly what has occurred here. If this Court grants final approval to the present settlement, both the damages class and the injunctive class will receive extraordinary relief. As noted (¶ 15 n.6, *supra*), Professor Silver takes no issue with my characterization of the settlement as extraordinary and highly beneficial to those in both the damages and injunctive classes. I cannot think of a less relevant analogy than a coupon settlement. The coupon settlement analogy might have had some merit in *Payment Card Interchange Fee,* where the injunctive relief was worthless to most class members. But it has no relevance here, given the substantial settlement of both the damages and

injunctive claims.  In his attempt to unravel this settlement, the fact that Professor Silver's best analogy is a coupon settlement speaks volumes.

* * *

40.  At bottom, nothing raised by Professor Silver in his current Declaration gives me any pause with respect to any of the conclusions I reached in my initial Declaration.  Indeed, his prior attorneys' fee expert declarations, amicus briefing, and academic writing support *my* opinions, not his.  In my view, this Court should reject the Colorado Objection's (and Professor Silver's) request to unravel this landmark settlement, and the Court should decline their request to appoint separate counsel for the injunctive class.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

Robert H. Klonoff

March 2, 2025

Ex. A

Declaration of Professor Charles Silver (excluding CV)

*In Re Namenda Direct Purchaser Antitrust Litigation*,
Case No. 1:15-cv-07488-CM-RWL,

Filed on March 13, 2020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Direct Purchaser Actions** | **Case No. 1:15-cv-07488-CM-RWL** |

**DECLARATION OF PROFESSOR CHARLES SILVER IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES**

**CONTENTS**

I. Summary of Opinions ........ 1
II. Credentials ........ 2
III. Prior Trial and Deposition Testimony ........ 3
IV. Documents Reviewed ........ 4
V. Facts ........ 7
VI. Background Analysis ........ 7
A. Fee-Setting Is A Positive-Sum Interaction ........ 8
B. Courts Should Mimic The Market When Awarding Fees ........ 9
C. Quality of Plaintiffs' Counsel ........ 10
VII. Fees Prevailing in the Private Market for Legal Services ........ 11
A. In Contingent Fee Litigation, Percentage-Based Compensation Predominates ........ 12
B. Clients Normally Pay Contingent Fees In The Range Of 25 Percent To 40 Percent ........ 14
1. Personal Injury Cases ........ 15
2. Large Commercial Lawsuits ........ 16
C. Direct Purchasers' Support For A One-Third Fee In Prior Generic Delay Antitrust Class Actions ........ 22
VIII. The Difficulty of Winning Antitrust Class Actions ........ 24
IX. Fee Awards in Comparable Cases ........ 28
X. Lodestar Cross-Check ........ 32
XI. Compensation ........ 37
XII. Conclusion ........ 37
Exhibit 1: Resume of Professor Charles Silver ........ 38

I, Charles Silver, state as follows:

## I.      SUMMARY OF OPINIONS

1.      This is a landmark settlement.  At $750 million, it is the largest-ever settlement of a private antitrust case against a single drug maker alleging suppression of generic competition.  It is also in the top 1 percent of all class action settlements regardless of case type.

2.      This litigation is also exceptional in that class certification was achieved over Forest's objection rather than with its acquiescence as part of a settlement.  Settlement classes are more common than litigation classes, but the latter convey greater bargaining leverage in settlement negotiations.  That the lawsuit settled on the eve of trial reflects the importance Forest attached to avoiding the risk of suffering a class-wide judgment at trial.

3.      The failure of any governmental agency to pursue the generic delay arrangement shows that Class Counsel bore all the litigation risk associated with this claim alone.  While it is true that the New York Attorney General ("NYAG") obtained an injunction against the product hop, only Class Counsel pursued damages on that claim.  Class Counsel also pursued damages on the generic delay settlement, which the NYAG did not challenge and which accounts for the bulk of damages sought.

4.      The time, effort, and expense devoted to this lawsuit—approximately 52,000 hours of professional time and approximately $5.8 million in out-of-pocket costs—reflect the difficulty and intensity of the litigation and, in view of the success Class Counsel achieved, justify an ample fee award.

5.      In view of the preceding, I believe that a request by Class Counsel for 27.5 percent of the recovery—$206.25 million—as fees and reimbursement of approximately $5.8 million in

expenses is reasonable. I also believe that an award of this magnitude is supported by (1) rates prevailing in the private market for legal services, (2) awards granted in other generic delay cases, (3) awards granted in other cases with mega-fund recoveries (recoveries of $100 million or more), and (4) a lodestar cross-check.

## II. CREDENTIALS

6. I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991. Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

7. I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years. I have published over 100 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration. My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

8. My first publication after joining the Texas Law faculty, an analysis of the restitutionary basis for fee awards in class actions, appeared in 1991. Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991). My most recent publication in the field, an empirical study of fee awards in securities fraud class actions, appeared in the Columbia Law Review nearly twenty-five years later. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in*

*Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) (*Is the Price Right?*). The CORPORATE PRACTICE COMMENTATOR chose this article as one of the ten best in the field of corporate and securities law in 2016. The study of attorneys' fees has been a principal focus of my academic career.

9. From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

10. I have testified as an expert on attorneys' fees many times. Courts have cited or relied upon my opinions when awarding fees in many class actions, including *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6888488 (E.D.N.Y. 2019); and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), all of which settled for amounts exceeding $1 billion.

11. Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

12. I have attached a copy of my resume as Exhibit 1 to this declaration.

## III. PRIOR TRIAL AND DEPOSITION TESTIMONY

13. In the past four years, I have testified in the following matters:

| Case | Proceeding | Jurisdiction | Topic of Testimony | Year |
|---|---|---|---|---|
| William “Max” Duncan, Jr. and Duncan Litigation Investments, LLC v. Robert C. Hilliard and HMG, LLP | Arbitration | N/A | Legal Ethics-Fee Splitting with Non-Lawyer | 2019 |

## IV. DOCUMENTS REVIEWED

14. In preparing this report, I reviewed the items listed below. I also reviewed other items including, without limitation, cases, studies, and published scholarly works.

**Documents Generated in Connection with This Case**

- Order on Certain Evidentiary Matters Raised in the Parties’ October 23, 2019 and October 24, 2019 Letter Briefs, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Oct. 24, 2019) (ECF No. 907)
- Transcript of Final Pretrial Conference, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Oct. 10, 2019) (ECF No. 889)
- Transcript of Settlement Conference, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Oct. 38, 2019) (ECF No. 913)
- Revised Joint Pretrial Order, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Apr. 30, 2019) (ECF No. 699)
- Memorandum of Law in Support of Class Counsel’s Motion for Attorneys’ Fees, Reimbursement of Expenses and Incentive Awards for the Named Plaintiffs
- Declaration of Bruce E. Gerstein in Support of Class Counsel’s Motion for Attorneys’ Fees, Reimbursement of Expenses and Incentive Awards for the Named Plaintiffs
- Memorandum Decision and Order Denying Defendants’ Motion for Summary Judgment; Granting in Substantial Part and Denying in Part Defendants’ *Daubert* Motions to Exclude Opinions and Testimony of Plaintiffs’ Experts; and Granting Plaintiffs’ Motion for Class Certification *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Aug. 16, 2018) (ECF No. 570)
- Settlement Agreement, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Dec. 24, 2019) (ECF No. 919)
- Order Granting Direct Purchaser Class Plaintiffs’ Motion for Preliminary Approval of the Form and Manner of Notice to the Class and Proposed Schedule for a Fairness Hearing, *In re Namenda Direct Purchaser Antitrust Litigation*, 15-cv-07488 (S.D.N.Y. Jan. 6, 2020) (ECF No. 920)
- Settlement Notice

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 7 of 30

**Other Documents**

- Settlement Agreement Between the Attorney General for the State of New York and Allergan, *People of the State of New York v. Actavis Plc, et al*, 14-cv-07473 (S.D.N.Y. Nov. 30, 2015) (ECF No. 96-1)
- Transcript of Civil Cause for Settlement and Attorneys' Fees, *In re Buspirone*, 01-md-1410 (S.D.N.Y. Apr. 11, 2003)
- Letter from Steven Winick, *In re Asacol Antitrust Litigation*, 15-cv-12730 (D. Mass. Oct. 26, 2017) (ECF No. 581-1)
- Letter from Robert J. Tucker, *In re Asacol Antitrust Litigation*, 15-cv-12730 (D. Mass. Sept. 15, 2017) (ECF No. 582-2)
- Letter from David A. Schumacher, *In re Asacol Antitrust Litigation*, 15-cv-12730 (D. Mass. Sept. 11, 2017) (ECF No. 582-3)
- Letter from David A. Schumacher, *In re Celebrex (Celecoxib) Antitrust Litig.*, 2:14-cv-00361 (E.D. Va. Jan. 2, 2018) (ECF No. 619-4)
- Letter from Robert J. Tucker, *American Sales Company, LLC v. Pfizer, Inc., et al.*, 2:14-cv-00361 (E.D. Va. Dec. 26, 2017) (ECF No. 619-5)
- Letter from Steven Winick, *In re Celebrex (Celecoxib) Antitrust Litig.*, 2:14-cv-00361 (E.D. Va. Jan. 4, 2018) (ECF No. 619-6)
- Letter from Robert J. Tucker, *In re Flonase Antitrust Litigation, American Sales Co., Inc. v. SmithKlineBeecham*, 08-cv-03149 (E.D. Pa. Dec. 19, 2012) (ECF No. 488-4)
- Letter from Steven Winick, *In re Flonase Antitrust Litigation, American Sales Co., Inc. v. SmithKlineBeecham*, 08-cv-03149 (E.D. Pa. February 13, 2013) (ECF No. 488-5)
- Letter from Robert J. Tucker, *In re K-Dur Antitrust Litigation*, 2:01-cv-01652 (D.N.J. Aug. 9, 2017) (ECF No. 1050-7)
- Letter from David A. Schumacher, *In re K-Dur Antitrust Litigation*, 2:01-cv-01652 (D.N.J. Aug. 7, 2017) (ECF No. 1050-8)
- Letter from Steven Winick, *In re K-Dur Antitrust Litigation*, 2:01-cv-01652 (D.N.J. Aug. 21, 2017) (ECF No. 1050-9)
- Letter from Donald W. Myers, *In re Neurontin Antitrust Litigation*, MDL No. 1479 (D.N.J. June 19, 2014) (ECF No. 750-3)
- Letter from Robert J. Tucker, *In re Neurontin Antitrust Litigation*, MDL No. 1479 (D.N.J. June 18, 2014) (ECF No. 750-4)
- Letter from Steven Winick, *In re Neurontin Antitrust Litigation*, MDL No. 1479 (D.N.J. June 16, 2014) (ECF No. 750-5)
- Letter from Steven E. Bizar, *In re Nifedipine Antitrust Litigation*, 1:03-ms-223 (D.D.C. Jan. 19, 2011) (ECF No. 331)
- Letter from Thomas L. Long, *In re Nifedipine Antitrust Litigation*, 1:03-ms-223 (D.D.C. Jan. 19, 2011) (ECF No. 331)
- Letter from Richard A. Ardoin, *In re Nifedipine Antitrust Litigation*, 1:03-ms-223 (D.D.C. Jan. 14, 2011) (ECF No. 331)
- Letter from Thomas L. Long, *Meijer, Inc. et al. v. Abbott Laboratories*, No. C 07-5985 (N.D. Cal. May 5, 2011) (ECF No. 510-1)
- Letter from Richard Ardoin, *Meijer, Inc. et al. v. Abbott Laboratories*, No. C 07-5985 (N.D. Cal. May 4, 2011) (ECF No. 510-1)

- Letter from Donald J. Myers, *Meijer, Inc. et al. v. Abbott Laboratories*, No. C 07-5985 (N.D. Cal. May 9, 2011) (ECF No. 510-1)
- Letter from Steven E. Bizcar, *In re OxyContin Antitrust Litig.*, MDL No. 1603 (S.D.N.Y. Nov. 10, 2010) (ECF No. 359-4)
- Letter from Thomas L. Long, *In re OxyContin Antitrust Litig.*, MDL No. 1603 (S.D.N.Y. Nov. 10, 2010) (ECF No. 359-5)
- Letter from Richard Ardoin, *In re OxyContin Antitrust Litig.*, MDL No. 1603 (S.D.N.Y. Nov. 15, 2010) (ECF No. 359-6)
- Letter from Robert J. Tucker, *In re Prandin Direct Purchaser Antitrust Litigation*, 2:10-cv-12141 (E.D. Mich. Dec. 10, 2014) (ECF No. 67-3)
- Letter from David A. Schumacher, *In re Prandin Direct Purchaser Antitrust Litigation*, 2:10-cv-12141 (E.D. Mich. Dec. 11, 2014) (ECF No. 67-4)
- Letter from Steven H. Winick, *In re Prandin Direct Purchaser Antitrust Litigation*, 2:10-cv-12141 (E.D. Mich. Dec. 16, 2014) (ECF No. 67-5)
- Letter from David A. Schumacher, *In re Prograf Antitrust Litigation*, 11-md-02242 (D. Mass. Apr. 1, 2015) (ECF No. 669-2)
- Letter from Robert J. Tucker, *In re Prograf Antitrust Litigation*, 11-md-02242 (D. Mass. Apr. 2, 2015) (ECF No. 669-3)
- Letter from Steven H. Winick, *In re Prograf Antitrust Litigation*, 11-md-02242 (D. Mass. Apr. 2, 2015) (ECF No. 669-4)
- Letter from David A. Schumacher, *King Drug Co. of Florence v. Cephalon, Inc., et al.*, 2:06-cv-1797 (E.D. Pa. Sept. 11, 2015) (ECF No. 864-3)
- Letter from Robert J. Tucker, *King Drug Co. of Florence v. Cephalon, Inc., et al.*, 2:06-cv-1797 (E.D. Pa. Sept. 14, 2015) (ECF No. 864-4)
- Letter from Steven H. Winick, *King Drug Co. of Florence v. Cephalon, Inc., et al.*, 2:06-cv-1797 (E.D. Pa. Sept. 11, 2015) (ECF No. 864-5)
- Letter from Donald W. Myers, *In re Metoprolol Succinate Direct Purchaser Antitrust Litigation*, 06-cv-052 (D. Del. Sept. 27, 2011) (ECF No. 189-1)
- Letter from Thomas L. Long, *In re Metoprolol Succinate Direct Purchaser Antitrust Litigation*, 06-cv-052 (D. Del. Sept. 27, 2011) (ECF No. 189-1)
- Letter from Richard Ardoin, *In re Metoprolol Succinate Direct Purchaser Antitrust Litigation*, 06-cv-052 (D. Del. Oct. 3, 2011) (ECF No. 189-1)
- Letter from Richard Ardoin, *In re Wellbutrin SR Antitrust Litigation*, 2:04-cv-5525 (E.D. Pa. Oct. 3, 2011) (ECF No. 409-3)
- Letter from Donald W. Myers, *In re Wellbutrin SR Antitrust Litigation*, 2:04-cv-5525 (D. Del. Sept. 27, 2011) (ECF No. 409-4)
- Letter from Thomas L. Long, *In re Wellbutrin SR Antitrust Litigation*, 2:04-cv-5525 (E.D. Pa. Sept. 27, 2011) (ECF No. 409-5)
- Letter from Robert J. Tucker, *In re Wellbutrin XL Antitrust Litigation*, 2:08-cv-2431 (E.D. Pa. Oct. 22, 2012) (ECF No. 481-4)
- Letter from Steven Winick, *In re Wellbutrin XL Antitrust Litigation*, 2:08-cv-2431 (E.D. Pa. Oct. 17, 2012) (ECF No. 481-5)
- Letter from Donald W. Myers, *In re Wellbutrin XL Antitrust Litigation*, 2:08-cv-2431 (E.D. Pa. Oct. 10, 2012) (ECF No. 481-6)

## V.    FACTS

15.    The litigation-related facts upon which my conclusions rest are set out in the documents listed above.

16.    In brief, Class Counsel[1] have negotiated a proposed settlement that will make $750 million (less attorneys' fees and other expenses) available for the benefit of the Direct Purchaser Class, which includes drug wholesalers, some of which are extremely large.

17.    Class Counsel have applied to the Court for a common fund fee award of 27.5 percent of the gross recovery ($206.25 million) plus cost reimbursements of approximately $5.8 million.

## VI.    BACKGROUND ANALYSIS

18.    Throughout my academic career, I have urged courts to base fee awards from common funds on rates prevailing in the private market for legal services.  Although the view was not widely shared when I first expressed it, it is now.  It is not unusual for courts to want to know what those rates are and to give them weight when deciding how much lawyers to award lawyers whose efforts create common funds, even when they are not legally bound to do so.  In this report, I will show that Class Counsel's request for a fee equal to 27.5 percent of the recovery falls on the low end of the range of percentages that prevails in the private market, which typically runs from 25 percent to 40 percent.

---

[1] Class Counsel are Garwin Gerstein & Fisher, LLP ("GGF"), Berger Montague PC ("Berger"), Faruqi & Faruqi LLP, Heim Payne & Chorush LLP, Odom & Des Roches LLC, and Smith Segura Raphael & Leger LLP.

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 10 of 50

**A. Fee-Setting Is A Positive-Sum Interaction**

19. Many people think that fee-setting is a zero-sum game in which more for the lawyer means less for the client. Because the object of class litigation is to help the victims, they infer that lower fees are always better than higher ones.

20. This belief is mistaken. Fee-setting is a positive-sum interaction in which higher fees can help claimants. To see this, imagine how class members would fare if courts set common fund fee awards at 0 percent. When the fee is zero, the expected recovery is zero too because lawyers will not agree to represent class members (or signed clients) on these terms. From class members' perspective, any fee percentage greater than zero is better than zero because any positive recovery is better than no recovery.

21. When regulating fees, then, the object should not be to set them as close to zero as possible. It should be to maximize class members' net expected recoveries—the amounts they expect to take home after paying their attorneys. Because a claimant who nets $1 million after paying a 40 percent fee is better off than one who nets $500,000 after paying a 20 percent fee, it is rational for clients to offer higher percentages when doing so is expected to leave them with more money after fees are paid.

22. Courts have known this for years. In 2002, a task force on fees commissioned by the Third Circuit stated that "The goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee.* The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report,* 208 F.R.D. 340, 373 (January 15, 2002) (emphasis added). The Seventh Circuit made a similar point in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001). It rejected the so-called "mega-fund rule," according to which fees must be capped at low percentages when recoveries are very large,

noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Id*. at 718. Private clients want lawyers to maximize the value of their claims, not to settle them cheaply.

**B. Courts Should Mimic The Market When Awarding Fees**

23. In the market for legal services, claimants negotiate fees when litigation starts, not when it ends. Upfront, they see the risks that lie ahead and the virtue of paying fees that encourage lawyers to bear them. As the Seventh Circuit observed,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d at 724.

24. Unfortunately, courts typically set fee terms when class actions end, not when they start. Consequently, the hindsight bias may cause them to set fees too low. To guard against this tendency, which can only harm class members in the long-run by weakening lawyers' incentives, I believe that courts should try to determine the percentage that class members would have agreed to pay had they bargained directly with their lawyers when litigation was about to commence.

25. The best evidence on which to base an answer is the market rate. A general insight from the economics of contracts is that parties tend to agree on terms that maximize the amount of wealth available for them to share. When markets are competitive, as the market for legal services plainly is, clients and lawyers should settle on the lowest percentages that maximize their joint expected return. This is the percentage that maximizes clients' net expected recoveries.

26. The information I have gathered over years of study shows that claimants typically agree to pay contingent fees of 25 percent to 40 percent, even when sophisticated clients hire

lawyers to handle complex commercial lawsuits with the potential to generate enormous recoveries. To encourage lawyers to maximize class members' net recoveries, I believe that courts should set fee awards from common funds in this range.

**C. Quality of Plaintiffs' Counsel**

27. When considering how much lawyers should be paid, it is also important to remember that the quality of counsel matters greatly. Lawyers' charges vary with experience, rank, and accomplishment. For example, it is well known that a select group of attorneys with outstanding reputations command exceedingly high rates, often more than $1,500 per hour.

28. In this case, the lawyers who represent the class are the best in the world at what they do. Lawyers comprising Class Counsel pioneered antitrust challenges to settlements that delay or impede the entry of generic drug manufacturers. The *Memorandum of Law in Support of Class Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for the Named Plaintiffs* ("*Fee Memorandum*") lists 27 prior cases of this type with gross recoveries exceeding $2.6 billion, "virtually of all which Class Counsel here prosecuted." The lawyers' experience is actually greater than this because there are several unlisted generic delay cases that turned out poorly. *See Fee Memorandum*, at pp. 5-7 (discussing cases that were lost). Lawyers have a learning curve, the antitrust caselaw needed time to develop, and even after it developed significant risks remained. The lawyers comprising Class Counsel know this minefield better than anyone else.

29. The antitrust world has taken note of Class Counsel's success. According to the *2018 Antitrust Annual Report*, Berger ranked 16th in aggregate antitrust settlements over the 2013 to 2018 period, with $975 million recovered, and GGF ranked 10th, with $1.18 billion recovered. University of San Francisco Law School and The Huntington National Bank, *2018 Antitrust Annual Report* (2019), p. 27. Because GGF and Berger are elite antitrust firms, the members of

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 13 of 50

the Direct Purchaser Class would rationally have agreed to pay them the prevailing rate for such firms when hiring them to handle this case.[2]

30. In fact, this is precisely what the class members did in past cases. As Class Counsel reports, in prior litigations members of the Direct Purchaser Class "provided letters and declarations attesting to the reasonableness of a 33⅓% fee." *Fee Memorandum*, pp. 2-3. Class members' willingness to pay 33⅓ percent of their recoveries as fees in prior antitrust cases of this type supports the inference that a percentage that high would be appropriate here, and a lower percentage like 27.5% moreso. There is no better evidence of market rates than the fees that sophisticated clients willingly pay.

## VII. FEES PREVAILING IN THE PRIVATE MARKET FOR LEGAL SERVICES

31. As mentioned, over the course of my career I have consistently urged courts to take guidance from the market for legal services when sizing fee awards, and the number of courts that do so has grown. For example, in *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000), the Second Circuit wrote that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Id*., p. 52. It is hard to do better than "ideal."

32. In my experience, courts have found the "mimic the market" approach attractive for two reasons. They understand the importance of incentivizing lawyers properly and they want an objective basis on which to decide how much lawyers will be paid. The two considerations–incentives and objectivity–are linked. By taking guidance from the market, courts constrain their discretion and thereby make lawyers' incentives clearer and more reliable.

---

[2] The *2018 Antitrust Annual Report* also points out that Faruqi & Faruqi LLP, another firm working for the class, was co-lead counsel in the sixth-largest settlement approved in 2018. *Id*., p. 15.

### A. In Contingent Fee Litigation, Percentage-Based Compensation Predominates

33. Having established that market rates are "ideal" proxies, it remains to consider how the market compensates plaintiffs' attorneys. In this section and the next, I explain what I know about this issue.

34. I start by noting that when clients hire lawyers to handle lawsuits on straight contingency, the market sets lawyers' compensation as percentages of claimants' recoveries. Even sophisticated business clients with complex, high-dollar legal matters use the percentage approach.

> [T]he contingency fee model covers all sorts of plaintiffs' litigation, including cases where sophisticated individual clients have high-stakes, complex claims worth hundreds of millions of dollars. . . . [I]t is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained.

*In re Payment Card Interchange Fee & Merchant Discount Litig*., 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014).[3] *See also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (Easterbrook, J.) (noting the predominance of the percentage method in plaintiff representations and observing that "[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate'" (emphasis in the original)).

35. Abundant evidence supports this contention. When two coauthors and I studied hundreds of settled securities fraud class actions specifically looking for terms included in fee agreements between lawyers and investors seeking to serve as lead plaintiffs, all the agreements we found provided for contingent percentage fees. *Is the Price Right*, *supra*. No lead plaintiff agreed to pay its lawyers by the hour; nor did any retain counsel on a lodestar basis.

36. The finding just described was expected. Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated

---

[3] This opinion became a nullity when the decision approving the settlement was reversed on appeal, but the observation quoted is correct.

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 15 of 50

business clients. To the best of my recollection, I have encountered only one in which a lead plaintiff paid class counsel out of pocket, and that case is more than 100 years old. Even wealthy clients that, in theory, might have paid lawyers by the hour used contingent, percentage-based compensation arrangements instead. Because percentage-based compensation arrangements dominate the market, courts should also use them when awarding fees from common funds.

37. The market also appears to favor fee percentages that are flat or that rise as recoveries increase. Scales with percentages that decline at the margin are rarely employed. Professor John C. Coffee, Jr., the country's leading authority on class actions, made this point in a report filed in the antitrust litigation relating to high fructose corn syrup.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context. However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ECF No. 1421, ¶ 22. My experience is similar to Professor Coffee's. I know of no instance in which a large corporation used a scale of declining percentages when hiring a lawyer or firm to represent only itself.

38. In view of the rarity with which declining scales are used, the 'mimic the market' approach suggests that flat percentages and scales with percentages that rise at the margin create better incentives. This is so because flat percentages and rising scales better incentivize plaintiffs' attorneys to extract higher dollars that are harder to obtain. Flat percentages or percentages that increase with the recovery encourage plaintiffs' attorneys to turn down inadequate settlements.

**B. Clients Normally Pay Contingent Fees In The Range Of 25 Percent To 40 Percent**

39. Countless plaintiffs have hired lawyers on contingency to handle cases of diverse types. Consequently, the market for legal services is a rich source of information about lawyers' fees. In this section, I survey this evidence.

40. Before doing so, I wish to note that there is broad agreement that fees ranging from 25 percent to 40 percent prevail in most types of plaintiff representations. For example, courts have often noted that fees in personal injury cases normally equal or exceed 33⅓ percent of plaintiffs' recoveries. *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery"); *Wolff v. Cash 4 Titles*, No. 03-22778-CIV, 2012 U.S. Dist. LEXIS 153786, 2012 WL 5290155, at *4 (S.D. Fla. Sept. 26, 2012) ("One-third of the recovery is considered standard in a contingency fee agreement."); *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (observing that "a counsel fee of 33.3% of the common fund 'is comfortably within the range typically charged as a contingency fee by plaintiffs' lawyers' in an FLSA action").

41. Many courts have also observed that attorneys regularly contract for contingent fees between 30 percent and 40 percent in non-class, commercial cases. *See, e.g., Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); *Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. CV 08-00235 (CCC), 2019 WL 4877563, at *8 (D.N.J. Oct. 3, 2019); *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017); and *In re Schering-*

*Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *32 (D.N.J. Oct. 1, 2013).

42. The point of surveying the evidence, then, is not to establish something new. It is to show that what everyone already knows is correct. In cases of diverse types, the market rate for contingent fee lawyers ranges from 25 percent to 40 percent of clients' recoveries.

1. Personal Injury Cases

43. If courts chose to base fee awards in class actions on fees charged in personal injury cases, this Report could be quite short. The evidence clearly shows that contingent fees normally range from 25 percent to 40 percent in these cases,[4] are often higher in mass tort contexts,[5] and are

[4] On fees in personal injury cases, *see* Deborah R. Hensler *et al*., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 N.Y.U. L. REV. 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[5] On fees in mass tort cases, *see* James S. Kakalik, *et al*., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation expenses equal to about 42 percent of their recoveries); James S. Kakalik *et al*., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries). For anecdotal reports of fees in mass tort cases, *see In re A.H. Robins Co., Inc*., 182 B.R. 128, 131 (E.D. Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, NEW YORK TIMES, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill – and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 18 of 50

higher still in medical malpractice cases, which are exceptionally risky and costly.[6] Lower rates prevail in commercial airplane crash cases, where liability is usually conceded.[7] Fees vary across contexts because cases of different types require lawyers to bear different risks.

2. Large Commercial Lawsuits

44. We do not know as much about fees paid in large commercial lawsuits as we might.[8] No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal their fee agreements. Consequently, most of what is known is drawn from anecdotal reports.[9] That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

---

the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent).

[6] On factors affecting the size of contingent fees charged in medical malpractice cases, *see* ABA/TIPS Task Force on Contingent Fees, Report on Contingent Fees In Medical Malpractice Litigation (September 20, 2004), available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf.

[7] *See id*., at 27. *See also* ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily . . . [made] an early settlement offer and concede[d] all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

[8] I have studied the costs insurance companies incur when *defending* liability suits. *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AM. L, & ECON, REV. 185 (2008). Unfortunately, this information sheds no light on the amounts that businesses pay when acting as plaintiffs.

[9] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses. In a recent case against Bank of America, for example, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery. Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORP. COUNS. (Online) April 9, 2010. Hybrid arrangements hold few lessons for class actions, however, because lawyers representing plaintiff classes must work on straight contingency.

*a) Patent Cases*

45. Consider patent infringement representations. There are many anecdotal reports of high percentages in this area. The most famous one related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry. NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a 33⅓ percent contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees. Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

46. The fee percentage that WRF received is typical, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALA. L. REV. 335, 360 (2012). In a case like this one that required the lawyers to bear significant litigation expenses with no guarantee of reimbursement a high fixed percentage would apply.[10]

---

[10] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors – a strictly results-based system.

47. Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns. Clients still prefer this arrangement to bearing the risks and costs of litigation themselves, so they willingly do.

*b) Other Large Commercial Cases*

48. Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery. A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E"). ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Ariz., Nov. 30, 1990).

49. Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery in a massive case. Second, V&E bore no liability for out-of-pocket

---

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

expenses. Third, the ETSI Pipeline case was enormous, ultimately generating a recovery greater than $600 million and a fee north of $200 million. Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by V&E could possibly be made.

50. The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations. After placing 5 corporate credit unions into liquidation in 2010, the NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks. To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-backed securities, the NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis. The original contract entitled the firms to 25 percent of the recovery, net of expenses. As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which the NCUA had paid $1,214,634,208 in fees.[11]

51. When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake. The failed corporate credit unions had sustained $16 billion in losses, and the NCUA's objective was to recover as much of that amount as possible. It also knew that dozens of defendants would be sued and that multiple settlements were possible. Even so, the NCUA

---

[11] The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations: Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

agreed to pay a straight contingent percentage fee in the standard market range on all the recoveries. It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones, nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

52.     In *In re Merry-Go-Round Enterprises, Inc*., 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young. He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar. The bankruptcy judge granted the request, writing: "[v]iewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." *Id*. at 335.

53.     Based on what lawyers who write about fee arrangements in business cases have said, contingent percentages of 33⅓ percent or more remain common. In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine." It included an article on alternative fee arrangements, which reported typical contingent fee rates of 33 percent to 40 percent.

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients,

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 23 of 50

> however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

*c) Sophisticated Named Plaintiffs in Class Actions*

54. I mentioned above that the members of the Direct Purchaser Class supported fee awards in the range of one-third of the recovery in many prior cases. By doing so, they joined many other sophisticated businesses that supported similarly sized fees when serving as lead plaintiffs in class actions. Here are a few examples.

