Jacob K. Danziger (SBN 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Arat (SBN 349086)
Tamarra Matthews Johnson (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
carat@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF FINAL SETTLEMENT APPROVAL**<br><br>Hon. Claudia Wilken<br>Hearing Date: April 7, 2025<br>Hearing Time: 10:00 AM<br>Location: Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................1

    I.   The Settlement's Pool Structure Is Fair, Reasonable, And Will Yield Significant Benefits To The Class ..........................................................................2

    II.  The Settlement's Roster Limits Are Fair And Reasonable.................................8

    III. Objections To How The Settlement Compensates "Walk-On" Student-Athletes Are Meritless................................................................................................13

CONCLUSION ............................................................................................................16

**DEFENDANTS' BRIEF ISO**
**FINAL SETTLEMENT APPROVAL**

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
No. 1:11-CV-0293, 2011 WL 3878200 (S.D. Ind. Sep. 1, 2011) .................................... 16

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ..................... 16

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) .................................................. 4

*Associated General Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ..................................................... 15

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984) ...................... 7

*Charron v. Wiener*,
731 F.3d 241 (2d Cir. 2013) ....................... 14

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ................................. 8

*Hamidi v. Serv. Emps. Int'l Union Loc. 1000*,
No. 2:14-CV-319, 2015 WL 2455600 (E.D. Cal. May 22, 2015) .................................... 12

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ................................... 2

*Holmes v. Continental Can Co.*,
706 F.2d 1144 (11th Cir. 1983) ....................... 14

*Howell v. Advantage RN, LLC*,
No. 17-CV-0883, 2018 WL 3437123 (S.D. Cal. July 17, 2018) ..................... 12

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 2:13-CV-20000-RDP, 2022 WL 4587618 (N.D. Ala. Aug. 9, 2022) ......................... 7

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*,
85 F.4th 1070 (11th Cir. 2023) ............................. 7

*In re California Pizza Kitchen Data Breach Litig.*,
No. 23-55288, 2025 WL 583419 (9th Cir. Feb. 24, 2025) ................................. 1

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
33 F.3d 29 (9th Cir. 1994) .................................. 9

-ii-

DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL

**Cases (cont.)**

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.,*
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) .................................................................. 3

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.,*
    958 F.3d 1239 (9th Cir. 2020) ................................................................................ 3

*In re NCAA I-A Walk-On Football Players Litig.,*
    No. C04–1254C, 2006 WL 1207915 (W.D. Wash May 3, 2006) ................................... 16

*In re Omnivision Techs., Inc.,*
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................. 14

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.,*
    895 F.3d 597 (9th Cir. 2018) ........................................................................... 14, 15

*Kincade v. General Tire & Rubber Co.,*
    635 F.2d 501 (5th Cir. 1981) ................................................................................ 14

*Laumann v. Nat'l Hockey League,*
    105 F. Supp. 3d 384 (S.D.N.Y. 2015) .................................................................... 12

*Matamoros v. Starbucks Corp.,*
    699 F.3d 129 (1st Cir. 2012) ................................................................................ 12

*Nat'l Basketball Ass'n v. Williams,*
    857 F. Supp. 1069 (S.D.N.Y. 1994) ...................................................................... 4, 5

*Nat'l Basketball Ass'n v. Williams,*
    45 F.3d 684 (2d Cir. 1995) ................................................................................... 4

*Nat'l Collegiate Athletic Ass'n v. Alston,*
    594 U.S. 69 (2021) ........................................................................................ 3, 4, 6

*Nunez v. BAE Sys. San Diego Ship Repair Inc.,*
    292 F. Supp. 3d 1018 (S.D. Cal. 2017) .................................................................. 14

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,*
    802 F.3d 1049 (9th Cir. 2015) ............................................................................ 3, 6

*Probe v. State Tchrs.' Ret. Sys.,*
    780 F.2d 776 (9th Cir. 1986) ................................................................................ 12

*Robertson v. Nat'l Basketball Ass'n,*
    556 F.2d 682 (2d Cir. 1977) .................................................................................. 7

*Rock v. Nat'l Collegiate Athletic Ass'n,*
    No. 1:12-CV-01019, 2016 WL 1270087 (S.D. Ind. Mar. 31, 2016) ................................ 16

**Cases (cont.)**

*San Francisco NAACP v. San Francisco Unified School Dist.*,
     59 F. Supp. 2d 1021 (N.D. Cal. 1999) ................................................................. 9

*White v. Nat'l Football League*,
     822 F. Supp. 1389 (D. Minn. 1993)........................................................ 4, 5, 13

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... 1, 7

**Other Authorities**

1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:64 (6th ed. 2024)...... 12

4 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 13:56 (6th ed. 2024).... 14

DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL

**INTRODUCTION**

The fact that less than *0.1%* of the approximately 389,700 potential class members have objected confirms that the settlement is fair and reasonable. *See In re California Pizza Kitchen Data Breach Litig.*, No. 23-55288, 2025 WL 583419, at *4–5 (9th Cir. Feb. 24, 2025). And none of the objections raised provides cause for the Court to depart from its prior finding preliminarily approving the settlement as fair, reasonable, and adequate under Rule 23(e)(2). The settlement will end decades of hard-fought litigation over the validity of the NCAA's rules regarding benefits to student-athletes. The benefits that would be permissible under the settlement massively outpace the much narrower forms of relief that past student-athlete classes obtained after lengthy and costly lawsuits. Indeed, Defendants' member institutions have widely embraced the ability to provide new and different types of benefits to student-athletes (while protecting existing scholarships) if the settlement is approved. And the issues raised by the objectors provide no basis for thinking that a return to litigation would be better for anyone besides perhaps the objectors' attorneys.

