1  **LATHROP GPM LLP**
   Laura Reathaford (SBN 254751)
2  laura.reathaford@lathropgpm.com
   2029 Century Park East, Suite 1280N
3  Los Angeles, CA 90067
   Tᴇʟ. 310.789.4600
4  Fᴀx: 310.789.4601
5
   Attorneys for Objector
6  Emma Reathaford
7
8                UNITED STATES DISTRICT COURT
9                NORTHERN DISTRICT OF CALIFORNIA
10
11 | IN RE COLLEGE ATHLETE NIL | Case No. 4:20-cv-03919 -CW
12 | LITIGATION,                |
                                | *Hon. Claudia Wilken*
13 |                            |
14 |                            | **RESPONSE TO OBJECTIONS
                                | IN OPPOSITION TO MOTION TO
15 |                            | APPROVE CLASS ACTION
                                | SETTLEMENT**
16 |                            |
17 |                            | Date:       April 7, 2025
                                | Time:       10:00 A.M.
18 |                            | Courtroom:  Courtroom 2, 4ᵗʰ Floor

**OBJECTION IN OPPOSITION TO MOTION**

# **TABLE OF CONTENTS**

I. OBJECTIONS AND RESPONSE TO PARTIES' ARGUMENTS……………………1

    A. Objector's Original Objections………………………………………………… 1

        1. The NCAA Could Impose Roster Limits Anyway………………………… 1

        2. The Roster Limits Are Inconsistent With The Express Objectives of This Litigation……………………………………………………………………...2

        3. The Standard For "Zero Tolerance" of Conflicts………………………….. 3

        4. The Cases Cited By The Parties Are Easily Distinguishable……………….5

    B. Objector's Request For a Stay………………………………………………………12

II. CONCLUSION……………………………………………………….…..……………..13

# TABLE OF AUTHORITIES

*Air Line Stewards and Stewardesses Association, Local 550, TWO, AFL-CIO, et al. v. American Airlines, Inc.*, 490 F.2d 636 (1973)………………………….. 5

*Auto Ventures, Inc. v. Moran,* No. 92-426-CIV, 1997 WL 306895 (S.D.Fla.1997) ……………....4

*Bayat v. Bank of the West*, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015)……………..………….6

*Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355 (N.D.Cal.2011)…………………….8

*Bieneman v. City of Chicago,* 864 F.2d. 463 (7th Cir.1988) ……………………………………….4

*Cohen v. Brown University*, 16 F.4th 935 (1st Cir. 2021) …………………………..………….11

*Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir.2003)……………………………………….8

*Gray v. International Brotherhood of Electrical Workers*, 73 F.R.D. 638 (D.D.C. 1977)…..…..9

*In re Moter Fuel Temperature Sales Pracs. Litig.*, No. 07-MD-1840, 2012 WL 1415508 (D. Kan. Apr. 24, 2012)……………………………………………….6

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation*, 311 F.R.D. 532 (N.D. Cal. 2015)…..8

*Lauman v. National Hockey League*, 105 F. Supp. 3d 384 (S.D.N.Y. 2015)……………….……..8

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 625 (N.D. Ill. 1989)……………………………..9

*North Brevard County Hospital District v. C.R. Bard, Inc.*, 710 F.Supp.3d 1090 (2023)………..4

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ……………………………………….…..….4

*Pickett v. Iowa Beef Processors,* 209 F.3d 1276 (11th Cir.2000) ………………………………..4

*Sharif by Salahudding v. N.Y. State Educ. Dep't,* 127 F.R.D. 84 (S.D.N.Y. 1989)…………...….9

*Sims v. Montgomery Cnty. Comm'n*, 890 F. Supp. 1520 (M.D. Ala. 1995)…………………….9

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ……………………………….….….4

*Weinberger v. Romero-Barcelo,* 456 U.S. 305 (1982) ……………………………………….2

*White v. National Football League*, 822 F. Supp. 1389 (D. Minn. 1993) …………...……..…6

I. **OBJECTIONS AND RESPONSE TO PARTIES' ARGUMENTS**

A. **Objector's Original Objections**

a. On or about January 25, 2025, Objector raised the following two objections:

   i. The Injunctive Relief Settlement creates a conflict between class members in violation of Rule 23(a)(4) and the Due Process Clause; an issue which Plaintiff's counsel admits (in writing) will harm some class members (*see* Section 1 below).

   ii. The Injunctive relief sought by the settling Parties is inconsistent with the Injunctive relief sought by the Plaintiffs in their Third Amended Complaint.

