Gary K. Shipman (*pro hac vice*)
gshipman@shipmanlaw.com
N.C. Bar No. 9464
James T. Moore (*pro hac vice*)
jmoore@shipmanlaw.com
N.C. Bar No. 38377
SHIPMAN WRIGHT & MOORE, LLP
575 Military Cutoff Road, Suite 106
Wilmington, NC  28405

William Audet, Esq. (SBN 117456)
waudet@audetlaw.com
AUDET & PARTNERS, LLP.
711 Van Ness Ave., Suite 500
San Francisco, CA 94102

*Counsel for Proposed Amicus Athletes.org, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### Oakland Division
No.: 4:20-cv-03919-CW

| | |
|---|---|
| IN RE:  COLLEGE ATHLETE NIL LITIGATION | AMICUS BRIEF OF ATHLETES.ORG INC. |

.

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3    Table of Authorities ……………………………………………    iii

4    INTERESTS OF *AMICI CURIAE*……………………………....    1

5    SUMMARY OF THE ARGUMENT…………………………….    4

6    ARGUMENT…………………………………………………….    4

7        I.    THE "CLASSIC ROLE" OF AMICUS CURIAE ……….    4

8        II.    AO SUPPORTS THE PROPOSED SETTLEMENT

9            AS A FIRST STEP …………………………………….    5

10       III.    NEEDED CLARIFICATION…………………………….    5

11         A.   The proposed settlement is not a substitute for

12            collective bargaining…………………………………    5

13         B.   Health and safety standards are not adequately

14            Addressed …………………………………………    7

15         C. The proposed settlement does not grant

16            Defendants protection under the non-statutory

17            labor exemption…………………………………….    8

18         D.  Future litigation is a certainty…………………………    9

19         E. Agreements with college athletes are being

20            Misused……………………………………………    10

21   SUMMARY AND CONCLUSION …………………………….    11

22   CERTIFICATE OF SERVICE…………………………………    13

23   INDEX OF EXHIBITS………………………………………….    14

24

25

26

27

28

Amicus Brief of Athletes.org, Inc.                    NO.   4:20-cv-03919-CW

## TABLE OF AUTHORITIES

Brown v. Pro Football, Inc.,

    518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996)……………..…… 8

California by and through Becerra v. United State Dep't of the Interior,

    381 F.Supp.3d 1153 (N.D. Cal.) (2019) …………………………………….. 4, 5

Cody v. Ring LLC

    718 F. Supp. 3d 993 (N.D. Cal. 2024) ………………..………………… 4

Delmore v. Ricoh Americas Corp.

    667 F. Supp. 2d 1129 (N.D. Cal. 2009) …………………………………… 10,11

Emp. Painters' Tr. V. J&B Finishes,

    77 F.3d 1188 (9th Cir., 1996) …………………………………………… 5

McNeill v. National Football League,

    Civ. No. 4-90-476, 1992 WL 315292 (D. Minn) (September 10, 1992) …….. 2,3

NCAA v. Miller,

    10 F.3d 633 (9th Cir., 1993) …………………………………………… 10

Pappas v. AMN Healthcare Servs.,

    No. 24-CV-01426-JST, 2025 WL 50440, (N.D. Cal. Jan. 8, 2025) …………. 10,11

White v. National Football League,

    822 F.Supp. 1389 (D. Minnesota, 1993) …………………………………….. 2, 3

Amicus Brief of Athletes.org, Inc.                    NO.    4:20-cv-03919-CW

1

## INTERESTS OF *AMICI CURIAE*

Athletes.org., Inc. ("AO") is a Non-Profit Corporation organized and existing under the laws of the State of Alabama with its principal office located in Birmingham, Alabama. (Ex. 1, Certificate of Formation). AO, also known as "The Players Association for College Athletes" (www.athletes.org) is a voluntary membership organization whose membership includes more than 4,000 current and former college athletes, including some of the named Plaintiffs (Grant House, Sedona Prince and Nya Harrison). AO exists to educate, organize and represent college athletes as their chosen players association in an attempt to ensure that their interests are protected as college athletics continues to evolve. (Ex. 1, p. 7). Nearly 4,000 of AO's Members have organized into chapters all over the United States, which allows AO's Members to discuss issues relevant to their specific schools/conferences. AO's Chapters also communicate and collaborate on issues common to all college athletes, and understandably, this case is among them.

