Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **JOINT SUPPLEMENTAL BRIEF IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Judge:  Hon. Claudia Wilken |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

I. The Ten-Year Injunction Term Is Consistent With Rule 23 And Due Process, And The Parties Have Made Further Changes To The Settlement To Confirm What They Always Intended And Address the Points Expressed by the Court. ............................................................. 1

  A. Class Action Injunctive Relief Settlements Regularly Include Future Class Members Who Receive the Benefits, And Are Subject To The Terms, Of The Settlement .................................. 2

  B. There Are No Due Process Concerns Arising From Future Class Members' Limited Release Of Injunctive Relief Claims ................................................................................................ 6

II. The Immediate Implementation Of Roster Limits Poses No Bar To Approval.................................................................................................... 9

III. Plaintiffs Have Adequately Addressed Any Glitches In The Settlement Administration Process. ....................................................... 12

IV. The Release Of The College Football Playoff Is Appropriate............................ 14

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.B. v. Haw. State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022) ........................................................................................... 2

*Alexander v. Nat'l Football League*,
1977 WL 1497 (D. Minn. Aug. 1, 1977) ......................................................................... 2

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................ 3

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) ............................................................................................ 8

*Bridgeman v. Nat'l Basketball Ass'n*,
838 F. Supp. 172 (D.N.J. 1993) ...................................................................................... 2

*Cohen v. Brown Univ.*,
16 F.4th 935 (1st Cir. 2021) .......................................................................................... 12

*In re College Athlete NIL Litig.*,
2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) ................................................................ 12

*Gaskin v. Pennsylvania*,
389 F. Supp. 2d 628 (E.D. Pa. 2005) ........................................................................... 4, 8

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1999) .................................................................................... 1, 12

*Laumann v. Nat'l Hockey League*,
105 F. Supp. 3d 384 (S.D.N.Y. 2015) .......................................................................... 12

*LeClair v. Mass. Bay Transp. Auth.*,
300 F. Supp. 3d 318 (D. Mass. 2018) ...................................................................... 2, 7, 8

*Martin v. Davies*,
917 F.2d 336 (7th Cir. 1990) .......................................................................................... 5

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
311 F.R.D. 532 (N.D. Cal. 2015) .................................................................................. 12

*Probe v. State Tchrs. Ret. Sys.*,
780 F.2d 776 (9th Cir. 1986) .......................................................................................... 4

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010) ............................................................................................. 9

*Robertson v. Nat'l Basketball Ass'n,*
    389 F. Supp. 867 (S.D.N.Y. 1975).......................................................................... 3

*Robertson v. Nat'l Basketball Ass'n,*
    72 F.R.D. 64 (S.D.N.Y. 1976) ............................................................................. 2

*Robichaud v. Speedy PC Software,*
    2013 WL 818503 (N.D. Cal. Mar. 5, 2013)............................................................ 5

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003)....................................................................... 1, 3, 4, 12

*White v. Nat'l Football League,*
    822 F. Supp. 1389 (D. Minn. 1993) ........................................................... 1, 3, 6, 7

**STATUTES**

Americans with Disabilities Act .................................................................................... 7, 8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ....................................................................................................*passim*

Fed. R. Civ. P. 23(b)(2)................................................................................................... 3

Fed. R. Civ. P. 23(e)(2).................................................................................................. 10

**INTRODUCTION**

The issue before the Court is whether "the settlement taken as a whole, rather than the individual component parts," is fair and reasonable. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1999)). Under that standard, the case for approval is clear. As the Parties have previously explained, the Settlement Agreement will open the door for schools to share approximately 50% of athletic department revenues with, and provide additional scholarships to, student-athletes. It also clears the way for many NIL transactions with third parties and submits the remainder to a fairer and more transparent review and enforcement process. In so doing, the settlement opens the door for *greater competition* between schools, which is exactly what the underlying antitrust lawsuits seek to accomplish. There is accordingly no question that the Settlement Agreement, as submitted to the Court, is a vast improvement over the status quo. It is also a win for the Parties upon consideration of "the risk, expense, complexity, and likely duration of further litigation," *Staton*, 327 F.3d at 959, particularly given that the past decade of litigation has resulted in lesser outcomes and delayed benefits to student-athletes.

While the Parties continue to stand by the Settlement Agreement as it was presented to the Court, we have carefully re-evaluated it in light of the Court's comments and questions, as well as the points raised by objectors, at the Final Approval Hearing. We have addressed some, but not all, of the points the Court identified, and explain our approach below. These revisions further confirm what over 99.9% of the class members have apparently realized—the Settlement Agreement is fair and reasonable, and should be approved so that its benefits can fully flow to the classes.

**I.    The Ten-Year Injunction Term Is Consistent With Rule 23 And Due Process, And The Parties Have Made Further Changes To The Settlement To Confirm What They Always Intended And Address the Points Expressed by the Court.**

The ten-year injunctive relief settlement term is essential for providing stability for class members and Division 1 college sports and is a central component of the Settlement. The alternative would be a succession of new antitrust cases each year, with uncertain—and potentially inconsistent—outcomes that could take years more to resolve. This is why the seminal antitrust class action settlements in the sports industry have involved multi-year injunctions. *See White v.*

*Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994), *cert. denied*, 115 S.Ct. 2569 (1995); *Bridgeman v. Nat'l Basketball Ass'n*, 838 F. Supp. 172, 174 (D.N.J. 1993); *Alexander v. Nat'l Football League*, 1977 WL 1497 (D. Minn. Aug. 1, 1977); *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64 (S.D.N.Y. 1976), *aff'd* 556 F.2d 682 (2d Cir. 1977). The same multi-year settlement structure is in the best interest of the Injunctive Relief Settlement Class here.

