

1099 18th Street
Suite 1900
Denver, CO 80202
303.253.6740 Phone
ddepeppe@buchalter.com

BY ELECTRONIC FILING

April 15, 2025

Ronald V. Dellums Federal Building
& United States Courthouse
c/o Class Action Clerk
1301 Clay Street
Oakland, CA 94612

**Re:    Berg, Lykins, et al Opposition Letter - College Athletes NIL Litigation (No. 4:20V-03919 (N.D. Cal)**

Dear Judge Wilken:

This letter is the one page rebuttal authorized by the court at the April 7th Fairness Hearing. The Parties' April 14th Joint Supplemental Brief claims there is "…no question that the Settlement Agreement, as submitted to the Court, is a vast improvement over the status quo… [and that it is] a win for the Parties..." (ECF No. 796 at 1) In opposition, our position is that the Parties' refusal to redress Roster Limits harm continues a pattern of deception to advance the interests of the Haves to the detriment of the Have Nots.

The putative settlement is not fair, reasonable and adequate to the large number of athletes facing roster cuts. Nor would any cut athlete accept that his/her interests were adequately represented by Class Counsel, as required by Rule 23(g)(4). Yet, rather than address any individual claim of harm, the Parties once again point to the overall benefits of the settlement. However, the Roster Limits present a narrow question limited to the Injunctive Relief Settlement and Class. The Damages Settlement benefits are irrelevant to addressing the harms caused by the Roster Limits.[1]

Our Brief (ECF No. 740) described a pattern of deception at member schools using the excuse of impending roster cuts to encourage rostered athletes, many with scholarship rights, to voluntarily leave the university via the transfer portal. Our letter to the court (ECF No. 711) alerted it to Defendant NCAA's premature program opt in deadline of March 1st, showing its actions in collusion with the other Defendants. The Joint Supplemental Brief reveals the Parties' "independent[] aware[ness] that member institutions and student-athletes have been making decisions in anticipation of the roster limits." Yet, not until April 3rd did the NCAA act to protect athletes being fleeced of their Article 4, Section 1 guarantee (see attached). In short, minimal efforts by the Defendants have been made to ensure rostered athletes' interests, including legal rights, have been protected – their focus has been to benefit the Damages Classes (the Haves).

The Joint Supplemental Brief asserts that the roster limits are a necessary restraint on trade[2] for pro-competition reasons. As our Brief argued, unfair and deceptive acts and practices (UDAP) that offend state law cannot serve as the predicate for a justifiable pro-competitive rationale under antitrust.

Sincerely,

BUCHALTER
A Professional Corporation

Douglas M. DePeppe

DMD:mt
Attachment

---

[1] The Parties do point to the many actions of member schools and conferences in preparation of settlement approval. That argument also is irrelevant, for the members of the Class are the student-athletes, and the legal duties at issue are owed to them.
[2] Notably, cut athletes will lose their opportunity to pursue NIL revenue generation, which is the crux of this case.



April 3, 2025

<u>VIA EMAIL</u>

TO: Division I Chancellors/Presidents, Athletics Directors, and Conference Commissioners.

FROM:  Scott Bearby, NCAA Senior Vice President of Legal Affairs and General Counsel.

SUBJECT: Reminder regarding *House* settlement roster limit changes

As you know, the final settlement approval hearing in the *House* case is on April 7. Leading up to that hearing, several objectors have submitted papers to the court incorrectly claiming that the new roster limits incorporated into the settlement will cause current student-athletes to lose their scholarships. Some of these papers state that current student-athletes have been told by their coaches that they will not have a roster spot in the 2025-26 academic year. These student-athletes have concluded from that information that they also will not have an athletic scholarship for 2025-26. Another concern some current scholarship student-athletes have raised is that they have been advised by their coaches that they will not have a roster spot for 2025-26, even though they will still retain their scholarship, and that they may want to consider entering the transfer portal, which could result in cancellation of their scholarship under ordinary application of NCAA rules.

As we have discussed, the settlement provides that the new roster limits cannot cause any current scholarship student-athlete to lose his or her scholarship. This provision of the settlement also means that a current scholarship student-athlete who enters the transfer portal after being told that they will lose their roster spot cannot lose their scholarship based on the decision to enter the portal if they ultimately decide not to transfer. While we do not have information to suggest that any program has informed a student-athlete that he or she will lose a scholarship because of the new roster limits, we are sending this communication to remind you of this important settlement protection. We encourage you to remind your coaching staffs of this issue and ask that they be mindful of it in communicating with student-athletes about roster management decisions.

Thank you for your attention and cooperation with this matter.