To the Honorable Claudia Wilkens,

RE: College Athlete NIL Litigation, Case No. 4:20-cv-03919

I respectfully submit this statement in strong opposition to the inclusion of roster limits as part of the *House v. NCAA* settlement framework.

Artificially capping team rosters may raise serious antitrust concerns as it could function as a coordinated restriction by the NCAA and its member institutions that limits opportunities for student-athletes and suppresses access to the college athletics marketplace. These limits do not arise from market forces but are instead uniform, top-down constraints that disproportionately impact non-revenue and Olympic sports. They restrict the supply of athletic opportunities while artificially controlling the cost structure of athletic departments—hallmarks of anticompetitive behavior.

Though the NCAA may argue that such limits promote competitive balance or operational efficiency, these justifications do not withstand scrutiny. There is no clear evidence that reducing participation improves fairness, and in the current NIL and revenue-sharing landscape, such claims appear increasingly unconvincing in the current NIL and revenue-sharing context. Operational necessity or financial strain cannot justify a blanket reduction in athlete access—individual schools can manage rosters independently without harming broad participation.

Further, while member schools voluntarily join the NCAA, voluntary association does not shield collusive rules from antitrust scrutiny. Courts have recognized the NCAA's dominant control over Division I sports as a meaningful constraint on the labor market for athletes—especially when realistic alternatives (e.g., NAIA, JUCO) are not truly comparable. Framing roster limits as non-commercial also fails in this context, as these rules directly affect athlete access, scholarships, and the broader economy of college sports.

Critically, current scholarship limits define upper bounds, but there are no enforceable lower bounds to protect the minimum number of opportunities by sport. Roster limits would give schools the cover to slash programs or team sizes without consequence, further reducing access. It is also deeply concerning that many schools appear to be opting into the settlement framework without demonstrating a financial capacity to sustain their current offerings under these new constraints.

Additionally, it should not be presumed that a lack of widespread opt-outs from the settlement reflects institutional consensus or approval. A low opt-out rate may instead signal a lack of awareness or understanding—particularly at the program or athlete level—of the full implications of the settlement, including the long-term consequences of structural changes like roster caps. Silence should not be mistaken for informed consent, especially in a case with such far-reaching impact.

It is my strong opinion that roster caps threaten to formalize exclusion, restrict competition, and disproportionately harm athletes—particularly in lower-profile sports—while offering no meaningful safeguards or financial accountability in return. I urge the Court to reject any attempt to impose or legitimize such limits within this settlement.

Sincerely,
Kristen Ciezak
Somerville, NJ

Mom to two aspiring collegiate gymnasts, who have trained 20 hours a week / 12 months a year for the 8 years, and will be directly impacted by this settlement.