**LATHROP GPM LLP**
Laura Reathaford (SBN 254751)
laura.reathaford@lathropgpm.com
2029 Century Park East
Suite 1280N
Los Angeles, California  90067
Telephone:  310.789.4600
Facsimile:  310.789.4601

Attorneys for Objector
Emma Reathaford

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION, | Case No. 4:20-cv-03919-CW<br><br>*Hon. Claudia Wilken*<br><br>**RESPONSE TO PARTIES' MAY 7, 2025 PROPOSAL RE: MOTION TO APPROVE CLASS ACTION SETTLEMENT** |

## I.  INTRODUCTION

This dispute centers on the Parties' request for an injunction that harms class members. The Court directed the Parties to revise the Settlement Agreement and suggested they consider something that would "ensure that *no members* of the Injunctive Relief Settlement Class *who have or had a roster spot will lose it* as a result of the immediate implementation of the settlement agreement." ECF No. 948 at 4. The Parties ignored the Court's suggestion.

Instead, the Parties have, with surgical precision, carefully word-smithed this Court's April 23, 2025 order to come up with a "bare minimum" proposal that fails to include adequate safeguards to prevent court ordered harm to *all* class members. Under the Proposal, roster limits remain mandatory but grandfathering is optional. Thus, any class member whose school does not exercise the *option* to grandfather athletes, will still be harmed by roster limits.[1]

While the Parties may believe an intermediary option by schools prevents roster limits from directly harming class members, this argument is flawed. Critically, the schools already had and have the choice to opt-in to the injunction and yet, the Court still found that class members were and will be directly harmed by roster limits. In this case, where class members cannot opt-out, giving a third party the choice to avoid causing harm is not the same as giving the class members a choice to avoid harm. The right to Due Process is a right held by the class members, not to the Defendants or their Member Institutions. *See, e.g. IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp.*, 371 F. 3d 150, 155 (3d Cir. 2004) (recognizing Due Process rights belong to class members pursuant to Rule 23(e)).

As a more fundamental matter, it bears reinforcing that the Parties are asking for an *injunction*. At its core, an injunction is meant to rectify the Defendants' own misconduct. That does not and cannot mean that the Defendants should benefit from the injunction at the expense of class members. The Proposal must be rejected and the Court can, and should, consider issuing an Order that requires the Parties implement a mandatory grandfathering provision as a condition of granting final approval. As discussed below, this type of order is contemplated by the Agreement, easily protects *all class members* and certainly avoids the burden and possible disputes surrounding any type of irregular, optional and unilateral "designation" system.

---

[1] Moreover, the Proposal also gives an optional "pass" to schools that prematurely cut athletes before final approval.

## II. ARGUMENT

The Proposal blatantly disregards the Court's April 23, 2025 Order which asked the Parties to revise their settlement agreement "so that members of the Injunctive Relief Settlement Class *will not be harmed* by the immediate implementation of the roster limit provisions." ECF 948 at 4 [emphasis added]. As the Court's April 23, 2025 order recognized, a non-opt out injunctive relief settlement must provide relief to *each and every member of the class* (citing, *Dukes v. Wal-Mart,* 564 U.S. 338 (2011) ("Rule 23(b)(2) applies *only* when a single injunction or declaratory judgment *would provide relief to each member of the class*.") [emphasis added]. That is because Rule 23 is clear that the Court can only approve the settlement if it "treats class members equitably relative to each other." ECF 948 at 4.

By making grandfathering under the injunction optional, the class members are still not treated equitably relative to each other and relief is not being provided to each member of the class as the law requires. Instead, the intraclass conflicts persist by protecting some athletes while leaving the others exposed.[2] Under the Proposal, each school is required to designate as "potentially grandfathered" only those athletes who were prematurely cut or were told they would be cut because of roster limits. Once labelled as a "Designated Student Athlete" or "DSA", there is no requirement for the schools to actually grandfather-in the DSA. So this begs the question – what does grandfathering mean and what protections does the DSA label actually provide to class members? The answer is simple – the DSA label is meaningless to athletes so designated unless a school chooses to grandfather them in and it does nothing to protect anyone else.[3]

The proposed labelling is also problematic because schools cannot, with any degree of certainty, know the universe of athletes who might actually be harmed by roster limits in the foreseeable future. Take,

---

[2] It is unclear why Plaintiffs' attorneys have submitted a proposal which further divides class members and pits them against each other. As class counsel, it was their responsibility to unify the class; not further divide class members.

