BUCHALTER
A Professional Corporation
Douglas M. DePeppe (SBN: 42161), *Pro Hac Vice*
Robert B. Hinckley, Jr. (SBN: 290786)
1624 Market Street, Suite 400
Denver, CO  80202
Telephone: 303.253.6740
Fax: 213.896.0400
Email:   ddepeppe@buchalter.com
         rhinckley@buchalter.com

Attorneys for Objectors, Madeline Berg, Emma Lykins and other Anonymous Division I Athletes

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE COLLEGE ATHLETE NIL LITIGATION** | Case No. 4:20-cv-03919-CW<br><br>**RESPONSE TO PARTIES' FOURTH AMENDED SETTLEMENT AGREEMENT ON BEHALF OF OBJECTORS BERG, LYKINS AND OTHER ANONYMOUS ATHLETES**<br><br>Date:   May 13, 2025<br>Judge:  Hon. Claudia Wilken |

This submission from the captioned Objectors follows the Court's May 7, 2025 Order and confirms our continued objection to the Parties' proposed modifications to roster limits contained in the Fourth Amended Settlement.

Simply put, the Parties have failed to adequately address the Court's findings and ongoing concerns related to the profound impact of the proposed roster cuts on members of the Injunctive Relief Settlement Class. Instead, with proverbial crossed fingers, the Parties have presented a non-solution for the Court's consideration: that members of the Injunctive Relief Class, facing immediate and continuing harm from roster cuts, should only be given *an opportunity* and not a guarantee to recover and maintain a roster spot. Cold comfort indeed for thousands of members of the Injunctive Relief Class, who did not ask for and do not deserve this indifferent treatment, or inability to opt out.

Defendants renew the position already rejected by this Court that loss of a roster spot is an allowable tradeoff when viewed holistically, including through consideration of new NIL compensation opportunities. (ECF No. 959) Plaintiffs likewise join in urging the Court to reject its own findings and ruling contained in the Court's April 23, 2025 Order on this point. (ECF No. 958) However, controlling precedent, as shown below and which the Court relied upon in its April 23, 2025 Order, makes clear that members negatively impacted from the roster limits provision *must be guaranteed restoration of their roster spots*. The Parties' proposed solution does not meet this requirement.

The Parties' proposed changes in the Fourth Amended Settlement fail to follow controlling law that harm cannot result to members of a class from an injunctive relief settlement term. The Court's April 23rd Order explained "the Court cannot approve the settlement agreement in its current form" (Order at 3; ECF No. 948) and relied upon *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), in finding that injunctive relief under Fed. R. Civ. P. 23(b)(2) must fairly redress the harm to "each member of the class". *Id.* at 360. Hence, *any* resulting harm to a member of the Injunctive Relief Settlement Class prevents the court from approving the proposed settlement.

In ruling against the Third Amended Settlement and that earlier roster limit provision, the Court's April 23rd Order made abundantly clear that *Wal-Mart Stores, Inc. v. Dukes* ruled out the

Parties' assertion that roster spots could permissibly be lost. Indeed, the Court succinctly stated the issue that *Dukes* imposes in this case: "whether a settlement agreement that involves injunctive relief for a Rule 23(b)(2) class can be approved where it has been shown that its immediate implementation will cause harm to some members of the Rule 23(b)(2) class." (Order at 3) Notwithstanding the Court's clear instruction to the Parties that harm to members cannot result from an injunctive relief settlement term, the Parties offered the court a non sequitur in response, admitting that:

"The revisions do maintain the discretion of Member Institutions to decide whether to provide roster spots….In other words, there are no guarantees [for] roster spots." (ECF No. 959 at 2) And with this provision, the Parties' proposed solution is undone.

The Court has not only already rejected the Parties' recycled argument that a mere *opportunity* to compete for a roster spot satisfies *Dukes*, the Court has further found that Member Institutions themselves have engaged in harmful conduct. Ignoring these findings, the Parties seek to bestow trust upon the very Member Institutions the Court determined caused harm from their premature implementation of roster cuts: "*The Court finds* that the decision by Defendants *and NCAA member schools* to begin implementing the roster limits before the Court granted final approval of the settlement agreement is not a valid reason for approval of the agreement in its current form despite the harm…." (Order at 4) The Parties have failed to respect the Court's findings that "objectors have shown that the immediate implementation of the roster limits provisions of the settlement agreement has resulted or will result in harm to a significant number of members of the Injunctive Relief Settlement Class". (Order at 2.) The discretion proposed in the Parties' Fourth Amended Settlement cannot stand because the Defendants, as well as the Member Institutions, continue to cause harm through their premature and ongoing implementation of the roster limits.

