1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                                              Case No. 20-cv-03919 CW

IN RE: COLLEGE ATHLETE NIL
9   LITIGATION                                 **OPINION REGARDING ORDER
                                               GRANTING MOTION FOR FINAL
10                                             APPROVAL OF SETTLEMENT
                                               AGREEMENT**

11                                             (Re: Dkt. No. 717)

12

13

14

15        Plaintiffs[1] are current and former Division I student-athletes who played various Division I

16   sports during the relevant period.  Defendants are the National Collegiate Athletic Association

17   (NCAA) and Conference Defendants Pac-12 Conference, Big Ten Conference, Big 12

18   Conference, Southeastern Conference, and Atlantic Coast Conference.

19        Plaintiffs bring this antitrust class action to challenge various of the NCAA's rules that

20   restrict or prohibit student-athlete compensation.  In particular, they seek to challenge the set of

21   rules that restrict or prohibit compensation that Division I student-athletes can receive: from third

22   parties for the use of their name, image, or likeness (NIL); from schools or conferences for the use

23   of their NIL, including in broadcasts; and from schools and conferences for their athletic services.

24   They also challenge NCAA restraints setting a maximum number or amount of scholarships that

25   schools can provide to Division I student-athletes in each sport.  Plaintiffs contend that these rules

26

27   _____

[1] Plaintiffs are Grant House, Sedona Prince, Tymir Oliver, Nya Harrison, DeWayne Carter, and
28   Nicholas Solomon.

United States District Court
Northern District of California

1    violate the Sherman Act, because Plaintiffs would receive greater compensation in the absence of

2    these collusive restraints.  Defendants deny this charge and assert that the challenged rules are

3    procompetitive.

4            Now before the Court is a motion for final approval of a settlement agreement that would

5    resolve all of Plaintiffs' claims for monetary and injunctive relief.  Plaintiffs represent that there

6    are 389,700 current members of the settlement classes.  If approved, the settlement agreement

7    would result in the distribution of $2.576 billion in damages for members of the settlement classes

8    who have been unable to receive compensation for the use of their NIL and for their athletic

9    services.  It would also result in ground-breaking changes in NCAA rules that govern student-

10    athlete compensation, which would enable NCAA schools to share their athletic revenues with

11    Division I college student-athletes for the first time in the history of the NCAA and would

12    eliminate NCAA limits on scholarships.  This is expected to open the door for Division I student-

13    athletes to receive, in the aggregate, approximately $1.6 billion dollars in new compensation and

14    benefits per year, with that amount increasing over the next ten years.

15            The NCAA has governed college sports for more than a century, and it has faced legal

16    challenges to its regulations throughout its history.  The present action follows a line of class

17    actions that have attacked prior iterations of some of the NCAA restraints that are now at issue

18    here.  This Court presided over two of those prior class actions.  The successes and failures of

19    those prior class actions against the NCAA and its conferences have informed the parties'

20    settlement negotiations in this case, as well as the Court's evaluation of the fairness and

21    reasonableness of the settlement agreement now before it.

22            In *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 963 (N.D. Cal. 2014),

23    *aff'd in part*, 802 F.3d 1049 (9th Cir. 2015), a class of student-athletes challenged NCAA

24    restrictions on NIL compensation and prevailed at trial.  However, that success resulted in an order

25    that merely increased the limit on education-related compensation that schools could offer student-

26    athletes to the cost of attendance, and that permitted NCAA members to provide $5,000 per year

27    in deferred cash compensation to student-athletes for the use of their NIL.  The Ninth Circuit

28    affirmed the increase on the limit on education-related compensation to the cost of attendance, but

United States District Court
Northern District of California

1    it reversed the aspect of the Court's ruling that permitted NCAA members to provide $5,000 per

2    student-athlete per year in deferred cash compensation for the use of their NIL.  The circuit court

3    based its opinion on the ground that the cash compensation was not tethered to education and the

4    amount constituted a "quantum leap" from the status quo.  *See O'Bannon v. Nat'l Collegiate*

5    *Athletic Ass'n*, 802 F.3d 1049, 1078 (9th Cir. 2015), *cert. denied.*, 580 U.S. 815 (2016).

6        In *Alston*, a different class of student-athletes challenged NCAA restrictions on

7    compensation for athletic services and education-related benefits.  The class lost at trial in

8    challenging the NCAA rules that prohibited compensation for athletic services.  *See In re Nat'l*

9    *Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig. (Alston)*, 375 F. Supp. 3d

10   1058, 1061-1110 (N.D. Cal. 2019).  Accordingly, those rules have remained in place to this day.

11   The class prevailed in its challenge to NCAA rules restricting education-related compensation.

12   However, the remedy that this Court issued was constrained by the Ninth Circuit's reversal in

13   *O'Bannon* of the $5,000 in deferred cash compensation allowed.  In light of the Ninth Circuit's

14   holdings in *O'Bannon*, the Court issued an order in *Alston* that enjoined restrictions on non-cash

15   education-related benefits but permitted the NCAA to continue to limit cash-equivalent education-

16   related compensation at $5,980 per student-athlete per year.[2]  *See id.*  The Ninth Circuit affirmed

17   that decision, and the Supreme Court did so unanimously, as well.  *See In re Nat'l Collegiate*

18   *Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020); *Nat'l*

19   *Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

20       In both *O'Bannon* and *Alston*, the partial success of the plaintiffs did not result in an order

21   that completely enjoined the challenged restrictions on student-athlete compensation even though

22   that had been the relief that the plaintiffs had sought in the complaint.

23       The settlement agreement here reflects compromises that were made in light of those legal

24   precedents, which demonstrate that success at trial can mean that student-athlete compensation

25   restrictions may be lessened but not eliminated.  Despite some compromises, the settlement

26

27   [2] The amount was originally $5,600 but it was increased to $5,980 in December 2020.  *See In re*
     *Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-MD-2541 CW,
28   2020 WL 9422404, at *3 (N.D. Cal. Dec. 30, 2020).

1    agreement nevertheless will result in extraordinary relief for members of the settlement classes. If

2    approved, it would permit levels and types of student-athlete compensation that have never been

3    permitted in the history of college sports, while also very generously compensating Division I

4    student-athletes who suffered past harms. The reaction of settlement class members has been very

5    favorable, as only a very small fraction of them have opted out or objected. The Court will,

6    therefore, grant final approval of the settlement agreement for the reasons below.

7    **I.    Procedural History**

8        This consolidated litigation began as two separate actions in 2020: (1) *House v. National*

9    *Collegiate Athletic Association*, 4:20-cv-03919 (*House*); and (2) *Oliver v. National Collegiate*

10    *Athletic Association*, 4:20-cv-04527 (Oliver). House was brought by named Plaintiffs Sedona

11    Prince, a current Division I student-athlete who competed for the University of Oregon's women's

12    basketball team, and Grant House, a current Division I student-athlete who competed for the

13    Arizona State University's men's swimming and diving team. Oliver was brought by named

14    Plaintiff Tymir Oliver, a former Division I student-athlete who competed for the University of

15    Illinois' men's football team. In each of the two actions, Plaintiffs asserted claims against

16    Defendants arising out of injuries they allegedly suffered as a result of certain NCAA rules, which

17    are set and enforced by agreement of Defendants. Those rules restrict the compensation that

18    student-athletes can receive in exchange for the commercial use of their NIL, and prohibit NCAA

19    member conferences and schools from sharing with student-athletes the revenue they receive from

20    third parties for the commercial use of student-athletes' NIL.

21        Defendants jointly moved to dismiss all claims in *House* and *Oliver*. On June 24, 2021,

22    the Court granted that motion only with respect to named Plaintiff Oliver's individual claims for

23    injunctive relief. *See Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818

24    (N.D. Cal. 2021). The Court otherwise denied the motions. *See id.*

25        On July 14, 2021, the Court adopted a stipulation to consolidate *House* and *Oliver* and to

26    permit Plaintiffs to file a consolidated complaint under the caption *In re College Athlete NIL*

27    *Litigation*, Case No. 20-cv-03919. Docket No. 154. Plaintiffs filed a consolidated complaint

28    shortly thereafter. Docket No. 164.

On September 22, 2023, the Court granted Plaintiffs' motion for certification of an injunctive relief class and appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for that class.  Docket No. 323.  On November 3, 2023, the Court granted Plaintiffs' motion for certification of three damages classes and again appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for those classes.  Docket No. 387.  Defendants filed a petition under Rule 23(f) for permission to file an interlocutory appeal of those certification orders, and the Ninth Circuit denied the request.

Merits discovery closed in October 2023.

On December 7, 2023, a proposed class action was filed in this district captioned *Carter v. National Collegiate Athletic Association* (*Carter*), Case No. 3:23-cv-06325 (N.D. Cal.), which alleged that the NCAA's rules prohibiting payments for athletic services (i.e., pay-for-play) violate the antitrust laws.

On April 3, 2024, Plaintiffs filed a motion for summary judgment in this case.  Docket No. 414.  While that motion was pending, on May 30, 2024, the Court stayed all case deadlines pending the resolution of the present settlement agreement.

In the operative complaint, which is the Third Consolidated Amended Complaint, Docket No. 533-1, the claims that were asserted in the *Carter* case were consolidated with the claims in this case, and the named Plaintiffs in *Carter*, namely DeWayne Carter and Nya Harrison, became named Plaintiffs in this action.

In the operative complaint, Plaintiffs challenge four types of NCAA restraints on student-athlete compensation:

(1)    Restraints that prohibit or limit compensation that Division I student-athletes can receive from schools or conferences for the use of their NIL (including NIL in broadcasts, or BNIL).  Plaintiffs allege that, in the absence of those restraints, they would have received compensation from schools and conferences for the use of their NIL (hereinafter, BNIL claims).

(2)    Restraints that prohibit or limit compensation that Division I student-athletes can receive from third parties for their NIL (including NIL in video games or other merchandise).

1    Plaintiffs allege that, in the absence of those restraints, they would have received compensation

2    from third parties for the use of their NIL (hereinafter third-party NIL claims).

3            (3)    Restraints that prohibit or limit compensation that Division I student-athletes can

4    receive from schools or conferences for their athletic services.  Plaintiffs allege that, in the absence

5    of those restraints, they would have received compensation from their schools or conferences for

6    their athletic services above the value of a scholarship (hereinafter, pay-for-play or athletics

7    services claims).

8            (4)    Restraints that set a maximum number or amount of scholarships that can be

9    provided in each sport to Division I student-athletes.  Plaintiffs allege that, in the absence of those

10   restraints, they would have received more scholarship money from NCAA member schools

11   (hereinafter, scholarship caps or partial scholarship claims).

12           On July 26, 2024, Plaintiffs moved for preliminary approval of the settlement agreement.

13   Docket No. 450.  The Court held a hearing on that motion on September 5, 2024.  After the parties

14   made some clarifications in the settlement agreement, the Court granted preliminary approval of

15   the SA, and approved the dissemination of the notice to the settlement classes, on October 7, 2024.

16   Docket No. 544.  The Court set the deadlines for filing claims, objections, and opting out for

17   January 31, 2025, 105 days after the notice date.

18           On December 17, 2024, Plaintiffs filed a motion for attorneys' fees and costs, and service

19   awards.  Docket No. 583.

20           On March 3, 2025, Plaintiffs filed a motion for final approval of the SA.  Docket No. 717.

21           On April 7, 2025, the Court held a final approval hearing.  The hearing lasted six hours and

22   counsel for the classes, Defendants, and objectors, as well as pro se objectors, were heard in

23   person and remotely.

24           After the final approval hearing, the Court issued an order in which it expressed concern

25   that some settlement class members could be impacted negatively by the immediate

26   implementation of certain provisions of the SA.  The Court set a deadline for the parties to modify

27   those provisions of the SA with the assistance of their mediator, Professor Eric Green.  The Court

28

1  asked three objector groups, represented by Laura Reathaford, Steven F. Molo, and the Buchalter

2  firm, to express their views on the proposed changes through the mediation process.

3        On May 7, 2025, the parties filed the Fourth Amended Stipulation and Settlement

4  Agreement, which is the operative version of the settlement agreement (SA).  Docket No. 958-1.

5  It contains some modifications to the provisions about which the Court expressed concern.  On the

6  same date, the parties renewed their request for the entry of an order granting final approval of the

7  SA.

8  **II.     Settlement Agreement**

9        The SA was negotiated at arm's length before Professor Green, a highly respected

10 mediator who has significant experience mediating disputes involving challenges to the NCAA's

11 compensation rules.  *See* Berman Decl. ¶ 4.  The parties conducted multiple negotiation sessions

12 over the course of more than one year.  The negotiations included discussions of NIL and

13 compensation for athletic services, as of August 2023.  *Id.* ¶ 6.  After this Court certified damages

14 classes and an injunctive relief class in the fall of 2023, the settlement discussions continued, with

15 the parties participating in lengthy mediation sessions on April 24 and 25, 2024.  The essential

16 elements of the settlement agreement were memorialized in settlement terms sheets signed on May

17 23-24, 2024.  *See id.* ¶¶ 8-9.  Throughout, the settlement discussions were structured and

18 sequenced to compartmentalize negotiations separately based on different relief and different

19 claims.  *See id.* ¶¶ 4, 6, 8-9.

20       Below is a summary of the key terms of the SA.

21       **A.     Settlement Classes**

22       The SA seeks to bind members of several classes proposed for certification for settlement

23 purposes only.[3]  The SA would bind three different damages classes and one injunctive relief class

24 (collectively, the settlement classes).

25

26

27

28         [3] Each of the classes excludes the officers, directors, and employees of Defendants, and judicial officers presiding over this action and their immediate family members and staff.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The three proposed damages classes under Rule 23(b)(3) (Damages Settlement Classes)

2    are:

3    **Football and Men's Basketball Class**: All student-athletes who
     have received or will receive full GIA scholarships and compete

4    on, competed on, or will compete on a Division I men's basketball
     team or an FBS football team, at a college or university that is a

5    member of one of the Power Five Conferences (including Notre
     Dame), and who have been or will be declared initially eligible for

6    competition in Division I at any time from June 15, 2016 through
     September 15, 2024.

7

8    The proposed representatives for this class are Tymir Oliver and DeWayne Carter.

9    **Women's Basketball Class**: All student-athletes who have
     received or will receive full GIA scholarships and compete on,

10   competed on, or will compete on a Division I women's basketball
     team at a college or university that is a member of one the Power

11   Five Conferences (including Notre Dame), and who have been or
     will be declared initially eligible for competition in Division I at

12   any time from June 15, 2016 through September 15, 2024.

13   The proposed representative for this class is Sedona Prince.

14   **Additional Sports Class**: Excluding members of the Football and
     Men's Basketball Class and members of the Women's Basketball

15   Class, all student-athletes who compete on, competed on, or will
     compete on a Division I athletic team and who have been or will

16   be declared initially eligible for competition in Division I at any
     time from June 15, 2016 through September 15, 2024.

17

18   The proposed representatives for this class are Grant House, Nya Harrison, and Nicholas

19   Solomon.

20   The proposed class for injunctive relief under Rule 23(b)(2) is:

21   **Injunctive Relief Settlement Class**: All student-athletes who
     compete on, competed on, or will compete on a Division I athletic

22   team at any time between June 15, 2020 through the end of the
     Injunctive Relief Settlement Term.

23

24   The proposed named representatives for this class are Grant House, DeWayne Carter, Nya

25   Harrison, Sedona Prince, and Nicholas Solomon.  The Injunctive Relief Settlement Term is

26   defined in the SA as ten Academic Years from the date of Final Approval of the SA.  *See* SA ¶

27   1(cc).

28

8

1    The settlement classes above differ from the classes that the Court certified in September

2    2023 and November 2023.  Accordingly, the Court will conduct a certification analysis for

3    settlement purposes below.

4    Plaintiffs represent that there are an estimated 389,700 current class members in all

5    settlement classes.  *See* Docket No. 717 at 21.

6    **B.    Recovery Under the SA**

7    **1.    Damages**

8    Pursuant to the SA, Defendants have agreed to pay $2.576 billion in total to compensate

9    members of the damages classes.  Damages payments will be paid yearly over the course of ten

10    years following the Effective Date.  *See* SA ¶¶ 3-4.

11    The SA calls for the creation of a fund of $1.976 billion labeled as "NIL Claims Settlement

12    Amount" in the SA, but referred to in the parties' filings as the "NIL Settlement Fund."  This fund

13    will be distributed pursuant to Plaintiffs' proposed allocation plan, which is based on the

14    economics analysis of Dr. Daniel Rascher.  Dr. Rascher was Plaintiffs' economics expert in

15    *Alston*, as well as in this case.  Plaintiffs' proposed plan calls for distribution of the fund to

16    members of the damages classes who have valid claims for NIL-related injuries, including BNIL,

17    videogame NIL, and third-party NIL.  The fund will be distributed as follows:

18    (1)    $71.5 million (before deducting a proportional share of any amounts approved by

19    the Court for fees and costs, awards, and administrative expenses) will be distributed pro rata to

20    members of the Football and Men's Basketball Class, and of the Additional Sports Class if they

21    played football or basketball, based on the sport and years they played, for Video Game NIL

22    injuries (Videogame Settlement Fund).  Rascher Decl. ¶¶ 20-22.

23    (2)    $1.815 billion (before deducting a proportional share of any amounts approved by

24    the Court for fees and costs, awards, and administrative expenses) will be distributed pro rata to

25    members of the Football and Men's Basketball Class and Women's Basketball Class based on the

26    sport, conference, and years played, for broadcast NIL injuries (BNIL Net Settlement Fund).

27    Rascher Decl. ¶¶ 27-28.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

(3)     $89.5 million (before deducting a proportional share of any amounts approved by the Court for fees and costs, awards, and administrative expenses) will be distributed for third-party NIL injuries to members of the Football and Men's Basketball Class, Women's Basketball Class, and Additional Sports Class who received third-party NIL payments after July 2021 and who played their sports during certain years of eligibility prior to July 2021, based on Dr. Rascher's before-and-after damages methodology (Lost Opportunities Net Settlement Fund).  *See* Rascher Decl. ¶¶ 31-32.

