Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
Telephone: (917) 513-5541
Email: leigh@equityix.com

Jeffrey E. Faucette
SKAGGS FAUCETTE, LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Telephone: (415) 874-3181
Email: jeff@skaggsfaucette.com

*Attorneys for Objector*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No.  4:20-cv-03919-CW |
|  | **OBJECTOR'S NOTICE OF MOTION FOR LEAVE TO AMEND OBJECTION LETTER TO INJUNCTIVE RELIEF PORTION OF THE CLASS ACTION SETTLEMENT** |
|  | Hrg. Date:   November 6, 2025 |
|  | Time:          1:00 p.m. |
|  | Judge:         Hon. Claudia Wilken |
|  | Courtroom:  3, Third Floor (and Zoom) |

## I.   INTRODUCTION

Dominic Amoroso ("Objector"), by and through undersigned counsel, respectfully moves this Court for leave to file an Amended Objection Letter to the Second Amended Injunctive Relief Settlement ("Injunctive Relief"), attached hereto as Exhibit A. As shown in the redline comparison attached as Exhibit B, the proposed amendment substitutes Objector with his daughter, Ariana Amoroso, who reached the age of majority on October 16, 2025, and now possesses the legal capacity to assert her own rights and interests in this matter. Granting this motion will not prejudice any party and will promote the interests of justice by allowing the affected individual to be heard directly.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On September 22, 2025, Objector Dominic Amoroso filed a timely objection letter to the Injunctive Relief portion of the Fourth Amended Stipulation and Settlement Agreement ("Settlement Agreement") on behalf of his daughter, Ariana Amoroso, who was a minor under the age of 18 at the time of the filing. ECF 1049.

On October 14, 2025, Counsel for Plaintiffs (Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP, collectively "Class Counsel") filed an omnibus response to objections to the Injunctive Relief. ECF Nos. 1044, 1049-1054, 1056. In their response, Class Counsel argued that Objector lacked standing because his daughter was not currently a member of a Division I athletic team and because the Court had previously declined to address objections filed by parents who are not class members. ECF 1057 at 4 n.2.

On October 16, 2025, the United States District Court for the Northern District of California issued an order setting a hearing for objections to the Injunctive Relief on November 6, 2025. ECF 1059. In that order, the District Court ruled that "Objector Dominic Amoroso lacks standing to object because he is a parent and, therefore, not a class member." *Id.*

Since the filing of the original objection, Ariana Amoroso reached the age of majority, turning 18 years old on October 16, 2025. See Exhibit C. As she is no longer a minor, Ms. Amoroso now has the legal capacity to assert her own rights and interests in this matter. Accordingly, Objector seeks leave of Court to file an Amended Objection Letter submitted directly by Ariana Amoroso.

### III.    ARGUMENT

Federal Rule of Civil Procedure 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15 "is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks omitted).

Although an objection is not a pleading with the meaning of Fed. R. Civ. P. 7(a), courts may apply the liberal standard of Rule 15 by analogy when considering amendments to objections, especially when doing so serves the interests of justice and does not prejudice the other parties. *See Ponzio v. Pinon*, 87 F.4th 487, 500 (11th Cir. 2023) (explaining that objections must be specific and accurate in their factual nature to be evaluated); *1988 Trust for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 520 (4th Cir. 2022) (asserting that the specificity standard for objections is "somewhat analogous" to pleading standards).

In determining whether to grant leave to amend, courts consider several factors: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Id.* at 1052 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (internal quotation marks omitted). Among these, prejudice to the opposing party is the most significant factor. *Id.* at 1052.

None of these factors apply to the proposed Amended Objection Letter. *See id.* The amendment is timely, made in good faith, and seeks only to substitute the original Objector with Ariana Amoroso, who now has standing to assert her own rights

following her attainment of majority. The amendment does not alter the substance of the original objection and will not prejudice any party. Rather, it ensures that the Court hears directly from the individual whose interests are at stake.

### A. Defendants Will Suffer No Prejudice from Amendment

"Prejudice is the touchstone of the inquiry under rule 15(a)." *Eminence Capital*, 316 F.3d at 1052 (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)) (internal quotation marks omitted); *Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973) ("Unless undue prejudice to the opposing party will result, a trial judge should ordinarily permit a party to amend its complaint"). The NCAA, the ACC, the Big Ten Conference, the Big 12 Conference, the Pac-12 Conference, and the SEC (collectively, "Defendants") are not likely to suffer any prejudice from the proposed amendment. The oral hearing on objections to the Injunctive Relief is scheduled for November 6, 2025, and will be conducted remotely via Zoom webinar. ECF 1059.

Counsel for Objector, Leigh Ernst Friestedt, is also representing two other objectors—Piper Whitty and Katherine McCabe Ernst—who are raising similar issues. ECF Nos. 1050, 1051. The Court has indicated that it will hear Ms. Friestedt on behalf of those objectors. ECF 1059. Therefore, substituting Dominic Amoroso with Ariana Amoroso, who is now of legal age, will not disrupt proceedings or impose any burden on Defendants. The amendment merely ensures that the appropriate party is heard, without altering the substance of the objection.

### B. The Proposed Amendment is Timely and Not Unduly Delayed

This is Objector's first request to amend the objection letter, and it is filed without undue delay. The original objection was submitted timely on September 22, 2025. On October 14, 2025, Class Counsel raised the issue of standing in a footnote. ECF 1057 at 4 n.2. Two days later, on October 16, 2025, the Court issued an order finding that Objector Dominic Amoroso lacked standing because he is a parent and not a class member. ECF 1059.

On that same day, October 16, 2025, Ariana Amoroso reached the age of 18 years old. See Exhibit C. Within one week, Objector filed this motion for leave to amend the objection letter to substitute Ariana Amoroso as the proper objector.

Given the timeline, there has been no undue delay. *See Eminence Capital*, 316 F.3d at 1052. The motion is prompt, responsive to the Court's ruling, and seeks to ensure that the appropriate party with standing is heard.

### C. The Proposed Amendment is Not Futile

An amendment is considered futile only if "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (citation omitted). Because of the liberal standard applied to motions to amend, denial on this ground is rare. *See Nebula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003).

Here, the proposed amendment is not futile. As explained above, Objector seeks to substitute himself with Ariana Amoroso, who has now reached the age of majority and possesses the legal capacity to assert her own rights. This substitution directly addresses the Court's prior ruling that Mr. Amoroso lacked standing as a parent and non-class member. ECF 1059.

### D. The Proposed Amendment is Offered in Good Faith

As discussed above, Ariana Amoroso did not submit the original objection letter herself because she was a minor at the date of the objection deadline, September 22, 2025. Accordingly, her father, Dominic Amoroso, filed the objection on her behalf.

In the original letter, Objector identified Ariana Amoroso's NCAA Eligibility ID 2404283604, a unique identification number that would have allowed both Defendants' and Plaintiffs' Counsel to recognize the identity of the individual whose interests were being represented. ECF 1049 at 1.

Following the Court's October 16, 2025, ruling that Mr. Amoroso lacked standing as a parent and non-class member, and coinciding with Ariana Amoroso

reaching the age of majority on that same day, Objector promptly filed this motion for leave to amend. The timing and circumstances reflect that the proposed amendment is made in good faith to ensure that the appropriate party with standing is properly before the Court. *See Eminence Capital*, 316 F.3d at 1052.

## IV.   CONCLUSION

In the absence of factors such as undue delay, bad faith, or futility of amendment, as is the case here, Rule 15 provides that leave to amend should be granted freely. Accordingly, Objector respectfully requests that the Court grant leave to file the Amended Objection Letter, attached hereto as Exhibit A.

DATED: October 23, 2025

*/s/ Leigh Ernst Friestedt*
Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

*Attorneys for Objector*

*/s/ Jeffrey E. Faucette*
Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

# APPENDIX A

## AMENDED OBJECTION LETTER

## ARIANA AMOROSO

October 23, 2025

The Honorable Claudia Wilken
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street
Oakland, CA 94612

From: Ariana Amoroso

Re:     College Athlete NIL Litigation Case No. 4:20-cv-03919 (N.C. Cal)
        Objection – Injunctive Relief Settlement – Title IX

Dear Judge Wilken,

Thank you for taking the time to read this important letter that I am writing on behalf of myself (NCAA ECID 2404283604), but which could undoubtedly impact so many other NCAA D1 athletes like me. I am an incoming freshman who was recruited in November of 2024 as a swimmer at California Polytechnic State University (Cal Poly) in San Luis Obispo with an athletic scholarship, and was informed a few months later, on March 7, 2025, that the Swim and Dive program had been cut, directly related to the House Settlement that Cal Poly opted into. Unfortunately, the Settlement did not take my needs into consideration as an incoming freshman for the 2025/2026 school year.

**I respectfully object to the Injunctive Relief Settlement and urge the Court to consider its impact on incoming student athletes like me who have been devastated by the loss of athletic participation and scholarship opportunities, and commitments made to them, with no meaningful recourse or protection. Women should not be forced to sue their universities to enforce a civil rights law that has been in place for more than fifty years. These protections should be part of the Settlement itself to ensure compliance and avoid unnecessary lawsuits.**

My father, Dominic Amoroso, explained our situation to Mr. Jeffrey Kessler in May of this year but was informed that my situation was outside the scope of the Settlement (see email below).

From: Kessler, Jeffrey <JKessler@winston.com>
Sent: Monday, May 19, 2025 5:58 AM
To: Nick Amoroso <amorosono5@ca.rr.com>
Cc: steve@hbsslaw.com
Subject: Re: House vs NCAA settlement - impacted student concern

I am sorry to hear about your daughter's situation.  Unfortunately,  this is not likely a situation where the House settlement scholarship protection applies.

The scholarship protection in House applies where a student is cut because of  new roster limits being imposed  by the NCAA. Here, the school is cutting an entire team purportedly because of financial considerations.  The House settlement does not provide scholarship protection in such a case.

I also can observe that it appears that the House settlement is just an excuse being cited by the school.  There is nothing in the settlement which required the team to be cut.

We wish your daughter good luck in finding a new team if that is her goal.  One point that  might help her is that all limits on the number of scholarships will be removed by the House settlement so that there should be a greater availability of scholarship opportunities throughout Division 1 if the settlement is approved.

---

From: Nick Amoroso <amorosono5@ca.rr.com>
Sent: Sunday, May 18, 2025 11:18:28 PM
To: Kessler, Jeffrey <JKessler@winston.com>
Cc: steve@hbsslaw.com <steve@hbsslaw.com>
Subject: House vs NCAA settlement - impacted student concern

Dear Mr. Kessler,

In the Fall of 2024, my daughter committed to Cal Poly San Luis Obispo for the Fall of 2025 with a swim scholarship. As I'm sure you are aware, the swim program there has been cut. The reason for the cut was stated to be financially based, with the following FAQ on the school website:

> Q.  Does this have to do with the House v. NCAA settlement?
> A.  The overall financial health of the athletic department is the primary reason, and certainly the House v. NCAA settlement (loss of nearly $500,000 per year) has an impact on the department finances, along with the state cuts (nearly 8% for Cal Poly) impacting the entire University.

I have heard from someone close to the case that the settlement for the House vs NCAA will protect existing scholarships for the full 4 years.  If this is true, it is my hope that it would apply to incoming signed athletes like my daughter, who is not alone in this predicament, as well as the student athletes who have already begun the program.  I'm hoping you can provide some clarity for me around this point.

For full transparency, my daughter signed a year-to-year scholarship, and the school has stated the scholarship will only be honored for one year. However, it is well known that these scholarships are almost always renewed each year and have the potential to increase, particularly if the athlete's performance improves. My daughter had significantly improved her times following her commitment in anticipation of her college debut and was on a trajectory to positively impact her scholarship potentially even further.  As a family who was counting on this scholarship, it would be devastating to lose this opportunity for even one year.

We are still holding out hope for any chance that the program might be re-instated and are doing what we can to influence that.  In the more likely case that the program remains cut, I'm seeking to understand the impact on her scholarship relative to the House vs NCAA settlement.

Any insights you can provide are greatly appreciated.

Although Mr. Kessler's speculation minimized the role of the House Settlement in Cal Poly's decision to cut the Swim and Dive program, the impact has been well publicized. On June 19, 2025, the Associated Press quoted Cal Poly President Jeffrey D. Armstrong as follows:

> Armstrong said the move was difficult but that it was unavoidable.
>
> "This is an unfortunate reality given the approved NCAA House settlement, state budget and the tenuous situation moving forward for both the state and the NCAA," he said. "I want to reiterate that the significant and unequitable changes in the NCAA and the House settlement (and new organizations resulting from this settlement) had an impact that weighed heavily in this decision."

