Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Sofia Arguello (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
sarguello@winston.com
aidale@winston.com
sviebrock@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

IN RE COLLEGE ATHLETE NIL
LITIGATION

**Case No.** 4:20-cv-03919-CW

**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT [ECF NO. 958-1, EX. 1]**

Judge:   Hon. Nathanael M. Cousins

## <u>NOTICE OF MOTION AND MOTION</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

PLEASE TAKE NOTICE THAT on May 27, 2026, at 11:00 a.m., before the Honorable Nathanael M. Cousins, Magistrate Judge, at the Oakland Courthouse, Courtroom 5, 1301 Clay Street, Oakland, CA 94612, the Plaintiffs will and hereby do move the Court pursuant to the Fourth Amended Stipulation and Settlement Agreement (ECF 958-1), and the District Court's Order at ECF 981 for an order declaring the following:

- Multimedia Rights companies are not "Associated Entities or Individuals," as that term is defined in the Injunctive Relief Settlement and therefore, NIL agreements involving Multimedia Rights companies are not subject to review by the College Sports Commission ("CSC") (or any Defendant enforcement body) unless the party ultimately receiving and paying for the use of a Class Member's NIL is an Associated Entity or Individual.

- Third-party brand sponsors are not "Associated Entities or Individuals," merely because a school was involved in arranging or procuring an NIL agreement between such sponsor and a Class Member.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, all exhibits and appendices to such documents, any papers filed in reply, any arguments as may be presented at the hearings, and all other papers and records on file in this matter.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. - 1 -

II. BACKGROUND ................................................................................................. - 3 -

    A. Procedural History .................................................................................... - 3 -

    B. Defendants' Narrow Authority Over Agreements Between Class Members and Associated Entities or Individuals Under the Settlement Agreement ......................... - 4 -

    C. Multimedia Rights Companies and Brand Sponsors in the College Sports Ecosystem- 7 -

    D. The CSC Overreaches to Treat MMRs and Sponsors as Associated Entities or Individuals ........................................................................................................ - 9 -

III. LEGAL AUTHORITY ....................................................................................... - 11 -

IV. ARGUMENT ..................................................................................................... - 12 -

    A. MMRs Fall Well Outside the Narrow Scope of "Associated Entities or Individuals"; They Support Hundreds of Schools, Not Any "Particular Member Institution" ....... - 12 -

    B. Third-Party Brand Sponsors Are Not "Associated Entities or Individuals" .............. - 15 -

V. CONCLUSION ................................................................................................... - 16 -

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Carter et al. v. NCAA et al.*,
No. 4:23-cv-06325 (N.D. Cal. filed Dec. 7, 2023) ..............................................................3

*Harris v. Gulf Ins. Co.*,
297 F. Supp. 2d 1220 (N.D. Cal. 2003) ...............................................................15, 16

*Hubbard et al. v. NCAA et al.*,
4:23-cv-01593-CW (N.D. Cal filed Apr. 4, 2023)...............................................................4

*Schertzer v. Bank of Am., NA*,
109 F.4th 1200 (9th Cir. 2024) ...............................................................14, 16

**Other Authorities**

Fed. R. Civ. P. 53...............................................................................................................12

Ben Portnoy, *College Sports Giant Learfield Finalizing Sale to Private Equity Firm*, Sports Business
Journal (Apr. 13, 2026), https://www.sportsbusinessjournal.com/Articles/2026/04/14/college-
sports-giant-learfield-finalizing-sale-to-private-equity-firm/ ...............................................7

*College, Sols. for Athletic Dept's & Confs.*, Playfly Sports, https://www.playfly.com/college...............7

*Compliance, Role of Boosters,* NCAA, https://www.ncaa.org/sports/2013/11/27/role-of-
boosters.aspx#:~:text=Boosters%2C%2%200referred%20to%20by%20the,promoting%20the
%20university's%20athletics%20programs...............................................................5

*Media*, Learfield, https://www.learfield.com/media/...............................................................7

*NIL*, Learfield, https://www.learfield.com/what-we-do/nil/ ...............................................................8

*Our Mission*, Playfly Sports, https://www.playfly.com/mission ...............................................................7

*Our Partners*, JMI Sports, https://www.jmisports.com/property-category/multimedia-rights/ ...............7

*Our Partners*, Learfield, https://www.learfield.com/our-partners/...............................................................7

PLS.' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT
CASE NO. 4:20-CV-03919-CW

## I.    INTRODUCTION

The Fourth Amended Stipulation and Settlement Agreement (ECF 958-1) ("Settlement") has transformed the economic landscape for college athletes by allowing them to participate in, and earn income from, the market for their name, image and likenesses ("NIL"), which Defendants long prohibited. In addition to Defendants' agreement to pay billions of dollars in damages to Class Members, on a going-forward basis, the Settlement provides that schools can share revenues directly with Class Members, and most relevant to this motion: that Class Members are free to enter NIL deals with third parties.[1] Oversight of only a carefully negotiated "narrow" category of third-party NIL agreements remains permissible under the Settlement. Yet Defendants, through their newly created enforcement arm, the College Sports Commission ("CSC"), are overreaching their enforcement efforts well beyond what the Settlement permits.

