Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
Telephone: (917) 513-5541
Email: leigh@equityix.com

Jeffrey E. Faucette
SKAGGS FAUCETTE, LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Telephone: (415) 874-3181
Email: jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants: Charlotte North, Mai Nirundorn, Sarah Brooke Baker, Katherine McCabe Ernst, Piper Whitty, Ariana Amoroso, Scott Iannaccone, Abigail Leight, and Reid Hinds Macdonald*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

IN RE COLLEGE ATHLETE NIL
LITIGATION

Case No.  4:20-cv-03919-CW

**OBJECTORS-APPELLANTS' MOTION TO INTERVENE IN PLAINTIFFS' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT**

Hrg. Date:    June 10, 2026
Time:         11:30 a.m.
Judge:        Hon. Nathanael M. Cousins
Courtroom:    Courtroom 5 (via Zoom)

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................................................... 1

II. PROCEDURAL HISTORY ................................................................................... 3

III. LEGAL STANDARD............................................................................................ 4

IV. ARGUMENT ........................................................................................................ 5

    A. The Motion to Intervene is Timely ............................................................. 6

    B. Objectors-Appellants Have a Significantly Protectable Interest in Enforcing the Settlement ................................................................................................... 6

    C. Disposition of the Motion to Enforce May Impair Objectors-Appellants' Ability to Protect Their Interests ................................................................. 7

    D. Existing Parties Do Not Adequately Represent Objectors-Appellants' Interests ........ 8

        1. Class Representatives Are Inadequate Because Their Interests Diverge from Current Injunctive Relief Class Members Harmed by Motion to Enforce ...... 8

        2. Class Counsel's Representation Is Inadequate Because It Advances the Interests of Football and Men's Basketball at the Expense of Women's and Olympic-Sport Athletes ................................................................................. 10

            a. Class Counsel Will Not Make Objectors-Appellants' Arguments... 11

            b. Class Counsel Is Not Capable or Willing to Make Objectors-Appellants' Arguments..................................................................... 11

            c. Objectors-Appellants Offer Necessary Elements That Existing Parties Will Neglect........................................................................... 12

        3. Class Counsel's Representation of Nebraska Football Players Creates a Conflict of Interest and Confirms Inadequate Representation of the Injunctive Relief Class ......................................................................................... 13

    E. Objectors-Appellants Satisfy Rule 24(a)(2)................................................ 14

V. CONCLUSION..................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arakaki v. Cayetano*,
324 F.3d 1078, 1086 (9th Cir. 2003) ................................................................. 5 , 11

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893, 897 (9th Cir. 2011) .................................................................. 4 , 5

*In re Gypsum Antitrust Cases*,
565 F.2d 1123, 1127 (9th Cir. 1977) .................................................................. 3

*Smith v. L.A. Unified Sch. Dist.*,
830 F.3d 843, 853 (9th Cir. 2016) .................................................................. 4

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528, 538 n.10 (1972) .................................................................. 5

**Statutes**

Fed. R. Civ. P. 23(a)(4) ..................................................................................... 2

Fed. R. Civ. P. 23(d)(1)(B) ................................................................................ 3

Fed. R. Civ. P. 24(a)(2) .............................................................................. passim

**Other Sources**

Chelsea Ale, *Collateral Damage: The NCAA Settlement Puts Olympic and Non-Revenue Sports on the Brink*, Sports Bus. J. (June 30, 2025) ………………………………………...……....………. 2

Matthew McGavic, *Louisville QB Miller Moss Signs UDFA Deal with Bears*, Sports Illustrated (Apr. 25, 2026) ………………………………………………………...…..…………. 9

## I.    INTRODUCTION

Objectors-Appellants Charlotte North ("North"), Mai Nirundorn ("Nirundorn"), Sarah Brooke Baker ("Baker"), Katherine McCabe Ernst ("Ernst"), Piper Whitty ("Whitty"), Ariana Amoroso ("Amoroso"), Scott Iannaccone ("Iannaccone"), Abigail Leight ("Leight"), and Reid Hinds Macdonald ("Hinds Macdonald") respectfully move to intervene in connection with Plaintiffs' Motion to Enforce the Fourth Amended Stipulation and Settlement Agreement ("Motion to Enforce"), filed on April 20, 2026. ECF 1095. Intervention is necessary because the Motion to Enforce seeks relief that would alter the Settlement's oversight structure for the Injunctive Relief Class, while Plaintiffs' Counsel, who also serve as Class Counsel, are advancing a position directly adverse to Objectors-Appellants and to the largest segment of the Injunctive Relief Class: women and Olympic-sport athletes whose protections would be diminished under Plaintiffs' interpretation.

Class Counsel represent both the Damages Class and the Injunctive Relief Class under the Fourth Amended Stipulation and Settlement Agreement ("Settlement"). In their Motion to Strike Objectors-Appellants' Objection to Plaintiffs' Motion to Enforce ("Motion to Strike"), filed on May 11, 2026, Class Counsel assert that Objectors-Appellants "*have no right to intervene here*" and that "none of the Objectors-Appellants *need* to intervene to protect their rights" because Class Counsel represents all absent Class Members. ECF 1100 at 4. That assertion underscores the conflict. Class Counsel claims exclusive authority to speak for the Injunctive Relief Class while simultaneously declining to advance the arguments necessary to protect the class members most vulnerable to the Motion to Enforce, women and Olympic-sport athletes.

