Jacob K. Danziger (SBN 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Calanthe Arat (SBN 349086)
Matthew Skanchy (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
carat@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION** |
| | Magistrate Judge: Hon. Nathanael M. Cousins |
| | Judge: Hon. Claudia Wilken |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 3

FACTUAL BACKGROUND .......................................................................................... 6

I.    The Settlement Preserved Monitoring Efforts to Prevent Circumvention of the Benefits Pool Structure. ..................................................................................... 6

II.   The Settlement Committed to Arbitration Disputes Over "Associated Entity or Individual" Designations. ................................................................................... 9

III.  Judge Cousins Properly Rejected Plaintiffs' Request for a Categorical Ruling That MMRs and "Third-Party Brand Sponsors" Can Never Be Associated Entities. 10

STANDARD OF REVIEW ............................................................................................ 12

ARGUMENT ................................................................................................................. 12

I.    The Court Should Reject Any Efforts to Obtain Relief that Was Not Requested or Ruled on Below. .............................................................................................. 12

II.   In the Alternative, the Court Should Affirm on the Merits Because Judge Cousins Correctly Denied the Motion to Enforce, and Class Counsel's Newfound Arguments Are Meritless. ................................................................................. 14

      a.    The Court Should Reject Class Counsel's Efforts to Undercut the CSC's Authority to Investigate Whether Businesses Are "Associated Entities." ............................................... 14

      b.    Accepting Class Counsel's Position Would Undercut the Arbitration Procedures that Class Counsel Highlighted As a Reason for Approval. ....................................................... 18

      c.    The Court Should Also Deny Class Counsel's Requests For Extensive Information About the CSC's Operations. ................. 21

CONCLUSION .............................................................................................................. 22

-1-

## TABLE OF AUTHORITIES

**Cases**

*Bernard v. Los Angeles Cnty. Metro. Transp. Auth.*,
   2025 WL 3162331 (C.D. Cal. Nov. 10, 2025) .................................................................. 13

*Convolve, Inc. v. Compaq Computer Corp.*,
   2004 WL 1944834 (S.D.N.Y. Sept. 1, 2004) .................................................................. 13

*Greenhow v. Sec'y of Health & Hum. Servs.*,
   863 F.2d 633 (9th Cir. 1988) .......................................................................................... 12

*Harris v. Gulf Ins. Co.*,
   297 F. Supp. 2d 1220 (N.D. Cal. 2003) .......................................................................... 17

*Hillis v. Heineman*,
   626 F.3d 1014 (9th Cir. 2010) ........................................................................................ 13

*McGrain v. Daugherty*,
   273 U.S. 135, (1927) ....................................................................................................... 15

*PPG Indus., Inc. v. Pilkington plc*,
   825 F. Supp. 1465 (D. Ariz. 1993) ................................................................................. 17

*Smith v. Marsh*,
   194 F.3d 1045 (9th Cir. 1999) ........................................................................................ 13

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020) ........................................................................................................ 15

*United States v. Dade*,
   2022 WL 4015645 (9th Cir. Apr. 12, 2022) ................................................................... 14

*World Triathlon Corp. v. Dunbar*,
   539 F. Supp. 2d 1270 (D. Haw. 2008) ........................................................................... 12

**Statutes**

28 U.S.C. § 1291 ....................................................................................................................... 14

**Rules**

Fed. R. Civ. P. 53(f)(3)–(4) ...................................................................................................... 12

**INTRODUCTION**

Class Counsel's appeal of Judge Cousins's denial of their Motion to Enforce the Fourth Amended Stipulation and Settlement Agreement, Plfs.' Mot. Objecting to Special Master's Order ("Appeal"), Dkt. No. 1138 is both procedurally improper and substantively without merit. The "appeal" is an improper effort to obtain rulings from this Court on issues that were never presented to or resolved by Judge Cousins, and can be denied on that ground alone. On the merits, Class Counsel seek to rewrite the Settlement Agreement, undercut the carefully negotiated provisions that this Court approved regarding Associated Entities and Individuals, and effectively nullify the arbitration process that Class Counsel held up as a core reason for approving the Settlement. None of this is appropriate.

Start with procedure. Class Counsel asked Judge Cousins for a pair of categorical rulings—that "Multimedia Rights companies" (or MMRs) and "third-party brand sponsors" can never be Associated Entities or Individuals under the Settlement. That is the specific relief they requested in their motion, Motion to Enforce the Fourth Amended Stipulation at i ("Mot. to Enforce"), Dkt. No. 1095; that is the issue Judge Cousins believed he was addressing (with no correction from Class Counsel), *see* June 10, 2026 Hr'g Tr. 66:21–24; and that is the issue Judge Cousins decided, Order Denying Pls.' Mot. to Enforce the Fourth Am. Stipulation and Settlement Agreement at 1 ("Order"), Dkt. No. 1136.

Class Counsel have now changed their tune. After conceding at the June hearing on their Motion to Enforce that MMRs *can* qualify as Associated Entities or Individuals, Class Counsel now claims that the problem is that the College Sports Commission ("CSC")—the "Designated Enforcement Entity" under the Settlement—is "presumptively" treating MMRs and third-party brand sponsors as Associated Entities and Individuals, and they ask the Court to order the CSC to "cease investigating and regulating third-party NIL agreements with these entities absent a specific basis to do so." Appeal at 2. Class Counsel are wrong about what the CSC is doing. But more importantly, *that is not the issue Class Counsel presented to Judge Cousins*. No permutation of the word "presumption" or the "specific basis" standard appears in the Motion to Enforce, in Class

DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION

Counsel's reply brief, or in Judge Cousins's ruling. Parties cannot use appeals to raise new issues they never presented below, or to obtain relief they did not seek before.

Similarly, Class Counsel ask the Court to "order Defendants to produce the information that Plaintiffs and the Special Master requested." *Id.* But Judge Cousins has not yet ruled on this request, to the extent it is even properly before him. Plaintiffs initially requested certain materials about the CSC's operations as part of a "Notice" of evidentiary requests filed after the hearing on their Motion to Enforce, Plfs.' Notice re Evidentiary Requests ("Plfs.' Evidentiary Notice"), Dkt. No. 1133. After Judge Cousins ruled against them, they renewed that request in a new filing, titled "Plfs.' Notice re Update on Plfs.' Evidentiary and Document Requests" ("Plfs.' Updated Evidentiary Notice"), Dkt. No. 1137, in which they again requested that Judge Cousins "order Defendants to comply with Plaintiffs' requests." *Id.* at 2. Judge Cousins has not acted on that Notice, nor have Plaintiffs filed any motion for discovery, so it is improper for Plaintiffs to raise this issue on appeal now.

