Gannon Flynn
10612 Roy Butler Dr, Austin TX 78717
Gannon.Flynn72@gmail.com
NCAA ID: 2203480546

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE COLLEGE ATHLETE NIL LITIGATION

Case No.: 20-cv-03919-CW
**Objection of Gannon Flynn**

Judge: Hon. Claudia Wilken

On June 6th, 2025, this court approved the Injunctive Relive Settlement in this case. Since that approval college athletics has descended into further chaos. Over the last year we have seen countless programs get cut, scholarships being removed, and tens of thousands of athletes were forced into the transfer portal. This settlement has moved college athletics into a tornado that could have been avoided. This settlement caused irreversible harm to thousands of athletes' lives by forcing athletes into the transfer poral where they spend thousands of dollars moving their lives across the country and forced athletes into walking away from scholarships just to keep playing their sports. Countless athletes had to pick between their sport or delaying graduation just to finish their eligibility. Counsel told your honor that this settlement would bring more scholarships to athletics, when it has simply shifted the money from women's and Olympic sports over to football and basketball. For those reasons I object to the continued enforcement of this settlement.

**Standing**

On April 7th, 2025, I appeared before this court as a student athlete at the University of Utah. While at the hearing I spoke about the catastrophic effects that roster limits would have on college athletics. However, I object as an incoming athlete at a new institution. I also object because this court knew that roster limits would cause harm and attempted to use DSA to mitigate that harm. However, this failed. Designated Student Athletes didn't stop the tens of thousands of athletes that had to enter the transfer portal and that endured new damages since approval.

I object today as a student athlete from Boston University. When I was forced into the transfer portal by House v NCAA, I chose to go to a school that prioritized academics and was outside of this settlement. I chose a school where I wouldn't be under the effects of a settlement that puts the wants of the few revenue generating athletes over Olympic and women's sports. Now Boston University decided that in order to complete with larger schools we need to opt into revenue sharing by joining the IRS. I moved to a school that was not under the effects of the IRS and now that the institution that I attend is going to the placed under the rules of this settlement I have the right to object.

Additionally, my ability to transfer dose not override and erase the injury this case brought. This case brough both financial injury to me and exceeded this courts discretion to inflict harm against me in a settlement that I could not opt out of. Additionally, federal rule of civil procedure 23(5)(A) allows me to argue that I object on behalf of the subset of the class; I object to this settlement on behalf of the 28,976 student athletes that were forced into the transfer portal due to this settlement agreement.

**Roster Limits**

During the final approval process council told the court that no one would be losing their roster spots. I stood before the court and showed otherwise. The attempt to delay the harmful roster limits by this court were too late. When the settlement was approved it took effect 30 days later. Way too late for the students that were counting on this court to make a decision that would change their lives. 28,976 Division 1 student athletes entered the transfer portal during the 2025 cycle (Aug 2024-July 2025) (1). According to the data that the NCAA published only 18,421 student athletes were successful at transferring. Leaving 10,555 athletes who did not get to continue their athletic careers. Only 68% of those who were able to transfer transferred with an athletic scholarship at their new school. The rest of the athletes that were able to transfer were forced to do so without athletic scholarships or transferred to Division 2/3 schools. While D2 and D3 athletes are incredible athletes, it is not the same level as D1. That decision was not made by the athletes but forced on them by this settlement. This settlement forced thousands of athletes out of Division 1 athletics. 19,320 student athletes with athletic scholarships at their original institution entered the transfer portal, 13,320 of them being athletes in non-revenue generating sports. Only 61% of athletes in non-revenue sports who had athletic aid at their original school transferred to athletic aid at their new school. This settlement stripped thousands of athletes away from their scholarships all in the name of paying a few people.

Schools didn't just cut current athletes. Schools cut recruits and people that had already signed scholarship agreements and National Letters of Intent. These athletes had singed binding contracts to play for schools. However, due to this settlement they were forced to pick between going to their school and not getting to play or trying to find another school just so they could continue the sports they

had spent their life training for.

Thousands of athletes flat out quit their sports due to the roster limits. They were forced to pick between graduating on time, walking away from the families they had built and the degrees they were chasing. Thousands of athletes chose not to try and transfer.

