Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com
david.greenspan@winstontaylor.com
adam.dale@winstontaylor.com
sarah.viebrock@winstontaylor.com
neha.vyas@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

*Class Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**JOINT LETTER BRIEF RE PLAINTIFFS' MOTION TO COMPEL DOCUMENTS FROM THE COLLEGE SPORTS COMMISSION**<br><br>Judge: Hon. Claudia Wilken<br><br>Magistrate Judge: Hon. Nathanael M. Cousins |

**I. Plaintiffs' Position:** This dispute arises from Class Counsel's April 20, 2026 Motion to Enforce the Fourth Amended Stipulation and Settlement Agreement. Dkt. No. 1095. In that Motion, Class Counsel informed the Court that, with respect to MMRs and third-party brand sponsors, Defendants and CSC are "overreaching their enforcement efforts well beyond what the Settlement permits" and "overburdening Class Members and third parties with . . . requests that impose substantial costs and delays before approval." *Id.* at 1–2. Defendants and CSC argued that Class Counsel did not have sufficient facts, but Defendants and CSC simultaneously refused to provide Class Counsel with documents or information[1] that would shed light on CSC's practices and policies and crystallize any dispute over its investigative conduct.

After rounds of briefing and decisions, Judge Wilken confirmed what the Settlement provides: Plaintiffs are entitled to "request and receive . . . documents and information ***relating to the parties' dispute about the CSC's investigations of MMRs and third-party brand sponsors***." Dkt. No. 1144 ("Order") at 4 (emphasis added). The standard for assessing those requests is in the Settlement itself: CSC must produce documents "as are reasonably necessary and appropriate to implement and effectuate the purposes" of the IRS, including Class Counsel's rights to monitor and enforce the IRS. IRS Art. 10, § 4; *see also id.* at Art. 6, § 1(c). This Court required the parties to meet and confer about the breadth and scope of any objections to Class Counsel's document requests and the substantive issue of "whether the CSC's investigations of MMRs and third-party brand sponsors are being conducted 'absent a specific basis' or otherwise in a manner that violates the IRS." Dkt. No. 1146. Class Counsel have worked hard to substantially narrow their requests from their March 6, 2026 letter to now principally focus on a representative sample set of CSC investigations.

CSC's prolonged stonewalling did not end after the Court weighed in. Rather than addressing "any disputes about the breadth or scope of [Class Counsel's] requests for documents and information" (Order at 4), CSC has used the meet-and-confer process to relitigate the threshold question of whether Plaintiffs are entitled to discovery at all. It declared that "CSC does not believe the IRS entitles Class Counsel to obtain 'discovery' (as you put it) from the CSC in order to see if a 'problem' exists," and that "CSC does not believe the IRS or Judge Wilken's order authorize that form of inquiry."[2] Sep. 7, 2026 Email from S. Swaney; Sep. 23, 2026 Email from S. Swaney. Even now, CSC continues to question Class Counsel's "monitorship rights." Judge Wilken already rejected that position. The Order does not condition production on Class Counsel first proving that CSC's investigations into MMRs and third-party brand sponsors violate the IRS without any transparency into CSC's practices and policies; it instead recognizes that seeking relevant documents *is* the means by which Class Counsel effectuate their monitoring and enforcement responsibilities over CSC's compliance with the IRS. *See* Order at 4. Indeed, the Court did not (yet) find CSC in violation of the IRS, but nonetheless ordered CSC to produce documents and information about its "investigations of MMRs and third-party brand sponsors." *Id.* at 3–4.

Rather than responding to Class Counsel's document requests, CSC provided a position statement and ten self-selected exhibits and told Class Counsel to accept CSC's own say-so rather than receiving actual evidence of CSC's investigative policies and practices. This is curated advocacy, not

---

[1] Class Counsel first requested documents and information in a March 6, 2026 letter. *See* Dkt. No. 1095-4.