- In *Payment Card,* 2019 WL 6888488, a multi-billion-dollar litigation, twelve business clients signed retainer agreements when litigation commenced which generally provided that class counsel would receive one-third of the class-wide recovery.[12]

---

[12] Typical language read as follows:

> (a) Fees As Class Counsel
>
> (1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.
>
> (2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.
>
> (b) Fees Owed If Recovery Is Made Outside Of Class Action.
>
> In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 24 of 50

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed. (The 35 percent fee was bargained down after initially being set at over 40 percent.)
- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal. Expenses were to be reimbursed separately.
- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

**C. Direct Purchasers' Support For A One-Third Fee In Prior Generic Delay Antitrust Class Actions**

55. Having shown that sophisticated business clients regularly pay contingent fees in the range requested here and that they do so when serving as lead plaintiffs in class actions too, I will now discuss the support that the three largest members of the Direct Purchaser Class—AmerisourceBergen, Cardinal Health, and McKesson—offered for the fees requested in prior cases. They did so by submitting letters when the lawsuits settled.

56. AmerisourceBergen, Cardinal Health, and McKesson are enormous companies. In 2018, their revenues were $170 billion, $137 billion, and $208 billion, respectively. They plainly qualify as highly sophisticated clients with ready access to the market for legal services and great ability to bargain with lawyers over prices. Their attitudes and actions in prior cases where Class Counsel represented them therefore merit study.

57. Table 1, below, identifies a group of settled antitrust class action for which I have information showing that AmerisourceBergen, Cardinal Health, and McKesson submitted letters expressing their affirmative support for proposed settlements and fee awards. In all but one of the listed cases, all three companies did so. There are also many cases not listed in the table in which,

although these businesses did not submit supporting letters, they did not object. Given their sophistication, it seems reasonable to infer that silence equals approval.

| **Table 1: Settlements With Letters Of Support From The Three Largest Direct Purchasers** | | | | | |
|---|---|---|---|---|---|
| **Litigation** | **Settlement (Millions)** | **Fee** | **Amerisource Bergen** | **Cardinal Health** | **McKesson** |
| In re Asacol Antitrust Litig., No. 15-12730 (D. Mass. Dec. 7, 2017) | $15.00 | 33⅓% | Y | Y | Y |
| In re K-Dur Antitrust Litig., No. 01-1652 (D.N.J. Oct. 5, 2017) | $60.00 | 33⅓% | Y | Y | Y |
| In re Prograf Antitrust Litig., No. 11-md-2242 (D. Mass. May 20, 2015) | $98.00 | 33⅓% | Y | Y | Y |
| In re Prandin Direct Purchaser Antitrust Litig., No. 10-12141 (E.D. Mich. Jan. 20, 2015) | $19.00 | 33⅓% | Y | Y | Y |
| In re Neurontin Antitrust Litig., No. 02-1830 (D.N.J. Aug. 6, 2014) | $191.00 | 33⅓% | Y | Y | Y |
| In re Flonase Antitrust Litig., No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150.00 | 33⅓% | N | Y | Y |
| In re Wellbutrin XL Antitrust Litig., No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% | Y | Y | Y |
| In re Metoprolol Succinate Antitrust Litig., No. 06-52 (D. Del. Jan. 11, 2012) | $20.00 | 33⅓% | Y | Y | Y |
| In re Wellbutrin SR Antitrust Litig., No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49.00 | 33⅓% | Y | Y | Y |

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 26 of 50

| Table 1: Settlements With Letters Of Support From The Three Largest Direct Purchasers | | | | | |
|---|---|---|---|---|---|
| **Litigation** | **Settlement (Millions)** | **Fee** | **Amerisource Bergen** | **Cardinal Health** | **McKesson** |
| In re Nifedipine Antitrust Litig., No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35.00 | 33⅓% | Y | Y | Y |
| In re Oxycontin Antitrust Litig., No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16.00 | 33⅓% | Y | Y | Y |
| In re Celebrex (Celecoxib) Antitrust Litig., No. 2:14-CV-00361, 2018 WL 2382091 (E.D. Va. Apr. 18, 2018) | $94.00 | 33⅓% | Y | Y | Y |
| Meijer, Inc. v. Abbot Labs., No. 07-5985 (N.D. Cal.) (August 11, 2011) | $52.00 | 33⅓% | Y | Y | Y |
| King Drug Company of Florence, Inc. v. Cephalon, Inc., No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512.00 | 27.5% | Y | Y | Y |

## VIII. THE DIFFICULTY OF WINNING ANTITRUST CLASS ACTIONS

58. The successes that Class Counsel has accomplished when attacking generic delay settlements on antitrust grounds may create the impression that the cases are "slam-dunks." They are not. Many hurdles must be overcome.

59. Class Counsel describe many of the risks they faced in the *Fee Memorandum* and the *Declaration of Bruce E. Gerstein in Support of Class Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for the Named Plaintiffs*. Because they know this terrain far better than I do, I can add little to their account. However, I can say, first, that had this lawsuit been a "slam dunk," it would have been financially advantageous for Forest to have

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 27 of 50

settled far sooner than it did. Why waste tens of millions of dollars defending a lawsuit until the eve of trial when it is obvious that one will lose? Why file a 71-page motion to dismiss or resist class certification if it is obvious that both maneuvers will fail? Why spend millions more on expert witnesses too? Forest's willingness to mount an aggressive defense makes sense only if the company thought it had a decent chance of winning the case.

60. I can also point out that antitrust class actions with mega-fund recoveries are fairly uncommon. From 2013 to 2018, the median settlement amount (half above/half below) for antitrust class actions varied from a high of $11 million (in 2013) to a low of $5 million (in 2016 and 2017). Of the 730 settlements that occurred over this period, 92 percent fell below $100 million, the traditional mega-fund threshold. *2018 Annual Antitrust Report*, supra, p. 14.

61. The lack of a prior governmental investigation of the Forest/Mylan generic delay settlement is also worth mentioning because it a sign of high risk.[13] A government agency's involvement in a lawsuit may reduce the burden on class action lawyers, lend credence to the plaintiffs' allegations, and be a source of valuable information or other assistance. Many antitrust cases produced mega-fund recoveries were assisted substantially by criminal prosecutions and guilty pleas. *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) ($365 million class recovery and 34.6% fee award in case supported by criminal prosecutions and guilty pleas); *In re TFT-LCD (Flat Panel) [Indirect Purchaser] Antitrust Litig.*, MDL No. 1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ($1.08 billion class recovery and

---

[13] In late 2014, the New York Attorney General sued to enjoin the withdrawal of Namenda IR from the market. It did not challenge the generic delay settlement that is at the heart of this case. It also wound down its lawsuit after an injunction was secured, without seeking damages. *Gerstein Dec.*, ¶¶ 3 & 7.

Case 1:15-cv-07488-CM-RWL Document 928 Filed 09/13/20 Page 28 of 50

approximately 30% fee to class counsel and state attorneys general in case supported by sweeping criminal prosecutions and guilty pleas).

62. If prior or parallel government proceedings make class actions less risky, then (other things being equal) fee awards should be higher in cases like this one, where Class Counsel undertook the litigation challenging a patent litigation settlement without help from a regulator. In fact, in this context the lack of a governmental investigation of the Forest/Mylan generic delay settlement may have increased the risk, because the settlement was submitted to the Federal Trade Commission and the Justice Department, both of which chose not to act. Had this fact been made know to a jury—and Forest intended to introduce evidence of it at trial—its members may have inferred that the settlement was fine.

63. By saying that Class Counsel undertook the litigation without help from a regulator, I do not mean to deny that the New York Attorney General sued Forest and secured an injunction against the company's attempt to "product hop" by withdrawing Namenda IR from the market. I mean that only Class Counsel attacked the anticompetitive settlement agreement between Forest and Mylan and that only Class Counsel sought damages for the attempted product hop. The New York Attorney General seemed to think that the injunction it secured protected purchasers sufficiently. Nor did the New York Attorney General assist the private action by obtaining guilty pleas or other concessions, such as an agreement to cooperate, that might have made the damages action less risky. Only Class Counsel quantified the damages and bore the risk associated with the generic delay settlement.

64. Finally, it bears emphasis that Class Counsel secured class certification for trial before negotiating the proposed settlement. Although settlement classes are common in antitrust

cases and cases of other types, litigation classes are not, as other commentators have noted. The following paragraph appears in a study published in 2017.

> Many class actions are resolved as settlement classes—meaning that the parties settle the class certification issue at the same time as they settle the merits, and present both agreements to the judge for approval at the fairness hearing. Settlement classes were common in our data, constituting approximately three-quarters of the cases: Of the 422 cases for which data were available, 318 were settlement classes and 104 were litigation classes.

Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 961 (2017). Eleven of the 16 antitrust cases in the authors' dataset were settlement classes. *Id.*, Table 10.

65. Both the risk and the value of certifying a class for litigation are important. Winning a contested certification motion in an antitrust case is hard. During the era of the Roberts Court, federal courts have been increasingly hard on antitrust plaintiffs. *See, e.g.,* Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM ANTITRUST 26, 26 (2014) (observing that "the Roberts Court has consistently raised the threshold for plaintiffs seeking to pursue class actions"). Plaintiffs who win in the trial courts also face a serious prospect of losing on appeal, as I pointed out almost two decades ago.

> Rule 23(f) is a one-way ratchet for defendants. Although early evidence was ambiguous, … a clear pattern of antiplaintiff decisions has emerged. See Jennifer K. Fardy, Disciplining the Class: Interlocutory Review of Class Action Certification Decisions Under Rule 23(f), 13 Class Actions & Derivative Suits 3, 9 (2003) (reporting that federal circuit courts have granted thirty-two petitions for interlocutory review, that "the vast majority of the decisions ... have resulted in elimination of class status," and that no federal circuit has used [a] 23(f) appeal to reverse [a] denial of class certification), available at http://www.seyfarth.com/db30/cgi-bin/pubs/fardy.PDF.

Charles Silver, "*We're Scared to Death": Class Certification and Blackmail*, 78 N.Y.U. L. Rev. 1357, 1430 (2003).

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 30 of 50

66. Although the odds of losing are great, the value of having a class certified for litigation is enormous. Certification cements counsel's control of the lawsuit and forces the defendant to confront the possibility of suffering a class-wide judgment at trial. The combination greatly enhances plaintiffs' leverage in settlement negotiations.

## IX. FEE AWARDS IN COMPARABLE CASES

67. In my experience, courts want to know how other courts have handled fees in similar cases. Being familiar with both empirical studies of fee awards and awards made in cases with recoveries exceeding $100 million, I can confidently report that Class Counsel's request for a fee of 27.5 percent of the recovery falls at the low end of the range that courts typically award.

68. The *2018 Antitrust Annual Report, supra*, at p. 23, contains the most comprehensive information I have been able to find on fee awards in antitrust class actions. It reports that fees and expenses are most often calculated as a percentage of the overall settlement fund, and that lodestar cross checks are common too. The report then breaks out median fee awards and expenses in antitrust class action by size of recovery. As is visually apparent, at most recovery levels, the median award falls between 28 percent and 33 percent. Only when recoveries exceed $1 billion does the median fee award percentage substantially decline.



Source: University of San Francisco Law School and The Huntington Bank, 2018 Antitrust Annual Report, Fig. 12 (2019).

69. In this case, Class Counsel may request a fee award equal to 27.5 percent of the $750 million recovery. The request falls slightly below the median award—28 percent—for cases in the relevant size band. In view of this, Class Counsel's request seems modest, not exceptional.

70. An examination of fee awards in mega-fund cases with recoveries of $100 million or more strengthens this impression. There are many mega-fund cases with awards in the relevant range, as shown in Table 2, below. The table is exemplary, not exhaustive. There may be more cases than it reports. The entries have not been adjusted for inflation, either. By increasing settlement values to current dollars, an inflation adjustment would increase the number of qualifying cases and make the older cases in the table seem larger. For example, the $359 million paid in the *Vitamins* antitrust case in 2001 equals $523 million in 2020.

| Table 2: Mega-Fund Settlements With Fee Awards Of 30 Percent Or More | | | | |
|---|---|---|---|---|
| | **Case** | **Settlement Amount (in Millions)** | **Fee** | **Type** |
| 1 | In re Vitamins Antitrust Litig., No. MDL 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) | 359.00 | 34% | Antitrust |
| 2 | In re Urethane Antitrust Litig., 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | 835.00 | 33% | Antitrust |
| 3 | In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | 586.00 | 33% | Securities |
| 4 | In re Tricor Direct Purchaser Antitrust Litig., No. 05-340-SLR, ECF No. 543 (D. Del. 2009) | 250.00 | 33% | Antitrust |
| 5 | In re Buspirone Antitrust Litig., MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) | 220.00 | 33% | Antitrust |
| 6 | *In re Neurontin Antitrust Litig.,* No. 02-1830 (D.N.J. Aug. 6, 2014) | $191.00 | 33⅓% | Antitrust |
| 7 | In re Titanium Dioxide Antitrust Litig., No. 10-CV-00318 RDB, 2013 WL 6577029 (D. Md. Dec. 13, 2013) | 163.50 | 33% | Antitrust |
| 8 | In re Se. Milk Antitrust Litig., No. 2:07-CV 208, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013) | 158.60 | 33% | Antitrust |
| 9 | In re Flonase Antitrust Litig., 951 F. Supp. 2d 739 (E.D. Pa. 2013) | 150.00 | 33% | Antitrust |
| 10 | In re Apollo Grp. Inc. Sec. Litig., No. CV 04-2147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) | 145.00 | 33% | Securities |
| 11 | In re Plasma-Derivative Protein Therapies Antitrust Litig., No. 09-cv-07666, ECF Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) | 128.00 | 33% | Antitrust |
| 12 | Erica P. John Fund, Inc. v. Halliburton Co., No. 02-xc-01152, ECF No. 844 (N.D. Tex. Apr. 25, 2018) | 100.00 | 33% | Securities |
| 13 | Dahl v. Bain Capital Partners, LLC, No. 07-CV-12388, ECF No. 1095 (D. Mass. Feb 2, 2015). | 590.50 | 33% | Antitrust |

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 33 of 50

| Table 2: Mega-Fund Settlements With Fee Awards Of 30 Percent Or More | | | | |
|---|---|---|---|---|
| | **Case** | **Settlement Amount (in Millions)** | **Fee** | **Type** |
| 14 | In re Relafen Antitrust Litig., No. 01-12239, ECF No. 297 (D. Mass. Apr. 9, 2004) | 175.00 | 33% | Antitrust |
| 15 | Standard Iron Works v. Arcelormittal, et al., No. 08-cv-5214, ECF. No. 539 (N.D. Ill. 2014) | 163.90 | 33% | Antitrust |
| 16 | In re Auto. Refinishing Paint Antitrust Litig., No. MDL NO 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | 105.75 | 33% | Antitrust |
| 17 | Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006) | 1075.00 | 31% | Securities |
| 18 | In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) | 410.00 | 30% | Antitrust |
| 19 | Schuh v. HCA Holdings Inc., No. 3:11-cv-01033, ECF No. 563 at 1 (M.D. Tenn. Apr. 14, 2016) | 215.00 | 30% | Securities |
| 20 | In re Linerboard Antitrust Litig., No. CIV.A. 98-5055, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004), amended, No. CIV.A.98-5055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) | 203.00 | 30% | Antitrust |
| 21 | City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al., No. 12-cv-05162, ECF No. 458 (W.D. Ark. 2019) | 160.00 | 30% | Securities |
| 22 | In re Polyurethane Foam Antitrust Litig., No. 1:10 MD 2196, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015), appeal dismissed (Dec. 4, 2015) | 147.80 | 30% | Antitrust |
| 23 | In re: Informix Corp. Sec. Litig. No 97-CV-1289-CRB, ECF No. 471 (N.D. Cal., Nov 23, 1999) | 142.00 | 30% | Securities |
| 24 | Anwar et al v. Fairfield Greenwich Limited et al, No. 09-cv-0118, ECF No. 1457 (S.D.N.Y. Nov. 20, 2015) | 125.00 | 30% | Securities |
| 25 | Kurzweil v. Philip Morris Cos., 1999 U.S. Dist. LEXIS 18378, (S.D.N.Y. Nov 24, 1999) | 123.80 | 30% | Securities |
| 26 | In re Ikon Office Sols., Inc., Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) | 111.00 | 30% | Securities and Derivative |

| Table 2: Mega-Fund Settlements With Fee Awards Of 30 Percent Or More | | | | |
|---|---|---|---|---|
| | **Case** | **Settlement Amount (in Millions)** | **Fee** | **Type** |
| 27 | In re Morgan Keegan Open-End Mutual Fund Litigation, No. 07-cv-02784, ECF No. 435 (W.D. Tenn. Aug 2, 2016) | 110.00 | 30% | Securities |
| 28 | In re Prison Realty Sec. Litig., No. 3:99–0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001). | 104.00 | 30% | Securities |

71. The cases in Table 2 show that courts try to award fees that are appropriate in the circumstances. They apply percentages in the normal range, even when settlements are unusually large, when they determine that the facts warrant.

## X. LODESTAR CROSS-CHECK

72. When awarding fees, courts often gauge their reasonableness by performing lodestar cross-checks. These cross-checks employ two components: the lodestar basis, which combines hourly rates and time expended; and a multiplier, which is a factor that brings the basis into line with the fee request. I discuss both quantities here.

73. Before doing so, I wish to note that I oppose the use of cross-checks and have argued against them in print. By assigning weight to cross-checks, courts encourage lawyers to expend time rather than to conserve it. In other words, courts unintentionally penalize efficiency and reward inefficiency. To the best of my knowledge, claimants never use the lodestar method when hiring lawyers directly. I therefore see no reason for courts to rely on it when assessing the reasonableness of class counsel's fees.

74. Turning to the comparison itself, Class Counsel requests compensation for approximately 52,000 hours of work at a blended rate of approximately $667 per hour for all timekeepers ($34.7 million in fees divided by 52,000 hours of work). There are many sources of information that may help assess the reasonableness of the requested blended rate. For example,

one can study the fee applications that lawyers submit in bankruptcy proceedings.  Using this approach, one learns that many lawyers are compensated at rates far higher than those requested here.  For example, in the Sears bankruptcy proceeding, the fee application submitted in 2019 by Weil, Gotshal & Manges LLP, the debtors' attorneys, includes dozens of lawyers whose hourly charges exceed $1,000, with nine lawyers charging $1,500 per hour or more.  Unlike Class Counsel, these lawyers did not work on contingency.  Even so, the bankruptcy judge approved the fee request in full.

75.     Even higher hourly rates were sought in the Toys R' Us bankruptcy, where Kirkland & Ellis LLP serves as debtors' counsel.  There, the highest hourly rate was $1,795, the blended rate for all partners, of which there were dozens, was $1,227, and the blended rate for all timekeepers, including paralegals and support staff, was $901.

76.     Looking at bankruptcy cases more broadly, a survey of almost 3,000 fee requests found that, "[i]n major markets, bankruptcy partners make $1,000 an hour or more."  Katelyn Polantz, *In Bankruptcy, Flat is Fine; Median Rates at Large Firms Ran $595 Per Hour,* The National Law Journal, May 16, 2016.

77.     One can also examine opinions containing lodestar cross-checks to learn what hourly rates courts find reasonable.  For example, when presiding over *Pantelyat v. Bank of Am., N.A.*, No. 16-CV-8964 (AJN), 2019 WL 402854 (S.D.N.Y. Jan. 31, 2019), which settled for $22 million, Judge Alison J. Nathan of the Southern District of New York approved a 25 percent fee based on a blended hourly rate of $695,[14] higher than the blended rate Class Counsel requests here.

---

[14] I calculated the blended hourly rate in *Pantelyat* by dividing the lodestar basis ($1,125,294.50) by the number of hours worked (1,618.8).

78.     Finally, one can consult surveys of law firms' billing rates, such as those taken by the NATIONAL LAW JOURNAL (NLJ).  The number of firms participating in the NLJ surveys varies from year to year, but always exceeds 100.  The NLJ surveys are often cited to courts as evidence supporting hourly rates in fee applications.  *See, e.g.*, *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010) (admitting into evidence and relying upon expert report by Professor William Rubenstein which was based in part on NLJ surveys).

79.     The NLJ surveys report that senior partners at large law firms often charge $1000 per hour or more.  *See* Karen Sloan, *NLJ Billing Survey: $1,000 Per Hour Isn't Rare Anymore,* The National Law Journal (January 13, 2014).  Reading the text of the article, one learns that "[n]early 20 percent of the firms included in The National Law Journal's annual survey of large law firm billing rates [in 2014] had at least one partner charging more than $1,000 an hour." Lawyers who practice in the Supreme Court routinely charge more than $1,000 per hour too. *Billing Rates*, The National Law Journal Supreme Court Brief (Online), Sept. 6, 2019.

80.     The 2014 NLJ survey, which contained information for 159 of the largest law firms in the U.S., found a median rate (half above/half below) for the highest partner billing rate category of $775 and a median high hourly rate for associates of $510.  Since then, rates at major law firms have risen, but even so the blended rate that Class Counsel requests falls with the identified range.

81.     As explained, Class Counsel are the best in the world at litigation of this type. Consequently, they should be paid at rates comparable to those charged by other outstanding attorneys.  Having considered a variety of sources, it is my opinion that the requested blended rate of $667 per hour for all timekeepers is reasonable.

82.     I turn now to the multiplier portion of the lodestar, which will equal 5.9 if the Court awards 27.5 percent of the recovery as fees.  The best-known feature of multipliers is that they

Case 1:15-cv-07488-CM-RWL Document 928 Filed 03/13/20 Page 37 of 50

increase sharply as settlements become larger. For example, a study published in 2017 reported a mean multiplier of 1.82 for all federal class actions, but also noted that "higher multipliers are associated with higher recoveries." Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 966 (2017). It is difficult to say more than this, however, because the number of enormous settlements is small. For example, in the study just cited the largest decile of cases, which has a mean multiplier of 2.72, includes all settlements greater than $67.5 million. *Id*., Table 13. Because multipliers increase greatly as recoveries grow, a category that would lump a $67.6 million settlement together with a $750 million settlement is likely to hide more than it reveals.

83. Although a 5.9 multiplier is certainly above average, I believe that a federal district court judge has discretion to approve it in appropriate circumstances. One reason for holding this opinion is that multipliers in the same range, including some higher ones, have been awarded in other mega-fund cases. Table 3, below, lists settlements I found with multipliers of 6 or more. The table is meant to be illustrative, not complete. There may be cases I have not found.

**Table 3. Mega-Fund Cases with Lodestar Multipliers of 6 or More**

| | Case | Settlement (Millions) | Multiplier |
|---|---|---|---|
| 1 | In re Doral Financial Corp. Secs. Litig., No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) | $129.00 | 10.26 |
| 2 | Cosgrove v. Sullivan, 759 F.Supp. 166, 167 n. 1 (S.D.N.Y.1991) | $100.00 | 8.74 |
| 3 | In re Buspirone, 01-md-1410 (S.D.N.Y. Apr. 11, 2003) | $220.00 | 8.46 |
| 4 | New England Carpenters Health Benefits Fund v. First Databank, Inc., No. 05 Civ. 11148, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) | $350.00 | 8.30 |
| 5 | In re Healthsouth Corporation Securities Litig. (UBS Defendants), No. 05-cv-01500. ECF No. 1721 (N.D.Ala. Jul 26, 2010) | $117.00 | 7.01 |
| 6 | In re Rite Aid Corp. Sec. Litig., MDL No. 1360, 2005 WL 697461 at *2-3 (E.D. Pa. Mar. 24, 2005) | $126.64 | 6.96 |
| 7 | In re UnitedHealth Grp. Inc. PSLRA Litig., 643 F. Supp. 2d 1094 (D. Minn. 2009) | $925.50 | 6.50 |
| 8 | In re Credit Default Swaps Antitrust Litig., No. 13MD2476 DLC, ECF No. 554 (S.D.N.Y. April 18, 2016) | $1,864.65 | 6.36 |
| 9 | Spartanburg Regional Health Servs. District, Inc. v. Hillenbrand Indus., Inc., No. 03-DV-2141, ECF No. 377 (D.S.C. Aug. 15, 2006) | $489.80 | 6.00 |
| 10 | In re Cardinal Health Inc. Sec. Litig., 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600.00 | 6.00 |

84. Another reason for awarding large multipliers in mega-fund cases is that, without them, lawyers' incentives will be dulled. The multiplier is the lodestar component that ties the fee award to the recovery. Unless it increases sharply as settlements grow larger, lawyers will find it advantageous to settle cheaply because, by doing so, they will not put their fees at risk—which they do whenever settlement offers are declined. In other words, the upside potential of refusing to settle must exceed the downside risk of losing fees, which it will only if lodestar multipliers reward lawyers adequate for taking large risks.

85. I therefore conclude that a lodestar cross-check confirms the reasonableness of Class Counsel's fee request.

## XI. COMPENSATION

86. I received a flat fee of $50,000 for preparing this report.

## XII. CONCLUSION

87. For the reasons set out above, I believe that Class Counsel's request for a fee award of 27.5 percent of the gross recovery is reasonable and should be approved.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 11th day of March, 2020, at Austin, Texas.

CHARLES SILVER

Ex. B

Declaration of Professor Charles Silver (excluding CV)

*Allapattah Services, Inc., et al. v. Exxon Corp.*,
Case No. 91-00986-ASG,

Filed on February 16, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| **ALLAPATTAH SERVICES, INC., et al.,** | ) | |
| **Plaintiffs,** | ) | **CASE NO. 91-0986-CIV-GOLD** |
| **v.** | ) | |
| **EXXON CORPORATION,** | ) | |
| **Defendant.** | ) | |

# EXPERT REPORT OF PROFESSOR CHARLES SILVER CONCERNING ATTORNEYS' FEES AND EXPENSES

I, Charles Silver, declare as follows:

## SUMMARY OF OPINIONS

In this Report, I will advance the following general opinion:

- The Court should enter an order requiring each Class Dealer who eventually recovers money from Exxon via the claims process to pay Class Counsel 33.33% of the recovery as fees and in reimbursement of expenses.

I will also express opinions on subsidiary issues and related issues.

## CREDENTIALS

### GENERAL

I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991, and held visiting professorships in the law schools at the University of Michigan and Vanderbilt University in 1994 and 2003, respectively.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years. I have published 50 major writings, many focusing on subjects relevant to this Report. A copy of my resume is attached.

### CLASS ACTIONS AND OTHER LAWSUITS INVOLVING MULTIPLE CLAIMANTS

I have studied and written about the law and economics of class actions and other large lawsuits for many years. My published and forthcoming works include:

- Paul Edelman, Richard Nagareda, and Charles Silver, *The Allocation Problem in Multiple-Claimant Representations, Supreme Court Economic Review* (forthcoming 2006);
- Charles Silver, *Merging Roles: Mass Tort Lawyers as Agents and Trustees*, 31 *Pepperdine Law Review* 301 (2004);
- Charles Silver, *We're Scared To Death: Class Certification and Blackmail*, 78 *New York University Law Review* 1357 (2003);
- Charles Silver, *Law and Economics of Class Actions and Group Lawsuits, International Encyclopedia of Law and Economics* (2000);
- Lynn A. Baker and Charles Silver, *The Aggregate Settlement Rule and Ideals of Client Service*, 41 *South Texas Law Review* 227 (1999);
- Charles Silver, *Preliminary Thoughts on the Economics of Witness Preparation*, 30 *Texas Tech Law Review* 1383 (1999);
- Charles Silver and Lynn Baker, *I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds*, 84 *University of Virginia Law Review* 1465 (1998);
- Charles Silver & Lynn Baker, *Mass Lawsuits and the Aggregate Settlement Rule*, 32 *Wake Forest Law Review* 733 (1997);
- Charles Silver, *Comparing Class Actions and Consolidations*, 10 *Texas Review of Litigation* 496 (1991); and
- Jules Coleman and Charles Silver, *Justice In Settlements*, 4 *Social Philosophy and Policy* 102 (1986).

My writings have been cited in leading treatises and other authorities, including the *Manual for Complex Litigation, Third* (1996) and the *Manual for Complex Litigation, Fourth* (2004). I currently serve as one of three Associate Reporters on the American Law Institute's Project on Aggregate Litigation.

I also have substantial practical experience with group lawsuits. I have submitted briefs amicus curiae on class action issues to the Supreme Courts of Texas and the United States. (I was the principal author of an amicus brief submitted to the U.S. Supreme Court on behalf of a group of law professors in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), urging affirmance of the Third Circuit's standard for the certification of settlement classes. The Supreme Court affirmed on the issues addressed in the brief.) I

have testified before and submitted written comments to the Advisory Committee on the Rules of Practice and Procedure of the Judicial Conference of the United States regarding proposed amendments to the federal class action rule. I have also testified as an expert witness on class action issues, including certification, settlement, and attorneys' fees, many times in state and federal courts. Finally, I have served as co-counsel or consulting counsel in several class actions and have advised lawyers on aspects of many group lawsuits involving large numbers of clients.

**ATTORNEYS' FEES**

I have written at length about the subject of attorneys' fees and fee awards, including lodestar-based fee awards, fee awards in class actions, and fees charged in group representations. My published works include:

- Charles Silver, *A Critique of* Burrow v. Arce, 26 *William & Mary Environmental Law & Policy Review* 323 (2001);
- Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 *Tulane Law Review* 1809 (2000);
- Charles Silver, *Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers*, 4 *Connecticut Insurance Law Journal* 205 (1998);
- Charles Silver, *Incoherence and Irrationality in the Law of Attorneys' Fees*, 12 *Review of Litigation* 301 (1993);
- Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 *Texas Law Review* 865 (1992); and
- Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 *Cornell Law Review* 401 (1991).

My writings have been cited in treatises, law review articles, and published judicial opinions in several states.

I have substantial practical experience with attorneys' fees issues. I have submitted expert affidavits and testified as an expert on attorneys' fees many times and in

many locations, including federal and state courts, the U.S. House of Representatives, and the Texas legislature.