Defendants continue to support approval of the proposed settlement as submitted to and preliminarily approved by the Court, and submit this brief to respond to three discrete sets of objections to the Injunctive Settlement: (1) complaints about the Pool structure, which allows schools to provide benefits to student-athletes that vastly exceed both the status quo and the results of prior litigation; (2) challenges to the implementation of roster limits under the settlement that serve to *increase* the number of student-athletes eligible to receive scholarships; and (3) objections to the decision by Plaintiffs' counsel to not allocate so-called "BNIL" damages to non-scholarship football and basketball student-athletes. All of these objections rehash arguments the Court already considered and rejected at the preliminary approval stage. And none provides a basis for derailing this unprecedented settlement and denying its benefits to hundreds of thousands of current and future student-athletes.

**ARGUMENT**

One overarching point bears emphasis at the outset. The question before the Court is *not* whether the settlement is the best possible outcome for every single class member or whether different attorneys claim they could have achieved a better result. Instead, the question is whether

the agreement—as a whole—is "fair, reasonable or adequate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). In evaluating that question, the Court can consider not only the substantial benefits permitted by the settlement, but also the risks the class members would face in continued litigation, the delays inherent in litigation (even if successful), and the course (and results) of prior similar litigation in this Court and others. Applying those standards, the case for final approval is clear.

## I.   THE SETTLEMENT'S POOL STRUCTURE IS FAIR, REASONABLE, AND WILL YIELD SIGNIFICANT BENEFITS TO THE CLASS

The settlement structure is estimated to allow Division I schools to devote up to approximately 50% of athletic revenues to student-athletes, who will then receive a similar share of revenues as professional athletes in various leagues. Pls.' Mot. for Prelim. Settlement Approval, ECF No. 450 at 21–22; Decl. of Daniel A. Rascher, ECF No. 450-4 at 37–38; Pls.' Supp. Br. in Supp. of Mot. for Prelim. Settlement Approval, ECF No. 534 at 1–2. The settlement adds to the status quo the opportunity to provide an additional 22% of a defined set of revenues that is guaranteed to increase on a yearly basis, and can increase even further at defined intervals during the 10-year settlement term. Am. Stipulation & Settlement Agreement, ECF No. 535-1 at 62. This structure will not only open the door to an unprecedented amount of *new* benefits to student-athletes, but also allow schools to continue to provide significant benefits to a *broad population* of student-athletes.

The objections to this new structure essentially take three forms: to the Pool structure as an unlawful "cap," to the absence of a mandatory "floor" for institutional spending, and to the fact that some rules will persist if the settlement goes into effect. These objections were raised before the Court granted preliminary approval. *See, e.g.*, ECF Nos. 473, 475, 485, 539. As before, they fundamentally misunderstand the inquiry before the Court and the lengthy litigation history that preceded the settlement. None provides a legitimate basis for denying final approval.

***The Settlement's Pool Structure Is Reasonable And Will Yield Unprecedented Benefits And Compensation For A Broad Array Of Student-Athletes.*** The settlement's Pool structure is not just a valid component of a fair, reasonable, and adequate resolution of the claims covered by

the settlement, but also defensible under antitrust law. In the context of college sports, limitations on benefits are evaluated under the rule of reason. *See, e.g.*, Order Granting Mot. For Certification of Damages Classes, ECF No. 387 at 13 ("Where, as here, a claim under Section 1 arises out of the alleged anticompetitive effect of NCAA rules, the determination of whether there has been a Section 1 violation *is based on the application of the rule of reason . . . .*" (emphasis added)); *see also Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96–97 (2021); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1058, 1064 (9th Cir. 2015). Applying that standard, courts have time and again concluded that certain limits on student-athlete benefits are reasonable and appropriate.

In *O'Bannon*, for example, the Ninth Circuit modified the NCAA's rules limiting NIL compensation to allow student-athletes to receive full cost-of-attendance scholarships, but it did not require anything further. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1079 (9th Cir. 2015). And in *Alston*, this Court held that:

> [T]he NCAA may continue to limit the grant-in-aid at not less than the cost of attendance, and to limit compensation and benefits that are unrelated to education provided on top of a grant-in-aid. The NCAA may also limit academic or graduation awards or incentives, provided in cash or cash-equivalent, as long as the limit imposed by the NCAA is not less than the athletics participation awards limit.

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1109 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

Had litigation proceeded in this case, as in those cases, Defendants would have presented evidence and expert testimony that caps (and/or other limitations on benefits) are necessary both for competitive balance and to ensure the greatest output of student athletic opportunity. *See, e.g.*, Expert Report of Gautam Gowrisankaran, ECF No. 415-6 (expert testimony offered in this case regarding procompetitive justifications for existing restrictions on direct compensation of student-athletes). Those procompetitive justifications apply equally to the Pool structure. Courts have long recognized that compensation caps come with "pro-competitive effects," including "the maintenance of competitive balance" between teams, that can "outweigh their restrictive

consequences." *Nat'l Basketball Ass'n v. Williams*, 857 F. Supp. 1069, 1079 (S.D.N.Y. 1994) (upholding "Salary Cap" designed "to distribute 53 per cent defined gross revenue to the Players"), *aff'd*, 45 F.3d 684 (2d Cir. 1995); *see also, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 204 (2010) (emphasizing "that the interest in maintaining a competitive balance among athletic teams is legitimate and important" (cleaned up)); *Alston*, 594 U.S. at 111 (Kavanaugh, J., concurring) (recognizing that "paying student athletes" might "require[] something like a salary cap . . . to preserve competitive balance").