*See* ECF #602. Objector also asked that this Court stay the implementation of the Injunctive Relief Settlement pending the outcome of any appeals. Objector addresses the Parties' responses to the objections and request for stay as follows:

1. **The Parties Contend The NCAA Could Impose Roster Limits Anyway**

At p. 12 of its brief in support of final approval, the NCAA states, "the roster limits could…have been imposed absent the settlement, because they are procompetitive."[1] Saving for another day the notion that roster limits are "pro competitive" (they are not),[2] this statement begs the question: if the NCAA can impose roster limits without the settlement, then why should the court impose them via injunction?[3] The answer is simple: it should not.

---

[1] Plaintiffs echo this sentiment at p. 46 of their motion.

[2] *See* the Statement of Interest filed by the United States, Dkt. #595. *See also,* Plaintiffs' Third Amended Complaint ("TAC") at ¶112 where Plaintiffs allege,"[t]he NCAA rules, and each Conference Defendant's rules, that limit the scholarships ***and roster spots available*** to players for their athletic services ***are illegal cartel agreements***."

[3] Plaintiffs argue at p. 46 of their motion that roster limits are not required by the settlement and that objections to roster limits are "not an objection to anything in the Settlement Agreement." This statement is confusing, at best. First, the NCAA states that that the roster limits are part of the Settlement Agreement at p. 8 of their brief ("roster limits, outlined in Appendix B to the Amended Stipulation and Settlement Agreement…will apply to NCAA member institutions...") Second, the NCAA has informed the United States that it intends to use this Court's approval of the Settlement as a "defense to liability" against any future antitrust claims. *See* Dkt. #595-2. Last, the roster limits are explicitly delineated in the Settlement Agreement. Based on the foregoing, it is Objector's belief that roster limits are in, and form a material part of, the Settlement Agreement.

It is well established that, "[a]n injunction should issue only where the intervention of a court of equity 'is *essential* in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney,* 248 U.S. 453, 456 (1919)) [emphasis added]. "[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger,* 456 U.S. at 312 (citing cases). Since the Parties contend that the NCAA could lawfully implement roster limits without this settlement, the roster limits are not essential and no fear of irreparable injury warrants an injunction.[4]

Additionally, any idea that the Injunctive Relief Settlement (and the roster limits contained therein) is "essential" in order to protect class members going forward is undermined by the fact that any D1 school can opt out of it. As Plaintiffs explained at p. 45 of their motion, "there will be no new NCAA roster limits unless member institutions choose to opt-in to the revenue sharing model outlined by the settlement." Accordingly, because schools are permitted to opt-out of the settlement, the roster limits (and the Injunctive Relief Settlement as a whole) are not essential and serve no injunctive purpose. The Court should not approve it.

Parenthetically, opting out of the settlement means preserving the *status quo* for those schools. At p. 12 of its brief, however, the NCAA argues that preservation of the *status quo* works against the settlement and "the Court should give little if any weight to the objections of student athletes who want to continue receiving the benefits flowing from the status quo repeatedly attacked as anti-competitive." The Parties do not explain why the preservation of the *status quo* is permitted by schools in this settlement but the class member objections asking to preserve the *status quo* should be "given little if any weight."

### 2. The Roster Limits Are Inconsistent With The Express Objectives of This Litigation

At p. 12 of their response in support of Plaintiffs' motion, the NCAA argues that the roster limits are included in the Settlement because they will "enhance competitive balance between

---

[4] In fact, it appears that this particular Injunctive Relief Settlement will actually cause (and in some cases has already caused) irreparable injury; not protect against it.

NCAA D1 member institutions that choose to provide benefits." The NCAA claims that the roster limits will presumably prevent schools from stockpiling talent, provide more opportunities for more athletes to participate meaningfully in each sport, and will ensure teams do not have a different number of players to circulate on and off the field during games. *Id*.

However, "enhanc[ing] competitive balance between NCAA D1 member institutions" is not among the objectives of this litigation as set forth in the TAC. Nor did the Plaintiffs allege problems with "stock piling talent,"[5] "meaningfully participating in each sport" or "ensuring teams do not have a different number of players to circulate on and off the field during games." Instead, and as explained in Objector's initial objection, the aim of the TAC was to **restrain** the NCAA from enforcing its anti-competitive agreements restricting competition and scholarships to D1 athletes. *See* TAC at p. 105. The Parties have not explained how imposing uniform roster limits advances *this* objective.