Some of AO's Members have already provided comments to this Court about the proposed settlement. (*See e.g.* Doc. 580). Undoubtedly, the interests of AO's Members will be impacted by the decisions made regarding whether to approve the proposed settlement in this case. As an organization whose purpose includes advocating for college athletes, AO provides this Brief to provide this Court with the concerns of college athletes that will continue to exist whether the proposed settlement is approved or not.

AO's Board of Directors (https://www.athletes.org/about/) consists of executives from professional sports unions; college sports attorneys; media executives; former professional athletes; athlete talent agency executives; former conference commissioners; former Power Conference athletic directors and former college head coaches. AO has been authorized by its Board of Directors to file this Brief.

AO believes that its perspective regarding what the proposed settlement does

1

not accomplish, and/or leaves unanswered and other matters that need clarification, represents the thoughts and sentiments of its membership.  While a contention may be advanced that the "reaction" from the settlement class has been "overwhelmingly positive" based upon the claims that have been filed and/or the objections that have not been made, (Doc. 717, p. 8), that observation can only be said to apply to the reaction from class members who are to receive money from this settlement.  The reaction from class members and/or their family members who are impacted by provisions of the injunctive relief class settlement and who have voiced their concerns to the Court cannot be characterized as positive.  For those class members, there is no claim to make to demonstrate their satisfaction, and because the settlement has not yet been approved, most of the class members whose interests will be affected at some point have not yet experienced some of the impacts of this settlement.

Some of the communications from current and former college athletes, including AO's Members, the Plaintiffs Grant House, Sedona Prince and Nya Harrison, have amplified the need to effectuate further changes in college athletics, including a process for fair representation of college athletes in the decisions and rule-making process that surround college athletics.  The position has been advanced that "[c]ollective bargaining….was not required to achieve this historic settlement" (Doc. 717, p. 25), citing *White v. National Football League,* 822 F.Supp. 1389 (D. Minnesota, 1993).  However, the *White* case was filed and settlement reached only after a jury rendered a verdict in *McNeill v. National Football League*, Civ. No. 4-90-476, 1992 WL 315292 (D. Minn.., September 10, 1992) finding that certain Right of First Refusal/Compensation Rules of the NFL had a "substantially harmful effect on competition in the relevant market for the services of professional football players"; and that plaintiffs suffered economic injury as a result of those rules.  *White*, 822 F. Supp. 1389, 1394.  The NFLPA, who by the time of the settlement had been designated by the majority of NFL players as its "exclusive

Amicus Brief of Athletes.org, Inc.                    No.  4:20-cv-03919-CW

bargaining representative", supported the settlement, held meetings with its members to encourage their support for the settlement, and "paid most of class counsel's fees…." *Id* at p.p. 1401 -1405.  So, to suggest that any settlement was reached in the *White* case without any involvement of the NFLPA, the collective bargaining unit for the NFL players, is simply not accurate.  Here, no collective bargaining unit for college athletes participated in negotiations of this proposed settlement, making any references to *White* inapposite, some college athletes have suggested in their comments to this Court that AO would be an acceptable organization that could provide representation of college athletes. But to date, unlike *White,* no such organization has been formally recognized and sanctioned to act on behalf of college athletes.

AO is not, therefore, a "labor union" for college athletes, as college athletes have not been broadly classified as "employees".  However, AO, in terms of services that it offers is an organization that operates similarly to professional sports unions such as the NFLPA and NBPA and serves as an independent athlete advocacy organization dedicated to representing and amplifying the voices of college athletes. AO provides essential, independent support to its members across a range of areas, including negotiating with universities; the necessity of ensuring that "standard" contracts used with college athletes provide for the protection of their physical and mental health; agent certification; and financial literacy and education.  AO's sentiments expressed herein are provided as advocates for those college athletes who will be affected by this Court's decision.  AO contends that there are key clarifications that should come from this Court if the proposed settlement is approved; that there are issues that are not adequately addressed in the proposed settlement; and that the potential for future litigation surrounding college athletics is certain, so as to form the need, AO contends, for college athletes to be adequately represented if they and college athletics are to secure the desired long-term stability that the Parties here apparently seek.