During the Final Approval Hearing, the Court raised questions about the procedures to make sure that all future Injunctive Relief Settlement Class members have a clear notice and opportunity to object to the continuation of the Settlement before releasing their injunctive relief claims. The Parties appreciate the Court's rigor in fulfilling its role of ensuring that the Settlement is fair and reasonable. In response to the Court's questions, the Parties have agreed to adjust the release provisions of the Settlement Agreement, consistent with their intent and representations during the Final Approval Hearing, to clarify that future Division 1 athletes will not release their injunctive relief claims until they have received notice and an opportunity to object to the continuation of the Settlement. *See* Berman Decl., Ex. A, (revised release provisions).[1] This clarification, the proposed notice that will be provided to each future class member (Berman Decl., Ex. C), and the objection procedures provided therein are, to the Parties' knowledge, the most robust and protective process ever devised to safeguard the rights of future Injunctive Relief Settlement Class members. They fully comply with Rule 23 and due process.

### A. Class Action Injunctive Relief Settlements Regularly Include Future Class Members Who Receive the Benefits, And Are Subject To The Terms, Of The Settlement

During the Final Approval Hearing, the Court asked whether injunctive relief class action settlements, such as this one, can include future class members. *See* Final Approval Hr'g Tr. ("Tr.") at 165:17–166:20. The answer is unequivocally yes: "[c]lass action settlements may cover both present and future class members." *LeClair v. Mass. Bay Transp. Auth.*, 300 F. Supp. 3d 318, 323 (D. Mass. 2018) (collecting authorities); *see also A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828,

---

[1] These revised release provisions are incorporated into the Third Amended Settlement Agreement, which is attached as Exhibit A to the Declaration of Steve W. Berman in Support of Joint Supplemental Brief in Support of Final Approval of Class Action Settlement ("Berman Decl."), filed concurrently herewith.

838 (9th Cir. 2022) ("The inclusion of future class members in a class is not itself unusual or objectionable, because when the future persons referenced become members of the class, their claims will necessarily be ripe." (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010)). In multiple contexts—ranging from education, to sports, to employment, to housing—where the composition of the class is inherently transitory, courts have approved Rule 23(b)(2) injunctive relief settlement classes that include *future* class members who are subject to the benefits and restrictions of the injunction.

For example, in *White*, the District of Minnesota approved—and the Eighth Circuit affirmed—a seven-year injunctive relief settlement between the NFL and a plaintiff class that included "all college and other football players who have been, are now, ***or will be eligible*** to play football as a rookie for an NFL team at any time from August 1, 1987, to the date of final approval of the settlement of this action." 822 F. Supp. at 1403, *aff'd*, 41 F.3d 408 (8th Cir. 1994) (emphasis added).[2] In other words, the class included football players who were not yet (and may never have been) NFL players when the settlement was approved, so long as they were "eligible" to play in the NFL in the future. As the District of Minnesota explained:

> To be effective, any settlement must [ ] address the NFL 'structural' rules that will govern players in future years. Thus, a comprehensive agreement or order must encompass such future rules in order to afford appropriate relief to plaintiffs and to be acceptable to the defendants.

*Id.* at 1408.[3]

Similarly, in *Staton v. Boeing Co.*, the Ninth Circuit approvingly discussed a three-year injunctive relief settlement between Boeing and a plaintiff class of "all African-Americans

---

[2] In *Amchem*, the Supreme Court noted that Rule 23's certification criteria apply with equal force for settlement-only classes and should not be "obviated" or "reduce[d]" in the context of a settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1997). The Court quoted the Eighth Circuit's passing observation in *White* that "the adequacy of class representation [] is ultimately determined by the settlement itself," *White*, 41 F.3d at 408, but did not call into question *White*'s holding. And indeed, after making that remark in *White*, the Eighth Circuit went on to analyze and overrule objectors' specific adequacy objections, consistent with *Amchem*, concluding that they lacked merit as a factual matter, rather than relying on the settlement. *Id.*

[3] *See also Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 896–97 (S.D.N.Y. 1975) (explaining that in the class certification context, "[c]ourts have approved classes which included future members" and explaining that any concern about notice would be alleviated because "plaintiffs have agreed to give notice of the proceedings to all present and future members.")

employed by Boeing from the beginning of the applicable limitations periods until the expiration of the decree (***including new employees hired after the preliminary approval date*** of the decree)." 327 F.3d at 948 (emphasis added).[4] Likewise, in *Gaskin v. Pennsylvania*, the Eastern District of Pennsylvania approved a five-year settlement between the Pennsylvania public school system and a plaintiff class of:

> all present ***and future school*** age students with disabilities in the Commonwealth of Pennsylvania who have been denied the option of receiving a free appropriate education with individualized supportive services, or have been placed in regular education without supportive services, individualized instruction and accommodations they need to succeed in the regular classrooms.