[3] The chart provided by Plaintiffs' counsel is also meaningless because it only lists individuals who objected to this Settlement. Since it is the *schools* that must label an athlete as a DSA, submitting a list of objectors and parents to the court as "examples" of persons who might be labelled as a DSA is misleading. For example, Objector Emily Ellis (who appears on Plaintiffs' Exhibit C at ECF 958-3 at p. 3), after being told in December 2024 that she would not be cut if there was a remedy to roster limits, was just cut from her team on May 9, 2025 – and was told that she was not being cut due to roster limits. Thus, Ms. Ellis' designation as a DSA on Exhibit C is inaccurate.

It is also unclear whether the submission of this chart (listing objectors only) was designed to moot the objections by suggesting that every person who objected might no longer take issue with roster limits. Setting aside the propriety of such a strategy for another day, as noted above, no one has actually been designated yet and therefore, any attempt to moot an objection at this stage would be improper.

LATHROP GPM LLP
ATTORNEYS AT LAW
LOS ANGELES

for example, certain sports where injuries are commonplace and a DSA has been injured. As one of the class member declarants aptly explained, this injury could cause him to get cut because of his injury although the release from the team could be indirectly tied to the court-mandated roster limits:

> …roster limits are also unfair to players who get injured. That can happen to any of us, and it's bad enough on its own….But roster limits could result in injured players being cut because the full limit of players is needed just to implement practices.

*See* ECF 628-5, p. 38.

The same harm might occur to someone not labelled a DSA. For example, if two athletes are injured, a coach may feel forced to retain the injured DSA and cut the non-DSA simply because s/he was not labelled a DSA. The Proposal, therefore, improperly extends protection only to athletes who get the DSA label in advance. The remaining athletes get no protection whatsoever.

Accordingly, the Court cannot be confident that any immediate "designation" of a student athlete as an "optionally grandfathered" DSA will remain unchanged or that any DSA will not be cut from the team due to roster limits. The only way to ensure that all class members are treated equally and not harmed by the imposition of roster limits is to protect ***all*** currently enrolled D1 student-athletes and high school seniors who have accepted offers at D1 schools from roster limits until each athlete's respective eligibility expires.

With these principles in mind, the Parties could have easily chosen options that were both simple and effective such as (a) delaying the implementation of roster limits for a certain number of years; or (b) grandfathering all athletes currently on the school's rosters until their eligibility expired. Each proposal is of limited duration and of limited scope and would have resulted in no undue burden or harm to the Defendants. Unfortunately, given the harm the premature implementation of roster limits has already caused (and which this Court has already recognized), it appears mandatory grandfathering is now the only way to avoid and/or remedy harm caused by court-imposed roster limits.[4] Grandfathering is entirely reasonable in the context of a 10+ year injunction where these class members will be grandfathered only for a small portion of that time.[5]

The Parties acknowledge that grandfathering and returning athletes to rosters is possible because

---

[4] Delaying the implementation of roster limits (to, say the 2029-2030 school year) would have been the simplest way to avoid immediate harm to all student athletes. This option would have placed the athletes in exactly the same position as before the settlement and would have preserved coach discretion. However, it is too late for this relief since the Defendants and some Member Institutions have already implemented roster limits causing massive harm.

[5] Since not all class members are incoming freshmen, the impact of grandfathering will also diminish over time.

they are permitting (as opposed to mandating) schools to do it.[6] Additionally, this Court similarly recognized that one possible solution might include a proposal that permits or allows student-athletes to "stay on the roster until they graduate." *See* Apr 7, 2025 hearing transcript at 40:16-17.