Member Institutions cannot be trusted to protect class members in this situation. If given the opportunity, some Member Institutions will continue to harm members by refusing to bring back cut class members and continuing to cut members in the future. Schools have no incentive to do otherwise, which is the compelling reason why the proposed solution is illusory. Instead, power

should be placed in the hands of the student-athletes and they should be given the protection of mandatory grandfathering. This is a problem created by the Parties and they should bear responsibility for its solution.

Moreover, as revealed in our earlier Reply Brief (ECF No. 740), Objectors Berg and Lykins were not just prematurely cut from the roster, their coach is currently recruiting replacements for their roster spots. Further, the Declaration of Thomas Wiegand (ECF No. 961, Ex. A) bears witness to what our Reply Brief asserted: "tens of thousands of Division I student-athletes could be directly impacted within a year. Moreover, the roster limit rule change will result in a rinse and repeat cycle year after year, as student-athletes are sacrificed for replacements annually." (ECF No. 740, at 5) The member schools, many of whom having made roster cuts just in the weeks since April 23rd, have no intrinsic incentive to reverse course and invite back their cut athletes.

These Objectors concur generally with the approach offered in the Menke-Weidenbach Response, except with respect to the degree of discretion countenanced in their brief concerning Member Institutions and rosters. (ECF 961) To guard against abuses of discretion described in this Brief, we offer below a protective mechanism. Additionally, our Response here joins in the arguments of the Reathaford Objector Response, including its call for prescriptive suggestions from the Court, which we build upon below.

We join in the Reathaford Objector brief's call for three ways to fix the harm already caused by Defendants and their member schools, which are summarized here: mandatory grandfathering of D1 rostered athletes from the 2024-2025 school year; mandatory grandfathering of recruited high school seniors; and reinstatement of negatively affected D1 student-athletes onto rosters. (See May 13, 2025, Reathaford Brief, ECF No. 965 at 6)

In addition to those three fixes, these Objectors call for specific improvements to the arbitration system that the Menke-Weidenbach Response noted in the Fourth Amended Settlement. (ECF No. 961 at 2). As previously proposed to Defendants and Class Counsel, a grievance process to enable athletes to seek redress for a variety of harms is needed. Perhaps in response, Plaintiff Counsel asserted in its Supplemental Motion that it would enforce certain athlete rights under its proposed model. (ECF No. 958 at 3) These Objectors believe that relying on member institution

good faith alone – the Plaintiff Counsel approach – is unrealistic. A formal grievance system is needed, as well as oversight. Anonymous Objectors, and also Objectors who have openly asserted their rights, all fear retaliation. An Ombuds Program, like what exists at the US Olympic and Paralympic Committee, should be created.[1] Such a program would be consistent with the NCAA's recent Core Guarantees and their protections for athlete mental health and other misconduct.[2] Distrust from premature implementation of roster limits now permeates many D1 sport programs. An affirmative oversight and grievance system is needed to start to restore trust.

The Parties' unhelpful and nonresponsive modifications to the roster limits provision ignored the mandate of *Dukes* to *cause no harm*, despite the Court's reliance and guidance to them from this controlling precedent from the US Supreme Court. Even the Court's injecting selected Objectors into the Mediation process failed to convince the governing bodies of D1 college sport to do the right thing by the student-athletes under their authority and care. As a result, these Objectors respectfully urge the Court to appoint a magistrate to conduct a final mediation, as contemplated in the Court's May 7, 2025 Order in an effort to reach agreement on implementation of the above-referenced solution.

DATED:  May 13, 2025

BUCHALTER
A Professional Corporation


By:  */s/ Douglas M. DePeppe*
DOUGLAS M. DEPEPPE

*/s/ Robert B. Hinckley, Jr.*
ROBERT B. HINCKLEY, Jr.
Attorneys for Objectors

---

[1] See the Office of the Athlete Ombuds, https://www.usopc.org/athlete-ombuds .

[2] See Student-Athlete Core Guarantees, https://www.usopc.org/athlete-ombuds .