The SA also calls for the creation of a $600 million fund, which is labeled as the "Additional Compensation Claims Settlement Amount" in the SA and in the parties' filings.  This fund will be distributed to class members pursuant to Plaintiffs' proposed allocation plan, which is based on Dr. Rascher's economic analyses, to members of any of the damages settlement classes who have pay-for-play (i.e., athletic services) claims.  That fund will be divided into two portions:

(1)     95% of the Additional Compensation Claims Settlement Fund (before deducting a proportional share of any amounts approved by the Court for fees, costs, awards, and administrative expenses) will be allocated to the "Power Five Football and Basketball Portion," which in turn will be distributed in a ratio of 75/15/5% to athletes across the three sports (football, men's basketball, and women's basketball).  Within each sport, damages amounts will be calculated using a formula that includes a standardized minimum amount, and that makes individualized adjustments based on seniority, recruiting star rating, and certain performance metrics.  *See* Docket No. 450 at 22-23; Rascher Decl. ¶¶ 50-81.

(2)     The remaining 5% of the Additional Compensation Net Settlement Fund (before deducting a proportional share of any amounts approved by the Court for fees, costs, awards, and administrative expenses) will be allocated to the "General Portion" proportionally among Additional Sports Class claimants who received a partial or full GIA from the 2019-20 school year through the end of the class period.  Class members eligible for distributions out of this fund will receive an expanded share if they played certain sports at certain schools outside of the Power Five where their school's team is among the highest revenue generating.  *See* Docket No. 450 at 22-23; Rascher Decl. ¶¶ 67-81.

1    Together, the NIL Claims Settlement Amount and the Additional Compensation Claims

2    Settlement Amount are referred to in the SA as the "Gross Settlement Fund."  SA ¶ 1(x).  No

3    money from the Gross Settlement Fund will be allocated to compensate settlement class members

4    who may have suffered injury as a result of the challenged NCAA scholarship caps.

5    The amounts that members of the damages settlement classes are expected to receive under

6    the SA are set forth in a chart filed by Plaintiffs as Exhibit A to their motion for preliminary

7    approval of the SA.  Docket No. 450.

8                    **2.    Injunctive Relief Settlement**

9    The SA also provides for injunctive relief for members of the Injunctive Relief Class.  The

10    injunctive relief aspect of the SA is referred to as the "Second Amended Injunctive Relief

11    Settlement" (Injunctive Relief Settlement or IRS), which is set forth in Appendix A to the SA.  It

12    permits the NCAA and its members to modify existing NCAA rules and to enact new rules that

13    govern student-athlete compensation and rosters over a ten-year period following the approval of

14    the SA.  *See* SA ¶ 1(cc).  The rule modifications that the IRS permits will apply only to NCAA

15    members that choose to participate in the Injunctive Relief Settlement.  Some of these

16    modifications are described below.

17    First, the IRS permits the NCAA to modify current rules to permit schools to provide

18    additional direct benefits and compensation to Division I student-athletes that are worth up to 22%

19    of the Power Five schools' average athletic revenues each year, subject to specified yearly

20    increases (hereinafter, the "Pool").  *See* IRS Art. 3.  The SA sets forth how the yearly Pool cap

21    will be calculated, as well as which types of benefits and compensation will count against the Pool

22    and in what amounts.  *See* IRS Art. 3, §§ 1-4.  Dr. Rascher estimates that the annual Pool cap will

23    start at more than $20 million per school in the 2025-26 school year and grow to $32.9 million per

24    school in 2034-35.  For all Power Five Schools, that would allow for additional spending of up to

25    $1.6 billion for 2025-26, growing to $2.3 billion in 2034-35, and totaling at least $19.4 billion for

26    the 10-year period of the IRS.  *See* Rascher Decl. ¶ 85 & Ex. 25.

27    Second, the IRS requires the NCAA to modify its rules to eliminate the scholarship limits

28    challenged in the operative complaint.  Dr. Rascher estimates that the elimination of the

11

United States District Court
Northern District of California

scholarship limits could result in more than 115,000 additional scholarships being made available to Division I athletes on an annual basis.  *See* Rascher Final Approval Decl. ¶ 74 & Ex. 5.  Each school will be able to award scholarships to Division I athletes above the number permitted under current NCAA rules, subject to the roster limits addressed in Article 4, Section 1 of the Injunctive Relief Settlement.  *See* IRS Art. 3, § 3(b).

Third, the IRS permits the NCAA to continue its prohibitions on NIL payments to student-athletes, except that the prohibitions permitted under the IRS will be narrower than the prohibitions under existing NCAA rules.  Specifically, under the IRS, the NCAA will be permitted to prohibit class members from receiving payments for their NIL from a limited set of third parties that are labeled as Associated Entities or Individuals.  *See* IRS Art. 1, § 1(c).  The SA does not permit the NCAA to prohibit NIL payments from other third parties that are not Associated Entities or Individuals.  By contrast, under its existing rules, the NCAA may prohibit NIL payments to student-athletes by *any* third party.  An Associated Entity is one that is closely affiliated with an NCAA member school for the purpose of promoting the school's athletics program or its student-athletes.  *See* IRS Art. 1, §1(c).  An Associated Individual is an individual who is a member of an Associated Entity or who has contributed more than $50,000 over their lifetime to a particular NCAA member school, or an Associated Entity, to promote their athletics program or student-athletes, or who has assisted a school in the recruitment or retention of student-athletes.  *See* IRS Art. 1, § 1(c).  Payments from Associated Entities or Individuals can be prohibited by the NCAA only if they are not for a "valid business purpose" related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation "at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution."[4]  *See id.*

---

[4]  Associated Entities and Individuals will be allowed to make indirect payments to student-athletes for their NIL by making contributions to the schools, which can then make payments to student-athletes.

United States District Court
Northern District of California

The IRS requires that any disputes arising out of NCAA members' enforcement of the third-party NIL restrictions that are permissible under the IRS be resolved via neutral arbitration. *See* IRS Art. 6, § 2.  This is in contrast to the system currently in place, which vests all authority in the NCAA to make enforcement decisions and to resolve disputes in connection with the prohibitions on third-party NIL payments.  The neutral arbitration required under the IRS will be accompanied by due process protections and a degree of transparency that settlement class members do not have under current NCAA rules.  Those protections include provisions requiring that no penalties can be imposed on a student-athlete while arbitration is pending, absent the arbitrator's finding of good cause, and that the arbitrator issue a written decision.  *See* IRS Art. 6, § 2(d).

Fourth, the SA permits the NCAA to adopt roster limits for Division I sports.  *See* IRS Art. 4, § 1.  After the final approval hearing, the parties modified the SA to provide that settlement class members whose roster spots were taken away or would have been taken away because of the immediate implementation of the SA will be exempt from roster limits at any Division I school for the duration of their college athletics careers.  This means that the class members in question will not count toward any school's roster limit for the remainder of their Division I athletic eligibility. The parties agreed that (1) within thirty days of final approval, each Division I school would use good-faith efforts to identify for Class Counsel Division I student-athletes who were on a 2024-25 roster or were recruited to be on a 2025-26 roster and who were removed or would have been removed from the roster for 2025-26 due to the implementation of the roster limits (the student-athletes in question will be deemed "Designated Student-Athletes"); (2) Class Counsel will make information about who was identified as a Designated Student-Athlete to class members; (3) the Designated Student-Athletes will not count toward any Division I school's roster limits for the duration of their remaining Division I athletic eligibility; and (4) nothing in the NCAA rules will restrict schools from allowing Designated Student-Athletes who transferred because of the immediate implementation of the roster limits to transfer back to their original school.  *See* IRS, Art. 4, § 1; *see also* Docket Nos. 958, 967.

1

**C.    Effective Date of the SA**

2      The Effective Date of the SA is the date when the judgment becomes final and all appeals

3   have been resolved.  *See* SA ¶ 32.  The Injunctive Relief Settlement will go into effect on the date

4   on which the Court grants final approval of the SA, regardless of whether there is an appeal.  *See*

5   SA ¶ 18.

6

**D.    Interpretation of the SA**

7      The SA provides that the Court shall retain jurisdiction to resolve all disputes that may

8   arise concerning compliance with, the validity of, interpretation of, or enforcement of the terms

9   and conditions of the SA, including through appointment of a special master whose decisions shall

10  be appealable to the Court.  *See* SA ¶ 45.

11

**E.    Releases**

12     In exchange for the recovery that the SA will provide for settlement class members, those

13  class members will release the following claims.

14     The named Plaintiffs and members of the Damages Settlement Classes who do not opt out

15  will release the Released Damages Class Claims, which are claims that were raised or could have

16  been raised in this action prior to Final Approval "(1) on account of, arising out of, or resulting

17  from any and all previously existing NCAA and conference rules regarding monies and benefits

18  that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I

19  Member Institutions, or (2) relating in any way to any NCAA or conference limitations on the

20  numbers of scholarships allowed or permitted in any sport[.]"  *See* SA ¶ 1(pp).

21     The named Plaintiffs and members of the Injunctive Relief Class will release the Released

22  Injunctive Relief Class Claims, which are all declaratory and injunctive relief claims that were

23  raised or could have been raised in this action prior to Final Approval or during the Injunctive

24  Relief Settlement Term arising out of "the continuation of existing (at the time of filing for

25  preliminary approval of the Injunctive Relief Settlement) NCAA and conference rules, as well as

26  new or revised NCAA and conference rules agreed to as part of the Injunctive Relief Settlement,

27  regarding (1) monies and benefits that may be provided to student-athletes by the NCAA, Division

28  I conferences, and/or Division I Member Institutions under NCAA or conference rules; (2) NCAA

United States District Court
Northern District of California

1    roster and scholarship limits as agreed to in the Injunctive Relief Settlement; or (3) the subjects

2    addressed by the Related Injunctive Relief NCAA & Conference Rules (collectively, the

3    'Injunctive Rules')[.]"  *See* SA ¶ 1(qq).  The Released Injunctive Relief Class Claims do not

4    include damages claims.

5         The SA provides that certain claims, denominated Unreleased Claims, will not be released

6    because they are not covered by either of the two release clauses described above.  *See* SA ¶

7    1(ww).  Unreleased Claims include those that arise out of the Fair Labor Standards Act or other

8    federal or state labor laws, and claims under Title IX of the Education Amendments of 1972, 20

9    U.S.C. § 1681, *et seq*., other than those arising out of or relating to the distribution of the Gross

10   Settlement Fund.  *See id.*

11        After the final approval hearing, in response to some objections, the parties modified the

12   SA (1) to clarify that future members of the Injunctive Relief Settlement Class who will compete

13   in Division I for the first time after the SA is approved will not release their injunctive and

14   declaratory relief claims until they have received notice and an opportunity to object to the

15   continuation of the SA and any objections they make are addressed by the Court.  *See* SA ¶ 1(aa);

16   *id.* ¶¶ 14, 19-21, 36.

17        **F.    Method of Notice for Current Class Members**

18        The Court approved the parties' proposed notice plan in its order granting preliminary

19   approval of the SA.  The notice plan involved a digital media campaign, press releases, and notice

20   by email and post card.  Peak Decl. ¶¶ 10-26.  Prior to approving the notice plan, the Court

21   reviewed and edited the notices to ensure that they informed class members of the nature of the

22   action, the definitions of the settlement classes, the claims and issues in the litigation, that class

23   members could enter an appearance through an attorney if they so desired, that the Court would

24   exclude class members who requested exclusion by the exclusion deadline, and the binding effect

25   of a class judgment on the members of the settlement classes.  The notice that the Court approved

26   also specified the details of Plaintiffs' proposed allocation plan for each type of claim.  *See* Docket

27   No. 544.

28

United States District Court
Northern District of California

1    After the Court granted preliminary approval of the SA, Defendants notified Division I

2    institutions to provide the claims administrator with data about class members, including NCAA

3    EC IDs, names, addresses, email addresses, sports played, and other information.  Based on the

4    information, the claims administrator disseminated 372,838 unique class member email notices

5    and 91,084 postcard notices, totaling over 463,922 notices to class members.  *See* Peak Decl. ¶¶

6    14, 19-20.  Wherever possible, the claims administrator contacted class members through both

7    email and postcard notices.  Before mailing each notice, the claims administrator checked the

8    potential class members' names and addresses against the U.S. Postal Service's National Change

9    of Address database to identify any address changes.  *Id.* ¶ 7.  Before e-mailing each notice, the

10   Settlement Administrator cleansed and validated each email address to verify its existence with

11   Internet Service Providers.  *Id.* ¶ 17.  One week prior to the claim-filing deadline, the claims

12   administrator sent out an additional email notice to settlement class members reminding them of

13   the deadline.  *Id.* ¶ 22.

14       The claims administrator also disseminated a digital notice by purchasing over 72 million

15   impressions on numerous digital platforms used extensively by the settlement class members.

16       The claims administrator issued a press release on October 18, 2024, to AP News, and to a

17   College Media Influencer List consisting of journalists specifically reporting on college news,

18   which was viewed 9,859 times and picked up by over 910 news outlets nationwide.  *Id.* ¶ 24.  The

19   claims administrator distributed a second press release on January 21, 2025, to alert class members

20   of the pending deadline to opt out, object, or submit claims.  *Id.* ¶ 26.

21       **G.      Method of Notice for Future Class Members**

22       The SA provides that, during the term of the IRS, NCAA members "shall take reasonable

23   steps to" provide notice of the Injunctive Relief Settlement in a form approved by the Court and

24   Class Counsel to all incoming members of the Injunctive Relief Settlement Class at or before the

25   time they first enroll at a Division I member school or later join, for the first time, a Division I

26   member school athletic team.  SA ¶ 14.  All such class members will have the right to file written

27   objections to a continuation of the Injunctive Relief Settlement with the Court within sixty days of

28   receiving such notice.  The releases contained in the SA shall not be effective against incoming

1  student-athletes, not currently attending a school, until after they have been provided the notice

2  and the sixty-day objection period has expired or, if they file an objection, until their objection has

3  been heard and ruled upon.  *See id.*

4        **H.**    **Method of Distributing Damages Relief**

5        To receive payment for damages claims, some members of the damages classes were not

6  required to submit a claim form, namely Power Five FBS Football, Men's Division I Basketball,

7  and Power Five Women's Basketball student-athletes who received a full-GIA scholarship, as well

8  as any Division I student-athlete who competed in the same sport prior to and after July 1, 2021,

9  and had an NIL deal after July 1, 2021, that was provided to Plaintiffs by their school.  See Notice,

10  Docket No. 544-4 at 11.  Those class members automatically qualified for a distribution from the

11  damages funds if they confirmed their contact and payment information with the claims

12  administrator.  *See id.*; Peak Decl. ¶ 33.  The rest of the members of the damages classes were

13  required to submit a claim form to receive a distribution from the damages funds.  *See id.*  Claim

14  forms could be submitted online or downloaded from the settlement website to be mailed to the

15  settlement administrator.  Class members were provided with 105 days from the notice date, i.e.,

16  until January 31, 2025, to submit their contact and payment information or a claim form.

17        Damages distributions to members of the Damages Settlement Classes who submitted

18  valid and timely claims, or who provided updated contact and payment information to the claims

19  administrator, will be paid yearly over the course of ten years following the Effective Date.  *See*

20  SA ¶¶ 3-4.  The SA does not contain any provisions that unclaimed portions of the settlement

21  funds that were intended for the settlement classes will revert to Defendants.

22        A total of 101,935 class members submitted a claim form or updated their payment

23  information, which represents approximately 26.2% of the estimated 389,700 current members of

24  the settlement classes.  *See* Peak Decl. ¶¶ 28, 35; Docket No. 717 at 21.

25        **I.**    **Opt Outs**

26        Class members wishing to opt out were required to submit an opt-out request within 90

27  days of the date the Court granted preliminary approval of the SA, i.e., by January 31, 2025.

28  There are a total of 357 opt outs.

17

United States District Court
Northern District of California

### J.    Attorneys' Fees and Costs

Under the SA, Class Counsel may apply for an award of fees and costs in connection with the damages aspect of the case and the Injunctive Relief Settlement, respectively.

With respect to the damages aspect of the case, Class Counsel may apply for fees and costs for distribution from the Gross Settlement Fund.  *See* SA ¶¶ 28-29.

With respect to the Injunctive Relief Settlement, Class Counsel may apply for three different sets of fees and costs, as follows: (1) an "upfront injunctive fee and cost award" of $20 million; (2) an award of a percentage of the total amount spent by Division I institutions under the Pool for each academic year, which shall start at .75% and increase by .25% no more than three times when the Pool is reset, for as long as the SA remains in effect without material modification; (3) fees and costs for monitoring and enforcing compliance with the SA.  *See* SA ¶ 27.

In their motion for final approval of the SA, Class Counsel request an award of attorneys' fees equivalent to 20% of the NIL Claims Settlement Fund ($395.2 million), 10% of the Additional Compensation Claims Fund ($60 million), an upfront injunctive relief award of $20 million to be paid by Defendants, the right to apply to the Court or special master for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75 to a maximum of 1.25%), and the right to apply to the Court or special master for an award of fees and costs for their ongoing work in monitoring and enforcing compliance with the IRS.  Class Counsel also request reimbursement of $9,081,356.70 to cover the out-of-pocket litigation expenses incurred in connection with prosecuting this litigation.  The Court will rule on this motion in a separate order.

### K.    Service Awards

Class Counsel ask the Court to approve service awards for the named Plaintiffs, as follows: $125,000 each for Grant House, Sedona Prince, and Tymir Oliver; $10,000 each for DeWayne Carter and Nya Harrison; and $5,000 for Plaintiff Nicholas Solomon.  The Court will rule on this motion in a separate order.