2

Reference: [Cal Poly's swimming and diving programs won't be reinstated despite fundraising efforts | AP News](#)

Since the time of my father's email exchange with Mr. Kessler, I have learned that his dismissal of my case as being outside the scope of representation is incorrect, and that my needs, and the needs of other incoming recruits, should have been considered.

To the extent that Cal Poly sought to avoid compliance with the House Settlement by eliminating an entire athletic program—rather than selecting individual athletes for roster reductions to address budgetary constraints—this constitutes a clear loophole the Court should address immediately. Without such intervention, other student-athletes, male and female, risk losing promised scholarships solely because their program was cut rather than through roster adjustments.

On January 23, 2025, Meeting Notes from the Cal Poly Athletics Advisory Board stated:

> House v. NCAA – (Don Oberhelman) Athletes who competed in 2016-2024 and did not receive NIL (name, image, and likeness) compensation will receive payments totaling $2.8 billion over the next ten years. Cal Poly is paying for the transgression of others and will suffer near a half-million-dollar loss per year due to the settlement. **Roster cuts will be necessary.** (See Appendix)

**Requested Amendments to Injunctive Relief Settlement:**

To be constructive and protect all other Division I female student-athletes adversely affected by the terms of the Second Amended Injunctive Relief Settlement dated May 7, 2025 (ECF 958-2), I respectfully request that the Court amend the Injunctive Relief to ensure equal treatment and participation opportunities for all current and future female student-athletes under Title IX of the Education Amendments Act of 1972. 20 U.S.C. § 1681 et seq.

1. **Designated Student Athlete (DSA):** Propose adding language clarifying that, while a DSA does not count toward a team's roster limit, he or she must be counted as a "participant" for purposes of Title IX compliance.

   For example, football programs are subject to a roster limit of 105 male athletes; however, many universities designate additional male athletes as DSAs, resulting in actual team sizes of approximately 125. Although only 105 counts toward the roster limit, the remaining 20 male athletes should be included in the institution's total male participant counting for Title IX reporting and compliance purposes.

2. **Article 3 – Benefits Pool § 1(a) Payments and/or Benefits; § 2 Institutional Decision-Making and Conference Level Rules:** As a condition of participating in the distribution of additional payments and/or benefits to student-athletes beyond their annual scholarships, a university must be in full

3

compliance with Title IX with respect to: (1) participation opportunities, and (2) scholarships, financial assistance and recruiting resources. Absent such compliance, participation in the Benefits Pool risks further exacerbating inequities, as disproportionate payments are likely to be allocated to male student-athletes.

For example, Cal Poly established a "Players Trust" with the stated goal to "Attract, Retain and Win" by identifying and developing talented-student athletes. While this may be a well-intentioned, Cal Poly is already in violation of Title IX – failing to provide substantially proportionate participation opportunities, equivalent benefits, and/or proportional financial assistance, as detailed in multiple letters sent to President Armstrong. (See Appendix)

The Cal Poly athletic department operates at a deficit. It should therefore be impermissible for a university that is violating federal law and facing budgetary constraints to incur additional financial losses by making voluntary payments under the Injunctive Relief provisions. Any donations to the university should instead be directed toward remedying the existing sex-based discrimination within its current athletic programs.

3.  **Article 3 – Benefits Pool § 1(c) Shared Revenue:** The revenue categories used to calculate the Benefits Pool, as set forth in Appendix A of the NCAA 2024 Agreed-Upon Procedure, appear to be selectively defined to exclude categories that would trigger Title IX compliance obligations. Specifically, the excluded categories include:

    - Direct State of Other Government Support – "Funding **specifically earmarked** for athletics department by government agencies for which the institution cannot reallocate"
    - Student-Fees – Student fees assessed and restricted for intercollegiate athletics
    - Direct Institutional Support – Direct funds provided by the institution for intercollegiate athletics
    - Indirect Institutional Support – Value of costs covered and services provided by the institution to athletics but not charged to athletics
    - Contributions – Donations by individuals, corporations, associations, foundations, clubs
    - Compensation and Benefits Provided by a Third Party – Includes media income, shoe and apparel income
    - Athletics Restricted Endowment and Investment Income
    - Other Operating Revenue

4

By contrast, the categories included in the Benefits Pool calculation are those that can be directly attributed to men's sports and used to justify disproportional "revenue sharing" payments – such as ticket sales, media rights, NCAA distributions, conference distributions, royalties/licensing/advertisement and sponsorships and Football Bowl revenues.

This bifurcation of revenue sources operates to sidestep Title IX's requirements for equal treatment and benefits. To the extent this structure enables institutions to allocate disproportionate Benefits Pool payments to male athletes while excluding revenue from Title IX analysis, it should be expressly identified and amended in the Settlement.

4. **Equity in Athletics Disclosure Act (EADA):** Enacted in 1994, the EADA requires educational institutions to annually collect and publicly disclose detailed information about their intercollegiate athletics program. The purpose is to provide **transparency** regarding **gender equity** in athletics and to enable student-athletes, prospective students, and the public to assess whether institutions are providing equitable athletic opportunities and treatment to men and women, as required by Title IX.

In accordance with the EADA, I request that the following data be mandated for inclusion in publicly available reports:

- **Revenue Sharing Payments and/or Benefits** provided by a university broken down by sport and gender
- **Designated Student-Athletes** DSA broken down by sport and gender
- **Revenue Categories** with amounts for each category, including those currently excluded from reporting

Membership Financial Reporting System Reports - Data and Public Disclosure: Under the NCAA Constitution, the Membership Financial Reporting System Reports (MFRS) requires member institutions to submit annual financial data. Injunctive Relief Section 5 – Mandatory Member Institution Reporting already obligates schools to provide this information, and Section 5 - Pool Payments/Benefits Reporting requires institutions to report the total and type of payments or benefits report to the Court and Class Counsel.

I request that these reports – particularly the Pool Payments/Benefits data – be made publicly available and incorporated in the EADA reporting framework. Public disclosure of this information is critical to ensure transparency, allow for independent monitoring of gender equity, and ensure that revenue distribution and benefits are subject to the same scrutiny as other EADA-mandated data.

<u>5.</u>    **Title IX Release:**  The term "Unreleased Claims" is defined in the Fourth Amended Stipulation and Settlement Agreement as:

> "Claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq*., **other than any claims arising out of or relating to the distribution of the Gross Settlement Fund***."(ECF 958-2 at 16-17)

> I respectfully request that the clause *"other than any claims arising out of or relating to the distribution of the Gross Settlement Fund"* be deleted. This revision is necessary to ensure it is unequivocally clear that female student-athletes retain their full rights under Title IX to challenge any inequitable payments—whether related to past damages or to the Injunctive Relief payments—arising from the $20.5 million "revenue-sharing" distribution.

**Request to Speak at Hearing – Legal Representation:**

I have retained an independent counsel, **Leigh Ernst Friestedt**, to assist with my legal representation. Ms. Friestedt is currently representing other women who have objected to the House Settlement (Charlotte North, Mai Nirundorn, Katherine Ernst, and Brooke Baker). I am in my freshman year at Cal Poly and am unlikely to attend the hearing scheduled for November 6, 2025.

Accordingly, I respectfully request that Ms. Friestedt be permitted to speak on my behalf at the November 6, 2025 hearing.

Thank you, Your Honor, for your attention to and consideration of this important matter. Your careful review is essential to ensuring the principles of fairness, equity, and compliance with federal law are upheld for all student-athletes. I appreciate the Court's time and thoughtful consideration of these issues.

Respectfully,

Ariana Amoroso

Cc:    Leigh Ernst Friestedt
       Jeffrey Faucette

# APPENDIX

1.   **Athletics Advisory Board Minutes (Jan. 31, 2025)**

2.   **Letter #1 to Jeffrey Armstrong – Title IX (June 27, 2025)**

3.   **Letter #2 to Jeffrey Armstrong – Title IX (Aug. 4, 2025)**

# ATHLETICS ADVISORY BOARD

**January 23, 2025**
**11:10 a.m. – 12:00 p.m.**
**Zoom Meeting**

**Meeting Notes**

**Attendees:**

Ashleigh Jeanne Spragins, Bing Anderson, Colleen Russell, Cynthia Vizcaino, Villa, Danny Gampe, David A. Valadez, Don Oberhelman, Marc Cabeliza, Megan Lambertz-Berndt, Rick Salomon, Robert Holtzapple, Tom Mase, Trey Berberich Bernard

**Not in attendance due to schedule conflict:** Alexander Levine

1. Welcome/Introductions – Don Oberhelman welcomed the group and each member introduced themselves.

2. Conference Realignment – Don Oberhelman outlined the conference changes, which included Hawaii leaving and Sacramento State joining the big West.

3. House v. NCAA – (Don Oberhelman)  Athletes who competed in 2016-2024 and did not receive NIL (name, image, and likeness) compensation will receive payments totaling $2.8 billion over the next ten years. Cal Poly paying for the transgression of others and will suffer near half-a-million-dollar loss per year due to the settlement. Roster cuts will be necessary.

4. Facilities Update – (Don Oberhelman)

   - Women's Soccer locker room -   fully donor-funded and features 35 new Holman lockers, new lighting, flooring, lounge furniture, audio and video systems and a fueling station.
   - Comerford Pavilion – New state of the art facility is complete and will be unveiled at ribbon cutting a week from Saturday, (February 1).

5. SNAC Opening – (Jackson Stava)  Swanson Nutrition Athletic Center, a donor-funded facility opened October 3. With this nutrition center we can help provide the ability for a healthy way to compete at the highest levels

6. Fall Sports Update (Don Oberhelman)

   - Volleyball in first place – picked to win the conference
   - Men's soccer in second place with 2 matches remaining
   - Women's soccer picked to be second in conference but currently 7th
   - Cross Country – both men and women's expected to win conference
   - Basketball right around the corner; game tomorrow at noon

 

**Leigh Ernst Friestedt**
Founder – Attorney

**Equity IX, LLC**
40 Mercer St. Suite 15
New York, NY 10013
leigh@equityix.com
(917) 513-5541

**Nancy Hogshead**
CEO – Attorney

**Champion Women**
2103 River Road
Jacksonville, FL 32207
hogshead@championwomen.org
(904) 384-8484

June 27, 2025

Via email:
jarmstro@calpoly.edu

Jeffrey Armstrong (President)
California Polytechnic State University, San Luis Obispo
1 Grand Avenue
San Luis Obispo, CA 93407

      **RE:**    *Eliminating the Women's Swimming & Diving Team, in Violation of Title IX*

Dear President Armstrong,

We have been retained by members of the California Polytechnic State University, San Luis Obispo ("Cal Poly") Women's Swimming & Diving Team ("Women's Swimming") to address concerns regarding gender-based inequities within the university's athletic programs.

We respectfully request that Cal Poly take the necessary actions to ensure both immediate and long-term compliance with applicable state and federal laws. We urge your prompt attention to this matter and look forward to discussing potential solutions with you.

### Elimination of Women's Swimming – Violation of Title IX

On March 7, 2025, you publicly released "Letter from President Armstrong on Budget and Organizational Changes," which announced that both Men's and Women's Swimming and Diving Programs ("Programs") would be "*discontinued effective immediately*."

The elimination of Women's Swimming is a violation of **Title IX of the Education Amendments of 1972** ("Title IX"). Title IX prohibits discrimination on the basis of sex in educational programs and activities, including athletics, for institutions that receive federal financial assistance.[1] Title IX's implementing regulations further specify that:

---

[1] 20 U.S.C. § 1681, et seq., U.S. Department of Education, Office for Civil Rights, "A Policy Interpretation: Title IX and Intercollegiate Athletics," 44 Fed. Reg. 71,413, 71,415 (1979), available at: https://www.ed.gov/about/offices/list/ocr/docs/t9interp.html

"[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a).

This provision clearly mandates that Cal Poly must offer equitable athletic opportunities, and the elimination of Women's Swimming on March 7, 2025, violates that mandate. Below are facts, data, and law that clearly demonstrate that Cal Poly cannot cut its Women's Swimming Team. Further, Cal Poly needs to add additional women's athletic teams.