The Settlement entitles Class Members to freely enter NIL agreements without any oversight from Defendants, with one limited exception: it allows Defendants to regulate third-party NIL agreements between Class Members and a carefully defined category of "Associated Entities or Individuals"—entities and individuals that are colloquially known as "boosters" or "collectives." As the District Court put it, Associated Entities or Individuals "are, generally speaking, entities or individuals that promote or support a *particular* NCAA member school's athletic program."[2] And with regard to NIL payments from Associated Entities or Individuals, Defendants' regulatory authority is limited to requiring that NIL payments are "for a valid business purpose" and at "rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value."[3]

This narrow exception was designed to ensure that well-funded entities and individuals who are fans and avid supporters of a specific institution cannot simply pay Class Members to enroll at "their" school under the guise of an NIL agreement. The Settlement allows for limited regulation of deals with

---

[1] The Settlement contains two components: a backward-facing damages portion and forward-looking Injunctive Relief Settlement ("IRS"), which is set forth in Appendix A to the Settlement. *See* Settlement ¶ 2; Appx. A. This Motion concerns the IRS.

[2] *See* ECF 978, Op. Regarding Order Granting Mot. For Final Settlement Approval at 47 (emphasis added); *see also* ECF 534, Pls.' Suppl. Br. ISO Mot. For Prelim. Approval at 8 (the Settlement "only permits the NCAA to continue to apply its existing prohibition on certain NIL payments to a narrow group of individuals and entities . . .").

[3] IRS Art. 4, § 3.

PLS.' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT
CASE NO. 4:20-CV-03919-CW

those entities and individuals because they do not necessarily engage in NIL deals to try to turn a profit. Rather, Associated Entities or Individuals—sometimes—simply want to support a particular college or university by paying athletes. But Multimedia Rights Companies ("MMRs") and third-party brand sponsors are nothing of the sort and do not qualify for the expressly defined category of Associated Entities or Individuals that are subject to Defendants' regulation. They are in the business of entering into and/or facilitating NIL deals with Class Members for commercial gain.

Defendants created the "Designated Enforcement Entity" that the Settlement allowed—*i.e.*, the CSC—to review the subset of Class Members' NIL agreements with Associated Entities or Individuals to confirm that the deals are for a valid business purpose and fall within a fair market range of compensation. The CSC, however, has instead been scrutinizing virtually *every* NIL agreement with a Class Member. The result is an over-zealous, over-bureaucratic, overreach that is delaying and rejecting deals that should never have been reviewed in the first place. Even for deals that the CSC ultimately approves, it is overburdening Class Members and third parties with repeated federal-court-style discovery requests that impose substantial costs and delays before approval. This could not be further from what the District Court envisioned and sanctioned.

When a Class Member enters into an agreement with any entity or individual that *does not* meet the heavily negotiated definition of an "Associated Entity or Individual," the Settlement *precludes* Defendants (and the CSC) from regulating it. Contrary to the Settlement, the CSC has been imposing, and recently announced its intent to maintain, an overly broad and demonstrably incorrect interpretation of the term "Associated Entity and Individual" to substantially expand its limited oversight rights and improperly claim authority to regulate thousands of NIL agreements that the Settlement took out of Defendants' purview. Specifically, the CSC has asserted that: (1) MMRs—national commercial entities that have, for decades, served as consultants and licensing agents for hundreds of colleges and conferences across the country; and (2) third-party sponsors—including nationally recognized brands—are Associated Entities or Individuals whose NIL deals with Class Members are subject to extensive CSC review and approval.

Class Counsel has been hearing reports about the CSC's overreach for months and has repeatedly attempted to raise their concerns with Defendants and the CSC directly. But Defendants and the CSC

have doubled down.  On April 7, 2026, the CSC issued a memorandum to Division I colleges and universities emphasizing that it will continue to treat MMRs as Associated Entities or Individuals, even if an MMR is merely acting as a payment processor.[4]  And the memorandum announced that the CSC will even treat third-party sponsors—including national brands—as Associated Entities or Individuals if a school was involved in arranging or facilitating an NIL deal between the sponsor and a Class Member.[5]

The CSC's positions are contrary to the plain language of the Injunctive Relief Settlement ("IRS"), the clear intent of the parties, and the District Court's directives, which required the parties to narrow Defendants' regulatory authority during the settlement approval process and limit "Associated Entities or Individuals" to an extremely narrow subset of entities and individuals.  Class Counsel therefore seeks an Order from the Special Master declaring that MMR companies and third-party sponsors are not "Associated Entities or Individuals" under the Settlement and to instruct the CSC to immediately cease its overreach.

## II.    BACKGROUND

### A.    Procedural History

This antitrust action was filed on June 15, 2020, challenging the NCAA's rules prohibiting college athletes from receiving compensation in exchange for the use of their NILs.[6]  Defendants' motion to dismiss was denied,[7] and on September 22, 2023, the District Court certified an injunctive relief class.[8] On November 3, 2023, the District Court certified three Damages Classes.[9]  On December 7, 2023, Class Counsel filed an additional antitrust action, *Carter et al. v. NCAA et al.*, challenging Defendants' rules prohibiting college athletes from being paid for their participation in athletics.[10]  Thereafter, the parties reached a settlement of both actions, and on July 26, 2024, Plaintiffs filed a Second Consolidated Amended Complaint challenging Defendants' rules prohibiting athletes from receiving compensation in

---

[4] *See* Declaration of Jeffrey Kessler ("Kessler Decl.") Ex. A, Apr.7, 2026 CSC Memo at 2-3.