The conflict is not theoretical. Class Counsel's Motion to Enforce was filed on behalf of eighteen University of Nebraska football players—a narrow subset of male athletes whose sole interest is ensuring that their NIL payments are cleared without scrutiny. ECF 1099 at 5, 14–15. In doing so, Class Counsel has taken the position that Multimedia Rights companies ("MMRs") and third-party brand sponsors are not "Associated Entities or Individuals" subject to review by the College Sports Commission ("CSC"). ECF 1095 at 5–7. Objectors-Appellants take the opposite view: MMRs and third-party sponsors are "Associated Entities or Individuals" and should remain subject to CSC review. ECF 1097 at 5, 14.

1

Objectors-Appellants represent the broader, unrepresented majority within the Injunctive Relief Class, athletes in the so-called "non-revenue" sports, including women's and Olympic sports. These athletes face the greatest risk of resource diversion and structural inequity under the Settlement's Injunctive Relief provisions. The President's April 3, 2026, Executive Order, "*Urgent National Action to Save College Sports*", underscores these concerns, warning that the "chaotic state of affairs" has "reduced opportunities for student-athletes and jeopardized support for the current range of college athletics, particularly women's and Olympic sports." ECF 1097 at 133–34, 36. However, Class Counsel is unwilling to advance these arguments, and the named Class Representatives cannot make them, as none are current members of the Injunctive Relief Class and will not be affected by the District Court's ruling on the Motion to Enforce. ECF 1051 at 1–2.

While Class Counsel's Motion to Enforce is focused solely on economic interests, Objectors-Appellants are concerned with both economic and non-economic harms—most notably, the risk that universities will eliminate varsity programs as they restructure their athletic departments to fund the $20.5 million in revenue-sharing payments to football and men's basketball. ECFs 1050 at 1–3, 1051 at 2–4, 7–9; 1052, 1053; 1060 at 8. This threat falls directly on women's and Olympic-sport athletes, who already face structural inequalities and reduced participation opportunities under the current system—concerns that were publicly raised immediately after the Settlement's approval in the June 30, 2025, article, *Collateral Damage: The NCAA Settlement Puts Olympic and Non-Revenue-Sports on the Brink.* https://www.sportsbusinessjournal.com/Articles/2025/06/30/collateral-damage-the-ncaa-settlement-puts-olympic-and-non-revenue-sports-on-the-brink/

Because the interests of women's and Olympic-sport athletes are not being represented, and because Class Counsel's conflict prevents them from advancing the arguments necessary to protect those interests, intervention is essential to ensure adequate representation for the millions of current and future student-athletes governed by the Injunctive Relief provisions, as required by Fed. R. Civ. P. 23(a)(4) and warranted under Fed. R. Civ. P. 24(a)(2).

Defendants, the NCAA and Power Five Conferences, also oppose the Motion to Enforce, but for reasons fundamentally different from those of Objectors-Appellants. As parties to the litigation, Defendants argue that Class Counsel is attempting to "*rewrite*" the agreement, "improperly narrow

the definition of 'Associated Entity' to which parties agreed," and circumvent the negotiated $20.5 million revenue-sharing cap by permitting schools "*to launder unlimited payments through MMR or brand sponsors wholly immunized from CSC review.*" ECF 1099 at 4–5, 17.

Objectors-Appellants, by contrast, seek intervention not because they negotiated the Settlement, but because they will be directly harmed if the Motion to Enforce is granted. Unlike Defendants, who are protecting the terms they bargained for, Objectors-Appellants are protecting their substantive rights as members of the Injunctive Relief Class, rights that would be materially diminished if MMRs and third-party brand sponsors were categorically excluded from CSC oversight.

This divergence in interests matters for two reasons. First, if the Court were to approve Class Counsel's new enforcement structure, unnamed Injunctive Relief Class Members never received notice of this new interpretation and had no opportunity to object, in violation of basic fairness and due process principles governing class settlements. See *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977); Fed. R. Civ. P. 23(d)(1)(B). Second, Objectors-Appellants represent the athletes most harmed by the consequences of unlimited third-party funding: women's sports and Olympic non-revenue sports, which are already experiencing cuts and program eliminations to subsidize $20.5 million in revenue-sharing payments for men's football and basketball. Because the Motion to Enforce threatens to accelerate these harms and redefine the Settlement in ways that disproportionately harm the Injunctive Relief Class, it is imperative that Objectors-Appellants be permitted to intervene to protect their interests under Rule 24(a)(2).

## II.   PROCEDURAL HISTORY

Objectors-Appellants North, Nirundorn, Baker, and Ernst (collectively, "*North et al.*") each filed separate, timely objection letters with the District Court on January 31, 2025, opposing the Damages Settlement and Injunctive Relief. ECFs 638, 669, 670, 671.

On June 6, 2025, the District Court overruled the objections and granted its Order of Final Approval, Final Judgment, and Dismissal with Prejudice. ECFs 978, 979, 980. Under the terms of the Settlement, the Injunctive Relief went into effect immediately. ECFs 980, 958-1. *North et al.* appealed that decision to the United States Court of Appeals for the Ninth Circuit. ECF 984; Ninth Circuit Case No. 25-3835.

Objectors-Appellants Whitty, Amoroso, Ernst, Iannaccone, Leight, and Hinds Macdonald (collectively, "*Whitty et al.*") each filed separate, timely objection letters with the District Court on September 22, 2025, opposing the continuation of the Injunctive Relief. ECFs 1049, 1050, 1051, 1052, 1053, 1054, 1056, 1060. The District Court overruled those objections, and *Whitty et al.* filed separate appeals to the Ninth Circuit from that decision. Case Nos. 25-7461, 25-7467, 25-7469, 25-7869.