Turning to the merits, Plaintiffs seek to rewrite the Settlement in multiple ways and walk away from the bargain they struck and advocated for on behalf of the Settlement Class. The parties agreed that it would be a positive development for student-athletes if, as Class Counsel put it, "true third-party NIL" were permitted "for the length of the injunctive relief term." Pls.' Supp. Br. ISO Mot. for Preliminary Settlement Approval at 14 ("Supp. PA Br."), Dkt. No. 534. But the parties also agreed that it would undermine the transformative Benefits Pool structure established by the Settlement if student-athletes could receive "payments by affiliated parties that are characterized as NIL but, in reality, are just pay-for-play compensation from a third party." *Id.* at 8,11.

The compromise the parties reached, and the Court approved, was straightforward: Transactions involving any "Associated Entity or Individual," i.e., those "closely affiliated with an NCAA member school for the purpose of promoting the school's athletics program or its student-athletes," could be subjected to heightened scrutiny under the Settlement. Order Granting Mot. for Final Approval of Settlement Agreement at 12 ("Final Approval Op."), Dkt. No. 978. The Associated Entity or Individual definition contains multiple subparts, including one defining an "Associated Entity" as any entity that "(1) has been directed or requested by a Member Institution's

-4-

athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes Second Am. Injunctive Relief Settlement Art. 1, § 1(c)(d) ("IRS"), Dkt. No. 963-2 That language was carefully drafted to ensure that efforts to improperly circumvent the Benefits Pool could be regulated, even in situations that did not involve "collectives" that support a single school's athletic program. As Class Counsel acknowledged, this authority "was an essential part of the compromise." Supp. PA Br. at 20.

Plaintiffs appear to flip-flop between two requests to the Court, neither of which is appropriate. At some points in their brief, they appear to continue to press the argument that MMRs and "third-party brand sponsors" can never be Associated Entities—a position Judge Cousins rightly rejected as inconsistent with the plain text of the Settlement and the negotiation history as well as the facts in the record. At other points, they ask for an order saying that the CSC should not be allowed to pose any questions to these entities "absent a specific basis to do so." Appeal at 2. That vague and amorphous position is similarly groundless. The Settlement does not contain a "specific basis" standard or require the CSC to obtain permission before gathering information about a particular transaction. Instead, it allows the CSC to investigate and make decisions, and then allows student-athletes to challenge any unfavorable decisions in binding neutral arbitration.

Granting Class Counsel's motion would hamstring any efforts to inquire into Associated Entity status, which would open the door to the exact type of Benefits Pool circumvention that the parties acknowledged it was essential to prevent. Class Counsel's requested relief would also hollow out the arbitration process that they highlighted as a key justification for Settlement approval. Arbitration would be pointless, if not nonexistent, if Class Counsel could rush to court, even on the basis of an unfounded rumor or complaint, to preempt a pending arbitration ruling (as they seemingly tried to do here) or stop the CSC from even investigating a transaction.

To be clear, Defendants' position is not that MMRs or "third-party brand sponsors" are always Associated Entities. Whether they are or aren't depends on the facts and circumstances of the entity's activities. The only way for the CSC to make these determinations is to inquire, which it is doing promptly and appropriately. If the CSC does not clear a deal and a student-athlete

-5-

disagrees, the remedy provided by the Settlement is arbitration—not factually unsupported, constantly shifting, and procedurally improper motions by Class Counsel.

The Court should affirm Judge Cousins's ruling.

## FACTUAL BACKGROUND

### I.    The Settlement Preserved Monitoring Efforts to Prevent Circumvention of the Benefits Pool Structure.

The Injunctive Settlement, like the Settlement Agreement as a whole, was the product of hard-fought negotiation and compromise, with each term representing part of an integrated and unified whole. After years of litigation, and months of negotiation, Defendants agreed to allow Member Institutions to directly compensate student-athletes for their NIL. IRS art. 3. The parties also agreed on the importance of imposing limits on direct payments to ensure competitive balance—a common feature in American sports.

One of those limits is the cap on the Benefits Pool. The logic behind the cap was clear: If each Member Institution could spend unlimited amounts on student-athlete benefits, competitive balance would cease to exist. The Court recognized this in its final approval order, noting "that the cap is procompetitive because it is necessary for competitive balance and to ensure the greatest output of athletic opportunity." Final Approval Op. at 42.

The parties also acknowledged that this Benefits Pool structure would not work as intended if Member Institutions could circumvent it with payments from closely affiliated individuals and entities. Accordingly, the parties initially agreed that while bona fide NIL payments from third parties would no longer be prohibited, payments by "boosters" would receive heightened scrutiny. *See* Stipulation and Settlement Agreement, App. A, art. 1, § 1(f), Dkt. No. 450-3 (defining "Booster" as "'representative of athletics interests,' as defined in NCAA Bylaws 8.4.2, 13.02.16, and 13.02.16.1."); *id.* art. 4, § 3(a) (allowing scrutiny of booster deals to determine whether they are fair market value NIL transactions). The NCAA's definition of the term "booster" was broad, including (among others) "anyone who has . . . [p]rovided a donation in order to obtain season tickets for any sport at the university," "[p]articipated in or has been a member of an organization promoting the university's athletics programs," "[a]ssisted in or has been requested by university

-6-

staff to assist in the recruitment of prospective student-athletes," or "[a]ssisted in providing benefits to enrolled student-athletes or their families."[1] And once an entity was identified as a "representative of athletics interests," it would retain that designation forever. *Id.*