**Financial damages**

I like many other student athletes chose to transfer instead of leaving college athletics. Due to the direct effects of this settlement, I lost my roster spot at Utah. I was told by my coaches that the only reason I was being cut was because of the roster limits. The roster limits from this settlement forced me into the transfer portal. Despite my scholarship at Utah, I had to pick between continuing the sport I love and staying to finish college for a cheaper price. I chose my sport. I transferred from a public state college in Utah to a private school in Boston. While the final decision to transfer to Boston was my decision, this court and this settlement forced me into the transfer portal. Additionally, Boston University dose not fund their men's swimming and Diving program with any athletic scholarships. This settlement forced me and many others to transfer from cheaper public schools to more expensive private schools due to roster limits.  And I like thousands of others had to transfer leaving our scholarships to no athletic aid.

Additionally, since the approval of House v NCAA many institutions have been taking away Allson money; payments from universities authorized from Allson v NCAA. The University of Utah refers to this program as the "UAchieve Excellence Award". The University of Utah is one of many schools that is taking away this money that all athletes who were on any amount of scholarship received. Now, post settlement, schools have taken away programs like these. The programs that paid athletes for expenses not included in their scholarships are ending at

universities across the country (Exhibit A).

Universities are also cutting scholarships from Olympic sports to compensate for the tens of millions of dollars that schools are pouring into football and basketball. Schools are actively hurting Olympic and women's sports just to pay a few athletes more. This settlement created tens of millions of dollars worth of additional expenses without schools having more than 30 days from approval to implementation. Schools had no time to come up with additional revenue, and we have only seen the start of it.

Schools have cut thousands of Olympic and women's sports scholarships since the settlement was approved. (2) This settlement has also led to a significant number of sports being cut as Senator Cantwell said "We're seeing thousands of Men's and Women's athletic roster slots and a hundred athletic programs being cut" because of this settlement. (3) This settlement has so much wrong with it that it has forced congress into agreeing; something needs to change with college athletics before it is gone.

This settlement fails to reach the fairness and equitable standard in rule 23. This settlement is not fair. No one can sit there and say that it is fair to force over 28,000 student athletes into the transfer portal. To strip 39% of the non-revenue generating athletes who entered the transfer portal of their athletic aid. It is not fair to force athletes out of their schools and to transfer to more expensive schools. It is not fair to take away Allson money from athletes. It is not fair nor equitable to harm tens of thousands of non-revenue generating athletes just to pay a select few athletes.

Your Honor said in the preliminary hearing that "I've found that taking things away from people is usually not too popular" in regard to NIL collectives. What about our sports. What about our roster spots. What about our scholarships.

What about our Allson money.

Class council argued that the scholarships limits were illegal cartel agreements that restricted the market and violated anti-trust laws. The roster limits that this court approved are the same illegal cartel agreements that led to this lawsuit; except these limits actively restrict competition and people's ability to even be on a team. ***Local Number 93 v. City of Cleveland***, 1986, found that a court can not enforce a settlement that violates federal law. Roster limits are illegal cartel agreements that restrict people's ability to compete, and this court cannot use its power to enforce an illegal cartel agreement.

The courts attempt to minimize the effects of roster limits failed. 28,000 student athletes still entered the transfer portal. The court was too late in trying to protect athletes and it resulted in immediate and irreparable harm.

**Post Approval Developments**

Class council said that no sport would be cut due to this settlement, however we have already seen that was a lie. According to Senator Cantwell hundreds of sports have already been cut due to this settlement. These sports are going to keep disappearing unless something changes.

Under ***Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)** the supreme court held that when there is a significant change in circumstances that the court may require a modification to the continued enforcement of a settlement agreement. Rule 60 (b)(5) says the court can modify this settlement if: there a significant change in circumstances and the request is suitably tailored to the change in circumstances.

Class council said very few people would get cut. My own calculations that I shared on April 7th, 2025, significantly underestimated the number of athletes that would lose their roster spots. 28,000 student athletes is a large number of class

members that were harmed. The creation of Designated Student Athletes failed to protect tens of thousands of athletes from being harmed by roster limits. This constitutes a significant change in circumstances. I request that under Rule 60 this court modify or force a modification to the settlement to exclude roster limits as they are: detrimental to public interest in non-revenue and women's sports, violate federal antitrust laws and fail to meet the fair, reasonable and equitable standard required by Rule 23.