[2] Plaintiffs have not attached the documents cited herein as exhibits in light of Judge Cousins's Standing Order, but will readily do so upon the Court's request.

the production of information the Court's Order and the IRS demand. Yet even this fragment of cherry-picked information revealed that CSC has been telling schools that the definition of "Associated Entity or Individual" is something far broader than, and different from, the definition the parties negotiated—and Judge Wilken approved—in the IRS. The exhibits show CSC providing this incorrect definition to member schools, asking if an entity meets it, and then relying on schools' capitulation that the entity is "Associated" under the overbroad and unauthorized definition that CSC is propagating. CSC admitted it uses this definition as "boilerplate" in its communications with schools. In its position statement—and again now—CSC relies heavily on schools self-identifying Associated Entities to defend investigating these entities' deals. A school's identification is meaningless, however, if it does so in reliance on a definition of "Associated" that contradicts the IRS's language. In sum, even CSC's tiny and gerrymandered "production" exposed a glaring problem in its investigative practices and policies toward MMRs and third-party brand sponsors, underscoring the critical importance of the Court ordering CSC to make a *real* document production that provides transparency into CSC's conduct.

For their part, Class Counsel sought to compromise to address CSC's burden and relevance concerns. Class Counsel have narrowed their requests to deal files in merely half of the 190 instances where CSC itself changed an entity's status from Non-Associated to Associated. For that small sample of 95 deals out of the 45,000+ that CSC has reviewed in total, Class Counsel asked for what any meaningful review into "CSC's investigative activities" requires (*see* Order at 3): the complete deal file, including materials submitted in connection with the deal, internal and external communications relating to the investigation of Associated status, and documents reflecting CSC's determination to approve or reject the deal.[3] Basically, for a very small number of deals (around two-tenths of a percent of what CSC has reviewed), Class Counsel want to be able to review CSC's entire investigative process from beginning to end. CSC, by contrast, wants to pick and choose what investigative documents to turn over, and for a fewer number of deals.

Further, in light of the revelation that CSC has been disseminating an unquestionably false definition of "Associated Entity or Individual," Class Counsel requested that CSC conduct a reasonable search for communications with schools describing the definition or criteria for Associated status. CSC, however, refuses to conduct any independent search for such documents—arguing that Class Counsel will get whatever happens to be included in the small number of incomplete deal files it has offered to produce.

CSC's purported relevance and burden concerns are unavailing:

***Complete Deal Files:*** CSC raises two objections to producing complete deal files.

First, on volume: CSC offered to produce information for just 26 of the approximately 260 instances it initially identified where it independently changed an entity's status from Non-Associated to Associated. Class Counsel countered with half: 130 instances. CSC then disclosed that roughly 70

[3] Two days ago, CSC first stated that in some instances it made a determination about an entity's or individual's Associated status with no deal pending. Sep. 30, 2026 Email from S. Swaney. Putting aside Class Counsel's concern that CSC would ever investigate anything in the absence of a pending NIL transaction, Class Counsel requested for such instances (i) the documents related to CSC's determination that the entity or individual was Associated, and (ii) the complete file for the next deal involving that entity or individual after CSC made its determination.

of those instances involved duplicates, reducing the unique universe to approximately 190. With that corrected baseline, CSC moved to 52; Class Counsel came down to 95—again, half of an already small sample set. CSC declined to negotiate from there.[4]

The parties' dispute about volume is over the production of 95 versus 52 deal files. CSC protests the burden of producing more than 52 deal files (out of 45,000+ CSC-reviewed deals) because it purportedly does not maintain "deal files" in the ordinary course. It is hard to believe that nobody at CSC organizes documents by transaction, but even if that were the case, search terms and other ESI tools may be used to alleviate any burden. The production of investigative documents for 95 deals—in which CSC's inquiries supposedly "are narrowly tailored and typically pose a few simple questions to the institution or relevant entity"—is reasonable.