**PROFESSIONAL RESPONSIBILITY**

The subject of attorneys' fees falls within the area of professional responsibility, also called legal ethics or the law governing lawyers. I have taught a survey course in professional responsibility law many times, and I now offer a class that focuses exclusively on litigation, under the title Professional Responsibility for Civil Litigators. My writings on professional responsibility are extensive and include the following:

- Charles Silver, *When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs*, 44 *Arizona Law Review* 787 (2002);
- Ellen Smith Pryor and Charles Silver, *Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases*, 15 *Georgetown Journal of Legal Ethics* 30 (2001);
- Charles Silver and Frank B. Cross, Review Essay, *What's Not To Like About Being A Lawyer?*, *Yale Law Journal* (2000);
- Ellen Smith Pryor and Charles Silver, *Defense Lawyers' Professional Responsibilities: Part I–Excess Exposure Cases*," 78 *Texas Law Review* 599 (2000);
- Charles Silver, *The Legal Establishment Meets the Republican Revolution*, 37 *South Texas Law Review* 1247 (1996);
- Charles Silver, *Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis*, Institutional Choices in the Regulation of Lawyers, 65 *Fordham Law Review* 233 (1996);
- Charles Silver, *Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas*, 58 *Law & Contemporary Problems* 213 (Summer/Autumn 1996) (multiple authors);
- Charles Silver and Michael Sean Quinn, *All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram*, 6 *Coverage* 47 (May/June 1996);
- Charles Silver and Michael Sean Quinn, *Are Liability Carriers Second-Class Clients? No, But They May Be Soon–A Call to Arms against the Restatement of the Law Governing Lawyers*, 6 *Coverage* 21 (Jan./Feb. 1996);

- Charles Silver and Michael Sean Quinn, *Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers*, 5 *Coverage* 1 (Nov./Dec. 1995);
- Charles Silver & Kent Syverud, *The Professional Responsibilities of Insurance Defense Lawyers*, 45 *Duke Law Journal* 255 (1995); and
- Charles Silver, *Does Insurance Defense Counsel Represent the Company or the Insured?* 72 *Texas Law Review* 1583 (1994).

In 1997, a program sponsored jointly by the Insurance Law and Professional Responsibility Sections of the Association of American Law Schools was devoted to my work on the professional responsibilities of insurance defense lawyers. My work in this area significantly influenced the *Restatement (Third) of the Law Governing Lawyers*, Formal Opinion 96-403 of the American Bar Association, and decisions issued by state courts. I am a former member of the Executive Committee of the Professional Responsibility Section of the Association of American Law Schools.

I have testified as an expert witness on professionalism issues many times, and I frequently advise lawyers on problems arising in this field.

## DOCUMENTS REVIEWED

I reviewed the items listed below when preparing this Report. Unless indicated otherwise, documents were generated in connection with this case.

- Exxon Submission Regarding Notice to the Class of Potential Recovery, Proof of Claim and Hearing [D.E. 1483]
- Plaintiffs' Memorandum Regarding Class Notice, Proof of Claim Form and Claim Administration [D.E. 1505]
- Exxon's Response to Plaintiffs' Memorandum Regarding Class Notice, Proof of Claim Form and Claim Administration [D.E. 1515]

- Order on Status Conference and Pending Motions and Report and Recommendation Regarding Class Notice, Proof of Claim Form and Claims Administration Procedures [D.E. 1602]
- Exxon's Objection to Report and Recommendation Regarding Class Notice, Proof of Claim Form and Claims Administration Procedures [D.E. 1609]
- Plaintiffs' Opposition to Exxon's Objection to Report and Recommendation Re: Class Notice, Proof of Claim and Claims Administration [D.E. 1611]
- Exxon's Response to Plaintiffs' Objection to Report and Recommendation Re: Class Notice, Proof of Claim and Claims Administration [D.E. 1610]
- Order Approving in Part and Overruling in Part Report and Recommendation Re: Class Notice, Proof of Claim and Claims Administration Procedures [D.E. 1623]
- Plaintiffs' Motion for Determination of Class Notice Issues [D.E. 1638]
- Exxon's Response to Plaintiffs' Motion for Determination of Class Notice Issues and Report of the Garden City Group, Inc. [D.E. 1641]
- Plaintiffs' Reply to Exxon's Response to Plaintiffs' Motion for Determination of Class Notice Issues and Report of The Garden City Group, Inc. [D.E. 1642]
- Order Following Hearing on Class Notice Issues [D.E. 1646]
- Plaintiffs' Motion in Support of Garden City Group's Proposed "Wave B" Notice Program [D.E. 1666]
- Plaintiffs' Motion to Specify Content of Wave "B" Notice Program [D.E. 1668]
- Exxon's Response and Objection to Garden City Group's Proposed "Wave B" Notice Program [D.E. 1665]
- Order Approving Proposed "Wave B" Program [D.E. 1675]

- Plaintiffs' Motion to Extend Deadline for Filing Class Member Claims [D.E. 1621]
- Exxon's Opposition to Plaintiffs' Motion to Extend Deadline for Filing Class Member Claims [D.E. 1624]
- Plaintiffs' Reply on Motion to Extend Deadline for Filing Class Member Claims [D.E. 1625]
- Order Extending Deadline for Filing Class Member Claims [D.E. 1631]
- Plaintiffs' (Second) Motion to Extend Claims Filing Deadline [D.E. 1700]
- Exxon's Opposition to Plaintiffs' Motion to Extend Claims Filing Deadline [D.E. 1707]
- Slides from Claims Presentation
- Order Extending of Claim Filing Deadline [D.E. 1718]
- Plaintiff's Motion to Implement Phase II of Claim Administration Process [D.E. 1672]
- Exxon's Response to Plaintiffs' Motion to Implement Phase II of Claims Administration Process [D.E. 1677]
- Plaintiffs' Reply in Support of Motion to Implement Phase II of Claims Administration Process [D.E. 1683]
- Stipulation on Claims Procedures [D.E. 1706]
- Notice of Filing Proposed Order on Claims Procedures [D.E. 1713]
- Plaintiffs' Emergency Motion for Injunction Prohibiting Non-Party Interloper's Misleading Solicitation of Class Members [D.E. 1648]

- Non-Party's Notice of Filing of its Amended and Expanded Response of Claims Compensation Bureau, Inc. to Plaintiffs' Emergency Motion for Injunction [D.E. 1657]
- Plaintiffs' Response to CCB's Amended and Expanded Response to Emergency Motion for Injunction [D.E. 1658]
- Report and Recommendation on Plaintiffs' Motions for Injunctions [D.E. 1724]
- Order Affirming Report and Recommendation [D.E. 1769]
- Exxon's Motion to Dismiss Claims Filed By Florida, New Jersey and Virginia [D.E. 1821]
- Florida's Opposition to Motion to Dismiss [D.E. 1966]
- Plaintiffs Opposition to Motion to Dismiss State Claims [D.E. 1929]
- New Jersey and Virginia's Opposition to Motion to Dismiss [D.E. 1930]
- Exxon's Consolidated Reply in Support of its Motion to Dismiss [D.E. 1987]
- Plaintiffs' Notice of Supplemental Authority [D.E. 2002]
- Plaintiffs' Motion for Sanctions [D.E 1874]
- Exxon's Opposition [D.E. 1899]
- Plaintiffs' Reply [D.E. 1910]
- Order [D.E. 1986]
- Exxon's Brief
- Allapattah's Brief
- Exxon's Reply Brief
- Allapattah's Reply
- 333 F.3D 1248 (11th Cir. 2003) (affirmed)

- Exxon's Petition for Rehearing En Banc

- Allapattah's Petition for Rehearing En Banc

- 362 F.3d 739 (11th Cir. 2004) (rehearing en banc denied, Tjoflat dissent)

- Exxon's Petition for a Writ of Certiorari

- Allapattah's Brief in Opposition

- Exxon's Reply

- Allapattah's Supplemental Brief

- Order Granting Certiorari

- Exxon's Merits Brief

- Allapattah's Brief in Opposition

- Exxon's Reply

- Allapattah's Supplemental Brief

- Exxon's Supplemental Brief

- Order

- Plaintiffs' Motion for Determination of Legal Basis and Responsibility for Payment of Attorneys' Fees [D.E. 1690]

- Exxon's Opposition to Plaintiffs' Motion for Determination of Legal Basis and Responsibility for Payment of Attorney's Fees [D.E. 1699]

- Plaintiffs' Reply Memorandum in Support of Motion for Determination of Legal Basis and Payment of Attorney's Fees [D.E. 1703]

- Plaintiffs' Notice of Filing Supplemental Authority [D.E. 1719]

- Order re: Attorney's Fees [D.E. 1721]

- Stearns Weaver's Petition for an Award of Attorney' Fees, Costs, and Reimburseable Expenses
- Stearns Weaver's Petition for Determination of Attorney' Fee and Reimburseable Expenses in Fee Shifting States Texas, Arizona and Arkansas

## ANALYSIS

### I. INTRODUCTION

In this case Class Counsel have done an extraordinary job. I say this as an academic who has written about class actions and other large lawsuits for years, as a lawyer who has served as co-counsel and consulting counsel in many enormous and hotly contested lawsuits, and as an expert witness who has submitted many reports on attorneys' fees.

Because of Class Counsel's efforts, Class Dealers may recover 100% of their losses, including prejudgment interest and, for Class Dealers in three states, attorneys' fees.[1] A 100% recovery in a case where the aggregate loss is estimated to exceed $1 billion is almost unprecedented.

To secure this terrific result, Class Counsel:

- Weathered years of litigation against a mighty opponent, which seems primed for battle still;
- Expended hours worth tens of millions of dollars on Class Dealers' behalf, with no guarantee of compensation;
- Incurred expenses worth millions more, also for the benefit of Class Dealers and also at their own risk of loss;

---

[1] I write "may recover," not "will recover," because my understanding is that Exxon intends to seek Supreme Court review of any judgments entered in favor of Class Dealers in this case.

- Kept alive claims that might have been thought dead, because Class Dealers signed releases or waited too long to assert them;
- Prevailed, in the trial court and on appeal, on class certification;
- Tried the lawsuit to a jury *twice*, obtaining a verdict in favor of the class on the second attempt;
- Preserved the class-wide jury verdict in the Eleventh Circuit;
- Prevailed in the U.S. Supreme Court;
- Mounted the largest, most sophisticated, and most successful campaign to locate class members I have ever seen, with over 90% of claims by dollar value having been asserted;
- Protected the interests of missing class members by convincing several states to apply for funds on their behalf;
- Further enriched the class by prevailing on a motion for sanctions, one result of which was to prevent the Defendant from asserting its right to setoffs in the claims process;

Taken individually, any of these accomplishments would entitle Class Counsel to hold their heads high. Taken together, these accomplishments mark Class Counsel as elite members of the complex litigation bar.

Having endured a litigation war and prevailed on the most important issues, Class Counsel now ask the Court to enter an order requiring Class Dealers who eventually recover funds to pay them attorneys' fees and to reimburse their expenses. Class Counsel asks that each Class Dealer pay a 33 1/3% fee, which includes reimbursement for Class Counsel expenses. In my opinion, the request for fees and expenses is reasonable, and the time to set payment terms has come.

## II. GENERAL PRINCIPLE: MIMIC THE MARKET WHEN SETTING FEES IN CLASS ACTIONS

The main point of this Report is simple. When setting compensation terms in class actions, judges should mimic as closely as possible the rates and other terms that prevail in the market for legal services, where clients and lawyers bargain face-to-face. There are two reasons for this. First, compensation terms used in the private market provide valuable information about clients' goals in litigation and the means clients use to achieve them. Second, compensation at market rates cures the problem of unjust enrichment as well as can be done. Each point requires elaboration.

### A.. The Market for Legal Services Shows that Contingent Percentage Fees Work Best for Claimants

Everyone familiar with the private market for legal services knows that different compensation arrangements prevail in different sectors. Claimants, including those who are wealthy, overwhelmingly pay attorneys contingent percentage fees. Respondents typically pay their lawyers hourly rates. Fixed fees (also called flat fees) prevail in contexts where lawyers deliver discrete products, such as form wills, form leases, and uncontested marital dissolution pleadings. Academic researchers have observed these patterns repeatedly.

The tendency of clients and lawyers to use particular compensation arrangements in particular contexts is readily explained. Compensation arrangements are better suited to some tasks than others, and a competitive market, which the market for legal services surely is, pressures sellers (lawyers) to offer buyers (clients) payment terms that work best for them. In the legal services market, as in the competitive sector more generally, sellers gain by keeping buyers happy. Lawyers seeking to develop prosperous practices

therefore have incentives to offer clients efficient compensation arrangements, i.e., payment terms that help clients achieve their goals at the least cost.

The prevalence of contingent percentage fees in the market for claimant representations is, then, not an accident but a reflection of the advantages clients derive from this method of compensation. The frequency with which sophisticated clients with large claims use contingent fees makes this clear. For example, institutional investors with sizeable holdings have served as lead plaintiffs in many fraud class actions filed after the enactment of the Private Securities Litigation Reform Act (PSLRA) in 1995. These investors are highly sophisticated. Many, such as public pension funds, have in-house legal departments with experienced lawyers responsible for monitoring litigation. These clients have every incentive to use efficient compensation arrangements that get them the most "bang for the buck." And in every post-PSLRA case I know of in which an institutional investor took the helm, the lead plaintiff agreed that its lawyers would receive a contingent percentage fee. Even sophisticated claimants find contingent percentage fees attractive.

The Named Plaintiffs who stand at the head of this class action also opted for the contingent percentage approach. Each Named Plaintiff signed a contract entitling class Counsel to 33% of any recovery plus expenses. Although the Named Plaintiffs are not institutional investors, their claims are fairly large. Their claims range in size from $95,000 to $445,000 and average $270,000, and they used contingent percentage approaches uniformly. None offered to pay Class Counsel a guaranteed hourly rate or any other form of compensation. Presumably, the agreements between the Named Plaintiffs and Class Counsel reflected prevailing conditions, including the potential of a class action to generate economies of scale and the Named Plaintiffs' desire to pay the

smallest possible fee. The Named Plaintiffs would only have hurt themselves by agreeing to pay excessive fees.

Were this a securities fraud class action, the retainer agreements between the Named Plaintiffs and Class Counsel would enjoy a strong presumption of reasonableness. See, e.g., *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298, 301 n.10 (3d Cir. 2005) ("In *[In re] Cendant [Corp. Litig.]*, 264 F.3d 201, [284 (3d Cir. 2001),] we noted, under the Private Securities Litigation Reform Act, the aim of the fee award analysis is not to assess whether the fee request is reasonable,' but 'to determine whether the presumption of reasonableness has been rebutted.'"); *In re Global Crossing Sec. & ERISA Litig.* 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *In re Lucent Technologies, Inc. Sec. Litig.*, 327 F.Supp.2d 426, 432 (D.N.J. 2004) ("Under [the] PSLRA, a fee[] award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness. This presumption preserves the lead plaintiff's role as 'the class's primary agent vis-a-vis its lawyers.' Absent unusual and unforeseeable changes, courts should honor that presumption.") (citations omitted). A presumption should also exist here, I believe, at least in favor of respecting the Named Plaintiffs' choice of the contingent percentage form. By selecting it, the Named Plaintiffs followed a path sophisticated clients and claimants in general find advantageous.

It remains to identify the advantages contingent percentage arrangements afford. Judge Frank Easterbrook identified them in *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986), where he explained that contingent percentage fee arrangements: (1) align the

interests of claimants and lawyers by rewarding superior performance and punishing failure; (2) minimize the need to evaluate the reasonableness of attorneys' efforts *ex post*, which is both time consuming and often hard to do; and (3) transfer the burden of financing lawsuits and other risks from claimants to attorneys who are better able to bear them. In keeping with the larger point of this Report, Judge Easterbrook also maintained that because claimants use contingent percentage fees almost exclusively, judges should use them when awarding fees in claimant representations. *Id.*, at 326.

All three advantages are important, but in class actions (1) carries special weight and demands further attention. Even if it is true that contingent percentage fees align the interests of lawyers and clients, what do clients involved in lawsuits as claimants typically want? The consensus among judges and scholars is that claimants seek to make themselves as well off as possible. In lawsuits brought for monetary relief, this means they wish to maximize their expected net recoveries—the amounts they expect to take home after paying legal fees and other litigation expenses. See, e.g., *In re Cendant Corp. Litig.*, 264 F.3d 201, 254-55 (3d Cir. 2001) ("a rational, self-interested client seeks to maximize net recovery; he or she wants the representation to terminate when his or her gross recovery minus his or her counsel's fee is largest"); Lucian Arye Bebchuk, *The Questionable Case for Using Auctions to Select Lead Counsel*, 80 Washington University Law Quarterly 889, 890 (2002) ("From the perspective of the class, it would be desirable to select ... a fee schedule so as to maximize the expected net recovery for the class. This expected net recovery is in turn equal to (i) the expected recovery in the case, minus (ii) the expected expenditure on legal representation."); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tulane Law Review 1809, 1841 (2000) ("[J]udges should set percentages with an eye to encouraging lawyers to

maximize the value of class members' claims. They should do what the sole holder of an entire set of claims would do, namely, select the fee formula that is expected to yield the largest net recovery after the lawyers are paid.").

The belief that claimants prefer more to less is the bedrock supporting the Supreme Court's modern due process jurisprudence, which allows class actions to proceed only when absent claimants are adequately represented. In two recent cases involving claims for monetary relief, the Supreme Court refused to allow class actions to proceed because the class representatives could not be relied on to obtain the largest available recovery for absent class members. In *Amchem v. Windsor*, 521 U.S. 591, 621 (1997), the Court struck down a class-based settlement of claims that could not be certified for litigation, pointing out that "[c]lass counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer." Two years later, the Court invalidated the settlement in *Ortiz v. Fiberboard Corporation*, 527 U.S. 815 (1999), for a similar reason. Owing to a conflict of interests, putative class counsel had a "great incentive to reach any agreement in the global settlement negotiations ..., rather than the best possible arrangement for the substantially unidentified global settlement class." *Id.* at 818. Absent class members are adequately represented only when class counsel have the ability and the incentive to obtain the largest available dollars for them, because absent class members prefer larger recoveries to smaller ones. To put the point another way, adequate representation occurs only when class members' interest in receiving a large recovery aligns with class counsel's interest in receiving a sizeable fee.

The analysis thus far shows two things: claimants seeking to maximize *their net* recoveries pay lawyers contingent percentage fees when purchasing legal services in the

private market; and the requirement of adequate representation entails that class counsel must be motivated to maximize absent claimants' recoveries. A third point follows from these two: judges can best ensure adequate representation in class actions by paying class counsel contingent percentage fees.

Academic writers agree that fee arrangements help align the interests of clients and attorneys by incentivizing lawyers to work hard for clients. However, no fee arrangement does this perfectly. Because all fee arrangements have defects, the object can only be to select the arrangement thought to work best in a given settling. Judging from private transactions in the market for legal services (including transactions between lawyers and sophisticated clients with large stakes), contingent percentage fee arrangements achieve the closest harmony of interests in claimant representations. In combination, the Supreme Court's concern that class counsel represent absent claimants zealously and the market's strong signal that contingent percentage arrangements work best exclude any argument for other compensation arrangements. By using some other arrangement, such as an approach based on hourly rates, judges would predictably saddle absent class members with inferior representation and violate the Due Process Clause.

B. **Contingent Percentage Fees Cure Unjust Enrichment**

This Court possesses great familiarity with the restitutionary principles that historically gave rise to the practice of awarding fees to attorneys in successful class actions. I shall therefore refrain from covering the basics,[2] I shall directly address two questions: Do restitutionary principles allow a court presiding over a class action to use

[2] I examine the basics with some care in "*A Restitutionary Theory of Attorneys' Fees in Class Actions*," which appeared in the Cornell Law Review in 1991. Until recently, my article provided the only extended scholarly treatment arguing that the practice of compensating attorneys in class actions accords with general principles of restitution. With the publication of § 30 of the *Restatement (Third) of Restitution And Unjust Enrichment*, this view has become mainstream.

the contingent percentage approach?; and Do these principles allow a court to set a fee before a final judgment is entered? In my opinion, the answer to both questions is "yes."

On the propriety of awarding fees as contingent percentages, the law has long been clear. The Supreme Court approved the practice in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), a foundational case. There, the lower court granted a lien reflecting a 10% fee in favor of lawyers who represented a creditor class. When members of the class appealed, the Supreme Court affirmed the power of the lower court to award the fee, but cut the fee to 5%, reflecting the contingent percentages promised by the lead plaintiffs. *Id.* at 128. The practice of awarding fees as contingent percentages in class actions is older than that of basing fee awards on hourly rates.

The practice of awarding fees as contingent percentages reflects the tendency of court's to mimic markets when granting restitution to persons whose efforts benefit others. Thus, when absent class members benefit from class counsel's efforts, "[r]estitution is typically measured by legal fees and expenses because that is how benefits of this character are priced." *Restatement (Third) of Restitution And Unjust Enrichment* § 30 (2005). The law of restitution requires payment at customary rates, which in claimant representations means contingent percentage fees. See *Kirchoff*, 786 F.2d at 324 ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (emphasis in original).

The remaining question is whether the time to set the fee has come. This is a matter concerning which there may be some confusion, unless one distinguishes an order setting fee terms from an order awarding payment. Under the law of restitution, a court may order payment only when the existence of a common fund or other *res* establishes

enrichment and enables a court spread litigation costs equitably among the members of a benefited class. By contrast, the Federal Rules of Civil Procedure authorize judges presiding over class action to set fee terms at any time, and anticipate that they will do so as early as practicable in contested cases. In a case like this one where a class has been certified for litigation, a federal judge can set fee terms long before a common fund or other *res* appears, and ordinarily should do early on.

This Court examined the conditions under which an order directing payment of fees is proper in its *Order on Procedure for Determination and Entry of Final Judgment* and, more recently and at greater length, in its *Order on Plaintiffs' Motion for Determination of Legal Basis and Responsibility for Payment of Attorneys' Fees*. The *Order on Procedure* provided that fees "shall be paid from the escrow account applicable to the claimants involved." However, the *Order on Procedure* did not set other fee terms. It instructed class counsel to submit a proposal concerning fees instead. The *Order on Plaintiffs' Motion* did not set fee terms either. It merely found that Class Counsel's request for payment was premature. The notices class members received relating to the claims process reflect these orders. They indicate that fees and expenses will be deducted from Class Dealers' recoveries, but do not specify amounts.

As matters now stand, everyone knows Class Counsel will be paid from Class Dealers' escrow accounts, but no one knows the payment terms. This uncertainty is undesirable for two reasons. First, from a due process perspective, Class Dealers should know how much they may be required to pay, and Class Counsel should know how much they stand to collect. Until the Court sets fee terms, Class Dealers will lack assurance against being overcharged and will not know whether to object. Class Counsel's incentives will also be impaired. In particular, Class Counsel will not know whether they

stand to gain by helping Class Dealers' maximize their recoveries in the claims process and any subsequent appeals. The link between Class Dealers' self-interest and Class Counsel's advantage will be impaired. Second, and relatedly, by leaving fee terms unclear, the Court deviates from the "mimic the market" approach, for in the private market for legal services clients and lawyers always set the terms of contingent fees at or near the start of representations. The market strongly signals that contingent fee terms should be negotiated when no one knows how litigation risks will turn out, not after those risks have been resolved.

Many scholars, including me, have urged judges to set compensation terms early in class actions and other contexts where fees are awarded.[3] In response to this pressure, Rule 23 of the Federal Rules of Civil Procedure was amended in 2003 in ways that allow judges to set fee when certifying classes and that allow this Court to set fees at this time. Rule 23(g)(1)(A) requires a court to appoint class counsel when certifying a class. Rule 23(g)(1)(C)(iii) allows a judge to ask candidates "to propose terms for attorney fees and nontaxable costs" when applying for the position. Rule 23(g)(2)(C) allows a judge to memorialize the understanding regarding fees and expenses in "[t]he order appointing class counsel." Rule 23(h)(1) states that when fees are requested in a class suit, notice *must be "directed to class members in a reasonable manner." Notice must also be sent at a reasonable time, so class members can exercise their right under Rule 23(h)(2) to object if they believe requested fees are too high. As currently written, Rule 23 creates a process that enables judges to "mimic the market" by setting fees before litigation risks play out.

---

[3] In *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Texas Law Review 865 (1992), I proposed a procedure for setting the terms of fees awarded pursuant to statutes early in litigation.

The Court certified a class in this case before the 2003 amendments to Rule 23 took effect. Consequently, the Court understandably left fee terms unsettled, as was the pre-2003 practice. There is, however, every reason to bring this case into compliance with the new terms of the rule. By setting fees now (and choosing a contingent percentage arrangement), the Court will align the interests of Class Dealers and Class Counsel throughout the claims process, as due process (and common sense) require. When it comes to setting compensation terms in litigated class actions, judges need not and should not wait for common funds or other payment sources to appear.

C. ***Camden I* Permits Percentage Fees Set at Market Rates**

The Eleventh Circuit established case law governing the calculation of common fund fee awards in *Camden I Condominium Association, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). After the trial court set a fee using the lodestar method, the Eleventh Circuit reversed, pointing out that "every Supreme Court case addressing the computation of a common fund fee award has determined such fees on a percentage of the fund basis." *Id.* at 773. Not surprisingly, the Eleventh Circuit endorsed the percentage approach as well. "Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Id.* at 774.

*Camden I* also tells district court judges how to set percentages. As commonly read, it requires a trial judge to start with benchmark of 25% and to vary that number upward or downward in light of many factors. Relevant factors include those contained in the American Bar Association's (ABA) rule on fees (as memorialized in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, (5th Cir.1974)), and matters relating to "the economics involved in prosecuting a class action." *Camden I*, 946 F.2d at 775.

I have already shown that "the economics involved in prosecuting a class action" weigh in favor of using market rates, which encourage plaintiffs' attorneys to maximize the expected net value of class members' claims. I now add that the ABA rule on fees allows lawyers to charge prevailing market rates. The rule expressly recognizes "the fee customarily charged in the locality for similar legal services" as a factor bearing on reasonableness, and the customary fee is simply a lawyer's market rate. The *Restatement (Third) of the Law Governing Lawyers* agrees. It recognizes that market forces help keep fees of all kinds reasonable.

> To the extent competition for legal services exists among lawyers in the relevant community, a tribunal can assume that the competition has produced an appropriate level of fee charges. A stated hourly rate, for example, should be compared with the hourly rates charged by lawyers of comparable qualifications for comparable services, and the number of hours claimed should be compared with those commonly invested in similar representations. The percentage in a contingent-fee contract should be compared to percentages commonly used in similar representations for similar services (for example, preparing and trying a novel products-liability claim).

*Restatement (Third) of the Law Governing Lawyers* § 34, Comment c (2004). In most areas, the market for legal services is competitive. The lawyer population in the United States is at or near the 1 million mark, and no barriers prevent lawyers from moving into practice areas where fees are artificially high. Judges can therefore assume that prevailing market rates are reasonable and proper under the ABA rule and *Camden I*.

## II. DETERMINING MARKET RATES

When clients hire lawyers in the private market, questions rarely arise about lawyers' market rates. The market rate is whatever the client agrees to pay and the lawyer agrees to accept in a bargaining environment where both are free to reject any proposal, and where other lawyers and clients are easy to find. When questions do arise, the evidence needed to settle the matter is usually close at hand. For example, a lawyer accused of gouging can show that a disgruntled client paid the lawyer's usual and customary rate, that the fee was fully explained before the representation started, etc. Once these facts are established, the claim of overcharging usually fails.

In class actions, lawyers and absent class members do not bargain over fees. Consequently, insofar as absent claimants are concerned, the evidence of market rates that normally exists—prices agreed to at arm's length in competitive markets where buyers and sellers can freely take their business elsewhere—is missing. Judges acting as regulators must decide what they will pay.

I have already shown that, when donning their regulator caps, judges should set fees in class actions as closely as possible to prevailing market rates. This means judges should attempt to identify the terms absent class members and class counsel would have come to had they bargained over fees face-to-face 14 years ago. See *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001) (*Synthroid I*) ("[W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market *at the time*.") (emphasis added).

Judges could make short work of this project by taking the terms the named plaintiffs agreed to and applying them class-wide. The U.S. Supreme Court did this in

*Pettus*. After learning that the named plaintiffs promised the lawyers 5% of the recovery, it ordered other creditors who collected under the judgment pay 5% as well. The Court found "no reason" the absent claimants should pay more or less in fees than the named parties. *Pettus*, 113 U.S. at 128. Following the named plaintiff's lead also is the emerging practice in securities fraud class actions filed after the enactment of the PSLRA, as previously explained.

The practice of applying a named plaintiff's terms class-wide makes sense when one believes that a named plaintiff bargained for a fee that was efficient for a class as a whole. This may or may not be the case. On the one hand, a named plaintiff has an interest in economizing, because *ceteris paribus* a lower fee means the named plaintiff takes home more money at the end of the day. This interest is important. One often hears that fees should be lower in class actions than other contingent fee cases because class actions generate significant economies of scale. If and when this is true, however, a rational named plaintiff should be able to bargain for a lower fee. By ignoring scale economies or other factors that tend to make litigation cheaper, a named plaintiff would overpay class counsel, to his or her own disadvantage. One usually expects disinterested business clients (such as the named plaintiffs in this case) to seek the best terms they can get.

On the other hand, the context in which named plaintiffs bargain with lawyers seeking to become class counsel may be less than ideal. The named plaintiffs may (or may not) be unsophisticated in the use of legal services. The lawyers may (or may not) possess significant informational advantages. The local market for legal services may (or may not) be shallow, meaning the named plaintiffs may (or may not) have had to choose

among a small number of attorneys. In a flawed bargaining environment, a named plaintiff may agree to pay a fee higher than the efficient fee for a class.

In this case, the original bargaining environment was good. The named plaintiffs and other dealers were experienced business persons, some of whom had likely dealt with lawyers before, and all of whom had signed diverse financial agreements involving responsibilities for larger sums, including the contracts with Exxon that were the focus of this litigation. The named plaintiffs and other dealers all agreed to pay their lawyers contingent fees of 33% plus expenses. See, e,g., Letter from Jay H. Solowsky to Remaining Named Class Representatives EXXON DFC Class action, dated October 21, 2004 (showing that 9 individuals representing 10 dealerships agreed to the indicated terms.) Because the fee terms were spelled out clearly in the retainer agreements, it is unlikely that all members of the group misunderstood the commitment entailed. The named plaintiffs and other dealers signed contingent fee agreements at different times and resided in different states. There was no conspiracy to round everyone up at one time, and access to alternative sources of legal assistance was easy. Because there is no obvious reason to believe that all dealers who signed individual agreements were ignorant bribed, duped, coerced, or otherwise deprived of the ability to bargain, the presumption that dealers economized on fees seems sound, as does the case for applying their fee terms class-wide.

One might also question the fees agreed to by the signed clients if they departed markedly from one's best estimate of then-prevailing market rates. To form such an estimate, one needs evidence of fees that were paid or promised in similar cases around the time this lawsuit commenced, that is, in the late 1980s and early 1990s. The evidence I know of supports the reasonableness of the signed clients' fee terms.

A. **Fees in Mass Tort Cases**

The category of mass tort actions covers a range of cases in which tens, hundreds, or thousands of persons with related claims hire attorneys individually. The category includes asbestos cases, drug cases, other defective products cases, pollution cases, cases arising out of hotel fires, airplane crashes, and other disasters, and many more. Because claimants hire attorneys individually, advertising is widespread, and the pool of lawyers willing to handle these cases is deep, one expects compensation terms agreed to in these cases to be efficient.