Another key procompetitive justification—that some limits on compensation ensure greater output of student-athlete opportunities in collegiate sports—is also particularly salient. As Plaintiffs have explained:

> The merits defenses advanced by Defendants and their economic experts with respect to the NIL claims—including that NCAA institutions do not have monopsony power when it comes to compensation of student-athletes for their NIL and that any such restrictions are justified in order for institutions to produce greater output of student-athlete opportunities and collegiate sports—would arguably be stronger in the pay-for-play context, given this Court's and the Supreme Court's recognition of potential procompetitive benefits to restrictions on pay-for-performance.

Pls.' Mot. for Prelim. Settlement Approval, ECF No. 450 at 20. For these reasons, a structure that provides unprecedented benefits to student-athletes is reasonable, despite not allowing for unlimited compensation.

Indeed, the only meaningful difference between the forms of relief ordered in *O'Bannon* and *Alston*, on the one hand, and this settlement on the other, is the vast scope of benefits permitted by the settlement without the need for further years of litigation. As explained in the next section, that further supports the legitimacy of the Pool structure, rather than rendering it impermissible.

***The Settlement Will Open The Door To Approximately 50% Revenue Sharing—An Outcome Equivalent To A Competitive Market.*** The value of existing benefits to Division I athletes and the 22% Pool, combined, is estimated to amount to approximately 50% of Division I athletic revenues. Pls.' Mot. for Prelim. Settlement Approval, ECF No. 450 at 21–22; Decl. of Daniel A. Rascher, ECF No. 450-4 at 38. That amounts to a level of revenue sharing that is on par with a number of professional sports leagues—proof that the settlement is a fair, reasonable, and

-4-

1    adequate outcome for the class. *See, e.g.*, *White v. Nat'l Football League*, 822 F. Supp. 1389,

2    1413–14 (D. Minn. 1993); *Williams*, 857 F. Supp. at 1079.

3            Challenges to the revenue categories included in these calculations are misguided. *See, e.g.*,

4    ECF No. 539 at 11. The categories of revenue counted for purposes of revenue sharing are

5    comprehensive, and include all consistent revenues (of any magnitude): ticket sales, guarantees,

6    media rights, NCAA distributions, conference distributions, royalties, licensing, advertising,

7    sponsorships, and football bowl revenues. Am. Stipulation & Settlement Agreement, ECF No.

8    535-1 at 61, 101–05. Moreover, the selection of these categories resulted from arms-length,

9    extensive negotiations between counsel, Pls.' Mot. for Prelim. Settlement Approval, ECF No. 450

10    at 16, who are experienced in collective bargaining with professional sports leagues and in

11    successfully litigating antitrust suits against the NCAA. Objectors present no compelling reason

12    that other, variable revenue categories should be counted, or any reason to think they would have

13    achieved a better outcome through litigation. And in any event, even if the cap were

14    underinclusive—which it plainly is not—the settlement would still fall within a range of

15    reasonable outcomes meriting approval. *See* Defs.' Reply in Supp. of Mot. for Prelim. Settlement

16    Approval, ECF No. 495 at 12–13.

17            Equally misguided is the claim that the Pool structure is illegitimate outside the context of

18    collective bargaining. While the outcomes of this settlement are reasonable in comparison to the

19    products of collective bargaining in professional sports leagues, Defendants do not claim that the

20    non-statutory labor exemption applies in this context and it need not apply for this settlement to

21    be approved. Again, this is a rule of reason case, and as explained above, this settlement will yield

22    *greater* benefits to a *greater* number of student-athletes than could be reasonably anticipated

23    through litigation. It also bears noting that student-athletes will receive these benefits without

24    having to endure the time-intensive process of joining together in a players' union and bargaining.

25    In addition, nobody holding up collective bargaining as a solution has explained how it would

26    work—such as who the putative bargaining units would represent (all football players? Football

27    players in a conference? Or in a school? Or all athletes in a conference, or in a school?); how

28    student-athletes from both private and public institutions across state lines could negotiate together

-5-

1  under applicable laws; or who would be negotiating on the other side. Moreover, such a structure

2  could easily create more winners and losers depending on how these issues would be resolved,

3  among many others. The bottom line is that the settlement should be evaluated based on real-world

4  facts, not undertheorized conjecture. Against that backdrop, it represents a fair, reasonable, and

5  adequate outcome for the settlement classes.

6      ***Antitrust Lawsuits Never Result In Mandatory Spending.*** The various objections that

7  there should be some minimum level of benefits guaranteed to student-athletes are also without

8  merit. The notion that member institutions should be required to devote a minimum amount of

9  revenue to student-athlete benefits runs counter to the idea of a competitive market, in which

10 schools would make such decisions based on budgetary concerns and other interests that might

11 change year-over-year.

12     Indeed, the notion of a spending floor in this context is contrary to the purpose of the

13 antitrust laws, which are about remedying anticompetitive conduct, not compelling entities to

14 undertake an action that may not be in their economic interest in a market unrestrained by

15 anticompetitive conduct.[1] It is for this reason that past cases have given schools latitude to

16 determine what distributions to make to student-athletes. *See, e.g.*, *O'Bannon*, 802 F.3d at 1079

17 ("The Rule of Reason requires that the NCAA permit its schools to provide *up to* the cost of

18 attendance to their student athletes. It does not require more." (emphasis added)); *Alston*, 594 U.S.

19 at 107 ("*By permitting* colleges and universities to offer enhanced education-related benefits, its

20 decision may encourage scholastic achievement and allow student-athletes a measure of

21 compensation more consistent with the value they bring to their schools." (emphasis added)).