Nor can they because this settlement is not **restraining** any anti-competitive conduct by the NCAA at all. It is actually doing the opposite. It is, instead, sanctioning the very conduct that the Plaintiffs complained about in the TAC. Specifically, at paragraph 112 of the TAC, Plaintiffs allege that, "[t]he NCAA rules, and each Conference Defendant's rules, that **limit** the scholarships and **roster spots** available to players for their athletic services **are illegal cartel agreements**." The roster limits are actually the alleged problem and as such, they cannot also be the solution.[6]

Moreover, as stated in Objector's initial objection, roster limits have nothing to do with the ultimate remedy sought in this case: compensation for student athletes. Even Plaintiffs acknowledge this at p. 64 of the TAC where they allege that the very NCAA rules complained about (i.e. roster limits) "***are not necessary to serve any purported procompetitive purpose***." [emphasis added].

---

[5] There is no evidence that schools could afford to stock-pile athletes; even if they wanted to.

[6] As the United States has similarly argued with respect to earning caps (Dkt. #595 at 7), this Court should not give its judicial *imprimatur* to roster limits when the legality of roster limits remains disputed and has never been adjudicated on the merits.

3
**OBJECTION IN OPPOSITION TO MOTION**

Accordingly, since the imposition of roster limits would not advance any of the objectives or effect any of the remedies requested by the Plaintiffs in the TAC, this Court must deny the settlement.

### 3. The Standard For "Zero Tolerance" of Conflicts

The settling Parties acknowledge that there are conflicts amongst class members. However, they assert that the settlement should nonetheless be approved because, according to the Plaintiffs at pp. 35-36 of their motion, a "standard of zero conflicts is impossible to defend or meet." Plaintiffs' contention is legally unsupported.

It is black letter law that under Rule 23(b)(2), a settlement only complies with the Due Process Clause where the "class seeks an indivisible injunction **benefitting all** its members at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011). This principle is particularly acute in mandatory injunctive relief classes because class members cannot opt out. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). The case law also makes clear that injunctive relief is inappropriate where "there are likely winners and losers from the requested equitable relief." *North Brevard County Hospital District v. C.R. Bard, Inc.*, 710 F.Supp.3d 1090, 1114 (2023); *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir.2000) (reversing certification of a class of cattle producers where the class definition included producers who claimed to have been harmed by contracts and marketing agreements that benefited some of the unnamed members of the class); *Bieneman v. City of Chicago,* 864 F.2d. 463, 465 (7th Cir.1988) (class certification denied where some putative class members "undoubtably derive great benefit" while others allegedly experience harm); *Auto Ventures, Inc. v. Moran,* No. 92-426-CIV, 1997 WL 306895, *5 (S.D.Fla.1997) (refusing to certify a class of Toyota dealers because "the class collapses into distinct groups of winners and losers").

Here, the Injunctive Relief Settlement does not benefit all class members at once. Instead, it unequivocally creates a requirement for some schools to cut players from their rosters if the schools choose provide revenue to other players. *See* NCAA's brief at p. 8. Accordingly, anyone not cut from their teams will benefit from the settlement and anyone who is cut will clearly lose. This loss, as the NCAA admits, will derive directly from and only because of this Injunctive

Relief Settlement, should it be approved. *Id*. And, in some cases, this loss will be more than just losing a roster spot but will also result in direct financial out-of-pocket harm.[7] This court must deny the settlement because the roster limits contained in the settlement agreement violate Rule 23 and Due Process.

Plaintiffs attempt to minimize this conflict by arguing at p. 4 of their motion that the move to roster limits was part of the overall settlement ***compromise*** which in their judgment, contains negative effects that are allegedly "dwarfed by the extraordinary benefits provided by the settlement to the class as a whole." However, achieving a compromise is not the same as ***resolving a conflict***. It simply demonstrates that clear harm to some members of the mandatory 23(b)(2) class was traded away in exchange for benefits to other members. If the conflict were actually resolved, then it would no longer exist.