Amicus Brief of Athletes.org, Inc.                    No.  4:20-cv-03919-CW

No counsel for any of the Parties in this litigation authored this Brief, in whole or in part, or contributed money that was intended to fund preparing or submitting this Brief.  No other persons, other than AO, contributed money that was intended to fund preparing or submitting this Brief.

## SUMMARY OF THE ARGUMENT

AO supports the proposed settlement as an initial step, but only that.  The proposed settlement is not a replacement for collective bargaining.  The proposed settlement does not adequately address vital health and safety standards for college athletes.  The proposed settlement does not grant the Defendants' protections under the applicable non-statutory labor exemptions that have shielded professional sports leagues from certain anti-trust claims.  All of the disputes between the NCAA, its Members and college athletes are not resolved in this settlement.  Various state legislatures have introduced legislation that directly challenge elements of the proposed settlement, and others have existing laws that appear to prohibit certain elements of this proposed settlement from being implemented.  This legal ambiguity makes future legal disputes certain, and college athletes have no structural protections that are provided in this settlement to ensure that their interests are represented, and the law does not otherwise appear to provide those protections.

## ARGUMENT

## I.     THE "CLASSIC ROLE" OF AMICUS CURIAE

It is within the Court's discretion whether to allow amici to file a brief, and courts generally exercise "great liberality" in permitting amicus briefs.  *California by and through Becerra v. United State Dep't of the Interior*, 381 F.Supp.3d 1153, 11654 (N.D. Cal., 2019); *Cody v. Ring LLC,* 718 F. Supp. 3d 993, 1004 (N.D. Cal. 2024).  The "classic role" of amicus curiae is to assist a court in a case of public interest by "supplementing the efforts of counsel."  *Id.* (citations omitted).  "The salient question is whether such brief is helpful to the Court."  *Becerra*, 381

4

F.Supp.3d at 1164.

This case is undoubtedly one of "public interest."  In this case, AO's Brief, it contends, supplements the efforts of counsel and is helpful to the Court by providing additional insight and authorities for this Court's consideration.

## II.    AO SUPPORTS THE PROPOSED SETTLEMENT AS AN INITIAL STEP

Having reviewed the provisions of the proposed settlement, the various objections thereto, and the Motion for Final Settlement Approval and Omnibus Response to Objections (ECF. No. 717), AO supports this proposed settlement as an *initial* step in the right direction of addressing long-standing injustices that have existed within college athletics.; but that does not mean, from AO's perspective, that the proposed settlement should be approved, and AO fully understands that decision to rest with this Court.  The proposed settlement signals a necessary shift from the restrictive, outdated model that has governed college sports for more than 150 years.

However, while the proposed settlement is a positive step, AO continues to have grave concerns about how this proposed settlement is being publicly and privately characterized by leaders in college athletics that have already acted upon some of the proposed terms, which actions include contract provisions that prevent athletes from objecting to this settlement.  If this settlement is approved, AO respectfully requests that the Court clarify several key points so as to ensure that this settlement is not misconstrued as a comprehensive and final solution for college athletics.

## III.    NEEDED CLARIFICATION

## A.    The proposed settlement is not a replacement for collective bargaining.

It is axiomatic that parties to a collective bargaining agreement are "conclusively presumed to have equal bargaining power…."  *Emp. Painters' Tr. V. J&B Finishes*, 77 F.3d 1188, 1193 (9th Cir., 1996).  However, unlike professional athletes in the NFL and NBA who are represented by unions and have engaged in

collective bargaining to secure minimum standards and protections on a broad range of issues, this proposed settlement is not a collective bargaining agreement and does not provide athletes with a comparable framework. No one need suggest, therefore, that moving forward college athletes will have "equal bargaining power" with any of the Defendants.