389 F. Supp. 2d 628, 629–31 (E.D. Pa. 2005) (emphasis added). And in *Baez v. New York City Housing Authority*, the Southern District of New York approved a three-year settlement between the New York City Housing Authority ("NYCHA") and a class of "[c]urrent and future residents of NYCHA who have asthma that substantially limits life activity and who have mold and/or excessive moisture in their NYCHA housing." Order at 2–4, No. 1:13-cv-08916-WHP (S.D.N.Y. Apr. 8, 2014) (ECF No. 21). In each of these cases, the court approved a multi-year injunction binding future class members because of the need for long-term structural changes that would both benefit and bind future class members.[5]

Yet, in none of these cases approving multi-year injunctive relief settlements did any court express a concern about how the class notice would reach future class members, about the ability of the class representatives and class counsel to represent those individuals' future interests, or about the fact that future class members would be bound by the injunctive relief secured under the settlement. With good reason: as the Seventh Circuit recognized, where a "group's composition

---

[4] The *Staton* settlement approval was reversed by the Ninth Circuit not because it involved future class members but "because of several considerations relating to the award of attorneys' fees and because of the structure of the damages payments established by the decree." *Id.* at 945.

[5] The Ninth Circuit has also rejected arguments that including future class members creates a conflict. *See Probe v. State Tchrs. Ret. Sys.*, 780 F.2d 776, 779, 781 (9th Cir. 1986) (defining class to include those who were, "are or will be employed" and "who are currently receiving, eligible to receive or in the future will receive" retirement benefits, over objection "that there is a conflict between currently retired teachers and teachers presently working," reasoning that if the challenge plan "violate[s] Title VII, it will be invalidated notwithstanding the fact that there may be some who would prefer that it remain in operation").

changes every day," "[t]here would be little point" in entering a settlement agreement that "bind[s] only those who were [class members] on the day the [settlement] was signed." *Martin v. Davies*, 917 F.2d 336, 339 (7th Cir. 1990).

In this case, the Injunctive Relief Settlement goes to unprecedented lengths to ensure that future class members will have unvarnished notice and an opportunity to object. As Plaintiffs previously committed, they will add new class representatives throughout the Injunctive Relief Settlement term to ensure that there is always a current athlete representative.[6] Tr. at 26:21–27:1. In addition, *every* future class member will receive direct notice of the Injunctive Relief Settlement at or before the time he or she first enrolls or first joins an athletic team. *See* Berman Decl., Ex. C (proposed notice); Ex. A (Third Amended Settlement Agreement), ¶ 14. Upon receipt of the notice, each future class member will have 60 days to determine whether to: (i) release any right to challenge the terms of the Injunctive Relief Settlement by participating in Division I college sports without submitting an objection, (ii) not participate in Division I college sports (and therefore not be bound), or (iii) submit an objection to the Court explaining why she or he thinks that the Injunctive Relief Settlement should not continue.

Further, in response to the Court's questions, and consistent with the Parties' representations at the Final Approval Hearing about how the Settlement was always intended to work, the Parties have agreed to amend the Settlement Agreement to clarify that future class members will not release any injunctive relief claim against Defendants until their 60-day objection window has lapsed or until their objection is ruled upon by the Court. If the settlement is approved, the Parties will also submit to the Court a proposed timeline for the upcoming Academic Year with more specific dates, which will include a proposed hearing date where the Court can hear and consider any new

---

[6] Substituting out class representatives as a named plaintiff graduates is permissible. *See, e.g.*, *Robichaud v. Speedy PC Software*, 2013 WL 818503, at *8 (N.D. Cal. Mar. 5, 2013) ("[W]here a named plaintiff's individual claims fail or become moot for a reason that does not affect the viability of the class claims, courts regularly allow or order the plaintiffs' counsel to substitute a new representative plaintiff." (internal citations omitted)). At the current time, Sedona Prince is still a student and thus has active standing to represent the Injunctive Relief Settlement Class. New class representatives who are current students will be added over the ten-year life of the Injunctive Relief Settlement so that there is always at least one such class representative in place.

1    objections to the Injunctive Relief Settlement from incoming class members. The Parties will
2    follow the same procedure each year during the Injunctive Relief Settlement term.

3        In short, this process unquestionably comports with the notice requirements of Rule 23 and
4    due process, and is exponentially more robust than any other notice and objection procedure that
5    the Parties are aware of.

6    ### B.    There Are No Due Process Concerns Arising From Future Class Members' Limited Release Of Injunctive Relief Claims

7

8        The Court also asked if the Injunctive Relief Settlement would violate future class
9    members' due process rights by requiring them to release their claims for injunctive relief. The
10   answer is no. Courts regularly find that future class members—even those who never receive notice
11   of a settlement and could not have conceived that they would become a class member in the
12   future—can be barred from asserting future injunctive relief claims. But here, the Parties are going
13   to extraordinary lengths to ensure that every future class member understands her rights and is
14   provided an opportunity to make an informed judgment: a future class member will not release any
15   claims until she has received notice and an opportunity to object to the continuation of the
16   Injunctive Relief Settlement.

17       As previously discussed, in *White v. NFL*, the District of Minnesota approved—and the
18   Eighth Circuit affirmed—a settlement that included both then-current *and future* NFL players. 822
19   F. Supp. at 1403 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994), *cert. denied*, 115 S.Ct. 2569
20   (1995). The release in that settlement, as set forth in the Court-approved notice, applied to both
21   current *and future* NFL players:

22           If the proposed settlement is approved by the Court, the National
             Football League and its member clubs ***will be released from any and***
23           ***all liability*** to class members for all claims alleged in the Complaints,
             ***and class members will be precluded from obtaining any further***
24           ***damages or injunctive relief*** based upon the following claims that:
             … (B) the NFL College Draft is unlawful and an unreasonable
25           restraint of trade in violation of the antitrust laws; (C) the NFL Player
             Contract or any term therein, is unlawful and an unreasonable
26           restraint of trade in violation of the antitrust laws.