Objector is mindful that schools and coaches traditionally have the discretion to manage their rosters, and this is why the Parties dislike mandatory grandfathering. However, this issue is of the Parties' own making because it is they who seek court approval (and the proverbial "legal cover") of an injunction mandating roster limits. If the Parties did not want to judicially mandate roster limits, then there would be no need to grandfather. Again, the purpose of an injunction is to remedy Defendants' prior misconduct; it is not intended nor should it be used to inflict harm on class members. Since it is the Defendants who want ***mandatory*** roster limits included in the injunction, then ***mandatory*** grandfathering of all current D1 athletes and high school seniors is the necessary cost of rectifying Defendants' malfeasance. And it goes without saying, if the Defendants want this settlement to ***force*** coaches to cut players in order to abide by mandatory roster limits, the settlement can also ***force*** coaches to grandfather current and incoming athletes.

The Parties also incredibly contend that the imposition of grandfathering is improper because "federal courts do not sit as super-personnel departments that reexamine an entity's business decisions." This statement is ironic, at best, because this is exactly what the Parties are asking this court to do by issuing the requested injunction - which is filled with personnel business decisions such as (1) how many "personnel" can play for each team (Article 4); (2) how much money those "personnel" can get paid (via revenue sharing caps) (Article 2); and, (3) the benefits the "personnel" receive, including reporting and audit rights (Article 3).

Moreover, the Settlement Agreement appoints this Court to manage and resolve disputes concerning these personnel decisions in Article 6, paragraph (b):

> The Court shall retain jurisdiction to ***resolve all disputes*** that may arise concerning compliance with, the validity of, interpretation or enforcement of the terms and conditions of this Injunctive Relief Settlement…[emphasis added].

It is hypocritical (to say the least) to ask this Court to be "hands off" in requiring the settlement to grandfather in class members while, at the same time, thrusting the Court into the NCAA's personnel

---

[6] It cannot be overlooked that prior to submitting their Proposal, Defendants argued at length that it would be impossibly disruptive to grandfather-in athletes. ECF 796 at 9-12. However, it appears this position has changed. Moreover, the University of Notre Dame has announced that it will grandfather in all current athletes (although it is yet unclear whether the school is doing so because of this settlement).

business affairs, including a judicial sanction to cut players from teams.

On this note, Objector suggests that this Court can, and should, identify specific modifications that would bring this settlement into compliance with Rule 23 and Due Process, pursuant to Article 6(b) of the Agreement, such as:

1. Mandatory grandfathering of all current D1 student athletes who were on a Member Institution's roster during the 2024-2025 school year until their eligibility expires;

2. Mandatory grandfathering of any high school senior who had, prior to an order granting final approval of this settlement, accepted an offer to join the roster of a Member Institution for the 2025-2026 school year until their eligibility expires;

3. The reinstatement of any athlete (at the athlete's request) who was on a Member Institution's 2024-2025 roster but who was cut and/or transferred to another Member Institution due to roster limits, including the reinstatement of all moneys/benefits which were lost as a result of being cut. This option might also include a suspension of certain transfer rules to ensure any athlete who transfers can do so immediately and without losing a year of eligibility.

While Objector understands that courts cannot modify settlement agreements, based on the fact that the Parties still failed to adequately propose language protecting class members (despite the Court's clear direction) and have delegated the Court to resolve disputes, Objector requests that the Court suggest to the Parties what, in its opinion, will pass muster.

Finally, should the court approve this settlement, Objector again requests that it stay the implementation of the injunction until the resolution of all appeals. A stay is particularly necessary here because Plaintiffs' counsel has informed the public that paragraph 18 (agreeing to no stay pending appeal) is in the Agreement to influence the Court of Appeal not to overturn final approval of the Settlement.[7] This Court should prevent this fundamental unfairness and issue an immediate stay if it approves this settlement.

Dated: May 13, 2025                                LATHROP GPM LLP

By:      /s/
     Laura Reathaford
     Attorneys for Objector

---

[7] *See* May 12, 2025, podcast featuring Mr. Berman at https://www.sportswisepod.com/ep-84-the-latest-on-the-twists-and-turns-in-the-house-v-ncaa-settlement-with-co-lead-counsel-ste/. At timestamp 11:54 – 12:55, Mr. Berman responds to a question regarding why the Parties agreed not to stay the implementation of the injunction which included roster limits. Mr. Berman stated, "I thought it was really powerful for appeal to tell the Court of Appeals, we're already doing this….You really want to overturn this? So I think that is why we did that."