1

**L.    Class Member Response**

As of the date of Plaintiffs' motion for final approval, more than 73,115 class members who needed to file claims in order to receive damages payments did so, and more than 28,816 class members who needed only to update their contact and payment information did so.  Peak Decl. ¶ 33.  Thus, a total of 101,935 class members submitted a claim form or updated their payment information, which represents approximately 26.2% of the estimated 389,700 current members of the settlement classes.  *See* Peak Decl. ¶¶ 28, 35; Docket No. 717 at 21.

As noted, only 357 class members opted out, and there were only 73 valid, timely objections filed by class members, as discussed in more detail below.  *See* Berman Decl., Ex. A, Docket No. 717-1.

**M.    Class Action Fairness Act (CAFA)**

Defendants filed a declaration on the docket attesting that they served the notices required under CAFA.  Docket No. 550.

**LEGAL STANDARD**

"The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  The approval of a settlement involves a preliminary approval stage, during which the Court directs notice to class members and then holds a fairness hearing to determine whether final approval of the settlement agreement is warranted under Rule 23(e).

"[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).

//

**DISCUSSION**

**I.    Class Certification**

A court may certify a class for the purpose of entering judgment on a proposed settlement agreement under Rule 23(e) if the requirements of Rule 23(a) have been met.  Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

The party moving for certification also must show that the class can be certified based on at least one of the grounds in Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  As relevant here, certification of damages classes under Rule 23(b)(3) is appropriate if Plaintiffs show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Certification of an injunctive relief class under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Where the Court is evaluating a settlement under Rule 23 and it previously certified a class, the Court must consider "whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted."  Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment.

Here, the Court previously certified damages classes and an injunctive relief class, and the Ninth Circuit denied Defendants' request for an interlocutory appeal of that order.  However, the SA calls for a change in the classes that the Court certified in 2023.  Accordingly, the Court will conduct a new class certification inquiry for the settlement classes for settlement purposes.

Where, as here, the Court must conduct a new class certification inquiry for the purpose of determining whether to approve a proposed settlement, the Court must examine the proposed

settlement with a "higher level of scrutiny for evidence of collusion or other conflicts of interest." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 976 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement.  Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest[.]"); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (holding that the "specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.  Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold").

### A.    Rule 23(a)

#### 1.    Numerosity

The requirement of numerosity looks to whether the proposed class is "so numerous that joinder of all members individually is impracticable." Fed. R. Civ. P. 23(a)(1).  "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members."  *See Krzesniak v. Cendant Corp.*, No. 05-05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007) (citations omitted).

Here, Plaintiffs represent, and no objector or party has disputed, that each of the settlement classes contains tens of thousands of members.  *See* Docket No. 717 at 21.

Because this is undisputed, and because it would be impracticable to join them all, the Court finds that the numerosity requirement is satisfied with respect to each of the settlement classes.  *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 539 (N.D. Cal. 2015) (finding that the numerosity requirement was met because "the proposed classes comprise thousands of potential members").

#### 2.    Commonality

Commonality requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, "[e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  The common question must be of

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "such nature that it is capable of class-wide resolution—which means that the determination of its

2   truth or falsity will resolve an issue that is central to the validity of each of the claims in one

3   stroke." *Id.* at 350.  The requirements of Rule 23(a)(2) have been construed "permissively," and

4   "[a]ll questions of fact and law need not be common to satisfy the rule." *See Ellis v. Costco*

5   *Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citation omitted).

6        "[T]he court must make a 'rigorous assessment of the available evidence and the method or

7   methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common

8   question in one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31

9   F.4th 651, 666 (9th Cir. 2022).  "In determining whether the 'common question' prerequisite is

10  met, a district court is limited to resolving whether the evidence establishes that a common

11  question is capable of class-wide resolution, not whether the evidence in fact establishes that

12  plaintiffs would win at trial." *Id.* at 666-67.  This analysis may "entail some overlap with the

13  merits of the plaintiff's underlying claim." *Id.* at 667 (citations and internal quotation marks

14  omitted).  Where that is the case, the "[m]erits questions may be considered [only] to the extent [ ]

15  that they are relevant to determining whether the Rule 23 prerequisites for class certification are

16  satisfied[.]" *Id.*

17       Here, several questions of law and fact that pertain to the existence of an antitrust violation

18  are common to members of each of the proposed settlement classes, including (1) whether the

19  rules challenged in the operative complaint constitute a horizontal agreement, contract, or

20  combination that caused significant anticompetitive effects in the relevant markets for student-

21  athletes' labor services; (2) whether Defendants' procompetitive justifications for the challenged

22  NCAA rules are valid; and (3) whether any procompetitive justifications for the challenged NCAA

23  rules can be achieved with less restrictive alternatives.  No objector or party argues that the

24  commonality requirement is not met with respect to the settlement classes.  Accordingly, the Court

25  finds that the commonality requirement is satisfied.

26                      **3.      Typicality**

27       The typicality requirement looks to whether the claims or defenses of the representative

28  parties are typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  "Typicality

refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). "In the antitrust context, generally, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by defendants." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. at 539 (citation and internal quotation marks omitted).

Here, the claims of the named Plaintiffs Grant House, Sedona Prince, Tymir Oliver, DeWayne Carter, Nya Harrison, and Nicholas Solomon are typical of those of the members of the proposed settlement classes each seeks to represent because all named Plaintiffs are or were Division I student-athletes and allege the same antitrust violations as the members of the proposed settlement classes, namely that the challenged restrictions are anticompetitive and caused them cognizable antitrust injury by depriving them of compensation they would have received if the rules had not been in place. No objector or party argues that the typicality requirement is not met with respect to the settlement classes. Accordingly, the Court finds that the typicality requirement is met.

### 4.    Adequacy of Representation

The requirement of adequate representation requires a showing that the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether the representatives (i) have any conflicts of interest with class members and (ii) will prosecute the action vigorously on behalf of the class. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Rule 23(g)(2) imposes a similar adequacy requirement on class counsel. *See* Fed. R. Civ. P. 23(g)(2) (providing that the court may appoint class counsel if counsel will fairly and adequately represent the interests of the class based on factors that include the work of counsel, their experience in handling the types of claims asserted in the action, their knowledge of the applicable law, and the resources they will commit to the class).

Here, Plaintiffs have shown that named Plaintiffs House, Prince, Oliver, Carter, Harrison, and Solomon are adequate representatives for each of the proposed settlement classes they seek to represent, because their interests are aligned with members of those classes in securing a more

United States District Court
Northern District of California

competitive market for the labor of Division I student-athletes and in achieving greater

compensation for Division I student-athletes via this litigation.  The Court finds that each of the

named Plaintiffs has prosecuted this action vigorously to the benefit of all members of the

settlement classes.  Some objectors argue that the named Plaintiffs are not adequate

representatives for some segments of the settlement classes; however, the Court will reject those

arguments for the reasons discussed in more detail in the objections section of this order.  The

Court finds that the named Plaintiffs satisfy the adequacy of representation requirement with

respect to the settlement classes they seek to represent.

The Court further finds that Hagens Berman Sobol Shapiro LLP and Winston & Strawn

LLP satisfy the requirements for appointment as Class Counsel for the proposed settlement

classes.  Both were previously appointed lead counsel for college student-athletes in complex

antitrust actions and have achieved significant success in that role.  For example, the Court

appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP to represent student-

athletes who asserted both damages and injunctive relief claims in *Alston*, 375 F. Supp. 3d at

1058, on a contingency basis, and they achieved great results in that case.  Before the parties

reached a settlement agreement in this case, the Court appointed those firms in 2023 to serve as

co-class counsel on behalf of damages and injunctive-relief classes of student-athletes in this

action.  The Court is now very familiar with both of these firms given that the Court presided over

*Alston* and now this case.  The Court finds that their work and experience in representing student-

athletes has been excellent.  Accordingly, the Court finds that these firms would be and have been

outstanding representatives for the members of all of the settlement classes here.

Some objectors argue that Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP

have conflicts of interests with some members of the proposed settlement classes but, for the

reasons discussed in more detail below in the objections section of this order, the Court will reject

those arguments.  The Court is persuaded that Hagens Berman Sobol Shapiro LLP and Winston &

Strawn LLP have prosecuted this action vigorously and fairly on behalf of those classes and that

they satisfy the requirements of Rule 23(a)(4) and Rule 23(g)(2).

**B.        Rule 23(b)(3)**

Under Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) requires a court to consider whether a class action would be a superior method of litigating the claims of the proposed class members by taking into account (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).

Here, the Court finds that the predominance requirement is met with respect to all of the proposed settlement damages classes.  The questions that are central to Plaintiffs' claims under Section 1 of the Sherman Act are capable of resolution on a classwide basis with common proof, including whether the challenged NCAA rules violate Section 1 and whether the members of the proposed classes suffered antitrust injury as a result of that violation.  No objector or party argues otherwise.

The Court further finds that a class action is superior to other methods of adjudicating the claims of members of the settlement damages classes.  Members of the settlement damages classes are unlikely to want to pursue individual actions given that the amount of damages that each class member can recover is likely too low relative to the costs of litigating a complex antitrust class action against Defendants, who are repeat litigants.  Further, litigating the action in this forum is desirable because this Court has presided over several other actions involving antitrust challenges to NCAA rules and involving the same Defendants.  The manageability of litigating the claims of the damages settlement class members at trial is irrelevant for the purpose of certification for settlement purposes.  *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) ("[I]n deciding whether to certify a settlement-only class, a district court need not inquire

United States District Court
Northern District of California

1  whether the case, if tried, would present intractable management problems.") (citation and internal

2  quotation marks omitted).

3       **C.      Rule 23(b)(2)**

4       Rule 23(b)(2) permits certification of an injunctive relief class when "the party opposing

5  the class has acted or refused to act on grounds that apply generally to the class, so that final

6  injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

7  Fed. R. Civ. P. 23(b)(2).  The Ninth Circuit has explained that the Rule 23(b)(2) requirements "are

8  unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory

9  relief from policies or practices that are generally applicable to the class as a whole."  *Parsons v.*

10 *Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citation omitted).  "That inquiry does not require an

11 examination of the viability or bases of the class members' claims for relief, does not require that

12 the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not

13 require a finding that all members of the class have suffered identical injuries."  *Id.* (footnote

14 omitted).  "Rather, as the text of the rule makes clear, this inquiry asks only whether 'the party

15 opposing the class has acted or refused to act on grounds that apply generally to the class.'"  *Id.*

16 (quoting Fed. R. Civ. P. 23(b)(2)).

17      Here, the Court finds that the requirements of Rule 23(b)(2) are met with respect to the

18 Injunctive Relief Settlement Class because the NCAA restraints on student-athlete compensation

19 that are challenged in the operative complaint apply generally to the entire class such that final

20 injunctive relief from the challenged restraints is appropriate with respect to the entire class.

21      Some objectors have argued that, in their view, the Injunctive Relief Settlement's roster

22 limits provisions will cause injury to some members of the Injunctive Relief class.  It is not clear

23 whether these objectors challenge certification of the Injunctive Relief Settlement Class for failure

24 to comply with Rule 23(b)(2)'s requirements on those grounds, but to the extent that they do, the

25 Court rejects their objections, as discussed in more detail in the objections section below.

26      Some objectors also have argued that the inclusion of future Division I student-athletes in

27 the Injunctive Relief Settlement Class is inappropriate because their claims are not yet ripe.  It is

28 not clear whether these objectors challenge certification of the Injunctive Relief Settlement Class

26

1    for failure to comply with Rule 23(b)(2)'s requirements on those grounds, but to the extent that

2    they do, the Court rejects their objections, for the reasons discussed in more detail below in the

3    objections section of this order.

4    **II.    Fairness of the Settlement Agreement**

5            In determining whether the SA can be approved under Rule 23(e)(2), the Court must

6    consider the factors set forth in that rule to determine whether the settlement is fair, reasonable,

7    and adequate, namely whether (A) the class representatives and class counsel have adequately

8    represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for

9    the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the

10   effectiveness of any proposed method of distributing relief to the class, including the method of

11   processing class-member claims; (iii) the terms of any proposed award of attorneys' fees,

12   including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3);

13   and (D) the proposal treats class members equitably relative to each other.

14           For the reasons set forth below, the Court finds that the SA satisfies the requirements for

15   approval under Rule 23(e)(2).

16           **A.    Adequate Representation**

17           As discussed above, Class Counsel have represented classes of student-athletes in multiple

18   litigations challenging NCAA restraints on student-athlete compensation, and they have achieved

19   extraordinary results.  Class Counsel's representation of the settlement class members here is no

20   exception.  The relief that Class Counsel achieved on behalf of the settlement classes is

21   exceptional, as will be discussed in more detail below.  Further, the record shows that Class

22   Counsel have prosecuted this litigation vigorously on behalf of all settlement class members.

23   They conducted substantial discovery; they successfully opposed a motion to dismiss; and they

24   successfully obtained certification of three damages classes and an injunctive relief class despite

25   significant opposition from Defendants, and they successfully defended the class certification

26   decision on appeal.  Those are remarkable results, not least because prior attempts to certify

27   damages classes challenging NCAA compensation restrictions had failed.

28

1    In light of the excellent results that Class Counsel have achieved to date on behalf of

2    settlement class members, and their substantial experience in prosecuting complex class actions

3    challenging NCAA restrictions on student-athlete compensation, the Court finds that Class

4    Counsel were well informed about the strengths and weaknesses of class members' claims before

5    and during their settlement negotiations and were well-positioned to negotiate a fair settlement on

6    behalf of the settlement classes.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir.

7    2009) ("[W]e have held that [p]arties represented by competent counsel are better positioned than

8    courts to produce a settlement that fairly reflects each party's expected outcome in litigation" and

9    this weighs "in favor of approval") (citation and internal quotation marks omitted).

10    The Court finds that Class Counsel have adequately represented settlement class members

11    throughout this litigation, and that this factor weighs in favor of granting final approval.

12    **B.    Whether the Settlement Agreement was Negotiated at Arm's Length**

13    As discussed above, the SA was negotiated at arm's length before Professor Eric Green, a

14    highly respected mediator who has significant experience mediating disputes involving challenges

15    to the NCAA's compensation rules.  *See* Berman Decl., ¶ 4.  The parties conducted multiple

16    negotiation sessions over the course of more than one year.  Throughout, the settlement

17    discussions were structured and sequenced to compartmentalize negotiations separately based on

18    different relief and different claims.  *See id.* ¶¶ 4, 6, 8-9.  The parties first focused on negotiations

19    regarding settling the injunctive relief claims.  Only after agreeing to the principal terms of the

20    Injunctive Relief Settlement did the parties turn to discussions of damages.  Plaintiffs then made

21    separate demands for damages relating to NIL damages and additional compensation damages

22    (and a demand relating to damages in the *Hubbard v. National Collegiate Athletic Association*

23    matter, Case No. 4:23-cv-01593-CW).  The demands, subsequent negotiations, and ultimate

24    agreed-upon settlement amounts took into account the different damages estimates, procedural

25    postures, and risks and strengths of the respective claims.  *Id.*  The parties negotiated attorneys'

26    fees after all material terms of the SA had been agreed upon.

27    The Court finds that the SA is the product of arm's length negotiations given: the

28    participation of a neutral and highly respected and experienced mediator, the back-and-forth

28

between the parties as to the terms of the SA for more than a year, and the parties' decision to structure settlement discussions to compartmentalize negotiations separately based on different relief and different claims and to negotiate attorneys' fees after all other terms had been agreed upon. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (holding that participation of a mediator is not dispositive but is "a factor in favor of a finding of non-collusiveness"); *see also Youth Just. Coalitions v. City of Los Angeles*, No. 2-16-CV-07932-VAPRAOX, 2020 WL 9312377, at \*3 (C.D. Cal. Nov. 17, 2020) ("The sustained back and forth negotiations between the parties indicate that the Settlement Agreement was the result of a process that was fair and full of adversarial vigor.") (citation and internal quotation marks omitted). The Court has carefully reviewed the record and finds no indication of fraud, overreaching, or collusion.

Accordingly, the Court finds that this factor weighs in favor of granting final approval. The SA's provisions relating to Class Counsel's attorneys' fees and costs do not alter this finding, for the reasons discussed in more detail below.

### C.  Whether the Relief Provided for the Class Is Adequate

Rule 23 requires that a court consider whether the relief provided for the class is adequate in determining whether to approve a settlement. In considering whether the relief provided to the class is adequate, the Court accounts for: (i) the costs, risks, and delay of a jury trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C).

The Court finds that the relief that Class Counsel achieved on behalf of settlement class members is outstanding.

Class Counsel secured a total of $2.576 billion dollars for distribution to eligible members of the damages classes. Based on the economic analyses of Dr. Rascher, the $1.976 billion that Class Counsel secured for the "NIL Claims Settlement Amount" represents 67.4% of the estimated damages for the settlement classes for NIL-related injuries (BNIL, videogame NIL, and

United States District Court
Northern District of California

1    third-party NIL).  Rascher Decl. ¶¶ 7, 33.  The Court is very well acquainted with Dr. Rascher's

2    work, as he filed numerous reports and provided testimony as Plaintiffs' economics expert in

3    *Alston* and has filed multiple reports in this litigation.  The $1.976 will be split into sub-funds for

4    each of the three types of NIL-related injuries in a manner that is proportionate to their estimated

5    single damages, so that the recipients of each of type of NIL claims will also receive, in gross,

6    67.4% of their estimated single damages (i.e., $1.815 billion for BNIL, $71.5 million for

7    videogame NIL, and $89.5 million for third-party NIL).  *See id.* ¶¶ 22, 28, 32.  Further, the $600

8    million that Class Counsel secured for the Additional Compensation Claims Settlement Amount

9    represents 31.6% of the estimated damages for pay-for-play claims.  *See* Rascher Decl. ¶¶ 8, 49.

10   These are outstanding results, particularly given that lesser recoveries in other antitrust actions

11   have been hailed as excellent.  *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No.

12   13MD02420YGRDMR, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-

13   15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (finding as "excellent" that "the common

14   fund of the settlement equates to 11.7 percent of the single damages" for a nationwide class in an

15   antitrust case); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,

16   688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only

17   a fraction of the potential recovery will not per se render the settlement inadequate or unfair.").