Similarly, under **California state law**, discrimination on the basis of sex is prohibited in schools, and individuals are guaranteed the right of equitable treatment, benefits and an equitable opportunity to participate in all academic extracurricular activities, including athletics. Cal. Educ. Code § 221.8.[2] This state provision further reinforces the protection offered under federal law, Title IX, ensuring that women have the same opportunity to participate in athletic programs as their male counterparts.

Based on available information, Cal Poly is not in compliance with Title IX or the Cal. Education Code § 221.8.

Evidence we have reviewed is clear: in Cal Poly's athletic department, male students are receiving disproportionately more participation opportunities than female students, more athletic scholarship dollars, as well as more favorable treatment and benefits. These discrepancies directly contradict the requirement of both federal and state law, which mandates equal opportunities and equitable treatment for all students.

### Equal Participation Opportunities, Equal Athletic Scholarships, & Equal Treatment and Benefits

Title IX prohibits three broad categories of discrimination against student-athletes based on sex. First, educational institutions must provide female students with **equal athletic participation opportunities**. 20 U.S.C. § 1681. Second, educational institutions must provide men and women with **equal athletic scholarships**.[3] Third, long-standing federal

---

[2] See California State Law regarding Equality in Athletics:
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=EDC&sectionNum=221.8

[3] 34 CFR § 106.37 Financial assistance.
(c) Athletic scholarships.
(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.
(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and 34 CFR § 106.41. https://www.ecfr.gov/current/title-34/subtitle-B/chapter-I/part-106/subpart-D/section-106.37

law mandates female students receive **equal treatment and benefits** compared to their male counterparts.[4]

Cal Poly is engaging in all three forms of sex discrimination. Specifically, Cal Poly has failed to provide female athletes with equal participation opportunities, equal athletic scholarships, and has not ensured that female athletes receive equal treatment and benefits. These actions represent separate violations of Title IX.

### Facts from the Equity in Athletics Disclosure Act

According to the most recent publicly available **Equity in Athletics Disclosure Act** ("EADA")[5] report submitted by Cal Poly to the Department of Education, in the 2023-24 academic year, Cal Poly has an undergraduate population of 10,697 men and 10,774 women, with women representing **50.2%** of total undergraduate enrollment.

During that same academic year, Cal Poly's athletic department provided men with 403 athletic opportunities and women with 296 athletic opportunities, using the duplicated count. As such, women comprised **42.35%** of total athletic participation opportunities. Using the unduplicated count, Cal Poly reported 357 males and 223 female athletes, meaning women comprise just 38.45% of all Cal Poly athletes.

---

[4] See, e.g., U.S. Dept. of Educ., Office for Civil Rights ("OCR") Policy Interpretation, 44 Fed. Reg. 71, 415 (1979); 34 C.F.R. § 106.429(c)(2)-(10); *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp 2d 1093, 111-12 (S.D. Cal. 2012) (finding unequal treatment and benefits as to class of female athletes).

[5] EADA data, available at: https://ope.ed.gov/athletics/?#/ - *Champion Women* made the data easier for a non-lawyer or expert to understand, here: https://titleixschools.com/



Again, with the duplicated count, Cal Poly would need 38.9% more athletic opportunities for women in order to equal the number of opportunities the school provides to men, or **115** more women.

Using the unduplicated count, Cal Poly would need to add **141** more female athletes to its athletic programs in order to achieve equity in athletic participation opportunities.

### Additional Facts From Roster Counts on Cal Poly's Athletics Website

In 2023 – 2024, according to a **roster count from Cal Poly's athletics' website**,[6] Cal Poly gave 365 men and 237 women athletic opportunities, including swimming. According to the Cal Poly website, women that year were just 39.3% of the athletes at Cal Poly.

In 2024 – 2025, according to a roster count from Cal Poly's athletics website, Cal Poly provided athletic opportunities to 341 men and 220 women, including swimming. Again, according to the Cal Poly website, women were just 39.2% of athletes at Cal Poly.

---

[6] https://gopoly.com/

### EADA Athletic Scholarship Data

Women athletes at Cal Poly are entitled to equal athletic scholarship allocation while participating in athletic educational opportunities.[7]According to the EADA's latest data, Cal Poly needs to add $1,428,121 in athletic scholarship aid for women.



**California Polytechnic State University – San Luis Obispo**

---

---

[7] 34 CFR § 106.37 Financial assistance. (c) Athletic scholarships.
(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.
(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

### EADA Athletic Recruiting Dollars Data

Women athletes are entitled to equal treatment while participating in athletic educational opportunities, including equal recruiting.[8] According to the EADA's latest data, Cal Poly needs to add $124,327 in recruiting dollars for its women's sports.



---

[8] 34 CFR §106.41(10), Athletics, and §106.23, 1975, https://www2.ed.gov/policy/rights/reg/ocr/edlite-34cfr106.html#S41 **Recruitment.** (a) *Nondiscriminatory recruitment.* A recipient to which this subpart applies shall not discriminate on the basis of sex <u>in the recruitment and admission of students</u>. A recipient may be required to undertake <u>additional recruitment efforts</u> for one sex as remedial action pursuant to §106.3(a), and may choose to undertake such efforts as affirmative action pursuant to §106.3(b).

**Title IX Liability**

On March 7, 2025, Athletic Director **Don Oberhelman** informed members of both the men's and women's swimming teams that both Swimming Programs were being discontinued. During this in-person meeting on campus, Mr. Oberhelman was directly asked whether the elimination of Women's Swimming constituted a Title IX violation. He responded by stating that cutting Women's Swimming does not violate Title IX.

Mr. Oberhelman's assertion is legally incorrect and reflects a fundamental misunderstanding of federal anti-discrimination law.

*Even prior to the announced elimination of Swimming, Cal Poly would have needed to add 141 more female athletes to achieve compliance with Title IX.*

Eliminating Men's and Women's Swimming cut 29 male athletes and 29 female athletes. The simultaneous discontinuation of both the Men's and Women's Swimming Teams, with the same number of athletes on each team, does not mitigate Cal Poly's Title IX liability. But with women comprising 37.3% of total athletic participation, the cuts actually widened the participation gap between female enrollment and athletics participation to 12.9%.

Obviously, eliminating Women's Swimming reduced athletic participation opportunities for women.

Here, the facts show that the gaps between men's and women's athletic opportunities at Cal Poly remains large. Both before and after the cuts to one or both Swimming Teams, women were not, and are not, receiving equal educational opportunities:
- in the percentage of women athletes in the athletic department,
- in the percentage of women athletes Cal Poly needs to add, and
- in the additional number of female athletes needed to equal the opportunities it currently provides its male students.

**Financial Constraints Do Not Exempt Title IX Compliance**

Financial constraints or budget cuts are not a valid excuse for non-compliance with federal laws. As a federally funded institution, Cal Poly is legally required to ensure that its athletic programs provide equal opportunities and treatment for female athletes, regardless of budgetary concerns.

Your March 7, 2025 letter to the teams stated that, "Cal Poly's men's and women's swimming and diving programs will be discontinued effective immediately. While this is disappointing news to share, the financial realities made this decision unavoidable." On June 16, 2025, you reiterated your financial concerns, stating, that despite raising $9 million, "the fundraising effort has fallen well short of the goal to reinstate the program."

Title IX mandates that equitable access to sports programs, and this obligation cannot be circumvented due to financial limitations. In other words, Cal Poly cannot justify discriminatory

treatment based on funding sources from boosters, sponsors or other third party sources. As the Civil Rights Restoration Act made clear, Title IX prohibits discrimination in all programs and activities of an institution that receives any federal funds, regardless of how a particular program or activity is funded.[9] The fact that there may be different funding sources for different teams is irrelevant to the institution's obligation to ensure equal treatment for the male and female sports programs. According to the Office for Civil Rights Investigator's Manual:

> [W]here booster clubs provide benefits or services that assist only teams of one sex, the institution shall ensure that teams of the other sex receive equivalent benefits and services. If booster clubs provide benefits and services to athletes of one sex that are greater than what the institution is capable of providing to athletes of the other sex, then the institution shall take action to ensure that benefits and services are equivalent for both sexes.[10]

In *Brown v. Cohen*, the court noted that if funding were a sufficient defense against claims of discrimination, Congress would not have needed to enact Title IX, which aims to eliminate gender discrimination in educational programs receiving federal assistance.[11]

### Retaliation

Title IX prohibits retaliation against any individual who complains of sex discrimination, including parents, coaches, and students, regardless of whether that person was the direct victim of discrimination in the original complaint.[12]

Complainants seeking to exercise their rights under Title IX are afforded both statutory and regulatory protections against retaliation. Retaliation from complaints of sex discrimination is considered "intentional conduct that violates the clear terms of [Title IX].'" *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d at 1113.

It is our understanding that Title IX and retaliation claims related to Women's Swimming have already been filed against Cal Poly. Therefore, it is imperative that Cal Poly take all necessary steps to ensure that no member of Women's Swimming, nor anyone associated with them

---

[9] See, 20 U.S.C. § 1687; Office for Civil Rights, Department of Education, *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance*, (2003) available at http://www.ed.gov/about/list/ocr/title9guidanceFinal.html

[10] Office for Civil Rights, Department of Education, *Title IX Athletics Investigator's Manual* (1990), available at: https://titleixspecialists.com/wp-content/uploads/2013/09/1990-Title-IX-Athletics-Investigators-Manual-Summary-no-text.pdf

[11] *See, Cohen v. Brown Univ.*, 809 F.Supp. 978, 982-83(D.R.I. 1992) (concluding that "all monies spent by Brown's Athletic Department, whether originating from university coffers or from the Sports Foundation [booster club] must be evaluated as a whole under §106.41(c)")

[12] *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 870-71 (9th Cir. 2014).

(including family members, friends, their supporters, or coaches), is subjected to any form of retaliation.

**<u>Remedy</u> – Reinstate Women's Swimming, and
Provide Women with Equal Treatment & Benefits**

We respectfully request that Cal Poly representatives meet with us to engage in productive and structured negotiations aimed at helping the university implement both immediate short and long-term changes, to ensure compliance with Title IX. Specifically, we propose the following actions:

1. Reinstate Women's Swimming immediately;
2. Elevate Women's Athletic Scholarships on the Swimming Team;
3. Ensure Women's Swimming and all female athletes at Cal Poly receive Equal Treatment and Benefits, including Recruiting Budgets; and
4. Create a plan to add additional women's teams post-haste, to provide women at Cal Poly with equal educational opportunities.

We look forward to discussing these matters with you and working toward a resolution that ensures full compliance with both federal and state law.

Please respond to this letter as soon as possible and, in any event, no later than Monday, July 7, 2025.


Sincerely,



**Leigh Ernst Friestedt**
Equity IX, LLC

**Nancy Hogshead**
Champion Women


Cc:   Dr. Mildred Garcia (Chancellor of the California State University)
      csu-chancellor@calstate.edu
      Robin Webb (General Counsel) rwebb@calstate.edu
      Don Oberhelman (Athletic Director) obe@calpoly.edu

  

**Leigh Ernst Friestedt**
Founder – Attorney

**Equity IX, LLC**
40 Mercer St. Suite 15
New York, NY 10013
leigh@equityix.com
(917) 513-5541

**Nancy Hogshead**
CEO – Attorney

**Champion Women**
2103 River Road
Jacksonville, FL 32207
hogshead@championwomen.org
(904) 384-8484

August 4, 2025

Via email: jarmsrto@calpoly.edu

Jeffrey Armstrong (President)
California Polytechnic State University, San Luis Obispo
1 Grand Avenue
San Luis Obispo, CA 93407

**RE:    Immediate Reinstatement of Cal Poly Women's Swimming & Diving Team:
President Trump Executive Order - Title IX Compliance**

Dear President Armstrong,

Pursuant to President Donald J. Trump's Executive Order titled "***Saving College Sports***," issued on July 24, 2025, we hereby renew our formal demand for the immediate reinstatement of the California Polytechnic State University, San Luis Obispo ("Cal Poly" or the "University") Women's Swimming & Diving Team.

This federal directive underscores the critical importance of complying with Title IX of the Education Amendments Act of 1972 ("Title IX") and preserving women's and Olympic sports.

<u>**Executive Order: "*Saving College Sports*"**</u>

The Executive Order ("Order") states:

> "It is the policy of my administration that ***all college sports should be preserved*** and, ***where possible, expanded***."

According to President Trump:

> "A national solution is urgently needed to prevent this situation from deteriorating beyond repair and to protect non-revenue sports, including many ***women's sports*** that comprise the ***backbone of intercollegiate athletics***."