[5] *Id.* at 3.

[6] ECF 1, Compl.

[7] ECF 152, Order Granting in Part and Denying in Part Mots. to Dismiss.

[8] ECF 323, Order Granting Mot. for Certification of Injunctive Relief Class.

[9] ECF 387, Order Granting Mot. for Certification of Damages Classes.

[10] *Carter et al. v. NCAA et al.*, No. 4:23-cv-06325 (N.D. Cal. filed Dec. 7, 2023).

exchange for their NILs *or* for their athletic performance.[11]  That same day, Plaintiffs filed their Motion for Preliminary Settlement Approval on July 26, 2024.[12]

During the lengthy approval process, dozens of objections were submitted concerning a broad range of topics, and objectors were afforded multiple opportunities to be heard.  At the District Court's suggestion, the parties amended the Settlement multiple times to address concerns raised by the Court.[13]  On October 7, 2024, the District Court preliminarily approved the Settlement.[14]  On June 6, 2025, the Court granted Plaintiffs' motion for final approval of the Settlement[15] and ordered the entry of the IRS.[16]

**B.    Defendants' Narrow Authority Over Agreements Between Class Members and Associated Entities or Individuals Under the Settlement Agreement**

A core component of the Settlement has always been that Class Members would be free to enter into NIL agreements almost entirely free of Defendants' oversight or regulation.  Indeed, prior to the Settlement, no third-party agreements—including those with Associated Entities or Individuals—were actively regulated *at all* even though the then-existing NCAA rules provided for that regulation.  As part of the quid pro quo for Defendants agreeing that schools would, for the first time, be permitted to share revenues with Class Members, Plaintiffs agreed that Class Members' NIL agreements with what were ultimately defined as Associated Entities or Individuals could be subject to limited and specified regulations.  As the District Court put it, this regulatory oversight would be "narrow" because "taking things away from people generally doesn't work well."[17]

Under the initial proposed settlement terms, Defendants retained regulatory authority over NIL agreements between Class Members and "Boosters" as the NCAA had historically defined that term.[18]  During the Preliminary Approval Hearing, some objectors expressed concern about the use of the term

---

[11] ECF 448-1. Second Consolidated Am. Compl.  The Parties settled *Hubbard et al. v. NCAA et al.*, 4:23-cv-01593-CW (N.D. Cal filed Apr. 4, 2023), at the same time, but *Hubbard* was a separate action challenging NCAA restrictions on education-related benefits that were declared unlawful in *Alston* and seeking damages for athletes who did not receive those benefits.

[12] ECF 450, Mot. for Prelim. Settlement Approval.

[13] *See, e.g.*, ECF 796-2, Third Am. Settlement Agreement; ECF 958-1, Fourth Am. Stipulation and Settlement Agreement.

[14] *See* ECF 544, Order Granting Pls. Mot. for Prelim. Settlement Approval.

[15] ECF 979, Order Granting Pls. Mot. for Final Settlement Approval.

[16] ECF 980, Final Judgment of Dismissal with Prejudice at 1.

[17] ECF 525, Prelim. Approval Hr'g Tr. 80:20–21.

[18] ECF 450-3, Stipulation and Settlement Agreement, Appx. A, Art. 1, § 1(c); *id.* Art. 4, § 3(a).

- 4 -

"Booster," which the NCAA had defined to include anyone who has "been involved [ ] in promoting university athletics."[19]   The Menke-Weidenbach Objectors, for example, argued that the term was too broad because it potentially included "any individual independent agency corporate entity; e.g., apparel or equipment manufacturer or other organization that has promoted or assisted the school's athletic department or the student athlete," thereby affording the NCAA too much latitude to scrutinize third-party NIL deals.[20]   The District Court also expressed concern that using the historical "Booster" label could be interpreted to give Defendants too much leeway to regulate and prohibit third-party NIL deals.[21]

Following the Preliminary Approval Hearing, the parties renegotiated the provision, further narrowing Defendants' oversight of NIL deals to an even more defined subset of deals between Class Members and "Associated Entities or Individuals."[22]

Article 1, Section 1 of the IRS defines "Associated Entity or Individual" as:

(a) an entity that is or was known (or should have been known) to an athletics department to exist, in significant part, *for the purpose of promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes* and/or creating or identifying NIL opportunities *solely for a particular Member Institution's student-athletes*; (b) an individual who is or was a member, employee, director, officer, owner, or agent of such an entity; (c) an individual who directly or indirectly has contributed more than $50,000 over their lifetime to a particular Member Institution or to such an entity; (d) an individual or entity *that has been directed or requested by an athletics department to assist in the recruitment or retention of prospective or current student-athletes*, or that has otherwise assisted in such recruitment or retention; or (e) any entity owned, controlled, or operated by, or otherwise affiliated with, the foregoing individuals or entities, other than a publicly traded corporation.[23]

In agreeing to replace "Booster" with "Associated Entity and Individual,"[24] Plaintiffs understood—and informed the Court of their understanding—that:

---

[19] *Compliance, Role of Boosters,* NCAA, https://www.ncaa.org/sports/2013/11/27/role-of-boosters.aspx#:~:text=Boosters%2C%2%200referred%20to%20by%20the,promoting%20the%20university's%20athletics%2 0programs.(last visited April 20, 2026).