Additionally, on October 14, 2025, Class Counsel objected to the standing of Dominic Amoroso, who had submitted a written objection to the Injunctive Relief Settlement on behalf of his minor daughter, Ariana Amoroso. ECF 1057 at 4 n.2. On October 16, 2025, the District Court issued an order finding that Objector Dominic Amoroso lacked standing because he is a parent, not a class member. ECF 1059. In response, Mr. Amoroso filed a Motion for Leave to Amend the objection letter to substitute Ariana Amoroso, who had by then reached the age of majority, as the proper Objector. ECF 1060. No party opposed the motion. On October 31, 2025, the District Court granted the Motion for Leave to Amend, accepted Amoroso's written objection, and authorized her attorney to appear on her behalf at the November 6, 2025, oral hearing. ECF 1061.

### III.     LEGAL STANDARD

Under Rule 24(a)(2), a proposed intervenor is entitled to intervene as of right if: (1) the motion is timely; (2) the intervenor has a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the intervenor is so situated that disposition of the action may, as a practical matter, impair or impede the intervenor's ability to protect that interest; and (4) that interest is inadequately represented by the existing parties. *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016); ECF 1100 at 4. The Ninth Circuit construes Rule 24(a)(2) broadly in favor of intervention and is guided by practical considerations, not technical considerations. *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

Timeliness is determined by the totality of the circumstances, including: (1) the stage of the proceedings; (2) prejudice to the existing parties; and (3) the reason for and length of any delay. *Smith*, 830 F.3d at 854. The "crucial date" for assessing timeliness is when the proposed intervenor knew or should have known that its interests would not be adequately protected by the existing parties. *Id.*

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

(reversing denial of intervention where a post-settlement change in circumstances, not the age of litigation, triggered the timeliness analysis, and where denial of intervention would impair the proposed intervenors' ability to protect class-wide interests not adequately represented by existing parties.)

The U.S. Supreme Court has found that the burden to show inadequate representation is "minimal"; the proposed intervenor need only show that representation of its interests "may be" inadequate. *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n.10 (1972); *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). In determining adequacy, the Ninth Circuit considers three factors: (1) whether the existing parties will undoubtedly make all of the proposed intervenor's arguments; (2) whether the existing parties are capable and willing to make those arguments; and (3) whether the proposed intervenor would offer any necessary elements to the proceeding that the existing parties would neglect. *Arakaki*, 324 F.3d at 1086.

The most important adequacy factor is how the proposed intervenor's interests compare with the interests of the existing parties. *Arakaki*, 324 F.3d at 1086. When the proposed intervenor and an existing party share the same ultimate objective, a presumption of adequate representation may arise. However, that presumption may be rebutted by a showing of adversity of interest, collusion, or nonfeasance. *Id.* Representation may also be inadequate where an existing party must balance broader interests that are related to, but not identical with, the proposed intervenor's narrower interests. *Trbovich*, 404 U.S. at 538-39 & n.10 (permitting intervention where the Secretary of Labor had to represent both the complaining union member's interest and the broader public interest in union-election enforcement, creating sufficient doubt about whether the member's narrower interests were adequately represented); *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898-99 (9th Cir. 2011).

## IV.    ARGUMENT

Objectors-Appellants satisfy all requirements for intervention as of right under Rule 24(a)(2). Their motion is timely, they possess significantly protectable interests implicated by Plaintiffs' Motion to Enforce, disposition of that motion may, as a practical matter, impair or impede their ability to protect those interests, and, under the Supreme Court's minimal adequacy standard, their interests

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

are not adequately represented by the existing parties. Objectors-Appellants seek limited intervention in connection with the Motion to Enforce and Motion to Strike; they do not seek to reopen final approval or relitigate the Settlement as a whole.

## A. The Motion to Intervene is Timely

The Motion to Intervene is timely. Objectors-Appellants timely submitted their opposition to the Motion to Enforce on April 29, 2026. ECF 1097. Class Counsel then moved to strike the filing on the ground that Objectors-Appellants had not formally intervened on May 11, 2026. ECF 1100 at 3–4. Objectors-Appellants filed this Motion in good faith to cure the asserted procedural defect without causing delay or prejudice. Filing the Motion now provides the District Court with time to review the issues before the June 10, 2026 hearing, ensuring that individuals with interests at stake are considered.

This Motion arises from a post-settlement change in circumstances. Class Counsel's Motion to Enforce and Motion to Strike, together, threaten to alter the Settlement's enforcement structure while excluding class members whose interests are most directly affected. Objectors-Appellants moved only after Class Counsel asserted that intervention was required and after it became clear that Class Counsel would not protect their interests. The Motion therefore satisfies the timeliness requirement under Rule 24(a)(2).

## B. Objectors-Appellants Have a Significantly Protectable Interest in Enforcing the Settlement

Objectors-Appellants have a significantly protectable interest in enforcing the Settlement because Class Counsel's Motion to Enforce, described by Defendants themselves as "*extraordinary,*" would materially alter the rights and obligations of the Injunctive Relief Class. ECF 1099 at 5. In their Opposition, Defendants explain that Class Counsel's motion would "improperly narrow the definition of 'Associated Entity,'" and "seeks to rewrite the Settlement, not enforce it." ECF 1099 at 5–6. Defendants further warn that Class Counsel's position would circumvent the negotiated $20.5 million revenue-sharing cap by enabling universities to "launder" and "funnel unlimited additional money to student-athletes" through third-party entities. ECF 1099 at 6–7, 17.