At the preliminary approval hearing, the Court expressed concerns about the breadth of the definition of "booster," but critically, *not* the overall concept of scrutinizing payments that might be disguised efforts at cap circumvention. Accordingly, the parties negotiated a new framework for determining which transactions should receive heightened review. The parties ultimately settled on a new defined term, "Associated Entity or Individual," to replace the term "booster." The term "Associated Entity or Individual" encompasses five different and independent sub-definitions, which are collectively narrower than the "booster" definition, but still account for evolving cap-circumvention structures that might develop in the future. IRS art. 1, § 1(c), accordingly provides as follows:

(c) "Associated Entity or Individual" means:

a. An entity that is or was known (or should have been known) to the athletics department staff of a Member Institution, to exist, in significant part, for the purpose of (i) promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes; and/or (2) creating or identifying NIL opportunities solely for a particular Member Institution's student-athletes;

b. An individual who is or was a member, employee, director, officer, owner, or agent of an entity described in Section 1(c)(a) above;

c. An individual who directly or indirectly (including contributions by an affiliated entity or family member) has contributed more than $50,000 over their lifetime to a particular Member Institution or to an entity described in Section 1(c)(a) above;

---

[1] *See, e.g.*, Role of Boosters, NCAA (Nov. 27, 2013), archived at https://web.archive.org/web/20260221222204/https://www.ncaa.org/sports/2013/11/27/role-of-boosters.aspx.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION

d. An individual or entity that (1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes; or

e. Any entity owned, controlled, or operated by, or otherwise affiliated with, the individuals or entities described in Section 1(c)(a)-(d) above other than a publicly traded corporation.

As Class Counsel acknowledged, the point of the Associated Entity and Individual construct was to allow for screening of payments that might be efforts to circumvent the Benefits Pool by providing payments through "affiliated parties that are characterized as NIL but, in reality, are just pay-for-play compensation from a third party." *See* Supp. PA Br. at 1, 11. In their brief supporting preliminary approval of the Settlement, Class Counsel agreed that the narrowed regulatory authority would focus not on all boosters, but on the "group of entities and individuals closely affiliated with the schools ('Associated Entities or Individuals') *to prevent circumvention of the settlement*." *Id.* at 1 (emphasis added). Several pages later, they noted that the Settlement would generally allow third-party NIL transactions, but "permit[ ] the NCAA to continue to apply existing rules which prohibit certain types of payments by affiliated parties that are characterized as NIL but, in reality, are just pay-for-play compensation from a third party." *Id.* at 11.

Class Counsel's and Defendants' understanding of the scope and purpose of the Associated Entity concept was mutual. As the NCAA's counsel explained at the final approval hearing, "the associated entities are the ones that we think are more likely to be engaged in cap circumvention." April 7, 2025 Tr. Final Approval Hr'g, 218:1–11; *see also id.* 217:1-19 ("That increase on revenue sharing doesn't work if you can immediately circumvent it with payments that are pay-for-play that are disguised NIL. So . . . there's an anti-circumvention rationale as well that comes along with the benefit that is being provided to the class of additional revenue sharing."). Class Counsel said nothing to the contrary. And in approving the Settlement, the Court acknowledged these rationales, pointing to potential "procompetitive justifications for these NIL provisions." Final Approval Op. at 47.

-8-

In short, the text of the Settlement, the negotiation history, and the parties' representations to the Court support the conclusion that the Associated Entity or Individual definition was designed to encompass entities that might be engaged in efforts to circumvent the Benefits Pool cap.

## II.    The Settlement Committed to Arbitration Disputes Over "Associated Entity or Individual" Designations.

In designing the Settlement infrastructure, the parties anticipated that disputes may arise over efforts to enforce the restrictions contained in the Settlement—including the "prohibitions related to NIL transactions *involving* Associated Entities or Individuals." IRS art. 4, § 3 (emphasis added). They accordingly made clear, in Article 6 of the IRS, who would be responsible for addressing those disputes.

Article 6, Section 2 of the IRS allows "the NCAA, Conference Defendants, and Non-Defendant Conferences" to pass rules consistent with the IRS (including "prohibitions" in Article 4, Section 3), and to "enforce" those rules "implementing the terms of this Injunctive Settlement." IRS art. 6, § 2(a). It then requires the parties to select arbitrators "to arbitrate *any and all disputes* regarding *any discipline imposed* pursuant to subsection (a) immediately above or *any rule(s) promulgated pursuant to Article 4, Section 3*." *Id.* art. 6, § 2(b) (emphasis added). In short, the Settlement directs to arbitration—not to this Court—any disputes regarding the enforcement of the Associated Entity or Individual rules, whether by the NCAA, the Conference Defendants, or the CSC (the "designated enforcement entity" contemplated by the Settlement). *Id.* art. 1, § 1(h). If student-athletes wish to challenge discipline imposed on them,[2] they are required to go to arbitration—as are Member Institutions, to the extent arbitration is consistent with state law. *Id.* art. 6, § 2(e). This system recognizes the reality that the issues committed to arbitration depend on individualized facts.

As Class Counsel notes, the Settlement provides that disputes "concerning the interpretation or enforcement of this Injunctive Relief Settlement shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court." *Id.* art. 6, § 1(a). But the very next

---

[2] Arbitrations are completed on an expedited basis, and any discipline is stayed pending completion of the arbitration, absent good cause. IRS art. 6, § 2(d).

-9-

sentence goes on to clarify that this general reservation of authority does *not* extend to disputes regarding Associated Entities or Individuals:

> For the avoidance of doubt, *any disputes regarding enforcement of NCAA or conference rules against student-athletes* or Member Institutions that are subject to this Injunctive Relief Settlement, including but not limited to questions of eligibility, *shall be governed by Section 2 of this Article.*

*Id.* (emphasis added). In other words, "any disputes," *id.*, about how the CSC is enforcing the rules as to transactions "involving" Associated Entities and Individuals, *id.* art. 4 § 3, must go to arbitration, rather than being resolved on an incomplete factual record in this Court, *id.* art. 6 § 2(b)–(e).