Additional changes in circumstances include Trump EO 14322, issued on July 24th, 2025. EO 14322 sec. 2(b) say that "It is the policy of the executive branch that any revenue-sharing permitted between universities and collegiate athletes should be designed and implemented in a manner that preserves or expands scholarships and collegiate athletic opportunities in women's and non-revenue sports." Additionally, Trump EO 14400 issued on April 3rd, 2026. EO 14400 Sec. 4 (iv) states that "the implementation of revenue-sharing between higher education institutions and student-athletes" should be done "in a manner that preserves or expands scholarships and collegiate athletic opportunities in women's and Olympic sports, including through provisions toprevent revenue-sharing from being allocated in a manner that results in
a reduction in scholarships and opportunities in women's and Olympic sports;".

I have shown a significant change in circumstances and development since approval of this settlement, and a suitably tailored change due to the circumstances and request that this court modify the settlement accordingly.

**Congressional Action**

While not legally binding as a bill this court should take under advisement that congress agrees that roster limits are harmful to athletics. Senator Cruz (R-

TX), Senator Cantwell (D-WA), Senator Coons (D-DE), and Senator Schmitt (R-MO) introduced the Protect College Sports Act on May 27th, 2026. The PCSA passed the Senate Committee on Commerce, Science and Transportation and is awaiting a vote on the Senate floor.

Congress has recognized a bipartisan need to fix college sprots, including many flaws from this settlement. During the Commerce committee roundtable on June 10th, 2026, the senate distributed papers to the participants highlighting the need for such legislation (Exhibit B). The senate recognizes the roster chaos, the loss of scholarship opportunities for women's and Olympic sports. Additionally, Rep. Baumgartner (R-WA) has introduced a companion bill in the House of Representatives.

Section 125 of the PCSA is the "Protection of Women's Sports and Olympic Sports" section (Exhibit C). The PCSA seeks to remove roster limits, restore the number of women and Olympic sports at schools and to keep scholarships in those sports by restoring roster sizes, scholarship allocations and number of sports as schools had during the 2024 school year, prior to this settlement being enacted. This bill is seeking to directly change part of this settlement that has been so detrimental to college athletics. This court should be protecting all class members and not harming women's and Olympic sports.

The court should take under advisement the pending legislation and modify the settlement prior to the passing of the PCSA.

**Conclusion**

This settlement has actively placed and continues to place athletes at risk. This settlement fails to meet criteria required under Rule 23. This settlement conflicts with Executive policy, pending legislative actions, and federal precedent

This court can't continue to enforce roster limits that are harmful to athletes. Roster limits represent an even more severe "unlawful labor market restraints" that class council alleged scholarships limits caused. Rule 60 lays the framework and guide to modify the settlement and I request that this court make the adequate modification that I have outlined by removing roster limits from this settlement.

Respectfully submitted,

/s/ Gannon Flynn

**Citations**

1. **NCAA.** Transfer Portal Data: Division I Student-Athlete Transfer Trends. [Online] https://ncaaorg2.sidearmsports.com/sports/2022/4/25/transfer-portal-data-division-i-student-athlete-transfer-trends.aspx?path=research.

2. **Protect College Sports Act: Hearing on S. 4668 . 119th Cong. 3 (June 3, 2026) . Vols. Before the S. Comm. on Commerce, Sci. & Transp., .**

3. **Cantwell, Maria.** ***Protect College Sports Act: Hearing on S. 4668 Before the S. Comm. on Commerce, Sci. & Transp., 119th Cong.*** **June 3, 2026.**

# Exhibit A



Jun 25, 2025 at 3:19 PM

ARMS Msg from Jason Greco: Student-Athletes,

For those of you that are eligible to receive the UAchieve Excellence Award after the spring semester, this notification is to let you know that those awards will begin processing after July 1st. Again, you would have to been eligible after the spring 2025 semester and still on your teams roster in order to receive th disbursement. The hope is that all will be processed at the very latest the week after July 4th.

Lastly, as we approach this new era of collegiate athletics, this will be the last disbursement of the monies from the UAchieve program.

If you have any questions please feel free to reach out.

Thanks,
Jason Greco
Reply using

Click to Load Preview

armsapp.io

Exhibit A- A message from Jason Greco, Executive Senior Associate Atheltic Director at the University of Utah to student athletes regarding the end of the UAchieve program sent to student athletes.

# Exhibit B

U.S. SENATE COMMITTEE ON
**COMMERCE, SCIENCE, & TRANSPORTATION**

## The Protect College Sports Act

*Senators Ted Cruz (R-Texas) and Maria Cantwell (D-Wash.)*

**The Problem**

College sports have always been bigger than the final score. They bring families and towns together on October Saturdays and winter nights, unite generations of alumni and friends, and create opportunities for young men and women to compete, learn, and represent their schools with pride.