Second, and more problematically, CSC says it will only produce deal documents "bearing on its determination that an entity is Associated"—meaning only external communications about Associated status. Sep. 28, 2026 Email from S. Swaney. Nothing else. It contends that "the additional documents [Plaintiffs] are requesting are not relevant to the current dispute" and that the burden of producing complete files "would be enormous" (without explaining how the burden can be so large if its inquiries are as limited as it says). *Id.* Both fail. On relevance, CSC's argument rests on its cramped insistence that this dispute is "specific to the CSC's determination of whether an entity is Associated." *Id.* But this dispute is about CSC's "rules, policies, and presumptions relating to Associated Entities and Individuals" that "govern or otherwise provide the framework for the CSC's investigative activities." Order at 3. Class Counsel complained that "CSC has propounded relentless document and information requests that are frustrating this and other third-party NIL transactions" and "imposes on parties the burden to provide myriad information through broad and interminable discovery requests during its review process." Dkt. No. 1101 at 2, 13. And the Court described the issue as "whether the CSC's investigations of MMRs and third-party brand sponsors are being conducted 'absent a specific basis' *or otherwise in a manner that is overbroad and in violation of the IRS*." Order at 3 (emphasis added).[5]

Class Counsel need to see the direct evidence of CSC's investigative conduct—albeit for a reasonable number of investigations—to evaluate it in relation to the IRS. Complete deal files—including all communications with third parties, internal communications, follow-up demands, and investigative protocols—are "reasonably necessary and appropriate" to determine whether, and how, CSC's "investigative activities" are "in violation of the IRS." *See id.*; IRS Art. 10, § 4. Neither Class

---

[4] CSC bemoans that Class Counsel "unilaterally declared impasse" and "refused to have a call" about CSC's eleventh-hour proclamation that it does not understand what a "deal file" is after the parties had spent one month negotiating about the number of "deal files" CSC should produce. The parties have communicated regularly since Class Counsel concluded the parties were at an impasse. CSC's positions never changed, confirming that the parties were indeed at an impasse. And Class Counsel never "refused" to take a call; Class Counsel said they were unavailable and responded in writing.

[5] CSC argues that on page four of a brief (Dkt. No. 1143 at 4), Class Counsel conceded that this dispute does not concern CSC's investigative practices or deal files. But the first sentence of that same brief describes this dispute as CSC improperly presuming that MMRs and brand sponsors are Associated, "and from that false premise, subject[ing] them to burdensome investigative and regulatory oversight." *Id.* at 1.

Counsel nor the Court should be required to adopt CSC's position paper as gospel. CSC's proposal to limit its deal-file production to documents concerning only questions about *whether* the entity is Associated does not get to the related debate about CSC subjecting such putative Associated Entities "to burdensome investigative and regulatory oversight." Dkt. No. 1143 at 1. For example, CSC represents here that it "has *never* propounded 'federal-court style' document requests; its inquiries are narrowly tailored and typically pose a few simple questions." CSC's proposal, however, would exclude documents that would *show* whether CSC's inquiries are in fact "narrow[]" and "few."

On burden, CSC has already identified every relevant deal; it simply refuses to collect and produce the documents. That is not a basis to deny Plaintiffs' request for discovery that comports with the Settlement's terms. *See Thomas v. Cate*, 715 F. Supp. 2d 1012, 1032 (E.D. Cal. 2010) ("A party opposing discovery on the basis that the request is overbroad bears the burden of showing why discovery should be denied."). We address CSC's macro-burden objections below.

***Targeted Search for "Associated" Definitions Communicated to Member Schools:*** CSC has flatly refused—multiple times—to run any targeted search for documents reflecting how it defines "Associated Entity or Individual" to schools. Its objections boil down to three points: the request is "overbroad and would impose significant burden"; its existing production already includes "several examples" and is "representative of the majority of its communications with institutions about Associated status"; and "discovery of additional communications that merely reflect the same interpretation of Associated Entity will not shed further light on the issue." Sep. 7, 2026 Email from S. Swaney; Sep. 23, 2026 Email from S. Swaney. Each misses the mark.