Mass tort cases resemble this case in important respects. First, this case includes related claims that have common elements and unique elements. The former were adjudicated class-wide at trial; the latter will be dealt with in the claims process. Mass tort cases are similar. When an explosion occurs, as happened in Brenham, Texas years ago, buildings close to its center may be destroyed while buildings farther away are only damaged. Issues relating to the blast itself—why it happened, when it happened, how large it was, etc.—were common to all property owners' claims, while issues relating to damages varied across properties. Second, this case involves a large corporate defendant with tremendous resources and significant experience in litigation. Such companies frequently appear in mass tort cases as well. In fact, the list of mass tort defendants reads like a "Who's Who" of corporate America because mainly solvent companies get sued. (Insolvent companies also show up in mass tort cases when they have insurance, but this just means that entity calling the shots on the defense side is an enormous, solvent, and litigation-savvy liability insurer.) Third, the claims brought together in this case range in size from middling to large but not enormous. My understanding is that the average claimant stands to recover about $120,000, that many claims exceed $1 million, and that

thousands of claimants seek hundreds of thousands of dollars. Again, mass tort cases are similar. In an asbestos case, mesothelioma victims often obtain settlements in the low seven figures, while plaintiffs with less severe injuries receive much smaller sums. Fourth, this case posed daunting technical issues, which sophisticated attorneys eventually came to understand with the help of expert witnesses and which were capable of being proved only with expert testimony. Mass tort cases are similar. In fact, the *Daubert* case, which Exxon invoked in an unsuccessful effort to disqualify the plaintiffs' main economics expert in this case, was part of a mass tort campaign again Merrell Dow, the manufacturer of a popular morning sickness drug that was alleged to cause birth defects. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Fifth, this case required plaintiffs' lawyers to advance enormous amounts of time and financial capital. Mass tort cases require similar speculative investments. Seventh, this case required an extraordinary outreach program (extraordinary for class actions, that is) to locate Class Dealers, to convince them to file claims, and to help them prepare claim forms. Mass tort lawyers have long been recruiting clients, communicating with clients, and developing clients' claims *en masse*.[4] Eighth, in one mass tort context—asbestos—jury trials often occur, and fees presumably reflect the greater expenses and risks trials entail. This case was tried to a jury *twice* (a phenomenon I cannot recall encountering and cannot imagine enduring as plaintiffs' counsel), so it seems reasonable to assume the risk of trial was palpable when the case began.[5]

---

[4] I discuss some of the techniques mass tort lawyers use in *Preliminary Thoughts on the Economics of Witness Preparation*, 30 Texas Tech Law Review 1383 (1999);

[5] Exxon's willingness to defend large class actions through verdicts and appeals is well known, as is its support of the tort reform movement. Exxon continues to defend claims arising out of the Valdex oil spill that were tried as a class. Like this lawsuit, the Valdez case is now well over a decade old.

Given the similarities just listed, one might reasonably take mass tort cases as a model for this case and ask what the payment terms in mass tort cases tend to be. After studying the literature on group lawsuits and participating in many group lawsuits personally, I can report that contingent percentage fees of 33-40 percent are common and that higher fees often prevail.[6]

Studies of asbestos litigation by the Institute for Civil Justice at RAND bear out this assessment. For example, a study of over 3,000 claims closed before August, 1982 found that plaintiffs' legal fees and other litigation expenses consumed an average of about 42 percent of plaintiffs' gross recoveries. James S. Kaklik, *et al.*, *Costs of Asbestos Litigation* Table S.2 (1983). Another RAND study of asbestos cases reported legal fees and expenses consumed 39 percent of plaintiffs' gross recoveries. James S. Kakalik *et al.*, *Variation in Asbestos Litigation Compensation and Expenses* xviii Figure S.1 (1984). In the authors' words:

> We have concluded that legal fees in tried [asbestos] cases were typically 33 to 45 percent of total compensation, and averaged about 39 percent. Other expenses in tried cases ranged from 1 to 12 percent of recovery, but were generally about 6 percent.
>
> Plaintiffs' legal fees as a percentage of compensation were lower for settled cases; they typically ran from 28 percent to 40 percent with an average of 34 percent. Other expenses on settled claims averaged approximately 5 percent of the recovery, though on occasion they were much higher or lower.
>
> In summary, the average plaintiff litigation expenses (including both legal fees and other expenses) were 39 percent of total compensation for all 1980-1982 closed claims combined.

*Id.*, at 83-84. Defendants' litigation costs were comparable.

---

[6] I made this point previously in *Due Process and the Lodestar Method*, surpa, at 1843-1844.

My experience as a consultant in large-group lawsuits supports RAND's findings. In one case I participated in, approximately 1,700 plaintiffs alleging asbestos-related personal injuries each agreed to pay fees in the range of 33 to 40 percent, with expenses separately reimbursed. In a second instance, 600 plaintiffs who suffered property damage as a result of an explosion at a natural gas storage facility agreed to pay fees of 33 percent of the recovery, plus expenses. In a third instance, approximately 60,000 plaintiffs who suffered property damage as a result of defective polybutylene plumbing agreed to pay fee of 40 percent of the recovery, plus expenses. A fourth case was one in which a single law firm settled the claims of several thousand asbestos clients against a single defendant. Again, fees ranged from 33 to 40 percent, with expenses separately reimbursed. I also am familiar with fees lawyers have charged in a variety of cases involving prescription drugs, such as Fen-Phen, and know that fall into the same range. These examples show that contingent fees of 40 percent are common in the market for aggregated lawsuits involving large numbers of plaintiffs.

Certain cases arising out of commercial airplane crashes are the exception that proves the rule. A footnote to ABA Formal Opinion 94-389 reports that "[i]n cases where airline insurers voluntarily sent out the 'Alpert letter' which makes an early settlement offer and concedes all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery." ABA Formal Opinion 94-389, n. 13 (1994) (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 The Brief 4, 38 (November 1982)). Market forces explain these lower percentages, as, in the same footnote, the ABA opinion observes. When a defendant concedes liability and puts a settlement offer on the table from the get-go, risks fall and the market pays contingent fee lawyers less for handling cases. In this case, of course, Exxon denies liability

completely, denies damages, and refuses to pay anything. The fees in this case should therefore exceed those lawyers receive for working on uncontested injury matters stemming from commercial aircraft disasters.

When comparing this case to mass tort cases, one must also remember that this case was *tried*. Fee agreements used in mass tort cases usually contain scales of percentages that increase with the amount of litigation required. Consequently, fees and costs in tried mass tort cases fall often exceed the 33%-40% range that is normal for these cases. As the RAND study of asbestos cases quoted above found, "legal fees in tried cases ... averaged about 39 percent," and "[o]ther expenses in tried cases ... [averaged] about 6 percent." The combined load on plaintiffs' recoveries in tried asbestos cases was therefore averaged about 45%, far more than Class Counsel seeks in this case.

Taking mass tort cases as a guide, then, the available evidence indicates that Class Counsel's request for payment of 33.33% of recovered funds is reasonable.

**B. Conventional Plaintiff Representations**

The conventional wisdom, shared by many judges and commentators, is that the standard contingent fee in conventional plaintiff representations is one-third of the recovery. Empirical studies show that although one-third fees are common, the conventional wisdom overstates their frequency. Contingent percentage fees vary in size, both within practice areas and across them. Generally speaking, they range from a low of 20 percent in automobile accident cases that settle even before complaints are filed to a high of 50 percent in medical malpractice cases. The variation reflects, among other things, the differing risks and costs that different lawsuits entail.

Herbert Kritzer, a professor of Political Science and Law at the University of Wisconsin, is the country's leading empirical researcher of attorneys' fees in plaintiff

representations.[7] In an article based on a sample of 989 representations in Wisconsin, he reports that in slightly more than half the cases the client agreed to pay a one-third contingent fee. Herbert M. Kritzer, *Investing in Contingency Fee Cases, Wisconsin Lawyer* 11, 12 (August 1997). Many other clients agreed to pay contingent percentages that varied in size according to the stage litigation reached before ending. The following graph, taken from the same article, shows the range of percentages agreed to for each stage of litigation.

Source: Herbert M. Kritzer, *Investing in Contingency Fee Cases, Wisconsin Lawyer* 11, 12 (August 1997).

[7] At my invitation, Professor Kritzer published an article in the *Texas Law Review* summarizing many existing studies of the impact of fees on lawyers' behavior. Herbert M. Kritzer, *Lawyer Fees and Lawyer Behavior in Litigation: What Does the Empirical Literature Really Say?*, 80 *Tex. L. Rev.* 1943 (2002).

Generally speaking, fee percentages increased as litigation became riskier. Lower fees were promised when cases settled without lawsuits than when they settled after petitions were filed. Still higher percentages were promised when cases were tried or appealed.

Other studies have generated findings similar to Kritzer's. For example, a non-scientific survey conducted by the State Bar of Texas found average contingent fees ranging from 28% to 45% in the early 1990's. State Bar of Texas, *1995 Attorney Billing & Compensation Study*. A study of federal lawsuits by RAND found that, of the cases in which contingent fees were paid, the percentage was 33% over half the time, less than 33% about a quarter of the time, and more than 33% in the remainder. See Herbert M. Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 Washington University Law Quarterly 739, 760 (2002) (summarizing data reported in James S. Kakalik et al., *An Evaluation of Judicial Case Management under the Civil Justice Reform Act* (1996)).

Taking conventional contingent fee representations as a guide, the payment terms Class Counsel request seem reasonable.

C. **Fee Agreements Negotiated by Sophisticated Clients**

As a general matter, little is known about the fees businesses and other sophisticated clients agree to pay when acting as plaintiffs in litigation. (It is known that insurance companies defending liability suits spend as much as plaintiffs do on legal services, and probably more.) Businesses suing as plaintiffs rarely make their fee agreements public, and no one has studied their practices empirically, insofar as I know. Businesses also frequently use hybrid arrangements that combine guaranteed hourly rate fee payments with contingent bonuses. These arrangements hold few lessons for class actions because lawyers representing plaintiff classes work on straight contingency. That

said, the limited evidence available on the use of pure contingent fees by sophisticated clients (or payers) shows that marginal percentages tend to be high.

A famous case involving the Texas law firm of Vinson & Elkins (V&E) exemplifies the use of contingent percentage compensation arrangements by sophisticated clients seeking large recoveries. ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

Declaration of Harry Reasoner, filed in *In re Washington Public Power Supply System Securities Litigation*, U.S. District Court, District of Arizona, MDL No. 551, Nov. 30, 1990.

Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery in a massive case. Second, V&E bore no liability for out of pocket expenses. The percentage was high even though the deal was more favorable to the law firm than the usual contingent fee arrangement, which requires the lawyer to bear litigation costs and entitles the lawyer to reimbursement only if the plaintiff prevails. Third, the case was enormous, ultimately generating a recovery almost fives times as large as the common fund here. Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by

V&E could possibly be made. Fifth, EPP's lawsuit commenced in 1984 and went to trial against the final defendant in 1989. The fee agreement Mr. Reasoner described was thus in force until shortly before this lawsuit against Exxon was filed in 1991.

Another, and perhaps even more telling, example of a fee promised by a sophisticated client is described in *Synthroid II*. There, financial intermediaries with tens of millions of dollars at stake agreed to pay outside law firms fees averaging 22 percent of the recovery *even though a settlement was already on the table when the lawyers were hired*. The lawyers' job was merely to garner as much as possible of the settlement fund for the clients, not to litigate the case. Given the lack of risk of non-payment, the size of the percentage reflects well on the 33.33% fee requested by the lawyers in this case, who bore an enormous risk of non-payment and incurred sizeable expenses on behalf of the class.

Other sources of information about fees paid by sophisticated clients also support the reasonableness of class counsel's fee request. In a report filed in *In re: High Fructose Corn Syrup Antitrust Litigation*, Professor John C. Coffee, Jr., in my opinion the leading class action scholar in the United States, reported that the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%," respectively. In the same case, an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement. Three other corporate class members, Honickman Group, The Coca-Cola Company, and Admiral Beverage Corporation, submitted affidavits stating that they would have paid at least a 25% fee. Declaration of John C. Coffee, Jr., *In re High Fructose Corn Syrup Antitrust Litigation*, pp. 1-2 (Oct. 7, 2004). In the same lawsuit, class counsel submitted a list showing the contingent percentage fees agreed to by 6 named plaintiffs, all of which were

businesses that purchased corn syrup. The percentages ranged from 20% to 33%, often varying with the duration of the lawsuit. *Plaintiffs' Supplemental Memorandum on Attorneys' Fees in Common-Fund Cases*, Exhibit E, submitted in *In re: High Fructose Corn Syrup Antitrust Litigation* (Oct. 7, 2004). These fee promises support the reasonableness of Class Counsels' request for a 33.33% fee in a twice-tried case.

Fees appear to be somewhat lower in massive securities fraud class actions that have enormous institutional investors at the helm. In my experience, institutional investors typically pay 15%-25%. They also often use increasing scales of percentages that offer higher fees when cases are tried or when larger dollars are recovered.

Unfortunately, the data supporting the observation just made are anecdotal.[8] Securities class actions also differ from this lawsuit in ways that might lead lawyers in those cases to charge less. First, many securities class actions are filed on the heels of governmental investigations of corporate wrongdoing, often but not always investigations by the SEC. These investigations make securities class actions safer bets for attorneys, both by signaling the existence of fraud and developing evidence. Consequently, one would expect fees in securities class actions to be lower than those paid in lawsuits (like this one) where class counsel operates without government support. Second, securities

---

[8] In *Synthroid I*, 264 F.3d at 720, Judge Easterbrook asserted that "[d]ata about these *ex ante* arrangements [in securities class actions] have been widely available since the changes to securities practice wrought by legislation in the mid-1990s." This is incorrect. Academic studies of deals negotiated between large investors serving as lead plaintiffs in securities class actions and lawyers serving as class counsel contain small numbers of examples. *See, e.g.*, Jill E. Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel by Auction*, 102 *Colum. L. Rev.* 650 (2002) (discussing examples of fee arrangements negotiated by institutional investors). The *Third Circuit Task Force Report Selection of Class Counsel*, 208 F.R.D. 340 (January 15, 2002), confirms this. Although the Report cites testimony by Professor Joseph A. Grundfest of the Stanford Law School to the effect that "in auction cases and cases involving 'hard bargaining by a competent named plaintiff,' awards range from 7% to 21.2%," it warns in a footnote that the sample of cases is small. *Id.* and *Id.*, n. 103. Professor Michael Perino, of the law school at St. John's University, has a study underway of fee agreements in post-PSLRA cases, but the results have not been published and the soundness of his methodology and conclusions has yet to be evaluated.

cases are far more numerous than other class actions, including breach-of-contract cases like this one. Consequently, all of the following are easier to predict in securities cases than in cases like this one: whether a class will be certified; whether the case will be dismissed, tried, or settled; how large the settlement will be if settlement occurs; the investments of time and money class counsel will have to make; and the number of years the lawsuit will last. Lower fees should be expected when risks are more predictable. Third, lawyers can reduce the risks securities class actions entail somewhat by diversifying them. By maintaining portfolios of cases, law firms that specialize in the securities field can make their inflows more predictable. It is much harder for law firms specializing in other areas to diversify, especially for law firms like Stearns Weaver that rarely handle plaintiffs' work. Finally, institutional investors may make class litigation less expensive for lawyers by bearing some of its costs themselves.

Overall, it seems best to say (1) that little is known about the contingent percentages sophisticated clients typically paid in the early 1990s when serving as plaintiffs; (2) that sophisticated clients sometimes pay fees similar to those Class Counsel requests; and (3) that lower fees in securities class actions probably reflect characteristics of those cases that are not relevant here. The evidence from cases involving sophisticated clients thus leaves intact my conclusion that Class Counsel's fee request is reasonable.

## III. THE HINDSIGHT BIAS AND SIMPLE-MINDED VIEWS ON CONFLICTS OF INTEREST

### A. The Hindsight Bias Causes Judges to Underestimate Litigation Risks

In the private market, clients and lawyers set contingent fees when representations begin, that is, when the outcome of litigation is unknown. In class actions, judges set fees much later, usually when cases settle. Judges thus know far more about outcomes when

setting fees than parties to real contingent fee agreements do. In this case, for example, the Court is being asked to set fees after 14 years of litigation, during which time an incredible number of risks played themselves out. Fourteen years ago, no one knew whether a class would be certified, whether the case would survive motions to dismiss, or how the Eleventh Circuit or the U.S. Supreme Court would rule on the question of subject matter jurisdiction. No one knew what the evidence would show or how a jury would rule. No one knew whether this Court would allow the jury to return a formula verdict or whether such a verdict would stand up on appeal. No one knew how long this lawsuit would last, how much lawyer effort it would require, or how much it would cost. No one knew how many class members would file claims or what those claims might be worth. Today, these questions and many others have been resolved, and in most important respects, the class has prevailed.

A serious danger exists that knowledge of these outcomes (and many others) will bias downward the Court's assessment of the risk Class Counsel faced in this case, just as knowledge of settlements in other cases likely causes judges to underestimate risks as well. This danger arises because of something called the hindsight bias, a well-known deficiency in the way human beings reason about probabilities.

The hindsight bias occurs when a person who knows how a risk actually played out is asked to "go back in time" and estimate the *ex ante* likelihood that the observed outcome would occur. For example, one might ask a group of baseball fans to place themselves mentally back in early 1997 and estimate the odds at the start of the season that the Florida Marlins would win the World Series. Experiments with real people show that the fans' knowledge that the Marlins did win that year would cause them to overestimate the Marlin's chances considerably. If the actual probability of a Marlins

victory at the start of the 1997 season was 5%, a fan asked to assess those odds today might put the team's chances at 50% *or more*. Some would even say a Marlins victory was inevitable.

A study of federal judges shows that the hindsight bias afflicts them as well. Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 Cornell L. Rev. 777, 803 (2001). The researchers gave more than 150 federal magistrate judges a statement describing a case in which a prisoner appealed after being sanctioned by a trial judge for filing a frivolous complaint. One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the last third indicated that the appellate court vacated the sanction entirely. All the judges were then asked to "go back in time" and identify the result that was most likely to occur. To no one's surprise, the judges' estimates of the "most likely" outcome of the appeal depended on the information they received about the actual outcome of the appeal. "[T]he judges exhibited a predictable hindsight bias; when they learned that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred."

The hindsight bias poses an enormous threat to the incentive structure of the class action and, therefore, to due process of law. To set fees in a class action appropriately, a trial judge must "go back in time" mentally, estimate the expected costs and benefits "at the outset of this case (that is, when the risk of loss still existed)," and figure out the terms class members and class counsel would have come to had they been able to bargain face-to-face. *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001) (*Synthroid I*). Unfortunately, when fees are set after years of litigation, a trial judge has far too much information, including information about outcomes that did not exist when a

lawsuit began. This information will predictably cause judges to greatly over-estimate the *ex ante* likelihood of success, as in the experiment run by Guthrie et al. knowledge of the actual appellate decision inflated judges' estimates of the likelihood of that result.

B. **Fee Setting is Not a Zero-Sum Game**

Professional fee objectors (of which there are far too many) argue that fee setting is a zero-sum game. The more the lawyers get, the less class members receive. Consequently, they contend, judges, as absent class members' guardians, should keep fees as low as possible, and should cut percentages to the bone in cases that produce "mega-funds." Otherwise, class members will be impoverished and lawyers' wages will be obscene. Some intelligent people who have no strategic motivations also think this way.

The contention that class members always prefer lower fees to higher ones is, however, silly. Taken to its limit, it implies that class members would be happiest with a 0% fee. This is false. At the outset of litigation, a 0% fee looks terrible to a class (indeed, to any claimant) because no lawyer will take a case for that amount. When the fee is zero, a class member's expected net recovery is zero as well, and any positive amount is better than zero.

The contention that fee-setting is a zero-sum game has appeal only when it is made at the end of a case—which is when it always is made, in my experience. At that point, the size of the recovery is known, so more for the lawyers really does mean less for the class. But the idea that judges should focus on the end of a lawsuit is absurd, as the conclusion that the optimal fee is 0% clearly shows.

A preference for higher fees may continue at levels well above 0%. For example, a 40% fee is superior to a 33% fee when it generates a higher expected net recovery. The

combination of an expected $10 million recovery and a $4 million fee (40%) yields an expected net recovery of $6 million. The combination of an expected $3 million recovery and a $1 million fee (33%) yields an expected net recovery of $2 million. In this example, the higher fee makes the claimant better off.

Why would a higher percentage fee generate a larger expected net recovery? Because it encourages lawyers to work harder, to invest more resources, and to hold out for higher dollars in settlement bargaining. Both the Third Circuit and the Seventh recognize this. The Third Circuit observed that "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) (emphasis added). The Seventh Circuit agreed in *Synthroid I*. It rejected the so-called "megafund rule," according to which the fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Synthroid I*, 264 F.3d at 718. Although judges sometimes apply fee caps and declining contingent percentages, neither market transactions nor economic reasoning provide much support for these practices.[9]

---

[9] Private market transactions indicate that clients, including sophisticated clients, generally appreciate the importance of giving lawyers significant marginal incentives, that is, significant incentives to work hard for higher dollars. Academic commentators understand why. As they explain, *high percentages reward lawyers for going after the highest dollars, which are also the hardest dollars to get*. Other things being equal, a defendant asked to pay $10 million will fight harder than one asked to pay $1 million, and a defendant asked to pay $100 million will fight harder still. Although any lawyer can settle cheaply, only a talented lawyer motivated by the possibility of earning a large fee can be predicted to maximize the recovery in a large case, given the resistance a defendant must be expected to mount. See Bebchuk, supra, at 891-892; Albert H. Choi, *Allocating Settlement Authority Under A Contingent-Fee Arrangement*, 32

The Third and Seventh Circuits recognize that higher fee percentage can generate larger expected net recoveries than smaller percentages because recoveries are not carved in stone. They reflect lawyers' efforts, litigation investments, and decisions. A percentage that discourages lawyers from working hard on a case, from investing sufficient resources, or from making good decisions harms class members by saddling them with inferior expected net recoveries. When setting fees, a court should therefore ask not "What is the lowest possible fee?" but "What fee would a group of claimants who wanted to maximize their take-home amounts have agreed to pay when this lawsuit started in 1991?" The only defensible answer to this question is "The market rate," which, in this case, probably equaled or exceeded 33.33%. Paying the market rate would have assured the availability of competent attorneys. Paying a higher rate would have been a waste. Paying a lower rate would have killed the lawsuit in its infancy, because lawyers capable of winning the case would have turned the claimants down.

## IV.    STUDIES OF CLASS ACTION FEE AWARDS[10]

Judges can mimic the private market in legal services without knowing the amounts other judges have awarded as fees in other class actions. Even so, in my experience judges often want to know about fee award practices prevailing in other courts. I therefore summarize the empirical literature on the subject here.

There are several relevant studies. Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and*

---

*Journal of Legal Studies* 585 (2003) (explaining that higher contingent fee percentages enable plaintiffs to maximize values in settlement negotiations, while lower percentages benefit defendants by weakening plaintiffs' attorneys' incentives).

[10] I do not discuss fees set in class counsel auctions because I do not believe they provide reliable indications of market rates, all auctions that I know of having had serious flaws.

*Settlements in Shareholder Class Actions?*, Table 9 (1996) (hereafter "NERA Study"): Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 151 (1996) (hereafter "FJC Study"); Mukesh Bajaj, *et al.*, *Securities Class Action Settlements: An Empirical Analysis* (Nov. 16, 2000) (hereafter "Cornerstone Study"); Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports 167 (2003) (hereafter "CAR Study"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 75 (2004) (hereafter "E&M Study"). The vast majority of cases covered in these studies are *settled* class actions. Consequently, the studies shed limited light on the fees that should prevail in class actions that are tried.

To get much out of the studies, one must also assume (1) that the class has won this case, and (2) that the class' recovery will be a certain amount. These assumptions are needed because most of the studies break the cases down by recovery ranges. In fact, this case is not over and no one can say with certainty how much class members will receive. It is tempting (for Class Counsel, mainly) to peg the total recovery north of $1 billion, but the truth is that Exxon has not paid a dime to this point and still seems intent on keeping its money. In my experience, heady talk about enormous recoveries is so much hot air until dollars actually change hands.

Turning now to the studies, the consistency of their findings is clear. Fee awards in settled class actions almost always fall in the range of 20%-40% of the recovery.[11] The

[11] *See, e.g.*, FJC Study, *supra*, at 69 (reporting median fee awards in class actions "rang[ing] from 27% to 30%, and observing that "[m]ost fee awards in the study were between 20% and 40% of the gross monetary settlement").

following tables from the 1996 NERA study are typical. The first table shows average and median fee awards for settled securities cases where the settlements ranged in size from less than $1 million to more than $50 million. The first table shows that fee consistently range from 30% to 33%, regardless of settlement size, exclusive of costs. The second table shows average and median awards for settled securities class actions when fees and expenses are combined. Again, the numbers are consistent. The average and median awards are approximately 35% when fees and expenses are combined.

Fee Awards in Settled Securities Class Actions 1991-1996

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 37 | $24,696,750 | $7,617,600 | 30.38% | 30.00% |
| $1.00-$1.99 | 66 | $96,506,502 | $30,642,005 | 31.88% | 33.33% |
| $2.00-$9.99 | 245 | $1,184,141,901 | $381,149,262 | 32.11% | 33.33% |
| $10.00-$49.99 | 76 | $1,488,892,280 | $471,161,635 | 31.72% | 33.15% |
| $50+ | 9 | $571,650,000 | $179,920,000 | 31.48% | 30.00% |
| Total | 433 | $3,365,887,433 | $1,070,490,502 | 31.84% | 33.33% |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?*, Table 9 (1996).

Fee and Expense Awards in Settled Securities Class Actions 1991-1996

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees and Expenses | Average Attorney Fees and Expenses as a Percentage of Settlement | Median Attorney Fees and Expenses as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 12 | $8,340,000 | $2,930,867 | 35.86% | 34.17% |
| $1.00-$1.99 | 10 | $14,600,000 | $4,625,958 | 32.02% | 31.67% |
| $2.00-$9.99 | 51 | $254,692,708 | $90,703,632 | 35.63% | 36.21% |
| $10.00-$49.99 | 31 | $575,640,000 | $208,189,333 | 35.84% | 33.33% |
| $50+ | 3 | $194,000,000 | $39,625,000 | 20.05% | 18.80% |
| Total | 107 | $1,047,272,708 | $346,074,790 | 34.94% | 34.64% |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?*, Table 9 (1996).

The E&M Study contains a larger and more diverse group of cases than the 1996 NERA study. It also contains finer gradations of recovery. In the following figure, the diamonds show the mean fee percentages for all cases of the identified settlement sizes. The lines extending outward from the diamonds show the range of fees falling within one

standard deviation of the means. Approximately two-thirds of the cases in each size category involve fee awards within these ranges. Importantly, the figures describe awards of fees only. They exclude expense reimbursements. If expenses were included, the percentages would be higher.

Looking at the boxes, which present results for the two different datasets the E&M Study employed, one sees that the average percentage falls as the size of the recovery rises, and that the percentages vary considerably in cases of all sizes. The bottom box, which summarizes the CAR dataset, shows that the average fee award is slightly less than 20% in cases with recoveries of $84 million and up, and the range defined by the first standard deviation extends upward to 27%. (The first standard deviation encompasses about two-thirds of the cases, meaning that another third are distributed above and below the whiskers' tips.) In the top box, which summarizes the "reported opinion dataset," the highest recovery range extends upward from $190 million. The mean fee in this group of settled cases is above 10% and the first standard deviation extends above 20%.[12]

[12] An important question, which I have been unable to resolve, concerns the impact of the enormous Cendant settlement on the largest settlement category. Given the unprecedented size of the settlement ($3.2 billion) and the tiny portion of the recovery devoted to fees ($55 million), a danger exists that this outlying case significantly depressed the average percentage fee in the largest category. I do not know whether it had this effect.

Figure 8: Fee percent range (one standard deviation) at levels of client recovery.



Source: Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 *Journal of Empirical Legal Studies* 27, 75 (2004).

Because Class Counsel seeks a percentage fee, it may be helpful to consider empirical studies that have focused solely on class actions in which the percentage method was employed. When the authors of the FJC Study did this, they found "[m]edian fee-recovery rates for distribution cases rang[ing] from 27% to 30%." FJC Study, at 73. The average percentages covered a slightly broader range, varying from a low of 26% in the Southern District of Florida to a high of 31% in the Northern District

of Illinois. The consistency across the districts was remarkable. The following chart displays the findings graphically.

**Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 151 (1996).

The E&M Study also broke out cases by type of fee award method employed. The following table shows the results. In most respects (and remembering that these numbers exclude cost reimbursements), the results are consistent with those described above. Using the "published opinion dataset," the average for percentage-based fee awards is just above 22%, and the range defined by the first standard deviation includes fees as high as 32%. The numbers barely change when one considers cases in which percentage fees are cross-checked against the lodestar. The CAR dataset yields a higher average of 27.5%, with a range defined by the first standard deviation running up to 35%.

Table 2: Fee-Award Percent Summary by Fee Method and Legal Regime

| | *Non-Fee-Shifting Cases* | | | | *Fee-Shifting Cases* | | | |
|---|---|---|---|---|---|---|---|---|
| *Fee Method* | *Mean* | *Median* | *SD* | *N* | *Mean* | *Median* | *SD* | *N* |
| A. Published Opinion Data, 1993–2002 | | | | | | | | |
| Percent | 22.3 | 24.0 | 9.9 | 197 | 26.7 | 30.0 | 14.1 | 17 |
| Mixed percent/lodestar | 22.9 | 25.0 | 9.0 | 68 | 24.3 | 23.0 | 10.8 | 9 |
| Pure lodestar | 17.2 | 16.5 | 10.5 | 38 | 46.6 | 50.1 | 28.4 | 33 |
| B. Class Action Reports Data (*CAR*), 1993–2002 | | | | | | | | |
| Percent | 27.5 | 30.0 | 7.5 | 370 | — | — | — | — |
| Lodestar | 26.3 | 29.6 | 8.4 | 260 | — | — | — | — |

NOTE: Fee shifting and non-fee-shifting are the two legal regimes for the published opinion data. The *CAR* data include only common fund cases and do not include a variable distinguishing fee-shifting from non-fee-shifting cases. The first column identifies the fee methods. The *CAR* data do not contain a separate "Mixed percent/lodestar" method category. Their percent method cases are likely dominated by what we code as percent cases in the opinion data. Panel A shows the numerical dominance of this category over the mixed category in the published opinion data.

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

Source: Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 *Journal of Empirical Legal Studies* 27, 52 (2004).

## V. STUDIES OF RESULTS OBTAINED

Many judges believe that fee awards should reward lawyers for producing good results. This attitude comports with the factors identified as relevant in cases like *Camden I*, which endorses the ABA's view that the reasonableness of an attorney's fee depends in part on "the amount involved and the results obtained." I will therefore take a

moment to put the results that may be achieved in this case in perspective. As before, it bears mention that settled cases dominate the studies I report below.