22     Further, there is no reason to believe that many institutions would pay 0% under the Pool

23 structure. The evidence and history from *O'Bannon* and *Alston* suggest that many schools,

24 particularly those of the Defendant conferences, are likely to provide substantial new benefits to

25 student-athletes. *See, e.g.*, Compl. *Hubbard v. NCAA*, No. 5:23-cv-01593-BLF (N.D. Cal. April 4,

26 2023), ECF No. 1 ¶ 4 ("The injunction [in *Alston*] did not *require* schools to pay Academic

27

28      [1] Defendants are not aware of any instance where a spending floor was imposed as part of a judgment or settlement in an antitrust case.

Achievement Awards, but with the anticompetitive prohibition removed [up to payments of $5,980], competition for the services of Division I athletes led colleges to do so."). And the widespread embrace of the settlement structure by schools throughout Division I over the last several months confirms as much. The underlying concerns of the objectors advocating for a compensation floor are thus overblown, if not illusory.

*A Settlement Need Not Change All Aspects Of The Status Quo.* Last, objections that the settlement does not represent a total victory for the Plaintiff classes, or that the settlement perpetuates some of the challenged conduct, badly miss the mark. It is far from clear that litigation would result in a complete elimination of all restrictions. In any event, achieving less than 100% of what a plaintiff sets out to obtain—and leaving in place some of the conduct challenged in litigation—is the essence of nearly every negotiated settlement. It is simply not a bar to approval if the settlement is fair and reasonable. *See Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984) ("[U]nless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar to approval." (citation omitted)); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (approving an antitrust settlement over the objection that "it perpetuates for ten years two 'classic group boycotts' in violation of Section 1 of the Sherman Antitrust Act" because "the alleged illegality of the settlement agreement is not a legal certainty." (citations omitted)); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2022 WL 4587618, at *23 (N.D. Ala. Aug. 9, 2022), (approving settlement on the basis that "the arrangement that will exist upon implementation of the Settlement is not clearly illegal"), *aff'd sub nom.*, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070 (11th Cir. 2023). Limits have been implemented in other antitrust cases regarding NCAA rules, so implementing a significantly higher limit—beyond what has ever before been achieved in litigation—is a permissible, fair, and reasonable outcome well within the bounds of the antitrust laws and Rule 23.

## II.    THE SETTLEMENT'S ROSTER LIMITS ARE FAIR AND REASONABLE

The settlement provides that all limits to NCAA Division I athletic scholarships will be eliminated, in favor of roster limits. Am. Stipulation & Settlement Agreement, ECF No. 535-1 at 71 (Appx. A, Art. 4, § 1). Those initial roster limits, outlined in Appendix B to the Amended Stipulation and Settlement Agreement, will come into effect during the first academic year following final approval of the Agreement, and will apply to NCAA member institutions that choose to provide or facilitate payments or benefits to student-athletes under the settlement. In every instance, the roster limits are equal to or greater than the existing scholarship limits, which means that the implementation of the roster limits, combined with the elimination of scholarship limits, would open the door for *more* student-athletes to receive scholarships than ever before. As Plaintiffs pointed out at the preliminary approval stage: "[t]he settlement also eliminates the NCAA's prior scholarship limits and replaces them with roster limits for all sports that are higher than the previous scholarship caps. *These developments, standing alone, are massive wins for the Settlement Classes.*" Pls.' Supp. Br. in Supp. of Mot. for Prelim. Settlement Approval, ECF No. 534 at 8 (emphasis added).

The objections to roster limits primarily rest on the premise that their implementation will take opportunities away from current student-athletes, or current high school students who will be attending college next year. As an initial matter, these objections were raised and considered by the Court prior to its decision to grant preliminary approval. *See, e.g.*, ECF No. 475 at 16; Revised Order Granting Pls.' Mot. for Preliminary Settlement Approval, ECF No. 544. The low volume of new objections further disqualifies it as a basis for denying approval. Out of the approximately 389,700 potential class members, *fewer than 300* have raised objections regarding roster limits. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval with similarly minuscule portion of objectors).[2]

---

[2] Moreover, many objections were actually submitted not by student-athletes, but by parents, ECF Nos. 574, 575, 604, 606, 607, 610, 611, 620, 667, 696, 700, 701, 707; associations, ECF Nos. 547, 674, 677, 691, 699, 704; or other attorneys or individuals, ECF Nos. 603, 701, 703, 705. These individuals and entities lack the legal standing to object to the proposed settlement; their objections therefore should be given minimal, if any, consideration. *See* Order Denying Mot. for Intervention, ECF No. 446 at 7 (denying motion to intervene and refusing to consider

-8-

DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL

The objection also fails on the merits because it rests on a pair of false premises. The first is the suggestion that the imposition of roster limits will cause student-athletes to lose "guaranteed" roster spots, preventing them from participating in their chosen sport. *See, e.g.*, ECF Nos. 575, 579, 592. But non-scholarship student-athletes *have never been guaranteed roster spots*. The current NCAA rules on this matter—which have never been challenged in litigation, including by any of the attorneys now raising concerns about roster limits—allow schools to cut non-scholarship student-athletes from their rosters at any point in time. Question and Answer: Impact of the Proposed Settlement on Current Division I Student-Athletes (Dec. 13, 2024), ECF No. 581-1 at 1. The settlement thus does not eliminate "guaranteed" roster spots or anything like them, or take away any rights to which non-scholarship student-athletes are currently entitled.

By contrast, the settlement contains features that explicitly prevent any harm to scholarship athletes. Changes to NCAA Division I or conference roster limit rules will not cause current student-athletes to lose their scholarships, nor will the roster limit changes reduce the number of permissible athletic scholarships under current NCAA Division I rules in any sport. Am. Stipulation & Settlement Agreement, ECF No. 535-1 at 19 (Appx. A, Art. 4). This provision makes it unnecessary to phase in roster limits, as some have suggested.[3] Scholarships are protected, and the roster limits will not cause anyone to lose anything to which they are currently otherwise entitled.