Here, class members who are adversely affected by roster limits will never be able to receive the monetary benefits of this forward looking settlement. They will only sacrifice their roster spots on college teams so that the other class members can receive the revenue sharing benefits. This not a resolution of a conflict. Instead, it represents the type of resultant antagonism amongst class members that has been rejected by courts in similar circumstances. *See, e.g., Air Line Stewards and Stewardesses Association, Local 550, TWO, AFL-CIO, et al. v. American Airlines, Inc.*, 490 F.2d 636 (1973) (reversing approval of class action settlement finding the Union, acting as the class members' representative, was inadequate because it represented current employees whose seniority rights would be bumped by the reinstatement of employees who were unlawfully fired), (citing, *Handsberry v. Lee*, 311 U.S. 32, 45 (1940)). For these additional reasons, this Court should deny approval of the settlement.

### 4.     The Cases Cited By The Parties Are Easily Distinguishable

Plaintiffs cite various cases at pp. 45-48 of their motion in support of the idea that class

---

[7] *See, e.g.*, Dkt. No. 628-5, at p. 142-143 where class member Ellis (a scholarship athlete who was told by her coach that she "would be cut from the team if the roster limits that are a part of the proposed settlement in this lawsuit were approved") testifies to a potential loss of almost $26,000.00 ***per year*** if she is ultimately cut from her track and field team (not including her scholarship which must remain unaffected under the terms of the settlement).

members may be harmed by class settlements. None of the cases cited stand for this remarkable proposition. Moreover, none of the cases cited involved any class member suffering concrete harm in order to benefit the other class members. Finally, unlike the case here, all of the cases cited where distinctions amongst class members were made, the distinction was tied to the actual relief sought in the operative complaint such as claims under Title VII and Title IX; which is not the case in this settlement where roster limits bear no relationship whatsoever to the relief sought.

### **_Bayat v. Bank of the West_ and _In re Motor Fuel Temperature Sales Pracs. Litig_.**

At p. 45 of their motion, Plaintiffs cite *Bayat v. Bank of the West*, 2015 WL 1744342 at *6 (N.D. Cal. Apr. 15, 2015) for the proposition that a court can grant class certification "even though a large number of class members were worse off." However, in that case, the settlement only secured injunctive relief for those class members who opted-in by filing a Request to Stop Calls. Accordingly, anyone who did not opt-in was worse off. *Id. Bayat* does not apply to this mandatory Injunctive Relief Settlement where no opt-in or out-out rights are available to any class member.

The same analysis applies to Plaintiffs' citation to *In re Moter Fuel Temperature Sales Pracs. Litig*., No. 07-MD-1840, 2012 WL 1415508 (D. Kan. Apr. 24, 2012). In that case, the district court stated that any harm to class members resulted from the **_choice_** of class members to purchase (presumably harmful) temperature adjusted gas in the future. The class members in this case have no choice whatsoever.

### **_White v. National Football League_**

Next, at p. 46, Plaintiffs (and the NCAA) cite to *White v. National Football League*, 822 F. Supp. 1389, 1405-06 (D. Minn. 1993) for the proposition that harm to class members is judicially permissible if the settlement serves to increase competition and provides benefits to the class. Specifically, the Plaintiffs argue that the "defendants in *White* opposed injunctive relief certification by arguing that introducing free agency would benefit some class members while hurting others because a starting position gained through free agency by one class member would

mean a starting position lost by another class member." The Plaintiffs then claim this argument was rejected by the Court. That is not an accurate statement of what happened in that case.

First, the Court in *White* never ruled on Defendant's argument because the Parties settled before Plaintiff's motion for class certification was even heard. *See White*, 822 F.Supp. at 1395 ("Defendants opposed that motion, which was still pending when the Parties, with the assistance of this court, reached a tentative agreement to settle this action on January 6, 1993."). Accordingly, the argument was never "rejected" as Plaintiffs claim in their motion.

Even if Plaintiffs' recitation were correct (it is not), it would appear that it was the introduction of free agency (which is a competitive concept) that might have caused one player to gain a starting position and another to lose. Unlike this case, it was not the ***actual terms of the settlement agreement*** directly causing harm to players. In this case, the roster limits (which the Plaintiffs here challenged as illegal) are mandated by the settlement agreement and are directly causing the harm.

The objection that the *White* court actually considered (and rejected) was the following:

> Several objectors argue that the class members' interests are adverse because the class is comprised of players in different stages of their careers, contending that there are conflicts between rookies and veterans, and between veterans with different levels of seniority. This, however, is not the type of adversity which precludes class certification. No matter what stage a player is in his career, defendants have imposed various rules "in substantially identical manner to all players within the NFL.