Professional athletes have collectively bargained for critical protections, including: (a) health and safety standards; (b) practice time and workload regulations; (c) an independent grievance process; (d) insurance coverage/workers compensation; (e) infraction protocols; and (f) game and travel schedules. However, these fundamental aspects of protections provided to professional athletes remain unaddressed in the proposed settlement. The mental health struggles that college athletes are susceptible to are well recognized. *See Chow*, et. al., "A Program to Reduce Stigma Towards Mental Illness and Promote Mental Health Literacy and Help-Seeking in National Collegiate Athletic Association Division I Student-Athletes", 15 *Journal of Clinical Sports Psychology*, pp. 185-205 (2021) (attached, Ex. 2). AO's Members are no different, as its Members have reported issues such as schools putting their mental and physical wellness at risk and putting the schools' financial interests ahead of the athletes' wellbeing, all with no significant means for athletes to protect themselves from their institutions. Although the pressures placed upon college athletes in a "revenue sharing" model will undoubtedly increase, the proposed settlement provides no additional protections for these athletes.

While AO does not wish to be disrespectful to any of those that negotiated the provisions of the proposed settlement, the reality is that the proposed settlement was not negotiated by representatives duly elected by college athletes and does not take into account the varying needs and demands of different sports. Any comparisons, therefore, between the proposed settlement and a professional sport collective bargaining agreement (confined to a single sport) are misplaced.

Amicus Brief of Athletes.org, Inc.                          No. 4:20-cv-03919-CW

Relatedly, the settlement explicitly asks the court to approve all existing NCAA rules regarding compensation and benefits that may or may not be provided by Division I conferences or schools to student-athletes, despite those rules being crafted without the input from any athlete representatives. Therefore, moving forward, the proverbial "playing field" for college athletes is still not level.

**B.    Health and safety standards are not adequately addressed.**

The proposed settlement does not address issues of health and safety for athletes that are as important as the notion of "revenue sharing", especially for the overwhelming number of college athletes that will receive only a nominal amount. Currently, health and safety standards in college athletics are left to the control and enforcement by the NCAA, its conference and member institutions. As it pertains to the NCAA, these standards are found in the NCAA's Division I, 2024-25 Manual (Ex. 3). While the NCAA espouses as one of its Principles that "[i]ntercollegiate athletic programs shall be conducted….in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes" (*Id*, Constitution, Article 1, Section D), there are few mandated standards under which that Principle is to be accomplished. Similarly, conferences, like the SEC (*See e.g.* Ex. 4 – Southeastern Conference 2024-25 Constitution and Bylaws) do not have as one of their fundamental policies a purpose to provide for the health and safety of college athletes. *Id.*, at 9. The reality is that the Defendants can alter any of their policies at any time without consultation with the athletes which those policies impact. For instance, the NCAA Division I Manual (Section 16.4, Medical Expenses) provides that an "institution shall provide medical care, including payment of out-of-pocket medical expenses, to a student-athlete for an athletically related injury," but the period of care is limited to "two years following either graduation or separation from the institution, or until the student-athlete qualifies for coverage under the NCAA Catastrophic Injury Insurance Program, whichever occurs first." However, the NCAA's Catastrophic Injury Insurance Program has a

Amicus Brief of Athletes.org, Inc.                                No. 4:20-cv-03919-CW

$90,000.00 deductible.  (See Ex. 5, "NCAA Catastrophic Injury Insurance Program).  That insurance program provides limited benefits for athletes who are injured and cannot work due to a total or partial disability.

The NCAA's health and safety standards simply do not adequately protect athletes, because those standards were implemented without any discussion and negotiation with athletes.  While NCAA member institutions "agree to establish and maintain high standards of personal honor, eligibility and fair play" (Ex. 3, Section 20.2.4.13), there appears to be no language contained within the NCAA Manual that explicitly dictates enforceable health and safety standards, with "termination or suspension" of a member institution being limited to "failing to maintain the academic or athletics standards…."  (Ex. 3, Section 20.2.5.1).  While NCAA member institutions may be subjected to various penalties for failing to "complete a comprehensive review of its mental and physical health, safety and performance support services" (*Id*, Section 20.2.4.24), athletes are not provided any rights to enforce obligations imposed upon NCAA member institutions.  If the Defendants were interested in providing additional health and safety protections, they most certainly could have done so in this proposed settlement.