27   Notice of Class Action Settlement at 1–2, *White*, No. 4:92-cv-00906-MJD (D. Minn Feb. 26, 1993)
28   (ECF No. 82) (emphases added). Creating this long-term certainty was necessary in the unique

context of sports. As Judge Doty explained, "[i]f individual players file separate actions seeking injunctive relief against NFL player restraints, there is a substantial risk of inconsistent or varying adjudications which would result in incompatible standards of conduct for the defendants." *White*, 822 F. Supp. at 1408 ("One court could grant injunctive relief, a second might deny such relief, and a third might grant injunctive relief that materially differs from that granted by the first court."). These differing results "would impair the [league's] ability to pursue a uniform continuing course of conduct where pragmatic considerations require that the defendants act in the same manner to all members of the class." *Id.* (quoting *Robertson*, 584 F.2d at 283).

The same is true here. College sports would be entirely unmanageable if individual future college athletes (or groups of future athletes) pursued different types of injunctive relief year over year over year. Indeed, college sports could not operate effectively if certain rules apply to certain athletes (or groups of athletes), while different rules apply to others. For the same reason, it would be impracticable for the Court to certify a new injunctive relief class each year with different rules applying to each class. The Injunctive Relief Settlement works only if it is durable and applicable to all current and future class members.

Still, it is important to emphasize that future class members are not without rights. *First*, no future class members are releasing their right to pursue future damages claims. *Second*, every future class member will receive notice and have the right to object to the Injunctive Relief Settlement—and have any objection adjudicated—before her release takes effect. *See* Berman Decl., Ex. A, ¶¶ 14, 19–21.

This proposed structure is more protective of future class member rights than due process requires, as no future class member is subject to any release until *after* she receives notice of her class membership and an opportunity to object. In other cases, courts have barred future class members under principles of *res judicata* and claim preclusion from pursuing injunctive claims even where they had no notice that they were members of a class, and even where they *did not* explicitly release those claims as part of the class action settlement.

In *LeClair v. Massachusetts Bay Transportation Authority*, the District of Massachusetts dismissed a case from seeking injunctive relief against the Massachusetts Bay Transportation

Authority ("MBTA") under the Americans with Disabilities Act, finding that those claims were barred by a class action settlement entered by the MBTA eleven years earlier. 300 F. Supp. 3d at 321. Under the earlier settlement, the class was defined to include "[a]ll individuals with … disabilities, as defined by Title II of the [ADA] … who use, **will use**, or would use the bus, light rail, and heavy rail rapid transit services." *Id.* at 323 (alterations in original, emphasis added). In *LeClair*, the plaintiff argued that precluding his claim would "violate his due-process rights" because he was not a class member at the time of the prior settlement—he only became disabled *after* that settlement was entered. *Id.*

The District of Massachusetts found that argument "unpersuasive for multiple reasons." *Id.* Among other things, the Court explained that the settlement class "explicitly included future members (that is, persons who would become disabled in the future and who would use the MBTA)." *Id.* at 324. In addition, the Court expressed concern that "the requested relief—that is, separate injunctive relief addressing the identical subject matter [as the prior settlement]—would undermine the finality of the settlement and create a substantial potential for inconsistent judgments." *Id.*

In *Blunt v. Lower Merion School District*, a group of African American students brought a series of claims concerning the Pennsylvania Department of Education's failure to identify and accommodate the students' disabilities due to racial animus. 767 F.3d 247 (3d Cir. 2014). The District of Pennsylvania held that a class action settlement agreement in *Gaskin v. Pennsylvania*—which was entered two years before *Blunt* was filed—barred the claims. *Id.* at 262. The Third Circuit affirmed. *See generally id.* The Circuit Court noted that "[t]he *Gaskin* plaintiffs made similar (although not identical) allegations as those in this case" on behalf of a class of plaintiffs that "was very broad and included 'all present and future school age students with disabilities in the Commonwealth of Pennsylvania.'" *Id.* at 262–63. Thus, "[al]though not all[] of the plaintiff students" in *Blunt* were class members at the time of the *Gaskin* settlement, the Court nonetheless concluded that the *Blunt* claims had been released. *Id.* at 281–82.

In contrast to the plaintiffs in the above-mentioned cases, the Injunctive Relief Settlement here provides future class members direct notice of their membership in the class, an opportunity

to object to the continuation of the Injunctive Relief Settlement, and does not provide for any release until he or she has an opportunity to submit an objection and have it adjudicated. In sum, the proposed ten-year Injunctive Relief Settlement here—which provides all future class members unprecedented notice and protections—is clearly consistent with the requirements of Rule 23 and due process. It should be approved as being in the best interests of the Injunctive Relief Settlement Class.