18          Class Counsel also secured the Injunctive Relief Settlement, which will open the doors for

19   each Division I school that chooses to opt in to the IRS to provide Division I student-athletes with

20   benefits and compensation of more than $20 million for the first year of the IRS (2025-26), with

21   the amount increasing over the ten-year period of the IRS to reach approximately $32.9 million

22   per school in 2034-35.  *See* Rascher Decl. ¶¶ 82-87.  Dr. Rascher opines that it would be

23   economically reasonable to expect due to competition that Division I schools, in the aggregate,

24   will provide Division I student-athletes with at least $1.6 billion in 2025-26 in new benefits and

25   compensation that were not previously permitted under existing NCAA rules but will be permitted

26   under the IRS.  *See id.* ¶¶ 86-87.  Dr. Rascher estimates that, in 2025-2026, the combined value of

27   existing benefits to Division I student-athletes and the Pool benefits and compensation that will be

28   permitted under the IRS will represent approximately 50% of Division I revenues.  Rascher Decl.

¶¶ 82-87.  According to Dr. Rascher, that percentage is similar to the share of professional sports revenue that is shared with professional athletes.  *See Id.*  Dr. Rascher estimates that, in the aggregate, the combination of benefits and compensation that are permitted under current NCAA rules and the new benefits and compensation that will be allowed under the IRS will total at least $19 billion over the ten-year period of the IRS.  *See id.*

The IRS will provide additional benefits to Division I student-athletes over its ten-year period, however.  It requires the elimination of the NCAA scholarship limits that restrict scholarships that Division I schools can provide in each sport.  The IRS will also result in new protections for student-athletes in the context of third-party NIL payments.  The IRS will permit the NCAA to continue its current restrictions on third-party NIL payments to Division I student-athletes, but only to the extent that such payments are made by Associated Entities or Individuals.  By contrast, the NCAA's current rules allow it to prohibit *all* third-party NIL payments to Division I student-athletes, regardless of their source.  The IRS further requires that any disputes arising out of the enforcement of third-party NIL restrictions permitted under the IRS be resolved via neutral arbitration under rules that will ensure transparency and due process protections for student-athletes, which is a significant improvement over the NCAA's current system for enforcing third-party NIL restrictions.

The Court finds that the relief provided to settlement class members under the SA is fair and reasonable considering the exceptionally positive reaction of the settlement class members, which, as noted, resulted in approximately 26.2% of the estimated 389,700 current members of the settlement classes submitting claim forms or updating their contact and payment information to receive damages distributions and only 73 valid objections and 357 opt outs.  This conclusion is supported, as well, by the Rule 23(e)(2)(C) factors, which the Court discusses below.

### 1.    The Costs, Risks, and Delay of Trial

The parties settled this action after Plaintiffs achieved certification of damages and injunctive relief classes, and after the parties had begun their briefing on their respective motions for summary judgment and had completed discovery.

1    Class Counsel represent that, in light of the significant risks involved with proceeding to a

2    jury trial and a possible appeal, the settlement of the claims under the terms now before the Court

3    would be in the best interest of the settlement classes.  Class Counsel explain that some of the

4    risks the class members would face at trial include the risk of *Daubert* challenges and the burden

5    to establish liability and damages over Defendants' arguments that Plaintiffs' damages models are

6    inadequate.  Defendants would argue that Plaintiffs' estimated BNIL damages are insufficiently

7    supported because they have never before been valued as a separate component of damages, that

8    no college basketball video game would have existed during the relevant period, and that the NIL

9    lost opportunity damages model relies on unreliable data.

10    Class Counsel also explain that, even if they were to prevail at trial, an appeal would be

11    certain, during which Defendants would raise the same arguments just discussed.  The Court is

12    persuaded that, if the litigation had continued through trial and appeals, it is very possible that

13    Plaintiffs would have recovered less, or nothing.  In 2015, the Ninth Circuit vacated this Court's

14    injunction that would have allowed college football and basketball players to receive $5,000 in

15    deferred compensation for the use of their NILs.  *See O'Bannon*, 802 F.3d at 1078.  Given that, ten

16    years ago, the Ninth Circuit found that $5,000 in deferred compensation for student-athletes was

17    not permissible shows that the relief that Class Counsel obtained on behalf of settlement class

18    members under the SA, including the extraordinary amounts of student-athlete compensation that

19    will be permissible pursuant to the Injunctive Relief Settlement and the multi-billion dollar

20    damages funds, is a significant achievement.

21    The Court thus finds that the relief provided for settlement class members is reasonable

22    and fair when compared with the costs, risks, and delay of trial.

23    **2.    The Effectiveness of the Proposed Method for Distributing Relief to the
          Class**

24

25    As noted, to receive distributions for damages claims, some members of the damages

26    classes were required to submit a claim form, while others were only required to submit their

27    updated contact and payment information.  *See* Notice, Docket No. 544-4 at 11; Peak Decl. ¶¶ 32-

28    35.  After the hearing on Plaintiffs' motion for preliminary approval, the Court reviewed and

United States District Court
Northern District of California

edited Plaintiffs' proposed claim form to ensure that it was easy to understand and fill out, and did not require class members to provide any unnecessary information or information that could be burdensome to collect. *See* Docket No. 544-2.

Members of the damages classes were provided with 105 days from the notice date, i.e., until January 31, 2025, to submit their claim form or contact and payment information on the settlement website or by mail. Damages distributions to those class members who submitted valid and timely claims, or who provided updated contact and payment information to the claims administrator, will receive yearly distributions from the damages funds over the course of ten years following the Effective Date pursuant to Plaintiffs' proposed allocation plan. *See* SA ¶¶ 3-4.

The SA does not contain any provisions that unclaimed portions of the settlement funds that were intended for settlement class members will revert to Defendants. Any balance remaining in the Gross Settlement Fund after the initial distributions, because of uncashed checks or otherwise, may be distributed, subject to Court approval, in an equitable and economical fashion to "Authorized Recipients," which are defined in the SA as members of the damages settlement classes who are entitled to a distribution under the SA. *See* SA ¶¶ 1(f) & 9.

The Court finds that the proposed method for distributing relief to the classes is fair and reasonable and weighs in favor of granting final approval of the SA.

### 3.    The Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment

In considering whether the relief provided to the classes pursuant to the SA is adequate, the Court accounts for the terms of "any proposed award of attorneys' fees, including timing of payment[.]" *See* Fed. R. Civ. P. 23(e)(2)(C). Rule 23(e) requires courts to "balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *See Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021). This requires scrutinizing the settlement agreement for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 1023. Such subtle signs exist: (1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a "clear sailing" arrangement

providing that defendants will not oppose class counsel's request for fees; and (3) when the parties arrange for fees not awarded to class counsel to revert to defendants rather than to the class members (i.e., a so-called "kicker" clause). *Id.*  Where any of these signs are present, the district court must "examine the negotiation process with even greater scrutiny than is ordinarily demanded" and the "approval of the settlement [must] be supported by a clear explanation" of why the negotiated attorneys' fee is justified and "does not betray the class's interests." *In re Bluetooth*, 654 F.3d at 949.

Here, the SA does contain two arguably clear-sailing provisions.  The SA provides that Defendants will not oppose paying the $20 million upfront injunctive fee and cost award, and that Defendants shall not unreasonably oppose fees that Class Counsel may apply for in the future as a percentage of the total amount spent by Division I institutions under the Pool for each academic year, or for monitoring and enforcement work in connection with the IRS. *See* SA ¶¶ 27-29.  Even when viewing these provisions as clear-sailing provisions, their presence does not preclude the Court from granting final approval of the SA.  The Court has carefully reviewed the record and has found no indication of collusion or that the settlement negotiations were not conducted at arm's length.

Class Counsel request an award of attorneys' fees equivalent to 20% of the NIL Claims Settlement Fund (or $395.2 million in fees), 10% of the Additional Compensation Claims Settlement Fund (or $60 million in fees), an upfront injunctive relief award of $20 million to be paid by Defendants, the right to apply to the Court or special master for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75% to a maximum of 1.25%), and the right to apply to the Court or special master for an award of fees and costs for their ongoing work in monitoring and enforcing compliance with the IRS.

The Court compares the amount in fees that Class Counsel now seek under the terms of the SA to the relief that Class Counsel achieved for the settlement classes, taking into account the risks of continued litigation discussed above.  The Court finds that all of the fees that Class Counsel request are proportionate to the benefits that the SA provides for the settlement class

United States District Court
Northern District of California

1    members, because the fees requested represent a small of percentage the benefits that settlement

2    class members will receive.  That is in contrast with other settlements where the fees requested

3    were disproportionate to the benefits conferred on class members.  *Cf. Lowery v. Rhapsody Int'l,*

4    *Inc.*, 75 F.4th 985, 991 (9th Cir. 2023) ("The district court's fee award is not reasonable under

5    Rule 23, given that the $1.7 million fee award is more than thirty times larger than the amount

6    paid to class members"); *In re Bluetooth*, 654 F.3d at 938 (vacating attorneys' fee award of

7    $800,000 where class members received "zero dollars for economic injury" and $100,000 in cy

8    pres awards); *Briseno*, 998 F.3d at 1026 (finding that attorneys' fees of almost $7 million were

9    disproportionate to the benefits conferred on the class, which would total less than $1 million).

10   Additionally, the percentages in fees that Class Counsel request are lower than the 25%

11   benchmark in the Ninth Circuit.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949

12   (9th Cir. 2015) ("Under the percentage-of-recovery method, the attorneys' fees equal some

13   percentage of the common settlement fund; in this circuit, the benchmark percentage is 25%.").

14   The Court finds that the requested fees do not render the SA unfair to class members for the

15   additional reason that Class Counsel committed substantial resources on a contingency basis for

16   the benefit of the class and achieved excellent results on behalf of the class throughout this highly

17   contested litigation.

18       The Court further finds that the proposed timing for the payment of any fees awarded to

19   Class Counsel does not detract from the fairness and reasonableness of the SA to settlement class

20   members.  Class Counsel ask that fees on damages claims be paid to them over the same ten-year

21   period as the damages funds will be distributed to members of the damages classes, which the

22   Court finds to be fair and reasonable.  *See* Docket No. 583 at 25.  Further, the fees that Class

23   Counsel will apply for in the future as a percentage of the total amount spent by Division I

24   member institutions under the Pool for each academic year will also be distributed as the Pool

25   amounts are provided to members of the Injunctive Relief class, which is also fair and reasonable.

26   Any fees for monitoring and enforcing the IRS, if approved, will be paid when earned.  The $20

27   million upfront injunctive relief award, if approved, will be paid by Defendants into an escrow

28   account within 45 days of the entry of the Court's order approving the award, and thereafter will

1  be paid to Class Counsel within 10 days of the Effective Date.  *See* SA ¶ 27(a)-(d).  The Court

2  finds that the timing of the injunctive fee award is appropriate and fair to settlement class members

3  because those fees will be paid by Defendants and will not be taken out of funds that would

4  otherwise go to settlement class members.  *See id.*

5  Because there is no evidence of collusion here and the requested attorneys' fees are

6  reasonable when compared to the settlement class members' recovery under the SA and other

7  factors discussed above, the Court finds that this factor weighs in favor of granting final approval

8  of the SA.[5]  *See In re Bluetooth*, 654 F.3d at 949; *Briseño*, 998 F.3d at 1026-28.

9  Some objectors argue that the fees that Class Counsel can seek under the terms of the SA

10  indicate the existence of a conflict.  For the reasons discussed in more detail below in the

11  objections section of this order, the Court will reject those arguments.

### 4. Any Agreement Required to be Identified Under Rule 23(e)(3)

13  The parties have not identified any agreement under Rule 23(e)(3) to disclose.

14  Accordingly, this factor does not impact the Court's findings as to the fairness of the SA.

### D. Whether the Settlement Agreement Treats Class Members Equitably Relative to Each Other

17  The Court is required to consider whether the "proposal treats class members equitably

18  relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).

19  The Court finds that the SA satisfies that standard.  A plan of allocation is equitable and

20  fair where it distributes funds based on the strength of the class members' claims.  *See In re*

21  *Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate

22  the settlement funds to class members based on the extent of their injuries or the strength of their

23  claims on the merits.") (citation and internal quotation marks omitted).  Plaintiffs' proposed

24  allocation plans for the damages funds do exactly that.

---

[5] The Court will resolve Plaintiffs' motion for attorneys' fees and costs, Docket No. 583, in a separate order.  The SA provides that any applications by Class Counsel for fees and costs are not a part of the SA and that proceedings relating to any such applications shall not affect or delay the finality of the SA.  *See* SA ¶ 30.

United States District Court
Northern District of California

1    Plaintiffs' proposed allocation plan for the NIL Claims Settlement Fund will result in the

2  distribution of that fund in a manner that is proportional to Dr. Rascher's estimated damages for

3  each type of NIL-related claim (BNIL, videogame NIL, and third-party NIL) alleged in the

4  operative complaint.  Damages funds for BNIL and videogame NIL will be distributed amongst

5  eligible settlement class members based on Dr. Rascher's opinions relating to the types of

6  Division I student-athletes who were likely to receive each type of NIL compensation in the but-

7  for world.  *See, e.g.*, Rascher Decl. ¶¶ 20-28.  Damages for third-party NIL will be further

8  distributed amongst eligible class members based on Dr. Rascher's before-and-after methodology,

9  which takes into account actual payments that student-athletes received from third parties for their

10 NIL.  *See, e.g.*, Rascher Decl. ¶¶ 31-32.

11    Plaintiffs' allocation plan for the Additional Compensation Settlement Fund will result in

12 the distribution of 95% of the Fund to damages class members who played football, men's

13 basketball, and women's basketball and who, according to Dr. Rascher's economic analyses,

14 would most likely have received compensation for their athletic services in the but-for world in

15 light of the revenues that those sports achieve.  *See* Rascher Decl. ¶¶ 50-81.  Allocations to those

16 athletes will be based on a formula that will provide class members with an individual

17 compensation minimum that Dr. Rascher believes would likely be paid in high-revenue sports like

18 basketball and football, and that would account for certain individual factors, such as seniority,

19 recruiting star rating, and other metrics.  *See id.*  The remaining 5% of the Fund will be allocated

20 to members of the Additional Sports Class who play certain sports, based on Dr. Rascher's

21 opinions as to which sports would have been likely to support compensation for athletic services

22 in the but-for world based their lesser revenues.  *See id.*

23    Plaintiffs submitted a chart that shows the approximate damages recovery by class and by

24 type of claimed damages.  *See* Docket No. 450, Exhibit A.  The recoveries range from $80 to

25 $91,000 per athlete.

26    The Court finds that Plaintiffs' proposed damages allocations are adequately supported by

27 Dr. Rascher's opinions and treat damages class members equitably.  They reflect the extent of

28 class members' injuries and the strength of their claims.  Any members of the damages classes

1    who were dissatisfied with the proposed allocations had the opportunity to opt out of the SA and

2    pursue their claims individually.

3        The parties acknowledge that neither of the damages settlement funds will compensate

4    members of the damages classes who suffered injury only as a result of the NCAA's limits on

5    scholarships.  That is not inequitable because Plaintiffs have shown that claims arising out of those

6    injuries have little or no value given that prior cases that challenged scholarship caps did not get

7    beyond the class certification stage and were, thus, not successful.  This is discussed in more detail

8    in the objections section of this order.

9        The Court also finds that the IRS treats members of the Injunctive Relief Settlement Class

10   equitably.  The IRS' provisions will apply equally to all NCAA member schools that choose to opt

11   in to the IRS.  Accordingly, members of the Injunctive Relief Settlement Class who choose to

12   attend schools that opt in to the IRS will be subject to the same NCAA rules regarding

13   compensation and benefits that are permitted under the IRS.  Some objectors argue that some

14   provisions of the IRS do not treat class members equitably, but the Court rejects those arguments

15   for the reasons discussed below in the objections section.

16       Class Counsel's request for service awards for the named Plaintiffs does not render the SA

17   inequitable.  As noted, Class Counsel request that the Court approve service awards for the named

18   Plaintiffs, as follows:  $125,000 each for Grant House, Sedona Prince, and Tymir Oliver; $10,000

19   each for DeWayne Carter and Nya Harrison; and $5,000 for Plaintiff Nicholas Solomon.  The

20   Court finds that these requested service awards, which are not opposed by any of the objectors, do

21   not evidence inequitable treatment of settlement class members.  The Court finds that the

22   requested service awards are intended to compensate class representatives for their work on behalf

23   of settlement class members, their active involvement in this litigation (including assisting Class

24   Counsel in prosecuting the case, responding to discovery requests, and preparing for and attending

25   depositions), the financial or reputational risks they undertook in bringing the action (which were

26   significant given the high degree of publicity this action has received), and the very favorable

27   results they were able to achieve for the settlement class members by way of the SA.  The fact that

28   some members of the damages classes are estimated to receive settlement damages payments of

1    tens of thousands of dollars each, *see* Docket No. 450, Exhibit A, further supports the Court's

2    conclusion that the amounts of the service awards are not unreasonable.  Other courts have found

3    service awards of a magnitude similar to the ones requested to be appropriate.  *See, e.g.*, *In re*

4    *High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal.

5    Sept. 2, 2015) (authorizing service awards of $120,000 and $80,000 where the average recovery

6    would be $5,770 per class member). The Court finds that this factor weighs in favor of granting

7    final approval of the SA.