The Order affirms that institutions like Cal Poly should not prioritize football at the expense of women's sports:

> "While major college football games can draw tens of millions of television viewers and attendees, they feature only a very small sample of the many athletes who benefit from the **_transformational opportunities that college athletics provides_**."

Section 2 of the Order, titled "**_Protecting and Expanding Women's and Non-Revenue Sports_,**" calls for preserving and expanding opportunities in women's and non-revenue sports.

> "Opportunities for scholarships and collegiate athletic competition in **_women's and non-revenue sports must be preserved_** and, where possible, **_expanded_**, including with respect to the **2025-2026 athletic season** and future athletic seasons."

Women's sports are essential—not only for advancing gender equity, but also for cultivating future leaders in our country. As the Order affirms:

> "A substantial majority of female executives at the largest American companies participated in sports during adolescence, many at the high school or collegiate level, and examples of business leaders and former Presidents who played college sports are legion."

In light of this recognition, educational institutions like Cal Poly are required to ensure that women's athletic programs are not diminished, but preserved and expanded.

## Cal Poly Is Not in Compliance with the Executive Order, Title IX, or California State Laws Prohibiting Sex Discrimination

Cal Poly's elimination of the Women's Swimming and Diving Team–an Olympic sport–stands in direct violation of the Order *"Saving College Sports."* This action undermines both the federal mandate to preserve and expand women's athletic opportunities and the University's obligations under Title IX. Noncompliance exposes Cal Poly to significant legal and financial risk, including potential federal intervention and the loss of federal funding.

President Trump's Order explicitly directs the Secretary of Education—along with the Attorney General and other federal officials—to develop a comprehensive enforcement strategy within 30 days. This strategy includes Title IX enforcement actions, federal funding decisions tied to compliance, and other regulatory and litigation mechanisms to ensure institutional accountability.

## Cal Poly Announced Emerging Sports: STUNT and Flag Football

On August 1, 2025, Cal Poly's announced that it will "transition" STUNT club team to varsity status in 2026-27 and "pursue" the addition of women's flag football "as early as 2027". Cal Poly's announcement does **not** remedy the University's current or historical Title IX violations.

First, Cal Poly's women's swimmers are facing sex discrimination now, and STUNT and Flag Football do not remedy their intentional sex discrimination. The graphs we provided earlier

demonstrate that Cal Poly has never provided women with equal educational opportunities in athletics. Courts have held that a school's promise to add women's teams in the future does not constitute Title IX compliance. See; *Boucher v. Syracuse Univ.*, 164 F.3d 113, 116 (2d Cir. 1999) (finding that a Title IX claim by female athletes against was not moot where the university had promised to establish a varsity women's softball team by the next year but had not yet done so); *Favia v. Indiana University of Pennsylvania,* 812 F. Supp. 585 (W.D. Pa. 1993).

Furthermore, while STUNT is recognized by the NCAA as an Emerging Sport for women, Cal Poly will not elevate it to varsity status for at least another year. Importantly, designation as an Emerging Sport does not automatically satisfy Title IX requirements. To count toward compliance, universities must provide full varsity-level support—ensuring equitable treatment in scholarships, recruiting, coaching, and access to facilities, consistent with other established varsity programs.

Flag Football was recommended for inclusion as an NCAA Emerging Sport for women in January 2025, but it has not yet been officially designated as such by the NCAA, and thus, for Title IX compliance. Nor has the NCAA given Flag Football full championship status; without it, Cal Poly could not provide women with the same educational opportunities currently afforded to its male athletes. NCAA President Charlie Baker has merely projected that flag football could potentially reach championship status by 2028.

Title IX and California State Law require that Cal Poly provide equitable athletic opportunities and treatment for women **now**, not years from now. The federal and state laws do not permit a university to eliminate an existing varsity team and delay compliance based on speculative future plans.

Additional facts demonstrating Cal Poly's ongoing noncompliance with Title IX include:
- Cal Poly will not elevate STUNT to varsity status until the 2026-27 academic year, leaving a multi-year gap in varsity opportunities for women.
- Cal Poly has stated it will "not add significant management nor personnel" to support STUNT, which has operated as a club since 2010–suggesting a varsity designation without meaningful institutional investment.
- Cal Poly has not stated its plans to offer athletic scholarships or invest in recruiting to build either team.
- Cal Poly and the NCAA have not confirmed a launch date for Flag Football; the earliest possible start is the 2027-28 academic year.
- Cal Poly has not specified plans to build facilities for STUNT and Flag Football.
- Neither STUNT nor Flag Football replaces Women's Swimming and Diving—an Olympic sport with over 100 years of history, national competition, and athletic scholarship opportunities.

By eliminating the Women's Swimming & Diving Team, Cal Poly has **reduced—rather than expanded**—varsity opportunities for women. Title IX compliance is measured by actual participation numbers, not speculative future projections. Cal Poly's future plans do not satisfy its current legal obligations under Title IX.

**To comply with federal law and the Executive Order, Cal Poly must immediately reinstate the Women's Swimming and Diving Team.**

### Stephen F. Austin State University – Comparable Case to Cal Poly

On Friday, August 1, 2025, *Myers et. al., v. Stephen F. Austin State University,* the U.S. District Court for the Eastern District of Texas granted the plaintiff's motion for a preliminary injunction under very similar facts to Cal Poly. The female athletes challenged the university's decision to cut three women's sports teams, arguing that the decision perpetuated SFA's history of depriving women equal opportunities to participate in varsity intercollegiate athletics.

The court held:

> "Plaintiffs' expert, Dr. Donna Lopiano determined that women currently make up 63% of SFA's undergraduate population and receive only 45.6% of the athletic opportunities. According to Dr. Lopiano's calculations, SFA needs to add 223 varsity intercollegiate athletic opportunities for women to achieve proportionality. Furthermore, if the beach volleyball, bowling, and men's and women's golf teams are eliminated and the other facts stay the same, the female athlete participation gap will increase to 245."

The Judge also rejected SFA's request to delay the reinstatement of the women's teams and instead develop a future compliance plan. The court stated:

> "SFA asks the Court that, in the event it finds injunctive relief is warranted, it should afford SFA an opportunity to create a plan to demonstrate compliance. The Court declines to provide SFA with this opportunity, especially considering it had the chance to become compliant with Title IX… Instead of seeking compliance, it cut three women's programs. This does not demonstrate any desire to be compliant. Therefore, injunctive relief is proper."

The facts and the law are practically identical in the two schools: Stephen F. Austin and Cal Poly. The school is digging a hole for itself, with unnecessary legal fees and campus strife.

### Retaliation

As outlined in our letters dated June 27 and July 4, and reaffirmed in our email of August 1, 2025, retaliation remains a serious and ongoing concern for our clients. To date, the University has failed to provide any assurances that such intimidation will be addressed or prevented in the future.

Examples of retaliatory behavior targeting the Women's Swimming and Diving Program include:

- **Repurposing of Facilities**: Removing access to training spaces (e.g., draining or filling in a pool) to prevent continued use by athletes, even recreationally.
- **Destruction of Facilities:** Trying to block women from asserting their rights under California state and federal law by destroying the pool.
- **Denial of Access to Resources:** Blocking athletes from using locker rooms, weight rooms, or athletic trainers following the program's elimination.
- **Silencing or Intimidation:** Discouraging athletes from speaking out, threatening academic or disciplinary consequences.
- **Retaliation Against Complainants:** Punishing students or staff who raise Title IX concerns, including exclusion from team activities or adverse employment actions.

Trump Executive Order and Stephen F. Austin University Required to Reinstate Women's Teams

- **Loss of Scholarships:** Rescinding athletic scholarships previously awarded to team members or promised during recruitment.
- **Erasure of Legacy:** Removing or eliminating recognition of Hall of Fame members associated with the program, signaling institutional hostility for speaking out on behalf of women in sports.
- **Unequal Treatment in Grievance Processes:** Denying procedural fairness to complainants.

### Title IX Lawsuits: Lack of Money Is Not a Defense to Sex Discrimination

The following Title IX lawsuits illustrate that lack of financial resources is not a valid defense in a sex discrimination case.

- *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085 (S.D. Iowa 2020): A federal court granted a preliminary injunction to female student-athletes, preventing the university from eliminating its women's swimming and diving team. The court found that the athletes had a fair chance of succeeding on their Title IX claim for inequitable participation opportunities and demonstrated irreparable harm. The ***court rejected the university's budgetary justifications***, emphasizing the statistical evidence of underrepresentation of female athletes.
- *Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824 (10th Cir. 1993): The court held that ***budgetary constraints are not a permissible defense*** to claims of discriminatory practices under Title IX.
- *Murray v. New York University*, 57 F. Supp. 2d 180 (S.D.N.Y. 1999): The court stated that Title IX's prohibition against sex discrimination does ***not allow institutions to evade liability by citing financial difficulties***.
- *Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009): The Sixth Circuit upheld that ***financial constraints do not excuse a failure to comply with Title IX*** requirements regarding equitable treatment of male and female students.
- *Kelley v. Board of Trustees*, 35 F.3d 265 (7th Cir. 1994): The University of Illinois faced allegations of violating Title IX after eliminating the men's swimming program while retaining the women's program. The university had previously been found in violation of Title IX for denying equal athletic opportunities. To address budget deficits, the university decided to cut certain programs, including men's swimming. Legal counsel advised against cutting the women's program to avoid further Title IX violations. The court ultimately upheld the university's decision to cut the men's program, emphasizing that the institution acted prudently within the framework of Title IX regulations and policy interpretations.

### Remedy: Reinstate Women's Swimming / Provide Equal Treatment & Benefits

In your response to us dated July 2, 2025, you, President Armstrong, expressed a commitment to gender equity and indicated that a compliance plan would be forthcoming. To date, no such plan has been shared addressing the sex discrimination issues we raised, including recruiting budgets, facilities, athletic scholarships, and harassment. We respectfully request that Cal Poly promptly

reinstate its Women's Swimming and Diving team, and meet with us to engage in good-faith negotiations aimed at implementing both immediate and long-term solutions.

We urge Cal Poly to reinstate the Women's Swimming & Diving Team without further delay. Please respond to this letter as soon as possible and, in any event, no later than **Friday, August 7**, 2025. We remain committed to resolving this matter collaboratively and in full compliance with federal and state law—without the need for litigation or federal enforcement by the Department of Education.


Sincerely,

*Leigh Ernst Friestedt*
_____
**Leigh Ernst Friestedt**
Equity IX, LLC

*Nancy Hogshead*
_____
**Nancy Hogshead**
Champion Women


Cc:    Dr. Mildred Garcia (Chancellor of the California State University)
       Robin Webb (General Counsel)
       Don Oberhelman (Athletic Director)
       Kaitlyn Blakey (Director, Civil Rights & Title IX Coordinator)

# Presidential Documents

Executive Order 14322 of July 24, 2025

## Saving College Sports

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* College sports are a uniquely American institution that provide life-changing educational and leadership-development opportunities to more than 500,000 student-athletes through almost $4 billion in scholarships each year. College athletics also provide substantial support to local economies and form an indelible part of family activities, pastimes, and culture in many communities.

While major college football games can draw tens of millions of television viewers and attendees, they feature only a very small sample of the many athletes who benefit from the transformational opportunities that college athletics provide. Sixty-five percent of the 2024 United States Olympic Team members were current or former National Collegiate Athletic Association (NCAA) varsity athletes, and approximately seventy-five percent were collegiate athletes. The 2024 United States Olympic Team earned 126 total medals, leading the overall medal count for the eighth consecutive Summer Olympic Games.

Beyond driving our unrivaled success in international competition, college athletes are more likely to report better outcomes in important respects during college and after graduation. A substantial majority of female executives at the largest American companies participated in sports during adolescence, many at the high school or collegiate level, and examples of business leaders and former Presidents who played college sports are legion. It is no exaggeration to say that America's system of collegiate athletics plays an integral role in forging the leaders that drive our Nation's success.

Yet the future of college sports is under unprecedented threat. Waves of recent litigation against collegiate athletics governing rules have eliminated limits on athlete compensation, pay-for-play recruiting inducements, and transfers between universities, unleashing a sea change that threatens the viability of college sports. While changes providing some increased benefits and flexibility to student-athletes were overdue and should be maintained, the inability to maintain reasonable rules and guardrails is a mortal threat to most college sports.