[20] *See* ECF 525, Prelim. Approval Hr'g Tr. 80:1–7.

[21] *See id.* at 74:3–79:23.

[22] Article 4, Section 3 of the IRS provides that such agreements can be reviewed to ensure a "valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution."

[23] IRS, Art. 1, § 1(c) (emphases added).

[24] *See* ECF 535-2, Art. 1, § 1(c).

- 5 -

Collectives and other Associated Entities or Individuals may also act as marketing agents to find and facilitate sponsorship or endorsement agreements between student-athletes and businesses. ***So long as those contracting businesses do not themselves constitute Associated Entities or Individuals, there is zero regulatory obstacle to any such sponsorship or endorsement agreements***.[25]

And the NCAA acknowledged at the Final Approval Hearing that the parties adjusted the Settlement to use the term "Associated Entities or Individuals" to "narrow[]" its scope from what was proposed in "the initial settlement based on comments and discussions at the previous hearing."[26]

The District Court also understood that the term "Associated Entities or Individuals" was intended to be "narrow" and designed to grant Defendants authority to regulate only a tiny subset of NIL agreements.[27]

If, and only if, a Class Member enters a deal with an Associated Entity or Individual may Defendants (now the CSC) do anything other than keep records of the deal. Article 4, Section 3 of the IRS provides that Defendants may only:

> [P]rohibit NIL payments ***by Associated Entities or Individuals*** (individually or collectively) to current or prospective student-athletes unless the license/payment is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution.[28]

Stated in the alternative, if a Class Member's NIL deal is *not* with an Associated Entity or Individual, the CSC has no jurisdiction whatsoever.[29] As counsel for the NCAA explained, the Settlement was designed to create a system where "if [an agreement] is real NIL, there is not a restriction on it. If it comes from a booster, it gets evaluated carefully for whether or not it is real NIL or not."[30] But the CSC

---

[25] ECF 534, Pls.' Suppl. Br. ISO Mot. For Prelim. Approval at 12 (emphasis added).

[26] ECF 797, Final Approval Hr'g Tr. 34:2–10.

[27] ECF 978, Op. Regarding Order Granting Mot. for Final Settlement Approval at 12 (explaining that the "prohibitions on NIL payments" permitted under the IRS are "narrower than the prohibitions under existing NCAA rules" and apply only to "a limited set of third parties that are labeled as Associated Entities or Individuals"). Some objectors still took issue with the narrower provision, with one calling the "Associated Entity" carveout an attempt by the NCAA to "control payment" by all NIL collectives. *See* ECF 797, Final Approval Hr'g Tr. 61:7–62:6.

[28] IRS Art. 4, § 3 (emphasis added); *See also* ECF 534, Pls.' Suppl. Br. ISO Mot. For Prelim. Approval at 9–10 ("***all third-party NIL deals that do *not* involve 'Associated Entities or Individuals' are permissible***") (emphasis added).

[29] *See also* IRS Art. 2, § 3 ("The NCAA shall not have any Division I rules prohibiting student-athletes from receiving payments from third parties for NIL, other than as set forth in this Injunctive Relief Settlement.").

[30] ECF 525, Prelim. Approval Hr'g 68:12–19.

is at best bottlenecking, and at worst denying, Class Member NIL deals that are *not* with boosters. That is a blatant violation of the Settlement Agreement.

The District Court preliminarily and finally approved the Settlement, including the narrow definition of Associated Entities or Individuals. In approving the settlement, the Court emphasized that Associated Entities or Individuals are "generally speaking, entities or individuals that promote or support a ***particular*** NCAA member school's athletic program" and "not . . . other third parties that may seek to license student-athlete NIL . . . such as companies that sell sports apparel, food, or other consumer products."[31]

### C. Multimedia Rights Companies and Brand Sponsors in the College Sports Ecosystem

Multimedia Rights Companies ("MMRs") are national organizations that provide consulting and agency services to various schools and various conferences to help maximize their revenues. For years, schools and conferences have retained the same handful of MMRs.[32] Learfield—one of the prominent MMRs—works with over 100 NCAA member schools.[33] Playfly Sports is engaged by over 75 colleges and college sports conferences.[34] And JMI Sports has been retained by over a dozen colleges and conferences.[35] Beyond selling and managing schools' sponsorship and licensing rights, MMRs often perform a range of supplemental roles for their college sports clients, including publishing audio, digital and social media; data analytics; ticketing, ticket sales and professional concessions expertise; branding; campus-wide business and sponsorship development; and venue technology systems.[36] Unlike Associated Entities or Individuals whose objective is to support "their" particular school, MMRs serve to support their varied client rosters (multiple colleges and universities) for the purpose of making a profit.

---

[31] ECF 978, Op. Regarding Order Granting Mot. For Final Settlement Approval at 47 (emphasis added).