These concerns mirror those raised by Objectors-Appellants, whose interests are directly tied to women's and Olympic-sport athletes—the athletes most vulnerable to the restructuring of college

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

sports under the Settlement. Like Defendants, Objectors-Appellants warn that the Motion to Enforce would eliminate oversight of school-connected payment structures and enable unchecked concentration of financial resources in men's football and basketball, at the expense of women's and Olympic sports. ECF 1097 at 7. But unlike Defendants, whose opposition arises from the terms they negotiated as parties, Objectors-Appellants object because the broader class of Injunctive Relief class members will be directly harmed if the Motion to Enforce is granted. As members of the Injunctive Relief Class, they explain how cap circumvention and MMRs functioning as payment facilitators would allow universities to evade compliance with federal civil rights laws, including Title IX of the Education Amendments of 1972. ECF 1097 at 18–20. Because the Motion to Enforce threatens to rewrite the Settlement in ways that would directly harm their interests, Objectors-Appellants satisfy Rule 24(a)(2)'s protectable interest requirement.

### C. Disposition of the Motion to Enforce May Impair Objectors-Appellants' Ability to Protect Their Interests

Objectors-Appellants satisfy the impairment requirement because Rule 24(a)(2) permits intervention where the disposition of the action may, "as a practical matter," impair or impede their ability to protect their legal interests. Here, Class Counsel's Motion to Enforce is properly understood as an effort to rewrite the Settlement by excluding MMRs and third-party brand sponsors from CSC oversight. If granted, the Motion to Enforce would allow universities to "launder unlimited payments" and "funnel unlimited additional money" to student-athletes through unregulated third-party entities—precisely the funding pathways the Settlement's Enforcement Entity (CSC) was designed to prevent. ECF 1099 at 6–7, 17. That outcome would directly harm women's sports and Olympic sports, which do not benefit from pay-to-play recruiting and retention systems and would face further resource diversion to men's football and basketball.

The impairment is even more pronounced when considering the civil rights implications. If MMRs and brand sponsors are allowed to operate as unregulated payment facilitators, revenue-sharing payments and other pay-for-play payments could be routed outside CSC oversight and characterized as beyond the reach of Title IX, since they would no longer be paid by federally funded universities. ECF 1095 at 7, 14; 1095-2 at 3. That result would impair Objectors-Appellants' ability

to protect their interests in equitable revenue sharing, equal treatment, and compliance with federal civil rights laws—interests squarely protected by Rule 24(a)(2)'s impairment of interest standard.

**D. Existing Parties Do Not Adequately Represent Objectors-Appellants' Interests**

Representation is inadequate because no existing party protects the distinct interests of women's and Olympic-sport athletes. Although both Objectors-Appellants and Defendants oppose Class Counsel's attempt to exclude MMRs and third-party brand sponsors from the definition of "Associated Entity" subject to CSC oversight, their reasons for doing so diverge. Defendants oppose the Motion to Enforce to preserve their contractual interpretation of the Settlement they negotiated as parties. Objectors-Appellants oppose the Motion for a fundamentally different reason: it threatens to accelerate varsity program eliminations, roster reductions, Title IX violations, and resource diversion away from women's and Olympic sports. This divergence demonstrates that neither Class Representatives, Class Counsel, nor Defendants can adequately represent Objectors-Appellants' interests, satisfying the inadequacy requirement under Rule 24(a)(2).

> **1. Class Representatives Are Inadequate Because Their Interests Diverge from Current Injunctive Relief Class Members Harmed by the Motion to Enforce**

The existing Class Representatives cannot adequately represent the Injunctive Relief Class because they no longer have any continuing, live stake in the relief Class Counsel seeks to modify. Each Class Representative has exhausted eligibility, graduated, and moved on to professional athletics or professional careers. They therefore face no risk of roster reductions, scholarship loss, program elimination, or resource diversion—the very harms the Injunctive Relief Class is now experiencing. ECFs 1044, 1049, 1050, 1051, 1052, 1053, 1054, 1056, 1060. Their interests diverge from those of current student-athletes whose participation opportunities depend on stable rosters, funded programs, and compliance with federal civil rights laws.

The District Court recognized the inadequate representation problem at the final approval hearing on April 7, 2025:

> "The objectors claim that the named plaintiffs or the class representatives are inadequate representatives of the future student athletes… because none of the named plaintiffs will be affected by the future injunctive relief since that's going to happen in the future when they won't be playing anymore." ECF 797 at 11–12.

The District Court further anticipated that the female Class Representatives, Sedona Prince and Nya Harrison, would not remain adequate representatives for the Injunctive Relief Class because they would no longer be student-athletes when relief took effect:

> "The settlement agreement would go into effect a year or so from then, and by that time I'm guessing neither of those young women would anymore be student athletes and won't be affected by the future injunctive relief but only have backward-looking damages relief." ECF 797 at 20.

That prediction proved correct. Ms. Prince and Ms. Harrison graduated from Texas Christian University and Stanford University in 2025 and have moved on to professional basketball and soccer. They no longer experience the same interest or injury that the current Injunctive Relief Class Members are facing, including the consequences of the Motion to Enforce.

Class Counsel's later addition of Miller Moss does not cure this adequacy defect. On October 31, 2025, Class Counsel moved to add Mr. Moss as a Class Representative based on his status as a current student-athlete. ECFs 1062, 1063. But Mr. Moss is not representative of the broader Injunctive Relief Class. ECF 1072 at 15. He is a high-profile, fifth-year elite football quarterback who transferred to the University of Louisville and then entered the NFL as a free agent with the Chicago Bears on April 25, 2026. https://www.si.com/college/louisville/football/miller-moss-udfa. As such, Mr. Moss belongs to the narrow subset of elite athletes who stand to benefit from the financial structures the Motion to Enforce seeks to expand. His interests align with maximizing revenue-sharing and third-party payments for football, not with protecting participation opportunities, roster limits, equal treatment rights, and civil rights protections for women's sports and Olympic athletes.