**III.    Judge Cousins Properly Rejected Plaintiffs' Request for a Categorical Ruling That MMRs and "Third-Party Brand Sponsors" Can Never Be Associated Entities.**

After the Court approved the Settlement, the CSC was created as the "Designated Enforcement Entity," and it began to carry out its responsibilities. Ex. A, Decl. of Bryan Seeley ISO Defs.' Opp'n ¶ 2 ("Seeley Decl."), Dkt. 1099-1. The Settlement requires student-athletes to report "any and all third-party NIL contracts or payments with a total value of . . . $600[] or more." IRS art. 2, § 4. The CSC then evaluates those deals to determine whether they involve an Associated Entity or Individual, and thus are subject to the heightened scrutiny permitted under the Settlement. *See* NCAA Bylaw 22.2.4, Dkt. No. 1095-6 ("The name, image and likeness clearinghouse shall review all reported noninstitutional name, image and likeness contracts or payment terms submitted by student athletes once all reporting requirements have been met (see Bylaw 22.2.2) to determine whether an associated entity or individual, including a noninstitutional payor, is involved."). As Defendants explained below, the CSC has been carrying out that function effectively. *See* Seeley Decl. ¶ 4(a) –(b). While some deals have taken longer to review, that is because of the need to conduct the factual inquiries expressly authorized under the Settlement, including whether a particular entity qualifies as an Associated Entity or Individual. *Id.* at ¶ 9. That process is further complicated when some MMRs are reluctant to provide even basic information about their operations or relationship with a given institution. *Id.* at ¶¶ 4(c)–(d); Def's Opp'n to

-10-

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
OBJECTION

Pls.' "Notice" Regarding Their Mot. to Enforce at 3 ("Opp'n to Pls.' Notice"), Dkt. No. 1135. Nevertheless, there had been, at the time of Judge Cousins's decision, only two arbitrations—suggesting general satisfaction with the CSC's process.

Nevertheless, Class Counsel filed their Motion to Enforce, asking Judge Cousins to rule, as a categorical matter, that MMRs and an undefined group of "[t]hird-party brand sponsors" can never be Associated Entities or Individuals. Mot. to Enforce at i. Defendants' brief in response included a declaration by Bryan Seeley, the CEO of the College Sports Commission, confirming that the CSC is not categorically treating any entity, including MMRs, as associated. Seeley Decl. ¶ 9. Instead, Seeley explained that MMRs may be Associated Entities depending on the facts and circumstances of their operations, and the CSC is accordingly inquiring into those facts and circumstances. *Id.*

At the hearing on the motion, Class Counsel ultimately conceded that MMRs *can* qualify as Associated Entities or Individuals.[3] It was therefore unsurprising that Judge Cousins correctly rejected Class Counsel's request for a categorical ruling. As he observed, there was evidence in the record "that MMRs have, for example, created institution-specific entities housed on college campuses that generate NIL deals for specific students at a particular campus, placed their employees directly in a campus's athletic department office to assist in locating deals for hopeful recruits, and provided money upfront to athletes and found a supporting deal thereafter." Order at 4. In such circumstances, "it is plausible the MMR '(1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes.' IRS art. 1, § 1(c)(d)." *Id.* The same basic logic applied to "third-party brand sponsors." Recognizing that this "is not a legally defined term," Judge Cousins noted that the Court's opinion on final approval "left open the possibility that such third-party brand sponsors

---

[3] *See* June 10, 2026 Hr'g Tr. 32:11 – 33:4 (Mr. Kessler: "So what does that language mean? In our view, what you have to do to show recruitment is that the MMR or some other entity was actually told to contact students and say, hey, you should stay at this school or you should come to this school, one is retaining, one is going, because we will do these good things to you, so please stay at this school or recruit this school. . . . I think the way this is set up, they would have to have some information that that's what was going on before they could treat them as an associated entity.").

-11-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION

could fall within the definition of Associated Entity and did not explicitly preclude such a finding." Order at 5–6. For these reasons, Judge Cousins denied the relief Class Counsel sought from him—a "categorical[] ruling" excluding these entities from any form of Associated Entity review. *Id*. at 4; June 10, 2026 Hr'g Tr. at 66:21–24.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 53(f)(3)–(4), the Court reviews a Special Master's legal conclusions and factual findings de novo. De novo review means that the Court independently evaluates whether Judge Cousins correctly decided the question presented to him. It does not give Class Counsel license to raise entirely new legal theories, requests for relief, or standards that were never presented below. *See World Triathlon Corp. v. Dunbar*, 539 F. Supp. 2d 1270, 1278 n.13 (D. Haw. 2008); *Greenhow v. Sec'y of Health & Hum. Servs.*, 863 F.2d 633, 638 –39 (9th Cir. 1988), overruled on other grounds by *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) (en banc). Accordingly, the Court's review here is properly limited to the question that Judge Cousins actually decided: whether MMRs and "third-party brand sponsors" categorically fall outside the scope of the Settlement's definition of "Associated Entity or Individual."

## ARGUMENT

**I.    The Court Should Reject Any Efforts to Obtain Relief that Was Not Requested or Ruled on Below.**

While Class Counsel originally sought categorical rulings that MMRs and "third-party brand sponsors" are not Associated Entities or Individuals, they ultimately had to retreat from that position at oral argument. *See supra* at 9–10. They now pivot entirely by asking the Court to order that the CSC cannot investigate these entities without a "specific basis" to do so. Appeal at 2. That request is not properly before the Court.

The law is clear that parties cannot raise new issues, arguments, or requests for relief in objecting to a Special Master's report. *World Triathlon Corp.*, 539 F. Supp. 2d at 1278 n.13, is on point. There, the court declined to consider arguments that had not been presented to the Special Master, because a party "cannot raise entirely new arguments for the first time in an objection to a Special Master's report." *Id.* at 1278 n.13. Many other cases are in accord. *See also Greenhow*,

-12-

863 F.2d at 638–39 ("Moreover, allowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act. We do not believe that the Magistrates Act was intended to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court."); *Bernard v. Los Angeles Cnty. Metro. Transp. Auth.*, 2025 WL 3162331, at *1 (C.D. Cal. Nov. 10, 2025) ("[A]ttempts to recast [] claims or present new theories . . . is improper."); *Convolve, Inc. v. Compaq Computer Corp.*, 2004 WL 1944834, at *1 (S.D.N.Y. Sept. 1, 2004) ("The new arguments now advanced by Convolve come too late because they could have been raised to the Special Master but were not.").

These precedents are consistent with ordinary principles of appellate presentation and preservation—a party must present an argument in order to subsequently raise it on appeal. *See, e.g.*, *Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010) ("These arguments are raised for the first time on appeal, and because they were never argued before the district court, we deem them waived."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal.").