But today that tradition is in crisis.

Fans see their favorite rivalries disappearing. Their schools are being eviscerated in the portal by the blue bloods. Olympic and women's sports are getting canceled. Student athletes are being pulled through an unstable, semi-pro market without clear protections or an education because of recent court decisions and a patchwork of state laws. Programs and governing bodies are trapped in constant litigation and uncertainty, making it impossible to enforce rules, operate with integrity, or have competitive balance.

**Why Is Legislation Needed?**

The courts have produced a system with unlimited transfers, pro athletes playing college ball, and shady NIL deals. Schools and governing bodies need the ability to preserve fair competition, protect student athletes from exploitation, and ensure that programs across the country can survive.

Without legislative action, more athletic programs will vanish, as will longstanding rivalries, and much of what generations of Americans have loved about college sports will soon fade away.

**The Solution: The Protect College Sports Act**

The Protect College Sports Act restores a national rulebook so student athletes can earn NIL, fans can still watch the teams they love compete fairly, and college sports does not become a two-conference minor league.

The Protect College Sports Act:

1. **Ends the roster chaos** with national rules for transfers (one free undergrad) and eligibility (5-in-5)
2. Creates enforceable **standards on recruiting, tampering**, and NIL disclosures
3. Protects student athletes' right to earn from their own NIL
4. Enables **enforcement of House settlement** on revenue sharing and fake NIL deals
5. Sanctions against agents that take advantage of student athletes, facilitate player poaching, and recruit tampering
6. Protects women's sports, Olympic sports, and scholarship opportunities
7. **Preserves historic rivalries**
8. Keeps college sports tied to education, so student athletes become successful adults
9. Prohibits **football coaches from quitting mid-season** to be hired by another program
10. Guarantees safety standards, health care, and an ombudsman for student athletes
11. Makes TV money work for college sports with an option for schools to pool media rights
12. Stops Super League consolidation

Exhibit B- A document presented to participants of the Senate Commerce Committee's June 10th round table on college athletics discussing the issues facing college athletics.

# Exhibit C

SEC. 125. PROTECTION OF WOMEN'S SPORTS AND OLYMPIC SPORTS.

(a) IN GENERAL.—An intercollegiate athletic association or conference comprised of Division I institutions, as defined by bylaw 20.9 of the National Collegiate Athletic Association, or a successor bylaw, shall not reduce the

Association, or a successor bylaw, shall not reduce the minimum intercollegiate athletic competitions, minimum participants on a varsity sports team, or the number of varsity sports teams, including the number of men's and women's varsity sports teams or Olympic varsity sports teams, that an institution must sponsor for membership within—

(1) Division I of the National Collegiate Athletic Association, as defined by bylaw 20.9 of the National Collegiate Athletic Association, or a successor bylaw; or

(2) the Football Bowl Subdivision, as defined by bylaw 20.9.9 of the National Collegiate Athletic Association, or successor bylaw.

(b) LARGE-SIZED INSTITUTIONS.—

(1) IN GENERAL.—Except as provided in paragraph (2), an intercollegiate athletic association or conference comprised of institutions shall provide that each institution shall, consistent with applicable intercollegiate athletic association rules, offer and maintain at least as many total grant-in-aid opportunities and total roster spots for non-revenue generating intercollegiate sports programs, including women's and Olympic intercollegiate sports programs, during each academic year as the member institution provided during academic year 2024–2025.

grams, during each academic year as the member institution provided during academic year 2024–2025.

(2) WAIVER.—

(A) IN GENERAL.—An institution may be granted a waiver from compliance with paragraph (1) for not more than one academic year at a time by an intercollegiate athletic association if the institution provides evidence that—

(i) annual athletics revenues have declined not less than 15 percent based on the average of the preceding three academic years, and total grant-in-aid accounts for not less than 45 percent of the total expenses of the athletic department of the institution;

(ii) compliance with paragraph (1) would materially impair the ability of the institution to comply with Federal law; or

(iii) there are extraordinary circumstances relating to financial hardship, including from a natural disaster, act of

war, or another catastrophe, that are beyond the control of the institution or materially impair the ability of the institution to comply with paragraph (1).

(B) CONDITION.—As a condition of seeking a waiver under subparagraph (A)(i), an institution shall first reduce the total compensation of the coaching staff of its revenue-generating varsity sports programs by the same proportion as any planned reduction in expenditures for its non-revenue generating intercollegiate sports programs during the waiver period.