Start with what CSC's own production revealed. The left column is the definition of "Associated Entity or Individual" from the IRS; the right column is CSC's "boilerplate" instruction to schools about how CSC defines "Associated Entity or Individual":

| Definition From IRS Art. 1, § 1(c) | CSC's "Boilerplate" Instruction |
|---|---|
| "'Associated Entity or Individual' means:<br>a. An entity that is or was known (or should have been known) to the athletics department staff of a Member Institution, to exist, in significant part, for the purpose of (i) promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes; and/or (2) creating or identifying NIL opportunities solely for a particular Member Institution's student-athletes; . . .<br>d. An individual or entity that (1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes[.]"[6] | "whether there is any expectation (contractual or otherwise) that [the entity] will or whether [the entity] is under any obligation (contractual or otherwise) to commit or devote financial resources to NIL deals with or otherwise support current or prospective [INSERT MEMBER SCHOOL] student-athletes pursuant to any of [the entity]'s agreements (written or non-written) with [MEMBER SCHOOL] or any entities Associated with or otherwise related to [MEMBER SCHOOL], including [MEMBER SCHOOL]'s Collective(s)." |

[6] The parties' briefing reveals that subsections (b), (c), and (e) are irrelevant to the issues at hand. *See, e.g.*, Dkt. No. 1099 at 13–14; Dkt. No. 1142 at 15–16; Dkt. No. 1143 at 6.

Whether CSC's use of this definition of "Associated" violates the IRS will be an issue for another day. But for present purposes, Class Counsel are entitled to know which schools or other parties CSC supplied this definition to. Class Counsel are also entitled to know whether CSC has disseminated any other "interpretations" of "Associated Entity or Individual," and if so, what those putative definitions were, and which schools or other parties were provided with any such definitions. There is no reason these documents should be limited to the 95 deal files Class Counsel have requested. And, again, search terms can be employed to ensure that the burden of the collection is reasonable.[7]

Because the specific documents that Class Counsel seek may be reasonably collected and produced, CSC resorts to claiming that it is a small organization with limited resources (albeit an organization that, per CSC, finds the time and resources to investigate whether an entity is Associated even when there is no pending NIL deal). CSC is the Designated Enforcement Entity formed by Defendants who superintend the multi-billion-dollar Division I ecosystem. CSC claims to have reviewed more than 45,000 NIL deals quickly and efficiently. It rings hollow for CSC to claim it is too much work to offer transparency into its investigative practices for merely 95 deals or to offer transparency into what it tells schools and third parties about the meaning of Associated. Especially when most document production work will be performed by CSC's outside counsel. Meanwhile, to the extent that "CSC already has dedicated hundreds of employee hours responding to Plaintiffs' sweeping demands," that was in connection with CSC's choices to prepare a position paper that Class Counsel never asked for and to curate a selection of ten exhibits that were not responsive to Class Counsel's document and information requests. Class Counsel's substantially narrowed requests are "reasonably necessary and appropriate to implement and effectuate the purposes" of the IRS and should be compelled. IRS Art. 10, § 4.

**II. The CSC's Position.** The issue that Judge Wilken referred to this Court is, in Plaintiffs' words, "whether the CSC's policy and practice of presuming that MMRs and national brands are Associated unless and until they prove otherwise violates the IRS." Dkt. 1143 at 8. The CSC has already provided Plaintiffs with ample discovery detailing its procedure for determining Associated Entity status, which should have obviated Plaintiffs' concerns. Plaintiffs were not satisfied with the CSC's initial production, so the CSC offered a substantial further production bearing on that issue. The parties are now before the Court because Plaintiffs are demanding that the CSC produce additional documents that have no bearing on the CSC's determination of whether an MMR or national brand is Associated, and that would impose a substantial burden on the CSC. The Settlement does not give Plaintiffs general audit rights over the CSC, and Judge Wilken's order was clear that Plaintiffs are entitled to discovery *on the specific issue Plaintiffs raised*, not on any topic of their choosing. The Court should deny Plaintiffs' demand for documents beyond what CSC has already produced and is currently offering.