In its February 2005 report, *Bear Market Cases*, National Economic Research Associates (NERA) produced the following "top 10" list of securities class action settlements. Assuming a $1.2 billion recovery, this lawsuit would rank third.

**Top Ten Securities Class Action Settlements**

| Ranking | Company | Year | Settlement Value ($MM) |
|---|---|---|---|
| 1 | Cendant Corp.* | 2000 | $3,528 |
| 2 | **WorldCom, Inc.**** | **2004** | **2,575** |
| 3 | Lucent Technologies, Inc. | 2003 | 517 |
| 4 | BankAmerica Corp.; NationsBank Corp. | 2002 | 490 |
| 5 | **Raytheon Company** | **2004** | **460** |
| 6 | Waste Management Inc. II | 2002 | 457 |
| 7 | Rite Aid Corporation | 2003 | 320 |
| 8 | **Bristol-Myers Squibb Co.** | **2004** | **300** |
| 9 | DaimlerChrysler AG | 2003 | 300 |
| 10 | Oxford Health Plans, Inc. | 2003 | 300 |

* [illegible] settlement value incorporates a $3[illegible] million settlement in the "Cendant PRIDES" case.

** This is a partial settlement involving Citigroup, Inc.

Source: Elaine Buckberg, Todd Foster, Ronald Miller, and Stephanie Plancich, *Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements* 7 (NERA, Feb. 2005).

The Securities Class Action Clearinghouse at the Stanford Law School provides a more recent list, which I checked on June 27, 2005 and copied into the page below. (I modified the chart slightly by eliminating some irrelevant information.) This list includes several enormous settlements that are not yet final. Assuming a $1.2 billion recovery, this lawsuit would rank fourth, ahead of the $1 billion IPO Allocation Litigation.

STANFORD LAW SCHOOL
# SECURITIES CLASS ACTION CLEARINGHOUSE
IN COOPERATION WITH CORNERSTONE RESEARCH

## Post-Reform Act Securities Case Settlements
## SECURITIES FRAUD "TOP TEN MEGA-SETTLEMENTS" LIST [1]

Top 10 Mega Settlements: Settlements of Post-Reform Act Securities Class Action Lawsuits in Excess of $100 million (YTD)

| Rank | Issuer | Maximum Asserted Valuation [1] |
|---|---|---|
| 1 | WorldCom | $6,128.3 Million |
| 2 | Enron | $4,760.5 Million |
| 3 | Cendant [2] | $3,527.5 Million |
| 4 | IPO Allocation Litigation | $1,000.0 Million |
| 5 | McKesson HBOC | $960.0 Million |
| 6 | Lucent Technologies | $673.4 Million |
| 7 | Raytheon | $535.0 Million |
| 8 | BankAmerica | $490.0 Million |
| 9 | Dynegy | $474.1 Million |
| 10 | Waste Management II | $457.0 Million |

[1] Settlement values may include securities as well as cash. Securities are valued as of the highest value asserted by any party in a court filing. Settlements include proceeds from all sources. Not all settlements have received final court approval. Settlement values in some cases may still increase as additional defendants settle individual claims.

[2] Includes settlements in the PRIDES and common stock litigation.

[1] Post-Reform Act Securities Case Settlements Over $100 Million

The preceding lists consider only securities cases. When one broadens the focus to class actions of all kinds, the number of large recoveries naturally increases. Even so, a $1.2 billion recovery would still be a terrific accomplishment. According to a study by *Class Action Reports*, only 64 class actions of all types had yielded recoveries exceeding $100 million by the end of 2002, and only 35 recoveries exceeded $150 million. Putting the point another way, a $100 million recovery ranked in the top 6 percent of all class actions identified by *Class Action Reports*, whose dataset included 1,120 cases. A $150 million recovery ranked in the top 3 percent. At $1.2 billion, this case would rank in the

top 1 percent of all class actions for which recoveries have been recorded. If extraordinary results justify extraordinary fees, this case is surely one to which the maxim applies.

## VI.    NO LODESTAR CROSS-CHECK SHOULD BE PERFORMED

The lodestar method of fee calculation bases the final fee award on a combination of time expended, hourly rates, and a multiplier or enhancement intended to offset risks and reward superior results. Courts often use lodestar cross-checks to evaluate the reasonableness of contingent percentage fees.

I regard the use of lodestar cross-checks as a singularly poor idea. There is no reason for a court to use the lodestar to second-guess a market-based contingent percentage fee. Before explaining this assertion, I note two things. First, the Eleventh Circuit strongly criticized the lodestar method in *Camden I Condominium Association, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), agreeing with other courts and legal scholars it subjects lawyers to bad incentives and places ridiculous demands on courts. Second, it is impossible as a practical matter to perform a lodestar cross-check in this case because Class Counsel's total hours will not be known until the claims process is completed.

First, a lodestar cross-check effectively nullifies the desirable incentives created by a contingent percentage fee. Consider the incentive to obtain the largest recovery in the shortest possible time. The lodestar method discourages quick settlements by punishing lawyers for acting efficiently. Lawyers who extend the litigation process and expend time needlessly stand to receive more compensation than those who put class members' interests ahead of their own. The lodestar also undermines the incentive to take risks that make class members better off, for example, by holding out for higher

dollars in settlement. A sliding scale that rises at the margin automatically rewards class counsel for bearing desirable risks by increasing the fee. The connection between fees and results is much weaker when the lodestar is employed. Everything turns on the multiplier, yet there is no guarantee how large a multiplier a court applying the lodestar method will grant. A sliding scale of percentages also reduces the burden lead plaintiffs and the trial court must carry of monitoring counsel's performance, by making counsel's recommendations reliable. A lawyer working on a contingent percentage arrangement benefits only by making recommendations that are good for a class. The lodestar method increases the burden of monitoring by undermining the link between counsel's self-interest and the results counsel obtains.

Second, a lodestar cross-check creates uncertainty over the collectibility of fees that discourages class counsel from investing in litigation. When a plaintiff enters into a fee agreement with an attorney or a court sets a contingent percentage fee in advance of settlement, a reward structure is created that enables counsel to predict the return on expenditures of time and money. In effect, the lawyer receives a property right in an asset—the recovery—that encourages the lawyer to maximize the asset's value by investing resources in it. A lodestar cross-check discourages the lawyer from developing the asset by introducing uncertainty. It renders the fee structure unreliable by substituting the subjective and less predictable opinion of the trial judge for the objective and more predictable percentage. Because most attorneys are risk averse, this uncertainty can only discourage them from maximizing the value of absent plaintiffs' claims.

This lawsuit is a multi-million dollar undertaking, and Class Counsel bears most of the cost. I know of no venture requiring a comparable investment that uses an

arrangement resembling a lodestar cross-check to determine the returns to a major investor.

In sum, because a lodestar cross-check can only be deleterious, I discourage the Court from making one.

## VII. EXXON'S OBLIGATION TO PAY FEES UNDER STATE FEE-SHIFTING LAWS

On behalf of the class, Class Counsel has asked the Court to shift part of the burden of fees to Exxon pursuant to statutes enacted in three states that entitle prevailing plaintiffs to recover fees and costs in cases like this one. One of these states is Texas. The question therefore arises whether the Court can require Exxon to bear the entire portion of Class Counsel's fee and cost award that falls upon Class Dealers residing in Texas. This question assumes that Class Dealers have received or will receive payments or other relief entitling them to claim prevailing party status under Texas law. It also assumes that Class Dealers' status as Texas residents or as non-residents entitled to the benefit of Texas law will have been determined by the Court.

To keep things simple and clear, I assume the following facts: a Dealer from Texas recovers $3 million from Exxon via the claims process; the Court sets Class Counsel's fee and expense award at 33.33%; pursuant to this order, this particular Dealer owes Class Counsel $1 million. On this hypothetical, the question is whether the Court should require Exxon to pay the Class $1 million in reimbursement of the Dealer's fee and cost obligation.

The answer depends on whether by Texas standards $1 million is a reasonable and necessary charge for a lawyer to impose upon a client in this situation. *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (allowing a

court to shift liability for reasonable and necessary fees under Texas' Deceptive Trade Practices Act); *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision."). To determine this, a Texas court would consider evidence relevant to the factors set out in Rule 1.04(b) of the *Texas Disciplinary Rules of Professional Conduct*. Because the Texas rule contains the same factors found in the ABA fee rule—that is, the same factors the Eleventh Circuit endorsed in *Camden I*—it follows logically that Texas law would require Exxon to pay the entire amount. The answers to the question "How much should the Dealer pay Class Counsel?" and to the question "How much should Exxon reimburse the Class for the Dealer's fees and costs?" are the same.

The view just expressed may seem to conflict with the U.S. Supreme Court's holding in *Venegas v. Mitchell*, 495 U.S. 82 (1990), a case I have written about at length. In *Venegas*, the Supreme Court distinguished the contingent percentage fee a client owed his lawyer from the lodestar-based fee and cost award the defendant owed the prevailing plaintiff, and held that the two need not be the same. The inconsistency disappears when one remembers that, although federal courts must use the lodestar method when awarding fees under federal statutes, Texas courts may base fee awards on contingent fee agreements when applying Texas fee-shifting statutes. They need only find that the terms of a contingent fee agreement are reasonable and necessary, as just explained.

The Fifth Circuit got the preceding right in *Mathis*, a case that also involved Exxon as the defendant. There, the district court ordered Exxon to pay attorneyss fees and costs of $2,289,462 pursuant to *Tex. Civ. Prac. & Rem. Code Ann.* § 38.001, the same Texas statute invoked in this case. The district court derived this amount by

applying the plaintiffs' attorneys' contingent fee agreement, which was supported by affidavits and expert testimony. The Fifth Circuit affirmed, stating that under Texas law "the district court did not abuse its discretion in awarding fees as contemplated by plaintiffs' contingency fee contract." *Mathis,* 302 F.3d at 462.

Likewise, this Court would exercise its discretion properly by requiring Texas Dealers to pay Class Counsel a reasonable fee and by requiring Exxon to pick up their tab. No Texas court would second-guess this Court's decision that 33.33% (expenses included) is a reasonable fee. Given this Court's superior knowledge of the relevant facts—including the amount and quality of the work performed, the risks incurred, the results obtained, usual and customary fees prevailing in Florida, etc.—and the uniformity of the factors set out in the Texas and ABA rules, Texas judges would surely defer. As a member of the Texas bar and a student of attorneys' fees who has spent his entire professional life in Texas (including the provision of consulting services to lawyers involved in large commercial disputes), it is my opinion that 33.33% is a normal contingent fee arrangement for commercial contract litigation in Texas and that Texas judges would recognize this. These terms also fall in the range judges in and around Texas have used when compensating class counsel in large common fund cases. See, e.g., *In re Combustion,* 968 F.Supp. 1116 (W.D.La.1997) (36% percent fee; $127 million recovery); *In re Lease Oil Antitrust Litigation (No. II),* 186 F.R.D. 403 (S.D.Tex.1999) (25% fee; $190 million recovery); *Weatherford Roofing Co. v. Employers National Insurance Co.*, No. 91-05637-F, 116th Judicial District (Dallas) (30% fee; $140 million recovery).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/1/05

Date

Charles Silver

Ex. C

Declaration of Professor Charles Silver (excluding CV)

*In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
MDL No. 1720(JG)(JO),
Civil No. 05-5075(JG)(JO),

Filed on April 11, 2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720(JG)(JO)<br><br>Civil No. 05-5075(JG)(JO)<br><br>**ELECTRONICALLY FILED** |
| This Document Relates To:<br><br>ALL ACTIONS. | DECLARATION OF PROFESSOR CHARLES SILVER CONCERNING THE REASONABLENESS OF CLASS COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES |

I, Charles Silver, declare as follows:

## 1. SUMMARY OF OPINIONS

Two facts stand out in this case. First, considering only the monetary relief, the proposed settlement is the largest class-based antitrust recovery in history and one of the largest recoveries regardless of case type in the history of American civil litigation.[1] At $7.25 billion, it ranks alongside the two landmark recoveries of the 21st Century: the $7.2 billion Enron settlement and the proposed $7.8 billion BP settlement. In an interesting way, it even rivals the settlement of the states'

[1] The settlement also requires the Defendants to change their procedures going forward. Relying on a report submitted by Dr. Alan Frankel, Class Counsel contends that the injunctive reforms will save merchants between $26.2 and $62.2 billion over the next decade. Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013). I took no account of the non-cash relief when formulating the opinions expressed herein. The cash fund alone is easily sufficient to justify the requested award of fees.

historic tobacco lawsuits. From 2002 to 2012, only the three most populous states (California, New York, and Texas) received payments from the tobacco companies exceeding $7.25 billion.[2]

Second, the credit for this accomplishment belongs in large part to the private attorneys who investigated the price-fixing scheme, initiated the litigation, and shouldered its cost over nearly a decade. Collectively, an army of plaintiffs' lawyers expended more than half a million hours and bore about $40 million in out of pocket expenses. These are enormous amounts of resources to have invested in a single, risky lawsuit against well-funded defendants. But, again, they are on par with the risks lawyers took in comparable cases. In *Enron*, for example, class counsel expended about 300,000 hours and bore $45 million in costs. Lawsuits that generate historic recoveries require exceptional dedication and impose enormous risks and costs on attonryes.

If lawyers working on contingency are to find cases like these financially attractive, the rewards must offset the costs and risks the lawyers have to bear. In the private market for legal services, where clients hire lawyers directly, compensation is automatically set at the level needed to do this. Otherwise, lawyers would decline to represent clients with large claims and find less risky work. In class actions, of course, fees are set by courts, not by clients and lawyers bargaining at arms' length. The possibility therefore arises that courts will set fees too low, in which event lawyers will be discouraged from handling big cases, or too high, in which event lawyers will receive more than the risks warrant.

Judges can avoid these bad outcomes by using the private market for legal services as a guide. In the private market, sophisticated clients pay only what they have to, to get the legal services they desire. Typically, they neither waste money by over-paying nor price themselves out

---

[2] Campaign for Tobacco-Free Kids, Actual Tobacco Settlement Payments Received by the States, 2002-2012, available at http://www.tobaccofreekids.org/research/factsheets/pdf/0365.pdf.

of the market for legal services by offering too little. By studying the amounts sophisticated clients pay attorneys to handle big cases, judges can reliably estimate the fees that are needed to persuade lawyers to accept the risks big class actions entail. The Second Circuit agrees that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 52 (2d Cir. 2000).

In the private market for legal services where sophisticated clients shop for attorneys, contingent fees normally equal or exceed 25 percent of recoveries. This is true even in cases where recoveries can be large. Agreed fees are sometimes lower in securities fraud cases where sophisticated investors seeking to serve as lead plaintiffs hire attorneys, but even here they commonly fall near 20 percent.[3] Taking the private market as a guide, then, one could justify a fee award of 20 percent or more in this case on the ground that the class as a whole, acting in the manner of a sophisticated client, would rationally have offered to pay that amount when litigation commenced.

In fact, several class members agreed to pay fees well in excess of 20 percent. When the original named plaintiffs in this lawsuit hired the lawyers who became Class Counsel,[4] many signed contracts setting fees at 33.33 percent of the recovery. Some even agreed to pay this amount out of their own recoveries, should the Court award less or should they settle individually rather than as part of a class. The private market thus sent a clear signal as to what a reasonable fee in this litigation would be.

---

[3] See Lynn A. Baker, Michael A. Perino and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, VANDERBILT LAW REVIEW (forthcoming 2013).

[4] Class Counsel are Robins, Kaplan, Miller & Ciresi L.L.P.; Berger & Montague, P.C.; and Robbins Geller Rudman & Dowd LLP

Yet, the lawyers are requesting far less. They have asked the Court to award approximately 10 percent in fees. This is a substantial amount of money, but it is on par with the $688 million Enron fee award and the $600 million in fees and expense reimbursements provided for in the BP settlement agreement. Taking market rates as a guide, the request is entirely reasonable and considerably below what the attorneys ought to receive.

## 2. CREDENTIALS

I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in the following enormous cases, as well as many smaller ones: *Allapattah Services, Inc. v. Exxon Corp*.[5] (30 percent fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litigation*, No. 09-md-2036,( S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million);[6] *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Silverman v. Motorola, Inc.*, No. 07 C 4507 (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5 percent on recovery of $200 million).

Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure

---

[5] See Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[6] See Order of Final Approval of Settlement, Authorizing Service Awards, Granting Application for Attorneys' Fees, and Overruling Objections to Settlement, available at http://www.bofaoverdraftsettlement.com/CourtDocuments.aspx.

in 1991. Since then I have been a Visiting Professor at University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years. I have published over 70 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report. My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have attached a copy of my resume as Exhibit A to this declaration.

**3. DOCUMENTS REVIEWED**

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case. I also reviewed other items including, without limitation, cases and published scholarly works.

- Declaration of K. Craig Wildfang, Esq

- Declaration of Thomas J. Undlin

- Engagement Letter, CHS Inc., dated June 14, 2005

- Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005

- Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005

- Engagement Letter, National Association of Convenience Stores, dated September 23, 2005

- Definitive Class Settlement Agreement

- Publication Notice, available at https://www.paymentcardsettlement.com/Content/Documents/Settlement%20Publication%20Notice.pdf

- Init B & M Draft Payment Card Fee Petition - Legal Section (3.14.13)

- Memorandum in Support of Class Plaintiffs' Motion for Class Settlement Preliminary Approval

- Objecting Plaintiffs' Opposition to Class Plaintiffs' Motion for Preliminary Approval of Proposed Settlement

- Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Amended Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Other Objections to Request for Preliminary Approval of Proposed Settlement

- Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005

- Engagement Letter, National Restaurant Association, dated April 14, 2006

- Engagement Letter, Coborn's, Incorporated, dated November 9, 2005

- Engagement Letter, NATSO, February 24, 2006

- Engagement Letter, D'Agostino Supermarkets, October 31, 2005

- Engagement Letter, National Community Pharmacists Association, February 7, 2006

- Engagement Letter, Jetro Holdings, Inc., September 16, 2005

- Engagement Letter, National Grocers Association, dated October 31, 2005

- Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013)

**4. TO ENSURE THAT CLASS MEMBERS RECEIVE ZEALOUS REPRESENTATION, COURTS SHOULD PAY LAWYERS WHO WIN CLASS ACTIONS AT MARKET RATES**

Starting with the first article I published as a law professor, I have urged judges to base fee awards in successful class actions on market rates.[7] Market rates comport with the law of restitution, the body of law upon which lawyers' rights to fee awards are based.[8] Market rates also create desirable incentives while protecting class members against over-payments. Many judges have accepted this argument. Some agreed with me; others reached the same conclusion on their own.

The view that class action lawyers should be compensated at market rates has been the rule in the Seventh Circuit since 1992, when Judge Richard A. Posner wrote that "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992). See also *Id.*, at 572 ("The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible.").[9]

Judge Frank Easterbrook elaborated on the rationale for the Seventh Circuit's rule in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001). He pointed out that rates prevailing in

---

[7] See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL LAW REVIEW 656 (1991) ("Silver, *Restitutionary Theory*").

[8] *Id.*, at p. 700. See also Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985) ("Quasi-contract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that.").

[9] Other Seventh Circuit cases establishing the rule are *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 409 (7th Cir. 2000); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995) (Florin II); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) (Florin I); and *In re Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir. 1993) (Continental II).

private markets compensate lawyers for the costs and risks they incur. *Id*. at p. 724 ("The greater the risk of loss, the greater the incentive compensation required."); *Id*. at p. 731 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."). He also noted that, because claimants always prefer larger recoveries to smaller ones, "markets would not tolerate" the "mega-fund" approach the district court judge applied, which encouraged class counsel to settle for lesser amounts. *Id*. at 723. He completely rejected the "mega-fund" rule, according to which fees must fall in the 6 percent to 10 percent range when recoveries exceed $75 million, because the market would never punish success. *Id*. at 722 ("We have never suggested that a 'megafund rule' trumps these market rates."). To the contrary, "if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only [the "mega-fund"] prospective return," the fee award had to be higher. *Id*. For these reasons, Judge Easterbrook urged "[district] courts [to] do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id*. at 718.

It probably surprises no one that Judges Posner and Easterbrook endorse the use of market rates. They usually prefer markets to other forms of regulation. But in this instance, they are right, and they have the most defensible account of fee awards going. To see this, one must initially recognize that fee award practices create the incentives to which lawyers are subject when acting on class members' behalf. Good fee award practices foster good incentives; bad practices foster bad ones. It remains to consider what makes particular incentives good or bad.

Due process law provides the relevant criterion, as I explained more than a decade ago. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TULANE

LAW REVIEW 1809 (2000). It permits judgments and settlements in class actions to bind absent class members only when they are zealously represented by lawyers whose interests align with their own. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) (rejecting a proposed settlement partly because "[c]lass counsel [] had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class").  Fee award practices directly impact the extent to which the interests of class members and their lawyers harmonize.  Good practices align their interests closely; bad practices cause their interests to conflict.

With this background in place, the relevance of fee-related practices prevailing in the market for legal services can quickly be explained.  When sophisticated claimants, such as businesses seeking to enforce patent or antitrust claims, hire plaintiffs' attorneys in the private market, they use fee arrangements that align their interests and their lawyers' interests as closely as possible.  By doing this, they position themselves to reach the goal they seek, which is to maximize their expected recoveries net of litigation costs.  By studying the market for legal services, then, judges can learn how sophisticated clients with good incentives and information use fee arrangements to encourage plaintiffs' attorneys to provide zealous representation.  By mimicking the market when awarding fees in class actions, judges can then give class members the greatest possible assurance of receiving the faithful representation that the law of due process requires.

When the Second Circuit took up the subject of class action lawyers' compensation in 2000, it "agree[d] that "that lawyers who successfully prosecute [class actions] deserve reasonable compensation, and that market rates, where available, are the ideal proxy for their compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000).  However, the Second Circuit had two concerns.  First, trial judges "cannot know precisely what fees common fund

plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." Id. Second "'hard data' on analogous situations-such as the fees sophisticated corporate plaintiffs typically agree to pay their attorneys-are "sketchy."

*Id*.

Neither concern should cause the Court to stray from market-based compensation in this case. For one thing, we know more about the fees sophisticated corporate clients pay when hiring lawyers on contingency than we did in 2000, and the evidence, which I survey below, shows that the fee Class Counsel requests is reasonable by comparison. For another, in this case, we have the fee agreements actually entered into by several trade associations that represent thousands of individual businesses.[10][11] When retaining Robbins, Miller, Kaplan and Ciresi LLP as Class Counsel and agreeing to pay a one-third of the class-wide recovery as fees, the trade associations "engage[d] in collective arm's-length negotiation with counsel", *Goldberger*, 209 F.3d at 52, as their members'

---

[10] The National Association of Convenience Stores is "an international trade association representing more than 2,200 retail and 1,600 supplier company members". About NACS, http://www.nacsonline.com/About_NACS/Pages/default.aspx. NATSO "represents more than 1,230 travel plazas and truckstops nationwide, owned by over 200 corporate entities"/ About NATSO, http://www.natso.com/about. The National Restaurant Association "is the largest foodservice trade association in the world*—supporting nearly 500,000 restaurant businesses". About Us, http://www.restaurant.org/About-Us. "The National Community Pharmacists Association … represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States." Introducing NCPA, http://www.ncpanet.org/index.php/home/introducing-ncpa. "The National Grocers Association (NGA) is the national trade association representing the retail and wholesale grocers that comprise the independent sector of the food distribution industry." Who We Are, http://www.nationalgrocers.org/who-we-are.

[11] Years after retaining Class Counsel, the trade associations withdrew as a named plaintiff and now oppose the proposed settlement. For present purpose, this is irrelevant. All that matters is that they thought one-third of the class-wide recovery was a reasonable contingent fee when hiring lawyers to advance the interests of their members at the start of litigation.

representatives. In this case, the Court has the information recognized in *Goldberger* as legitimating the use of market rates.

**5. BY BASING FEE AWARDS ON MARKET RATES, JUDGES CAN AVOID OVER-PAYING ATTORNEYS OR UNDER-PAYING THEM**

The view that judges should base class action fee awards on market rates has many adherents. It also appeals to judges regardless of political affiliation. Judges Easterbrook and Posner were appointed the bench by a Republican President. So was Judge Melinda Harmon, who awarded $688 million in fees out of the $7.2 billion *Enron* recovery. In dollars, this is the largest fee award I know of, and it was based in important part on market-based practices.[12] See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 753 (S.D. Tex., 2008) (rejecting the mega-fund rule and citing *Synthroid*, 264 F.3d at 718).

*Enron* is far from the only mega-fund case in which a judge granted an enormous fee award. For example, in the three *Air Cargo* settlements, which collectively generated $422.2 million in settlement monies, this Court awarded 25 percent of the total recovery—over $100 million—as fees.[13] Nor were the awards in the *Air Cargo* cases unprecedented. To the contrary, many mega-

[12] *Enron* was a federal securities action governed by the Private Securities Litigation Reform Act, [cite] ("PSLRA"). Under the PSLRA, the lead plaintiff candidate with the largest financial stake in the outcome of litigation gains control of the case and retains counsel for the class. As a result, there was a real fee contract between the Regents of the University of California—the *Enron* lead plaintiff—and the law firm of Coughlin, Stoia, Geller Rudman & Robbins LLP. Following the Seventh Circuit's lead, Judge Harmon found that the contract was reasonable and based the fee award on its terms. Judge Harmon also invoked the private market when addressing objections to the fee request. When an objector contended that she should assess the riskiness of the litigation *ex post* (as of the date of the first settlement with a major defendant), Judge Harmon pointed out that the private market values risk *ex ante* (when litigation begins). See *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d at 824 (quoting *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 565 (7th Cir.1994)).

[13] See *In re Air Cargo Shipping Servs. Antitrust Litig*. ("*Air Cargo 1*"), No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million recovery/$12.75 million in fees); *In re Air Cargo*

fund cases have yielded large percentage fee awards.  Table 1 lists 66 cases with recoveries of at

least $100 million and fee awards equal to or greater than 20 percent.



---

*Shipping Services Antitrust Litig.* ("*Air Cargo II*"), No. 06–MD–1775, MDL 1775, 2011 WL
2909162 (E.D.N.Y. July 15, 2011) ($153.8 million recovery/$38.5 million in fees); and *In re Air
Cargo Shipping Services Antitrust Litig.* ("*Air Cargo III*"), No. 06–MD–1775, MDL 1775, 2012 WL
3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million recovery/$54.3 million in fees).

**Table 1: Mega-Fund Class Actions with Fee Awards of At Least 20%**

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 1 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 2 | *In re AT & T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $956 | 20.00% |
| 3 | *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25.00% |
| 4 | *In re Fructose Antitrust Litig*., MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25.00% |
| 5 | *In re Initial Pub. Offering Sec. Litig*., 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 6 | *Spartanburg Regional Health Services Dist., Inc., et al. v. Hillenbrand Industries, Inc. et al.*, No. 7:03-2141-HFF (D. S.C. Aug. 15, 2006) | $468 | 25.00% |
| 7 | *In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529(LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) | $455 | 21.40% |
| 8 | *In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo I")*, No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million); *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo II)*, No. 06–MD–1775, MDL 1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) ($153.8 million); & *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo III)*, No. 06–MD–1775, MDL 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million) | $422.2 | 25.00% |
| 9 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 10 | *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), (S.D.N.Y. Oct. 27, 2006) | $410 | 20.00% |
| 11 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 12 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* No. M:02-cv-01486-PJH, MDL-02-1486 (N.D. Cal. Nov. 1, 2006) | $326 | 25.00% |
| 13 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I),* 146 F.Supp.2d 706 (E.D.Pa.2001)($193 million) & *In re Rite Aid Corp. Sec. Litig. (Rite Aid II),* 362 F.Supp.2d 587 (E.D.Pa.2005) ($126 million) | $319 | 25.00% |
| 14 | *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |
| 15 | *In re Williams Sec. Litig.,* No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25.00% |
| 16 | *In re Oxford Health Plans, Inc. Sec. Litig.,* MDL 1222 (S.D.N.Y. June 2003) | $300 | 28.00% |
| 17 | *In re DaimlerChrysler AG Sec. Litig*., No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) | $300 | 22.50% |
| 18 | *In re Enron Corp. Sec. and ERISA Litig*., MDL 1446, Case 4:01-cv-03913 (S.D. Tex. July 24, 2006) | $264 | 20.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 19 | *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 20 | *In re Comverse Technology, Inc. Securities Litig.,* 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25.00% |
| 21 | *In re Buspirone Antitrust Litig.,* No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |
| 22 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 23 | *In re Waste Mgmt., Inc. Sec. Litig.,* No. 97-7709, 21 Class Action Rep. 263 (N.D. Ill. filed Sept. 17, 1999) | $220 | 20.80% |
| 24 | *In re Washington Mutual, Inc. Sec. Litg.*, No. 2:08-md-01919 MJP (W.D. Wash. Nov. 4, 2011) | $208.5 | 21.00% |
| 25 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 26 | *Silverman v. Motorola, Inc.,* No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) | $200 | 27.50% |
| 27 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 28 | *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25.00% |
| 29 | *In re Home-Stake Prod. Co. Sec. Litig.,* MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 30 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 31 | *In re Relafen Antitrust Litig., No. 01-12239,* 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 32 | *Alaska Elec. Pension Fund v. Pharmacia Corp.,* No. 03-1519 (D.N.J. Jan. 30, 2013) | $164 | 27.50% |
| 33 | *In re: (Chase Bank) Checking Account Overdraft Litig.,* No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 34 | *In re Dollar Gen. Corp. Sec. Litig.,* No. 01-388 Order (M.D. Tenn. May 24, 2002) | $162 | 21.60% |
| 35 | *MBA Surety Agency, Inc. v. AT&T Mobility LLC*, No.1222-CC09746 (Mo. Cir. Ct. Mar. 7, 2013) | $152.6 | 25.00% |
| 36 | *In re: Managed Care Litig.*, No. 00-MD-1334, MDL1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003 | $150 | 29.00% |
| 37 | *Schwartz v. TXU Corp.,* No. 3:02–CV–2243–K, 2005 WL 3148350 (N.D.Tex. Nov.5, 2005) | $150 | 22.2% |
| 38 | *In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, No. MDL 150, 1994 WL 675265 (C.D. Cal. Aug. 11, 1994) | $140 | 21.00% |
| 39 | *Carpenters Health v. Coco-Cola Co*., 587 F.Supp.2d 1266 (N.S. Ga. 2008) | $138 | 21.00% |
| 40 | *In re: (Citizens Bank) Checking Account Overdraft Litig*., No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 41 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25.00% |
| 42 | *In re Informix Corp. Sec. Litig.,* Master File No. C-97-1289 CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 43 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 44 | *In re Infant Formula Antitrut*., MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25.00% |
| 45 | *PaineWebber Ltd. P'ships Litig. v. Geodyne Res., Inc.*, 999 F. Supp. 719 (S.D.N.Y. 1998) | $125 | 20.80% |
| 46 | *Kurzweil v. Philip Morris Co., Inc.,* Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 47 | *In re Deutsche Telekom AG Sec. Litig*., No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28.00% |
| 48 | *Hershey, et al, v. Pac. Inv. Mgmt. Co. LLC,* No. 1:05-cv-04681 (N.D. Ill. May 2, 2011)[7] | $120 | 28.00% |
| 49 | *In re: Bank One Sec. Litig. First Chicago S'holder Claims*, No. 00-CV-0767 (N.D. Ill. Aug. 26, 2005) | $120 | 22.50% |
| 50 | *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 51 | *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 52 | *Klein v. O'Neal, Inc*., 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 53 | *In re Cardizem CD Antitrust Litig.,* No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 54 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27.00% |
| 55 | *In re Sunbeam Sec. Litig*., 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25.00% |
| 56 | *In re DPL Inc. Sec. Litig.*, 307 F.Supp.2d 947 (S.D. Ohio 2004) | $110 | 20.00% |
| 57 | *In re Methionine Antitrust Litig.*, No. C 99-3491, MDL No. 00-1311 (N.D. Cal. Oct. 3, 2002) | $107 | 23.30% |
| 58 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 59 | *City of Greenville v. Syngenta Crop Protection,* No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 60 | *Haynes v. Shoney's*, No. 89-30093-RV, 1993 WL 19915 (N.D. Fla. Jan. 25, 1993)[8] | $105 | 23.20% |
| 61 | *In re Prison Realty Sec. Litig.,* Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |
| 62 | *Ingram v. Coca-Cola, Corp.*, 200 F.R.D. 685 (N.D. Ga. 2001)[9] | $104 | 20.00% |
| 63 | *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,* 3:09-md-02032-MMC (D. N.J. 2012) | $100 | 25.00% |
| 64 | *Baird v. Thomson Consumer Elecs.*, No. 00-761 (Ill. Cir. Court. Madison Co. June 15, 2001) | $100 | 22.00% |

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 17 of 38 PageID #: 48987

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 65 | *In re AT&T Corp. Sec. Litig*., 455 F.3d 160 (3d Cir. 2006) | $100 | 21.25% |
| 66 | *Stop N Shop Supermarket Company, et. al. v. SmithKline Beecham Corp*., Civil Action No. 03-CV-4578 (E.D. Pa. 2005) | $100 | 20.00% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% of any larger amount). This table reflects the values realized.