The second false premise is that the roster limits will materially reduce opportunities for student-athletes to compete. While some schools may ultimately carry smaller overall rosters for certain sports, it is important to note that the proposed roster limits will not meaningfully reduce the number of players that *actually compete* in any given sport. As shown below, the proposed roster limits for each sport are generally (often much) higher than the number of student-athletes

---

arguments opposing settlement "because HCU, as a non-class member, lacks standing to object"); *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994) (holding that only "an aggrieved class member" has standing to object to a proposed class settlement); *see also San Francisco NAACP v. San Francisco Unified School Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) (noting that "nonclass members have no standing to object to the settlement of a class action." (citation omitted)).

[3] *See, e.g.*, ECF Nos. 573, 575.

DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL

that actually competed in that sport in the Defendant Conferences during the 2022-2023 and 2023-2024 academic years, and in all instances are higher than the existing scholarship limits. This was by design in setting the initial roster limits.

**Fig. 1: Average Number Of Student-Athletes That Compete In College Sports[4]**

| Sport | Average No. of Participants 2022-2023 | Average No. of Participants 2023-2024 | Proposed Roster Limit[5] | Existing Scholarship Limit[6] |
|---|---|---|---|---|
| Football | 85.2 | 80.2 | 105 | 85 |
| Men's Basketball | 14.3 | 14.3 | 15 | 13 |
| Women's Basketball | 12.5 | 12.2 | 15 | 15 |
| Men's Baseball | 33.0 | 34.5 | 34 | 11.7 |
| Men's Cross Country | 13.3 | 13.3 | 17 | 12.6[7] |
| Men's Fencing | 25.0 | 27.5 | 24 | 4.5 |
| Men's Golf | 9.3 | 9.4 | 9 | 4.5 |
| Men's Gymnastics | 18.0 | 19.4 | 20 | 6.3 |
| Men's Ice Hockey | 26.7 | 25.3 | 26 | 18 |
| Men's Indoor Track & Field | 35.9 | 35.5 | 45 | 12.6 |
| Men's Lacrosse | 41.2 | 42.7 | 48 | 12.6 |
| Men's Outdoor Track & Field | 36.4 | 35.6 | 45 | 12.6 |
| Men's Soccer | 24.6 | 23.6 | 28 | 9.9 |
| Men's Swimming & Diving | 30.2 | 30.5 | 30 | 9.9 |
| Men's Tennis | 9.8 | 9.9 | 10 | 4.5 |
| Men's Volleyball | 17.5 | 15.3 | 18 | 4.5 |
| Men's Water Polo | 23.0 | 26.0 | 24 | 4.5 |

---

[4] This chart reflects participation in each of the listed sports across the five Defendant Conferences, measured by actual appearance in at least one contest during that sport's season and approximately weighted by number of current member schools in each conference. Some sports were not offered by every conference or by every school in a conference. Further, where participation data varied in how it was reported and/or was unavailable for certain conferences in certain sports for certain seasons, those figures were excluded for purposes of calculating weighted participation averages.

[5] Am. Stipulation & Settlement Agreement, ECF No. 535-1 at 130 (Appendix B, Art. I).

[6] NCAA, *Division I 2024-25 Manual* (2024), https://perma.cc/UL5J-2RVE.

[7] The 12.6 equivalency scholarships limit applies collectively to Men's Cross Country, Men's Outdoor Track & Field, and Men's Indoor Track & Field. *Id*. at 188 (Bylaw 15.5.3.1.1).

-10-

| | | | | |
|---|---|---|---|---|
| Men's Wrestling | 25.6 | 26.8 | 30 | 9.9 |
| Women's Acrobatics and Tumbling | 30.0 | 29.0 | 55 | 14 |
| Women's Beach Volleyball | 15.0 | 14.8 | 19 | 6 |
| Women's Bowling | 8.0 | 9.0 | 11 | 5 |
| Women's Cross Country | 15.6 | 15.2 | 17 | 18[8] |
| Women's Equestrian | 28.0 | 31.3 | 50 | 15 |
| Women's Fencing | 22.7 | 23.0 | 24 | 5 |
| Women's Field Hockey | 21.4 | 22.0 | 27 | 12 |
| Women's Golf | 7.9 | 7.8 | 9 | 6 |
| Women's Gymnastics | 14.6 | 14.8 | 20 | 12 |
| Women's Ice Hockey | 24.3 | 22.8 | 26 | 18 |
| Women's Indoor Track & Field | 36.8 | 35.8 | 45 | 18 |
| Women's Outdoor Track & Field | 38.3 | 37.8 | 45 | 18 |
| Women's Lacrosse | 31.0 | 27.9 | 38 | 12 |
| Women's Rowing | 61.2 | 53.2 | 68 | 20 |
| Women's Softball | 21.7 | 21.5 | 25 | 12 |
| Women's Soccer | 25.2 | 24.7 | 28 | 14 |
| Women's Swimming & Diving | 28.7 | 30.3 | 30 | 14 |
| Women's Tennis | 8.8 | 8.9 | 10 | 8 |
| Women's Water Polo | 24.3 | 24.0 | 24 | 8 |
| Women's Volleyball | 15.4 | 15.0 | 18 | 12 |
| Women's Wrestling | N/A | 25.0 | 30 | 10 |
| Co-ed Rifle | 10.0 | 9.5 | 12 | 3.6 |

---

[8] The 18 equivalency scholarships limit applies collectively to Women's Cross Country, Women's Outdoor Track & Field, and Women's Indoor Track & Field. *Id.* at 189 (Bylaw 15.5.3.1.2).

DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL

At base, objections to roster limits boil down to the preference of some student-athletes for the status quo. But Plaintiffs claim the status quo is anticompetitive. And "an interest by certain putative class members in maintaining the allegedly unlawful policy is not a reason to deny class certification." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) (citation omitted); *see also Probe v. State Tchrs.' Ret. Sys.*, 780 F.2d 776, 781 (9th Cir. 1986) (similar), *cert. denied*, 476 U.S. 1170 (1986); *Howell v. Advantage RN, LLC*, No. 17-CV-0883, 2018 WL 3437123, at *6 (S.D. Cal. July 17, 2018) (similar) (quoting *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 406 (S.D.N.Y. 2015)); *Hamidi v. Serv. Emps. Int'l Union Loc. 1000*, No. 2:14-CV-319, 2015 WL 2455600, at *6 (E.D. Cal. May 22, 2015) (similar). Accordingly, the Court should give little if any weight to the objections of student-athletes who want to continue receiving the benefits flowing from the status quo repeatedly attacked as anticompetitive. *See also* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:64 (6th ed. 2024).

The proposed roster limits could also have been imposed absent the settlement, because they are procompetitive. They will enhance competitive balance between NCAA DI member institutions that choose to provide and/or facilitate payments or benefits to student-athletes under the settlement, as evidenced by every professional sports league. The NFL limits its roster to 53 active players,[9] the NBA to 15,[10] the MLB to 26,[11] with similar practices in the NHL[12] and MLS.[13] Adopting roster limits for participating member institutions prevents schools from stockpiling talent, providing more opportunities for more student-athletes to participate meaningfully at the

---

[9] *NFL roster cuts tracker: Team-by-team player moves ahead of the 2024 season*, NFL (Aug. 19, 2024), https://www.nfl.com/news/nfl-roster-cuts-tracker-team-by-team-player-moves-ahead-of-the-2024-season.

[10] *Teams allowed to carry 15 players on active roster for 2020-21 season*, NBA (Dec.17, 2020), https://www.nba.com/news/teams-allowed-to-carry-15-players-on-active-roster-for-2020-21-season; *see also* Luke Adams, 2023/24 NBA Roster Counts, HOOPS RUMORS (July 15, 2023), https://www.hoopsrumors.com/2023/07/2023-24-nba-roster-counts.html.

[11] *26-man Roster*, MLB, https://www.mlb.com/glossary/transactions/26-man-roster (last visited Feb. 15, 2025).

[12] NHL limits its roster to 23 active players. *Hockey Operations Guidelines*, NHL, https://www.nhl.com/info/hockey-operations-guidelines (last visited Feb. 15, 2025).

[13] MLS limits its roster to 30 active players. *2025 MLS Roster Rules and Regulations*, MLS (Feb. 5, 2025), https://www.mlssoccer.com/about/roster-rules-and-regulations.

-12-

highest level of collegiate sports and ensuring that teams do not have different numbers of players to circulate on and off the field during games. Even objectors recognize that "schools with the resources" could "build the best teams" without such limits, ECF No. 475 at 16, reducing competitive balance and thereby making college sports worse for many student-athletes.

Last, it is important to put the roster limits objection into context. The roster limits are merely one aspect of a complex, interlocking settlement agreement that will undeniably benefit the class. Where, as here, a settlement is fair, reasonable, and adequate, that is the end of the inquiry. A court cannot "disapprove of the entire settlement as a result of one or two provisions," nor "strike or revise those objectionable provisions before approving the settlement." *White*, 822 F. Supp. at 1426. Thus, even if the roster limits objection raised by less than 0.1% of class members had merit (and it does not), it would not present an obstacle to final approval.

## III.    OBJECTIONS TO HOW THE SETTLEMENT COMPENSATES "WALK-ON" STUDENT-ATHLETES ARE MERITLESS

A handful of non-scholarship football and men's basketball student-athletes (i.e., "walk-ons") object to their ineligibility to receive the "BNIL" component of the damages settlement fund because, as non-scholarship athletes, they are members of the Additional Sports Class rather than the Football and Men's Basketball Class.[14] To be clear, these walk-on objectors[15] will receive meaningful compensation under the settlement. Rascher Decl., ECF No. 450-4 at 15, Ex. 6 (detailing available payment categories). But they claim they should receive more. In that sense, these objections are simply a rehash of "lost scholarship" objections the Court has already considered and rejected. *See* ECF No. 473 at 10–13 (arguing that the settlement provides insufficient compensation to non-scholarship athletes).

This objection is not a hurdle to approval. To the extent the walk-on objectors believe they are inadequately compensated by the settlement, including because they have NIL market value

---

[14] *See, e.g.*, ECF No. 593; ECF No. 601; ECF No. 612; and ECF No. 678.

[15] Some of the objectors refer to themselves as "preferred walk ons" or "PWOs." *See, e.g.*, ECF No. 612. But there is no official "preferred walk on" designation under NCAA rules. It is, at best, an unofficial description used by some players and coaches to refer to a student-athlete's recruiting status. It therefore would not be sufficiently definite to be part of a class definition in any regard.

**DEFENDANTS' BRIEF ISO**
**FINAL SETTLEMENT APPROVAL**

atypical of other walk-ons, they were free to opt out and seek individual relief. But their purportedly unique circumstances do not justify derailing a settlement impacting 389,700 other class members, the overwhelming majority of whom do not share their concerns. *See Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1049 (S.D. Cal. 2017) ("A settlement that is fair, reasonable, and adequate for the Class as a whole may nevertheless leave a smaller recovery for a small subset of Class Members who had a chance of larger individual recovery. But as already noted, such individuals were free to opt-out of the Settlement.").