*Id*. at 1405. There is no indication that any class member in *White* objected that they would be cut from their NFL team or be subject to anyone reneging on any prior commitment as a result of the settlement; which is precisely the harm caused by this settlement. *White* does not apply.

**This Court's Order Granting Certification of Damages Class (Dkt. No. 387)**

At p. 47 of their motion, Plaintiffs state that this Court has considered – and rejected the idea (raised by objectors now) that the roster limits have "exposed serious intra-class conflicts." In support, Plaintiffs cite to this Court's order granting class certification of a ***damages*** class and incorrectly argue that the "substitution effects" for scholarships or positions on the team created class conflicts which this Court rejected. Plaintiffs are wrong. Any "substitution effects" argued

7
**OBJECTION IN OPPOSITION TO MOTION**

in this litigation were speculative and based on the free choices of either the college or the athletes. *See* Dkt. No. 387 at 49. No one argued, and the Court did not discuss, whether the mandated imposition of roster limits in a mandatory ***injunctive relief settlement*** that would cause players to be cut from their teams supported class certification. This Court's order does not apply.

### *In re NCAA Athletic Grant-In Aid Cap Antitrust Litigation*

At p. 47 of their motion, Plaintiffs cite, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation*, 311 F.R.D. 532 (N.D. Cal. 2015). The reference to this case is confusing, at best.

First, *In re NCAA GIA*, is not a settlement case but was decided on a motion for class certification and no one argued that any team or player would lose a roster spot. Second, as the court noted, the Plaintiffs in that case did not challenge any of the NCAA rules setting minimum number of full grants-in-aid, which is not the case here where the Plaintiffs specifically challenged the scholarship and roster limit rules. *See*, 311 F.R.D. at 541.

Third, the court specifically found that any potential conflict was speculative and, citing, *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 359 (N.D.Cal.2011) and *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir.2003), noted that this "circuit does not favor denial of class certification on the basis of speculative conflicts. The mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical." 311 F.R.D. at 541. Here, the Parties admit that actual conflicts exist and in fact, many class members have experienced actual harm – by being cut from their teams because of the roster limits. *See* P. Mtn. at p. 4.

Finally, in *In re NCAA GIA*, this Court considered whether class certification should be denied "because some members of the proposed classes might be benefitted by, and thus prefer, continuation of antitrust violations." 311 F.R.D. at 542. On this basis, the Court rejected the argument, citing *Lauman v. National Hockey League*, 105 F. Supp. 3d 384, 400 (S.D.N.Y. 2015), and stated,

> "If the fact that ***illegal*** restraints operate to the economic advantage of certain class members were enough to defeat certification, the efficacy of classwide antitrust suits— and the deterrence function they serve— would wither. Here, although Defendants suggest that class members might prefer to leave an unlawful restraint in place because they

> otherwise would have to compete against one another, such preference for non-competition does not justify denying injunctive relief class certification."

311 F.R.D. at 542.

However, contrary to *In re NCAA GIA*, the objectors here are not advocating for any illegal restraints. They are arguing ***against*** illegal restraints – those that were specifically alleged as unlawful by the Plaintiffs in the TAC - the imposition of unilateral roster limits contained in the revenue sharing paradigm.[8] This is not asking to maintain the status quo, it is simply asking that any revenue sharing model that is being mandated via legal injunction comply with Rule 23 and Due Process. *In re NCAA GIA* does not apply.

### *Sims v. Montgomery Cnty. Comm'n, Meiresonne v. Marriott Corp. and Sharif by Salahudding v. N.Y. State Educ. Dep't*

At p. 47 of their motion, Plaintiffs cite *Sims v. Montgomery Cnty. Comm'n*, 890 F. Supp. 1520, 1529 (M.D. Ala. 1995), *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 625 (N.D. Ill. 1989) and *Sharif by Salahudding v. N.Y. State Educ. Dep't,* 127 F.R.D. 84, 88 (S.D.N.Y. 1989) for the proposition that "numerous courts have found that class conflicts are not created by fostering competition among class members." These cases do not stand for such a broad proposition.