## C.    The proposed settlement does not grant Defendants protection under the non-statutory labor exemption.

The non-statutory labor exemption sets forth "a national labor policy favoring free and private collective bargaining," requiring "good-faith bargaining over wages, hours and working conditions" and "delegate related rulemaking and interpretative authority to the National Labor Relations Board."  *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996).  Obviously, those components do not exist in the proposed settlement.  The proposed settlement is not the product of collective bargaining and therefore, is not protected under the non-statutory labor exemption that shields professional sports leagues from antitrust claims.  The Defendants have "expressly acknowledged that the settlement does not provide

1  immunity from future antitrust actions…." (ECF 717, p. 26). AO contends that this

2  Court should recognize the probability of future antitrust actions especially as it

3  pertains to: (a) health and safety violations; (b) Third Party NIL (Name, Image and

4  Likeness) restrictions; and (c) collusive activities impacting institutional athlete

5  compensation. The President of Mississippi State, also head of the College Football

6  Playoff executive board, has confirmed: "Even with the new settlement, we are

7  going to still be peppered with challenges and lawsuits."[1] So if this Court approves

8  the proposed settlement, this Court should hold the Defendants to their

9  representations that no provisions of the settlement insulate the Defendants from

10  future anti-trust liability, including any that may arise from the Defendants'

11  attempts to implement and administer provisions of this settlement.

12      That protection can only be provided to the Defendants if college athletes are

13  collectively represented, and the Defendants formally recognize that representation.

14  The proposed settlement and existing law currently provides no mechanism for such

15  representation and recognition to occur, but that observation simply amplifies the

16  unequal bargaining position that college athletes will continue to find themselves

17  in. That unequal bargaining position is illustrated in the adhesive contracts that

18  Division I conferences and member institutions are already utilizing, even before

19  this settlement is approved.

20  **D.  Future litigation is a certainty.**

21      As pointed out by some of the objections (*see e.g.* ECF No. 613), the proposed

22  settlement does not contain provisions regarding how any conflicts that may arise

23  out of the terms of this proposed settlement as applied against actual or proposed

24  legislation in various States will be resolved. While the suggestion is made that

25  this "settlement only resolves antitrust claims" and that "there is nothing in the

26

27  ---

[1] https://sports.yahoo.com/college-football/article/do-college-football-coaches-think-new-enforcement-arm-will-work-lsus-brian-kelly-it-is-not-a-slap-on-the-wrist-200619854.html

28

Amicus Brief of Athletes.org, Inc.                    No. 4:20-cv-03919-CW

settlement that releases non-compliance with individual state NIL laws" (ECF. No. 717, p. 26), that observation does not adequately address the notion that those conflicts do in fact exist. Such conflicts only invite future litigation, as this proposed settlement, involving only questions of Federal law, cannot preempt claims that may arise under State law. The prospects of Congressional action that would somehow insulate the Defendants from further legal challenges are remote. The burden would then be upon the NCAA to pursue litigation against the various States whose laws conflict with the provisions of this proposed settlement. *See e.g. NCAA v. Miller*, 10 F.3d 633 (9th Cir., 1993) (action to enjoin enforcement of Nevada state statutes). This uncertainty leaves athletes in a proverbial "no-man's land" as States, NCAA Member institutions, and college athletes seek clarity on their legal rights and obligations under evolving compensation models. Accordingly, this Court should make clear that this proposed settlement cannot and therefore, does not, preempt the application of the laws of the various States.