## II.    The Immediate Implementation Of Roster Limits Poses No Bar To Approval.

As the Parties explained at the hearing, the immediate implementation of the roster limits in the Injunctive Relief Settlement is part of an overall settlement compromise that is fair and reasonable to the Injunctive Relief Settlement Class, considered as a whole. The Parties are aware of no other organized team sports association—and Objectors have identified none—that operates without some form of roster limit. Courts have recognized the ability of sports organizations to have reasonable rules regulating their sports, which includes roster sizes. *See*, *e.g., Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport."). Moreover, it remains the case that (1) roster spots are not currently guaranteed, such that the Settlement does not take away anything to which student-athletes are currently entitled; (2) Defendants explained how they calibrated the roster limits to make the transition as smooth as possible; and (3) the move to roster limits is part of the overall compromise to open the door to countless more scholarships that may be awarded and, more generally, greater and different forms of competition between schools to provide benefits and attract and retain student-athletes. *See, e.g.*, ECF No. 717 at 43–45; ECF No. 721 at 8–13; ECF No. 745 at 1–4; Tr. 202:20–207:12.

The Parties appreciate the perspective and heartfelt stories that the student-athletes who objected shared, including those shared at the hearing. Defendants have evaluated—and discussed with numerous member institutions—the Court's suggestion to "grandfather" in the roster limits. Defendants, however, have informed Class Counsel that those discussions revealed no practicable way to do so, because "grandfathering" roster limits would cause significant disruption. The Parties

-9-

1  are both independently aware that member institutions and student-athletes have been making

2  decisions in anticipation of the roster limits being immediately effective if the Settlement is

3  approved.

4       Prior to preliminary approval, objectors raised concerns about the immediate

5  implementation of roster limits. *See, e.g.*, ECF No. 475 at 16 (Molo Objection noting that "[f]or

6  many schools and sports, these roster sizes are below current and projected team sizes, which

7  include walk-ons, and may impact their recruiting strategies"). The Court nevertheless granted

8  preliminary approval, finding it "will likely be able to approve the Settlement as fair, reasonable,

9  and adequate pursuant to Rule 23(e)(2), subject to further consideration at a hearing." ECF No. 544

10 at 2–3. Over the following six months, in order to be prepared for the upcoming academic year,

11 member institutions and student-athletes have been proceeding on the understanding that the roster

12 limits would "likely" go into effect immediately. *Id.* That understanding has impacted numerous

13 decisions and preparations around budgeting, recruiting, and enrollment that needed to be made.

14 Defendants have informed Class Counsel that member institutions in non-Defendant Conferences

15 have made initial decisions about whether or not to opt into the Pool structure if the Settlement is

16 approved; some have elected not to, in which case the roster limits have no effect on their student-

17 athletes. Those member institutions in Conferences that are parties to the Settlement, or that have

18 indicated they will opt to provide additional benefits permitted by the Settlement if the Settlement

19 is approved, have made decisions about how they will allocate resources across their athletic

20 department, including scholarships and other forms of financial aid.

21       These decisions, in turn, cascaded into tens of thousands of decisions by individual student-

22 athletes. Many kept their pre-existing roster spots (and may now receive scholarships), because the

23 roster limits were designed to capture the average number of participants across a season and

24 thereby minimize disruptions from the transition. *See* ECF No. 721 at 9–11 (describing initial roster

25 limits); Tr. at 206:3–18 (describing process for establishing roster limits). Some transferred to new

26 schools to seek roster spots and enhanced opportunities for athletic competition. Even though

27 student-athletes make similar decisions every year for reasons independent of the Settlement (and

28 coaches also advise student-athletes that there will be no roster spot the following year), at least

-10-

some of those decisions this year were likely made because of the Settlement. Incoming student-athletes have likewise made choices about where to enroll, potentially based on expectations of receiving a specific amount of playing time or opportunities for competition during the year.

For all these reasons, while implementing a "grandfather" provision might benefit some athletes, it would, at the same time, upset the settled expectations, enrollment decisions, and other preparations of numerous other student-athletes and member institutions. The Parties note, however, that the number of student-athlete objectors who have claimed to be cut as a result of the Settlement remains small—less than .05% of the class, if that. *See* ECF No. 628 at 1–2 (identifying tens of student-athletes compared to almost 390,000 class members).[7] And any adjustment to implementation of the roster limits is likely to have a snowball effect that would adversely impact other class members. There are likely many more student-athletes who made different decisions about where to compete this year or next year based on the likelihood that roster limits would be in effect, some of whom may also want a re-do if that door is opened. Those include student-athletes who transferred to a different institution in search of roster spots and enhanced opportunities for athletic competition. The group wanting a re-do may also include incoming or transferring student-athletes who would receive less playing time or competition opportunities than expected if additional students were added to their roster under a grandfathering approach. And every additional "round" of re-dos permitted would create a new set of potentially affected student-athletes who might want re-dos themselves; with thousands if not more individual decisions having been made on the understanding the roster limits would likely go in effect in less than three months. Defendants have therefore concluded that a "grandfather" provision is unworkable.

Notwithstanding the questions raised concerning roster limits, the Parties continue to agree that final approval should be granted given the overwhelming benefits of the Settlement for the Injunctive Relief Settlement Class. And that is so even looking just at the roster limits in isolation, as those limits apply to all Class members equally—who each have the opportunity to receive

---

[7] The Settlement ensures that any athlete who is released from his or her team because of roster limits will nonetheless retain his or her athletic scholarship. Third Amended Injunctive Relief Settlement, Art. 4, § 1.

significant new benefits that will likely collectively total tens of billions of dollars over ten years. *But see Staton*, 327 F.3d at 952; *Hanlon*, 150 F.3d at 1026 (discouraging such isolated analysis).