8    **III.    Adequacy of Notice**

9         A court must "direct notice [of a proposed class settlement] in a reasonable manner to all

10   class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Due process

11   requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of

12   the pendency of the action and afford them an opportunity to present their objections."  *Mullane v.*

13   *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

14        The Court finds that the notice provided to class members complied with the requirements

15   of Rule 23 and due process.  The notice plan, which the Court approved, involved direct notice (by

16   email and postcard where feasible), a digital campaign, and press releases.  Plaintiffs have shown

17   that the direct notice successfully reached over 81.9% of current settlement class members.  *See*

18   Peak Decl. ¶ 21.  Further, as discussed above, the Court reviewed and edited the notices to ensure

19   that they were easy to understand and described the settlement terms with more than sufficient

20   detail to enable class members to make educated decisions as to whether to file a claim, opt out, or

21   investigate further prior to the applicable deadlines.  *See In re Hyundai*, 926 F.3d at 567 ("To

22   satisfy Rule 23(e)(1), settlement notices must present information about a proposed settlement

23   neutrally, simply, and understandably.  Notice is satisfactory if it generally describes the terms of

24   the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

25   forward and be heard.") (internal citations and quotation marks omitted).  Although not required,

26   Plaintiffs made available as of December 17, 2024, on the settlement website estimates of

27   damages allocations where possible for members of the damages classes.  *See* Peak Decl. ¶ 29.

28

United States District Court
Northern District of California

1    Some objectors argue that the notice plan was deficient.  However, for the reasons

2    discussed below in the objections section of this order, the Court will reject those arguments.

3    The Court finds that the adequacy of the notice weighs in favor of granting final approval

4    of the SA.

5    **IV.    Objections to the SA**

6    Under Rule 23(e)(5), any class member may object to the settlement agreement if it

7    requires court approval under Rule 23(e).  "An objector to a proposed settlement agreement bears

8    the burden of proving any assertions they raise challenging the reasonableness of a class action

9    settlement."  *Noll v. eBay, Inc.*, 309 F.R.D. 593, 602 (N.D. Cal. 2015) (citation omitted).  "To

10   survive appellate review, the district court must show it has explored comprehensively all factors,

11   and must give a reasoned response to all non-frivolous objections."  *Dennis v. Kellogg Co.*, 697

12   F.3d 858, 884 (9th Cir. 2012) (citations and quotation marks omitted).

13   There were only 73 valid, timely objections filed by settlement class members, out of an

14   estimated 389,700 current settlement class members across all settlement classes.  *See* Berman

15   Decl., Ex. A, Docket No. 717-1.[6]

16   The Court has reviewed all of the objections, but will not address those that were filed by

17   non-class members, such as parents, athletics associations, and other individuals and entities who

18   are not class members, because non-class members do not have standing to object to the SA.[7]  *See*

19   *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1008 (N.D. Cal. 2015) (holding

20   that objector had "no legal standing to object to the settlement because he has not demonstrated

21   that he is an aggrieved class member") (collecting cases); *Moore v. Verizon Commc'ns Inc.*, No. C

22

23

24   [6] Class Counsel filed a chart that indicates which objections were invalid because they were

25   untimely, filed by non-class members, filed anonymously, or filed by class members who opted
     out.  *See* Docket No. 717-1.  The Court has reviewed that chart and agrees with Class Counsel's

26   conclusions and incorporates them here by reference.

27   [7] Some non-class members filed objections in the form of amicus curiae briefs.  *See, e.g.*, Docket
     Nos. 971, 760, 762, 603, 705.  The Court is not persuaded by these objections because the

28   individuals and entities who filed them do not have standing to object to the settlement, and
     because the Court does not find the briefs they filed to be helpful.

United States District Court
Northern District of California

09-1823 SBA, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013) ("[A] court need not consider the objections of non-class members because they lack standing.").

The Court will not address objections that were filed on the docket or postmarked after the January 31, 2025, deadline for objecting to the SA, with the exception of objections and related briefs that the Court specifically invited and permitted after the final approval hearing from objectors or their counsel who the Court invited to speak or argue during the final approval hearing.  The untimely objections fail to comply with the objection procedures that the Court set forth in its order granting preliminary approval of the SA.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-MD-1827 SI, 2011 WL 7575004, at *3 (N.D. Cal. Dec. 27, 2011).

The Court also will not address objections that were filed anonymously because such objections fail to comply with the requirements for objecting to the SA, which, among other things, required class members to include their full name in the objection.  *See Moore*, 2013 WL 4610764, at *9 (overruling objections because objectors "failed to comply with the proper procedures to object to the Settlement").

The Court also will not address objections filed by settlement class members who opted out, because class members who submitted them do not have standing to object to the SA given that they will not be affected by the SA as a result of having opted out.  *See In re TracFone*, 112 F. Supp. 3d at 1008; *Moore*, 2013 WL 4610764, at *9.

For all valid, timely objections, the Court has considered carefully any supporting declarations and other materials that the objectors attached to their objections.

Below, the Court addresses by topic the substance of the valid, timely objections that were filed by members of the settlement classes.  *See Dennis*, 697 F.3d at 884.

**A.    Injunctive Relief Settlement**

**1.    The Pool**

Multiple objectors argue that the SA does not satisfy the standards for final approval because of its provisions that limit or "cap" the compensation and benefits that schools can provide to class members under the "Pool."

1    Some objectors argue that the SA cannot be approved because the Pool cap, which limits

2 the compensation and benefits that each school can provide to student-athletes each year to 22% of

3 the Power Five schools' average athletic revenues each year (subject to certain specified yearly

4 increases), is anticompetitive and perpetuates the very harm that this litigation was supposed to

5 remedy.

6    The Court overrules these objections.  "So long as the conduct perpetuated under a

7 settlement agreement does not per se violate antitrust law, the settlement may be approved, even if

8 the perpetuated conduct might not withstand scrutiny under the rule of reason."  *In re Blue Cross*

9 *Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 108990 (11th Cir. 2023) (internal citation

10 omitted), *cert. denied sub nom. Behenna v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2686 (2024),

11 and *cert. denied sub nom. Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, 144 S. Ct.

12 2687 (2024).  Here, the objectors have not pointed to any authority that the Pool spending cap

13 provisions of the SA are a per se violation of the Sherman Act.  Accordingly, those provisions are

14 subject to the rule of reason.  Because the alleged anticompetitive effect of the Pool spending cap

15 provisions has not been established, and because Defendants argue that the cap is procompetitive

16 because it is necessary for competitive balance and to ensure the greatest output of athletic

17 opportunity, *see* Docket No. 721 at 8, it is not clear that the Pool spending cap provisions violate

18 the Sherman Act.[8]  Thus, the fact that the SA includes the Pool spending cap does not preclude the

19 Court from granting final approval of the SA.  *See id.*; *see also Robertson v. Nat'l Basketball*

20 *Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (affirming approval of a settlement agreement in antitrust

21 case brought by professional athletes against a professional league over objections that the

22 settlement agreement authorized the continuation of illegal conduct under the Sherman Act on the

23 basis that the conduct authorized by the settlement agreement was not "clearly illegal").

24

25

26 _____

27 [8] Because this action is being settled instead of being litigated through trial, the question of whether the Pool cap provisions violate the Sherman Act has not been and will not be adjudged by this Court.  *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions").

28

United States District Court
Northern District of California

1    Some objectors argue that the Pool cap is unfair to class members because, in their view,

2    there is no valid reason for imposing any kind of cap on student-athlete compensation and

3    benefits.

4    The Court overrules these objections. The Pool spending cap does not alter the Court's

5    finding, above, that the SA is fair, reasonable, and adequate to all class members. First, the Court

6    credits Class Counsel's representation that the Pool cap reflects a settlement compromise that was

7    informed by their extensive experience in challenging NCAA restraints. In prior cases where

8    classes of student-athletes prevailed at trial in challenging NCAA restraints on student-athlete

9    compensation, the relief achieved did not result in the complete elimination of those restraints.

10   For example, in *O'Bannon*, a class of student-athletes prevailed at trial and that success resulted in

11   an order from this Court that simply increased by a few thousand dollars the limit on education-

12   related compensation that the NCAA could bar schools from offering student-athletes to the cost

13   of attendance, and that permitted NCAA members to provide $5,000 per year in deferred cash

14   compensation to student-athletes for the use of their NIL. *See O'Bannon*, 7 F. Supp. 3d at 963.

15   The Ninth Circuit affirmed the increase of the lower limit on education-related compensation to

16   the cost of attendance, but it reversed the aspect of the Court's ruling that permitted NCAA

17   members to provide $5,000 per athlete per year in deferred cash compensation to student-athletes

18   for their NIL. The circuit court found that that amount of cash compensation, not tethered to

19   education, would constitute a "quantum leap" from the status quo. *See O'Bannon*, 802 F.3d at

20   1078. In *Alston*, a different class of student-athletes prevailed at trial in this Court but the remedy

21   that this Court issued was constrained by the Ninth Circuit's reversal in *O'Bannon* of the $5,000 in

22   deferred cash compensation. In light of the Ninth Circuit's holdings in *O'Bannon*, the Court

23   issued an order in *Alston* that enjoined restrictions on non-cash education-related benefits but

24   permitted the NCAA to continue to limit cash-equivalent education-related compensation at

25   $5,980 per student-athlete per year, and that ruling was affirmed by the Ninth Circuit and

26   unanimously by the Supreme Court. *See Alston*, 375 F. Supp. 3d at 1061-1110. In neither

27   *O'Bannon* nor *Alston* did the success of the plaintiffs result in an order that completely enjoined

28

United States District Court
Northern District of California

43

United States District Court
Northern District of California

1    the challenged restrictions on student-athlete compensation even though that had been the relief

2    that the plaintiffs had sought in the complaint.

3            The Court finds that, in light of that history, Class Counsel had a reasonable basis for the

4    compromises that are reflected in the Injunctive Relief Settlement, including the Pool spending

5    cap.  Plaintiffs have shown that, even with the Pool spending cap, the Injunctive Relief Settlement

6    will open the door for compensation and benefits for Division I student-athletes that will dwarf

7    what is permitted under current NCAA rules, even after *O'Bannon* and *Alston*.  The Pool spending

8    cap will permit schools that choose to opt in to the IRS to provide benefits and compensation to

9    Division I student-athletes of approximately $20 million per year per school.  That is a dramatic

10   increase from the $5,980 per student-athlete per year that was permitted in *Alston*, and from the

11   $5,000 per student-athlete per year that the Ninth Circuit reversed in *O'Bannon*.  The settlement

12   result here is all the more remarkable because, absent the SA, members of the settlement classes

13   risked a lesser recovery or no recovery at all.

14           Additionally, to the extent that class members in the future believe that the Pool cap has

15   caused them injury, they will be free to sue Defendants for claims arising out of the Pool cap, as

16   class members will not release damages claims that arise out of the Pool cap or any other

17   restrictions permitted by the Injunctive Relief Settlement.  *See* SA ¶ 1 (pp) & (qq).

18           Some objectors argue that the Injunctive Relief Settlement is unfair to class members

19   because Plaintiffs have overestimated the benefits that may become available to student-athletes

20   under the Pool.  Those objectors contend that the actual benefits and compensation that will be

21   provided to class members under the Injunctive Relief Settlement will be more modest than what

22   Plaintiffs contend, because schools will not be required to provide any benefits and compensation

23   to Division I student-athletes.  Instead, schools will be permitted to provide compensation and

24   benefits pursuant to the Injunctive Relief Settlement at their discretion, which means that schools

25   will have the ability to choose to provide compensation and benefits that are significantly below

26   the Pool cap or to provide no compensation and benefits at all.

27           The Court overrules these objections.  The absence of provisions in the Injunctive

28   Settlement Agreement that would require schools to provide specific amounts of benefits and

44

United States District Court
Northern District of California

1  compensation to class members does not render the SA unfair or inadequate.  The absence of those

2  provisions is explained by the fact that, even if Plaintiffs prevailed at trial, Plaintiffs would not be

3  able to obtain a court order forcing schools to provide any amount of compensation or benefits to

4  student-athletes.  The appropriate injunctive remedy in antitrust cases where liability has been

5  established is to remove or lessen anticompetitive restrictions, not to require that the defendants

6  pay any specific amounts to the plaintiffs.  *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594

7  U.S. 69, 85 (2021) (affirming injunction that precluded NCAA from limiting non-cash education-

8  related benefits while allowing the NCAA to continue to limit cash-equivalent education-related

9  compensation).  Further, Plaintiffs have shown that, even though the Injunctive Relief Settlement

10  does not require schools to provide benefits and compensation in specific amounts, competition

11  amongst schools to attract student-athletes is likely to lead schools to provide Division I student-

12  athletes with benefits and compensation under the Injunctive Relief Settlement.  *See* Rascher Final

13  Approval Decl. ¶¶ 15, 73.  As discussed above, the amounts and types of benefits and

14  compensation that schools will be permitted to provide under the Injunctive Relief Settlement will

15  be a significant improvement from what is currently permitted.  The Court thus finds that the

16  Injunctive Relief Settlement will provide settlement class members with significant and

17  meaningful relief.  *Cf. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No.

18  05-MD-1720 (E.D.N.Y.), 2024 WL 3236614, at *27 (E.D.N.Y. June 28, 2024) (declining to grant

19  approval of settlement agreement that included injunctive component in relevant part because the

20  relief it provided to class members was "significantly limited").

21       Finally, some objectors complain about the methodology that was used to determine the

22  Pool cap limits and the amounts by which the Pool cap can increase each year.  They argue, for

23  example, that the Pool cap should have been set at a higher limit because more of the Power Five's

24  revenues (such as revenues from concessions) should have been taken into account when

25  determining the Pool cap.  Other objectors complain about the fact that some types of

26  compensation and benefits that are permitted under current NCAA rules (such as *Alston* academic

27  achievement awards) will count against the cap; these objectors argue that benefits and

28  compensation currently permitted should not count against the cap.

United States District Court
Northern District of California

1    The Court overrules these objections. As discussed above, the standard for whether a

2    settlement can be approved is not whether the settlement could have been better, but rather

3    whether it is fair and adequate. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.

4    1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)

5    ("Settlement is the offspring of compromise; the question we address is not whether the final

6    product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from

7    collusion."). The Court finds that the parties' methodology for determining the Pool spending cap

8    amounts, as well as the types of benefits and compensation that will count against the cap, is fair

9    and reasonable despite the objectors' dissatisfaction with it, because it is the product of a

10    compromise that takes into account the history of prior class actions challenging NCAA

11    compensation restrictions, as well as the delay, risks and costs of continuing this litigation.[9]

12    **2.    Limits on NIL Payments from Associated Entities or Individuals**

13    Some objectors argue that the Injunctive Relief Settlement cannot be approved because it

14    permits the NCAA and its members to pass rules that allow them to police and veto student-

15    athletes' NIL deals with Associated Entities and Individuals. The objectors argue that these

16    provisions of the SA are anticompetitive restrictions on compensation that violate the Sherman

17    Act because they usurp the market's role in determining the fair market value for student-athletes'

18    NIL and vests that power in the NCAA.

19    The Court overrules these objections. As noted above, "[s]o long as the conduct

20    perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may

21    be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of

22    reason." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90. Here, the objectors

23    have not pointed to any authority that the IRS provisions that permit the NCAA to prohibit

24    payments to student-athletes from an Associated Entity or Individual third-party are a per se

25    violation of the Sherman Act. Accordingly, those provisions are subject to the rule of reason.

26

27    [9] The objectors cited declarations and reports by their own experts relating to the Pool cap. If the
      case were tried, Defendants might counter Plaintiffs' experts with experts like those of the
28    objectors. However, the Court does not find those submissions to be determinative.

United States District Court
Northern District of California

1   Because the alleged anticompetitive effect of the Associated Entity third-party NIL provisions has

2   not been established, and because Defendants advanced procompetitive justifications for these

3   NIL provisions at the final approval hearing, *see* Final Approval Hearing Tr. at 217-18, it is not

4   clear that such provisions violate the Sherman Act under the rule of reason.[10]  Thus, the

5   Associated Entity third-party NIL provisions do not preclude the Court from granting final

6   approval of the SA.  *See id*.; *see also Robertson*, 556 F.2d at 686.

7           Some objectors also argue that the third-party NIL Associated Entity provisions of the

8   Injunctive Relief Settlement are unfair to class members because they will preclude class members

9   from obtaining NIL payments from collectives and boosters and from obtaining the full market

10  value of their NIL from such third parties.

11          The Court overrules these objections.  The Court finds that the Associated Entity third-

12  party NIL provisions at issue are fair and reasonable to class members because they are a

13  significant improvement in two ways relative to existing NCAA rules that regulate third-party NIL

14  payments to student-athletes.

15          First, the Associated Entity third-party NIL provisions in the Injunctive Relief Settlement

16  will have the effect of allowing class members to receive any and all third-party payments for their

17  NIL, excepting only those that are made by Associated Entities or Individuals, which are,

18  generally speaking, entities or individuals that promote or support a particular NCAA member

19  school's athletic program.  *See* IRS Art. 1, §1(c).  The Injunctive Relief Settlement's Associated

20  Entity third-party NIL provisions will not apply to other third parties that may seek to license

21  student-athlete NIL and that do not fall within the definition of Associated Entity or Individual,

22  such as companies that sell sports apparel, food, or other consumer products.  By contrast, under

23  existing NCAA rules, the NCAA may limit or prohibit third-party NIL payments from all third

24  parties.  Under the Injunctive Relief Settlement, NIL payments by Associated Entities or

25

26  ───────────────

27  [10] Because this action is being settled instead of being litigated through trial, the question of whether the third-party Associated Entity NIL provisions violate the Sherman Act has not been and will not be adjudged by this Court.  *See Robertson*, 556 F.2d at 686 (holding that "a court in

28  approving a settlement should not in effect try the case by deciding unsettled legal questions").

1    Individuals can be prohibited *only if* the payment is not for a valid business purpose related to the

2    promotion or endorsement of goods or services provided to the general public for profit, with

3    compensation at rates and terms commensurate with compensation paid to similarly situated

4    individuals with comparable NIL value who are not current or prospective student-athletes at the

5    Member Institution.  *See* IRS Art. 4, § 3.  The Court finds that these provisions will not unduly

6    restrict class members' ability to enter into contracts with third parties for their NIL or to

7    maximize the payments they can obtain for their NIL from third parties.  This is because those

8    provisions will apply only to transactions with Associated Entities or Individuals.  Further, NIL

9    payments from Associated Entities and Individuals will be allowed if they are for a valid business

10   purpose and are commensurate with the NIL value of similarly situated individuals.  A similarly

11   situated individual could potentially be a professional athlete, celebrity, or public figure who earns

12   significant amounts for their NIL.  Further still, Associated Entities and Individuals will be

13   allowed to make indirect payments to student-athletes for their NIL by making contributions to the

14   schools, which can then make payments to student-athletes.