To illustrate, following a 2021 antitrust ruling from the United States Supreme Court striking down NCAA restrictions, the NCAA changed its rules to permit players to receive compensation for their name, image, and likeness (NIL) from third parties. But guardrails designed to ensure that these were legitimate, market-value NIL payments for endorsements or similar services, rather than simply pay-for-play inducements, were eliminated through litigation. Other limits on player transfers among schools were also taken down through litigation.

This has created an out-of-control, rudderless system in which competing university donors engage in bidding wars for the best players, who can change teams each season. Meanwhile, more than 30 States have passed their own NIL laws in a chaotic race to the bottom, sometimes to gain temporary competitive advantages for their major collegiate teams. As a result, players at some universities will receive more than $50 million per year, mostly for the revenue-generating sports like football. Entering the 2024 season, players on the eventual college football national champion

team were being paid around $20 million annually. By the 2025 season, football players at one university will reportedly be paid $35–40 million, with revenue-sharing included.

This not only reduces competition and parity by creating an oligarchy of teams that can simply buy the best players—including the best players from less-wealthy programs at the end of each season—but the imperative that university donors must devote ever-escalating resources to compete in the revenue-generating sports like football and basketball siphons away the resources necessary to support the panoply of non-revenue sports. Absent guardrails to stop the madness and ensure a reasonable, balanced use of resources across collegiate athletic programs that preserves their educational and developmental benefits, many college sports will soon cease to exist.

A national solution is urgently needed to prevent this situation from deteriorating beyond repair and to protect non-revenue sports, including many women's sports, that comprise the backbone of intercollegiate athletics, drive American superiority at the Olympics and other international competitions, and catalyze hundreds of thousands of student-athletes to fuel American success in myriad ways.

Attempting to create some guardrails and shelter from litigation, colleges have adopted a new regime, deciding to pay athletes directly and simultaneously limit the total number of athletes on their campuses. Given that the new roster limits, by exceeding the scholarship limits they replace, will increase the potential number of scholarships available in many sports, this opportunity must be utilized to strengthen and expand non-revenue sports. Simultaneously, the third-party market of pay-for-play inducements must be eliminated before its insatiable demand for resources dries up support for non-revenue sports. Otherwise, a crucial American asset will be lost.

It is the policy of my Administration that all college sports should be preserved and, where possible, expanded. My Administration will therefore provide the stability, fairness, and balance necessary to protect student-athletes, collegiate athletic scholarships and opportunities, and the special American institution of college sports. It is common sense that college sports are not, and should not be, professional sports, and my Administration will take action accordingly.

**Sec. 2**. *Protecting and Expanding Women's and Non-Revenue Sports and Prohibiting Third-Party Pay-for-Play Payments.* (a) It is the policy of the executive branch that opportunities for scholarships and collegiate athletic competition in women's and non-revenue sports must be preserved and, where possible, expanded, including specifically as follows with respect to the 2025–2026 athletic season and future athletic seasons:

(i) collegiate athletic departments with greater than $125,000,000 in revenue during the 2024–2025 athletic season should provide more scholarship opportunities in non-revenue sports than during the 2024–2025 athletic season and should provide the maximum number of roster spots for non-revenue sports permitted under the applicable collegiate athletic rules;

(ii) college athletic departments with greater than $50,000,000 in revenue during the 2024–2025 athletic season should provide at least as many scholarship opportunities in non-revenue sports as provided during the 2024–2025 athletic season and should provide the maximum number of roster spots for non-revenue sports permitted under the applicable collegiate athletic rules; and

(iii) college athletic departments with $50,000,000 or less in revenue during the 2024–2025 athletic season or that do not have any revenue-generating sports should not disproportionately reduce scholarship opportunities or roster spots for sports based on the revenue that the sport generates.

(b) It is the policy of the executive branch that any revenue-sharing permitted between universities and collegiate athletes should be designed and

implemented in a manner that preserves or expands scholarships and collegiate athletic opportunities in women's and non-revenue sports.

(c) To preserve the critical educational and developmental benefits of collegiate athletics for our Nation, it is the policy of the executive branch that third-party, pay-for-play payments to collegiate athletes are improper and should not be permitted by universities. This policy does not apply to compensation provided to an athlete for the fair market value that the athlete provides to a third party, such as for a brand endorsement.

(d) Within 30 days of the date of this order, the Secretary of Education, in consultation with the Attorney General, the Secretary of Health and Human Services, the Secretary of Education, and the Chairman of the Federal Trade Commission, shall develop a plan to advance the policies set forth in subsections (a)–(c) of this section through all available and appropriate regulatory, enforcement, and litigation mechanisms, including Federal funding decisions, enforcement of Title IX of the Education Amendments Act of 1972, prohibiting unconstitutional actions by States to regulate interstate commerce, and enforcement of other constitutional and statutory protections, and by working with the Congress and State governments, as appropriate.

**Sec. 3.** *Student-Athlete Status.* The Secretary of Labor and the National Labor Relations Board shall determine and implement the appropriate measures with respect to clarifying the status of collegiate athletes, including through guidance, rules, or other appropriate actions, that will maximize the educational benefits and opportunities provided by higher education institutions through athletics.

**Sec. 4.** *Legal Protections for College Athletics from Lawsuits.* (a) The Attorney General and the Chairman of the Federal Trade Commission shall work to stabilize and preserve college athletics through litigation, guidelines, policies, or other actions, as appropriate, by protecting the rights and interests of student-athletes and the long-term availability of collegiate athletic scholarships and opportunities when such elements are unreasonably challenged under antitrust or other legal theories.

(b) Within 60 days of the date of this order, to advance the purposes of subsection (a) of this section, the Attorney General and the Chairman of the Federal Trade Commission shall:

(i) review, and as necessary revise, litigation positions, guidelines, policies, or other actions; and

(ii) develop a plan to implement appropriate future litigation positions, guidelines, policies, or other actions.

**Sec. 5.** *Protecting Development of the United States Olympic Team.* The Assistant to the President for Domestic Policy and the Director of the White House Office of Public Liaison shall consult the United States Olympic and Paralympic Committee and other appropriate organizations of American athletes about safeguarding the integral role and competitive advantage that American collegiate athletics provide in developing athletes to represent our Nation in international athletic competitions.

**Sec. 6.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Education.

THE WHITE HOUSE,
*July 24, 2025.*

[FR Doc. 2025–14392
Filed 7–28–25; 11:15 am]
Billing code 4000–01–P

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

SOPHIA MYERS, KARA KAY, RYANN          §
ALLISON, ELAINA AMADOR, BERKLEE        §
ANDREWS, and MEAGAN LEDBETTER,         §
Individually and on Behalf of All Others §
Similarly Situated,                     §
                                        §
        *Plaintiffs*,                   §          CIVIL ACTION NO. 9:25-CV-00187
                                        §          JUDGE MICHAEL J. TRUNCALE
                                        §
VS.                                     §
                                        §
STEPHEN F. AUSTIN STATE UNVIERSITY,     §
a member of THE UNIVERSITY OF TEXAS     §
SYSTEM,                                 §
                                        §
        *Defendant*.                    §
                                        §

## ORDER GRANTING PLAINTIFFS' EMERGENCY
## MOTION FOR PRELIMINARY INJUNCTION

Before the Court is Plaintiffs Sophia Myers, Kara Kay, Ryann Allison, Elaina Amador, Berklee

Andrews, and Megan Ledbetter's *Emergency* Motion for Preliminary Injunction. [Dkt. 2]. For the

following reasons, the Court **GRANTS** the motion.

## I.      BACKGROUND

Plaintiffs, female student-athletes at Stephen F. Austin State University ("SFA"), filed this class

action lawsuit against SFA for alleged violations of Title IX of the Education Amendments of 1972.

[Dkt. 1]. They allege that SFA discriminated against them on the basis of sex by depriving them of equal

opportunities to participate in varsity intercollegiate athletics. *Id.*

On May 22, 2025, SFA announced its elimination of the varsity women's beach volleyball and

bowling teams, in addition to the men's and women's golf teams. [Dkt. 2 at 5]. This belated notification

left Plaintiffs scrambling to arrange alternative plans for the upcoming academic year. According to the

athletes, the transfer windows for women's bowling, beach volleyball, and golf had already closed or were

imminently closing after the announcement, with many alternative teams already having filled rosters and

allocated their scholarship budgets.[1] [Dkts. 2-1 at ¶ 13 (Declaration of Sophia Myers); 2-2 at ¶ 11 (Declaration of Kara Kay); 2-3 at ¶ 14 (Declaration of Ryann Allison); 2-5 at ¶ 9 (Declaration of Berklee Andrews); 2-6 at ¶ 11 (Declaration of Meagan Ledbetter)]. Many of the Plaintiffs are rising seniors who were faced with the "impractical reality" of transferring their academic credits so late in their college careers, thereby setting them back further in their education. [Dkts. 2-2 at ¶ 11; 2-3 at ¶ 14].

Finding no alternatives, Plaintiffs sought legal counsel who wrote to SFA informing the school of its Title IX allegations on June 5, 2025. [Dkt. 2 at 6–7]. Settlement negotiations fell through and SFA informed Plaintiffs it would not reinstate their teams on June 27, 2025. *Id.* at 7; [Dkt. 14 at 12]. Shortly thereafter, on June 30, 2025, Plaintiffs filed their Complaint and the Present motion. [Dkts. 1, 2]. The Court held a hearing on the motion on July 30–31, 2025.

In their motion, Plaintiffs seek an order preserving the women's beach volleyball, bowling, and golf team, in addition to all other women's varsity teams at SFA during the pendency of this case. [Dkt. 2 at 5]. In response, SFA argues that Plaintiffs' motion does not meet the substantive requirements for a preliminary injunction. [Dkt. 10].

## II.    LEGAL STANDARDS

### A. Preliminary Injunction

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citing *Planned Parenthood of Hous. & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)). The last two elements merge when the Government is an opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

---

[1] Some of Plaintiffs' teammates were able to transfer successfully.

"A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation marks and citation omitted). Nevertheless, a movant "is not required to prove [its] case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). However, when a plaintiff seeks a mandatory injunction, as here, he "bears the burden of showing a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam)).

The purpose of a preliminary injunction is "to preserve the relative positions of the parties" until the merits can be determined. *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Camenisch*, 451 U.S. at 395); *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023), *vacated on other grounds*, 144 S. Ct. 480 (2023) (mem. op.). "The 'status quo' to be restored is 'the last peaceable uncontested status existing between the parties before the dispute developed.'" *Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) (quoting Charles Alan Wright & Arthur R. Miller, 11A Federal Practice & Procedure § 2948 (3d ed. 2013)). As articulated by the Fifth Circuit:

> If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties by the issuance of a mandatory injunction or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (citations omitted).

Finally, the decision of whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## B. Title IX Framework and Relevant Analysis

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program

3

or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Related to enforcement provisions, Title IX specifically "authorizes each agency awarding federal financial assistance to any education program to promulgate regulations 'ensuring that aid recipients adhere to § [1681(a)'s] mandate.'" *Pederson v. La. State Univ.*, 213 F.3d 858, 877 (5th Cir. 2000) (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514 (1982)). As a result of the enforcement mandate, the Department of Education ("DOE") utilized its statutory authorization to promulgate regulations governing the operation of federally funded programs, including athletics. *Id.* at 877.

Of relevance to athletics programs is DOE's 1975 implementing regulation. 34 C.F.R. § 106.41. The regulation provides ten factors for an athletic director to consider whether equal opportunities in athletics are available to men and women:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

*Id.* § 106.41(c). Notably, "violations of Title IX in the area of athletics are often divided into effective accommodation claims and equal treatment claims," where the former claim is governed by the first factor and the latter claim is governed by the subsequent nine factors.[2] *Pederson*, 213 F.3d at 865 n.4; *see also*

---

[2] SFA suggests that the Court should consider all ten factors together because "the regulatory text requires consideration of *all* ten factors" because the text does not suggest "that a weakness of one factor cannot be offset by strength in another factor." [Dkt. 10 at 12]. However, the Fifth Circuit has long recognized the division of the factors into two separate claims, and Plaintiffs bring a claim only under the accommodation portion described in § 106.41(c)(1). *Pederson*, 213 F.3d at 865 n.4. The Court finds that this distinction makes sense. In the Court's view, it would be illogical to find no Title IX violation if a school gives women unequal accommodations of their interests and abilities but treats the lesser-accommodated athletes equally. For example, assume the undergraduate population is 50/50 men-to-women, but 70% of the athletics opportunities are provided to men and only 30% of the opportunities are given to women despite the women's interests and abilities to play 50% of the sports. The mere equality in publicity, training facilities, allowances, and scheduling between men and women does not cure the fact that women are nevertheless being provided with unequal opportunities to enjoy the benefits of the school's athletics program. This directly flies in the face of Title IX's prohibition against denying women the benefits of educational activities on the basis of sex.