[32] According to a recent Sports Business Journal article, "Learfield, Playfly, JMI Sports and a handful of others remain major players in the multimedia rights business." *See* Ben Portnoy, *College Sports Giant Learfield Finalizing Sale to Private Equity Firm*, Sports Business Journal (Apr. 13, 2026), https://www.sportsbusinessjournal.com/Articles/2026/04/14/college-sports-giant-learfield-finalizing-sale-to-private-equity-firm/ (last visited Apr. 19, 2026).

[33] *See Our Partners*, Learfield, https://www.learfield.com/our-partners/ (last visited April 20, 2026).

[34] *See College, Sols. for Athletic Dept's & Confs.*, Playfly Sports, https://www.playfly.com/college (last visited April 20, 2026).

[35] *See Our Partners*, JMI Sports, https://www.jmisports.com/property-category/multimedia-rights/(last visited April 20, 2026).

[36] *See, e.g., Media*, Learfield, https://www.learfield.com/media/ (last visited Apr. 9, 2026); *Our Mission*, Playfly Sports, https://www.playfly.com/mission (last visited Apr. 9, 2026).

PLS.' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT
CASE NO. 4:20-CV-03919-CW

While MMRs have existed and provided services to schools and conferences for years, their roles naturally expanded after the Settlement expanded the marketplace for agreements with college athletes. After the Settlement, MMRs began sourcing and facilitating third-party NIL deals for athletes, and particularly deals with brands that were also interested (or already involved) in sponsoring the athlete's school.[37] By offering a sponsor the ability to use both a school's intellectual property like logos, colors and uniforms (as sponsors have done for decades) *and* athletes' NILs (which was newly permissible), sponsors can combine those rights to create advertisements featuring, for example, college athletes in their school uniforms. These campaigns, in turn, generate revenues for both athletes and their schools. Indeed, the parties contemplated in the Settlement that MMRs would expand their work to source and facilitate third-party NIL deals for Class Members, but the Settlement notably *does not* state that MMRs are to be treated as Associated Entities or Individuals. *See* IRS Art. 2, § 2 ("the Member Institution or a designee/subcontractor of the Member Institution (e.g., a local rights holder) may act as the marketing agent for the student-athlete with respect to third-party NIL contracts.").[38]

Today, as the parties anticipated, these handful of MMRs serve as a bridge between hundreds of different schools, athletes and their third-party sponsors and brand partners. In some cases, MMRs facilitate NIL deals between Class Members and sponsors so that the athletes are paid directly by the sponsor that utilizes his or her NIL. In others, the payment passes through the MMR company, which in turn, pays the Class Member. In both structures, the funds originate from third-party sponsors that the Settlement does not permit the NCAA or the CSC to regulate and are in turn, paid to Class Members in exchange for the sponsor's right to use the Class Member's NIL.

Brand sponsors—from banks to apparel companies to airlines to car dealerships—have permeated the college sports industry for even longer than MMRs. Historically, brands have sponsored college athletics programs and in exchange, received the right to use a school's intellectual property, including its

---

[37] *See, e.g.*, *NIL*, Learfield, https://www.learfield.com/what-we-do/nil/ (last visited Apr. 12, 2026).

[38] Similarly, the Settlement expressly provides that "[i]f a Member Institution contracts with any individual student-athlete, directly or through a designee/subcontractor of the Member Institution (e.g., a local rights holder), to act as marketing agent for that student-athlete (as opposed to contracting with the student-athlete directly), third party payments procured for the student-athlete shall not be counted against the Pool [the prescribed amount that schools may directly pay their athletes]." *Id.*, Art. 3, § 3(c). There too, the parties *did not* provide that such arrangements would instead be treated as deals with Associated Entities or Individuals subject to CSC oversight.

name, logo and colors.  These companies partner with schools because they see economic opportunity—not because they are boosters or "fans" of a particular school.

In many cases, schools help facilitate NIL agreements between their existing or prospective brand sponsors and athletes.  And some schools have negotiated terms in their own sponsorship agreements that require or encourage those sponsors to enter NIL agreements directly with Class Members at their school.  In all cases, however, Class Members are paid with funds that originate with the brand sponsor in exchange for the sponsor's right to use the Class Member's NIL.

### D.    The CSC Overreaches to Treat MMRs and Sponsors as Associated Entities or Individuals

On January 9, 2026, the CSC circulated a memorandum to Division I athletics directors styled as a "reminder" of the regulations applicable to third-party NIL deals.[39]  Among other things, the CSC stated that "many MMR and other partners" will be treated as Associated Entities or Individuals.[40]

In response, and after receiving dozens of reports from Class Members and third parties that the CSC was taking an impermissibly broad approach to "Associated Entities or Individuals," and as a result, was investigating, delaying and interfering with Class Members' NIL agreements, Class Counsel sent a letter to the CSC on March 6, 2026, stating that the CSC's overbroad interpretation of Associated Entities or Individuals violated the IRS.[41]  Class Counsel reminded the CSC of its extremely limited regulatory authority over third-party NIL agreements under the Settlement.[42]

The CSC responded on March 24, 2026, and doubled down.[43]  It insisted that it is entitled to scrutinize—and ultimately, prohibit—NIL arrangements facilitated by MMRs and even agreements with third-party sponsors.[44]  In doing so, the CSC cited NCAA Bylaw 22.02.1, which purports to define "Associated Entity" but conspicuously omits a critical component of the definition under the Settlement: that the entity must exist in significant part to support "*a particular*" school.  *Compare* IRS Art. 1, § 1(c)

---

[39] *See* Kessler Decl. Ex. B, Jan. 9, 2026 CSC Memo at 1.