By contrast, Objectors-Appellants Whitty, Amoroso, Iannaccone, Leight, and Hinds Macdonald are current students whose interests are directly affected by the Injunctive Relief and the Motion to Enforce. They experience, and will continue to experience, program eliminations, roster limits, and scholarship reductions resulting from the financial pressures created by the Settlement and Injunctive Relief. ECFs 1049, 1050, 1051, 1052, 1053, 1054, 1056, 1060, 1072 at 7–11. Those harms will be exacerbated by Class Counsel's Motion to Enforce, which seeks to expand the flow of money to football and men's basketball through third-party entities. These harms are concrete, ongoing, and

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

unique to current students—not to former student-athletes who no longer participate in college athletics or to elite football players whose interests align with the challenged payment structures. Class Representatives, therefore, cannot adequately represent the Injunctive Relief Class.

Recent graduates of Vanderbilt University and the University of Georgia, Objectors-Appellants Ernst, Baker, and Nirundorn, similarly informed the District Court that female student-athletes are being harmed more now than before the Settlement. ECF 1072 at 6–11, 24–25. These harms include the loss of $5,980 in *Alston* payments, reductions in team resources, such as meal allowances and travel squad size, and the diversion of funding from women's teams to subsidize $20.5 million revenue sharing payments for men's football and basketball. ECF 1051 at 1–4, 7–9.

The divergence in interests is clear. Class Representatives primarily seek to preserve $2.6 billion backward-looking damages relief, while Mr. Moss and the athletes on whose behalf Class Counsel filed the Motion to Enforce seek expanded third-party payment opportunities for elite football players. Objectors-Appellants, by contrast, face both economic and non-economic harms: loss of participation opportunities, elimination of teams, reduced scholarships, diminished educational and athletic experiences, and erosion of Title IX protections. Because the Motion to Enforce would accelerate those harms by permitting additional money to flow to football and men's basketball through third-party entities, the interests of current Injunctive Relief Class Members are not adequately represented by the existing Class Representatives.

**2. Class Counsel's Representation Is Inadequate Because It Advances the Interests of Football and Men's Basketball at the Expense of Women's and Olympic-Sport Athletes**

Class Counsel has repeatedly demonstrated a conflict of interest and an unwillingness to advance arguments necessary to protect the interests of women's and Olympic-sport athletes. Objectors-Appellants repeatedly informed the District Court—through objection letters and statements at the April 7, 2025, and November 6, 2025, fairness hearings—that Class Counsel was not representing their interests. ECFs 797 at 118–19; 1072 at 12–13. The Motion to Enforce confirms those concerns. Class Counsel now seeks to expand third-party payment pathways for football and men's basketball while disregarding the harms to the broader Injunctive Relief Class. Under Rule 24(a)(2), intervention is warranted where existing parties will not "undoubtedly make all of a

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

proposed intervenor's arguments," are not "capable and willing" to do so, and where intervenors "offer any necessary elements" that the existing parties will neglect. *Arakaki*, 324 F.3d at 1086. All three factors are met here.

### a.    Class Counsel Will Not Make Objectors-Appellants' Arguments

Class Counsel has made clear that they will not advance the arguments necessary to protect Objectors-Appellants' interests. At the April 7, 2025, fairness hearing, attorney Leigh Ernst Friestedt ("Friestedt") detailed conflicts of interest inherent in Class Counsel's representation, including their refusal to acknowledge Title IX implications of the Settlement. ECFs 797 at 118–19; 806. Class Counsel repeatedly insisted this is an antitrust case, not a Title IX case, and that the Title IX release was "narrow," despite evidence that the release extinguishes claims against federally funded institutions that are not even parties to this litigation. ECFs 797 at 14, 22–23, 51–52, 117–18; 1072 at 25–26.

Similarly, in an email correspondence with pro se Objector-Appellant, Gracelyn Laudermilch, Class Counsel stated that "we are the lawyers representing the athletes who are asking the judge to approve the settlement," underscoring the very inadequacy. ECF 1044 at 2–3, 8. Class Counsel's position is clear—they will not make the arguments Objectors-Appellants seek to advance, including arguments about Title IX compliance, roster limits, program elimination, and resource diversion—all central to the Injunctive Relief Class. ECFs 797 at 88; 806; 1072 at 12–15.

### b.    Class Counsel Is Not Capable or Willing to Make Objectors-Appellants' Arguments

Class Counsel is not only unwilling to make Objectors-Appellants' arguments; they are unable to do so without contradicting their own litigation strategy. At the April 7, 2025 hearing, Mr. Kessler dismissed the existence of any Title IX issues and asserted that, had such claims been viable, Class Counsel would have raised them after conducting their own research. ECF 797 at 23. That position now prevents Class Counsel from acknowledging the very Title IX concerns that Objectors-Appellants seek to protect. Moreover, Class Counsel instructed their economic experts to exclude Title IX from the calculation of past damages, and they negotiated a Title IX release that shields the NCAA, athletic conferences, and even non-party universities from liability. ECFs 670 at 8–9; 958-1

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

at 15. This strategic decision disproportionately harms female student-athletes, who represent 47% of the class, and underscores the conflict of interest with Class Counsel. ECFs 618-1 at 2–4; 747 at 6–7.