Class Counsel's new proposed "specific basis" standard flunks this test. Appeal at 15. As described in *Greenhow*, Class Counsel tried one set of arguments before Judge Cousins, and after losing, are trying to pivot to entirely different arguments and requested relief. It is misleading in the extreme for Class Counsel to claim that Judge Cousins "declined to declare the CSC's policy of treating MMRs and brand sponsors as presumptive Associated Entities to be a violation of the Settlement." *Id.* at 9. Class Counsel specifically requested that Judge Cousins rule that "Multimedia Rights companies" (or MMRs) and "third-party brand sponsors" are categorically not Associated Entities or Individuals under the Settlement. Mot. to Enforce at 15–16. Judge Cousins's rejection of that specific relief is all that is properly before the Court on this appeal.

For related reasons, the Court should reject Class Counsel's effort to obtain informal discovery from the CSC. Shortly after the hearing before Judge Cousins, Class Counsel filed their "Notice re Evidentiary Requests and Request for Production of Documents or, in the Alternative, an Adverse Inference re Their Motion to Enforce the Fourth Amended Stipulation and Settlement

-13-

Agreement." *See* Plfs.' Evidentiary Notice. In that motion, Class Counsel requested a wide range of information from the CSC. Several days later, Judge Cousins then denied the Motion to Enforce. *Id.* at 2; Ex. 1 to Notice, Class Counsel Letter Re Request for Information, Dkt. No. 1133-1. Several days after that, on June 29, Plaintiffs renewed their requests through a "Notice re Update on Plaintiffs' Evidentiary and Document Requests." *See* Plfs.' Updated Evidentiary Notice. But Plaintiffs have filed no motion seeking discovery. To date, Judge Cousins has not taken any action on the notice, to the extent it even properly raises an issue before him. There is accordingly no order to appeal. *See, e.g.*, 28 U.S.C. § 1291; *United States v. Dade*, 2022 WL 4015645, at *1 (9th Cir. Apr. 12, 2022).

**II.   In the Alternative, the Court Should Affirm on the Merits Because Judge Cousins Correctly Denied the Motion to Enforce, and Class Counsel's Newfound Arguments Are Meritless.**

**a.   The Court Should Reject Class Counsel's Efforts to Undercut the CSC's Authority to Investigate Whether Businesses Are "Associated Entities."**

Putting aside the procedural deficiencies, the Court should affirm Judge Cousins's ruling and reject Class Counsel's new request. Before Judge Cousins, Class Counsel sought to exempt MMRs or third-party brand sponsors entirely from the Associated Entity definition. Now, they seek to prevent the CSC from conducting any investigation into those entities unless it has a "specific basis" for doing so (though notably, Class Counsel provide no details about how this "specific basis" standard would work). Appeal at 15. Either option would significantly limit the CSC in its authority to properly inquire whether any given MMR or "third-party brand sponsor" is an Associated Entity, which would allow circumvention of the pay-for-play limitation that is core to this Settlement.

Class Counsel's erroneous arguments stem from an erroneous premise about the CSC's activities. The CSC's policy is a case-by-case, fact driven process involving inquiry where appropriate. As Mr. Seeley declared, "[t]he CSC must evaluate the facts in each case to determine whether a given entity is associated." Seeley Decl. ¶ 9. Plaintiffs have now filed over a half-dozen briefs on this issue without once providing any evidence to the contrary.

-14-

With that clarification, the question simply becomes whether the Settlement Agreement authorizes the CSC to inquire into whether a specific business entity fits within the definition of "Associated Entity." Class Counsel provide no textual support for their position that the CSC can only investigate MMRs and "third-party brand sponsors" in limited circumstances. As Judge Cousins correctly determined, the Settlement Agreement does not mention, let alone carve out, such entities in any way. Order at 5–6. Nor does the Settlement Agreement discuss or in any way contemplate the "specific basis" standard at which Class Counsel feint.[4] Instead, the Settlement Agreement allows Defendants to continue to enforce "existing prohibitions related to NIL transactions involving Associated Entities or Individuals." IRS art. 4, § 3. Class Counsel already agreed that investigation is a necessary first step. *See* NCAA Bylaw 22.2.4. And it is axiomatic that the power to prohibit necessarily implies the power to investigate. *See, e.g.*, *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020); *McGrain v. Daugherty*, 273 U.S. 135, 161, (1927); *cf.* J. Wigmore, 9 *Evidence in Trials at Common Law,* § 2483, at 276–77 (Chadbourn rev. 1970) ("[T]he judicial power itself . . . implies inherently a power to investigate as auxiliary to the power to decide."). The Settlement Agreement does not contain an enumerated and exhaustive list of Associated Entities and Individuals—it instead describes five categories of conduct that would give rise to that status. *See* IRS art. 1, § 1(c). The only way to determine whether an entity's conduct falls within one of those categories is to inquire, which is what the CSC has been doing.

Class Counsel's only response to this straightforward argument is that the parties did not intend to include MMRs or "third party brand sponsors" in the Settlement Agreement. That is flat wrong and misrepresents the Settlement's text and history. Class Counsel imply, for example, that only entities that support a "particular" school (such as collectives) qualify as Associated Entities, calling subsection (a) the "definitional anchor." *See, e.g.*, Appeal at 10. But the five sub-definitions of "Associated Entity" are independent and disjunctive. Under subsection (d), the Associated

---

[4] Indeed, the standard raises more questions than answers. What constitutes a "specific basis"? How much evidence is required to trigger that standard? Who decides if a "specific basis" is present? What if there is a dispute over whether the standard has been met? Class Counsel cannot answer any of these questions because the concept has no basis in the Settlement Agreement. And as explained below, indulging it would effectively nullify the arbitration procedures set forth in the Settlement Agreement.