(3) DEFINITIONS.—In this subsection:

(A) INSTITUTION.—The term ''institution'' means an institution, as defined by bylaw 20.9 of the National Collegiate Athletic Association, or a successor bylaw, that, upon the date of the enactment of this Act, reports, as required under section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)), having generated not less than $80,000,000 in total annual athletics revenue during the preceding academic year.

(B) NON-REVENUE GENERATING INTERCOLLEGIATE SPORTS PROGRAM.—the term ''non-revenue generating intercollegiate sports program'' means an intercollegiate sports program at an institution for which, during an aca-

attributable to that sports program are less than the direct and allocated operating expenses of that sports program.

attributable to that sports program are less than the direct and allocated operating expenses of that sports program.

(4) SUNSET.—This subsection shall terminate on the date that is 9 years after the date of the enactment of this Act.

(c) TRANSITIONAL PROTECTION FOR WOMEN'S AND OLYMPIC SPORTS AT MID-SIZED INSTITUTIONS.—

(1) IN GENERAL.—Except as provided in paragraph (2), an intercollegiate athletic association or conference comprised of covered mid-sized institutions shall provide that each such institution shall, consistent with applicable intercollegiate athletic association rules, offer and maintain at least as many total grant-in-aid opportunities and total roster spots for non-revenue generating intercollegiate sports programs, including women's and Olympic intercollegiate sports programs, during each academic year as the institution provided during academic year 2024–2025.

(2) EXEMPTIONS.—An institution shall be exempt from the requirement under paragraph (1) for an academic year if—

(A) the total annual athletics revenue of 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)), declined by not less than 15 percent from the immediately preceding academic year;

(B) the institution petitions the relevant intercollegiate athletic association for, and is granted, an exemption based on a demonstrable financial hardship;

(C) compliance with that paragraph would materially impair the ability of the institution to comply with Federal law; or

(D) there are extraordinary circumstances relating to financial hardship, including from a natural disaster, act of war, or other circumstance that is beyond the control of the institution or materially impair the ability of the institution to comply with that paragraph.

(3) COVERED MID-SIZED INSTITUTION DEFINED.—In this subsection, the term ''covered mid-sized institution'' means an institution, as defined by bylaw 20.9 of the National Collegiate Athletic Association, or a successor bylaw, that, upon the date of the enactment of this Act, reports, as required under section 485(g) of the Higher Education Act of 1965

$50,000,000 but less than $80,000,000 in total annual athletics revenue during the preceding academic year.

$50,000,000 but less than $80,000,000 in total annual athletics revenue during the preceding academic year.

(4) SUNSET.—This subsection shall terminate on the date that is 4 years after the date of the enactment of this Act.

(d) CLARIFICATION OF FLEXIBILITY.—Nothing in this section may be construed to prevent an institution or a covered mid-sized institution from modifying or substituting which varsity sports it sponsors, or the number of roster spots and grant-in-aid opportunities on each varsity sport, so long as the institution—

(1) complies with bylaw 20.9 of the National Collegiate Athletic Association, or a successor bylaw, or bylaw 20.9.9 of the National Collegiate Athletic Association, or a successor bylaw; and

(2) as applicable under subsections (b) and (c), offers and maintains at least as many total grant-in-aid opportunities and total roster spots for non-revenue generating intercollegiate sports programs during each academic year as the institution provided during academic year 2024–2025.

(e) CLARIFICATION OF WALK-ON ATHLETE ELIGI-

(1) IN GENERAL.—Notwithstanding any provision of this Act—

(A) an institution and the athletic director of an institution shall retain full authority to

include para athletes on their roster spots for intercollegiate sports as walk-on athletes;

(B) subparagraph (A) does not constitute a violation of roster or scholarship limits for intercollegiate sports covered under this Act or under ''In Re College Athlete NIL Litigation'', No. 20–cv–03919 (N.D. Cal. June 6, 2025); and

(C) para athletes included as walk-on athletes shall not be counted toward any roster cap or scholarship count established for that intercollegiate sport.

(2) DEFINITIONS.—In this subsection:

(A) PARA ATHLETE.—The term ''para athlete'' means a nationally or internationally classified athlete eligible to compete in the Paralympic Games pursuant to qualifications determined by the United States Olympic and Paralympic Committee under chapter 2205 of title 36, United States Code.

(B) WALK-ON ATHLETE.—The term ''walk-on athlete'' means an enrolled student athlete who participates on a sport roster without receiving athletics-based scholarship aid.