**BACKGROUND.** This dispute arises from Plaintiffs' assertion, first raised in their objections to this Court's order denying their Motion to Enforce, that "the CSC presumes that all third-party brand sponsors and MMRs are 'Associated Entities or Individuals,' . . . whether or not the CSC has a specific, fact-based reason to believe a particular entity falls within the carefully limited definition of

[7] CSC complains, for example, that it would be unduly burdensome to produce "*all* of the CSC's communications with institutions regarding the definition of Associated Entity." But if CSC's definition (above) of "Associated" is indeed "boilerplate," then it is exceedingly simple to use search terms to identify the schools that received definition. The same search-term practicalities would be true for any other definition of "Associated" that CSC sent to schools or third parties.

'Associated.'" Dkt. 1143 at 5. Judge Wilken described the dispute as whether "Defendants and the CSC have enacted rules and policies relating to Associated Entities or Individuals pursuant to which the CSC presumes that MMRs and third-party brand sponsors are Associated Entities or Individuals until proven otherwise." Dkt. 1144 at 2. Plaintiffs' brief attempts to obfuscate this point, claiming the dispute is broadly about "the CSC's investigations of MMRs and third-party brand sponsors." That is incorrect; the parties' dispute has always been about how the CSC determines an entity's Associated status. And Judge Wilken's order only authorized Plaintiffs to seek "documents and information *relating to the parties' dispute*."

During the initial meet-and-confer call on August 13, the CSC asked Plaintiffs to explain the basis for their allegations and to identify any entities that Plaintiffs believe the CSC improperly treated as Associated. Plaintiffs stated that the CSC was imposing "relentless demands" and "federal-court style" document requests on entities submitting NIL deals for review, causing deals to "fall apart," and specifically referenced deals involving trading card companies and airlines as examples of entities the CSC was incorrectly treating as Associated.

On August 27, the CSC provided Plaintiffs with a seven-page, single-spaced narrative statement describing in detail its process for reviewing deals to determine if an entity is Associated, supported by corresponding data and exhibits. The CSC explained that the initial "presumption" it applies is that the information provided in the deal submission is accurate. For deals in which either the institution or entity identifies the entity as "Associated" in the initial submission, the deal enters the "Associated queue" and is reviewed accordingly. Of the 2,600 entity-institution relationships that are designated as Associated, about 85% were so designated because the institution or entity self-identified as Associated.

The CSC further explained that for deals in which no entity is identified as Associated in the initial submission, the deal enters the "Non-Associated queue." The CSC clears most deals in the Non-Associated queue without additional inquiry. In some cases, the CSC poses follow-up questions when it has reason to believe a party may meet the definition of Associated. In those cases, the CSC has *never* propounded "federal-court style" document requests; its inquiries are limited and typically pose a few simple questions to the institution or entity. The CSC produced to Plaintiffs representative examples of its communications requesting information on whether an entity is Associated, which included inquiries related to multiple parts of the Associated Entity definition (not only what Plaintiffs refer to as the "CSC's 'boilerplate' instruction").[8] The CSC identified approximately 190 unique instances where, after inquiry and review, it determined that an entity should be considered Associated without express agreement on that point by that institution.