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Class counsel received a percentage of the stock as fees.

[7] The attorneys' fee award was not part of the final judgment. The settlement notice stated that class counsel would request 20% of the recovery as fees and the final judgment

[8] This amount reflects only the cash relief. Additional non-cash relief was valued at $30 million.

[9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments."

A curious observer might reasonably ask whether in *Enron*, the *Air Cargo* cases, and the other cases listed in Table 1 the presiding judges were too generous. The fee awards were certainly large. Were they sized appropriately or excessive?

The mimic-the-market approach provides an objective basis for answering this question. A fee award is right-sized if it pays the amount that is reasonably thought to be needed to obtain legal services in the private market, given the best available evidence of prevailing rates. It is too large if it pays more than this amount and too small if it pays less. The basis for these conclusions is straightforward. By awarding a market-based fee, a judge transfers only the amount of resources that is needed to acquire legal services on contingency, as demonstrated by actual transactions between clients and lawyers. By picking a percentage above the market rate, a judge would require class members to pay more than the services are worth. In other words, the fee will exceed the amount class members could have offered plaintiffs' lawyers and found ready takers. By choosing a below-market rate, a judge would fail to cover the value of the legal services, as demonstrated by the amounts lawyers are willing to accept and real clients are willing to pay. Consequently, they would discourage lawyers from handling class actions.

The market-based approach also meshes well with the law of restitution, the law upon which lawyers' payment rights are based. A standard measure of recovery in restitution is the market value of the service supplied, often referred to as the providers usual and customary charge.[14] It makes sense to use the market for this purpose. Restitution provides for payments when, for various

---

[14] See Silver, *Restitutionary Theory*, *supra*, at p. 700 ("Quasi-contractual damages usually equal the reasonable or market value of the service provided."). Douglas Laycock, arguably the most prominent living writer on restitution, concurs. "Quasi-contract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that." Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985)).

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 19 of 58 PageID #: 48989

reasons, service recipients and service providers cannot bargain directly. Had direct negotiations been possible, however, there is every reason to think that the parties would have settled on the going rate. The recipient would have had no reason to pay more than the market price, that being demonstrably sufficient to obtain the service. The provider would have had no reason to work for less, other opportunities being more profitable. The rate prevailing in the market is thus the most reliable measure of the payment that would have changed hands had a voluntary exchange been possible.

To evaluate the reasonableness of the fee awards in *Enron*, the *Air Cargo* cases, and the other mega-fund class actions listed in Table 1, one thus needs evidence of the amount clients willingly pay for legal services and lawyers willingly accept. The next two sections of this report survey the evidence I have been able to amass about fees agreed to in cases involving sophisticated clients. Section 6 shows that sophisticated clients use the percentage approach. Section 7 shows that they commonly pay 20 percent of recovered amounts or more.

If fees paid by *un*sophisticated clients were dispositive, the discussion would be very brief. There is broad agreement that contingent fees normally range from 25 percent to 40 percent in personal injury representations.[15] See, e.g., Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997)

---

[15] Somewhat lower rates prevail in commercial airplane crash cases, where liability is usually conceded. Higher rates are charged in medical malpractice cases and many mass tort representations, where costs are unusually high and the risk of losing can be great.

(reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee). Fees tend to be about the same, or perhaps slightly higher, in mass tort cases that involve large numbers of injured claimants.[16] Lower fees are said to prevail in cases arising out of commercial airplane crashes, where liability is often conceded.[17] Market forces account for this. When a defendant concedes liability and puts a

---

[16] See, e.g., *In re A.H. Robins Co., Inc.*, 182 B.R. 128, 131 (E.D.Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, New York Times, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill—and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent); James S. Kaklik, et al., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation equal to about 42 percent of their recoveries); James S. Kakalik et al., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries); Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & tbl.5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 NEW YORK UNIVERSITY LAW REVIEW 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[17] See ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily sent out the 'Alpert letter' which makes an early settlement offer and concedes all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

settlement offer on the table from the get-go, risks fall and the market pays contingent fee lawyers less for handling cases.

Many judges know that market rates normally equal or exceed 33.3 percent of recoveries in personal injury cases. For example, in *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir.1998), where he affirmed a 38 percent fee, Judge Posner stated that the market range for contingent fee cases is 33 percent to 40 percent. Many cases contain similar observations. *See, e.g., Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33% to 40% of the amount recovered.").

By comparison to the rates charged in any context where plaintiffs' lawyers represent unsophisticated clients on contingency, the fee Class Counsel requests is low. Thus, if fees paid by unsophisticated clients are considered, the reasonableness of Class Counsel's fee request is patent.

## 6. THE FEE AWARD SHOULD BE A PERCENTAGE OF THE RECOVERY

When awarding fees in *Enron*, Judge Harmon understood that, to approximate the bargain class members and their attorneys would have struck in direct negotiations, she needed evidence of prevailing market rates. She cited *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005), for the following proposition:

> Although it is impossible to know *ex post* exactly what terms would have resulted from arm's length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions."

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 824 (S.D.Tex., 2008). For reasons that need not be addressed here, class counsel auctions were discredited after *Taubenfield* was decided. Even so, the spirit of *Taubenfeld* is absolutely correct. To mimic the

private market for legal services, judges need to know how the market compensates plaintiffs' attorneys. This is a factual matter requiring evidence.

When searching for evidence, one must narrow the focus. Lawyers who handle class actions normally work on contingency. They get paid when they win and not otherwise. This is so because class members rarely agree to hire them on other terms. That was true here. Upon being asked to submit a report on attorneys' fees in this case, I asked Class Counsel whether the named plaintiffs signed retainer agreements. On learning that they had, I requested copies of the agreements and examined their terms. Without exception, the named plaintiffs hired the lawyers on contingency.[18]

There is nothing odd about this. To the contrary, it would be extremely unusual, although not entirely unprecedented,[19] for a named plaintiff to pay a lawyer a guaranteed hourly rate for waging a class suit.[20] Consider securities fraud class actions filed after the enactment of the Private Securities

---

[18] See Engagement Letter, CHS Inc., dated June 14, 2005; Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005; Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005; and Engagement Letter, National Association of Convenience Stores, dated September 23, 2005; Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005; Engagement Letter, National Restaurant Association, dated April 14, 2006; Engagement Letter, Coborn's, Incorporated, dated November 9, 2005; Engagement Letter, NATSO, February 24, 2006; Engagement Letter, D'Agostino Supermarkets, October 31, 2005; Engagement Letter, National Community Pharmacists Association, February 7, 2006; Engagement Letter, Jetro Holdings, Inc., September 16, 2005; and Engagement Letter, National Grocers Association, dated October 31, 2005.

[19] *Trustees v. Greenough*, 105 U.S. 527 (1881), is the most recent reported case I can think of in which a named plaintiff paid a lawyer to wage a class action out of his own pocket.

[20] It would be unusual for personal injury clients to do so as well. In 1998, Professor Herbert Kritzer, now of the University of Minnesota Law School, published the results of a survey of Wisconsin lawyers that produced 511 usable responses containing information on 989 cases, including 332 that were unfiled, 390 that were filed but not tried, and 267 that went to trial. Only 3% of the cases "involved a fee with a contingency element that did not conform to the standard percentage fee arrangement". Interestingly, none of the variations Professor Kritzer described resembled the lodestar method; that is, none combined a contingent hourly rate with a multiplier. Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL LAW REVIEW 267, 284-288 (1998).

Litigation Reform Act in 1995. In my academic study of these cases and my experience with them as a consultant, both of which are extensive, I have encountered not a single instance in which an investor serving as a lead plaintiff agreed to pay class counsel by the hour. This is true even though lead plaintiffs are often wealthy institutional investors that could afford to pay guaranteed rates if they thought that advisable. Lead plaintiff in securities fraud class actions offer contingent fees because they want to transfer litigation-related risks and costs to lawyers.

The relevant part of the market for legal services to scour for evidence is, then, the sector in which sophisticated clients agree to pay contingent fees. This is important for a simple reason: contingent fees are almost always set as percentages of clients' recoveries. Although judges sometimes base fee awards on hourly rates or use so-called "lodestar cross-checks", sophisticated clients who hire lawyers on contingency rarely do. No one has ever shown that sophisticated clients use the hourly-rate based lodestar method extensively, or even frequently, when hiring lawyers on contingency, and I represent to the Court that they do not. Percentage-of-the-recovery compensation predominates. See, e.g., David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 ALABAMA LAW REVIEW 335 (2012) (reviewing contingent fee agreements used in patent cases and reporting on percentage compensation offered). This being so, the mimic-the-market approach establishes that judges should also use the percentage approach was awarding fees in class actions.

Abundant evidence supports my contention that sophisticated clients use percentage-based fee arrangements. In this case, for example, the named plaintiffs that hired Robbins Miller Kaplan & Ciresi LLP agreed to pay a percentage of the recovery. In *Enron* and other securities fraud class actions where compensation terms are set in *ex ante* agreements, lead plaintiffs also use percentage-based approaches. See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586

F.Supp.2d 732, 766 (S.D. Tex., 2008) (finding that "[t]he *ex ante* fee agreement," according to which Class Counsel was hired on contingency pursuant to a rising scale of percentages, "weighs heavily in support of awarding Lead Counsel 9.52% of the net settlement fund"); Expert Report of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for An Award of Attorneys' Fees, submitted in *In re Enron Corp. Securities, Derivative & ERISA Litigation*, Civil Action No. H-01-3624 (S.D. Texas—Houston) (reporting scales of percentages set in *ex ante* fee agreements in securities fraud class actions). The same is true in patent representations and other commercial lawsuits.

Presumably, the market favors percentage-based compensation in contingent fee representations because these arrangements motivate lawyers to prosecute claims aggressively by giving them sizeable stakes in the upside of litigation. Lodestar-based fee payments would not have this effect because they tie lawyers' rewards more heavily to time expended than to results obtained. Multipliers or bonuses linked to amounts recovered could improve matters somewhat. But the overwhelming use of percentage-based compensation in the private market suggests that anchoring fees primarily to hours expended creates interest conflicts that fee enhancements cannot readily ameliorate.

Second Circuit precedent allows the Court to use the percentage method. In *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir.2000), the Second Circuit freed district courts from having "to undertake the cumbersome, enervating, and often surrealistic process of lodestar computation." *Id.*, 209 F.3d at 49-50 (internal quotation marks omitted). See also *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("Courts may award attorneys' fees in common fund cases under either the "lodestar" method or the "percentage of the fund" method.") The reversal of precedent worked in *Goldberger* was based partly on the Supreme Court's pronouncement that

"under the 'common fund doctrine,' ... a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984) (quoted in *Goldberger*, 209 F.3d at 49). It makes overwhelming sense when one considers practices prevailing in the market as well.

*Goldberger* allows the Court to base a percentage fee award on prevailing market rates as well. After holding that percentage-based fee awards are permitted, the Second Circuit identified the "criteria" a district court just must consider "in determining a reasonable common fund fee", including: the magnitude and complexities of the litigation; the risk of the litigation, the requested fee in relation to the settlement; and public policy considerations. *Goldberger*, 209 F.3d at 50. The first three factors all matter in the private market transactions where contingent percentages are set. The last permits the Court to decide that, as a matter of public policy, it makes sense to take percentage fees paid by sophisticated clients as a guide.

Plainly, the magnitude and complexity of litigation and the risk involved determine the size of contingent percentages in the private sector. For example, percentages are higher in medical malpractice cases than in most other personal injury cases because the former are more expensive to wage and harder to win. Percentages are also high in patent infringement cases because they involve sizeable commitments of resources and, therefore, large risks. These matters are discussed further below.

The requested fee in relation to the settlement practically begs for a market-based comparison. What can it mean to say that the relation is appropriate except that it falls in the usual and customary range? And how can the usual and customary range be determined, except by studying the workings of the private market, where lawyers collect contingent fees every day.

Finally, as a policy matter, percentage-based awards are justified on the ground that they create superior incentives for attorneys to maximize class members' expected recoveries. This conclusion reflects the high frequency with which sophisticated clients pay lawyers contingent percentage fees when acting as plaintiffs in civil lawsuits. Given the due process imperative to ensure that class members are represented zealously, judges desirous of protecting class members' rights should learn from the market and use the contingent percentage approach.

## 7.  SOPHISTICATED CLIENTS NORMALLY PAY CONTINGENT FEES OF 20 PERCENT OR MORE

Having established that judges should use the percentage method when awarding fees in class actions, it remains to consider how large fee percentages should be. In this section, I survey what is known about the fees sophisticated clients, normally businesses, usually pay. Because business clients can shop for lawyers and compare rates, are experienced negotiators, and have good information, the fees they pay should reflect the value of the services lawyers provide.

We know less about the fees businesses pay than we might.[21] No publicly available database collects this information, and businesses that sue as plaintiffs do not often make their fee agreements public. Consequently, most of what is known is drawn from anecdotal reports. Businesses also sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.[22]

---

[21] I have studied the costs insurance companies incur when *defending* liability suits. See Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AMERICAN LAW AND ECONOMICS REVIEW 185 (2008). Unfortunately, this information sheds no light on the amounts businesses play when acting as plaintiffs.

[22] In a recent case against Bank of American, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery. Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORPORATE COUNSEL (Online) April 9, 2010. I note that the combination of a guaranteed payment with a contingent bonus differs from the lodestar method, which is a contingent hourly rate.

These arrangements hold few lessons for class actions because lawyers representing plaintiff classes must work on straight contingency. That said, the limited evidence available on the use of pure contingent fees by sophisticated clients shows that marginal percentages tend to be high.

Consider patent infringement representations. Reports of high percentages in this area abound. The most famous such instance may be the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry. NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees. Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03. Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[23] after securing a $501 million jury award against Boston Scientific. Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008).[24] In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc. Penalties and interest added $90 million to the total. The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million,

---

[23] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate. Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in securities class actions.

[24] The parties later settled the case for $50 million. AMERICAN LAWYER, *Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents*, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b5487d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20Lawyer_Saffran.pdf.

Case 1:03-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 28 of 38 PageID #: 48998

assuming the verdict held up. Cheryl Hall, *Patents and patience pay off for Dallas law firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

In a recent article, Assistant Professor David L. Schwartz reports findings based on interviews with 44 experienced lawyers who represent plaintiffs in patent cases and his review of 42 contingent fee agreements.[25] His conclusion: The percentages are high.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges. There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation, supra*, at 360. In a case like this one that lasted almost a decade, the highest graduated rates would apply.[26]

---

[25] See David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 ALABAMA LAW REVIEW 335 (2012).

[26] Professor Schwartz's findings are consistent with reports found in patent blogs. The following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.

This item can now be found at http://patentlitigationstrategy.com/?page_id=30.

Another example of the use of scaled contingent percentages in patent litigation appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), which involved a sophisticated client with an enormous intellectual property claim. The decision reports that the plaintiff agreed to pay his attorneys a scale of contingent percentages. "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id.* at 248-249. The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both a high percentage and a potentially enormous amount.

The payment of high contingent fees in patent cases is not a new phenomenon. In 1993, the AMERICAN LAWYER ran a cover story featuring patent litigator Gerald Hosier, who, by handling cases on contingency, reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined." Stewart Yerton, *The Sky's the Limit*, AMERICAN LAWYER (May 1993). An article published in 1997 reported that attorney Alfred Engelberg began handling patent cases on contingency in 1985. In an interview, Engelberg stated that he "ha[d] been involved in seven contingent patent challenges over the last 10 years … and ha[d] received remuneration in excess of $100 million. On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610

(1997). Clearly, in the segment of the market where sophisticated businesspeople hire lawyers to handle patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.

Turning from patent lawsuits to business representations more generally, many examples show that high percentage compensation is common. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation*, MDL No. 551 (D. Arizona, Nov. 30, 1990).

Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery in a massive case. Second, V&E bore no liability for out-of-pocket expenses. The percentage was high even though, by comparison to this case, where Class Counsel advanced costs and bore the risk associated with them until the end of litigation, the deal was favorable to the law firm. Third, the case was enormous, ultimately generating a recovery greater than $600 million.

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 31 of 58 PageID #: 49001

Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by V&E could possibly be made.

If lawyers who write about fee arrangements in business cases can be believed, high contingent percentages remain common today. In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine." It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOC. (TEXAS) 20 (2011).

A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates. In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 32 of 38 PageID #: 49002

to the law firm of Susman & Godfrey ("S&G"). S&G had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, (10th Cir. February 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html. "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed*." *Id*. The fee agreement thus entitled S&G to be paid $50 million for a year of work—and that is what an arbitrator decided S&G should receive, before the case went to the Tenth Circuit, subject to an offset of less than $2 million that, for present purposes, is irrelevant.

Examples of high contingent fees can also be found in reported cases involving business clients who retained lawyers to participate on their behalf in class actions. Several appear in the *Synthroid* opinion written by Judge Easterbrook. He reports that, *after a settlement was already on the table*,

> a group of more than 100 [third party payers] … contracted with two law firms to represent them.… [T]he contracts provided for a 25% contingent fee at maximum. The "Porter Wright Group" (18 [third party payers] referred to collectively by their law firm's name) also negotiated with and hired counsel. Their setup allowed each insurance company to pick one of two fee options. Either the client paid Porter Wright's full costs and 70% of its normal hourly fees each month, with a 4% of recovery kicker at the end, or the client paid only costs each month but had to pony up 15% of the final settlement. Insurers are sophisticated purchasers of legal services, and these contracts define the market. Unfortunately, though, they identify a market

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 33 of 38 PageID #: 49003

> mid-way through the case, after defendants already had agreed to pay substantial sums.[27]

*In re Synthroid Marketing Litig*., 264 F.3d at 727. In *Synthroid*, the lawyers' job was merely to garner as large a portion of the settlement fund as possible for the third party payers. They bore minimal risk of non-payment. Even so, their sophisticated clients promised them large percentage fees than Class Counsel is seeking in this case, where the non-payment risk was enormous.

One can also consider the fees sophisticated business client serving as named plaintiffs or opt-out claimants agree to pay when they hire lawyers in connection with class actions. In *In re: High Fructose Corn Syrup Antitrust Litigation*, the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%", respectively, and an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement. *Declaration of John C. Coffee, Jr*., submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2. In securities fraud class actions, where lead plaintiffs sometimes enter into *ex ante* fee agreements with their chosen counsel, substantial percentages are also promised. For example, the State of Wisconsin Investment Board (SWIB), a sophisticated client, promised the fees set out in Table 2 when it served as lead plaintiff in three securities fraud cases.

---

27

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 34 of 38 PageID #: 49004

| **Table 2: Fees Promised by SWIB in Three Securities Fraud Class Actions** | | |
|---|---|---|
| **Case** | **Fee** | **Recovery** |
| *In re Anicom Inc. Securities Litigation*, 00-CV-04391 (N.D. Ill.) | 23.5% | $40 Million |
| *In re Physician Computer Network, Inc. Securities Litigation*, Civil No. 98-981 (D.N.J.) | 15% | $21 Million |
| *Gluck v. CellStar Corp.*, 976 F. Supp. 542 (N.D. Tex. 1997) | 18% | $15 Million |

Source: Letter from Keith Johnson, Chief Legal Counsel, State of Wisconsin Investment Board (May 21, 2005), filed in *Schwartz v. TXU Corp.*, Civil Action No. 3:02-CV-2243-K (N.D. Texas—Dallas).

Having studied and consulted on securities class actions for years, I know of many other cases in which lead plaintiffs agreed to pay fees in this range. Rather than belabor the matter, though, I will represent to the Court that lead plaintiffs often agree to pay fees of 15 percent or more in securities class actions. This is so even in cases that generate larger recoveries than those listed in Table 2.

Really, though, the Court need not search through other cases to learn how much business clients serving as named plaintiffs are willing to pay. The Court need only consider the fee agreements signed by several of the named plaintiffs in this case. In all, I reviewed retainer agreements entered into by 12 class merchants. The agreements vary in important respects, indicating that they were negotiated agreements, but generally provide that Class Counsel will receive a fee equal to one-third of the class-wide recovery.[28] Some contain additional provisions

---

[28] Typical language reads as follows:

(a) Fees As Class Counsel

> (1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any

promising to make up any difference between one-third of the class-wide recovery and the actual fee from the client's share of the recovery or to pay a one-third fee from the client's recovery if the client recovers individually rather than as part of a class action. The market thus sent a strong signal that a fee well above the percentage Class Counsel requests would be reasonable in this case.

I hope the Court agrees that the cumulative weight of the examples presented in this section overwhelming. Sophisticated business clients routinely pay contingent fees of 15 percent or more (usually the latter) and rarely pay less. Class Counsel's request for about 10 percent of the recovery is thus at the far low end of the range and is therefore unquestionably reasonable.

**8. RISK INCURRED**

The papers filed in support of the requested fee award describe the litigation risks Class Counsel incurred in detail. They make clear, for example, that this lawsuit has lasted about eight years, from the time (2005) the original complaint was filed through the fairness hearing on the proposed settlement (2013).

But the papers do not explain that, by class action standards, nine years is a very long time. A study of federal class actions resolved in 2006 and 2007 found that antitrust class actions lasted

---

request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b) Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

1,140 days on average.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 820, Table 2 (2010).  The longest antitrust class action in the dataset resolved in 2,480 days.  At 8 years and counting, this case has already outlived the longest class action in Professor Fitzpatrick's dataset.[29]

When this case started, no one could say with confidence when it would end.  Even now, the answer is not entirely clear.  Even assuming that the Court approves the proposed settlement and the requested fee award, there may be appeals that drag on for months or years.

I mention case duration because the difficulty of predicting it provides a vivid reminder of the risks Class Counsel incurred when the investigation that preceded this litigation began nine years ago.  Today, with $7.25 billion on the table, it is all too easy to think that a hugely successful result was inevitable.  It may even be difficult for many people to credit the possibility that the suit might have been lost.  As social scientists have shown repeatedly, when people know how a risk actually turned out, they often grossly over-estimate the likelihood of the observed result.  "Hindsight vision is 20/20. People overstate their own ability to have predicted the past and believe that others should have been able to predict events better than was possible. Psychologists call this tendency for people to overestimate the predictability of past events the 'hindsight bias.'" Chris Guthrie, Jeffrey J.

---

[29] Studies also find that other types of class actions typically resolve much faster than this one has. See, e.g., Thomas E. Willging et al., AN EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 16 (Federal Judicial Center 1996) (reporting that, in the four federal district courts studied, median time periods from filing to closing for settled non-securities class actions ranged from "eleven and thirteen months" on the low end to "thirty-six and fifty months" on the high end); Michael Klausner and Jason Hegland, *When are Securities Class Actions Dismissed, When Do They Settle, and For How Much?—Part II*, XXIII PLUS JOURNAL 1, 4 (2010) (study of securities class actions filed from 2000 to 2003 reporting the cases that survived a motion to dismiss settlement in a mean length of time 24 months after the motion was decided).

Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 CORNELL LAW REVIEW 777, 799 (2001) (citations omitted).

In the fee-setting context, the hindsight bias may cause a court to over-estimate the likelihood of a successful result. In other words, a court may inadvertently set the risk of non-recovery, and the related risk of non-payment, too low, simply because it knows that the case turned out well for the plaintiffs. As Judge Easterbrook wrote in the *Synthroid* case,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d at 724.

In *Inside the Judicial Mind*, Professors Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich documented the tendency of the hindsight bias to influence judge's estimates of *ex ante* likelihoods. They gave more than 150 federal magistrate judges a statement describing a case in which a prisoner appealed after being sanctioned by a trial judge for filing a frivolous complaint. One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the last third indicated that the appellate court vacated the sanction entirely. All the judges were then asked to "go back in time" and identify the result that was most likely to occur. Demonstrating the influence of the hindsight bias, the judges' estimates of the *ex ante* likelihoods depended on the information they received about the actual outcome. "[T]he judges exhibited a predictable hindsight bias; when they learned

that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred." Guthrie et al., *Inside the Judicial Mind, supra*, at 803.

The Court possesses an enormous amount of information about the actual outcomes associated with probabilistic events in this litigation. For example, the Court is knowledgeable regarding all of the motions filed in the case and the risks they pose for all parties. Through their motions and oral arguments, the Court also knows what many documents obtained in discovery revealed and what many witnesses testified to in depositions. This knowledge could only have been guessed at when the lawsuit started, but today they are known outcomes which, because of the hindsight bias, may seem far more likely to have occurred than they actually were.

To accurately assess the risks Class Counsel incurred when litigation started in 2005, the Court would somehow have to blind itself to much of what it knows about the case. That is impossible, obviously. But there is a way out. The Court can take guidance from the private market for legal services, including the fees set in the retainer agreements signed by the named plaintiffs and information about prevailing market rates more generally. This is appropriate because in the contingent fee sector, compensation terms are set *ex ante*—when litigation begins—not *ex post*—when the results are known. *Ex ante* fees can provide valuable guidance concerning the fees that are needed to offset the litigation risks that are actually incurred.

## 9. WHEN DONE CORRECTLY, FEE-SETTING IS A POSITIVE-SUM GAME

Judges take seriously their role as absent plaintiffs' guardians when awarding fees from class action settlements. However, because they ordinarily set fees at the end of litigation rather than the beginning, they tend to believe that fee setting is a zero-sum game in which more for the lawyers means less for the class. This view exerts strong downward pressure on fees that may hurt class members in many ways, such as by discouraging lawyers from handling risky cases and from developing the cases they do take as fully and intensively as warranted.

The belief that class members always prefer lower fees to higher ones is incorrect. Taken to the limit, it implies that class members would be happiest with a fee of 0 percent. This is obviously wrong. At the outset of litigation, a 0 percent fee looks terrible to a class member (indeed, to any claimant) because no lawyer will take a case for that amount. When the fee is zero, a class member's expected recovery is also zero. Because any positive recovery is better than zero, any positive fee is also better than a zero fee.

The market for legal services, in which contingent fees are set *ex ante*, recognizes that fee setting is a positive-sum game, not a zero-sum competition. A higher attorney's fee can mean a larger expected net recovery for a claimant because a lawyer will take the case, expend effort on it, and increase the value of the client's claim by an amount that exceeds the lawyer's fee. Both the Third Circuit and the Seventh Circuit recognize this. The Third Circuit observed that "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) (emphasis added). The Seventh Circuit agreed in *Synthroid I*. It rejected the so-called "mega-fund rule," according to which the fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. 264 F.3d at 718. Judge Harmon also rejected the "mega-fund rule" in *Enron*, as previously states.

When setting fees, then, a court should not ask 'What is the lowest possible fee?' but 'What fee would a group of claimants rationally have agreed to pay when this lawsuit began?' The best

answer is 'The market rate' because that is the fee shown by real engagements of attorneys to be most likely to maximize the expected value of claims net of litigation costs.

## 10. ANALYSIS OF THE COURT'S OPINION IN *IN RE VISA CHECK/ MASTERMONEY ANTITRUST LITIGATION*

In the preceding sections, I have urged the Court to place great weight on fee percentages prevailing in the market for legal services when fixing the size of Class Counsel's fee award. I know that in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), the Court considered and rejected several arguments like those I have made. I therefore take a moment to respectfully urge the Court to give the "mimic the market" approach another look.

In *Visa Check*, the Court's decision to award a low percentage fee seems to have been strongly influenced by the Second Circuit's observation in *Goldberger* that "in megafund cases [], courts have 'traditionally accounted for [] economies of scale by awarding fees in the lower range[s]'". *Visa Check*, 297 F. Supp. 2d at 521 (quoting *Goldberger*, 209 F.3d at 52). Importantly, the quoted language appears in a portion of the *Goldberger* opinion where the Second Circuit criticized the benchmark approach employed in the Ninth Circuit, which employs a presumption that 25 percent is a reasonable fee.

> Moreover, even a theoretical construct as flexible as a "benchmark" seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case. Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." [citation omitted.]

*Goldberger*, 209 F.3d at 52.

I agree with this observation. A benchmark set at 25 percent could over-compensate lawyers for many reasons, one being the existence of economies of scale in litigation costs. That said, over-compensation cannot occur when judges set fees on the basis of rates prevailing in the market in cases where substantial economies of scale are present. Securities fraud class actions provide the best examples of cases fitting this description. Like antitrust class actions, they involve thousands or millions of claimants and, therefore, enormous scale economies. They also provide evidence of market-based fees because law firms compete for opportunities to represent institutional investors with large financial stakes. Many institutional investors routinely consider multiple proposals or hold 'beauty pageants' before choosing law firms and agreeing on fees. As Associate Professor David H. Webber observed recently, "institutions are ideally situated to force [law] firms to compete with one another, particularly on price." David H. Webber, *The Plight of the Individual Investor in Securities Class Actions*, 106 NORTHWESTERN UNIVERSITY LAW REVIEW 157, 167 (2012).