The objections also fail on the merits. Schools *had* the opportunity to compensate walk-on athletes with scholarships but chose not to do so in favor of awarding scholarships to other student-athletes. As a result, walk-ons have substantially weaker antitrust claims and face significantly increased litigation risk relative to full grant-in-aid ("GIA") scholarship recipients. That means the walk-on objectors are *not* similarly situated to the Football and Basketball class members, which in turn means there is no reason for the settlement to treat them the same way.

***Walk-Ons Need To Be Treated Similarly To Full-Scholarship Recipients Only If They Are Similarly Situated.*** "All class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments." *Charron v. Wiener*, 731 F.3d 241, 253 (2d Cir. 2013). A court's job is to "ensure" that "dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." 4 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 13:56 (6th ed. 2024). For that reason, settlements need not compensate all class members *equally*, so long as "higher allocations to certain parties are rationally based on legitimate considerations." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) (citing *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506 n.5 (5th Cir. 1981)).

One such consideration is the strength of a class member's claims. "It is reasonable to allocate settlement funds to class members based on the extent of their injuries and the strength of their claims on the merits." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008). A settlement is fair if it takes into account the relative strengths of different class claims. *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*,

-14-

1   895 F.3d 597, 608–09 (9th Cir. 2018) (rejecting argument that class settlement was unfair to certain

2   class members with "fairly weak" claims and who thus received less of the settlement, explaining

3   that "[i]nstead of getting nothing," those with weaker claims received compensation "quite

4   possibly . . . *because* they were in the same class" as those with more valuable claims).

5       ***Walk-Ons Face Significantly Increased Litigation Risk Relative To Full-Scholarship***

6   ***Athletes.*** Throughout this litigation, Defendants have vigorously contested Plaintiffs' ability to

7   establish antitrust injury as to any student-athletes. But the problem is particularly severe for walk-

8   ons—whose schools chose *not* to provide them with scholarships, in favor of the full GIA student-

9   athletes on the roster. For that reason, walk-ons have a materially weaker case that NCAA rules

10  caused them antitrust injury, relative to full GIA student-athletes. By definition, walk-ons did not

11  receive all the permissible benefits for which they were eligible under the existing NCAA rules,

12  so there is little reason to think that, absent the challenged rules, they would have received more.

13  *See Associated General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519

14  (1983) (affirming dismissal of antitrust action where plaintiffs could not demonstrate that they

15  were harmed by defendant's alleged anticompetitive conduct.)

16      That is especially so given the history of this case. As this Court acknowledged in ruling

17  on Defendants' motion to dismiss, the alleged antitrust "BNIL" injury for which the settlement

18  compensates is the lost *opportunity to negotiate* for payment in exchange for use of Plaintiffs' so-

19  called BNIL, not for their actual participation in broadcasts. *See* Order, ECF No. 152 at 17–19; *see*

20  *also* Rascher Report, ECF No. 598-1 at ¶ 151–67 (opining that the parties would "enter[] into *ex*

21  *ante* group-licensing deals with incoming" student-athletes, not offer payment based on actual use

22  of NIL). The non-scholarship student-athletes had the opportunity to negotiate for a full

23  scholarship, but they were unsuccessful in those negotiations at the schools they chose to attend.[16]

24  ────────────────

25      [16] It does not help objectors that some of them claim that they were offered a scholarship
    at one school but chose to attend a different school. Choosing a school requires analyzing multiple

26  variables, both financial and non-financial. The non-financial benefits of attending one school as
    a walk-on must have exceeded the financial benefits of attending a school offering a scholarship.

27  That choice is not an antitrust injury caused by Defendants that can or should be compensated in
    this settlement. Indeed, this argument instead underscores why class certification would have been

28  much more difficult for non-scholarship athletes.

-15-

1    There is little reason to believe that student-athletes who did not receive compensation permitted

2    under the challenged rules would have successfully negotiated *additional* compensation for so-

3    called BNIL in the absence of the challenged rules.

4         Beyond the issue of antitrust injury, the walk-on objectors would face insuperable obstacles

5    in certifying a damages class. The objections themselves confirm that walk-ons are a disparate

6    group. Some objectors claim to have been incredibly successful, earning regular or even starting

7    roles on their teams. *See, e.g.*, ECF No. 689. Others admit, as is the case for most walk-ons, that

8    they spent little or no time on the actual playing field. *See, e.g.*, ECF No. 684. Without even the

9    commonality of scholarships (as the full GIA student-athletes have), this variety would make it all

10   but impossible to certify a "BNIL" class for walk-ons, much less calculate damages in any

11   formulaic way. Indeed, efforts to certify such classes have failed every time attorneys have tried.

12   *See In re NCAA I-A Walk-On Football Players Litig.*, No. C04–1254C, 2006 WL 1207915 at *7–

13   8, *13 (W.D. Wash May 3, 2006) (denying motion for class certification); *see also Rock v. Nat'l

14   Collegiate Athletic Ass'n*, No. 1:12-CV-01019, 2016 WL 1270087, at *7–9, *14 (S.D. Ind. Mar.

15   31, 2016) (same); *cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, No. 1:11-CV-0293, 2011 WL

16   3878200, at *10 (S.D. Ind. Sep. 1, 2011) (granting motion to dismiss similar claim), *aff'd*, 683

17   F.3d 328 (7th Cir. 2012). Those repeated failures reflect that there is virtually no chance of

18   recovering damages (much less damages of any significant amount) for the non-scholarship

19   student-athletes' claims for additional compensation from schools, confirming the fairness and

20   adequacy of the meaningful compensation these student-athletes are receiving under the

21   settlement.