In *Sims*, a class of African American females brought a class action lawsuit against their police department employer for race and gender discrimination under Title VII.  An injunctive relief class was certified that required the employer to develop and implement new, nondiscriminatory permanent promotion procedures. White men objected to the settlement claiming that the new procedures would create an adverse impact as to them. The Court rejected this argument on two grounds. First, the Court found that the procedures met Title VII requirements and, second, the court found that the procedures do "not establish any quotas for the department." 890 F. Supp. at 1533. *Sims* is therefore, unlike this case where roster limits are

---

[8] For this reason, the cases cited by the NCAA at page 12 of their brief where it asserts that objectors are simply advocating for the "status quo" also do not apply here. Moreover, Objector points out that she has also not asked to maintain the *status quo*. She has only objected to the roster limits contained in the Injunctive Relief Settlement.

9
**OBJECTION IN OPPOSITION TO MOTION**

effectively acting like quotas which are adversely impacting many of the class members. *See also, Gray v. International Brotherhood of Electrical Workers*, 73 F.R.D. 638 (D.D.C. 1977) (denying motion for class certification stating, "…in view of the undoubtedly ***finite*** number of employment opportunities available to them, the likelihood of potential class members harboring mutually antagonistic interests is very great.") [emphasis added].

Similarly, *Meiresonne* was a class action for gender discrimination under Title VII based on the allegation that female employees were not being promoted to the same extent that men were being promoted. In opposing the motion, Marriott argued that because class members compete against each other for the same promotions, none can adequately represent the class. The Court rejected that argument under the paradigm of Title VII because to adopt it would obscure Title VII's fundamental anti-discriminatory purpose,

> That absurd proposition would of course doom almost every *class* action charging discrimination in promotion—a drastic rewrite of the law in this area. After all, when *no* woman is promoted, it is impossible to determine which one should have been….In the universe Marriott would create, discrimination law would be simpler because class-discriminatory promotion would be cost-free. That view must of course be rejected.

124 F.R.D. at 625.

*Meiresonne* does not apply for three reasons. First, there was no discussion or consideration of any forward looking injunctive relief class that would adversely affect any class member. Second, the court certified the class based on the alleged uniform policy not to promote women; this was not the approval of a settlement where any employee would be displaced. Third, as noted above, the purpose of Title VII is to remedy discrimination and the competition for jobs (primarily between men and women) was the entire point of the litigation.

Plaintiffs argue that *Meiresonne* should apply because in every college antitrust case, competition amongst class members exists. However, if this proposition were adopted, then courts could never deny approval of any antitrust class action settlement. Rule 23 and Due Process would be rendered meaningless.

Finally, *Sharif by Salahudding* similarly does not apply. In that case, the Plaintiffs sued New York state based on its awarding scholarships solely based on SAT scores. Plaintiffs argued

that this paradigm discriminated against women. In deciding a class certification motion (not a settlement), the State argued that commonality did not exist because any change in the scholarship criteria would benefit some females at the expense of others who would not win a scholarship but for the change. The Court rejected this distinction finding that the State did not understand the underlying claim. 127 F.R.D. at 89.

Like the plaintiffs in *Sims*, the Court found that the Plaintiffs were simply advocating for a neutral award system. There was no contention that any class member would actually be harmed as a result of this claim nor that any class member would have their scholarship taken away as a result of any class action or settlement. This case does not apply here, where class members must sacrifice roster spots so that other class members can benefit from the proposed revenue sharing.

***Cohen v. Brown University***

Finally, Plaintiffs, at p. 48, cite *Cohen v. Brown University*, 16 F.4th 935 (1st Cir. 2021) stating that "the First Circuit upheld the grant of final approval of a revised settlement agreement in a case where objectors argued that class members whose teams had been cut had conflicting interests from class members whose teams had not been cut because the latter preferred the status quo." Plaintiffs misstate the facts and the holding of *Cohen*.

First, in *Cohen*, no teams were "cut" as Plaintiffs assert. Instead, *Cohen* dealt with Brown University's decision to either upgrade or downgrade certain athletic teams to/from varsity and club status. Specifically, *Cohen* was a Title IX case where Brown had been subject to an injunction for 22 years after a settlement between the university and a class of then-attending female athletes. That injunction required, in part, that Brown maintain gender balance of its athletic teams pursuant to Title IX.

After 22 years, Brown proposed to *downgrade* some men's and women's varsity teams to club status and *elevate* some women's club teams to varsity status. The former class plaintiffs filed a new class action alleging Brown had violated the prior injunction. A new class action settlement was then reached whereby Brown agreed that it would elevate two women's teams and not downgrade any women's team to club status. The settlement further provided that, if Brown

sought to elevate any men's club team, then it had to restore an equal number of women's teams plus two to varsity status.