**E.    Agreements with college athletes are being misused.**

AO has obtained copies of agreements between college athletes and conferences/universities. (Exs. 6 through 11). Even before this proposed settlement is approved, college athletes are being asked to sign "revenue-sharing contracts" that are contingent upon approval of the proposed settlement in this case. (*See e.g.* Exhibit 6, Big Ten Memorandum of Understanding, §12; Ex. 8 – SEC Template, §13; Ex. 9 – University of Minnesota template, §12; Ex. 10 – University of Kansas term sheet, "Conditions of Athletics' Obligations (Conditions Precedent)"; Ex. 11 – University of Arizona term sheet, §2). These contracts of adhesion are "standardized contracts", drafted by those with superior bargaining strength, that relegates to college athletes only the opportunity to adhere to these contracts, or reject them. *Delmore v. Ricoh Americas Corp.*, 667 F. Supp. 2d 1129, 1136 (N.D. Cal. 2009); *Pappas v. AMN Healthcare Servs.*, No. 24-CV-01426-JST, 2025 WL 50440, at *4 (N.D. Cal. Jan. 8, 2025) ("An adhesive contract is a standardized form

offered by the party with superior bargaining power on a take-it-or-leave-it-basis."). These contracts grant the institutions exclusive rights to an athlete's NIL; releases institutions from any use of an athlete's NIL; waive any right of the athlete to approve how his/her NIL is used; requires that athlete's "decline" to object to this proposed settlement; requires advance approval of an athletes' social media posts and prohibits any content that "disparages" the institution, the conference or "any third party"; prohibit the promotion of "political organizations", including any "candidate"; and prohibit an athlete from entertaining any inquiry from any other college. (Ex. 6, ¶1, 2, 12; Ex. 7, "Adjustment"; Ex. 8, ¶1, 2(b), 4(b), 4(c), 7, 9; Ex. 11, ¶10(a),12, 13).

Any suggestion that this proposed settlement does not deny athletes certain rights and privileges may be literally true. But the adhesion contracts that are being offered in a "take it or leave it" fashion by the NCAA's member institutions do and otherwise seek to control virtually every aspect of an athlete's life. What this Court should clarify if this settlement is approved is that the Defendants simply do not, through this settlement, escape the ongoing scrutiny that these contractual relationships demand.

## SUMMARY AND CONCLUSION

No one can characterize the proposed settlement as a comprehensive solution to the myriad of issues that college athletes face, and it is imperative that the proposed settlement not be misrepresented as such. The proposed settlement can never serve as a replacement for collective bargaining, nor provide the mechanisms to protect the rights and future interests of college athletes.

Respectfully submitted this the 27th day of March 2025.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHIPMAN & WRIGHT & MOORE, LLP**
*Attorneys for Athletes.org, Inc.*

By:     /s/ Gary K. Shipman
_____
**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
**JAMES T. MOORE**
N.C. State Bar No.: 38377
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990

**WILLIAM AUDET** (SBN 117456)
waudet@audetlaw.com
711 Van Ness Ave., Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555

Amicus Brief of Athletes.org, Inc.                          No.  4:20-cv-03919-CW

1
2
3
## <u>CERTIFICATE OF SERVICE</u>
4
        I HEREBY CERTIFY on March 27, 2025, I filed the foregoing with the Court
5
by uploading to the CM/ECF system for the United States District Court for the
6
7
Northern District of California and that a true and accurate copy was served on all
8
Registered parties via Notice of Electronic Filing.
9
10
                                        By:    /s/ Gary K. Shipman
11                                          _____
                                            **GARY K. SHIPMAN**
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amicus Brief of Athletes.org, Inc.                    No.  4:20-cv-03919-CW

<u>INDEX OF EXHIBITS</u>

Exhibit 1      Certification of Formation

Exhibit 2      Chow, et. al, "A Program to Reduce Stigma Towards Mental Health Illness and Promote Mental Health Literacy and Help-Seeking in National Collegiate Athletic Association Division I Student-Athletes", 15 *Journal of Sports Psychology*

Exhibit 3      NCAA Division I 2024-25 Manual

Exhibit 4      SEC Constitution & Bylaws

Exhibit 5      NCAA Catastrophic Injury Insurance Program

Exhibit 6      Big Ten Memorandum of Understanding

Exhibit 7      Big Ten Summary of Principal Terms

Exhibit 8      SEC Term Sheet

Exhibit 9      University of Minnesota Agreement

Exhibit 10     University of Kansas Agreement

Exhibit 11     University of Arizona Template

Amicus Brief of Athletes.org, Inc.                    No.  4:20-cv-03919-CW