At the hearing, Defendants articulated their procompetitive justifications for roster limits, including protecting competitive balance and enhancing output. *See* Tr. at 40:0–41:3; 217:1–220:17. Moreover, the move from scholarship limits to higher roster limits under which more student-athletes can receive athletic aid is a move towards a less restrained market—the stated goal of the antitrust lawsuits the Parties have settled. Indeed, while it is unfortunate that a small number of athletes may ultimately have lost roster spots as a result of the Settlement, the Settlement afforded them an opportunity to compete for scholarships (or larger scholarships) and additional compensation and benefits that were not previously available. The law generally does not sustain objections to a class settlement based upon the operation of a less restrained marketplace in which class members must compete with one another for such opportunities. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 400, 405–06 (S.D.N.Y. 2015). The Court's prior rulings in these cases endorse this principle, and there is no basis for a different outcome here. *See In re College Athlete NIL Litig.*, 2023 WL 8372787, at *27 (N.D. Cal. Nov. 3, 2023) (rejecting "substitution effect" argument regarding "substitutions or displacements that may or may not take place in a hypothetical but-for world"); *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 541–42, 546 (N.D. Cal. 2015) ("Here, although Defendants suggest that class members might prefer to leave an unlawful restraint in place because they otherwise would have to compete against one another, such preference for non-competition does not justify denying injunctive relief class certification."); *see also Cohen v. Brown Univ.*, 16 F.4th 935, 948–51 (1st Cir. 2021).

In short, the Injunctive Relief Settlement, including the roster limits, creates more competition when viewed as a whole, and that should not be a basis for denying approval of a class settlement of antitrust claims.

## III. Plaintiffs Have Adequately Addressed Any Glitches In The Settlement Administration Process.

At the Final Approval Hearing, the Court referenced "glitches" with the website and notice and allocation process and asked the parties to further address these issues and the efforts to address

Class Member questions. Class Counsel, who have been overseeing these matters, respond as follows.

Throughout the notice period and continuing to now, there has been an email address and phone number offered on the website for Class Members to submit inquiries. During the notice period, Verita Global, LLC (the "Settlement Administrator") received over 36,457 inquiries by email and phone and responded on average within 1.5 days. ECF No. 717-4, ¶ 31. The Settlement Administrator has and will continue to log calls and emails received from class members, as well as any unsuccessful attempts to return calls and emails. The approved Notice Plan provides for a telephone hotline and an email support service. ECF No. 450-5, ¶¶ 44–45. In addition, Class Counsel has similarly communicated with hundreds of Class Members and will continue to offer additional support for questions that arise.

Individual allocation estimates have been available through the settlement website since December 17, 2024. Class members have also been able to access information regarding the bases for those allocations from the data provided by their schools, including third-party NIL deals. Class Members have been offered the opportunity to submit additional or corrected information related to scholarship status, playing years, and third-party NIL deals if they believe the reported data was inaccurate. Class Counsel and Defendants have worked diligently to go back to Division I member institutions to confirm details in response to class member inquiries and correct any errors that may impact a class member's allocation and will continue to do so.

To the extent class members have submitted updated information, such as third-party NIL deals or scholarship status that impact an individual class member's allocation, the estimated allocation will be updated. Updates to allocations will be calculated and be made available to all class members once the late-claim deadline has passed and after the Court rules on Class Counsel's attorneys' fees motion. Because multiple categories of damages are distributed based on the number of claims filed, a single, simultaneous recalculation of allocations after the claims period has expired will be the most cost-efficient and accurate manner of recalculating allocations and will avoid the confusion of repeated changes to a class member's estimate.

Class Counsel and Defendants have agreed to accept late-filed claims up to May 16, 2025.[8] With the Court's permission, the Settlement Administrator will publish this updated claims deadline on the front page of the settlement website. The Settlement Administrator will also issue an additional press release and send an email update to all Class Members who have valid email addresses and have not filed a claim, indicating the updated deadline to submit claims and clearly identifying the information necessary to file a claim. These additional notices will also remind class members who are eligible for direct payments to update their contact information and payment method.

Certain objectors stated there were inaccuracies with their estimated allocation amount. ECF Nos. 637, 638, 669, 670, 671, 680, 695. Class Counsel has communicated with several of these Objectors, including the objectors who spoke on this issue at the Final Approval Hearing, and will continue to do so to explain the basis behind their allocations which are either limited by statute of limitations, class eligibility, or an inability to prove third-party NIL damages. For those who provided additional NIL information prior to the cutoff date for updating such information (such as that provided by Objector Olivia Dunne), updated allocations will be made.

## IV.    The Release Of The College Football Playoff Is Appropriate.

Last, the release of the College Football Playoff is appropriate, as all of the entities that comprise the College Football Playoff are affiliated with or comprised of the Defendants or their member schools. To avoid any doubt, the Parties have added the defined term "College Football Playoff"[9] to make clear which entities are currently encompassed by the release. But the Parties are

---

[8] The opt-out deadline has passed. Defendants have already allowed a series of late opt-outs supported by sufficient proof of an effort at timely submission, and there is no warrant for a further extension.