15          Second, the Associated Entity third-party NIL provisions in the Injunctive Relief

16   Settlement will result in an enforcement system that is far superior to the one that exists under

17   current NCAA rules.  Under the NCAA's current enforcement system for third-party NIL

18   payments, the NCAA is the only decision-maker with respect to the enforcement of NCAA rules

19   governing third-party NIL deals.  By contrast, the Injunctive Relief Settlement requires that any

20   disputes arising out of NCAA members' enforcement of the third-party NIL restrictions in the

21   Injunctive Relief Settlement be resolved via neutral arbitration.  *See* IRS Art. 6, § 2.  The

22   Injunctive Relief Settlement's requirement that disputes be resolved via neutral arbitration will

23   benefit class members, because neutral arbitration will be accompanied by due process protections

24   and a degree of transparency that class members do not have under current NCAA rules.[11]

25   _____

26   [11] Examples of due process protections and transparency that will be afforded to class members
     under the Injunctive Relief Settlement include that (1) during the pendency of an arbitration,
27   enforcement of any discipline imposed by NCAA members in connection with a violation of the
     SA's third-party NIL restrictions shall be stayed unless the arbitrator finds good cause to lift the
28   stay; and (2) the arbitrator will be required to issue a written decision.  *See* IRS Art. 6, § 2(d).

1    The Court finds that the Injunctive Relief Settlement's Associated Entity third-party NIL

2    restrictions are fair and reasonable to class members for the additional reason that they are the

3    product of a reasonable compromise that takes into account the delay, risks, and costs of continued

4    litigation and the fact that prior successful class actions challenging NCAA compensation

5    restrictions resulted in injunctions that permitted the NCAA to continue to limit student-athlete

6    compensation, as discussed above.  Further, the SA does not require class members to release

7    damages claims that arise out of the third-party NIL provisions in the Injunctive Relief Settlement.

8    ### 3.    Roster Limits

9    Multiple objectors argue that the SA does not satisfy the standards for final approval

10   because of its provisions that permit the NCAA to adopt roster limits for Division I if the SA is

11   approved.

12   Some objectors argue that the SA is not fair to class members because the provisions that

13   permit the NCAA to adopt roster limits are anticompetitive horizontal agreements that violate the

14   Sherman Act.  The objectors argue that the roster limits provisions are anticompetitive because

15   they reduce competition for student-athletes among NCAA members by restricting the number of

16   permissible roster spots for each team, which in turn limits the number of scholarships and other

17   student-athlete benefits that NCAA members can award to student-athletes on each team.  These

18   objectors contend that no procompetitive justification exists to justify the roster limits provisions

19   under federal antitrust law.

20   The Court overrules these objections.  As noted, "[s]o long as the conduct perpetuated

21   under a settlement agreement does not per se violate antitrust law, the settlement may be

22   approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason."

23   *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90.  Here, the objectors have not

24   pointed to any authority that the roster limits provisions are per se violations of the Sherman Act.

25   Accordingly, the roster limits provisions are subject to the rule of reason.  Because the alleged

26   anticompetitive effect of the roster limits provisions has not been established, and because

27

28

United States District Court
Northern District of California

1  Defendants have advanced procompetitive justifications for the roster limits provisions,[12] it is not

2  clear that the roster limits provisions violate the Sherman Act under the rule of reason.[13]  Thus, the

3  inclusion of the roster limits provisions in the SA does not preclude the Court from granting final

4  approval of the same.  *See id*.; *see also Robertson*, 556 F.2d at 686.

5       Some objectors argue that the SA is unfair and unreasonable because some class members

6  will suffer injury as a result of the immediate implementation of the SA's roster limits provisions.

7  Defendants began to implement the roster limits of the SA before the SA was approved, which is

8  not something that the SA requires.  The objectors contend that some class members have lost or

9  will lose their roster spots because of the immediate implementation of the SA's roster limits

10  provisions, and that this will cause those class members harm.  The objectors argue that the parties

11  should be pressured to modify the SA to either "grandfather" in the affected class members (i.e., to

12  guarantee that the affected class members will not be removed from their roster because of the

13  immediate implementation of the roster limits) or to require that the roster limits provisions be

14  implemented gradually over time to ensure that no class member is removed from a roster because

15  of the immediate implementation of roster limits.

16       The Court overrules these objections.  As noted above, the parties modified the SA to

17  provide that class members who lost or may lose roster spots because of the immediate

18  implementation of the roster limits provisions (i.e., the Designated Student-Athletes) will be

19  exempt from roster limits at any Division I school for the remainder of their Division I athletic

20  careers.  The Court finds that these modifications negate any harm that the roster limits could have

21  caused to class members who were or will be impacted by the immediate implementation of the

---

[12] Defendants argue that the roster limits provisions are procompetitive because they enhance competitive balance among Division I NCAA member institutions and enhance output of college athletics opportunities for student-athletes.  *See* Docket No. 721 at 17.  Roster limits promote competitive balance among NCAA Division I member institutions because they ensure that team sizes are uniform for each sport and that no team is able to stockpile team members.  Some objectors concede that most teams have a set number of players on each sport's roster.

[13] Because this action is being settled instead of being litigated through trial, the question of whether the roster limits provisions violate the Sherman Act has not been and will not be adjudged by this Court.  *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions").

roster limits, because they enable Designated Student-Athletes to be eligible for roster spots without the roster limits provisions posing an obstacle.  In other words, the modifications provide Designated Student-Athletes with what they had prior to the roster limits provisions being implemented, which was the opportunity to be on a roster at the discretion of a Division I school.

The fact that Defendants did not agree to modify the SA to guarantee roster spots for Designated Student-Athletes does not alter the Court's conclusion.  This is because, under current NCAA rules, roster spots are not guaranteed for any student-athlete and schools have discretion to revoke roster spots for any reason.  The parties' modifications of the SA maintain the schools' discretion to decide which student-athletes to have on their rosters.  This does not render the SA unfair or unreasonable.  Moreover, the SA contains other protections and new benefits for class members who may be impacted by the roster limits provisions.  For example, the SA provides that the implementation of NCAA rules on roster limits shall not result in the loss of an athletic scholarship for student-athletes receiving a scholarship who may be cut because of the SA's roster limits provisions, and that roster limits shall not result in a reduction in the number of scholarships permitted under NCAA rules.  *See* IRS, Art. 4, § 1.  Further, the SA's elimination of all Division I athletic scholarship limits, *see* IRS, Art. 4 § 1, may lead to the creation of tens of thousands of new scholarships that could potentially be awarded to the class members who lost a roster spot because of the immediate implementation of the roster limits provisions.  *See* Rascher Final Approval Declaration ¶ 74, Ex. 5 (opining that the SA, if approved, would open the door for more than 115,000 additional scholarships annually that would be available to class members).  Finally, the Court finds that the SA modifications to exempt Designated Student-Athletes from roster limits will make those athletes more valuable to teams than they otherwise would be, because they will be able to participate on a team without counting against the roster limits.

Some objectors argue that the modifications to the SA to exempt Designated Student-Athletes from roster limits are not sufficient to negate the harm that the immediate implementation of the roster limits provisions caused to certain class members for two particular additional reasons: first, because the modifications are not coupled with any procedures that would permit class members who were impacted by the immediate implementation of the roster limits

1    provisions to challenge errors in the Designated Student-Athletes lists; and second, because class

2    members will be unable to sue Defendants for claims arising out of the immediate implementation

3    of the roster limits provisions.

4        The Court overrules those objections.  The Court finds that the SA contains sufficient

5    procedural protections to ensure that Designated Student-Athlete designations are accurate and

6    fair.  The SA requires schools to identify Designated Student-Athletes in good faith, and to

7    provide copies of the Designated Student-Athletes lists to Class Counsel.  The Court interprets

8    these requirements as empowering Class Counsel to ascertain that the Designated Student-Athletes

9    lists are accurate and to ensure that any inaccuracies are corrected promptly.  Class Counsel has

10   already compiled a preliminary list of Designated Student Athletes and Defendants have not raised

11   any dispute over that list.  Additionally, the SA provides that Class Counsel have the power to

12   monitor and enforce each school's obligations under the Injunctive Relief Settlement, and that the

13   Court has jurisdiction to resolve any disputes that may arise concerning compliance with the SA.

14   *See* SA ¶ 48; IRS, Art. 6 §§ 1-3.  Those provisions can be employed by Class Counsel to bring to

15   the Court's attention any disputes about Designated Student-Athlete designations.  Finally

16   contrary to objectors' argument, the SA preserves the right of class members to bring damages

17   claims against Defendants that arise out of the implementation of the SA, including its roster

18   limits provisions.  *See* SA ¶ 1 (pp) & (qq).

19       Some objectors contend that the SA's roster limits provisions created conflicts of interests

20   between the named Plaintiffs and other class members who are on athletic scholarships, on the one

21   hand, and class members who are not on scholarships, on the other hand.  The objectors argue that

22   those conflicts exist because scholarship student-athletes, including the named Plaintiffs, are elite

23   athletes who are not in danger of being cut from a roster because of any roster limits, whereas the

24   same cannot be said for non-scholarship class members, who are not considered to be elite when

25   compared to scholarship athletes and are therefore more likely to be cut from a roster because of

26   roster limits.

27       The Court overrules those objections.  The Court finds no evidence of a conflict between

28   class members on athletic scholarships and class members who are not on athletic scholarships,

United States District Court
Northern District of California

52

United States District Court
Northern District of California

whether in the context of the roster limits provisions or otherwise.  To the contrary, the Court finds that *all* class members in this case share a common interest in securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation.  The Court further finds that the existence of this overarching common interest is sufficient to conclude that non-scholarship student-athletes had adequate representation from the named Plaintiffs in the context of the roster limits provisions, as well as the remainder of the SA.  The fact that the parties made modifications to the SA to exempt from roster limits for the remainder of their Division I eligibility any class members who lost or would have lost roster spots because of the implementation of the roster limits provisions supports that the interests of class members who were or would have been negatively impacted by the roster limits provisions have been adequately represented.[14]  While some of the objectors argue that the modifications in question did not go far enough to protect class members who were or would have been affected by the immediate implementation of the roster limits provisions, those arguments fail given that the standard for approving a settlement agreement does not require perfection but rather requires that the settlement be fair, reasonable, and adequate to class members.  The Court finds that the SA, as modified, satisfies the fair, reasonable, and adequate standard with respect to all class members, including those who were or may be impacted by its roster limits provisions. *See Cohen v. Brown Univ.*, 16 F.4th 935, 945–46, 953 (1st Cir. 2021) (affirming approval of class settlement and noting, in relevant part, that a settlement need not be "perfect" for it to be "fair, reasonable, and adequate").

### 4.    Future Student-Athletes

Some objectors argue that the SA does not satisfy the standards for final approval because the Injunctive Relief Settlement Class includes future Division I student-athletes who are unknown and whose claims are unripe and because those future student-athletes will not receive

---

[14] These modifications were made after the Court recommended them and the parties considered the advocacy of counsel for certain groups of objectors who are represented by Laura Reathaford, Steven Molo, and the Buchalter firm.  The Court allowed these groups of objectors to participate through their counsel in the negotiations pertaining to the SA's roster limits provisions that took place after the final approval hearing.

notice and an opportunity to object to the SA before it is approved and before they release their claims.

The Court overrules those objections.  "Class action settlements may cover both present and future class members."  *See LeClair v. Massachusetts Bay Transportation Auth.*, 300 F. Supp. 3d 318, 323 (D. Mass. 2018) (citations omitted); *see also Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628, 631 (E.D. Pa. 2005) (approving five-year settlement agreement that bound a class comprised of present and future students); *Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (approving injunctive relief settlement class of Boeing employees including future employees, but reversing approval of the settlement for other reasons).  The Court finds that the inclusion of future athletes in the Injunctive Relief Settlement Class is appropriate and permissible because the composition of that class is inherently transitory given that the rosters for Division I change each year.  *See A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (holding that a Rule 23(b)(2) class of students who participated in athletics at a particular school could include future athletes because the student body was expected to turn over significantly each year and "[g]iven the purely equitable nature of the claims, there is little if any benefit to continually joining, or potentially dismissing, large numbers of additional class members").  The fact that the claims of future student-athletes are not yet ripe is not problematic, because those claims will become ripe when the future student-athletes become members of the Injunctive Relief Class.  *See id.* ("The inclusion of future class members in a class is not itself unusual or objectionable," because "[w]hen the future persons referenced become members of the class, their claims will necessarily be ripe.") (collecting authorities).

Further, as discussed above, the parties modified the SA to clarify that future Division I athletes will not release their injunctive and declaratory relief claims until they have received notice and an opportunity to object to the continuation of the SA and the Court has resolved any objections.  The Court finds that those procedural protections satisfy the requirements of Rule 23 and due process.  Objectors have not cited any authority providing otherwise, nor have they cited any authority that the claims of future student-athletes cannot be released after they have received notice and an opportunity to object as the SA provides.

United States District Court
Northern District of California

1    Some objectors argue that the SA cannot be approved in its current form because future

2  student-athletes who are members of the Injunctive Relief Settlement Class did not have adequate

3  representation by the named Plaintiffs in the negotiation of the SA.  The objectors contend that

4  none of the named Plaintiffs will be a class member when the Injunctive Relief Settlement goes

5  into effect and, for that reason, the named Plaintiffs do not share the same interests as future

6  Division I student-athletes, because they will not be impacted by the Injunctive Relief Settlement

7  as future Division I student-athletes will be if the SA is approved.

8    The Court overrules those objections.  As discussed above, the Court has found that the

9  named Plaintiffs are adequate representatives for *all* class members, because they share with all

10  class members a common interest in securing a more competitive market for the labor of Division

11  I student-athletes and in achieving greater compensation for Division I student-athletes via this

12  litigation.  The existence of this overarching common interest is sufficient to conclude that future

13  Division I student-athletes who are a part of the Injunctive Relief Settlement Class had adequate

14  representation from the named Plaintiffs.  *See Cohen*, 16 F.4th at 948–51 (rejecting objections that

15  settlement could not be approved due to intra-class conflict because of finding that all class

16  members had a "significant interest" in common).  Although not necessary to ensure adequate

17  representation for future student-athletes, Plaintiffs will add new class representatives for the

18  Injunctive Relief Settlement Class throughout the ten-year term of the Injunctive Relief Settlement

19  to replace previous class representatives as they graduate.  *See* Final Approval Hearing Tr. at 26-

20  27.

21    **5.    Ten-year Duration of SA**

22    Some objectors argue that the SA is unfair and should not be approved because the

23  Injunctive Relief Settlement will be in force for ten years if approved.

24    The Court overrules that objection.  First, the parties represent, and the Court is persuaded,

25  that the ten-year term is essential for providing stability for Division I college sports.  The Court

26  credits the parties' representations that college sports would be unmanageable if individual future

27  student-athletes (or groups of future student-athletes) pursued different types of injunctive relief

28  each year, that would result in certain rules applying to certain athletes (or groups of athletes),

while different rules applied to others.  The Court finds that the stability that the ten-year duration of the Injunctive Relief Settlement will provide to Division I sports and, consequently, to class members, is highly beneficial for class members and weighs strongly in favor of granting final approval of the SA.  Second, Plaintiffs have shown that multi-year settlements in antitrust cases challenging student-athlete compensation are commonplace where, as here, the settlement is fair to class members and will provide stability in the industry.  *See, e.g., Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 71 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 682 (2d Cir. 1977) ("The proposed settlement constitutes a negotiated compromise which fairly seeks to protect the interests of both the players and the club owners.  It should make for an era of peace and stability in professional basketball for many years to come.").  On the other hand, objectors have not cited any authority that a settlement agreement in an antitrust case cannot be approved if it will be in force for a multi-year period.

### 6.    Stay Pending Appeal

Some objectors argue that the SA is unfair because paragraph 18 of the same provides that the Injunctive Relief Settlement will not be stayed if there is an appeal of an order granting final approval of the SA.  The objectors request that the Court stay the implementation of the Injunctive Relief Settlement pending appeal.  The objectors argue that a stay is necessary because class members will suffer irreparable harm if the Injunctive Relief Settlement goes into effect immediately after the SA is approved.  The potential harm that the objectors describe arises from NCAA members' implementation of the roster limits permitted under the SA, which the objectors claim will result in class members losing roster spots.

The Court overrules those objections.  The Court is not persuaded that the term of the SA that provides that the implementation of the Injunctive Relief Settlement will not be stayed pending appeal is unfair to class members.  To the contrary, the Court is persuaded that the provision in question is in the best interests of class members, because it will ensure that NCAA members that wish to opt in to the Injunctive Relief Settlement will not delay in providing the extraordinary levels of compensation and benefits to class members that are permissible under the SA.

United States District Court
Northern District of California

The Court finds that the objectors have not met their burden to show that a stay of the Injunctive Relief Settlement pending appeal is warranted. "An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation and internal quotation marks omitted). "[S]imply showing some possibility of irreparable injury" is insufficient. *Id.* (citation and internal quotation marks omitted). "The minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Id.* (citation and internal quotation marks omitted). "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Id.* at 1008 (citation and internal quotation marks omitted, ellipses in the original).