*Niblock v. Univ. of Ky.*, No. CV 5:19-394-KKC, 2024 WL 4891025, at *2 (E.D. Ky. Oct. 28, 2024) ("Gender discrimination claims in college athletics fall into two categories based on the § 106.41(c) factors: effective accommodation claims focus on the first factor, and equal treatment claims focus on the other nine factors."). Here, Plaintiffs allege gender discrimination in violation of Title IX under the accommodation claim, governed by 34 C.F.R. § 106.41(c)(1). *See* [Dkt. 1 at ¶ 127].

To determine whether SFA's actions complied with legal requirements, Plaintiffs argue that the Court should rely upon the Department of Education's 1979 Policy Interpretation and 1996 Policy Guidance, which articulates a three-part test for equal participation opportunities under Title IX. *See* 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979) [hereinafter "1979 Policy Interpretation"]; Office of Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test*, https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html (Jan. 16, 1996) [hereinafter "1996 Clarification Letter"]. In contrast, SFA argues that the three-part test should not apply because, pursuant to the Supreme Court's decisions in *Loper Bright* and *Kisor*, the Court should analyze the plain meaning of Title IX and the 1975 Title IX implementing regulations. *See Loper Bright v. Raimondo*, 603 U.S. 369 (2024); *Kisor v. Wilkie*, 588 U.S. 558 (2019).

### i. *Loper Bright* and Interpretations of Ambiguous Statutes

A federal agency cannot act without congressional authorization. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). It cannot confer power upon itself. *Id.* "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374–75. Under the Supreme Court's decision in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), for decades courts have sometimes been required "to defer to 'permissible' agency interpretations of the statutes those agencies administer—even when a reviewing court reads the statute differently." *Loper Bright*, 603 U.S. at 378.

The Supreme Court has done away with this requirement: "*Chevron* is overruled." *Id.* at 412. The Court made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency

has acted within its statutory authority." *Id.* The exercise of such independent judgment, the Court explained, is rooted in the "solemn duty" imposed on courts under the Constitution to "say what the law is." *Id.* at 385 (first citing *United States v. Dickson*, 40 U.S. 141, 15 Pet. 141, 10 L.Ed. 689 (1841) (Story, J.); and then citing *Marbury v. Madison*, 5 U.S. 137 (1803)).

The exercise of independent judicial judgment to decide legal questions, the Court observed, is also embodied in the APA, which "directs that '[t]o the extent necessary to decision and when presented, [a] reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Loper Bright*, 603 U.S. at 391 (quoting 5 U.S.C. § 706). Likewise, under the APA, a reviewing court is required to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* (quoting § 706(2)(A)). "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.* at 391–92.

The *Loper Bright* Court recognized that a statute may authorize an agency to exercise a degree of discretion, and "some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 394. The Court went on to instruct that, when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. Courts "fulfill[ ] that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (cleaned up). "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts." *Id.*

Here, Plaintiffs argue that the *Loper Bright* decision does not apply to the present case for two reasons. First, the Supreme Court did not "call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to

6

statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412. Plaintiffs, in part, rely upon a 2000 Fifth Circuit case that concluded that Louisiana State University violated Title IX by eliminating its softball team by applying the plain text of Title IX, the Department of Education regulations, and policy interpretation. *See Pederson*, 213 F.3d 858. In fact, *Pederson* did not rely upon *Chevron*, making the extent of *Loper Bright*'s holding inapplicable.[3] Instead, *Pederson* utilized the three-part test articulated in the 1979 Policy Interpretation to determine whether the university failed to provide female athletes equal accommodation under the first factor of 34 C.F.R. § 106.41(c)(1), a *regulation* not the statute. *Id.* at 879.

Second, Plaintiffs argue that *Chevron*—which *Loper Bright* overruled—applied to courts' deference to agency interpretations of ambiguous *statutes* not the agency's own regulations. *Chevron*, 467 U.S. at 844. SFA argues that Title IX itself is unambiguous because Plaintiffs must prove that the university excluded them from participation in, denied them the benefits of, or discriminated against them "on the basis of sex," and that they failed to demonstrate that their programs were terminated because they are women. [Dkt. 10 at 14]. SFA provides only one precedent for the proposition that Title IX is unambiguous. *Peltier v. Charter Day School, Inc.*, 37 F. 4th 104 (4th Cir. 2022). That case, however, does not apply to the present case because the issue was limited to whether a public school's sex-based dress code violates Title IX. *Id.* at 129 n.20. The Fourth Circuit found that the statute unambiguously covered these dress codes because it was not included in the list of exclusions in the statute. *Id.* Here, it is undisputed that athletic programs are covered by the statute.[4]

---

[3] SFA did not cite any Fifth Circuit cases in the sports context holding otherwise since *Loper Bright*, and the Court in its own research could not find new case law.

[4] Even if the Court were to analyze Title IX solely on the basis of the text, it finds that SFA discriminated against its female student-athletes because of their sex by failing to provide them equal opportunities to enjoy the benefits of educational activities. Although SFA argues that it cut the women's beach volleyball, bowling, and golf teams because of financial reasons, other evidence demonstrates that sex played a role in its determination. For example, Athletic Director Michael McBroom stated that the reason why they cut three women's teams and only one men's team was to remain in compliance with NCAA regulations, which require the university to sponsor sixteen teams, which can broken up into, for example, eight women's teams and six men's teams. This essentially means that gender was a consideration in his decision to cut the teams. The evidence shows that only one men's team was cut. For the Court, this is sufficient at this stage to find a likelihood of success on the merits if looking solely at the statutory text.

### ii.   *Kisor* and Interpretation of Ambiguous Regulations

SFA primarily disputes the proper interpretation of the implementing regulation, 34 C.F.R. § 106.41(c). In *Kisor v. Wilkie*, the Supreme Court made clear that an agency has "leeway" to interpret its own regulatory language if "genuinely ambiguous" and is entitled to "fill out the regulatory scheme Congress has placed under its supervision." 588 U.S. at 580.  Thus, the DOE's interpretation of its own implementing regulation is entitled to deference so long as the Court's independent assessment finds the construction reasonable and not in conflict with Congressional intent.  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005); *Enron Oil & Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992).[5]

In aiding the Court's interpretation, the Court relies upon out-of-circuit cases because the courts within the Fifth Circuit have not tackled this particular issue since the Supreme Court issued *Kisor*. Since *Kisor*, many courts have continued interpreting § 106.41(c) under the DOE's 1979 Policy Interpretation and/or 1996 Clarification Letter. *See Balow v. Mich. State Univ.*, 24 F.4th 1051 (6th Cir. 2022); *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782 (8th Cir. 2021); *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021); *Allen v. Escanaba Area Pub. Schs.*, -- F. Supp. 3d --, 2025 WL 1328799 (W.D. Mich. May 6, 2025); *Soule v. Conn. Ass'n of Schools*, 755 F. Supp. 3d 172 (D. Conn. 2024); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499 (M.D. Pa. 2022); *Lazor v. Univ. of Conn.*, 560 F. Supp. 3d 673 (D. Conn. 2021); *Schroeder v. Univ. of Or.*, 6:23-CV-01556-MC, 2025 WL 1019760 (D. Or. Apr. 4, 2025); *Anders v. Cal. State Univ., Fresno*, 1:21-cv-179-AWI-BAM, 2021 WL 1564448 (E.D. Cal. Apr. 21, 2021).

Of these cases, the only court to specifically wrestle with the *Kisor* analysis was the Eastern District of Kentucky in *Niblock v. University of Kentucky*, No. 5:19-CV-394-KKC, 2023 WL 4997678 (E.D. Ky. Aug. 4, 2023). The court concluded that the policy interpretations were entitled to deference under *Kisor* because the phrase "equal athletic opportunity" is inherently ambiguous:

---

[5] The Court finds that this analysis is consistent with the spirit of *Loper Bright*'s emphasis on separation of powers and the judiciary's role to say what the *law* is. To interject the Court's own reading of the Executive Branch's interpretations of its own regulations would exceed its limited role. *Kisor* strikes a fine balance between preserving separation of powers and checking agency power by ensuring, among other reasons, that the agency's interpretation is reasonable.

[T]his Court finds that the regulation is in fact ambiguous. The term "equal athletic opportunity" is inherently ambiguous—so much so that the regulation then lists ten (non-exhaustive) factors that could help determine what "equal opportunity" even means. As to those factors, the terms "effectively accommodate the interests and abilities" offer further ambiguity. These are words "written at a high level of abstraction and, as a result ... ambiguous." *Chalenor*, 291 F.3d at 1047; *see also Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 795 (8th Cir. 2021) ("[The policy clarifications] represent authoritative interpretations of an ambiguous rule that are entitled to deference from the court."); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) ("[Later policy clarifications] reflect reasonable agency interpretations of ambiguities in its own regulation, and there is no reason to think that the agency's interpretations do not reflect its fair and considered judgment on the matter in question.") (cleaned up).

*Id.* at *2. Furthermore, the Eastern District of Kentucky found that the 1979 Policy Interpretation was reasonable because the university failed to cite any case law suggesting that the interpretation was unreasonable. *Id.* Similarly, here, SFA's only argument for unreasonableness was that the policy interpretations "substantial proportionality" prong essentially creates the long-term effect of a quota. [Dkt. 10 at 11]. Not only does SFA fail to cite supporting case law, the Fifth Circuit in *Pederson* rejected this argument. 213 F.3d at 878. Finally, the *Niblock* court found that the 1979 Policy Interpretation was entitled to deference because, among other reasons, (1) the interpretation is long-standing department policy, (2) Congress explicitly delegated the DOE with the responsibility of prescribing standards for athletic programs under Title IX, and (3) the Policy Interpretation does not create "unfair surprise" to educational institutions because of its flexible approach to regulation instituted after the Department found that the regulation was ambiguous. *Id.* at *2–3. The Court finds, for the same reasons articulated here, that the 1996 Clarification Letter also meets the *Kisor* requirements.

The Court agrees with *Niblock*'s comprehensive analysis and thereby adopts it in the absence of Supreme Court and Fifth Circuit precedence to the contrary. Furthermore, the Court, performing an independent assessment, finds the DOE's construction reasonable and not in conflict with Congressional intent. Accordingly, the Court will analyze Plaintiffs' Title IX claims under the guidance provided by the three-prong test articulated by the DOE.[6]

---

[6] SFA also argues that the Court should apply an Equal Protection Clause analysis to Plaintiffs' Title IX claims because Title VI—after which Title IX was modeled—employs an equal protection analysis. [Dkt. 10 at 15–19]. The Court

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

When considering likelihood of success on the merits, courts look to "standards provided by the substantive law." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). Plaintiffs' sole cause of action arises under Title IX's effective-accommodation provision. *See* [Dkt. 1].

Under the athletic regulations, a university "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). In determining whether equal opportunities are provided, a court must consider "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1). The 1979 Policy Interpretation put forth a three-prong test to determine whether a university effectively accommodated the interests and abilities of female athletes:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2) Where the numbers of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed. Reg. at 71,418. An institution complies with Title IX if it can demonstrate any part of this three-prong test. *Pederson*, 213 F.3d at 879 ("As a matter of law, a Title IX violation 'may be shown by proof of a substantial violation in *any one* of the three major areas of investigation set out in the Policy Interpretation.'" (quoting *Roberts v. Colo. State Univ.*, 814 F. Supp. 1507, 1511 (D. Colo. 1993), *aff'd in part & rev'd in part sub nom.*, *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th Cir. 1993))).

---

declines to entertain this suggestion because SFA cites no case law suggesting that the analyses are the same and coextensive.

### i. Substantially Proportionate

The first prong requires an analysis of "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." 44 Fed. Reg. at 71,418. Opportunities are substantially proportionate "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." 1996 Clarification Letter; *see also Balow*, 24 F.4th at 1061 ("[A] viable team is not an average one, but is instead one 'for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.'" (quoting 1996 Clarification Letter)).