[40] *Id.*

[41] *See* Kessler Decl. Ex. C, Mar. 6, 2026 Class Counsel Ltr. to CSC at 2.

[42] *See id.* at 1.

[43] *See* Kessler Decl. Ex. D, CSC Mar. 24, 2026 Response to Class Counsel's Letter.

[44] *Id.*

("Associated Entity or Individual means: a. An entity that is or was known (or should have been known) to the athletics department staff of a Member institution to exist, in significant part, for the purpose of (i) promoting or supporting *a particular Member Institution's* intercollegiate athletics program or student-athletes. . ."), *with* 2026 NCAA Manual Bylaw 22.02.1 ("An associated entity is [] an entity that is or was known (or should have been known) to an institution's athletics department staff to exist, in significant part, for the purpose of promoting or supporting *the institution's* intercollegiate athletics program or student athletes. . .") (emphases added).[45]

And on April 7, 2026, the CSC publicly reaffirmed its plan to improperly meddle in NIL agreements involving MMRs and third-party sponsors, again citing the NCAA Bylaws rather than the Settlement.[46]  It issued a memorandum explaining that it will treat many MMRs as Associated Entities, and will therefore scrutinize NIL deals involving MMRs, even if an MMR is merely acting as a payment processor between a Class Member and a third-party sponsor.  *See id.* at 2-3 (identifying a "Facilitator" in CSC parlance as the entity that "*actually makes payment(s)* to the student-athlete in connection with [NIL] deal," often on behalf of a Sponsoring entity, and that the "fact pattern" where a "Facilitator" is "most commonly" subject to Associated Entity review is where an "institution's MMR partner is an Associated Entity and acts as a Facilitator") (emphasis in original).

Although MMRs operate nationally on behalf of hundreds of colleges and are agnostic to whether one school client performs better than another, the CSC emphasized that (like consultants in other industries) MMRs often devote specific employees to work with a school, and some MMRs have helped schools create and operate NIL-focused entities to procure and facilitate NIL deals for the school's athletes.  Accordingly, the CSC has interpreted MMRs to be an Associated Entity or Individual under the Settlement because an MMR is purportedly "(1) an entity that is or was known (or should have been known) to an athletics department to exist, in significant part, *for the purpose of* **(i)** *promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes* and/or (2) creating or identifying NIL opportunities *solely for a particular Member Institution's student-*

---

[45] *See* Kessler Decl. Ex. E, 2025-2026 NCAA Division I Manual.

[46] *See generally* Kessler Decl. Ex. A, Apr. 7, 2026 CSC Memo.

*athletes.***"[47]**

The CSC's memorandum also sweeps third-party sponsors into its interpretation of Associated Entities or Individuals. Like MMRs, third-party sponsors are agnostic to whether an athlete selects or remains at a particular school. Instead, sponsors enter NIL deals with schools and athletes who the sponsor feel will effectively promote their brands. Nonetheless, the CSC contends that many brands are Associated Entities because they purportedly are "an individual or entity that has been directed or requested by an athletics department to assist in the recruitment or retention of prospective or current student-athletes."[48] Under the CSC's logic, "third-party NIL payments are a significant factor in recruitment and retention of student athletes," and thus, according to the CSC, if a school facilitates an NIL agreement for an athlete with existing or prospective "sponsors or partners of the institution" those sponsors and partners are "assist[ing] in the recruitment or retention" of athletes and thus, are Associated Entities subject to CSC oversight.[49]

None of this complies with the actual definition of Associated Entities or Individuals under the Settlement that was approved by the District Court.

### III.    LEGAL AUTHORITY

The Settlement contemplates that disputes may arise "between or among Defendants and Plaintiffs or any Class members concerning matters contained in [the Settlement Agreement]."[50] As a result, the Court retained "continuing, exclusive jurisdiction over the Settlement and Fourth Amended Settlement Agreement, including . . . review, consideration, and disposition of any claims filed by Class Counsel for enforcement, or violations, of the Fourth Amended Settlement Agreement" and "any other proceedings concerning the administration, interpretation, consummation, and enforcement of this settlement."[51] The Settlement further vested the Court with the authority to "appoint a special master to perform certain functions, including . . . to resolve disputes that may arise concerning compliance with, the validity of, interpretation, or enforcement of the terms and conditions of the Settlement and the IRS, where those

---

[47] *See id.* at 2-3.

[48] *Id.* at 3.

[49] *See id.* at 2–3.

[50] Settlement ¶ 45, IRS Article 6, § 1 *et seq.*

[51] *Id.*; ECF 979, Order Granting Pls.' Mot. for Final Settlement Approval, ¶ 20 *et seq.*

decisions shall be appealable to the Court unless the parties agree that the special master's ruling shall be final without further appeal.[52]  Pursuant to that authority, the District Court "appoint[ed] Magistrate Judge Nathanael Cousins under Federal Rule of Civil Procedure 53 to serve as the special master with respect to every matter regarding which a special master can be appointed by the Court under the terms of the Settlement and IRS, and to the full extent permissible under the terms of the Settlement, IRS, and Rule 53."[53]  Accordingly, Judge Cousins retains jurisdiction to address this motion.