Class Counsel's unwillingness to protect the Injunctive Relief Class is further illustrated by their communication with Objector-Appellant Whitty, an incoming Injunctive Relief Class Member. In an email, Mr. Kessler told Whitty's mother on May 1, 2025, "There was a right to object to the *House* Injunctive Settlement, but that deadline had passed. There is no right to opt out of an injunctive settlement." ECFs 1050 at 2; 1054 at 4. This was not accurate, Whitty never received notice as an Incoming Injunctive Relief Class Member but was bound by the terms of the release. Accordingly, Whitty retained independent counsel because it was clear that Class Counsel would not represent her interests.

The experience of Objector-Appellant Hinds Macdonald further illustrates Class Counsel's unwillingness to advocate on behalf of the Injunctive Relief Class Members. After the November 6, 2025 hearing, the District Court instructed Hinds Macdonald to contact Class Counsel to request clarification regarding his Designated Student-Athlete ("DSA") status. ECF 1071 at 7–8. He did exactly that, sending an email to Mr. Berman on December 9, 2025, and placing a follow-up phone call to his office. Neither communication was ever returned. *See* Ex. A. Class Counsel's failure to acknowledge a court-directed inquiry from a current Injunctive Relief Class Member demonstrates they are neither willing nor able to represent Objectors-Appellants' interests. This silence was not an isolated incident; numerous other objectors who attempted to contact Class Counsel for assistance likewise received no response, an issue the District Court highlighted at the April 7, 2025, fairness hearing. ECF 797 at 96–97, 226–27. This pattern of non-responsiveness underscores why Objectors-Appellants retained independent representation and why Class Counsel cannot adequately represent the Injunctive Relief Class.

### c. Objectors-Appellants Offer Necessary Elements That Existing Parties Will Neglect

Objectors-Appellants bring critical arguments and perspectives that no existing party will present. They represent the current and broader interests of the Injunctive Relief Class, including athletes outside of the revenue-generating sports of football and men's basketball, whose harms are

OBJECTORS-APPELLANTS' MOTION TO INTERVENE RE: PLAINTIFFS' MOTION TO ENFORCE
Case No. 4:20-cv-03919-CW

both economic and non-economic. These harms include loss of participation opportunities, team eliminations, roster limits, scholarship reductions, diversion of resources from women's and Olympic sports, and the erosion of Title IX protections. ECFs 1049, 1050, 1051, 1052, 1053, 1054, 1056, 1060.

Neither Class Counsel nor Defendants will raise these issues. Defendants oppose the Motion to Enforce for contractual reasons, not to protect women's or Olympic-sport athletes. Class Counsel, meanwhile, advances a position that benefits football players and accelerates harms to the rest of the Injunctive Relief Class. ECFs 1095 at 16–20; 1103 at 2. Objectors-Appellants therefore provide critical arguments concerning civil-rights compliance, athletic program preservation, and the structural integrity of the Injunctive Relief—arguments that existing parties do not advance.

### 3. Class Counsel's Representation of Nebraska Football Players Creates a Conflict of Interest and Confirms Inadequate Representation of the Injunctive Relief Class

Class Counsel's decision to file the Motion to Enforce on behalf of only eighteen University of Nebraska football players underscores a fundamental conflict of interest and demonstrates why Objectors-Appellants cannot rely on Class Counsel to protect the interests of the Injunctive Relief Class. ECF 1103 at 2. Nebraska football players represent a small, elite subset of the class, yet the Motion to Enforce is crafted to advance their financial interests, with broader implications that overwhelmingly benefit football and men's basketball. This narrow representation stands in stark contrast to the interests of the broader Injunctive Relief Class, which includes women's and Olympic-sport athletes, whose primary concerns include participation opportunities, equal treatment, and civil-rights protections—not maximizing revenue-sharing payments for already highly funded programs.

By advocating for an interpretation of the Settlement that would allow expanded payments to football and men's basketball through third-party entities, Class Counsel is actively pursuing a position that harms the very athletes they are obligated to represent. Women's teams and Olympic sports are already experiencing reduced funding, roster reductions, and program eliminations to subsidize $20.5 million revenue-sharing payments for men's sports. Class Counsel's alignment with the interests of elite football players, at the expense of more than 99% of the class, constitutes a conflict of interest and demonstrates inadequate representation under Rule 24(a)(2). This conflict makes intervention by Objectors-Appellants necessary to ensure that the interests of all Injunctive

Relief Class Members, not just the narrow subset of athletes who benefit from expanded third-party payment pathways, are protected.

**E.  Objectors-Appellants Satisfy Rule 24(a)(2)**

Because Objectors-Appellants satisfy each requirement for intervention as of right—timeliness, a significantly protectable interest, impairment of their ability to protect that interest, and inadequate representation—Rule 24(a)(2) requires that intervention be granted.

### V.    CONCLUSION

For the foregoing reasons, Objectors-Appellants respectfully request that the District Court grant the Motion to Intervene.