-15-

Entity definition encompasses "[a]n individual or entity that (1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes." IRS art. 1, § 1(c)–(d). Subsection (d) thus captures conduct (assisting in recruitment or retention regardless of whether the entity exists to support any particular school). The "fact that Defendants can point to a few instances of MMRs assisting with recruiting or retention," Appeal at 10; *see In re 18 Student-Athletes on the University of Nebraska-Lincoln Football Team v. The College Sports Commission* ("Nebraska Op."), Dkt. No. 1103-01, is precisely why the CSC must have the ability to inquire into potential Associated Entity status for particular businesses (including MMRs) to determine whether they fall within this definition.[5]

Class Counsel likewise misrepresent the negotiating history in suggesting that MMRs and third-party brand sponsors should rarely, if ever, be subject to scrutiny. As Class Counsel well know, it was paramount to Defendants to have the ability to police cap circumvention, whatever form it might take. The Settlement caps annual payments by schools for student-athletes' NIL rights at the "Pool" amount, IRS art. 3, § 1(a), and otherwise retains the NCAA's longstanding ban on paying student-athletes for playing a sport, *id.* art. 4, § 2. Those limitations would be meaningless if schools could funnel unlimited additional money to student-athletes simply by using organizations that label themselves as MMRs, brand sponsors, or any other third party categorically excluded from the definition of an Associated Entity to make payments to student-athletes designated as, but in reality disconnected from, NIL. That is precisely why the Settlement authorizes the CSC to inquire into whether deals with third parties that fall within the definition of an Associated Entity are "for a valid business purpose related to the promotion or endorsement of goods or services" and feature "compensation at rates and terms commensurate with compensation

---

[5] Class Counsel's complaints about the scope of CSC enforcement are without merit. *E.g.*, Appeal at 9 (complaining that CSCs are "impos[ing] burdensome, federal court-style information requests on MMRs"). Class Counsel have repeatedly represented to Defendants that they interact extensively with MMRs, but they have not provided a single example of this allegedly burdensome discovery in support of their motion, at any time over the many months of litigation over this issue. There is no support for Class Counsel's claim that the CSC review contemplated by the Settlement is materially interfering with legitimate third-party NIL deals with student-athletes.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
OBJECTION

Case No. 4:20-cv-03919-CW

paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution." IRS art. 4, § 3. It is that review that avoids cap circumvention and serves the procompetitive rationales for the Settlement that the Court acknowledged. *See supra* at 4–5,7. It is in fact Plaintiffs' interpretation that would produce absurd results. Categorically or presumptively exempting MMRs and brand sponsors from the definition would allow entities that *are* assisting with recruitment to escape scrutiny simply through labeling. Notably, Judge Cousins considered and understood this very type of concern during the June 10 hearing. *See* June 10, 2026, Hr'g Tr. 52:20–53:16. This Court has recognized that it "cannot adopt an interpretation that would lead to such absurd results." *Harris v. Gulf Ins. Co.*, 297 F. Supp. 2d 1220, 1226 (N.D. Cal. 2003) (Wilken, J.).

Class Counsel agreed with this framework when they asked the Court to approve the revised Settlement, acknowledging that the new definition of Associated Entities was designed "to prevent circumvention of the settlement" in just this way. Supp. PA Br. at 1; *see also id.* at 8 ("These NCAA rules avoid circumvention of the negotiated limits on revenue sharing established by the Pool calculation."). Objectors, too, agreed that achieving the Settlement's stated objectives requires enforcing its prohibitions on "certain third-party" NIL transactions. *See* Obj. to Am. Settl. Agmt. And Opp. To Final Approval at 21, Dkt. No. 628 ("The spending cap works only if the NCAA bars certain third-party NIL payments."). Yet Class Counsel's current position would enable exactly the type of circumvention they previously agreed it was critical to avoid.

Class Counsel likewise err in reprising the argument that third parties can never be Associated Entities if they merely pass through funds to student-athletes or arrange deals funded by other parties. *See* Appeal at 10. The Settlement permits Defendants to regulate any "NIL transactions *involving*" Associated Entities, not just deals in which the Associated Entity is the source of the funds. IRS art. 4, § 3 (emphasis added); *see PPG Indus., Inc. v. Pilkington plc*, 825 F. Supp. 1465, 1478 (D. Ariz. 1993) (interpreting "involving" in a contract broadly). The CSC's actions are consistent with that authority; all of the facts and circumstances must be evaluated to determine whether a third-party deal should be regulated by the CSC. *See* Seeley Decl. ¶ 9; *see also* Nebraska Op.

-17-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION

Further, the fact that the Settlement allows MMRs or other third parties to "act as the marketing agent for the student-athlete with respect to third-party NIL contracts," does not demonstrate that such entities can never be Associated Entities. Appeal at 10–11. That provision merely clarifies that it does not violate the Settlement or associated NCAA rules for an MMR or other third party to act as a marketing agent. It does not mean that MMRs or other third parties are wholly immune from CSC scrutiny, or that CSC can only inquire and investigate when there is some vague "specific basis" to do so.

**b.   Accepting Class Counsel's Position Would Undercut the Arbitration Procedures that Class Counsel Highlighted As a Reason for Approval.**

One of the hallmark features of the Settlement Agreement was the new, neutral arbitration procedures, designed to apply in all situations "regarding enforcement of NCAA or conference rules against student-athletes." IRS art. 6, § 1(a). The Settlement granted the NCAA and Conference Defendants the right to "continue, and pass new rules further clarifying and implementing, their existing prohibitions related to NIL transactions involving Associated Entities or Individuals." *Id.* art. 4, § 3. The NCAA did just that when it implemented the Settlement's "Associated Entity or Individual" provision in NCAA Bylaw 22, Dkt. No. 1095-6. The Settlement also allowed the NCAA and Conferences to "enforce (including through the Designated Enforcement Entity) NCAA and conference rules implementing the terms of this Injunctive Settlement including rules to be promulgated pursuant to Article 4." *Id.* art. 6, § 2(a). Class Counsel now appear to dispute how the CSC is applying NCAA Bylaw 22, including in individual enforcement actions. *See generally* Mot. to Enforce; *see also* April 7, 2026 CSC Memorandum interpreting NCAA Bylaw 22.1, Dkt. No. 1095-2; January 9, 2026 CSC Memorandum interpreting NCAA Bylaw 22.1, Dkt. No. 1095-3 (same); March 24, 2026 CSC Letter detailing language of NCAA Bylaws 22.1-3 and application of those rules, Dkt. No. 1095-5; NCAA Bylaw 22, Dkt. No. 1095-6.