The CSC also produced information relating to deals involving trading card companies and airlines. The CSC has reviewed roughly 1,300 deals involving major trading card companies, ***all of which were cleared***. Only three of those deals were designated as Associated, in each case because the institution or entity self-identified as such. The CSC asked follow-up questions regarding one trading card company's Associated status with three schools based on publicly available information concerning commercial relationships between that company and those schools. Ultimately, the CSC

[8] Suffice it to say, the CSC disagrees with Plaintiffs' assertion that it "has been disseminating an unquestionably false definition of 'Associated Entity or Individual.'" Still, the CSC has offered to discuss Plaintiffs objections with them and, if appropriate, adjust its approach. Plaintiffs have repeatedly declined to do so.

cleared all those deals. The CSC provided those communications to Plaintiffs, as well as detailed data on all 1,300 trading card deals. The CSC also informed Plaintiffs that it has reviewed 94 deals involving airlines, all of which were ultimately cleared, and that it is unaware of having made *any* inquiry into the Associated status of any airline. The CSC also provided detailed data on all 94 airline deals.

**THE PARTIES' DISCOVERY DISPUTE.** After the CSC provided the narrative statement and supporting documents, Plaintiffs accused the CSC of providing a "self-selected" and "gerrymandered 'production,'" and demanded that the CSC produce the "complete deal files" for the instances where it independently determined an entity was Associated. Plaintiffs also demanded that the CSC produce *every* communication between the CSC and institutions describing the definition or criteria for "Associated" status. The CSC suggested that it would be more constructive for Plaintiffs to articulate their specific concerns with the CSC's approach so the parties can address it directly. Plaintiffs responded that they needed to see the documents before they could identify a problem, and declined the CSC's offers to discuss and address their concerns.

Plaintiffs' suggestion that the CSC used the meet-and-confer process to relitigate whether they are entitled to discovery is simply untrue. The CSC does not dispute that Plaintiffs are entitled to discovery that is "necessary and reasonable" to address the issue they raised to Judge Wilken. The CSC has engaged in the meet-and-confer process to better understand Plaintiffs' concerns and to tailor discovery accordingly, with an eye towards resolving Plaintiffs' concerns (which the CSC believes are unfounded). When Plaintiffs were unsatisfied with the CSC's initial production, the CSC offered an extensive additional production. It was Plaintiffs who then chose to cut off the meet and confer process, unilaterally declare an impasse, and bring this dispute to the Court.[9] Throughout this process, the CSC has told Plaintiffs it welcomes the opportunity to engage with them—both to resolve this discovery dispute and to address Plaintiffs' substantive concerns. It still stands ready and willing to do so.

**THE CSC'S COMPROMISE PROPOSAL.** For 52 instances (to be selected at random) in which it independently determined that an entity was Associated, the CSC has offered:

- All materials submitted by any party related to the Associated status of the entity, including the initial submission regarding the entity's status;
- All external communications (including emails, text messages, NIL Go portal or other form) relating to the CSC's review of the entity's Associated status;
- All documents reflecting the CSC's research or information on an entity's Associated status;
- For each instance, the number of deals cleared or not cleared for that Associated Entity with that school after the entity's status was changed to Associated; and

[9] Unfortunately, this decision has prevented the CSC from being able to correct Plaintiffs' several misunderstandings, some of which are reflected in Plaintiffs' brief. For example, Plaintiffs assert that the CSC "stated that in some instances it made a determination about an entity's or individual's Associated status with no deal pending." That is wrong—the CSC does not make determinations about the Associated status of entities that have not engaged in NIL deals with student-athletes—and the CSC would have welcomed the opportunity to correct Plaintiffs' misunderstanding if given the chance. Similarly, Plaintiffs persist in asking for "deal files" even though the CSC has explained that "deal files" do not exist.

- For any not-cleared deals, the communication sent to the student-athlete regarding the basis for the CSC's determination, including the name of the student-athlete, their sport, the dollar amount of the deal, and the date the deal was actioned.

The CSC's compromise proposal directly addresses the issue Plaintiffs have raised and that Judge Wilken referred to this Court—which has always been about whether the CSC is violating the IRS by implementing a policy of presuming MMRs and brand sponsors are Associated Entities without a factual basis to do so, and burdening those entities with overbroad demands requiring them to disprove that they are Associated. The CSC has already provided Plaintiffs with information relating to those contentions, and is now offering to produce, for 52 instances, *all* information requests from the CSC regarding the entity's Associated status, *all* responses to those requests, *all* information submitted to the CSC regarding Associated status, *all* communications between the CSC and relevant parties concerning Associated status, and *all* the other information the CSC obtained to inform its determination that the entity is Associated.