In securities fraud class actions, I have never seen or read about a fee agreement between an institutional investor and a law firm that entitled the firm to 6.511 percent of the recovery, the amount the Court awarded in *Visa Check*. Contracted-for fees are always higher. The fee agreement in *Enron*, arguably the most comparable case and surely one where the scale economies were enormous, never dipped that low. It started at 8 percent of the first billion dollars recovered and topped out at 10 percent of all dollars in excess of $2 billion. This signals the possibility that the 6.511 percent fee discounted for economies of scale too heavily. Were the Court to apply the *Enron* fee agreement to the cash portion of this settlement, the fee award would equal $695 million, 9.6 percent of the recovery.[30]

---

[30] (.08 * $1 billion) + (.09 * $1 billion) + (.10 * $5.25 billion) = $80 million + $90 million + $525 million = $695 million.

Mistakes are inevitable, I believe, when fee awards are based on "reasonableness factors" alone without the benefit of evidence of market rates. When acting as guardians charged with protecting class members from excessive fees, many judges are predisposed to cut fee requests, especially in cases that generate enormous settlements and seemingly breathtaking requests for fees. The benefit to class members seems obvious. But both the restitutionary impulse to compensate lawyers reasonably and class members' rational desire to maximize their expected recoveries will be frustrated if judges use the existence of scale economies as a reason for cutting fees too much. Too be clear, my point is not that judges are wrong in believing that class actions generate scale economies—I am confident that they are right about this. Rather, the weight scale economies should receive is an empirical matter requiring evidence, and market rates provide the only source of evidence that is both reliable and readily available. Judges can learn how much weight to give scale economies by studying the amounts real clients pay real lawyers in securities fraud class actions and other cases that involve large numbers of claimants.

## 11. FEE AWARDS IN OTHER CLASS ACTIONS

In my experience, courts often are interested in the results of empirical studies of fee awards in class actions. I am familiar with these studies and am in the process of conducting one of my own. This section presents the results.

Before addressing the studies, however, I think it is important to make two points. First, fee awards in other class actions do *not* provide direct evidence of market rates. They show how judges regulate fees, and judges often deviate from market-based practices. The findings reported in this section are therefore fallible guides. Second, it is perilous to use the studies as a basis for the fee award in this case because there are no other antitrust class actions as enormous as this one. A dataset that contains no comparable cases cannot provide much to go on.

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 43 of 58 PageID #: 49013

Because empirical studies of class action fee awards document judicial practices, I begin by mentioning Table 1 of this report, which lists 66 mega-fund cases with recoveries of $100 million or more and fee awards of at least 20 percent. These cases provide ample precedent in support of the requested fee award. I also point to the $688 million award in Enron, arguably the most comparable case. Finally, I note that in the Vioxx MDL, which settled for $4.85 billion, the court awarded the lead attorneys $315,250,000 in common benefit fees *on top of* the enormous sum the very same lawyers received from their clients pursuant to contingent fee agreements capped at 32 percent. Order & Reasons, *In re Vioxx Products Liability Litigation*, MDL 1657 (E.D. LA, Oct. 19, 2010). Although the total amount the lead *Vioxx* attorneys took home is unknown, it surely equals or exceeds the amount Class Counsel is requesting even though the recovery in this case is billions of dollars larger.

I now turn to empirical studies of fee awards in class actions. There are many of these,[31] so I focus first on two of the most recent that examine class actions of diverse types: Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811 (2010) ("*Fitzpatrick Study*"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) ("*E&M Study*"). Both studies were peer-reviewed.

---

[31] See, e.g., Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS?, Table 9 (1996); Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (1996); Mukesh Bajaj, et al., SECURITIES CLASS ACTION SETTLEMENTS: AN EMPIRICAL ANALYSIS (Nov. 16, 2000); Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 CLASS ACTION REPORTS 167 (2003); and Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 27, 75 (2004).

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 44 of 58 PageID #: 49014

Before discussing studies, it will be helpful to explain a statistics concept: the standard deviation. The standard deviation is a measure of the extent to which data points are spread about a reported estimate. A larger standard deviation means that the data points are spread farther from the point estimate than a smaller standard deviation, which indicates closer clustering.

The standard deviation also provides an easy way of identifying the core of a distribution. Assuming a normal distribution, about 68 percent of the data points will fall within one standard deviation above or below the reported point estimate. For example, suppose the average height of a U.S. adult male is 70" with a standard deviation of 3". It follows that the range running from 67" to 73" will capture about 68 percent of all adult U.S. males. If the standard deviation were 4", a wider spread running from 66" to 74" would be required to achieve the same result.

Turning to the studies, Fitzpatrick collected all class action settlements approved by federal judges in 2006 and 2007, a total of 668 reported and unreported decisions. The following figure describes the range of fee awards in cases where judges applied the percentage method with or without a lodestar cross-check. As is apparent, awards ranging from 30 percent to 35 percent of the recovery constitute the most common category. Over 30 percent of the cases in Fitzpatrick's dataset had fee awards this large.



*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.

SOURCES: Westlaw, PACER, district court clerks' offices.

Source: *Fitzpatrick Study*, *supra*, at p. 834.

Fitzpatrick also reported aggregate settlement amounts and fee awards in antitrust class actions, which numbered 29 in all. In 2006, the antitrust settlements in his dataset collectively brought in $1.079 billion, 26 percent of which was awarded as fees. In 2007, settlements totaled $660.5 million, of which attorneys received 24 percent. *Fitzpatrick Study*, *supra*, at 825, Table 4 & p. 831, Figure 7.

Breaking down settlements by size, Fitzpatrick reported mean fee percentages for settlements in the largest decile, which contained 45 cases and spanned an incredible range from $72.5 million to $6.6 billion. The mean fee was 18.4 percent with a standard deviation of 7.9 percent, meaning that about two-thirds of the cases fell in the range extending from 10.5 percent to 26.3 percent. See *Fitzpatrick Study*, at p. 839, Table 10. The fee requested by Class Counsel falls at the low end of this range.

The *E&M Study* examined common fund class actions that closed from 1993 to 2008, a total of 689 cases. The authors drew their sample from Westlaw, Lexis and other reporters. For the entire dataset, the average fee-to-recovery ratio was 23 percent. *E&M Study*, *supra*, at pp. 258-259.

Focusing on antitrust cases, of which the dataset contained 71, the authors found a mean fee award of 22 percent on an average gross recovery of $163.48 million. *Id.*, at p. 262, Table 5.

Eisenberg and Miller also found a strong inverse correlation between the percentage awarded and the size of the common fund. Fee percentages tended to be larger in cases with smaller recoveries and smaller in the cases that produced the largest common funds. Figure 7, shown below, makes this relationship clear.

Table 7: Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008

| *Range of Class Recovery (Millions) Decile* | *Mean* | *Median* | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 68 |

Sources: Westlaw, LexisNexis, PACER.

Source: *E&M Study*, *supra*, at p. 265.

Obviously, the recovery in this case, $7.25 billion (excluding the non-cash relief), falls at the extreme high end of this the table. For the 68 cases in this decile, the mean (average) fee award was 12 percent with a standard deviation of 7.9 percent. The core of the distribution thus extended from about 4.1 percent to about 19.9 percent. The fee percentage requested by Class Counsel is lower than the mean and squarely within this size range.

The *E&M Study* also found a positive correlation between fee awards and risk. In most of the case categories studied, "mean fee percentages were higher in high-risk cases than in other cases." *E&M Study*, *supra*, at 265. The measure of risk was exceedingly noisy, however. The researchers could not assess the riskiness of any case directly, so they coded cases on the basis of the

comments about risk that appeared in judges' opinions. Consequently, although the finding makes sense, it would be a mistake to place much weight on the numbers. Having said that, the average fee in cases coded as high-risk was 26.1 percent, with no standard deviation reported. *E&M Study*, *supra*, at p. 265. Because this case was exceptionally risky, the requested fee of about 10 percent can easily be justified on that basis.

I will now briefly discuss two recent studies of fee awards in securities class actions, which can also be large, high-risk cases. Choi *et al*. found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions. Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 WASHINGTON UNIVERSITY LAW QUARTERLY 869, 897, Table 6A (2005). More recently, Professor Michael Perino, who also studied securities class actions, reported average fees of 26.6 percent, which dropped to 19.3 percent in cases where public pension funds served as lead plaintiffs. Michael Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions*, 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 368, 380, Table 1 (2012). Viewed as a percentage of the recovery, the fee requested in this case is well below average for cases led by public institutional investors.

In sum, empirical studies of fee awards in class actions suggest that a fee of about 10 percent in a case of this magnitude would be a normal result.

Case 1:05-md-01720-JG-JO Document 2113-5 Filed 04/11/13 Page 48 of 58 PageID #: 49018

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED: April 10, 2013

________________________________________
CHARLES SILVER

Ex. D

Declaration of Professor Charles Silver (excluding CV)

*Kolton v. Frerichs*,
Case No. 16-cv-3792,

Filed on September 22, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY D. KOLTON, *et al*.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 16-cv-3792** |
| | ) | **Hon. Charles P. Kocoras** |
| **MICHAEL W. FRERICHS,** | ) | |
| **Treasurer of the State of Illinois,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

# EXPERT REPORT OF PROFESSOR CHARLES SILVER ON THE REASONABLENESS OF CLASS COUNSELS' REQUEST FOR AN AWARD OF ATTORNEYS' FEES

---

## CONTENTS

I. Summary of Opinions .......... 3

II. Credentials .......... 3

III. Documents Reviewed .......... 5

IV. Facts .......... 6

V. Class Counsel are Entitled to a Fee Award under the Common Fund Doctrine .......... 8

VI. The Market Rate Determines the Size of the Common Fund Fee Award .......... 12

VII. The Court Can Base the Dollar Amount of the Fee Award on the Present Value of Future Payments .......... 13

VIII. The Proposed Settlement Eliminates the Treasurer's Liability for a Statutory Award of Attorneys' Fees .......... 18

IX. The Market Rate for Legal Services Ranges from One-Third to 40 Percent of the Recovery .......... 20

A. Market Rates Increasingly Dominate the Fee-Setting Process .......... 20

B. In Contingent Fee Litigation, Percentage-Based Compensation Predominates .......... 22

C. Sophisticated Clients Normally Pay Fees of 30 Percent to 40 Percent When Hiring Lawyers to Handle Commercial Lawsuits on Straight Contingency .......... 24

1. Sophisticated Named Plaintiffs In Class Actions .......... 26

2. Patent Cases .......... 27

3. Other Large Commercial Cases .......... 29

X. Fee Awards in Comparable Cases .......... 32

A. ERISA Cases .......... 32

B. Cases with Comparable Recoveries .......... 36

XI. No Lodestar Cross-Check is Advisable or Required .......... 38

XII. Compensation .......... 40

XIII. Conclusion .......... 40

I, CHARLES SILVER, declare as follows:

**I. SUMMARY OF OPINIONS**

1. The proposed settlement will create a common fund from which Class Counsel are entitled to be paid. This is true even though some Class Members will be paid in the future rather than immediately.

2. Class Counsel's fee should be set as a percentage of the fund because percentage-based compensation arrangements dominate the market for legal services obtained on contingency.

3. The percentage should be set in light of market rates, which typically range from one-third to 40 percent of the recovery. For this purpose, the Court can estimate the present value of the stream of payments that Class Members will receive.

4. Because Class Counsel have requested a fee equal to about 20.3 percent, their request is reasonable and should be granted.

**II. CREDENTIALS**

5. I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991. Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

6. The study of attorneys' fees has been a principal focus of my academic career. I published my first article on the subject shortly after I joined the law faculty at the University of Texas at Austin. See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991). Since then, I have published about a dozen more articles, two of which are empirical studies of fee awards in class actions. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, 66

Vanderbilt L. Rev. 1677 (2013); and Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) ("*Is the Price Right?*"). The CORPORATE PRACTICE COMMENTATOR chose *Is the Price Right?* as one of the ten best in the field of corporate and securities law in 2016. In his concurring opinion in in *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 376 P.3d 672 (2016), Justice Goodwin Liu cited *Is The Price Right?* nine times. He also cited two of my other works.

7.      My writings are also cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

8.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

9.      I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in many class actions, including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6888488 (E.D.N.Y. 2019), *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), all of which settled for amounts exceeding $1 billion.

10.     Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by

the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

11.  I have attached a copy of my resume as Appendix 1 to this declaration.

## III.  DOCUMENTS REVIEWED

12.  When preparing this report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case. I may also have reviewed other items including, without limitation, cases, studies, and published scholarly works.

- Second Amended and Supplemental Class Action Complaint
- Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Proposed Class Action Settlement
- Liability Analysis (Excel Spreadsheet)
- Interest Summary (Excel Spreadsheet)
- Notice of Certification of Class Action, Proposed Settlement of Class Action, and Hearing on the Proposed Settlement and Attorneys' Fee Petition
- Agreement of Settlement
- Order Preliminarily Approving Proposed Settlement, Directing the Issuance of Notices to the Classes, and Setting a Fairness Hearing
- Summary Notice of Proposed Class Action Settlement
- Judgment Approving Settlement and Dismissing Action (Draft)
- Declaration of Anthony Kolton
- Declaration of David Goldberg
- Declaration of Jeffrey Sculley
- Declaration of Henry C. Krasnow
- Declaration of Sam Peltzman (draft)
- Letter from Ken Wagers to G. Allen Mayer dated July 4, 2021
- Treasurer's Monthly Rate of Return, 6/1/2020-5/3/2021
- Minute Order, Doc. 121 (granting motion for preliminary approval of proposed settlement)

## IV. FACTS

13. Having won a substantial recovery by means of a settlement for the owners of unclaimed property in Illinois, Class Counsel have applied for an award of attorneys' fees and reimbursement of expenses equal to the lesser of 25 percent of the recovery or $9.5 million. In this Report, I focus upon the fee application.

14. The settlement includes two classes: a settlement class to be certified under Rule 23(b)(3) of the Federal Rules of Civil Procedure and a litigation class that the Court previously certified under Rule 23(b)(2).

15. The (b)(3) class contains all property owners "whose claims were paid or approved for payment during the period between August 22, 2017 and continuing through the date of the entry of the Preliminary Approval Order" (July 20, 2021). *Agreement of Settlement*, ¶ 2.1.1.

16. The (b)(2) class contains owners whose property was in the possession of the State of Illinois as of the date of the Preliminary approval order (July 20, 2021) and whose claims are approved for payment after that date. *Id*.

17. A third group of property owners falls outside both classes but also benefits from the settlement. This group contains all persons whose property is delivered to the State after July 20, 2021. The *Agreement of Settlement* refers to these individuals as "Future Claimants." *Id*. ¶ 1.14

18. The settlement entitles members of both classes to monetary relief in the form of interest payments calculated in the manner specified in ¶ 2.3 of the *Agreement of Settlement*. It also obligates the Treasurer to use the same method when returning funds to Future Claimants, unless and until the Illinois General Assembly passes a statute providing for a different method. *Id*., ¶ 2.3. See also *id*., ¶ 2.4.1 (reiterating requirement).

19. The settlement allows the Treasurer to deduct a $5 administrative fee from the interest paid on each property. *Id.*, ¶ 2.6.

20. Turning to the value of the settlement, the *Notice of Certification of Class Action, Proposed Settlement of Class Action and Hearing on the Proposed Settlement and Attorneys' Fee Petition* ("*Settlement Notice*") states that

> The Treasurer has calculated that, as of March 31, 2021, the net interest payable to Rule 23(b)(3) Settlement Class Members is $13,563,730.89. Net interest payable to Rule 23(b)(2) Class Members can only be estimated because those claims have not yet been made. However, based on historical averages relating to holding periods and return rates of the Unclaimed Property Trust Fund [UPTF], recent interest rates, and calculations of interest payable to the Rule 23(b)(3) Class, the Treasurer has estimated that the present value of interest payable to the Rule 23(b)(2) Class will be approximately $30,851,391.

Class Counsel has informed me that the Treasurer subsequently updated the present value of the interest payable to the (b)(3) class. As of July 20, 2021, it was $15,878,236.

21. Class Counsel believe that the Treasurer has understated the value of the settlement for the members of the (b)(2) class. According to their expert, who based his estimates on properties in the UPTF as of March 31, 2021, the interest payable to this class could turn out to be twice as much as the Treasurer predicts. *Declaration of Sam Peltzman*, p. 5..

22. The *Settlement Notice* does not indicate the present value of the settlement for Future Claimants but based upon the Treasurer's expert's calculation for the (b)(3) class, Class Counsel estimates that it will be $3.5-$4 million per year.

23. Taking the Treasurer's estimates included in the settlement notice and considering only the (b)(3) and (b)(2) classes (that is, ignoring payments to Future Claimants), the value of the settlement is $44,415,121.89. Using the Treasurer's updated figure for the (b)(3) class, the figure increases to $46,729,627. Below, I will refer to $46.7 million as the "conservative estimate" of the settlement's value.

24. As mentioned, Class Counsel have applied to the Court for a fee award equal to 25 percent of the recovery or $9.5 million, whichever is less. Applying 25 percent to the conservative estimate of $46.7 million yields a fee of about $11.7 million. The cap at $9.5 million therefore applies, so Class Counsel's request is for that amount, which equals 20.3 percent of the recovery.

## V. CLASS COUNSEL ARE ENTITLED TO A FEE AWARD UNDER THE COMMON FUND DOCTRINE

25. Class Counsel have applied to the Court for a common fund fee award. These awards are appropriate when a lawyer's efforts create or augment a fund for the benefit of passive recipients (here, non-party owners of unclaimed property), all of whom are entitled to share the gain and would be enriched unjustly if payment to their lawyers were withheld. As it happens, I wrote a foundational article on fee awards from common funds decades ago. *See* Charles Silver, *A Restitutionary Theory of Fee Awards in Class Actions*, 76 CORNELL L. REV. 656 (1991). My position on these awards was thus developed long before I had any involvement in this case.

26. In restitutionary parlance, a lawyer who requests an award from a common fund is known as a "claimant" and the persons who stand to gain by sharing the fund are "beneficiaries." *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 29 (2011). By paying a lawyer-claimant from a common fund, a court cures unjust enrichment by spreading the cost of legal services across the beneficiaries in proportion to their gains.

27. The Restatement provides an illustration.

> Plaintiffs sue Utility, asserting the illegality of rates charged to a particular class of customers. The statutes and regulations on which the action is based contain no provision for the recovery of attorney's fees by a successful litigant. Plaintiffs obtain a judgment requiring Utility to refund $5 million in excess charges to Plaintiffs and all customers within the affected rate class. Attorneys for Plaintiffs seek an award of fees and expenses. Although the claimants are not entitled to fees from Utility, an adverse party, they may require the beneficiaries of their intervention to contribute ratably to the expense of the litigation, including reasonable attorneys' fees. The court approves an award to Attorneys of $500,000,

payable from the amount of the judgment, thereby reducing to $4.5 million the aggregate refunds distributed to customers.

*Id.*, § 29, Illus. 1. Although the illustration differs from this case in that there the Utility is refunding money while here the Treasurer is restoring property to its rightful owners, the parallels between the two are many.

28. First, as in the illustration, the proposed settlement obligates an entity—there, the Utility; here, the Treasurer—to return money that, but for the litigation, it would have retained. Before Class Counsel filed suit, the Treasurer had been keeping all the interest earned on unclaimed money property, as required under a state statute. Now, if the proposed settlement is approved, the Treasurer will have to return the interest to an identified group of prior claimants and pay the interest going forward to a second set of beneficiaries who will claim their property in the future.[1]

29. Second, in both the illustration and this lawsuit, the beneficiaries have identical interests because successful litigation would entitle all to payments. The object of creating the fund—and of making it as large as possible—ensures that the beneficiaries' interests harmonize.

30. Third, in both instances, the creation of the fund requires the resolution of a legal question which, when decided, enables the amounts to be paid to be calculated formulaically. No individual issues of any substance need be considered, and the use of a formula ensures that the common fund is allocated among the beneficiaries in an appropriate manner.

31. Fourth, and again both here and in the illustration, the persons who stand to gain have individual claims to payments. The fund is a common one because the claims can be resolved by means of a single judgment or settlement that encompasses all individuals, not because the

[1] The Treasurer can charge members of both groups a one-time administrative fee of $5 for each property claimed.

beneficiaries own the fund jointly as, for example, two or more people may jointly own a piece of land or a house.

32.     Fifth, both groups of beneficiaries are enriched monetarily by ascertainable amounts after fees are paid.  In the illustration, they net 90 percent of the gross recovery ($4.5 million out of $5 million).  Here, per ¶ 3.2.5 of the Agreement of Settlement, fees are to be paid out of the UPTF, and, if the Court grants Class Counsel's fee request to award fees from monies that remain in the UPTF after Class Members are paid, Class Members will net 100 percent because, per ¶3.2.5 of the Agreement of Settlement, fees are to be paid out of the UPTF.[2]

33.     Sixth, in both instances the fee award distributes the cost of legal services across the beneficiaries in an equitable manner by requiring pro rata contributions.  Owners whose assets generate more interest pay more than others but also receive larger payments.

34.     Seventh, in both cases the beneficiaries are passive.  In the illustration, the only beneficiaries who hired counsel and sought to vindicate the refund claim were those in whose names the lawsuit was filed.  Here, the same is true.  All owners with unclaimed assets were passive, except the class representatives.

35.     Eighth, although the illustration does not address the matter explicitly, one imagines that both there and here beneficiaries need not take special steps to benefit from the fund.  In the example, the Utility could refund the overcharges for most or all ratepayers by discounting future bills.  Here, the Treasurer can pay the interest required to all owners who request their property.  Owners need not do anything extra to receive it.

---

[2] Paragraph 3.2.5 says nothing about deducting fees from Class Members' payments.  If the Court grants the fee request for 20.3 percent but does order that fees be deducted, Class Members will net 79.7 percent of the interest payments.

36. Abstracting from the illustration, the Restatement sets out the general requirements for common fund fee awards as follows.

> (2) A claimant may require those beneficiaries for whom the claimant is not acting by agreement to contribute to the reasonable and necessary expense of securing the common fund for their benefit, in proportion to their respective interests therein, as necessary to prevent unjust enrichment.
>
> (3) A beneficiary is liable in restitution only if:
>
> (a) liability will not oblige the beneficiary to make a net payment in cash;
>
> (b) the measurable value added to the beneficiary's interest in the common fund by the claimant's intervention exceeds the beneficiary's liability to the claimant;
>
> (c) the claimant has neither acted gratuitously nor received full compensation from others; and
>
> (d) liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 29 (2011).

37. Here, it is apparent that these conditions are met.

- Re condition (2): Class Counsel neither had nor could have had retainer agreements with absent property owners because their whereabouts are unknown. This is why the numerosity requirement for class certification is met. Paying Class Counsel out of the fund will also spread the burden across class members in proportion to their gains, thereby preventing unjust enrichment in an equitable way.
- Re condition (3)(a): Withdrawing the fee from the fund will not require any class member to make a net payment in cash. All class members will be better off than they would otherwise have been even after Class Counsel's fees are paid.
- Re condition (3)(b): The value to each owner of the increase in the common fund can be calculated with precision and will always exceed the owner's liability for fees.

- Re condition (3)(c): Class Counsel have neither acted gratuitously nor received payment from anyone. They have provided professional services for which they normally charge and for which they hoped to be compensated in this case if they prevailed.

- Re condition (3)(d): Class Counsel's compensation could not have been handled contractually, as previously explained.

## VI. THE MARKET RATE DETERMINES THE SIZE OF THE COMMON FUND FEE AWARD

38. Seventh Circuit case law requires judges to "mimic the market" when awarding fees from common funds, as Judge Andrea R. Wood of the Northern District of Illinois recently explained in *Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019), a case brought under the Telephone Consumer Protection Act that produced a $12.5 million settlement.[3] In the course of approving a fee award equal to 33.99 percent of the recovery, Judge Wood made the following observations.

- In a common fund case, "the Court should 'award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Id.*, at *11 (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001);

- "[T]he percentage-of-recovery method is preferable to the lodestar method in this instance." *Id.*;

[3] Judge Wood's decision approving the settlement was appealed, but the appeal was dropped after the settlement was amended. *Charvat v. Valente*, No. 19-3280, 2020 WL 6819148, at *1 (7th Cir. Mar. 20, 2020) (granting joint motion to remand filed by counsel for all parties).

- "[Class Counsel's] request for a 33.99% award comports with the attorneys' fees awards granted in similar cases." *Id.*; and
- "Class Counsel faced a real risk of nonpayment." *Id.*, at *12.

These observations apply with equal force here, the only exception being that Class Counsel's request for a 20.3 percent fee is considerably lower than the request that Judge Wood approved.

39. Because Seventh Circuit case law is utterly clear, I do not expect the Treasurer to disagree about the dependency of common fund awards on market rates and will not belabor the point. Instead, I will show below that the market rate for legal services normally ranges from 33.33 percent to 40 percent of the recovery, with lower fees and higher fees occasionally being charged.

## VII. THE COURT CAN BASE THE DOLLAR AMOUNT OF THE FEE AWARD ON THE PRESENT VALUE OF FUTURE PAYMENTS

40. I mentioned above that Judge Wood handled fees correctly in *Charvat v. Valente*, 2019 WL 5576932. Her analysis applies straightforwardly to the (b)(3) class, whose members will be paid in short order. But as regards the (b)(2) class, it is only suggestive because she did not have to address how fees should be measured when class members will be paid amounts that can only be estimated and will receive their benefits over time. Can the Court base the size of the fee award on the estimated present value of the stream of payments members of the (b)(2) class will receive? Or must Class Counsel be paid in dribs and drabs as class members file claims?

41. It is hardly unusual for class members to receive benefits over time. This often occurs in ERISA cases involving pension funds. The complaints in these cases frequently assert that benefits were calculated incorrectly, with the result that pensioners were underpaid in the past and that benefits should be more generous in the future. When the plaintiffs' position is vindicated,

benefits that were wrongly withheld can be calculated with precision and paid immediately, but the present value of future payment increases can only be estimated.

42. The Seventh Circuit considered a settlement involving payments of past and future benefits in *Williams v. Rohm & Haas Pension Plan*, No. 404-CV-0078-SEB, 2010 WL 1490350, at *1 (S.D. Ind. Apr. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011). There, the plaintiffs argued that they were wrongly denied cost of living adjustments when they opted for lump-sum payouts of their pension benefits. One subclass contained beneficiaries who received or elected to receive lump sum distributions on or before December 31, 2009. The other contained all other pensioners who would become eligible for lump sum payments after that date. Under the settlement, the members of the first subclass would receive payments in two installments dated one year apart. The members of the second subclass would be paid in the future, as they became eligible for benefits under the pension plan. *Joint Motion for Preliminary Approval of Class Action Settlement*, Doc. 234, ¶¶ 27 & 28, *Williams v. Rohm & Haas Pension Plan*, No. 404-CV-0078-SEB (S.D. Ind. Nov. 18, 2009).

43. In *Williams*, the parties estimated the settlement payments would have a total value between $176 million and $180 million. *Id*., ¶ 14. Some of the uncertainty existed because data relating to pension payments to members of the first subclass were still being collected when the settlement was approved. Some also reflected the fact that the size of the increments added to future lump-sum payouts would be determined on the basis of factors whose actual values could not be known until beneficiaries retired.

44. Neither the uncertainty nor the fact that benefits would be paid in the future prevented the trial court from awarding fees based on the settlement's expected value, which it pegged at $180 million for this purpose. Applying the Seventh Circuit's mimic-the-market

methodology, the district court ordered the pension plan to pay $43,500,000 in fees, 24.2 percent of the gross recovery. Pursuant to the settlement agreement, fees would be paid in installments on the same dates that the members of the first subclass were slated to receive their payments. When objectors challenged the award, the Seventh Circuit affirmed.

45. *Williams* establishes several important points, the first being that a settlement can produce a common fund recovery by requiring a defendant to make payments to individual class members, including payments in the future to persons who are not yet eligible to receive them. The district court judge described the *Williams* settlement as a "common fund," *Williams*, 2010 WL 1490350 at *1, and the Seventh Circuit embraced this characterization by applying the common fund methodology and affirming the trial court's fee award. The settlement submitted for the Court's approval here, which also requires individual payments and payments to be made in the future, is a common fund too. Consequently, when sizing the (b)(3) and (b)(2) classes' fee obligations, the Court can apply the common fund methodology and set the fee as a market-based percentage of the aggregate recovery.

46. *Williams* also shows that a court can properly base a decision approving a settlement and granting a common fund fee award on an estimate of the present value of a stream of payments. When doing so, of course, a court must demand evidence supporting the accuracy of an estimate and guard against inflated estimates whose purpose is to gain approval of a settlement or increase class counsel's compensation. And when a good-faith disagreement exists regarding the likely value of a proposal, a court must address the dispute.

47. Finally, *Williams* establishes that a court can properly order fees to be paid upfront, before many class members receive the benefits that a settlement confers. As mentioned, the *Williams* settlement agreement provided for the payment of fees in two installments made in

consecutive years, 2010 and 2011. The structure may seem novel because it entitled class counsel to be paid before some class members were compensated and, consequently, required that the fee award be based on an estimate of the present value of future benefits. But when time must inevitably pass before class members become eligible for benefits, the structure is natural, not odd. The entitlement to a future payment, which springs into existence when a settlement is approved, has a present value. It is something that, in theory at least, a class member could sell. Awarding fees payable in the present (or, as in *Williams*, the near future) recognizes this fact and cures the problem of unjust enrichment concurrently.

48. In *Williams*, the parties agreed that the pension plan would pay up to $43.5 million in attorneys' fees and would bill the expense as a reasonable cost of administration. Here, however, the Treasurer has not agreed to pay fees in any amount. The question therefore arises as to whether the Court can require the payment of fees upfront even though owners will receive their benefits in later years.

49. The law of restitution and unjust enrichment permits the Court to do this. Because unjust enrichment often occurs in contexts where a simple transfer of money from defendant to plaintiff will either leave the problem uncured or create new difficulties that should be avoided, this body of law encourages the use of creativity to achieve the desired, equitable result.