**CONCLUSION**

22

23        The Court should grant final approval of the Settlement Agreement.

24

25

26

27

28

-16-

1

Dated:  March 3, 2025                                    Respectfully Submitted,

2

**COOLEY LLP**                                          **WILKINSON STEKLOFF LLP**

3

4       By: /s/ Whitty Somvichian                        By: /s/ Rakesh N. Kilaru
        Whitty Somvichian (SBN 194463)                    Beth A. Wilkinson (*pro hac vice*)
5       Kathleen R. Hartnett (SBN 314267)                 Rakesh N. Kilaru (*pro hac vice*)
        Ashley Kemper Corkery (SBN 301380)                Kieran Gostin (*pro hac vice*)
6       3 Embarcadero Center, 20th Floor                  Calanthe Arat (SBN 349086)
        San Francisco, California 94111-4004              Tamarra Matthews Johnson (*pro hac vice*)
7       Telephone:  (415) 693-2000                        Matthew R. Skanchy (*pro hac vice*)
        Facsimile:  (415) 693-2222                        2001 M Street NW, 10th Floor
8       wsomvichian@cooley.com                            Washington, DC 20036
        khartnett@cooley.com                              Telephone:  (202) 847-4000
9       acorkery@cooley.com                               Facsimile:  (202) 847-4005
                                                          bwilkinson@wilkinsonstekloff.com
10                                                        rkilaru@wilkinsonstekloff.com
        Mark Lambert (SBN 197410)                         kgostin@wilkinsonstekloff.com
11      3175 Hanover Street                               carat@wilkinsonstekloff.com
        Palo Alto, CA  94304-1130                         tmatthewsjohnson@wilkinsonstekloff.com
12      Telephone:  (650) 843-5000                        mskanchy@wilkinsonstekloff.com
        Facsimile:  (650) 849-7400
13      mlambert@cooley.com

14                                                        Jacob K. Danziger (SBN 278219)
        Dee Bansal (*pro hac vice*)                       ARENTFOX SCHIFF LLP
15      1299 Pennsylvania Ave. NW, Suite 700              44 Montgomery Street, 38th Floor
        Washington, DC 20004-2400                         San Francisco, CA 94104
16      Telephone:  (202) 842 7800                        Telephone: (734) 222-1516
        Facsimile:  (202) 842 7899                        Facsimile: (415) 757-5501
17      dbansal@cooley.com                                jacob.danziger@afslaw.com

18

19      Attorneys for Defendant                           Attorneys for Defendant
        PAC-12 CONFERENCE                                 NATIONAL COLLEGIATE ATHLETIC
20                                                        ASSOCIATION

21

22

23

24

25

26

27

28

-17-

1

**MAYER BROWN LLP**

2

By: /s/ Britt M. Miller

3
Britt M. Miller (*pro hac vice*)
Daniel T. Fenske (*pro hac vice*)

4
71 South Wacker Drive
Chicago, IL 60606

5
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

6
bmiller@mayerbrown.com
dfenske@mayerbrown.com

7

8
Christopher J. Kelly (SBN 276312)
Two Palo Alto Square, Suite 300

9
3000 El Camino Real
Palo Alto, CA 94306

10
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

11
cjkelly@mayerbrown.com

12

13
Attorneys for Defendant
THE BIG TEN CONFERENCE, INC.

14

**SIDLEY AUSTIN LLP**

By:  /s/ Natali Wyson
David L. Anderson (SBN 149604)
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7412
dlanderson@sidley.com

Angela C. Zambrano (*pro hac vice*)
Natali Wyson (*pro hac vice*)
Chelsea A. Priest (*pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 969-3529
Facsimile: (214) 969-3558
angela.zambrano@sidley.com
nwyson@sidley.com
cpriest@sidley.com

Attorneys for Defendant
THE BIG 12 CONFERENCE, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-

**DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL**

**ROBINSON, BRADSHAW &
HINSON, P.A.**

By: /s/ Robert W. Fuller
Robert W. Fuller, III (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
Travis S. Hinman (*pro hac vice*)
Patrick H. Hill (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com
phill@robinsonbradshaw.com

**WHEELER TRIGG O'DONNELL
LLP**

By: /s/ Kathryn Reilly
Kathryn Reilly (*pro hac vice*)
Michael Williams (*pro hac vice*)
370 17th Street, Suite 4500
Denver, CO 80202
Tel: (303) 244-1800
Fax: (202) 244-1879
reilly@wtotrial.com
williams@wtotrial.com

**SEIFERT ZUROMSKI LLP**

Mark J. Seifert (SBN 217054)
One Market Street, 36th Floor
San Francisco, California 941105
Telephone: (415) 999-0901
Facsimile: (415) 901-1123
mseifert@szllp.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**LATHAM & WATKINS LLP**

By: /s/ Christopher S. Yates
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-1061
Facsimile: (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**

By: /s/ D. Erik Albright
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5368
Facsimile: (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

**DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL**

## SIGNATURE CERTIFICATION

I, Rakesh N. Kilaru, am the CM/ECF user whose ID and password are being used to file the Defendants' Brief in Support of Final Settlement Approval. In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated: March 3, 2025

Respectfully submitted,

**WILKINSON STEKLOFF LLP**

By:   */s/ Rakesh N. Kilaru*
     Rakesh N. Kilaru
     Attorney for Defendant
     National Collegiate Athletic Association

**DEFENDANTS' BRIEF ISO
FINAL SETTLEMENT APPROVAL**