There were 12 objectors; none of whom were on teams that were either upgraded or downgraded. The objectors argued that an intra-class conflict existed amongst current students because the women students on the five downgraded teams might want immediate reinstatement while their peers may have been more inclined to bargain for longer term-concessions. *Id*. at 950. The court rejected this argument as speculative because it found that, "the record [did] not suggest any reason to believe that the class representatives negotiations were apt to be skewed in favor of reinstating certain teams by jettisoning others." *Id*. at 950-951. The court further held that, "**all** of Brown's women athletes will **benefit** form the [new] settlement." *Id*. at 951 [emphasis added].

The opposite is true in this case where the record is very clear that the Parties have traded away opportunities for some class members to play on teams so that other class members can benefit from revenue sharing. The class members have not simply been "downgraded"; they must be cut from their teams altogether in order to abide by the new illegal roster limits. And, unlike *Cohen*, not all class members will benefit from this settlement. As discussed above, some class members will experience (and already have experienced) real, tangible, financial harm.

**B.     Objector's Request For a Stay**

Plaintiffs reiterate, at p. 56, their argument that since the NCAA can impose roster limits anyway, there is no showing that a stay will prevent future harm. However, as noted above, this argument is inconsistent with the NCAA's position that the roster limits are part of the settlement and that schools will be required to abide by them if they choose to share revenue with athletes.

Notwithstanding this inconsistency, if the Parties wish to have the NCAA implement roster limits anyway, the Objector contends that the Parties should re-write the agreement so that roster limits are removed.

Plaintiffs also argue at p. 57 that "[a] stay pending appeal would likely extend well into – or perhaps beyond – the upcoming academic year. This means that those class members who have

only one more year to compete in Division 1 would be deprived of the opportunity to ever receive the substantial benefits provided by the settlement." Of course, this delay cuts both ways. Since anyone cut from the rosters will **never** receive the substantial benefits provided by the settlement and will, instead, lose their spot on their teams, a stay would protect these individuals from irreparable harm so that an appellate court can weigh in on whether these class members were lawfully cut from their teams in the first place.

On this point, Plaintiffs argue that the inability to share in revenue is "concrete" harm. Not so. It is speculative, at best, since (a) not all schools have or will "opt-in" to the settlement and (b) it is yet unknown whether any schools will actually have any revenue to share with next year's athletes. Conversely, being cut from a team and suffering financial and other losses (when the extent of the revenue sharing is yet unknown), is precisely the kind of actual and concrete harm that warrants a stay in this case.

Plaintiffs next argue that "the Ninth Circuit will not overturn final approval based on an argument that one specific part of the settlement – such as those relating to roster limits – might not be desirable to a small percentage of the class." But Plaintiffs forget that hundreds of objections have been made to this settlement on multiple parts of the settlement including but not limited to Due Process, Title IX, the Sherman Act, and a violation of Rule 23, among others.

Accordingly, while it is possible that an appellate court might not reverse approval of this settlement based solely on a challenge to roster limits, there are multiple other grounds that, when taken *as a whole*, could easily result in such a reversal.

II.   **CONCLUSION**

A court may only enter a mandatory forward looking injunction if it is necessary and essential. Since the parties agree that the Injunctive Relief Settlement can be implemented without the Settlement, it is not necessary or essential and can be denied on this basis alone. The Settlement may also be denied because roster limits have nothing to do with the ultimate remedy sought in this case: compensation for student athletes. Moreover, roster limits are actually the problem alleged by the Plaintiffs in this case and as such, they cannot also be the solution. Finally, the Injunctive Relief Settlement can and should also be denied due to the irreparable

antagonism amongst class members: anyone cut from teams due to roster limits is sacrificing a roster spot so others may benefit. These conflicts have routinely formed the basis to deny class action settlements and this Court should similarly follow suit.

Finally, should this Court approve the settlement, then Objector contends that the balance of the harms supports an order staying the implemental of the Injunctive Relief Settlement until all appeals have been exhausted.

DATED: March 17, 2025                             LATHROP GPM LLP

                                        By:  /s/ Laura Reathaford
                                             Attorneys for Objector

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Objector certifies that this brief contains 4,907, which complies with the word limit of L.R. 11-6.1.


DATED: March 17, 2025            By:    */s/ Laura Reathaford*