[9] The term is defined to include (1) CFP Administration, LLC ("CFPA"), a Delaware limited liability company, whose members are the Conference Defendants, together with the American Athletic Conference, Conference USA, the Mid-American Conference, the Mountain West Conference, the Sun Belt Conference, and the University of Notre Dame; CFPA manages the day-to-day affairs of the College Football Playoff and sells tickets and certain sponsorships related to the College Football Playoff National Championship Game; (2) CFP Events, Inc., a Delaware corporation, all the shares of which are owned by CFPA; CFP Events manages certain events ancillary to the National Championship Game, such as the CFP fan fest; (3) BCS Properties, LLC, a Delaware limited liability company that holds the trademarks and copyrights related to the College Football Playoff; and (4) the College Football Playoff Foundation, a Delaware non-profit that provides charitable support for primary and secondary education teachers.

-14-

1  in agreement that the revenues from the College Football Playoff will be captured in the Pool,

2  through MFRS categories 11 ("Media Rights"), 13A ("Conference Distributions of Football Bowl

3  Generated Revenues"), and 19 ("Football Bowl Revenues"). *See* Third Amended Injunctive Relief

4  Settlement Art.3 § 1(c) & App. A.

5

6  DATED: April 14, 2025                                      Respectfully submitted,

7  By */s/ Steve W. Berman*                          By */s/ Jeffrey L. Kessler*

8  Steve W. Berman (*pro hac vice*)                  Jeffrey L. Kessler (*pro hac vice*)
   Emilee N. Sisco (*pro hac vice*)                  David G. Feher (*pro hac vice*)

9  Stephanie Verdoia (*pro hac vice*)                David L. Greenspan (*pro hac vice*)
   Meredith Simons (SBN 320229)                      Adam I. Dale (*pro hac vice*)

10 **HAGENS BERMAN SOBOL SHAPIRO LLP**              Sarah L. Viebrock (*pro hac vice*)
   1301 Second Avenue, Suite 2000                    Neha Vyas (*pro hac vice*)

11 Seattle, WA 98101                                 **WINSTON & STRAWN LLP**
   Telephone: (206) 623-7292                         200 Park Avenue

12 Facsimile: (206) 623-0594                         New York, NY 10166-4193
   steve@hbsslaw.com                                 Telephone: (212) 294-6700

13 emilees@hbsslaw.com                               Facsimile:  (212) 294-4700

14 stephaniev@hbsslaw.com                            jkessler@winston.com
   merediths@hbsslaw.com                             dfeher@winston.com

15                                                    dgreenspan@winston.com
   Benjamin J. Siegel (SBN 256260)                   aidale@winston.com

16 **HAGENS BERMAN SOBOL SHAPIRO LLP**              sviebrock@winston.com

17 715 Hearst Avenue, Suite 300                      nvyas@winston.com
   Berkeley, CA 94710

18 Telephone: (510) 725-3000                         Jeanifer E. Parsigian (SBN 289001)
   Facsimile:  (510) 725-3001                        **WINSTON & STRAWN LLP**

19 bens@hbsslaw.com                                  101 California Street, 21st Floor
                                                     San Francisco, CA 94111

20 Jeffrey L. Kodroff (*pro hac vice*)               Telephone: (415) 591-1000

21 Eugene A. Spector (*pro hac vice*)                Facsimile:  (415) 591-1400
   **SPECTOR ROSEMAN & KODROFF, PC**                jparsigian@winston.com

22 2001 Market Street, Suite 3420

23 Philadelphia, PA 19103                            *Class Counsel for Plaintiffs*
   Telephone: (215) 496-0300

24 Facsimile:  (215) 496-6611

25 jkodroff@srkattorneys.com
   espector@srkattorneys.com

26

27

28

1

**WILKINSON STEKLOFF LLP**                    **LATHAM & WATKINS LLP**

2

By: _/s/ Rakesh N. Kilaru_                    By: _/s/ Christopher S. Yates_

3
    Rakesh N. Kilaru (*pro hac vice*)           Christopher S. Yates (SBN 161273)
    Beth A. Wilkinson (*pro hac vice*)          Aaron T. Chiu (SBN 287788)

4
    Kieran Gostin (*pro hac vice*)              505 Montgomery Street, Suite 2000
    Cali Arat (SBN 349086)                      San Francisco, CA 94111

5
    Matthew Skanchy (*pro hac vice*)            Telephone: (415) 391-0600
    Tamarra Matthews Johnson (*pro hac vice*)   Facsimile: (415) 395-8095

6
    2001 M Street NW, 10th Floor                chris.yates@lw.com
    Washington, DC 20036                        aaron.chiu@lw.com

7
    Telephone: (202) 847-4000
    Facsimile: (202) 847-4005                   Anna M. Rathbun (SBN 273787)

8
    rkilaru@wilkinsonstekloff.com               555 Eleventh Street NW, Suite 1000
    bwilkinson@wilkinsonstekloff.com            Washington, D.C. 20004-1304

9
    kgostin@wilkinsonstekloff.com               Telephone: (202) 637-2200
    carat@wilkinsonstekloff.com                 Facsimile: (202) 637-2201

10
    mskanchy@wilkinsonstekloff.com              anna.rathbun@lw.com
    tmatthewsjohnson@wilkinsonstekloff.com

11
                                              **FOX ROTHSCHILD LLP**
    Jacob K. Danzinger (SBN 278219)