Here, the objectors have not shown that being cut from a roster because of the immediate implementation of roster limits constitutes *irreparable* harm. As discussed above, the parties modified the SA to negate any harm to class members who may be cut because of the immediate implementation of roster limits by ensuring that those class members will be exempt from any roster limits at any Division I school for the duration of their athletic eligibility. Those modifications will enable the affected class members to be eligible for roster spots for the remainder of their Division I career notwithstanding the roster limits, which is what those class members had before the SA. Further, the SA does not require any class members to release claims for damages arising out of new NCAA and conferences rules permitted under the Injunctive Relief Settlement. *See* SA ¶¶ 1 (pp) & (qq). This means that the affected class members will be able to sue Defendants for damages arising out of the roster limits provisions of the Injunctive Relief Settlement. Given the foregoing, the Court cannot conclude that class members who may be cut from rosters while an appeal is pending would suffer *irreparable* injury. Accordingly, the Court denies the objectors' request for a stay pending appeal.

### 7.    Unionization and Collective Bargaining

Some objectors argue that the SA is unfair because it risks stifling the efforts to unionize college student-athletes to enable collective bargaining. Other objectors argue that the SA cannot

1   be approved because any such agreement must be the product of collective bargaining in order for

2   it to include restrictions on student-athlete compensation (such as the Pool cap discussed above),

3   which the objectors argue are anticompetitive.

4        The Court overrules those objections.  First, the Court finds no basis for the objectors'

5   arguments that the SA will impede collective bargaining by student-athletes.  The SA expressly

6   provides that nothing in the agreement "shall limit or interfere" with the ability of student-athletes

7   or Defendants to explore and implement alternative structures for providing benefits to student-

8   athletes, "including but not limited to collective bargaining in the event that a change in law or

9   circumstances permits such collective bargaining to take place."  *See* IRS Art. 7, § 2.

10  Additionally, the SA provides that class members will not release claims under the Fair Labor

11  Standards Act or any other federal labor law or analogous state labor laws.  *See* SA ¶ 1(ww).

12       Second, collective bargaining is not a precondition for approving a settlement agreement

13  that includes restrictions that could be anticompetitive.  As discussed above, "[s]o long as the

14  conduct perpetuated under a settlement agreement does not per se violate antitrust law, the

15  settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under

16  the rule of reason."  *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90.  Here, the

17  conduct perpetuated under the SA does not per se violate the Sherman Act.  Accordingly, the SA

18  can be approved even if it contains elements that restrict student-athlete compensation and that the

19  objectors argue are anticompetitive.

20       To the extent that the objectors object to the SA on the basis that Plaintiffs should have

21  pursued, or that this Court should order, collective bargaining, the Court overrules that objection.

22  This is an antitrust action, not a labor law case.  The question of whether student-athletes are

23  employees who can unionize and engage in collective bargaining is not one for adjudication and

24  resolution in this litigation.

25      **B.**    **Allocations of Damages**

26         **1.**    **Damages Allocations Generally**

27       Some objectors oppose approval of the SA because they believe that damages class

28  members are being undercompensated for their injuries or that their personal circumstances entitle

United States District Court
Northern District of California

them to a higher damages payment under the SA.  In other words, these objectors take issue with Plaintiffs' damages allocation formulas.  Some of those objectors argue that the allocation formulas undercompensate female athletes, or athletes in lower-revenue sports, such as sports that are not football or basketball.

The Court overrules those objections.  For the reasons discussed above, the Court has found that Plaintiffs' damages allocations are fair and reasonable to all damages class members, and that they have an adequate basis in the economics analyses of Dr. Rascher, which reflect the extent of class members' injuries and the strength of their claims based on what class members would have received for their claims in the but-for world.  That some objectors believe that more favorable allocations could have been achieved does not alter that conclusion, particularly given that members of the damages classes had the opportunity to opt out of the SA if they were dissatisfied with Plaintiffs' damages allocations.  *See Hanlon*, 150 F.3d at 1027; *Nwabueze v. AT&T Inc.*, 2013 WL 6199596, at *7 (N.D. Cal. Nov. 27, 2013) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement."); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *12 (N.D. Cal. Apr. 1, 2011) (finding that "class members' challenges to the amount of their individual awards do not provide any grounds to reject the proposed settlement"); *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) (rejecting objections that settlement damages were insufficient because "if any objector believed that his or her personal claim was being sacrificed for the greater good . . . they had the right to opt-out of the class") (citation omitted); *Rosado v. Ebay Inc*., 2016 WL 3401987, at *9 (N.D. Cal. June 21, 2016) (granting final settlement approval over objector's contention "that he ha[d] suffered damages that [we]re significantly higher than the typical class member" because the objector "should opt out of the class and separately pursue his claims").

## 2.     The Pay-for-Play Claims

Some objectors argue that the SA is not fair and reasonable because settlement class members who have pay-for-play claims will receive only a small fraction of what those claims are

1    worth and because Plaintiffs' allocation formula for pay-for-play claims prioritizes revenue-

2    generating sports and disadvantages student-athletes in non-revenue-generating sports.

3        The Court overrules these objections for the reasons discussed above.  The Court has found

4    Plaintiffs' allocation formulas to be fair and reasonable because they are based on Dr. Rascher's

5    sound economic analyses and because they reflect the difficulties of challenging NCAA pay-for-

6    play restrictions in light of prior actions that failed to succeed on that claim, such as *Alston*.  *See*

7    *Alston*, 375 F. Supp. 3d at 1062-1110.  The objectors' belief that the allocations could have been

8    different and more favorable does not impact that finding.  To the extent that these objectors were

9    dissatisfied with Plaintiffs' damages allocations, they could have exercised their opportunity to opt

10   out of the SA.

               **3.      The Partial Scholarship Claims**

12       Some objectors argue that the SA is not fair because no settlement money is being devoted

13   to compensate damages class members who suffered injury as a result of the NCAA's caps on

14   scholarships.  These objectors argue that such claims are worth at least $300 million in damages

15   because some class members would have received at least partial scholarships in the absence of

16   the scholarship caps.

17       The Court overrules these objections.  The Court finds that the fact that damages class

18   members who allegedly suffered injury as a result of scholarship caps will not receive any

19   compensation out of the settlement funds specifically for those injuries does not render the SA

20   unfair or unreasonable.  Plaintiffs have shown that claims arising out of those injuries have little or

21   no value given that prior cases that challenged scholarship caps did not get beyond the class

22   certification stage and were, thus, not successful.[15]  *See In re: Cathode Ray Tube (CRT) Antitrust*

23   *Litig.*, No. C-07-5944 JST, 2016 WL 3648478, at *14 (N.D. Cal. July 7, 2016) ("Class counsel

24

---

25   [15] *See, e.g.*, *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D.
     Wash. May 3, 2006) (challenging scholarship limits on behalf of walk-on football players in the
26   Power 5); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) (challenging the
     NCAA's then-prohibition on multiyear scholarships and the cap on the number of scholarships per
27   team); *Rock v. National Collegiate Athletic Association*, 2016 WL 1270087, at *15-16 (S.D. Ind.
     Mar. 31, 2016) (challenging the multiyear scholarship and one-year limits imposed at that time by
28   the NCAA).

United States District Court
Northern District of California

here were within their rights to allocate the settlement proceeds according to the degree of injury suffered by the class" because "no Ninth Circuit case holds that the release of a class action claim must be compensated in all instances") (citations omitted); *see also Vinh Nguyen v. Radient Pharms. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[A]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.") (citation and internal quotation marks omitted).  Further, class members who allegedly suffered injury because of scholarship caps will be eligible for damages payments from the $600 million fund that will be used to compensate settlement class members for the value of their athletic services in the context of pay-for-play claims.  Plaintiffs argue, and the Court is persuaded, that the value of the athletic services of damages class members who the objectors argue would have received partial scholarships is the same value that would be considered in the context of determining injury and damages arising from the NCAA's scholarship caps.  Finally, to the extent that objectors were not satisfied with Plaintiffs' allocation plan, they could have opted out of the SA so that they could pursue their claims in a separate lawsuit.  *See Milligan v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012) (granting final approval of a settlement over objections that the settlement "provide[d] no benefit to" certain class members because "[o]bjectors who raised these concerns could have simply opted out of the settlement").

### 4.    Third-Party NIL Claims

Some objectors argue that SA is not fair and reasonable because Plaintiffs' damages allocation model undercompensates some damages class members for their third-party NIL claims.

The Court overrules this objection for the reasons discussed above.  The Court has found Plaintiffs' methodology for calculating and allocating third-party NIL damages to be fair and reasonable and to be based on Dr. Rascher's sound economic analyses.  The objectors' belief that the allocations could have been different and more favorable does not impact that finding.  To the extent that these objectors were dissatisfied with Plaintiffs' damages allocations, again, they could have exercised their opportunity to opt out of the SA.

United States District Court
Northern District of California

### 5.   Limits on BNIL Damages

Some objectors argue that the SA is not fair and reasonable because it limits BNIL damages to Division I football and basketball student-athletes who received a scholarship and does not allocate BNIL damages to walk-on (non-scholarship) athletes or to athletes who play sports other than football and basketball.

The Court overrules those objections.  The Court has found, as discussed in more detail above, that Plaintiffs' allocation plan for BNIL damages, which limits BNIL damages to Division I football and basketball student-athletes who received a scholarship, is fair and reasonable.  The fact that Plaintiffs' damages allocation plan does not call for the distribution of BNIL damages to damages class members other than those who played Division I football and basketball and received a scholarship is based on the assumption, based on Dr. Rascher's economic analyses, that other student-athletes have no BNIL claims.  Dr. Rascher opines that, because schools have not competed to offer scholarships to the student-athletes who the objectors argue should be eligible for BNIL payments under the SA, it is reasonable to assume that schools would not have competed to provide BNIL payments to those same athletes in the but-for world (i.e., if schools had been permitted to do so in the absence of the NCAA rules challenged in the operative complaint).  Because the student-athletes in question have no BNIL claims, the fact that they will not receive damages payments under the SA for BNIL claims does not render the SA unfair.  To the extent that the objectors were dissatisfied with Plaintiffs' allocation plan for BNIL damages, they had the opportunity to opt out so that they could litigate their BNIL claims in a separate action.

### C.   Antitrust Immunity

Some objectors have expressed concern that Defendants will attempt to use the approval of the SA as a shield in future antitrust litigation brought against them by people or entities who are not bound by the SA.  These objectors believe that Defendants will argue that the approval of the SA means that any conduct permitted under the SA is immune from antitrust scrutiny.

The Court overrules those objections.   Defendants may make these arguments but that does not mean they will be successful.  Because this action is being settled instead of being

1    litigated through trial, the questions of whether the conduct challenged in the operative complaint

2    and the conduct permitted under the terms of the SA violate the Sherman Act will remain

3    unresolved and unadjudicated. *See Robertson*, 556 F.2d at 686 (holding that "a court in approving

4    a settlement should not in effect try the case by deciding unsettled legal questions") (citation

5    omitted). The Court's approval of the SA will not constitute a judgment on the competitive

6    impact of the conduct challenged in the operative complaint or the conduct permitted under the

7    SA, nor will it constitute a determination that the conduct challenged in the operative complaint or

8    the conduct permitted under the SA complies (or does not comply) with the Sherman Act or any

9    other law.

            **D.    Title IX**

10

11          Some objectors argue that the SA is unfair to female class members because it violates

12   Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., in two ways: because

13   the SA's damages allocations favor male class members over female class members in violation of

14   Title IX, and because the SA does not contain any provisions that require that benefits and

15   compensation provided to class members pursuant to the Injunctive Relief Settlement be made in

16   compliance with Title IX.

17          The Court overrules these objections. First, the objectors have cited no authority that Title

18   IX applies to damages awards distributions or that damages distributions made by a claims

19   administrator are subject to Title IX. Accordingly, the Court cannot conclude that Title IX

20   violations will occur when the Gross Settlement Fund is distributed by the claims administrator

21   pursuant to the damages allocations that Plaintiffs have proposed.[16] Second, the Court cannot

22   conclude that violations of Title IX will necessarily occur if and when schools choose to provide

23   compensation and benefits to student-athletes pursuant to the Injunctive Relief Settlement. To the

24   extent that Title IX governs benefits and compensation provided by schools pursuant to the

25

26   _____

27   [16] Plaintiffs' proposed damages allocations are based on Dr. Rascher's damages methodology, which allocates more funds to class members who played Division I football and men's basketball on the basis that schools and conferences received far more revenues from those sports than from

28   other sports during the class period.

United States District Court
Northern District of California

1   Injunctive Relief Settlement, schools will be free to allocate those benefits and compensation in a

2   manner that complies with Title IX.  There is nothing in the SA that would prevent or prohibit

3   schools from distributing benefits and compensation pursuant to the Injunctive Relief Settlement

4   in a manner that complies with Title IX.  Further, the SA does not require class members to

5   release claims arising out of Title IX in connection with the implementation of the Injunctive

6   Relief Settlement.  *See* SA ¶ 1(ww) (providing that claims under Title IX are not released, except

7   for claims arising out of or relating to the distribution of the Gross Settlement Fund).  Thus, to the

8   extent that schools violate Title IX when providing benefits and compensation to student-athletes

9   pursuant to the Injunctive Settlement Agreement, class members will have the right to file lawsuits

10  arising out of those violations.

11      **E.    State NIL Laws**

12          Some objectors argue that the SA cannot be approved because, according to the objectors,

13  the terms of the Injunctive Relief Settlement contradict certain state laws that govern student-

14  athlete compensation.  These objectors contend that the SA cannot override the state laws that it

15  allegedly contradicts.

16          The Court overrules those objections.  First, the only binding authorities that the objectors

17  have cited for the proposition that the SA cannot be approved because it conflicts with state laws

18  regarding student-athlete compensation are inapposite.  Those authorities hold that, because state

19  officials do not have the authority to enter into agreements that would violate state or federal law,

20  any such agreements would be unenforceable.  *See League of Residential Neighborhood*

21  *Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) (holding that "[a] federal

22  consent decree or settlement agreement cannot be a means for state officials to evade state law");

23  *Keith v. Volpe*, 118 F.3d 1386, 1392 (9th Cir. 1997) (holding that state officials "could not agree

24  to terms which would exceed their authority and supplant state law").  Here, no state officials are

25  parties to the SA, which renders the objectors' authorities irrelevant.  Second, the SA does not

26  require that this Court find that the SA preempts state laws regarding student-athlete

27  compensation, nor is the Court making such a finding.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**F.      Scope of the Releases**

Some objectors argue that the SA cannot be approved because its release provisions are impermissibly broad.

The Court overrules those objections.  The scope of the Released Damages Class Claims is tailored to claims that were raised or could have been raised in this action.  *See* SA ¶ 1(pp).  The Court finds that the scope of that release is appropriate.  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (holding that a release may extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement").  The scope of the Released Injunctive Class Claims reflects the scope of the Injunctive Relief Settlement and the rules that Defendants are permitted to enact pursuant to the Injunctive Relief Settlement to effectuate the SA, and embraces the injunctive relief requested in the operative complaint.  *See id.* ¶ 1(qq).  The scope of this release is also permissible.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1088 ("Public policy does not categorically prohibit releases of future antitrust claims.") (collecting authorities).  The Court further finds that the scope of the releases is fair and reasonable because it represents the compromises that Class Counsel decided to make in light of the delay, risks, and costs of continued litigation, and the possibility that, absent the settlement, class members might have recovered nothing.

Some objectors argue that the SA's release provisions are overbroad because they release the unripe claims of future student-athletes who fall within the definition of the Injunctive Relief Settlement Class.

The Court overrules that objection.  As discussed above, the Injunctive Relief Settlement Class definition can include future student-athletes even though their claims are unripe at this point, because those claims will become ripe when the future student-athletes become members of the Injunctive Relief Class.  *See A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th at 838.  Further, the parties modified the SA to provide that future Division I student-athletes will not release their injunctive and declaratory relief claims until they have received notice and an opportunity to object to the continuation of the IRS.

United States District Court
Northern District of California

Finally, some objectors argue that the release provisions of the SA are overbroad because they release claims against entities and individuals who are not named as defendants in this action and who are not sufficiently identified in the SA, such as Division I member institutions and the College Football Playoff.

The Court overrules those objections. A settlement agreement may release claims against entities and individuals who are not named as defendants as long as the released claims are factually related to those asserted against the defendants. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) ("A class settlement may also release factually related claims against parties not named as defendants[.]") (citations and internal quotation marks omitted). The release of claims against Division I member institutions and the College Football Playoff is not improper because the released claims are factually related to those against Defendants given that the Division I institutions and the College Football Playoff are affiliated with Defendants.[17] *See id.*; *see also Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *9 (C.D. Cal. Jan. 30, 2014) (noting "[r]eleases of non-parties in class action settlements are readily approved and enforced" because "[n]o defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant").

## G. Adequacy of the Notice and Claims Submissions Process

Some class members object to the SA on the grounds that not every class member received the notice, and that there was no notice program specifically aimed at reaching African-American class members.

The Court overrules those objections. Rule 23 requires the Court to direct notice "in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to" approve the proposal under

---

[17] After the final approval hearing, the parties clarified that the College Football Playoff is comprised of entities that are affiliated with or comprised of Defendants and their member schools and that the revenues from the College Football Playoff are included as part of the Injunctive Relief Settlement (such that those revenues will be eligible for sharing with class members pursuant to the Injunctive Relief Settlement). *See* Docket No. 796 at 18; Docket No. 812 at 2, 6. The parties also modified the SA to define the term "College Football Playoff." *See* SA § A.1.(j).

1    Rule 23(e)(2) and certify the class for purposes of judgment on the proposal.  *See* Fed. R. Civ. P.

2    Rule 23(e)(1)(B).  The notice plan that the Court approved easily satisfies those requirements.  As

3    noted above, the notice plan involved direct notice (by email and postcard), a press release, and a

4    digital notice campaign.  The claims administrator estimates that the notice program successfully

5    reached at least 81.9% of current settlement class members.  Peak Decl. ¶ 21. The objectors have

6    not cited any authority that this notice program fails to comply with the requirements of Rule 23

7    and due process.

8        Some objectors argue that the SA should not be approved because the notice did not

9    contain any specific information that would permit class members to determine how much money

10   each of them would be able to recover in damages under the SA, and because the notice did not

11   include more detailed descriptions of the SA's terms, such as the NCAA rule changes that may

12   occur if the SA is approved.