Here, Plaintiffs' expert, Dr. Donna Lopiano determined that women currently make up 63% of SFA's undergraduate population and receive only 45.6% of the athletic opportunities. [Dkt. 2-8 at 21]. According to Dr. Lopiano's calculations, SFA needs to add 223 varsity intercollegiate athletic opportunities for women to achieve proportionality. *Id.* Furthermore, "if the beach volleyball, bowling, and men's and women's golf teams are eliminated and the other facts stay the same, the female athlete participation gap will increase to 245." *Id.*[7] In fact, SFA's own 2024 Title IX Summary report prepared by Helen Grant in January 2025 stated: "SFA is not providing male and female athletics participation rates in substantial proportionality to the male and female undergraduate enrollment rates." [Dkt. 10-1 at 3].

SFA argues that the Court should not rely on Dr. Lopiano and instead rely upon Michael McBroom, the Director of Athletics at SFA, who stated that "SFA's student enrollment was 36% male and 64% female, with "555 student-athletes (286 male and 269 female)." [Dkt. 10-2 at 3]. McBroom

---

[7] SFA states that the Court should not rely on this data because the data submitted to the DOE under the Equity in Athletics Disclosure Act ("EADA") was not available at this time. Instead, Dr. Lopiano used the SFA common data set retrieved from public rosters and information for the 2024–2025 school year in her report. *See* [Dkt. 2-8 at 21]. She also did not use the data from 2023–2024 because they were very unusual and demonstrated an even greater gender gap than the data on which she relied. *Id.* at 20–21. In employing this method, Dr. Lopiano actually gave SFA the benefit of the doubt.

testified that he got those numbers from a university website link.[8] He factored in the cheer and dance teams for the first time in SFA history.[9] Although SFA presented evidence that the addition of cheer would bring it in further compliance with Title IX, the university was not counting cheer as a sport at the time they discontinued three women's teams. *See* [Dkt. 10-1 at 11 (Helen Grant's Report) ("According to the latest information from the National Federation of State High School Associations (NFHS), there are three interscholastic sports (Competitive Cheer, Swimming & Diving, and Wrestling) for girls in the state of Texas, but not on the intercollegiate level at SFA."); *id.* at 36 (table of the active sports during the 2024–2025 academic year, which excluded cheer). Thus, *at the time they cut beach volleyball, bowling, and golf*, SFA was nowhere near close to substantial compliance.

However, even using the cheer team numbers, Dr. Lopiano prepared a supplemental report in response to the addition of cheer and dance, which demonstrates a female participation gap of 71 students. [Dkt. 14-1 at 29]. SFA itself noted that the average size of a women's team is 22.4 players. [Dkt. 10 at 21]. Absent the result of a survey (*see infra* Section III.A.iii), a gap of 71 does not create a substantially proportionate opportunity because the gap is large enough to field additional viable athletic teams, including the beach volleyball team, bowling team, and golf team, which require 10, 6, and 5 players, respectively. *Id.* at 24–25. *See, e.g., Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1094–101 (S.D. Iowa 2020) (holding that the estimated participation gap of 47 before teams were cut was sufficient to show likelihood of success on the merits of the plaintiffs' Title IX claim for inequitable participation opportunities); *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 111–12 (D. Conn. 2010) (finding the university out of compliance with a participation gap of 38 women), *aff'd*, 691 F.3d 85 (2d Cir. 2012).

Accordingly, the Court finds Plaintiffs present a likelihood of success on the merits that SFA is not incompliance with the first prong of the three-part test.

---

[8] In the Court's review of this link, it could not find the athletics ratio numbers utilized by McBroom.

[9] One of the primary arguments between the parties at the hearing and in their briefing is whether cheer and dance should be considered "sports" for purposes of the Title IX evaluation. At this stage, the Court does not find that determination relevant because SFA did not consider cheer a varsity athletic at the time they cut the women's beach volleyball, bowling, and golf teams.

### ii. History and Continuing Practice of Program Expansion

Here, SFA failed to brief its compliance on this prong. Therefore, the Court finds that it conceded its failure to meet this test, and it will not address it further. *See United States v. Martinez,* 263 F.3d 436, 438 (5th Cir. 2001) ("Generally speaking, a defendant waives an issue if he fails to adequately brief it."); *see also* E.D. Tex. Local R. CV-7(c) ("The briefing shall contain a concise statement of the reasons in support of the motion and citation of authorities upon which the movant relies.").

### iii. Effective Accommodation of Interests and Abilities

Finally, the Court must determine "whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." 44 Fed. Reg. at 71,418. In determining compliance with this prong, the DOE considers three questions: (1) whether there is unmet interest in a particular sport; (2) whether there is sufficient ability to sustain a team in the sport; and (3) whether there is a reasonable expectation of competition for the team. 1996 Clarification letter; *see also S.A. v. Sioux Falls Sch. Dist.*, No. 4:23-CV-04139, 2023 WL 6794207, at *10 (D.S.D. Oct. 13, 2023). Courts and universities consider several factors like whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students; whether a viable team for the underrepresented sex recently was eliminated; multiple indicators of interest; multiple indicators of ability; and frequency of conducting assessments. 1996 Clarification Letter. When a university has recently eliminated a viable team for the underrepresented sex, there is a "presumption that the institution is not in compliance with Prong Three that the institution can rebut through strong evidence that interest, ability, or competition no longer exists." See *Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 858 (D. Minn. 2019), *aff'd in part, vac'd in part, rev'd in part on other grounds*, 16 F.4th 577 (8th Cir. 2021); *see also* 1996 Clarification Letter.

Here, SFA attempts to rebut this presumption by demonstrating that (1) only 38 NCAA Division 1 universities like SFA sponsor bowling; (2) bowling "is also not sufficiently popular in Texas, as is not considered a UIL sport in Texas; (3) the bowling team must travel across the country to compete because

there is a lack of local competition; and (4) only 12 beach volleyball teams are in the Midsouth Region that serves SFA. [Dkt. 10 at 22–23]. None of this evidence to rebut the presumption negates the interest *of the SFA student body or admitted students* or that the university attempted to assess their students or prospective students about the viability of these programs. This is also supported by their Title IX compliance report that states: "SFA could argue compliance with Test 3 with the current sports offerings. However, that may be difficult to confirm without conducting an Interest Survey." [Dkt. 10-1 at 4]. SFA has not conducted an interest survey of its undergraduate population or admitted students. Finally, Athletic Director Michael McBroom admitted that SFA does not satisfy this prong because the school had an interest and ability to field the women's beach volleyball, bowling, and golf teams.

Accordingly, the Court finds that Plaintiffs demonstrated a likelihood of success that SFA is not in compliance with Title IX on the third prong.

### B. Irreparable Injury

Irreparable harm requires a showing that (1) the harm to the plaintiff is imminent, (2) the injury would be irreparable, and (3) that the plaintiff has no other adequate legal remedy. *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). "[W]hen a civil rights statute is violated, 'irreparable injury should be presumed from the very fact that the statute has been violated.'" *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) (citing *United States ex rel. Mitchell v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969)); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation.").

"In general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim." *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (citing *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009); *Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992), *aff'd*, 991 F.2d 888 (1st Cir. 1993); *Favia v. Ind. Univ. of Penn.*, 812 F. Supp. 578 (W.D. Pa. 1993), *aff'd*, 7 F.3d

332 (3d Cir. 1993); *Choike v. Slippery Rock Univ.*, Civil Action No. 06-622, 2006 WL 2060576 (W.D. Pa. July 21, 2006); *Barrett v. W. Chester Univ. of Penn.*, No. Civ.A. 03- CV-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003)).

Dr. Lopiano believes that it could take three to four years for the university to reinstate competitive teams if they are not immediately reinstated. [Dkt. 2-8 at 28–30]. She also indicated that academic harm may occur to transfer students because the transferee universities may not take all the credits SFA offers, thereby prolonging the women's education timelines. *Id.* at 30. There also may be financial harm where the athletes who transfer cannot get athletic aid. *Id.* at 31. Furthermore, Plaintiffs stated that their transfer prospects diminished, if not already foreclosed, by the time SFA eliminated their teams, thereby depriving them of an opportunity to continue playing a sport to which they dedicated years of hard work. [Dkts. 2-1 at ¶ 13; 2-3 at ¶ 14; 2-4 at ¶ 9; 2-5 at ¶ 9]. At least one of the Plaintiffs are rising seniors who were faced with the "impractical reality" of transferring their academic credits so late in their college careers, thereby setting them back further in their education. [Dkts. 2-2 at ¶ 11; 2-3 at ¶ 14].

SFA argues that Plaintiffs do not suffer from irreparable injury because their harm "is both speculative and self-inflicted." [Dkt. 10 at 25]. This callous assertion stems from its claim that Plaintiffs delayed in filing the suit and from the fact that some of their teammates already transferred. *Id.* at 24. First, the Court does not find that Plaintiffs delayed in filing their lawsuit. On May 22, 2025, SFA announced its elimination of the varsity women's beach volleyball and bowling teams, in addition to the men's and women's golf teams. [Dkt. 2 at 5]. Plaintiffs sought legal counsel who wrote to SFA informing the school of its Title IX allegations on June 5, 2025, two weeks later. *Id.* at 6–7. Settlement negotiations fell through and SFA informed Plaintiffs it would not reinstate their teams on June 27, 2025. *Id.* at 7; [Dkt. 14 at 12]. Shortly thereafter, on June 30, 2025, Plaintiffs filed their Complaint and the Present motion. [Dkts. 1, 2]. Nor can the Court say their injury was "self-inflicted" when the athletes were forced to make an impossible decision between remaining at SFA with no opportunity to play their sport or to transfer and potentially prolong their academic careers and not receive the same financial compensation.

15

For these reasons, the Court finds that Plaintiffs demonstrated a substantial threat of irreparable harm.

## C. Balance of Hardships and Public Interest

Finally, a court must weigh "the competing claims of injury" and considers "the effect on each party of the granting or withholding of the requested relief," paying close attention to the public consequences of granting an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

SFA argues that reinstatement of the women's bowling, beach volleyball, and golf teams would result in approximately $1 million in financial expenses annually. [Dkt. 10 at 27]. However, it failed to articulate *how* that burden overweighs the irreparable harm Plaintiffs will suffer without the injunction. *Id.* Gina Oglesbee, Senior Vice President for Organizational Effectiveness at SFA, testified that athletics has approximately a $20 million budget and that the school has a budget deficit. She admitted, however, that the university's cash reserve is not on the verge of collapse. Additionally, as noted by Plaintiffs, the financial harm that SFA claimed caused its elimination of the women's teams were exacerbated by its voluntary decision to opt into a settlement that contained a revenue-sharing model that permits the school to share up to $20.5 million with its athletes. [Dkts. 10-2 at 3; 2-1 at Ex. A]. Testimony from the student athletes and coaches represented a strong belief that their teams could be fielded if the Court instated an injunction. Based on this evidence, the Court finds that the financial burden self-imposed by SFA does not outweigh the harm suffered by Plaintiffs. Therefore, the Court finds that Plaintiffs satisfied their burden for issuance of a preliminary injunction.[10]

---

[10] SFA asks the Court that, in the event it finds injunctive relief is warranted, it should afford SFA an opportunity to create a plan to demonstrate compliance. [Dkt. 10 at 28–29]. The Court declines to provide SFA with this opportunity, especially considering it had the chance to become compliant with Title IX in January when it received the report indicating it was

### IV.    CONCLUSION

It is therefore **ORDERED** that Plaintiffs' *Emergency* Motion for Preliminary Injunction [Dkt. 2] is hereby **GRANTED**.

It is further **ORDERED** that Defendant Stephen F. Austin State University preserve the women's beach volleyball team, women's bowling team, women's golf team, and all other women's varsity teams at the University while this case is pending.

**SIGNED this 1st day of August, 2025.**

*Michael J. Truncale*
_____
Michael J. Truncale
United States District Judge

---

not in compliance with the statute. [Dkt. 10-1]. Instead of seeking compliance, it cut three women's programs. This does not demonstrate any desire to be compliant. Therefore, injunctive relief is proper.

# APPENDIX B

## REDLINED – AMENDED OBJECTION LETTER

## ARIANA AMOROSO

~~September~~ October 2~~3~~2, 2025

The Honorable Claudia Wilken
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street
Oakland, CA 94612

From: ~~California Polytechnic State University – Minor~~Ariana Amoroso

Re:     College Athlete NIL Litigation Case No. 4:20-cv-03919 (N.C. Cal)
         Objection – Injunctive Relief Settlement – Title IX

Dear Judge Wilken,

Thank you for taking the time to read this important letter that I am writing on behalf of my~~self minor daughter~~ (NCAA ECID 2404283604), but which could undoubtedly impact so many other NCAA D1 athletes like me~~her~~. ~~She is~~I am an~~n~~ incoming freshman who was recruited in November of 2024 as a swimmer at California Polytechnic State University (Cal Poly) in San Luis Obispo with an athletic scholarship, and was informed a few months later, on March 7, 2025, that the Swim and Dive program had been cut, directly related to the House Settlement that Cal Poly opted into. Unfortunately, the Settlement did not take my~~her~~ needs into consideration as an incoming freshman for the 2025/2026 school year.