## IV.    ARGUMENT

The parties' negotiating history and the Settlement language demonstrate that "Associated Entities or Individuals" was intended to be a narrowly circumscribed group, cabined only to the types of "boosters" and "collectives" that had historically—because of their rooting interest in a single, specific school— sometimes entered "faux" NIL agreements with athletes in order to encourage them to enroll or remain at a particular school.  The basic concept is that boosters and collectives do not always offer NIL deals with a genuine *business* purpose for *fair market value* because sometimes their objectives are to help their favorite institution rather than generating a profit.  Thus, the District Court recognized that "Associated Entities or Individuals" would only capture, "generally speaking, entities or individuals that promote or support a ***particular NCAA member school's athletic program***" and "not . . . other third parties that may seek to license student-athlete NIL . . . such as companies that sell sports apparel, food, or other consumer products."[54]

The CSC's attempt to rewrite the Settlement, shoehorn MMRs and third-party sponsors into the definition of Associated Entities or Individuals, and anoint itself a roving police force with limitless authority over Class Members' NIL deals, must be rejected.

### A.    MMRs Fall Well Outside the Narrow Scope of "Associated Entities or Individuals"; They Support Hundreds of Schools, Not Any "Particular Member Institution"

MMRs are nationwide organizations that work with and for hundreds of colleges and thousands of athletes across the country.  They have vast, nationwide, experience in the college sports industry and

---

[52] *Id.*

[53] ECF 981, Order Appointing Mag. Judge Nathanael Cousins as Special Master at 1–2.

[54] *See* ECF 978, Op. Regarding Order Granting Mot. For Final Settlement Approval at 47 (emphasis added).

a centralized infrastructure that has proven to be an efficient service for schools to outsource some or all of their licensing and marketing functions. Unlike collectives supported by fans and donors of an individual school—which became ubiquitous only when third-party NIL was first permitted in 2021—MMRs have been around for decades. While MMRs, like consultants (or agencies or even law firms) across various industries often devote specific employees to specific clients, the MMRs themselves are agnostic to whether one school outperforms another on the playing field or court or in recruiting. Indeed, a key value proposition that MMRs offer is that they are *not* tied to "a particular" school and they can tap into their nationwide experience and resources to support *all* their school clients equally. That is why *any* school can retain an MMR and take advantage of the industry expertise and the same support and services that the MMR provides to the countless other schools it works with.[55]

That is a far cry from the narrow scope of "Associated Entities or Individuals" that the Settlement authorizes the CSC to regulate. The "Associated Entities or Individuals" carveout was designed to capture traditional "boosters" and booster-led "collectives," who are focused on providing or securing compensation for a single school's athletes with the aim of recruiting or retaining athletes for that particular school. It would be anathema, for example, to a booster of the University of Texas or its collective to also support Texas A&M. MMRs by contrast, do just that—support multiple schools and facilitate NIL deals for athletes at all of them.

MMRs do not "exist, in significant part, for the purpose of promoting or supporting a ***particular Member Institution's intercollegiate athletics program or student-athletes*** and/or creating or identifying NIL opportunities ***solely for a particular Member Institution's student-athletes***," as the CSC contends in order to capture them within the definition of Associated Entities or Individuals. When it comes to Class Members' NIL arrangements, MMRs are marketing agents, and at times, merely payment processors. Neither role converts an NIL agreement involving an MMR into one with an Associated Entity or Individual and thus, subject to CSC oversight.

For example, the CSC has contended that if an MMR is hired to help "generat[e] NIL deals for

---

[55] *See supra* § II.C.

student athletes" at a school, that makes it an Associated Entity.[56]  But classifying a national MMR company as an Associated Entity because it has been hired and assigned certain employees to market a school's student athletes to potential NIL partners, cannot be squared with the Settlement's language, intent, or Judge Wilken's rulings.  Indeed, the Settlement recognizes that MMR companies would likely assume a role of procuring and facilitating NIL deals for Class Members, but the Settlement notably *does not* state that those NIL deals would then be treated as ones with Associated Entities or Individuals and subject to Defendants' regulation.[57]

The CSC has even gone so far as to contend that if an MMR merely processes NIL payments from a third-party to an athlete, the deal becomes one with an Associated Entity or Individual and is subject to lengthy CSC investigation and oversight.  *See* Kessler Decl. Ex. A, Apr. 7 2026 CSC Memo at 2–3 (acknowledging that a "Facilitator" often "coordinate[s] and make[s] payment[s] for a deal with a student athlete but the student-athlete's obligations in that case would be for the benefit of the Sponsor, rather than any business of the Facilitator" but contending that "since a deal Facilitator is, by definition, providing payment to a student-athlete, deals in which the Facilitator is an Associated Entity are subject to review for range of compensation.  This fact pattern occurs most commonly in deals in which the institution's MMR partner is an Associated Entity and acts as a Facilitator.").