DATED: May 25, 2026

<u>/s/ Leigh Ernst Friestedt</u>
Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

<u>/s/ Jeffrey E. Faucette</u>
Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants: Charlotte North, Mai Nirundorn, Sarah Brooke Baker, Katherine McCabe Ernst, Piper Whitty, Ariana Amoroso, Scott Iannaccone, Abigail Leight, and Reid Hinds Macdonald*

# EXHIBIT A

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No.  4:20-cv-03919-CW<br><br>**DECLARATION OF REID HINDS MACDONALD IN SUPPORT OF OBJECTORS-APPELLANTS' MOTION TO INTERVENE IN PLAINTIFFS' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT**<br><br>Hrg. Date:   June 10, 2026<br>Time:         11:30 a.m.<br>Judge:        Hon. Nathanael M. Cousins<br>Courtroom:  Courtroom 5 (via Zoom) |

I, Reid Hinds Macdonald, declare as follows:

1. I am an Injunctive Relief Class Member.

2. I was a member of the Long Island University ("LIU") Men's Lacrosse team and received a $12,000 athletic scholarship and $10,000 academic scholarship for my Freshman year (2023-24). My athletic scholarship increased to $25,000 my sophomore year and was promised for my remaining three years. I received my scholarships until May 30, 2025, when I was told that I was cut from the team due to roster limits with the House Settlement.

3. In October 2024 (my sophomore year), the LIU Men's Lacrosse coaches met with the team and explained that there were going to be changes to roster limits and that they would be making cuts to the team.

4. In December 2024, during my individual evaluation with my coaches, I understood from our conversation that I was likely going to be cut from the team, even though they did not say it directly. They recommended that I enter the transfer portal.

5. I was devastated by the news and did not want to transfer from LIU. I was doing well in my classes, liked my Business major, and had made close friends on the team.

6. I worked hard to improve my lacrosse skills so that I would not be cut from the team.

7. After I was told that I was likely going to be cut from the team, I researched the transfer process and asked my mother, Suzanne Hinds, to help me understand the transfer process and whether I would lose my scholarship.

8. Despite my coaches recommending that I enter the transfer portal, I did not because I was concerned that I was going to lose my scholarship and had a plan to develop my lacrosse skills to try to stay on the team. I wanted to stay at LIU.

9. Other players on my team were also told that they may be cut.

10. In March 2025, my roommate forwarded an article to me about the changes in roster limits due to the House Settlement. I sent this article to my mother.

11. As a Division I student-athlete with practices, classes and the pressure of being cut from my team, I asked my mother for assistance to gather information so that I could better understand my options and make an informed decision.

DECLARATION REID HINDS MACDONALD
Case No. 4:20-cv-03919-CW

12. From December 2024 through May 2025, my mom made multiple calls to the NCAA, the U.S. District Court for the Northern District of California, the Settlement website helpline, and my LIU lacrosse coach in an effort to understand the transfer process and whether I would lose my scholarship. We were not able to get a definitive answer about whether my scholarship would be protected if I entered the transfer portal.

13. On May 8, 2025, I returned home to Vancouver, Canada after my lacrosse season and the end of the spring semester at LIU.

14. On May 9, 2025, I called the NCAA to inquire about whether my athletic scholarship would be protected if I entered the transfer portal. I was not given an answer.

15. On May 30, 2025, Coach Levine called me at home and informed me that I was cut from the LIU team due to roster limits as part of the House Settlement.

16. Approximately ten other teammates lost their roster spots on the lacrosse team due to roster limits. LIU did not cut any incoming freshmen. As upperclassmen, we were never given an opportunity to try out for the team after we were cut. Players who were lower than me on the depth chart were not cut and did not have athletic scholarships.

17. Long Island University did not declare me as a "Designated Student Athlete."

18. On May 31, 2025, I entered the transfer portal and ultimately transferred to Queens University of Charlotte where I am currently a member of the Men's Lacrosse team.

19. I was late entering the transfer portal because I was concerned that I would lose my scholarship if I entered the portal. My late entry put me at a disadvantage to transfer.

20. Losing my roster spot caused significant emotional and financial harm and was disruptive to my academic progress.

21. On August 14, 2025, I received an email from the NCAA explaining how to file an objection.

22. On September 17, 2025, I sent a written objection letter to the U.S. District Court for the Northern District of California. The Court filed my letter on September 22, 2025. I did not request to speak at the oral hearing scheduled for November 6, 2025.

DECLARATION REID HINDS MACDONALD
Case No. 4:20-cv-03919-CW

23. On November 6, 2025, there was an oral hearing with Judge Wilken. I was not represented by an attorney and did not participate.

24. On November 13, 2025, Judge Wilken overruled my objection and objections of other Injunctive Relief Class members to the continuation of the Injunctive Relief. ECF 1071.

25. In Judge Wilken's order, she suggested I contact Class Counsel to request advice about whether I should have received Designated Student-Athlete status when I was cut from the LIU lacrosse team.

26. On December 9, 2025, I sent an email to Class Counsel, Mr. Steve Berman. I identified myself as an objector to the Injunctive Relief who was pressured to enter the transfer portal and lost my athletic scholarship. I requested Class Counsel to help me understand my legal rights and options.

27. I did not receive a response to my email to Mr. Berman.

28. On December 12, 2025, I called Mr. Berman's office directly to ask for assistance.

29. Mr. Berman never returned my call.

30. I retained attorney Leigh Ernst Friestedt, who was representing other Injunctive Relief Class members.

31. On December 13, 2025, I filed a notice of appeal with the Ninth Circuit and was assigned Case No. 25-7869.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 25th day of May 2026.

DATED: May 25, 2026

Respectfully Submitted,

*/s/ Reid Hinds Macdonald*
Reid Hinds Macdonald

DECLARATION REID HINDS MACDONALD
Case No. 4:20-cv-03919-CW

Date: Tue, Dec 9, 2025 at 7:10 PM
Subject: Objector - House Settlement
To: steve@hbsslaw.com <steve@hbsslaw.com>

Dear Mr. Berman,

My name is Reid Hinds Macdonald, and I objected to the Injunctive Relief after being pressured to enter the transfer portal and losing my athletic scholarship at LIU in May 2025. I understand that Judge Wilken recently overruled my objection.