The Settlement expressly commits such disputes to arbitration: "[N]eutral arbitrators . . . shall, . . . arbitrate any and all disputes regarding any discipline imposed pursuant to [Article 6, § 2(a)] immediately above or any rule(s) promulgated pursuant to Article 4, Section 3." IRS art. 6,

-18-

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
OBJECTION

§ 2(b); *see also id.* art. 6, §§ 1(a), 2(e). The arbitration rules, which Class Counsel reviewed and agreed to, *see id.* art. 6, § 2(d), recognize this same authority: "The Arbitrator shall have plenary authority to review the CSC's finding that an NIL transaction involving an Associated Entity or Individual (as defined in the Settlement Agreement) violates the NCAA Rules affirmed, revised, or created pursuant to the Settlement Agreement, and/or whether a penalty imposed by CSC was appropriate." Arbitration Rules and Procedures for Disputes with Student Athletes Concerning CSC Determinations (July 28, 2025) (hereinafter, "Arbitration Rules"), Rule 11(a).[6]

There accordingly can be no question that the Court and all parties intended for mandatory arbitration to resolve the enforcement questions raised by Class Counsel's motion. As the Court explained in approving the final terms, "the Injunctive Relief Settlement requires that any disputes arising out of NCAA members' enforcement of the third-party NIL restrictions in the Injunctive Relief Settlement be resolved via neutral arbitration." Final Approval Op. at 48 (citing IRS art. 6, § 2); *see also, e.g.*, Supp. PA Br. at 2 ("Under the settlement, student-athletes or institutions can challenge any payment-related discipline before a neutral arbitrator."). This dispute-resolution provision—mandatory neutral arbitration—was a material requirement for the Court's finding that the Settlement terms were fair and reasonable. *See* Final Approval Op. at 48 ("[T]he Associated Entity third-party NIL provisions in the Injunctive Relief Settlement will result in an enforcement system that is far superior to the one that exists under current NCAA rules."); *id.* ("[N]eutral arbitration will benefit class members, because neutral arbitration will be accompanied by due process protections and a degree of transparency that class members do not have under current NCAA rules."); *see also* Supp. PA Br. at 8 (Class Counsel arguing that "the Injunctive Relief Settlement mitigates the risk of abuse by the NCAA in its interpretation and enforcement of the rules permitted by Section 3 because, for the first time in the NCAA's long enforcement history, neutral arbitration will be available to challenge the NCAA's enforcement of such rules against athletes or their schools.").[7]

---

[6] https://assets.tina.io/29b83311-e587-42b1-861e-87ebde9aa253/CSC%20-%20Arbitration%20Rules%20and%20Procedure%20(Final%20dated%2007.28.2025).pdf
[7] Arbitration Rules, https://assets.tina.io/29b83311-e587-42b1-861e-87ebde9aa253/CSC%20-%20Arbitration%20Rules%20and%20Procedure%20(Final%20dated%2007.28.2025).pdf

-19-

The bargained-for arbitration system is working exactly how the parties envisioned. In the first arbitration under the Settlement Agreement, 18 class members (all football players from the University of Nebraska) initiated the first consolidated arbitration proceeding after the CSC refused to approve NIL deals involving Playfly, a multimedia rights organization (MMR) that partners with many Division I schools. Nebraska Op. Based on its investigation, the CSC concluded that Playfly was an "associated entity or individual" in connection with the deals at issue. Nebraska Op. at 13. CSC then determined that the deals failed scrutiny under NCAA rules adopted pursuant to the Settlement, with the review and approval of Class Counsel. *Id.* at 14. In a 41-page opinion, Arbitrator Strongin carefully evaluated the facts and circumstances, including the record evidence regarding Playfly and the deals at issue, and affirmed the CSC's findings. *Id.* at 41 ("Consistent with the foregoing, CSC properly determined that Playfly is an associated entity, and CSC properly determined not to clear the NIL deals at issue.").

Class Counsel's motion and appeal are an attack on this system and this Court's considered determination that the Settlement was fair and reasonable. Class Counsel's motion was filed on the eve of Arbitrator Strongin's ruling, in an apparent effort to try to strip him of jurisdiction to make an Associated Entity determination. And their response to his decision, once issued, was to argue that it was legally erroneous. *See* Plfs.' Response to Defendants' Notice at 3–4*,* Dkt. No. 1105. But under the Settlement, the parties agreed to live with the results of arbitration—not to run to this Court when the results are unfavorable. Accepting Class Counsel's position would effectively nullify the key dispute resolution mechanism of the Settlement. Almost any dispute that could be raised in arbitration could be recharacterized as being about the "interpretation or enforcement of th[e] Injunctive Relief Settlement." *Id.* art. 6, § 1(a). Allowing the parties to bring all of those disputes to Court would leave nothing for arbitration. It is improper for Class Counsel to highlight arbitration as a benefit to the Class when attempting to obtain approval, only to then try to short-circuit arbitration every time they do not like the results they think arbitration will supply.

Lastly, there is no reason to think, as Class Counsel have repeatedly suggested, that arbitration is an insufficient remedy because the CSC's investigations are chilling or slowing down

-20-

deals. As the record currently stands before the Court, the vast majority of deals are cleared promptly, *see* Seeley Decl. ¶ 4; there are instances where MMRs may be acting as Associated Entities or Individuals, *id.* at ¶ 8; and there have been only two arbitrations challenging deals that have not been cleared—all of which suggest that the system is working efficiently and as intended. CSC's practice, to date, has been to try to give entities every opportunity to provide documentation that will allow deals to be cleared. The fact that some MMRs are not inclined to accept that invitation, *see* Plfs.' Evidentiary Notice at 2; Opp'n to Pls.' Notice at 2, may explain why some delays are occurring, but none of that is chargeable to Defendants or the CSC.

The system contemplated by the Settlement is working as intended. The Court should reject Class Counsel's attempt to short-circuit it now.