The CSC's offer would provide documents directly responsive to the complaints Plaintiffs have raised. For example, in their brief Plaintiffs reiterate their complaint that the "CSC has propounded relentless document and information requests" and "impose[d] on parties the burden to provide myriad information through broad and interminable discovery requests." The CSC has offered to provide Plaintiffs a substantial production detailing its communications with institutions and entities about Associated status—in other words, documents *directly related* to the complaint Plaintiffs themselves articulate. Plaintiffs also say they "are entitled to know whether CSC has disseminated any other 'interpretations'" of the Associated definitions—and that is exactly what the CSC is offering to provide: even more examples of the CSC's Associated status inquiries and follow-up communications, which include the CSC's representations related to the Associated definitions. Those communications, like the ones already provided, are directly probative of both the issue Judge Wilken referred and what Plaintiffs currently seek.

Plaintiffs also apparently misunderstand the scope of the CSC's offer, characterizing it as an offer to produce documents "for a fewer number of deals" than they are requesting. The CSC's offer would almost certainly provide Plaintiffs information related to *more* NIL deals than their proposal would. This serves as further evidence that the parties would have benefited from continuing to confer on this dispute.

**PLAINTIFFS' CURRENT DEMAND.** Plaintiffs' current demand is for "complete deal files"—to include a privilege log—for 95 instances where the CSC independently determined an entity was Associated. Plaintiffs' demand seeks (among other things) "all documents and communications, internal and external, relating to" those instances; and "all notes and documents reflecting the CSC's determination whether to approve or reject" deals related to those instances. That is, Plaintiffs seek production of *every* document in the CSC's possession relating to those 95 instances, regardless of whether the documents relate to the CSC's determination that the entity is Associated. Plaintiffs also demand documents showing *all* communications where the CSC provided a definition of "Associated Entity."

Plaintiffs' demand goes materially beyond the dispute on which Judge Wilken ordered discovery and would impose a significant and undue burden on the CSC.

***First***, the discovery Judge Wilken authorized was specifically tied to Plaintiffs' contentions that the CSC has a policy of presuming that MMRs and brand sponsors are Associated and subjects those entities to "overbroad and burdensome investigations" without a "specific basis for doing so." Dkt. 1144 at 3–4. But Plaintiffs' demand for "complete deal files" would include *every* aspect of the CSC's review of individual deals, including its application of NCAA rules that apply only after an entity is designated Associated (such as rules regarding valid business purpose or compliance with the "rates and terms" requirement). Judge Wilken *expressly* found that Plaintiffs' contention is "not . . . about the enforcement of NCAA or conference rules;" rather, it is about whether the CSC has enacted "policies or presumptions relating to Associated Entities and Individuals." Dkt. 1144 at 3-4. Plaintiffs' demands not only improperly seek documents related to the CSC's enforcement of rules against student-athletes, they also seek information about the CSC's enforcement of rules that have nothing to do with its review of an entity's Associated status. Those documents are plainly outside the scope of the dispute Judge Wilken referred to this Court.

Plaintiffs have tried to justify their demand by arguing that they possess sweeping audit rights over the CSC, allowing them to demand any documents related to the CSC's practices. The Court previously expressed skepticism that the IRS vests Plaintiffs with that boundless authority. *See* 6/10/26 Hrg. Tr. at 58:19-59:1 (the Court observing that if Plaintiffs wanted "access to the information . . . to have some greater disclosure of what's going on," that Plaintiffs "should have [ ] negotiated for that"). Judge Wilken permitted discovery only as to the *specific* issue Plaintiffs raised with the Court: the CSC's alleged "presumption" that certain entities are Associated and its supposed "overbroad and burdensome" investigation of those entities' Associated status without a supporting "specific basis." That limited grant does not allow a general audit of the CSC's operations, which Plaintiffs did not negotiate for or obtain in the IRS.