50. A relevant example of appropriate creativity can be found in *Bowles v. Washington Dep't of Ret. Sys.*, 121 Wash. 2d 52, 847 P.2d 440 (1993), another pension fund case in which benefits were to be paid out in the future.[4] After finding that "the estimated present value of the

[4] Unsurprisingly, I have not found another case in which, like *Bowles*, an entity was required to pay attorneys' fees in the present and to recoup the cost from payments to be made to class members in the future. Few class actions are tried to judgments and parties usually provide for the payment of fees by agreement when these cases settle. This litigation is one of the few in which

class recovery was approximately $18.8 million," the trial judge "awarded $1.5 million in attorney fees to the plaintiffs' attorneys under the equitable 'common fund/common benefit' theory." *Id.*,121 Wash. 2d at 60-61, 847 P.2d at 444. The judge also "required the [defendant] to immediately pay the attorney fees" and to recoup the cost from class members by applying pro rata deductions to their benefit increases. *Id*. By this means, the cost of legal services would be spread across all class members in proportion to their gains, and the defendant would merely be a conduit through which dollars were routed from the beneficiaries to their attorneys.

51. On appeal, the Supreme Court of Washington affirmed. It found that the trial judge properly used the percentage method when setting the fee; that, at 8 percent of the recovery, the fee was far from excessive; and that the order to pay the fees upfront was proper even though the valuation of the recovery at $18.8 million was only an estimate. *Id*., 121 Wash. 2d at 73-74, 847 P.2d at 451-52. The court found no reason to doubt the accuracy of the estimate, which "was performed by the Office of the State Actuary." *Id*., 121 Wash.2d at 74, 847 P.2d at 452.[5]

52. Here, as mentioned, the present value of the settlement is disputed. The Treasurer has offered the estimate of $47.6 million, an amount that Class Counsel believe is overly conservative. Class Counsel argue that the value is considerably higher: as much as $27 million more because the estimate for the 23(b)(2) class is likely understated by that amount. As an expert, I cannot take a position on a disputed fact but I can say two things.

---

the parties have settled the merits portion of the case while continuing to dispute the amount and manner of paying the class's attorneys.

[5] The holding in *Bowles* was subsequently applied in *Lyzanchuk v. Yakima Ranches Owners Ass'n, Phase II, Inc*., 73 Wash. App. 1, 8, 866 P.2d 695, 699 (1994) ("Whether th[e] fund was immediately available or will be available at a reasonable future time is immaterial to the award of attorney fees based on the common fund theory.") (citing *Bowles,* 121 Wash.2d at 70-71, 847 P.2d at 440).

53. First, the Treasurer is not at risk of being prejudiced by an estimate that turns out to be too high because fees are to be paid out of the UPTF, the money in which is owned by the Class Members, not the Treasurer. Paying the fees out of the UPTF will achieve the restitutionary objective, which is to spread litigation costs across the pool of beneficiaries, which, I note here, includes Future Claimants as well as Class Members.[6]

54. Second, any harm that Class Members may suffer if the estimated value of the recovery turns out to be too high will be *de minimis*. For example, suppose that the estimated sum of interest payments exceeds the actual sum by $500,000 and that the Court awards a 20 percent contingent fee. The fee award would then be off by $100,000. Given the number of properties in the UPTF, which Class Counsel informed me was 27,310,863 in June of 2019, the overpayment per property would be less than a penny ($100,000/27,310,863 = 0.004). An error this trivial can safely be ignored.

## VIII. THE PROPOSED SETTLEMENT ELIMINATES THE TREASURER'S LIABILITY FOR A STATUTORY AWARD OF ATTORNEYS' FEES

55. When plaintiffs sue under 42 U.S.C. § 1983 and prevail, 42 U.S.C. § 1988 entitles them to recover attorneys' fees. Because courts use the lodestar method, not the market-based approach, when sizing statutory fee awards, these awards tend to be smaller than common fund awards. Consequently, a question arises: Can class counsel receive a common fund award that exceeds a statutory award in size? (This question concerns only the (b)(2) class, as the (b)(3) class has no claim for damages under § 1983 and, therefore, no right to a fee award under § 1988.)

[6] Future Claimants will benefit on the same terms as Class Members unless and until the State adopts a less generous interest rate formula. Even then, however, they will still benefit from the litigation because the Treasurer will pay some amount of interest per property.

56. The Seventh Circuit answered this question affirmatively in *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994). *Florin* was an ERISA case the settlement of which created a common fund. Because ERISA contains a fee-shifting provision, the question concerning class counsel's entitlement arose straightforwardly. Quoting *Skelton v. General Motors Corp*., 860 F.2d 250, 257 (7th Cir.1988), *cert. denied,* 493 U.S. 810 (1989), the court ruled that "'when a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorney's fees, equitable fund principles must govern the court's award of the attorney's fees.'" *Florin*, 34 F.3d at 563. The supporting reason was that "an award of fees from the settlement fund comports with the fee-shifting policy of enabling meritorious plaintiffs who would not otherwise be able to afford to bring a lawsuit under ERISA, to pursue their claims." *Id*., at 564.

57. As in *Florin*, no statutory fee is available here because the settlement agreement precludes one. To see why, one must know two things. First, losing parties, including settling defendants, fund statutory awards. Second, the Agreement of Settlement frees the Treasurer from having to spend the State's money. Paragraph 3.2.5 provides that "[a]ny award of attorneys' fees or reimbursement of expenses shall be paid from the Unclaimed Property Trust Fund." Because, as the Court knows, the State owns *none* of the money in the UPTF but merely holds it in trust for the property owners, State funds are no longer at risk and the possibility of shifting costs to Defendant is closed.[7] The settlement thus satisfies *Florin*'s requirement that a settlement release a defendant's liability for both damages and statutory fees.

---

[7] Defendant's Liability Analysis Spreadsheet indicates that the UPTF includes approximately $900 million in assets classified as "unknown/aggregates."

58. Under the settlement, then, a common fund award is the only option. There is nothing unusual about this. Many settlements include fee-waiver provisions, the use of which the Supreme Court approved in *Evans v. Jeff D.*, 475 U.S. 717 (1986). The limitation imposed by ¶ 3.2.5 also makes sense. The object of a common fund award is to spread costs across beneficiaries in proportion to their gains. Charging fees against the Fund will accomplish this.[8]

59. The only real question here, then, is how much Class Counsel should be paid, there being no option other than to charge fees against the common fund. The answer to that question is the market rate, as previously explained.

## IX. THE MARKET RATE FOR LEGAL SERVICES RANGES FROM ONE-THIRD TO 40 PERCENT OF THE RECOVERY

### A. Market Rates Increasingly Dominate the Fee-Setting Process

60. In both scholarly works and expert reports written over decades, I have urged judges to take guidance from the market for legal services when sizing fee awards. As mentioned, more and more judges are embracing the "mimic the market" approach. They increasingly understand "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000). It is hard to do better than "ideal."

61. Although only the Seventh Circuit currently mandates the exclusive use of market rates, federal judges across the country recognize the superiority of this approach and use it often.

---

[8] To understand this point, one must first recognize that when bargaining over terms the Treasurer, like any defendant, cared about the total cost of settling, not the division of the total between the Class and its attorneys—a matter in which the Treasurer has no financial stake. For example, the Treasurer would rationally be indifferent between paying $1 million to the Class and $200,000 to Class Counsel—with both payments coming out of the UPTF—and $1.2 million to the Class from which $200,000 would be withheld to pay Class Counsel's fees. The Treasurer's loss is the same in either event. Under both arrangements, fees are spread across Class Members pro rata too. Either $200,000 in fees is deducted from their payments or their payments are reduced by $200,000 (because the agreed interest rate is lower) and fees come out of the UPTF.

Examples include *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *21 (S.D.N.Y. Dec. 18, 2019); *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Practices Act (FDCPA) Litig.*, No. 2:13-MD-2426-DBH, 2016 WL 543137, at *9 (D. Me. Feb. 10, 2016); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 788 (N.D. Ill. 2015); *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL 6968424, at *6 (D. Mass. Dec. 9, 2014); *In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 842 F. Supp. 2d 346 (D. Me. 2012); *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009), *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011); *In re Cabletron Sys., Inc. Sec. Litig*., 239 F.R.D. 30, 40 (D.N.H. 2006).

62. When awarding fees from the enormous settlement in *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1203 (S.D. Fla. 2006), which exceeded $1 billion, the federal district court judge "conclude[d] that the most appropriate way to establish a benchmark is by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal." Anchoring the fee to the market rate avoids arbitrariness by providing an objective basis for awarding a particular amount and also creates desirable incentives. It also "create[s] incentives for the lawyer to get the most recovery for the class by the most efficient manner (and penalize[s] the lawyer who fails to do so)." *Nilsen v. York Cty*., 400 F. Supp. 2d 266, 277–78 (D. Me. 2005) . See also *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig*., 56 F.3d 295, 307 (1st Cir.1995) (observing that the percentage-of-fund method eliminates incentive to be inefficient, as inefficiency just reduces the lawyer's own recovery); and *Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*,396 F.3d 96, 121 (2d Cir.2005) (the percentage method "directly aligns the interests of the class and its counsel" and provides a powerful incentive for efficiency and early resolution).

63. State court judges see the wisdom of mimicking the market too. For example, in *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 376 P.3d 672 (2016), the Supreme Court of California cited the desirability of approximating the market as a reason for permitting judges to grant percentage-based fee awards from common funds.

> We join the overwhelming majority of federal and state courts in holding that when class action litigation establishes a monetary fund for the benefit of the class members, and the trial court in its equitable powers awards class counsel a fee out of that fund, the court may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created. The recognized advantages of the percentage method—including relative ease of calculation, alignment of incentives between counsel and the class, ***a better approximation of market conditions in a contingency case***, and the encouragement it provides counsel to seek an early settlement and avoid unnecessarily prolonging the litigation … convince us the percentage method is a valuable tool that should not be denied our trial courts.

*Laffitte*, 1 Cal. 5th at 503, 376 P.3d at 686, (emphasis added) (citations omitted).

64. Judges use the market-based approach and methods that approximate market conditions because they appreciate the importance of incentivizing lawyers properly and because they want an objective basis for deciding how much lawyers will be paid. The two considerations–incentives and objectivity–are linked. By taking guidance from the market, judges constrain their discretion and thereby make lawyers' incentives clearer and more reliable.

**B. In Contingent Fee Litigation, Percentage-Based Compensation Predominates**

65. Having established that market rates are "ideal" proxies, it remains to consider how the market compensates plaintiffs' attorneys. In this section and the next, I explain what I know about this issue.

66. I start by noting that when clients hire lawyers to handle lawsuits on straight contingency, the market sets lawyers' compensation as percentages of claimants' recoveries. Even sophisticated business clients with complex, high-dollar legal matters use the percentage approach.

67. Abundant evidence supports this contention. When two co-authors and I studied hundreds of settled securities fraud class actions specifically looking for terms included in fee agreements between lawyers and investors seeking to serve as lead plaintiffs, all the agreements we found provided for contingent percentage fees. *Is the Price Right*, *supra*. No lead plaintiff agreed to pay its lawyers by the hour; nor did any retain counsel on a lodestar-multiplier basis. Contracting practices are the same in antitrust cases, as discussed below.

68. The finding that sophisticated businesses use contingent fee arrangements when hiring lawyers to handle securities class actions was expected. Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated business clients. To the best of my recollection, I have encountered only one in which a lead plaintiff paid class counsel out of pocket; that case is more than 100 years old and was decided before the common fund doctrine was well established. Even wealthy named plaintiffs like prescription drug wholesalers and public pension funds that, in theory, could pay lawyers by the hour have used contingent, percentage-based compensation arrangements instead. Because percentage-based compensation arrangements dominate the market, courts should also use them when awarding fees from common funds.

69. The market also favors fee percentages that are flat or that rise as recoveries increase. Scales with percentages that decline at the margin are rarely employed. Professor John C. Coffee, Jr., the country's leading authority on class actions, made this point in a report filed in the antitrust litigation relating to high fructose corn syrup.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context. However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ECF No. 1421, ¶ 22. My experience is similar to Professor Coffee's. I know of few instances in which large corporations used scales with declining percentages when hiring attorneys.

70. In view of the rarity with which declining scales are used, the "mimic the market" approach suggests that flat percentages and scales with percentages that rise at the margin create better incentives. There is a sound economic rationale for this. Flat percentages and rising scales reward plaintiffs' attorneys for recovering higher dollars that are harder to obtain because they demand a willingness on the part of counsel to proceed ever closer to trial, thereby increasing their costs and exposing them to greater risk of loss. Flat percentages and percentages that increase with the recovery encourage plaintiffs' attorneys to shoulder the costs and risks that must be borne when lawyers encourage clients to turn down inadequate settlements.

### C. Sophisticated Clients Normally Pay Fees of 30 Percent to 40 Percent When Hiring Lawyers to Handle Commercial Lawsuits on Straight Contingency

71. Countless plaintiffs have hired lawyers on contingency to handle cases of diverse types. Consequently, the market for legal services is a rich source of information about lawyers' fees. In this section, I survey this evidence.

72. Before doing so, I wish to note that there is broad agreement that in most types of plaintiff representations contingent fees range from 30 percent to 40 percent of the recovery, and that higher fees prevail in litigation areas like medical malpractice and patents where costs and risks are unusually great. *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); and *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill.

2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery"). The same range is known to prevail in high-dollar, non-class, commercial cases. *See, e.g., Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); and *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017).

73. The point of surveying the evidence, then, is not to establish something new. It is to show that what everyone already knows is correct. The market rate for contingent fee lawyers generally ranges from 30 to 40 percent of clients' recoveries, with 33 percent being especially common.

74. We do not know as much about fees paid in large commercial lawsuits as we might.[9] No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal their fee agreements. Consequently, most of what is known is drawn from anecdotal reports.[10] That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

---

[9] I have studied the costs insurance companies incur when *defending* liability suits. *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AM. L, & ECON, REV. 185 (2008). Unfortunately, this information sheds no light on the amounts that businesses pay when acting as plaintiffs.

[10] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses. For example, when representing Caldera International, Inc. in a dispute with IBM, Boies, Schiller & Flexner LLP billed two-thirds of its lawyers' standard hourly rates and stood to receive a contingent fee equal to 20 percent of the recovery. Letter from David Boies and Stephen N. Zack to Darl McBride dated Feb. 26, 2003, available at https://www.sec.gov/Archives/edgar/data/1102542/000110465903028046/a03-6084_1ex99d1.htm (visited Aug. 23, 2020). According to Wikipedia, the damages sought in the lawsuit initially totaled $1 billion, but were later increased to $3 billion, and then to $5 billion. Wikipedia, *SCO Group, Inc. v. International Business Machines Corp.*, https://en.wikipedia.org/wiki/SCO_Group,_Inc._v._International_Business_Machines_Corp. (visited Aug. 23 , 2020).

1. Sophisticated Named Plaintiffs In Class Actions

75. Sophisticated business clients commonly agree to pay fees of 33 percent or greater when serving as lead plaintiffs in class actions. Here are a few examples.

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal. Expenses were to be reimbursed separately.
- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.
- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed. (The fee was initially set at over 40 percent but was later bargained down to 35 percent.)

76. Similar rates prevail in antitrust class actions in which businesses participate as plaintiffs. For example, I studied and prepared expert reports in a series of pharmaceutical cases bought against manufacturers that engaged in pay-for-delay settlements to patent challenges. The named plaintiffs in these cases were drug wholesalers. All were large companies, and several were of Fortune 500 size or bigger. All also had in-house or outside counsel monitoring the litigations.

The potential damages were enormous. In one case, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million. In the series as a whole, they won more than $2 billion. In most of the cases, these sophisticated businesses supported fees equal to one-third of the recovery. In one case, they endorsed a fee of 30 percent and in another of 27.5 percent.

77. These cases were not exceptional. Professor Brian Fitzpatrick gathered information on an even larger number of pharmaceutical antitrust cases—33 in all—that were resolved between 2003 and 2020. According to his forthcoming article, "the fee requests ranged from a fixed percentage of 27.5% to a fixed percentage of one-third"; "one-third *heavily* dominated" the sample"; and "the average was 32.85%." And "in the vast majority of cases, one or more of these corporate class members—often the biggest class members—came forward to voice affirmative support for the fee request, and not a single one of these corporate class members objected to the fee request in any of the 33 cases." Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORDHAM L. REV. 1151 (March 2021). Professor Fitzpatrick's table of cases appears in Appendix II.

78. In sum, when sophisticated business clients seek to recover money in risky commercial lawsuits involving large stakes, they typically pay contingent fees ranging from 30 percent to 40 percent, with fees of 33 percent or more being promised in most cases. As well, there is little variation in fee percentages across cases of different sizes.

2. Patent Cases

79. Now consider patent infringement cases, another context in which sophisticated business clients often hire law firms on contingency. There are many anecdotal reports of high percentages in this area. The most famous one relates to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry. NTP, the plaintiff,

promised its law firm, Wiley Rein & Fielding ("WRF"), a 33⅓ percent contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees. Yuki Noguchi, D.C. *Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

80.     The fee percentage that WRF received is typical, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALA. L. REV. 335, 360 (2012). In a case like this one that required the lawyers to bear significant litigation and trial preparation hours and expenses with no guarantee of payment or reimbursement, a high fixed percentage would apply.[11]

---

[11] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors. This is strictly a results-based system.

Matthew L. Cutler, *Contingent Fee and Other Alternative Fee Arrangements for Patent Litigation*, HARNESS DICKEY, (JUNE 8, 2020), https://www.hdp.com/blog/2020/06/08/contingent-fee-and-other-alternative-fee-arrangements-for-patent-litigation/.

81. Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn sizeable premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns. Patent plaintiffs have the option of paying lawyers to represent them on an hourly basis, but still prefer a contingency arrangement, even at 30-40 percent, to bearing the risks and costs of litigation themselves.

3. <u>Other Large Commercial Cases</u>

82. Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery. A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E"). ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. V&E took the case on contingency, "meaning that if it won, it would receive one-third of the settlement and, if it lost, it would get nothing." David Maraniss, *Texas Law firm Passes Out $100 Million in Bonuses*, WASHINGTON POST, Aug. 22, 1990, https://www.washingtonpost.com/archive/politics/1990/08/22/texas-law-firm-passes-out-100-million-in-bonuses/8714563b-10b8-4f85-b74a-1e918d030144/. After many years of litigation, a series of settlements and a $1 billion judgment against a remaining defendant yielded a gross recovery of $635 million, of which the firm received around $212 million in fees. Patricia M. Hynes, *Plaintiffs' Class Action Attorneys Earn What They Get*, 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS, 243, 245 (1991). It bears emphasizing that the clients who made up the plaintiffs' consortium, Panhandle Eastern Corp., the Bechtel Group, Enron Corp., and K N

Energy Inc., were sophisticated businesses with access to the best lawyers in the country. No claim of undue influence by V&E can possibly be made.

83.     The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations.   After placing 5 corporate credit unions into liquidation in 2010, NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks.  To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-backed securities, NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis.  The original contract entitled the firms to 25 percent of the recovery, net of expenses.  As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which NCUA had paid $1,214,634,208 in fees.[12]

84.     When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake.  The failed corporate credit unions had sustained $16 billion in losses, and NCUA's objective was to recover as much of that amount as possible.  It also knew that dozens of defendants would be sued and that multiple settlements were possible.  Even so, NCUA agreed to pay a straight contingent percentage fee in the standard market range on all the recoveries.  It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones,

---

[12]The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations:   Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

85. In *In re Merry-Go-Round Enterprises, Inc*., 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young. He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar. The bankruptcy judge granted the request, writing: "[v]iewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." *Id.* at 335.

86. Based on what lawyers who write about fee arrangements in business cases have said, contingent fees of 33⅓ percent or more remain common. In 2011, The Advocate, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine." It included an article on alternative fee arrangements, which reported typical contingent fee rates of 33 percent to 40 percent.

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

87.     In sum, when seeking to recover money in class actions involving large stakes and in commercial lawsuits, sophisticated business clients typically pay contingent fees ranging from 30 percent to 40 percent, with fees of 33 percent or more being promised in most cases.

## X.     FEE AWARDS IN COMPARABLE CASES

88.     In my experience, judges want to know how other courts have handled fees in similar cases.  Being familiar with empirical studies of fee awards, I can confidently report that Class Counsel's request for a fee equal to 20.3 percent of the monetary recovery falls below the range that courts typically award.

### A.     ERISA Cases

89.     When discussing the permissibility of basing a fee award on the estimated present value of a payment stream, I analogized this lawsuit to ERISA cases in which benefits are also often paid in the future.  I therefore begin this discussion by focusing on fee awards in ERISA class actions.

90.     To show that judges have often awarded fees greatly in excess of 20.3 percent, I begin by presenting a table of cases that resolved between 2010 and 2020 with fee awards equal to one-third of the recovery.

| TABLE 1. ERISA CLASS ACTIONS WITH FEE AWARDS EQUAL TO ONE-THIRD OF THE RECOVERY | |
|---|---|
| **CASE** | **FEE %** |
| Cassell v. Vanderbilt Univ., No. 16-2086, Doc. 174 (M.D. Tenn. Oct. 22, 2019) | 33.33 |
| Tussey v. ABB, Inc., No. 06-4305-NKL, Doc. 870 (W.D. Mo. August 16, 2019) | 33.33 |
| Sims v. BB&T Corp., No. 15-1705, 2019 WL 1993519 (M.D. N.C. May 6, 2019) | 33.33 |
| Clark v. Duke, No. 16-1044, 2019 WL 2579201 (M.D. N.C. June 24, 2019) | 33.33 |
| Ramsey v. Philips N.A., No. 18-1099, Doc. 27 (S.D. Ill. Oct. 15, 2018) | 33.33 |
| In re Northrop Grumman Corp. ERISA Litig., No. 06-6213, 2017 WL 9614818 (C.D. Cal. Oct. 24, 2017) | 33.33 |
| Gordan v. Mass. Mut. Life Ins. Co., No. 13-30184, 2016 WL 11272044 (D. Mass. Nov. 3, 2016) | 33.33 |
| Kruger v. Novant Health, Inc., No. 14-208, 2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) | 33.33 |
| Spano v. Boeing Co., No. 06-743, 2016 WL 3791123 (S.D. Ill. Mar. 31, 2016) | 33.33 |
| Abbott v Lockheed Martin Corp., No. 06-701, 2015 WL 4398475 (S.D. Ill. July 17, 2015) | 33.33 |
| Krueger v. Ameriprise Fin., Inc., No. 11-2781, 2015 WL 4246879 (D. Minn. July 13, 2015) | 33.33 |
| Beesley v. Int'l Paper Co., No. 06-703, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) | 33.33 |
| Nolte v. Cigna Corp., No. 07-2046, 2013 WL 12242015 (C.D. Ill. Oct. 15, 2013) | 33.33 |
| George v. Kraft Foods Global, Inc., Nos. 08-3899, 07-1713, 2012 WL 13089487 (N.D. Ill. June 26, 2012) | 33.33 |
| Will v. Gen. Dynamics Corp., No. 06-698, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) | 33.33 |
| Martin v. Caterpillar Inc., No. 07-1009, 2010 WL 11614985 (C.D. Ill. Sept. 10, 2010) | 33.33 |

91.     Although their datasets tend to contain few ERISA cases, empirical studies of class actions also support the conclusion that fee awards in excess of the one sought here are common. The table below is reproduced from a study of class actions that settled from 2009 to 2013. As the highlighted line shows, the mean and median fee awards were both 26 percent of the recovery.

TABLE 4. FEE AND CLASS RECOVERIES, BY CASE CATEGORY, 2009–2013

| Case Category | N | Recoveries: Mean (millions of dollars) | Recoveries: Median (millions of dollars) | Fees: Mean (millions of dollars) | Fees: Median (millions of dollars) | Fee Percentages: Mean (%) | Fee Percentages: Median (%) |
|---|---|---|---|---|---|---|---|
| Antitrust | 19 | 501.09 | 37.3 | 64.1 | 10.25 | 27 | 30 |
| Civil Rights | 21 | 6.51 | 3 | 1.66 | 0.91 | 28 | 30 |
| Consumer | 52 | 18.8 | 8.75 | 4.81 | 2.21 | 26 | 25 |
| Corporate | 9 | 19.47 | 16 | 5.01 | 2.2 | 27 | 29 |
| Derivative | 6 | 18.68 | 2.88 | 5.61 | 0.77 | 29 | 31 |
| Employment | 25 | 5.6 | 0.67 | 1.63 | 0.17 | 28 | 30 |
| ERISA | 22 | 25.75 | 6.6 | 4.92 | 1.75 | 26 | 26 |
| FCRA | 4 | 1.34 | 1.41 | 0.34 | 0.36 | 29 | 29 |
| FDCPA | 2 | 0.41 | 0.41 | 0.1 | 0.1 | 26 | 26 |
| FLSA | 108 | 4.15 | 1.03 | 1.19 | 0.3 | 30 | 33 |
| Health Care | 5 | 72.08 | 4 | 14.64 | 1.21 | 28 | 30 |
| Labor | 23 | 9.44 | 1 | 2.17 | 0.33 | 29 | 30 |
| Mass Tort | 13 | 23.34 | 4.2 | 5.5 | 1.11 | 27 | 28 |
| Other | 60 | 13.27 | 4.14 | 3.11 | 1.04 | 25 | 25 |
| Products Liability | 10 | 24.99 | 16.2 | 7.47 | 4.56 | 28 | 30 |
| Securities | 74 | 106.45 | 22.25 | 18.75 | 5.16 | 23 | 25 |
| TILA | 2 | 168.4 | 168.4 | 25.75 | 25.75 | 23 | 23 |
| Unknown | 3 | 0.86 | 1 | 0.22 | 0.18 | 27 | 30 |

Source: Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N. Y.U. L. REV. 937 (2017).

92. The table below is from an exhaustive study of federal class actions that settled 2006-2007. It reports similar mean and median fee percentages for ERISA cases.

Table 8: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | *Percentage of Settlement Awarded as Fees* | |
|---|---|---|
| *Subject Matter* | *Mean* | *Median* |
| Securities ($n = 233$) | 24.7 | 25.0 |
| Labor and employment ($n = 61$) | 28.0 | 29.0 |
| Consumer ($n = 39$) | 23.5 | 24.6 |
| Employee benefits ($n = 37$) | 26.0 | 28.0 |
| Civil rights ($n = 20$) | 29.0 | 30.3 |
| Debt collection ($n = 5$) | 24.2 | 25.0 |
| Antitrust ($n = 23$) | 25.4 | 25.0 |
| Commercial ($n = 7$) | 23.3 | 25.0 |
| Other ($n = 19$) | 24.9 | 26.0 |
| All ($N = 444$) | 25.7 | 25.0 |

Source: Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 820 (2010).

93. The preceding figures also show that, in percentage terms, fee awards in ERISA cases are on par with those made in class actions of other types. Taking this as true, one can infer that awards equal to or below 20.3 percent are exceedingly uncommon.

94. The figure below shows that distribution of awards by size of fee percentage Professor Brian Fitzpatrick's study of federal class actions. As is visually apparent, the awards cluster in the 25 percent to 35 percent range. Cases with awards of 15 percent or less are

uncommon. Because fee percentages are often smaller in cases with enormous recoveries, mega-fund settlements likely dominate this group.

*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.

Source: Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 820 (2010).

**B. Cases with Comparable Recoveries**

95. When one switches from subject matter to recovery size, the datasets become larger and the finding that awards rarely fall at or below 20.3 percent becomes more robust. The figure below, which reports results for antitrust class actions, comes from the 2018 Antitrust Annual Report. Only when recoveries exceed $1 billion does the median fee award become comparable to the percentage sought here. At all lower recovery levels, median awards are considerably higher.



Source: 2018 ANTITRUST ANNUAL REPORT, p.13, Fig. 12.

96. The same pattern of fee percentages is found in securities class actions. The figure below appears in the 2020 edition of an annual report on class actions of this type produced by NERA Economic Consulting. The relevant finding is that, for class actions with recoveries ranging from 25 million to $100 million, the median fee award was 25 percent during the 2011-2020 period.



Source: Janeen McIntosh and Svetlana Starykh, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2020 FULL-YEAR REVIEW (NERA 2021).

97.     I know of no dataset that surveys fee awards in unclaimed property cases. But the many studies I have reviewed all report that fee awards commonly exceed 20.4 percent in cases of other types with similarly sized recoveries. I therefore infer that, by comparison to awards made in other cases, Class Counsel's request for 20.3 percent of the recovery is reasonable.

## XI.     NO LODESTAR CROSS-CHECK IS ADVISABLE OR REQUIRED

98.     Courts in other circuits sometimes sneak the lodestar method in the back door by "crosschecking" the fee percentage they are inclined to award against class counsel's lodestar. See Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 820, 833 (2010) (finding that 49 percent of courts consider the lodestar when awarding fees with the percentage method); Theodore Eisenberg, Geoffrey Miller, and Roy

Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 945 (2017) (finding that courts used the percentage method with a lodestar crosscheck in 38 percent of the cases and used the percentage method alone in 54 percent of them).

99. The additional effort that lodestar cross-checks entail may not be worth the bother, however. Studying securities class actions, two coauthors and I found that "cross-checked fee awards [did] not differ statistically from those based on the percentage method alone." Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371, 1417 (2015).

100. By applying cross-checks, judges also depart from the Seventh Circuit's mandate to mimic the market. To my knowledge, sophisticated clients *never* use the lodestar method—as the primary fee formula or a cross-check—when they hire lawyers on contingency. They use the percentage method alone. Consequently, courts wanting to mimic the market should do so too.

101. The Seventh Circuit upheld reliance on the percentage method in *Williams*. After repeating the point it made years ago that "'[p]rivate parties would never contract for [] an arrangement [like the lodestar method with a capped multiplier], because it would eliminate counsel's incentive to press for" a higher settlement, the court upheld the district judge's finding "that a pure percentage fee approach best replicated the market for ERISA class action attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d at 636 (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)). The district court judge considered the lawyers' time and rates but gave their lodestar minimal weight.

102. In *Synthroid*, the Seventh Circuit identified one of the lodestar method's perverse incentives: it can discourage lawyers from holding out for higher recoveries. It also causes settlement delays, as lawyers engage in make-work so as to increase their hours, and encourages

fraud, as lawyers report more hours than they actually expended. Both effects make judges' jobs harder. The contingent percentage method lends credibility to a lawyer's opinion that a settlement is reasonable because it encourages attorneys to maximize the value of class members' claims. The lodestar method has the opposite effect. Consequently, judges must examine settlements more closely to fulfill their responsibilities under Federal Rule of Civil Procedure 23(e), which permits them to approve only settlements that are reasonable. The lodestar method also turns judges into bill auditors because lawyers statements may be unreliable. In my opinion, judges have more valuable things to do with their time than review lawyers' bill.

103.     I could opine about the lodestar's shortcomings at greater length, but I hope the point has already been made. It is an inferior compensation arrangement. That is why clients never use it. The market's verdict is clear.

## XII.     COMPENSATION

104.     I have been compensated for the time I spent preparing this report.

## XIII.     CONCLUSION

105.     Class Counsel's request for a fee award in the amount of $9.5 million, which equals 20.3 percent of the conservative estimate of the value of the recovery, is reasonable because it is below the market rate and compares favorably to awards in other cases.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 17th day of September 2021, at Austin, Texas.

CHARLES SILVER