12
    ARENT FOX SCHIFF LLP
    44 Montgomery Street, 38th Floor

13
    San Francisco, CA 94104                     By: _D. Erik Albright_
    Telephone: (415) 757-5500                       D. Erik Albright (*pro hac vice*)

14
    Facsimile: (415) 757-5501                       Jonathan P. Heyl (*pro hac vice*)
    jacob.danziger@afslaw.com                       Gregory G. Holland (*pro hac vice*)

15
                                                  230 North Elm Street, Suite 1200
                                                  Greensboro, NC 27401

16
    *Counsel for Defendant National Collegiate*     Telephone: (336) 378-5200
    *Athletic Association*                          Facsimile: (336) 378-5400

17
                                                  ealbright@foxrothschild.com
                                                  jheyl@foxrothschild.com

18
                                                  gholland@foxrothschild.com

19
                                              *Counsel for Defendant Atlantic Coast*
                                              *Conference*

20

21

22

23

24

25

26

27

28

JOINT SUPPL. BR. IN SUPP. OF FINAL SETTLEMENT APPROVAL                    Case No. 4:20-cv-03919-CW
010912-11/3185735 V1

1

2

**MAYER BROWN LLP**

**COOLEY LLP**

3

By: _/s/ Britt M. Miller_

  Britt M. Miller (*pro hac vice*)

4

  Daniel Fenske (*pro hac vice*)

  71 South Wacker Drive

  Chicago, IL 60606-4637

5

  Telephone: (312) 782-0600

  Facsimile: (312) 701-7711

6

  bmiller@mayerbrown.com

  dfenske@mayerbrown.com

7

8

  Christopher J. Kelly (SBN 276312)

  Two Palo Alto Square

9

  3000 El Camino Real, Suite 300

  Palo Alto, CA 94306-2112

10

  Telephone: (650) 331-2000

  Facsimile: (650) 331-2060

  cjkelly@mayerbrown.com

11

12

*Counsel for Defendant The Big Ten*

*Conference, Inc.*

13

By: _/s/ Whitty Somvichian_

  Whitty Somvichian (SBN 194463)

  Kathleen R. Hartnett (SBN 314267)

  Ashley Kemper Corkery (SBN 301380)

  3 Embarcadero Center, 20th Floor

  San Francisco, California 94111-4004

  Telephone: (415) 693-2000

  Facsimile: (415) 693-2222

  wsomvichian@cooley.com

  khartnett@cooley.com

  acorkery@cooley.com

  Dee Bansal (*pro hac vice*)

  1299 Pennsylvania Ave. NW, Suite 700

  Washington, DC 20004-2400

  Telephone: (202) 842-7800

  Facsimile: (202) 842-7899

  dbansal@cooley.com

  Mark Lambert (SBN 197410)

  3175 Hanover Street

  Palo Alto, CA  94304-1130

  Telephone: (650) 843-5000

  Facsimile:(650) 849-7400

  mlambert@cooley.com

  *Counsel for Defendant Pac-12 Conference*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SIDLEY AUSTIN LLP**

2

By: */s/ Angela C. Zambrano*

3
    Angela C. Zambrano (*pro hac vice*)
    Natali Wyson (*pro hac vice*)

4
    Chelsea Priest (*pro hac vice*)
    2021 McKinney Avenue, Suite 2000

5
    Dallas, Texas 75201
    Telephone: (214) 981-3300

6
    Facsimile: (214) 981-3400
    angela.zambrano@sidley.com

7
    nwyson@sidley.com
    cpriest@sidley.com

8
    David L. Anderson (SBN 149604)

9
    555 California Street, Suite 2000
    San Francisco, California 94104

10
    Telephone: (415) 772-1200
    Facsimile: (415) 772-7400

11
    dlanderson@sidley.com

12
*Counsel for Defendant The Big 12*
*Conference, Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROBINSON BRADSHAW & HINSON, P.A.**

By: */s/ Robert W. Fuller, III*
    Robert W. Fuller, III (*pro hac vice*)
    Lawrence C. Moore, III (*pro hac vice*)
    Travis S. Hinman (*pro hac vice*)
    Amanda P. Nitto (*pro hac vice*)
    Patrick H. Hill (*pro hac vice*)
    101 N. Tryon Street, Suite 1900
    Charlotte, NC 28246
    Telephone: (704) 377-2536
    Facsimile: (704) 378-4000
    rfuller@robinsonbradshaw.com
    lmoore@robinsonbradshaw.com
    thinman@robinsonbradshaw.com
    anitto@robinsonbradshaw.com
    phill@robinsonbradshaw.com

**WHEELER TRIGG O'DONNELL LLP**

By: */s/ Kathryn Reilly*
    Kathryn Reilly (*pro hac vice*)
    Michael Williams (*pro hac vice*)
    370 17th Street, Suite 4500
    Denver, CO 80202
    Tel: (303) 244-1800
    Fax: (202) 244-1879
    reilly@wtotrial.com
    williams@wtotrial.com

**SEIFERT ZUROMSKI LLP**

    Mark J. Seifert (SBN 217054)
    SEIFERT ZUROMSKI LLP
    100 Pine Street, Suite 1250
    San Francisco, California 94111
    Telephone: (415) 869-8837
    mseifert@szllp.com

*Counsel for Defendant Southeastern*
*Conference*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in

3

the filing of this document has been obtained from the signatories above.

4

By: _/s/ Steve W. Berman_

5

STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-