13       The Court overrules those objections.  The notices did not need to include individual

14   damages estimates or detailed information about the SA's terms for them to comply with the

15   requirements of Rule 23 and due process.  Instead, the notices needed to include only sufficient

16   information to permit class members to determine whether to investigate further, opt out, or

17   object.  *See Lane v. Facebook, Inc*., 696 F.3d 811, 826 (9th Cir. 2012) ("Notice provided pursuant

18   to Rule 23(e) must generally describe[] the terms of the settlement in sufficient detail to alert those

19   with adverse viewpoints to investigate and to come forward and be heard," which "does not

20   require detailed analysis of the statutes or causes of action forming the basis for the plaintiff

21   class's claims, [nor] an estimate of the potential value of those claims."); *In re Hyundai & Kia*

22   *Fuel Econ. Litig*., 926 F.3d 539, 567-68 (9th Cir. 2019) (holding that a class notice need not

23   "explain in a step-by-step formula how each class member's benefit is calculated" and that a

24   "settlement notice need not provide an exact forecast of the award each class member would

25   receive, let alone a detailed mathematical breakdown; it merely must give class members enough

26   information so that those with adverse viewpoints could investigate and come forward and be

27   heard") (citation and internal quotation marks omitted).  Prior to their dissemination, the Court

28   reviewed and edited the notices to ensure that they complied with the requirements just described.

United States District Court
Northern District of California

The notices informed class members of the nature of this action and the claims and issues presented therein, the class definitions, that class members could opt out or object and the procedures for doing so, the effect of a judgment in connection with the SA, the basic terms of the SA, that class members could access a complete copy of the SA on the settlement website or on PACER, and that class members could contact Class Counsel if they had questions about the SA. Nothing more was required.

One objector argues that the notice was inadequate because the parties modified the SA after the notice was disseminated to define "College Football Playoff."[18]  *See* Docket No. 802. The Court suggested this definition to satisfy an earlier objection.  The subsequent objection is that, because the modification to the SA to define "College Football Playoff" expanded the scope of the release and the modification took place after the notice was disseminated, the Court must strike the SA and deny final approval of the SA.  *See id.*

The Court overrules that objection.  The parties' modification to the SA to define the "College Football Playoff" did not expand the scope of the release but rather clarified what was stated in every prior version of the SA.  The College Football Playoff has been a releasee in those versions of the SA, including the version of the SA that was operative during the notice period. Because the clarification of the meaning of College Football Playoff in the SA did not expand the scope of the releases or otherwise effectuate modifications to the SA that adversely affect class members, the dissemination of a new notice is not required.  *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) (Koh, J.) (holding that additional notice may be necessary after a settlement agreement is modified if the modifications "adversely affect class members") (collecting authorities).

Some objectors argue that the SA should not be approved because they experienced problems or errors when submitting claims on the settlement website.

---

[18] This objection was styled as a motion to strike the SA.  *See* Docket No. 802.  The Court DENIES the motion to strike because the objector's arguments are not well-taken for the reasons set forth above.

United States District Court
Northern District of California

1    The Court overrules those objections.  The parties agreed to take several steps to ensure

2    that any errors or problems with the submission of claims are corrected.  After the final approval

3    hearing, the parties agreed to accept late-filed claims up to May 16, 2025, and to continue to work

4    with class members and NCAA member institutions to allow class members to submit additional

5    or corrected information that may impact a class member's damages allocation.  *See* Docket No.

6    796 at 18.  The parties also agreed to publish the new deadline for late claims on the settlement

7    website and to issue an additional press release and email to inform class members of the updated

8    deadline to submit claims and supporting information.  *See id.*  Class Counsel also committed to

9    continue to answer class member inquiries through the email addresses and phone numbers that

10   are posted on the settlement website.  *See id.*  The Court finds that these steps are sufficient to

11   mitigate any problems that may have occurred in connection with the submission of claims.

12         Some objectors argue that, apart from the arguments they raise about the submission of

13   claims, the SA should not be approved because the information that was provided to class

14   members about their estimated individual damages distributions on the settlement website was

15   inadequate, inaccurate, or confusing.  Other objectors argue that the SA should not be approved

16   because the individual estimated damages allocations on the settlement website do not reflect the

17   true value of their NIL or athletic services.

18         The Court overrules those objections.  As noted above, Plaintiffs were not required to

19   provide class members with detailed information about their individual damages estimates.  *See In*

20   *re Hyundai*, 926 F.3d at 567-68 (9th Cir. 2019).  Plaintiffs nevertheless chose to make available on

21   the settlement website individual damages estimates for class members who may be entitled to

22   damages, where possible.  To the extent that class members believe that their individual damages

23   estimates on the settlement website were incorrect for any reason, the parties have agreed to offer

24   class members the opportunity to submit additional or corrected information that bears on their

25   individual damages estimates, and they have further agreed to continue to work to correct any

26   errors that may impact class members' allocations.  *See* Docket No. 796 at 17-18.  As noted above,

27   Plaintiffs have also committed to continue to answer class member inquiries about damages

28   allocations through the email addresses and phone numbers that are posted on the settlement

website.  *See id.*  Further, if members of the damages classes were not satisfied with the damages estimates they saw on the settlement website, or with Plaintiffs' proposed damages allocation models, they had the opportunity to opt out of the SA so that they could pursue their claims against Defendants individually.  In light of the foregoing, the Court finds that the objectors' complaints lack merit.

### H.    Adequacy of Representation by Class Counsel

Some objectors argue that the SA does not satisfy the requirements of Rule 23 because the same Class Counsel represented both the Injunctive Relief Settlement Class and the Damages Settlement Classes in the context of negotiating the SA even though the members of the Injunctive Relief Settlement Class have interests that differ from those of the members of the Damages Settlement Classes.  The objectors contend that members of the Damages Settlement Classes have an interest in ensuring that they obtain the highest possible damages amount for past harm, whereas the members of the Injunctive Relief Settlement Class have an interest in ensuring that the rule changes that will be permitted under the Injunctive Relief Settlement going forward are beneficial to Division I student-athletes.  According to the objectors, these alleged diverging interests give rise to a conflict that requires separate counsel for the Injunctive Relief Settlement Class.

The Court overrules these objections.  In light of the Court's familiarity with the work and experience of Class Counsel, as discussed in more detail above, the Court appointed Class Counsel in 2023 to represent class members in this action in connection with the damages and injunctive relief claims asserted in the operative complaint, including for settlement purposes.  The objectors rely heavily on *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which in turn relies on *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  In *Ortiz* and *Amchem*, the Supreme Court reversed the approval of class settlement agreements that resolved a massive number of present and future personal injury claims arising out of asbestos exposure.  The Supreme Court held that the adequacy of representation requirement was not satisfied with respect to the settlement class in each case because the settlement in each case had been reached without structural protections that

1    would ensure fair and adequate representation for all class members involved in the settlements.

2    *See Ortiz*, 527 U.S. at 848-64; *Amchem*, 521 U.S. at 636-27.

3    The objectors rely on the following statement in *Ortiz* for the proposition that separate

4    counsel for the Injunctive Relief Settlement Class is necessary:

> 5    [I]t is obvious after *Amchem* that a class divided between holders of
> present and future claims (some of the latter involving no physical
> 6    injury and attributable to claimants not yet born) requires division
> into homogeneous subclasses under Rule 23(c)(4)(B), with separate
> 7    representation to eliminate conflicting interests of counsel.)

8    *See Ortiz*, 527 U.S. at 856 (citing *Amchem*, 521 U.S. at 627).

9    The Court is not persuaded that a conflict exists between members of the Damages

10    Settlement Classes and members of the Injunctive Relief Settlement Class that would require

11    separate counsel for the Injunctive Relief Settlement Class under *Ortiz*.  The conflict in *Ortiz* arose

12    from the fact that the same counsel achieved a global settlement on behalf of people who had

13    pending asbestos claims as well as people who could have future asbestos claims, without any

14    structural protections to ensure fair and adequate representation for all settlement class members.

15    The circumstances in *Ortiz*, which at least one court of appeals has described as "atypical,"

16    are not present here.  *See Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640,

17    646 (8th Cir. 2012) (noting that the circumstances that warranted separate counsel in *Ortiz* were

18    "atypical").  Class Counsel here took sufficient steps to ensure that structural protections were in

19    place that would ensure fair and adequate representation for all settlement class members.  Class

20    Counsel negotiated the SA at arm's length, used an experienced and highly regarded mediator, and

21    structured the settlement negotiations sequentially, such that the settlement of the injunctive relief

22    claims was done before the parties proceeded to negotiate the settlement of the damages claims.

23    The Court is persuaded that this manner of conducting the settlement negotiations served to ensure

24    that the interests of the members of the Injunctive Relief Settlement Class were not traded away

25    for the benefit of the members of the Damages Settlement Classes, and vice versa.  *See Pro.*

26    *Firefighters*, 678 F.3d at 646 (holding that appointing separate counsel is not "the only acceptable

27    means of addressing any conflicting interests of class members, and providing structural assurance

28    of fair and adequate representation for the entire class") (internal citations and quotation marks

71

1    omitted); *In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir.

2    2015) (quoting *Pro Firefighters*, 678 F.3d at 646, for the same proposition); *Fata v. Pizza Hut of*

3    *Am., Inc.*, No. 614CV376ORL37DCI, 2016 WL 7130932, at *3 (M.D. Fla. Oct. 31, 2016)

4    (holding that adequacy of representation requirement was met because "the extensive, arms-length

5    negotiations performed separately by counsel on behalf of each Subclass, with the assistance of an

6    experienced mediator, at least at the conditional certification stage, provide structural assurance of

7    fair and adequate representation") (citation and internal quotation marks omitted).  The Court has

8    carefully reviewed the record and finds no indication that the interests of one class were traded

9    away to benefit those of another in the context of the SA.

10         Further, the Court finds that Class Counsel's representation of all settlement class members

11   when negotiating the SA was beneficial for all settlement class members, because it likely

12   increased their bargaining power and resulted in a better outcome for all settlement class members

13   relative to the settlement they could have achieved with separate counsel.  *See In re Corrugated*

14   *Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[L]ogic dictates that one set of

15   negotiators, with the authority to release defendants from all claims, would be in a better

16   bargaining position than negotiators with authority to compromise only part of the action.").

17   Accordingly, the Court cannot conclude that the Injunctive Relief Settlement Class must be

18   represented by separate counsel for the adequacy of representation requirement to be met.  *See In*

19   *re Blue Cross Blue Shield Antitrust Litig*, 85 F.4th at 1091 ("Our precedents do not categorically

20   prohibit the same plaintiffs and counsel from representing an injunctive relief class and a damages

21   class" in the context of a settlement); *see also In re Payment Card Interchange Fee & Merch.*

22   *Disc. Antitrust Litig.*, 827 F.3d 223, 235 (2d Cir. 2016) (noting that Rule 23(b)(3) and Rule

23   23(b)(2) classes do not "necessarily and always require separate representation" in the context of a

24   settlement).

25         Some objectors argue that Class Counsel had an incentive to trade away the interests of

26   members of the Injunctive Relief Settlement Class because the SA contains a provision that will

27   allow Class Counsel to apply to the Court for a $20 million "upfront injunctive fee and cost

28   award," which shall be paid by Defendants within forty-five days after the SA is approved.  The

SA provides that Defendants shall not oppose any such application. The objectors argue that this fee is indicative of a conflict because Class Counsel will receive it regardless of whether members of the Injunctive Relief Settlement Class receive substantial compensation and benefits from the Injunctive Relief Settlement, as the fee is not tied to the amount of compensation and benefits that class members ultimately receive from the Injunctive Relief Settlement. The objectors argue that this upfront fee is in contrast to how the fees for the damages claims will be calculated, which will be based on a percentage of the damages funds.

The Court overrules those objections. First, the Court is not persuaded that the fee at issue is indicative of a conflict on the part of Class Counsel. The $20 million upfront fee will be paid by Defendants and will not be taken out of funds that would otherwise go to settlement class members. The Court has reviewed the record carefully and finds no evidence that Class Counsel traded away the interests of any set of class members to obtain fees for themselves. The Court has presided over the present action since 2020 and there have been close to 1,000 entries filed in the case. The Court also presided over *Alston*, which was brought by Class Counsel on behalf of a class of student-athletes to challenge NCAA rules on student-athlete compensation, as discussed in more detail above. The Court has observed Class Counsel's representation over almost a decade in this case and in *Alston* and has been impressed throughout with the skill and dedication that they have applied to their vigorous representation of student-athletes. The Court credits the evidence that Plaintiffs filed, which shows that the parties negotiated all fee provisions relating to the Injunctive Relief Settlement separately from the rest of the SA, and that they did so only after the substantive terms of the SA, including damages, were agreed upon. Professor Eric Green, who is a very experienced and highly regarded mediator who has facilitated successful settlements in many high-stakes and complex cases, has corroborated Class Counsel's representations. *See, e.g.*, Green Decl. ¶ 9, Docket No. 494-2. The Court finds that sequencing the negotiations of the fees in that manner served as a structural protection that ensured fair and adequate representation for all class members. *See Fata*, 2016 WL 7130932, at *3. Second, the SA provides that, in addition to the $20 million upfront fee, Class Counsel may seek fees based on a percentage of the money and benefits awarded each year to class members pursuant to the Injunctive Relief Settlement, subject

1    to Court approval.  *See* SA ¶ 27.  Thus, Class Counsel's potential fees in connection with the

2    Injunctive Relief Settlement are tied in part to the value of the relief provided to class members

3    pursuant to the Injunctive Relief Settlement in a manner that is similar to how their fees for the

4    damages claims will be tied to the value of the damages funds.  This is because such fees will be

5    commensurate with the likely value of the IRS to student-athletes each year.  Such fees will be

6    paid over the course of the IRS's ten-year term, just like benefits and compensation to student-

7    athletes under the IRS will be provided over that same term.

8            Some objectors argue that conflicts exist between the members of the Damages Settlement

9    Classes because different segments of the Damages Settlement Classes have different types of

10   claims (e.g., pay-for-play claims vs. third-party NIL claims vs. claims arising out of the

11   scholarship cap) and because each type of claim has a different value.  The objectors argue that,

12   because of these purported conflicts, the Court must create damages subclasses for each type of

13   damages claim and appoint separate counsel for each subclass.  The objectors further contend that

14   the failure to create damages subclasses represented by different counsel means that Class Counsel

15   was incentivized to agree to a settlement that resolved all types of damages claims at once without

16   realizing the full value of each type of claim, as doing so allowed Class Counsel to secure large

17   fees for themselves.

18          The Court overrules those objections.  The Court has reviewed the record carefully and

19   finds no evidence that Class Counsel traded away the interests of class members to obtain large

20   fees for themselves.  The Court credits the evidence that Plaintiffs submitted, which shows that the

21   parties structured the damages settlement negotiations to discuss each type of damages claim

22   (including associated damages and litigation risk) separately, and that the final, agreed-upon

23   damages amount for each type of claim was determined before the parties discussed the next type

24   of claim.  *See, e.g.*, Green Decl. ¶ 10, Docket No. 494-2.  The Court finds that sequencing the

25   negotiations in that way served as a structural protection that ensured fair and adequate

26   representation for all class members.  *See Fata*, 2016 WL 7130932, at *3.  The Court also credits

27   Class Counsel's representations that their assessments of the value of each type of damages claim

28   in the context of the settlement negotiations was informed by the methodologies and economic

United States District Court
Northern District of California

74

United States District Court
Northern District of California

analyses of Dr. Rascher, as well as their experience in litigating actions challenging NCAA rules on student-athlete compensation.  As discussed above, the Court is familiar with Dr. Rascher's work, as he filed numerous reports and provided testimony as Plaintiffs' economics expert in *Alston* and has filed multiple reports in this litigation.  The Court finds that Dr. Rascher's methodologies and economic analyses, as well as the risks and costs of continued litigation as informed by Class Counsel's experience in challenging NCAA compensation restraints, provide a reasonable basis for the settlement damages amounts that the parties agreed to for each type of damages claim.  Finally, as discussed above, the Court has found that Class Counsel's representation of all class members in a single settlement likely served to increase class members' bargaining power and resulted in a better settlement for all settlement class members relative to the settlement they could have obtained with separate counsel.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d at 208.  As discussed above, the recovery that Class Counsel was able to achieve for all class members is extraordinary.

Some objectors argue that Class Counsel have a conflict with class members because the SA requires Class Counsel to lobby arm-in-arm with the NCAA to secure antitrust immunity for Defendants, and to secure preemption of state laws regarding student-athlete compensation that may conflict with the Injunctive Relief Settlement.

The Court overrules those objections.  The SA provides that Class Counsel "will use reasonable efforts to support the portions of any proposed federal or state legislation implementing/codifying this Injunctive Relief Settlement, including reasonably cooperating to support antitrust immunity for conduct undertaken by Defendants in compliance with or to implement the terms of this Injunctive Relief Settlement during the Term or any court-approved extension thereof, and preemption of any state law existing before or as of the date of Final Approval in conflict with this Injunctive Relief Settlement."  *See* IRS Art. 7, § 1.  The Court interprets that provision as simply requiring Class Counsel to take the position that the SA and actions taken to implement it do not necessarily violate the antitrust laws or state laws.  Given that Class Counsel represents, and the Court has found, that the SA is in the best interests of class members, the Court finds that the provision in question does not indicate that Class Counsel are

75

not adequate representatives for class members, or that Class Counsel's interests conflict with those of class members.  Objectors have not cited any authority that a provision such as the one at issue precludes finding that Class Counsel are adequate representatives for class members or preclude granting approval of the SA.

## CONCLUSION

For the reasons set forth above, the Court will GRANT Plaintiffs' motion for final approval of the settlement agreement.  The Court will issue an order granting the motion for final approval and the judgment in separate documents.

IT IS SO ORDERED.

Dated: June 6, 2025

_____
CLAUDIA WILKEN
United States District Judge

76