**We I respectfully object to the Injunctive Relief Settlement and urge the Court to consider its impact on incoming student athletes like m~~ey daughter~~ who have been devastated by the loss of athletic participation and scholarship opportunities, and commitments made to them, with no meaningful recourse or protection. Women should not be forced to sue their universities to enforce a civil rights law that has been in place for more than fifty years. These protections should be part of the Settlement itself to ensure compliance and avoid unnecessary lawsuits.**

My father, Dominic Amoroso, I explained our situation to Mr. Jeffrey Kessler in May of this year but was informed that my ~~daughter's~~ situation was outside the scope of the Settlement (see email below).

1

From: Kessler, Jeffrey <JKessler@winston.com>
Sent: Monday, May 19, 2025 5:58 AM
To: Nick Amoroso <amorosono5@ca.rr.com>
Cc: steve@hbsslaw.com
Subject: Re: House vs NCAA settlement - impacted student concern

I am sorry to hear about your daughter's situation. Unfortunately, this is not likely a situation where the House settlement scholarship protection applies.

The scholarship protection in House applies where a student is cut because of new roster limits being imposed by the NCAA. Here, the school is cutting an entire team purportedly because of financial considerations. The House settlement does not provide scholarship protection in such a case.

I also can observe that it appears that the House settlement is just an excuse being cited by the school. There is nothing in the settlement which required the team to be cut.

We wish your daughter good luck in finding a new team if that is her goal. One point that might help her is that all limits on the number of scholarships will be removed by the House settlement so that there should be a greater availability of scholarship opportunities throughout Division 1 if the settlement is approved.

---

From: Nick Amoroso <amorosono5@ca.rr.com>
Sent: Sunday, May 18, 2025 11:18:28 PM
To: Kessler, Jeffrey <JKessler@winston.com>
Cc: steve@hbsslaw.com <steve@hbsslaw.com>
Subject: House vs NCAA settlement - impacted student concern

Dear Mr. Kessler,

In the Fall of 2024, my daughter committed to Cal Poly San Luis Obispo for the Fall of 2025 with a swim scholarship. As I'm sure you are aware, the swim program there has been cut. The reason for the cut was stated to be financially based, with the following FAQ on the school website:

> Q. Does this have to do with the House v. NCAA settlement?
> A. The overall financial health of the athletic department is the primary reason, and certainly the House v. NCAA settlement (loss of nearly $500,000 per year) has an impact on the department finances, along with the state cuts (nearly 8% for Cal Poly) impacting the entire University.

I have heard from someone close to the case that the settlement for the House vs NCAA will protect existing scholarships for the full 4 years. If this is true, it is my hope that it would apply to incoming signed athletes like my daughter, who is not alone in this predicament, as well as the student athletes who have already begun the program. I'm hoping you can provide some clarity for me around this point.

For full transparency, my daughter signed a year-to-year scholarship, and the school has stated the scholarship will only be honored for one year. However, it is well known that these scholarships are almost always renewed each year and have the potential to increase, particularly if the athlete's performance improves. My daughter had significantly improved her times following her commitment in anticipation of her college debut and was on a trajectory to positively impact her scholarship potentially even further. As a family who was counting on this scholarship, it would be devastating to lose this opportunity for even one year.

We are still holding out hope for any chance that the program might be re-instated and are doing what we can to influence that. In the more likely case that the program remains cut, I'm seeking to understand the impact on her scholarship relative to the House vs NCAA settlement.

Any insights you can provide are greatly appreciated.

Although Mr. Kessler's speculation minimized the role of the House Settlement in Cal Poly's decision to cut the Swim and Dive program, the impact has been well publicized. On June 19, 2025, the Associated Press quoted Cal Poly President Jeffrey D. Armstrong as follows:

> Armstrong said the move was difficult but that it was unavoidable.
>
> "This is an unfortunate reality given the approved NCAA House settlement, state budget and the tenuous situation moving forward for both the state and the NCAA," he said. "I want to reiterate that the significant and unequitable changes in the NCAA and the House settlement (and new organizations resulting from this settlement) had an impact that weighed heavily in this decision."

Reference: [Cal Poly's swimming and diving programs won't be reinstated despite fundraising efforts | AP News](#)

Since the time of my ~~father's~~ email exchange with Mr. Kessler, I have learned that his dismissal of my ~~Daughter's~~ case as being outside the scope of representation is incorrect, and that ~~my~~her needs, and the needs of other incoming recruits, should have been considered.

To the extent that Cal Poly sought to avoid compliance with the House Settlement by eliminating an entire athletic program—rather than selecting individual athletes for roster reductions to address budgetary constraints—this constitutes a clear loophole the Court should address immediately. Without such intervention, other student-athletes, male and female, risk losing promised scholarships solely because their program was cut rather than through roster adjustments.

On January 23, 2025, Meeting Notes from the Cal Poly Athletics Advisory Board stated:

> House v. NCAA – (Don Oberhelman) Athletes who competed in 2016-2024 and did not receive NIL (name, image, and likeness) compensation will receive payments totaling $2.8 billion over the next ten years. Cal Poly is paying for the transgression of others and will suffer near a half-million-dollar loss per year due to the settlement. **Roster cuts will be necessary.** (See Appendix)

**Requested Amendments to Injunctive Relief Settlement:**

To be constructive and protect all other Division I female student-athletes adversely affected by the terms of the Second Amended Injunctive Relief Settlement dated May 7, 2025 (ECF 958-2), ~~I~~we respectfully request that the Court amend the Injunctive Relief to ensure equal treatment and participation opportunities for all current and future female student-athletes under Title IX of the Education Amendments Act of 1972. 20 U.S.C. § 1681 et seq.

1. **Designated Student Athlete (DSA):** Propose adding language clarifying that, while a DSA does not count toward a team's roster limit, he or she must be counted as a "participant" for purposes of Title IX compliance.

   For example, football programs are subject to a roster limit of 105 male athletes; however, many universities designate additional male athletes as DSAs, resulting in actual team sizes of approximately 125. Although only 105 counts toward the roster limit, the remaining 20 male athletes should be included in the institution's total male participant counting for Title IX reporting and compliance purposes.

2. **Article 3 – Benefits Pool § 1(a) Payments and/or Benefits; § 2 Institutional Decision-Making and Conference Level Rules:** As a condition of participating in the distribution of additional payments and/or benefits

3

to student-athletes beyond their annual scholarships, a university must be in full compliance with Title IX with respect to: (1) participation opportunities, and (2) scholarships, financial assistance and recruiting resources. Absent such compliance, participation in the Benefits Pool risks further exacerbating inequities, as disproportionate payments are likely to be allocated to male student-athletes.

For example, Cal Poly established a "Players Trust" with the stated goal to "Attract, Retain and Win" by identifying and developing talented-student athletes. While this may be a well-intentioned, Cal Poly is already in violation of Title IX – failing to provide substantially proportionate participation opportunities, equivalent benefits, and/or proportional financial assistance, as detailed in multiple letters sent to President Armstrong. (See Appendix)

The Cal Poly athletic department operates at a deficit. It should therefore be impermissible for a university that is violating federal law and facing budgetary constraints to incur additional financial losses by making voluntary payments under the Injunctive Relief provisions. Any donations to the university should instead be directed toward remedying the existing sex-based discrimination within its current athletic programs.

3. **Article 3 – Benefits Pool § 1(c) Shared Revenue:** The revenue categories used to calculate the Benefits Pool, as set forth in Appendix A of the NCAA 2024 Agreed-Upon Procedure, appear to be selectively defined to exclude categories that would trigger Title IX compliance obligations. Specifically, the excluded categories include:

   - Direct State of Other Government Support – "Funding **specifically earmarked** for athletics department by government agencies for which the institution cannot reallocate"
   - Student-Fees – Student fees assessed and restricted for intercollegiate athletics
   - Direct Institutional Support – Direct funds provided by the institution for intercollegiate athletics
   - Indirect Institutional Support – Value of costs covered and services provided by the institution to athletics but not charged to athletics
   - Contributions – Donations by individuals, corporations, associations, foundations, clubs
   - Compensation and Benefits Provided by a Third Party – Includes media income, shoe and apparel income
   - Athletics Restricted Endowment and Investment Income
   - Other Operating Revenue

By contrast, the categories included in the Benefits Pool calculation are those that can be directly attributed to men's sports and used to justify disproportional "revenue sharing" payments – such as ticket sales, media rights, NCAA distributions, conference distributions, royalties/licensing/advertisement and sponsorships and Football Bowl revenues.

This bifurcation of revenue sources operates to sidestep Title IX's requirements for equal treatment and benefits. To the extent this structure enables institutions to allocate disproportionate Benefits Pool payments to male athletes while excluding revenue from Title IX analysis, it should be expressly identified and amended in the Settlement.

4.    **Equity in Athletics Disclosure Act (EADA):** Enacted in 1994, the EADA requires educational institutions to annually collect and publicly disclose detailed information about their intercollegiate athletics program. The purpose is to provide **transparency** regarding **gender equity** in athletics and to enable student-athletes, prospective students, and the public to assess whether institutions are providing equitable athletic opportunities and treatment to men and women, as required by Title IX.

In accordance with the EADA, I~~we~~ request that the following data be mandated for inclusion in publicly available reports:

- **Revenue Sharing Payments and/or Benefits** provided by a university broken down by sport and gender
- **Designated Student-Athletes** DSA broken down by sport and gender
- **Revenue Categories** with amounts for each category, including those currently excluded from reporting

Membership Financial Reporting System Reports - Data and Public Disclosure: Under the NCAA Constitution, the Membership Financial Reporting System Reports (MFRS) requires member institutions to submit annual financial data. Injunctive Relief Section 5 – Mandatory Member Institution Reporting already obligates schools to provide this information, and Section 5 - Pool Payments/Benefits Reporting requires institutions to report the total and type of payments or benefits report to the Court and Class Counsel.

I~~We~~ request that these reports – particularly the Pool Payments/Benefits data – be made publicly available and incorporated in the EADA reporting framework. Public disclosure of this information is critical to ensure transparency, allow for independent monitoring of gender equity, and ensure that revenue distribution and benefits are subject to the same scrutiny as other EADA-mandated data.

5

5.    **Title IX Release:**  The term "Unreleased Claims" is defined in the Fourth Amended Stipulation and Settlement Agreement as:

> "Claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq*., other than any claims arising out of or relating to the distribution of the Gross Settlement Fund*."(ECF 958-2 at 16-17)

I respectfully request that the clause *"other than any claims arising out of or relating to the distribution of the Gross Settlement Fund"* be deleted. This revision is necessary to ensure it is unequivocally clear that female student-athletes retain their full rights under Title IX to challenge any inequitable payments—whether related to past damages or to the Injunctive Relief payments—arising from the $20.5 million "revenue-sharing" distribution.

**Request to Speak at Hearing – Legal Representation:**

I have retained an independent counsel, **Leigh Ernst Friestedt**, to assist with my ~~Daughter's~~ legal representation. Ms. Friestedt is currently representing other women who have objected to the House Settlement (Charlotte North, Mai Nirundorn, Katherine Ernst, and Brooke Baker). ~~I~~My Daughter ~~will~~ am~~be~~ in my~~her~~ freshman year at Cal Poly and am~~is~~ unlikely to attend the hearing scheduled for November 6, 2025.

Accordingly, I respectfully request that Ms. Friestedt be permitted to speak on my ~~Daughter's~~ behalf at the November 6, 2025 hearing.

Thank you, Your Honor, for your attention to and consideration of this important matter. Your careful review is essential to ensuring the principles of fairness, equity, and compliance with federal law are upheld for all student-athletes. I appreciate the Court's time and thoughtful consideration of these issues.

Respectfully,

_____

~~Dominic~~ Ariana Amoroso

Cc:    Leigh Ernst Friestedt
       Jeffrey Faucette

# APPENDIX C

## CALIFORNIA LICENSE

## ARIANA AMOROSO