That is not what the Settlement provides, and it is certainly not what the parties or the District Court contemplated when it approved Defendants retaining a "narrow" regulatory authority over NIL agreements with Associated Entities or Individuals.  Indeed, under the CSC's interpretation, while the definition of Associated Entities or Individuals is, by its terms, tied to support for "*a particular* Member Institution," (IRS Art. 1, § 1(c) (emphasis added)) the *same MMR* would be an Associated Entity or Individual of dozens—perhaps hundreds—of different schools.  That absurd result is itself reason enough to reject the CSC's interpretation.  *See Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1211 (9th Cir. 2024) ("Our interpretation of terms in a contract must be fair and reasonable, not leading to absurd conclusions.") (citations omitted); *see also Harris v. Gulf Ins. Co.*, 297 F. Supp. 2d 1220, 1226 (N.D. Cal. 2003) (Wilken,

---

[56] *See* Kessler Decl. Ex. D, CSC Mar. 24, 2026 Response to Class Counsel's Letter, at 4–5 (discussing purported services provided by MMR company Playfly for LSU).

[57] *See* IRS Art. 2, § 2; *id.* Art. 3, § 3(c).

PLS.' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT
CASE NO. 4:20-CV-03919-CW

J.) ("The Court cannot adopt an interpretation that would lead to such absurd results.").

The Special Master should reject the CSC's overreach, declare that MMRs are not Associated Entities or Individuals under the Settlement, and order that the CSC immediately cease investigating or regulating NIL agreements procured or facilitated by MMR companies unless the individual or entity that ultimately pays for and receives the right to use an athlete's NIL is itself an Associated Entity or Individual.

### B.    Third-Party Brand Sponsors Are Not "Associated Entities or Individuals"

Equally egregious is the CSC's claimed authority to investigate and regulate NIL agreements between athletes and third-party *brand sponsors* where a school facilitated or assisted in procuring the deal. The CSC's rationale is as tortured as it is improper. It points to the portion of the Associated Entities or Individuals definition that includes "an individual or entity that has been directed or requested by an athletics department to assist in the recruitment or retention of prospective or current student-athletes, or that has otherwise assisted in such recruitment or retention."[58] The CSC then posits that, in its estimation, "[t]hird-party NIL payments are a significant factor in recruitment and retention of student athletes."[59] Thus, the CSC's theory goes, if a school arranges for one of its actual or potential sponsors to enter an NIL agreement with one of its athletes, the sponsor or partner is—knowingly or unknowingly— "assist[ing] in the recruitment or retention of prospective or current student-athletes" and is thus, an Associated Entity or Individual.

That is not what the Settlement says or what the parties or the District Court envisioned. In approving the Settlement, the District Court expressly stated its understanding that Associated Entities or Individuals would ***not*** encompass "companies that sell sports apparel, food, or other consumer products."[60] Indeed, Class Counsel represented to the District Court, without objection from Defendants, the parties' understanding that even Associated Entities or Individuals could procure or facilitate NIL deals for Class Members and those deals would not be subject to CSC oversight unless the party obtaining,

---

[58] *See* Kessler Decl. Ex. A, Apr. 7, 2026 CSC Memo at 3.

[59] *Id*. at 3.

[60] *See* ECF 978, Op. Regarding Order Granting Mot. For Final Settlement Approval at 47.

- 15 -

and ultimately paying for, the Class Member's NIL rights is an Associated Entity or Individual.[61]

The CSC's interpretation flips the District Court's understanding on its head. It would instantly grant Defendants broad oversight over ubiquitous brands' contractual relationships. Global companies like Adidas, Coca-Cola, Delta Airlines, and General Motors would suddenly become Associated Entities or Individuals of multiple schools, and their contractual relationships with Class Members would be subject to the same investigation and scrutiny by the CSC as agreements with a school's "collective" comprised of its most ardent fans and donors. That would be absurd. *See Schertzer*, 109 F.4th at 1211; *Harris*, 297 F. Supp. 2d at 1226. Indeed, regulation of such third-party NIL deals violates the terms of the Settlement. *See* IRS Art. 2, § 3 ("The NCAA shall not have any Division I rules prohibiting student-athletes from receiving payments from third parties for NIL, other than as set forth in this Injunctive Relief Settlement.").

The Special Master should confirm that third-party brands are not Associated Entities or Individuals merely because a school requested or arranged for it to enter an NIL agreement with a Class Member and order that the CSC immediately cease investigating whether schools facilitated NIL agreements between their actual or prospective sponsors and Class Members.

## V.    CONCLUSION

For all of these reasons, the Special Master should enter an order declaring that MMRs and third-party brands are not Associated Entities or Individuals and prohibiting the CSC or the NCAA from improperly investigating and regulating those entities' NIL agreements with Class Members.

---

[61] ECF 534, Pls.' Suppl. Br. ISO Mot. For Prelim. Approval at 12.

Dated:  April 20, 2026

By:  */s/ Steve W. Berman*

Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kodroff (*pro hac vice*)
Eugene A. Spector (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF, PC
2001 Market Street, Suite 3420
Philadelphia, PA 3420
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Class Counsel for Plaintiffs*

Respectfully submitted,

By:  */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Sofia Arguello *(pro hac vice)*
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas *(pro hac vice)*
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
sarguello@winston.com
aidale@winston.com
sviebrock@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Class Counsel for Plaintiffs*

PLS.' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT
CASE NO. 4:20-CV-03919-CW

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(I)(3)

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

Dated: April 20, 2026                                    Respectfully submitted,

By:  /s/ Jeffrey L. Kessler

- 18 -