As Class Counsel, could you please help me understand my legal rights and options?

Thank you for your time.

From: Reid Hinds Macdonald <reidhindsmac@gmail.com>
Date: Tue, Dec 9, 2025 at 7:10 PM
Subject: Objector - House Settlement
To: steve@hbsslaw.com <steve@hbsslaw.com>

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

|  |  |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No.  4:20-cv-03919-CW<br><br>**DECLARATION OF SUZANNE HINDS IN SUPPORT OF OBJECTORS-APPELLANTS' MOTION TO INTERVENE IN PLAINTIFFS' MOTION TO ENFORCE THE FOURTH AMENDED STIPULATION AND SETTLEMENT AGREEMENT**<br><br>Hrg. Date:   June 10, 2026<br>Time:         11:30 a.m.<br>Judge:        Hon. Nathanael M. Cousins<br>Courtroom:  Courtroom 5 (via Zoom) |

I, Suzanne Hinds, declare as follows:

1. I am the mother of Reid Hinds Macdonald ("Reid"), an Injunctive Relief Class member.

2. Reid was a member of the Long Island University ("LIU") Men's Lacrosse team on a four year promised athletic and academic scholarship.

3. Reid matriculated at LIU in September 2023.

4. During Reid's sophomore year, his lacrosse coaches encouraged him multiple times in December 2024 and spring 2025 to enter the transfer portal due to likely cuts on the men's lacrosse team from roster limits under the House Settlement.

5. Reid did not want to transfer from LIU and was concerned about losing his scholarship if he entered the transfer portal.

6. Reid was extremely busy as a Division I student-athlete trying to manage practices and classes with the threat of being cut from the team.

7. In an effort to help Reid understand the transfer portal and whether he would lose his scholarship, I contacted the NCAA, the U.S. District Court for the Northern District of California ("District Court"), the Settlement website helpline, and Reid's LIU lacrosse coach, Jordan Levine.

8. Below is a summary of my calls between December 2024, when Reid was put on notice that he may be cut, until May 30, 2025, when he was cut from the team.

9. On December 10, 2024, I called the NCAA three times and spoke to two different agents (duration of calls: 1 minute, 5 minutes, 12 minutes). I was told if Reid entered the transfer portal, his scholarship was no longer protected. I was advised to read the transfer portal information on the website.

10. On December 13, 2024, I called the NCAA and asked to speak with a supervisor (duration of call 10 minutes).

DECLARATION SUZANNE HINDS
Case No. 4:20-cv-03919-CW

11. On March 24, 2025, I called the NCAA and asked how to object and was transferred to a dedicated Settlement complaint line.

12. On April 4, 2025, I tried calling a different NCAA number. I was told the only option was to be transferred to the dedicated complaint line. NCAA assured me that they were listening to messages.

13. I learned from news articles that the oral hearing was being held in California.

14. On April 4, 2025, I called and left a message with the legislative team at the NCAA.

15. On April 4, 2025, I called the District Court to find out how to submit a letter to the judge. I was told that the Court was unable to provide this information because that would be legal advice.

16. On April 10, 2025, I called the NCAA to discuss concerns about the impact of proposed changes and expressed support for a grandfathering process to address roster limits. I was told the NCAA was waiting for a decision from the Court and could not advise. I asked to speak with a supervisor and was transferred to the Settlement complaint line. I asked for information on how to send a letter and was told they could not provide that information.

17. I searched for free legal advice to help me understand the process in the United States. I was unsure whether Reid could simply send a letter or whether it needed to be notarized.

18. On April 10, 2025, I called the courthouse again to try and find out how to object.

19. On May 13, 2025, I called the NCAA and was transferred to the Settlement complaint line, which was unable to tell me if Reid's scholarship would be safe if he went into the transfer portal. I was told that current rules did not protect his scholarship.

20. On May 14, 2025, I spoke with Reid's LIU coach, Jordan Levine. I asked if LIU was going to grandfather players who may be impacted by the roster cuts. Coach Levine informed me that would be a larger discussion with LIU and was out of his control. I asked whether

Reid's scholarship was protected if he entered the transfer portal. Coach Levine was unable to answer.

21. I continued to call the NCAA and asked about how to object and whether Reid's scholarship was at risk if he entered the transfer portal. I was told there was no decision and transferred to the Settlement help line.

22. I received no responses from any of the messages left regarding concerns and requests for information about how to bring concerns forward. I thought it was odd that there were no supervisors to speak with at the NCAA and that they would not give me an address to write a letter.

23. At the end of the season, Coach Levine said that a decision had been made that players entering the transfer portal would not lose their scholarships.

24. On May 8, 2025, Reid left LIU to return home in Canada, not knowing if he would return in the fall.

25. On May 30, 2025, Coach Levine called Reid and told him he was cut. The next day Reid entered the transfer portal.

26. Reid committed to Queens University in Charlotte, North Carolina and is currently a member of the men's lacrosse team.

27. On August 14, 2025, Reid received an email from the NCAA explaining how to file an objection.

28. Reid sent a written objection to the District Court on September 17, 2025, which was filed by the Clerk on September 22, 2025.

DECLARATION SUZANNE HINDS
Case No. 4:20-cv-03919-CW

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 25th day of May 2026.

DATED: May 25, 2026

Respectfully Submitted,

*/s/ Suzanne Hinds*
Suzanne Hinds

4