### c.   The Court Should Also Deny Class Counsel's Requests For Extensive Information About the CSC's Operations.

Class Counsel's request for discovery from the CSC is likewise improper because they have no grounds for requesting any of the materials they seek. At the hearing on the Motion to Enforce, Judge Cousins noted the possibility that Class Counsel were trying to renegotiate the Settlement in seeking additional information about the CSC's operations.[8] Just so. The Injunctive Settlement was a carefully crafted compromise designed to allow Class Counsel appropriate, but not unlimited, oversight. Class Counsel negotiated for, and obtained, the right to receive certain reports about topics covered by the Settlement. *See* IRS art. 2 § 5 (report of each NIL contract or payment reported to Conference Defendant Member Institutions); *id.* art. 3 § 5 (report of new payments and benefits provided by member institutions). They did *not* negotiate for, or obtain, any right to receive reports about the CSC's review and decisions. Class Counsel negotiated for, and obtained, limited audit rights over the MFRS data (and the MFRS data alone). *Id.* art. 3 § 6. They did *not* negotiate for, or obtain, any right to audit the CSC. Class Counsel negotiated for, and

---

[8] *See* June 10, 2026 Hr'g Tr. 58:19–60:1 (Judge Cousins: " I'm not trying to argue with you, but this maybe is a kind of argument is, are you negotiating for something which you could have asked for and didn't before, which is access to the information in the arbitrations, to have some greater disclosure of what's going on. You're saying you don't have access to it now. If your reaction is, well, did you have a right to it, and maybe you should have, you know, negotiated for that.").

DEFENDANTS' OPPOSITION TO PLAINTIFFS' OBJECTION

obtained, limited rights in the arbitration regime established by the Settlement, including the right to obtain copies of arbitral decisions and to submit amicus briefs and argument in certain circumstances. *Id.* art. 6 § 3. They did *not* negotiate for, or obtain, any right to superintend the CSC's pre-arbitration investigations.

The Settlement thus provides no basis for Class Counsel's effort to limit the CSC's investigative authority. Class Counsel's suggestion that a miscellaneous general catchall provision at the end of the Injunctive Settlement, *see id.* art. 10 § 4, allows such broad oversight into CSC's operations is the proverbial elephant in a mousehole. Reading such broad powers into a miscellaneous general provision would upset the Injunctive Settlement's careful balance in a way the parties clearly—and this Court—did not intend.

## CONCLUSION

Judge Cousins correctly resolved the issue Class Counsel presented to him: MMRs and "third-party brand sponsors" should not categorically be excluded from the "Associated Entity or Individual" definition. Class Counsel provide no justification for overturning that decision. To the extent Class Counsel now seek to obtain other rulings under the Settlement Agreement, those requests are not properly before the Court, and, in any event, are meritless.

The Court should affirm Judge Cousins's ruling and deny Class Counsel's appeal.


 Dated:  July 23, 2026                                   Respectfully Submitted.

Case No. 4:20-cv-03919-CW

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
OBJECTION

**WILKINSON STEKLOFF LLP**

By: /s/ *Rakesh N. Kilaru*
Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Calanthe Arat (SBN 349086)
Matthew R. Skanchy (*pro hac vice)*
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone:  (202) 847-4000
Facsimile:  (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
carat@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com

Jacob K. Danziger (SBN 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

**COOLEY LLP**

By: /s/ *Whitty Somvichian*
Whitty Somvichian (SBN 194463)
Kathleen R. Hartnett (SBN 314267)
Ashley Kemper Corkery (SBN 301380)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:  (415) 693-2000
Facsimile:  (415) 693-2222
wsomvichian@cooley.com
khartnett@cooley.com
acorkery@cooley.com

Mark Lambert (SBN 197410)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:  (650) 843-5000
Facsimile:  (650) 849-7400
mlambert@cooley.com

Dee Bansal (*pro hac vice*)
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 842 7800
Facsimile:  (202) 842 7899
dbansal@cooley.com

Attorneys for Defendant
PAC-12 CONFERENCE

-23-

**MAYER BROWN LLP**

By: /s/ *Britt M. Miller*
Britt M. Miller (*pro hac vice*)
Daniel T. Fenske (*pro hac vice*)
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 782-0600
Facsimile:  (312)  701-7711
bmiller@mayerbrown.com
dfenske@mayerbrown.com

Elspeth V. Hansen (SBN 292193)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
ehansen@mayerbrown.com

Attorneys for Defendant
THE BIG TEN CONFERENCE, INC.

**SIDLEY AUSTIN LLP**

By: /s/ *David L. Anderson*
David L. Anderson (SBN 149604)
101 California Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7412
dlanderson@sidley.com

Angela C. Zambrano (*pro hac vice*)
Natali Wyson (*pro hac vice*)
Chelsea A. Priest (*pro hac vice*)
2323 Cedar Springs, Suite 2600
Dallas, TX 75201
Telephone: (214) 969-3529
Facsimile: (214) 969-3558
angela.zambrano@sidley.com
nwyson@sidley.com
cpriest@sidley.com

Attorneys for Defendant
THE BIG 12 CONFERENCE, INC.

-24-

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
OBJECTION

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: /s/ *Robert W. Fuller*
Robert W. Fuller, III (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
Travis S. Hinman (*pro hac vice*)
Patrick H. Hill (*pro hac vice*)
600 S. Tryon St., Suite 2300
Charlotte, NC 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com
phill@robinsonbradshaw.com

Mark J. Seifert (SBN 217054)
SEIFERT ZUROMSKI LLP
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 999-0901
Facsimile: (415) 901-1123
mseifert@szllp.com

Kathryn Reilly (*pro hac vice*)
Michael Williams (*pro hac vice*)
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Suite 4500
Denver, CO 80202
Tel: (303) 244-1800
Fax: (202) 244-1879
reilly@wtotrial.com
williams@wtotrial.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**LATHAM & WATKINS LLP**

By: /s/ *Christopher S. Yates*
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-1061
Facsimile: (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**

By: /s/ *D. Erik Albright*
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5368
Facsimile: (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

## SIGNATURE CERTIFICATION

I, Rakesh N. Kilaru, am the CM/ECF user whose ID and password are being used to file the Defendants' Brief in Response to Objections. In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated: July 23, 2026                          Respectfully submitted,

                                              **WILKINSON STEKLOFF LLP**

                                              By:   /s/ Rakesh N. Kilaru
                                                    Rakesh N. Kilaru
                                                    Attorney for Defendant
                                                    National Collegiate Athletic Association

-26-