***Second***, Plaintiffs' document demands are unduly burdensome. The CSC is a small organization with limited human and financial resources. The CSC has 30 employees, most of whom have been added since April 2026, and less than half of whom are charged with reviewing hundreds of NIL agreements *each day*. For perspective, in September alone, student-athletes submitted over 7,500 NIL deals, worth over $165 million. Plaintiffs' demands will require (and have already required) the CSC to divert those few staff members away from performing their core function of reviewing NIL agreements, which will have tangible opportunity costs and potentially harm members of the class Plaintiffs represent. To date, the CSC already has dedicated hundreds of employee hours responding to Plaintiffs' sweeping demands. The CSC is willing to collect and review substantial additional documents relating to its process for reviewing Associated status; but the irrelevant information Plaintiffs demand would substantially increase the burden on the CSC.

For instance, Plaintiffs demand documents reflecting *all* of the CSC's communications with institutions regarding the definition of Associated Entity—which likely number in the hundreds (and possibly thousands). Those communications are not stored in a single repository; in some cases they reside in employee email accounts, in others they occur within the NIL Go platform, and in yet others they transpire over jointly managed email accounts. Collecting and reviewing *every single communication* would be a time-consuming, manual process. The CSC has explained this to Plaintiffs, and further explained that communications already produced are representative of how the CSC communicates with institutions about Associated status. Indeed, Plaintiffs' brief demonstrates that they already understand the CSC's position on this definition of Associated Entity. The CSC has offered to discuss Plaintiffs' concerns about that definition directly, rather than searching for hundreds of additional documents that say essentially the same thing. Plaintiffs have refused to modify their

demand—and, tellingly, their brief offers no explanation why they need hundreds of addition documents, other than that they "are entitled to" it. That alone is sufficient to deny them any additional relief. *See, e.g.*, *In re NCAA Student-Athlete NIL Litig.*, 2012 WL 629225, at *9 (N.D. Cal. Feb. 27, 2012) (denying motions to compel and finding sanctions were appropriate where "plaintiffs did not make reasonable attempts to avoid imposing an undue burden on . . . nonparties").

The CSC has already produced documents that allow Plaintiffs to determine whether it is employing "a policy and practice of presuming that MMRs and national brands are Associated," and subjecting those entities to "overbroad and burdensome investigations." Its compromise proposal would substantially expand that production, and in some ways produce even more information than Plaintiffs are asking for. It would also include data for all deals between the Associated Entity and student-athletes after the determination was made, allowing Plaintiffs to assess how that determination has impacted NIL deals. The Court should limit further discovery to the CSC's proposal.

Dated: October 2, 2026

Respectfully submitted,

By: */s/ Steve W. Berman*

Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kodroff (*pro hac vice*)
Eugene A. Spector (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, PC**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Class Counsel for Plaintiffs*

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com
david.greenspan@winstontaylor.com
adam.dale@winstontaylor.com
sarah.viebrock@winstontaylor.com
neha.vyas@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

*Class Counsel for Plaintiffs*

By: */s/ Steven E. Swaney*
Steven E. Swaney (SBN 221437)
**VENABLE LLP**
101 California Street
San Francisco, CA 94111
Telephone: (415) 653-3722
Facsimile: (415) 653-3755
seswaney@venable.com

*Attorney for College Sports Commission*

**FILER'S ATTESTATION**

I, Jeffrey L. Kessler, am the ECF user whose identification and password are being used to file **JOINT LETTER BRIEF RE PLAINTIFFS' MOTION TO COMPEL DOCUMENTS FROM THE COLLEGE SPORTS COMMISSION**. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

Dated: October 2, 2026

Respectfully submitted,

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler